# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **V.** | ) **CRIMINAL NO.** <u>3:14cr12</u> |
| | ) |
| **ROBERT F. MCDONNELL** | ) |
| **MAUREEN G. MCDONNELL** | ) |

## DEFENDANT ROBERT F. MCDONNELL'S MOTION #1
## MOTION FOR DISCOVERY OF SELECTED RECORDINGS OF COMMUNICATIONS BETWEEN PROSECUTORS AND MEMBERS OF <u>THE GRAND JURY</u>

Robert F. McDonnell, through undersigned counsel, respectfully moves the Court, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), for discovery of the instructions provided to the grand jury when securing today's indictment, as well as all other recordings of the prosecutors' statements to the grand jury about the legal validity of the charges. The grounds for this motion are set forth in the accompanying memorandum.

Dated: January 21, 2014

Respectfully submitted,


/s/ John L. Brownlee
John L. Brownlee (VSB No. 35378)
Holland & Knight LLP
800 17th Street N.W., Ste. 1100
Washington, DC 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564
Email: john.brownlee@hklaw.com

Henry W. Asbill (*pro hac vice pending*)
Jones Day
51 Louisiana Avenue, N.W.
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: hasbill@jonesday.com

*Counsel for Governor Robert F. McDonnell*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 21, 2014, I caused to be served a true copy of the foregoing via

electronic email on the following individual:

> AUSA Michael S. Dry
> United States Attorney's Office
> 600 E. Main Street, Suite 1800
> Richmond, Virginia 23219-2447
> Phone: (804) 819-5400
> Facsimile: (804) 771-2316
> Email: michael.s.dry@usdoj.gov


Dated: January 21, 2014              Respectfully submitted,


                                  /s/ John L. Brownlee
                                  John L. Brownlee (VSB No. 35378)
                                  Holland & Knight LLP
                                  800 17th Street N.W., Ste. 1100
                                  Washington, DC 20006
                                  Telephone: (202) 828-1854
                                  Facsimile: (202) 955-5564
                                  Email: john.brownlee@hklaw.com

                                  *Counsel for Governor Robert F. McDonnell*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **V.** | ) | **CRIMINAL NO.** 3:14cr12 |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | |
| **MAUREEN G. MCDONNELL** | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANT ROBERT F. MCDONNELL'S MOTION #1 SEEKING SELECTED RECORDINGS OF COMMUNICATIONS BETWEEN PROSECUTORS AND <u>MEMBERS OF THE GRAND JURY</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ............................................................................................... 3

ARGUMENT .................................................................................................... 4

I.     The Federal Government's Expansive Legal Theory Warrants Immediate
Disclosure Of All Grand Jury Recordings ......................................................... 4

      A.     The Federal Government's Expansive Legal Theory Is Inconsistent With
Federal Law And Would Criminalize Democratic Politics ................................. 5

           1.     The Government's Legal Theory Conflicts With Settled Law ................ 5

           2.     The Government's Attempt To Evade These Principles Has No
Legal Support ............................................................................................ 9

           3.     The Federal Government's Unprecedented Construction Of
Federal Law Would Criminalize Routine Political Courtesies ............... 11

II.    The Thin Factual Record Further Warrants Immediate Disclosure Of All Grand
Jury Recordings .............................................................................................. 14

      A.     The Federal Government Has No Evidence Of Corrupt Intent ........................... 14

      B.     The Federal Government Has No Evidence Showing That Governor
McDonnell Knowingly Falsified A Loan Application ....................................... 18

CONCLUSION .................................................................................................. 19

### INTRODUCTION

Bob McDonnell is an innocent man.  He never entered into an illegal agreement with Mr. Jonnie Williams or Star Scientific, nor did he ever promise or provide them any official benefits. To bring today's indictment, the federal government has concocted a never-before-used legal theory manufactured for the sole purpose of prosecuting Governor McDonnell and his wife. This new theory contravenes settled judicial precedent and disregards longstanding Virginia law and practice, seeking to punish the McDonnells for conduct that was legal before today.  The government's rickety legal foundation, moreover, underlies a precarious factual case, built largely from immunized testimony purchased with under-the-table promises to a key witness who would otherwise face criminal liability and massive financial penalties.  The federal government's decision to use these deceitful tactics in order to prosecute a popular and successful Republican Governor immediately upon his leaving office is disgraceful, violates basic principles of justice, and is contemptuous of the citizens of Virginia who elected him. Discovery into how the prosecution obtained this flawed indictment is appropriate.

The centuries-old crime of bribery requires—as it always has—proof of a quid pro quo in the form of illicit payments made to secure official government benefits.  That means a bribe-taking official must perform or agree to perform an "official act" in exchange for a bribe.  *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999).  Not everything a public official does to benefit a donor is an "official act," however, or every photo-op would be a crime. That is why the Supreme Court has explained that routine political courtesies—such as "receiving [] sports teams at the White House, visiting [a] high school, and speaking to [] farmers about USDA policy"—cannot support bribery charges.  *Id.* at 407.

Here, despite deploying tremendous prosecutorial resources in its pursuit of Governor McDonnell, the federal government has failed to uncover any credible evidence showing that he

even approached (or promised to approach) this line.   Yet rather than discontinue its investigation upon uncovering only innocence, the government decided to invent an unprecedented legal theory that eradicates all limitations on federal bribery law.  That theory would—if applied neutrally—outlaw basic political practices, making criminals of not only the President, but also the Governor's Democratic predecessor.  After all, the President routinely participates in corporate events which lend credibility to his major benefactors,[1] invites benefactors to events at the White House, allows his photo to be taken with benefactors, and includes benefactors in policy discussions with senior administration officials.[2]  Likewise, Governor McDonnell's predecessor, Governor Kaine, took thousands of dollars in gifts during his time in office,[3] while often taking actions to help those benefactors.[4]  The federal government has never before indicted a senior public official for engaging in such routine political conduct. That is, no doubt, because such conduct does not violate federal law.

It has been a long time since the Roman Emperor Caligula imprisoned people for violating laws written in tiny lettering on a pillar too high to see.[5]  The government's decision to deploy an untested theory in order to indict a high-profile Republican Governor is not much

---

[1] Matea Gold, *Obama Visit to DreamWorks Animation Spotlights Studio Run by Top Hollywood Donor*, The Washington Post (Nov. 25, 2013), http://goo.gl/utOVtR.

[2] Mike McIntire & Michael Luo, *White House Opens Door to Big Donors, and Lobbyists Slip In*, The New York Times (April 14, 2012), http://goo.gl/a6KiZM.

[3] *See* Jim Geraghty, *Virginia's Long Tradition of Expensive Gifts to Governors*, National Review (Aug. 9, 2013) (citing the Virginia Public Policy Access website), http://goo.gl/IBt5bs; *$18,000 Vacation Puts Kaine Atop Gift Recipients List*, The Washington Times (Feb. 4, 2006), http://goo.gl/LJHzcb.

[4] *Rayner: The Trouble with Gifts*, Richmond Times-Dispatch (Nov. 15, 2013), http://goo.gl/46HrYZ (detailing official appointments Governor Kaine dispensed to some of his biggest gift-givers).

[5] *See* Craig L. Carr (editor), *The Political Writings of Samuel Pufendorf*, p. 127, Oxford University Press 1994.

better.  That decision warrants immediate disclosure of the instructions provided to the grand jury when securing today's indictment, as well as all other recordings of the prosecutors' statements to the grand jury about the legal validity of the charges, so that the defense and the Court can determine whether the prosecution misinformed the grand jury about the requirements of federal law.  At the least, the Court should review all relevant prosecutorial statements before the grand jury in camera and order the production of everything that could be exculpatory or that could tend to negate the soundness of the indictment.

## BACKGROUND

For over a year, the federal government has conducted a wide-ranging investigation of Governor McDonnell and his wife, and their connection to Mr. Williams and the company he formerly captained, Star Scientific, Inc., a public corporation headquartered in Virginia.  That investigation has been conducted at the same time as a hotly contested election to succeed Governor McDonnell as Virginia's Governor.  Throughout the course of the investigation, each of its most salacious and damaging details has been reported in both the Richmond and Washington press due to repeated leaks by unnamed sources, many of whom the press has specifically identified as "law enforcement."[6]  The election occurred in the shadow of these leaks, with the Democratic candidate eking out a narrow victory over the Republican, while Governor McDonnell was effectively sidelined by the steady stream of negative leaks of confidential information.  That highly public investigation has now culminated with the federal government indicting Governor McDonnell and his wife.

---

[6] *See* William Selway, *Star's Williams Microwaved Tobacco Before McDonnell Probe*, Bloomberg News (July 1, 2013, 7:48 PM) ("Gifts are a focus of questions by the Federal Bureau of Investigation, which is asking people close to the governor whether his administration helped the company, according to a law-enforcement official familiar with the matter who asked for anonymity because of a continuing probe."), http://goo.gl/uOmkDy.

**ARGUMENT**

This prosecution is baseless.  On the law, there is little question that the federal government's untested, novel construction of the federal bribery statutes contravenes numerous judicial decisions.  If the government's theory were applied neutrally, virtually every elected official in the country would be facing federal indictment—overbreadth which confirms that theory is meritless.  As for the facts, the government has unearthed no direct evidence of an illicit agreement involving Governor McDonnell.  The government has failed to uncover such evidence even though it has explicitly immunized Mr. Williams from prosecution on all political corruption charges and has implicitly immunized him from independent charges of securities fraud, tax fraud, and violations of the Food, Drug, and Cosmetic Act, all while turning a blind eye to the actions of Williams' friend and supporter, Mary Shea Sutherland, who was Mrs. McDonnell's former chief of staff.  The government's indictment of the Governor on the basis of an unprecedented legal theory warrants disclosure of the prosecution's statements to the grand jury to determine whether or not those instructions accurately described federal law.  At the least, the Court should review all instructions or related statements by the prosecution to the grand jury, ordering production of everything that could be exculpatory or that could negate the soundness of today's indictment.

**I.      The Federal Government's Expansive Legal Theory Warrants Immediate Disclosure Of All Grand Jury Recordings.**

The grand jury is charged with the dual responsibilities of "determin[ing] whether there is probable cause to believe a crime has been committed and [] protect[ing] citizens against unfounded criminal prosecutions."  *United States v. Calandra*, 414 U.S. 338, 343 (1974).  It is supposed to serve as the "protector of citizens against arbitrary and oppressive government action."  *Id.*  If a prosecutor misstates the applicable law to the grand jury, that can yield "'grave

doubt that the decision to indict was free from the substantial influence' of the errors," *United States v. Peralta*, 763 F. Supp. 14, 21 (S.D.N.Y. 1991) (quoting *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256 (1988)), and provide a basis to dismiss the indictment.

Here, discovery of the prosecutors' instructions and other relevant statements to the grand jury is appropriate because that information could supply a ground "to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). Another district court in this Circuit recently granted a similar motion for discovery on a similar basis. As that court explained, "where a prosecutor's legal instruction to the grand jury seriously misstates the applicable law, the indictment is subject to dismissal." *United States v. Stevens*, 771 F. Supp. 2d 556, 567 (D. Md. 2011). The court therefore ordered disclosure and eventually dismissed the indictment once disclosure confirmed that the government had, in fact, misstated the law. Given the unprecedented nature of this indictment, a similarly substantial risk of improper instruction exists. Similar discovery is warranted.

> **A.  The Federal Government's Expansive Legal Theory Is Inconsistent With Federal Law And Would Criminalize Democratic Politics.**
>
> **1.  The Government's Legal Theory Conflicts With Settled Law.**

There is no question that the McDonnell Administration did not promise or provide any governmental benefit to Star Scientific or Mr. Williams. Mr. Anthony Troy, a former Democratic Attorney General of Virginia, conducted an in-depth investigation into this issue. He concluded that (1) Star "received no funds, grants, or contracts" during the McDonnell administration; (2) no Star officer, including Mr. Williams, "was appointed to a Commonwealth board or commission during the McDonnell administration"; and (3) neither Star nor Mr. Williams "received any direct monetary benefit" from any meeting with cabinet members or

their representatives.[7]  Star has confirmed Mr. Troy's findings, explaining that it "neither sought nor received any special benefits from any public official."[8]  All that Governor McDonnell is alleged to have done for Star or Mr. Williams was facilitate two meetings with Virginia Health and Human Resources officials (who gave Star nothing but a little of their time),[9] make a brief appearance at a Star event in Richmond,[10] attend a private luncheon hosted by his wife (and paid for by his PAC) at the Governor's mansion at which Star announced the award of research grants to two Virginia universities,[11] and attend a large healthcare reception at the Mansion to which his wife had invited a few Star representatives (invitations indistinguishable from those extended to thousands of other people over the Governor's time in office).

These facts preclude prosecution here.  The Supreme Court has made clear that not all actions taken by public officials are "official acts" for purposes of the bribery laws.  *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999).  In *Sun Diamond*, the Court held that public officials cannot be prosecuted for taking illegal gratuities based on routine

---

[7] Letter to J. Jasen Eige, Counselor and Senior Policy Advisor, Office of the Governor of Virginia, from Anthony F. Troy (July 18, 2013), available at http://goo.gl/onIKH9.

[8] Olympia Meola, *McDonnell: No Special Treatment for Donor*, Rich. Times-Dispatch (May 1, 2003), available at http://goo.gl/9c9DEJ.

[9] Facilitating meetings with government officials—meetings at which no attempt is made to  influence the outcome, and which do not in fact result in any state benefit—has  never been held to constitute an "official act" or otherwise serve as the basis for a federal crime.

[10] Between the beginning of the Governor's term and February 15, 2013, the Governor attended almost 200 of these so-called "stop bys," negating any inference that this perfunctory appearance was somehow improperly motivated.

[11] There are countless instances of the Governor attending receptions, ribbon-cuttings and photo-ops events involving local corporations and non-profits—both at the mansion and elsewhere—in circumstances that have nothing to do with gifts or benefits.  For example, there are pictures of the Governor drinking Lipton tea at an event commemorating the expansion of the Lipton plant in Suffolk, standing with the First Lady in front of WaWa products at "WaWa Day at the Capitol," tasting beer at a microbrewery, and posing with wine displays at several Virginia wineries.

courtesies.  The Court distinguished between actions that "are assuredly 'official acts' in some sense"—such as "receiving [] sports teams at the White House, visiting [a] high school, and speaking to [] farmers about USDA policy"—and the narrower category of "official acts" that fall within the federal bribery laws.  *Id.* at 407.  In making the commonsense point that political courtesies are not "official acts" under the bribery statute—lest every fundraiser become a federal crime—the Court specifically admonished that "a statute in this field that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter."  *Id.* at 412.  That is, no doubt, why the government has never before attempted to prosecute an elected state governor for conduct so far outside the mainstream of the criminal law.[12]

Courts have consistently reversed convictions where the public official did not take actions designed  to influence a specific  government decision, even if the official extended some courtesy (such as arranging a  meeting).  For example, in *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by McNally v. United States*, 483 U.S. 350 (1987), *superseded by statute*, 18 U.S.C. § 1346, the Eighth Circuit reversed a state legislator's Hobbs

---

[12] To the contrary, every recent prosecution of a state governor involved allegations that the governor illicitly provided actual official state benefits.  *See United States v. Warner*, 498 F.3d 666, 675 (7th Cir. 2007) (Illinois Governor, when serving as Secretary of State, improperly awarded leases and contracts in exchange for valuable benefits); *United States v. Edwards*, 303 F.3d 606, 609-12 (5th Cir. 2002) (Louisiana Governor with long history of corruption allegations convicted for demanding massive bribes in exchange for assistance securing valuable licenses); Monica Davey and Emma G. Fitzsimmons, *Jury Finds Blagojevich Guilty of Corruption*, The New York Times (June 27, 2011) (Illinois Governor offered appointment to President Obama's former senate seat, to support particular legislation, or to spend state money in exchange for bribes and payments), http://goo.gl/YjthoA; Brian MacQuarrie, *Rowland Pleads Guilty to FraudCcharge*, The Boston Globe (Dec. 24, 2004) (Connecticut Governor secured valuable state contracts in exchange for bribes), http://goo.gl/PkKLa7; Jill Wilson, *Former Governor Agrees to Plead Guilty to Extortion, Fraud*, Associated Press (April 13, 1990) (West Virginia Governor secured, among other things, substantial payments from a state health fund in exchange for a cut of those payments), http://goo.gl/OP8Mgx.

Act conviction on grounds that the legislator had no authority to secure state contracts for an architecture firm and that the firm had no reasonable belief that he did have such authority. *Id.* at 1028. The most the legislator could do, the court held, "was recommend them to state contractors as qualified architects and thereby gain them a friendly ear." *Id.* Though the legislator's "influence obviously helped," the court concluded that "no testimony established that any state contracting officer awarded any contract to [the architecture firm] because of the [legislator's] influence or that [the firm] believed [his] introduction was enough to secure the work." *Id.* As the Eighth Circuit has more recently explained, the conviction in *Rabbitt* was reversed because the "official in *Rabbitt* promised only to introduce the firm to influential persons" and "did *not* promise to use his official position to influence those persons." *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (emphasis added).

It is thus no surprise that successful Fourth Circuit corruption cases over the last twenty years featured a public official engaged in "official acts" that fall well within the bounds of federal law, such as awarding government funding, selling a formal legislative or governmental act (such as a council vote), or actively lobbying other officials to take action favorable to the bribe-giver on an official matter pending before those officials:

- In *United States v. Hamilton*, an 18 U.S.C. § 666 and Hobbs Act prosecution, the Vice Chairman of the Appropriations Committee of the Virginia House of Delegates obtained legislative funding for a new center at Old Dominion University in exchange for appointment as the Center's director. *See* 701 F.3d 404, 406 (4th Cir. 2012).

- In *United States v. Jefferson*, 674 F.3d 332 (4th Cir. 2012), a § 201 and honest-services fraud prosecution, a Congressman personally interceded with numerous agencies of the federal government and foreign governments to obtain contracts, regulatory approvals, and financial assistance for private companies that paid him bribes and kick-backs.

- In *United States v. Harvey*, a § 201 and honest-services fraud prosecution, the defendant orchestrated the award of a sole-source government contract to a company owned by a close friend, who funneled money back to the defendant. *See* 532 F.3d 326, 331 (4th Cir. 2008).

- In *United States v. Hedgepeth*, a Hobbs Act prosecution, a Richmond City Councilwoman agreed to sell her Council votes in exchange for cash and a donation retiring "her campaign debt."  418 F.3d 411, 415 (4th Cir. 2005).

- In *United States v. Quinn*, a § 201 prosecution, an official awarded lucrative public contracts to companies that would then kick back some of the proceeds by employing her paramour or issuing sub-contracts to a friend.  *See* 359 F.3d 666, 671-72 (4th Cir. 2004).

- In *United States v. Jennings*, a § 666 prosecution, the official assigned valuable government building contracts to a contractor in exchange for bribes.  *See* 160 F.3d 1006, 1011 (4th Cir. 1998).

- In *United States v. Hairston*, a Hobbs Act prosecution, an alderman solicited bribes in exchange for votes on public contracts, rezoning, and contract penalty decisions pending before the Board of Aldermen.  *See* 46 F.3d 361, 366-72 (4th Cir. 1995).

- In *United States v. Grubb*, a § 666 prosecution, an official orchestrated a scheme in which a campaign donation was made in exchange for two years of part-time public employment.  *See* 11 F.3d 426, 430 (4th Cir. 1993).

### 2.	The Government's Attempt To Evade These Principles Has No Legal Support.

Despite these many counter-examples, the federal government apparently now contends that innocuous political courtesies—materially indistinguishable from "receiving [] sports teams at the White House," *Sun-Diamond*, 526 U.S. at 407—*can* support a conviction for federal bribery.   Specifically, the defense understands the government's contention to be that the Governor's actions gave Star "credibility"—by helping to "promote" Star's products with the general public—and that lending "credibility" suffices to supply a "quo."  As a basis for this conclusion, the prosecution has articulated two alternative theories:   (1) that the Fourth Circuit's decision in *Jefferson* holds that any conduct which can be characterized as "business promotion" is necessarily an "official act" and (2) that the narrow definition of "official act" in the federal bribery statute does not apply to bribery prosecutions of state officials under the Hobbs Act or honest services fraud statutes, such that state officials can be prosecuted for conduct that the

Supreme Court has held is legal for federal officials.  Both of these theories are baseless.  If either underlies today's indictment, the indictment should be dismissed.

Foremost, *Jefferson* says the opposite of what the government has claimed.  In that case, a Congressman was convicted of using his office to obtain government financing and regulatory approval of various business ventures of bribe-paying companies.  *See generally* 674 F.3d at 341-51.  The Fourth Circuit held that business promotion and constituent services which are a "settled practice" of government officials can be official acts, but *only* if they *also* meet the *other* requirements of 18 U.S.C. § 201(a)(3).  As the court explained:  "[W]e agree with *Sun-Diamond* . . . that the bribery statute does not encompass every action taken in one's official capacity."  *Id.* at 356.  Though "every act within the range of official duty comes within the purview of an 'official act,' the inquiry *does not end there*" because such acts must *also* "adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy.'"  *Id.* (emphasis added) (quoting § 201(a)(3)).  "In other words, the jury could not rely exclusively on Jefferson's settled practices."  *Id.* at 357.  The court upheld Mr. Jefferson's conviction not because business promotion activities are always "official acts" but because the *specific* promotional activities in which he engaged involved him exerting "'inappropriate influence on decisions that the government actually makes.'"  *Id.* at 356-57 (quoting *Valdes v. United States*, 475 F.3d 1319, 1325 (D.C. Cir. 2007)).  That decision thus expressly contradicts—rather than supports—the federal government's claim that anything a public official customarily does can constitute a "quo."

The government's alternate contention that the "quo" concept is broader for state officials is equally meritless.  The prosecution has suggested that federal law holds state public officials to a higher standard than their federal counterparts.  But that theory stands federal criminal law on

its head.    The federal interest in prosecution is diminished—not heightened—when the prosecutorial target is a state official engaging in conduct that his state has affirmatively decided to permit.    That is why the Supreme Court recently explained that courts adjudicating honest services fraud prosecutions based on a bribery theory should draw upon other federal statutes, such as § 201, that proscribe similar conduct.    *See Skilling v. United States*, 130 S. Ct. 2896, 2933 (2010) (explaining that the risk of "arbitrary prosecutions" under vague statutes is minimized when   the   "prohibition of bribes and kickbacks draws content . . . from federal statutes proscribing—and defining—similar crimes" (citing § 201 and § 666)).    It is also why the Department of Justice's own Criminal Resource Manual readily concedes that "courts will probably not extend the 'color of official right' clause of the Hobbs Act beyond the parameters of crimes of bribery and gratuities in relation to federal officials that are described in 18 U.S.C. § 201."   DOJ Criminal Resource Manual §2404, http://tinyurl.com/6ns3keo.

The government devised these unprecedented arguments in order to overcome the fact that Governor McDonnell and his Administration have consistently declined to provide (and did not promise to provide) government benefits to Mr. Williams or his company.    But innocence is not something that prosecutors should invent novel legal theories to overcome.    Discovering that an investigatory target is innocent should be cause for discontinuing the investigation with satisfaction that justice has been done.    It should *never* be cause for clever argumentation that seeks retroactively to criminalize innocent conduct.    The government's apparent deployment of this novel legal rule suggests that the "prosecutor's legal instruction to the grand jury seriously misstate[d] the applicable law."   *Stevens*, 771 F. Supp. 2d at 567.

### 3.    The Federal Government's Unprecedented Construction Of Federal Law Would Criminalize Routine Political Courtesies.

If the government truly believes that the bribery laws prohibit the conduct that it now

claims, then a wide range of routine political practices would be federal crimes.   The government's allegations are predicated on its assertion that a photograph with a supporter or an appearance at a benefactor's event can be the basis of a federal crime.   Such a theory cannot be cabined to cases involving gifts or loans.   Federal law makes clear that quid pro quos can just as easily come in the form of campaign donations as personal gifts.   *See, e.g.*, *Hedgepeth*, 418 F.3d at 415; *Grubb*, 11 F.3d at 430.   It therefore applies with equal force to all sorts of innocuous conduct, such as President Obama's recent visit to DreamWorks studio in Hollywood, a company run by one of his top donors.[13]   Just like the political courtesies Governor McDonnell is alleged to have provided, the President's visit and kind remarks about DreamWorks——delivered in front of a DreamWorks banner and widely distributed by DreamWorks on television and YouTube[14]—conferred substantial reputational benefits on that company and its corporate chief, who is one of the President's significant and long-standing financial backers.   Similar examples of elected officials providing "credibility" to their supporters and benefactors through routine political courtesies abound:

- It is well known that being a major contributor to the President translates into White House access.   As *The New York Times* recently reported, "the regular appearance of big donors inside the White House underscores how political contributions continue to lubricate many of the interactions between officials and their guests, if for no other

---

[13] Matea Gold, *Obama Visit to DreamWorks Animation Spotlights Studio Run by Top Hollywood Donor*, The Washington Post (Nov. 25, 2013) ("'Contributing to the president's campaign or being a political supporter of the president doesn't guarantee you a presidential visit, but it shouldn't exclude you from one either,' said spokesman Joshua Earnest."), http://goo.gl/utOVtR; Jim Kuhnhenn, *Barack Obama Goes to DreamWorks, Talks Banjo with Steve Martin*, Huffington Post (Nov. 26, 2013) ("President Obama has toured many a factory floor and high-tech plant during his presidency.   It's part of his job. . . Obama toured the DreamWorks Animation studio of one of his top political benefactors, Jeffrey Katzenberg . . . Obama praised the entertainment industry . . . . 'Can't wait to see your next movie,' Obama added with a grin."), http://tinyurl.com/oov9z73.

[14] *See, e.g.*, http://tinyurl.com/olk87r9 (listing numerous videos of the President's speech).

reason than that donors view the money as useful for getting a foot in the door."[15]
This includes numerous instances of someone making a substantial gift and promptly
securing a desired meeting with a high-level aide.  *See id.*

- As anyone who has been invited to political fundraisers knows, the quid pro quo in
  that context is often explicit, such as when elected officials require a threshold
  donation to get a personal photo with the official, or to attend a retreat where the
  donor will have extensive access to public officials.[16]

- Access to official events and official government facilities is likewise often sold for
  an explicit price.  For example, at the 2013 presidential inauguration, "[c]orporations
  and other organizations that donate in the highest bracket—$1 million—will have
  access to a . . . 'benefactors reception,' and four tickets to the official inaugural ball,
  among other perks."[17]

- Similar explicit and implicit exchanges are commonplace for official White House
  holiday parties and even official state dinners.[18]

- Elected officials routinely auction off access to themselves and their senior staff.  For
  example, it has been reported that the President's political organization has held a
  "'founders summit' at a hotel near the White House, where donors paying $50,000
  each will mingle with Mr. Obama's former campaign manager, Jim Messina, and Mr.
  Carson, who previously led the White House Office of Public Engagement."[19]  Big
  donors regularly get presidential appointments and private meetings:  "Giving or
  raising $500,000 or more puts donors on a national advisory board for Mr. Obama's
  group and the privilege of attending quarterly meetings with the president, along with
  other meetings at the White House."  *Id.*

---

[15] Mike McIntire & Michael Luo, *White House Opens Door to Big Donors, and Lobbyists
Slip In*, The New York Times (April 14, 2012), http://goo.gl/a6KiZM.

[16] For example, a 2010 fundraiser for the Democratic Senatorial Campaign Committee
offered attendance at a retreat in Martha's Vineyard with 13 United States Senators in exchange
for $30,400.  *See* http://goo.gl/I4e2Dz (copy of invitation).

[17] Matthew Larotunda, *Obama Inauguration's Big Donor Packages Previewed*, ABC
News (Dec. 8, 2012), http://goo.gl/97XaY1.

[18] *See, e.g.*, *Top Donors to Obama Super PAC Among White House Guests*,
FoxNews.com (March 26, 2012) ("More than 60 of Obama's biggest campaign donors have
visited the White House more than once for meetings with top advisers, holiday parties or state
dinners, a review by The Associated Press has found."), http://goo.gl/jCcn88.

[19] Nicholas Confessore, *Obama's Backers Seek Big Donors to Press Agenda*, The New
York Times (Feb. 22, 2013), http://goo.gl/lGgex5.

These examples are just a small slice of the conduct that the government's expansive theory would criminalize if applied evenhandedly to federal and state officials. Photo ops are as old as cameras, and access for major contributors is, for better or worse, the lifeblood of democratic politics. In not one of these instances has the federal government *even investigated*—let alone prosecuted—the elected officials involved, which makes sense given that these practices are not federal crimes. For that reason, too, discovery of all relevant statements by the prosecutorial team to the grand jury is appropriate to determine whether the prosecution misstated the requirements of federal law.

## II.   The Thin Factual Record Further Warrants Immediate Disclosure Of All Grand Jury Recordings.

### A.   The Federal Government Has No Evidence Of Corrupt Intent.

Not only does the federal government's indictment depend upon an unprecedented legal theory, it also hinges on a highly tenuous evidentiary inference. There is no credible evidence— and certainly no documentary evidence—of any illicit agreement or corrupt intent. "Bribery requires the intent to effect an exchange of money (or gifts) for specific official action (or inaction)." *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). The courts have clearly held that "a goodwill gift to an official" made "with the 'generalized hope or expectation of ultimate benefit on the part of the donor,' does not constitute a bribe." *Id.* at 1013. It is not enough for gifts or payments to be made because of the elected official's status as a public official. As the Fourth Circuit has explained, virtually *every* gift to an elected official is "because of his office" or "motivated by the public office involved." *United States v. Taylor*, 993 F.2d 382, 385 (4th Cir. 1993). Indeed, "[a]ll payments to elected officials are intended to influence their official conduct." *Id.* at 385. That is why the law requires proof that an official

accepted a payment knowing it was made in return for "*specific* official acts." *Evans*, 504 U.S. at 268 (emphasis added).

The federal government rarely brings corruption charges against elected officials when it lacks clear evidence that those officials entered corrupt bargains[20] and there is not a shred of such evidence here. The government alleges nothing more than various benefits Mr. Williams provided to Governor McDonnell and his family, as well as a few routine courtesies Governor McDonnell extended to Mr. Williams.[21] Even setting aside the government's novel interpretation of the bribery laws, its factual allegations *still* supply an extraordinarily slender reed for federal prosecution; one which jeopardizes all sorts of routine political events.

Politics is replete with examples of major benefactors receiving more substantial government benefits than anything suggested here. For example, it is widely known that being a major donor is the best way to secure a Presidential appointment. As *The New York Times* has reported, if you want to be an Ambassador, "don't expect much if you didn't raise at least a million dollars."[22] "For some would-be diplomats, the hunt began the day after Mr. Obama's re-election in November, when the president's top aides began asking his leading fund-raisers if

---

[20] For example, in its prosecutions of Governor Blagojevich and Congressman Jefferson, the government did not move forward until after it had obtained credible, wiretap evidence of a corrupt bargain. *See, e.g.*, *Jefferson*, 674 F.3d at 346 ("The conversations between Jefferson and Mody concerning this illicit payment were monitored and recorded by the FBI."); Transcript, *Justice Department Briefing on Blagojevich Investigation*, The New York Times (Dec. 9, 2008) ("We have a tremendous amount of information gained from the wiretap and the bugs that occurred over the last month and a half or so."), http://tinyurl.com/mkpbwoe.

[21] Mrs. McDonnell is not a public official, and her actions cannot constitute "official acts." In any event, the allegation that she promoted Star products by making brief remarks at Star conferences cannot satisfy this requirement because those allegations do not involve any decision or action on a matter actually pending before the government. Moreover, no witness reports that she conspired with her husband to promote Star's products.

[22] Nicholas Confessore, *Well-Trod Path: Political Donor to Ambassador*, The New York Times (Jan. 18, 2013), http://goo.gl/GkRvu2.

they had interest in serving." *Id.*  And indeed, "[s]ince 2008, Obama has appointed at least three dozen big check writers and fundraisers to coveted ambassadorships in spots such as the United Kingdom, France and Italy."[23]  The same is true for high-profile appointments here at home.  For example, "[e]arlier this year, Obama gave the Commerce Secretary nod to Chicago hotel heiress Penny Pritzker, who served as national finance chairwoman of his first White House bid and raised more than $500,000 for his reelection."[24]

Moreover, Governor McDonnell's predecessors engaged in indistinguishable conduct, further negating any inference that Governor McDonnell acted with corrupt intent.  Virginia law does not limit the amount of gifts that a political official can receive and, in fact, it expressly exempts from criminal prosecution the receipt of gifts with a frequency that gives rise to an appearance of misuse of office.  *See* Va. Code § 2.2-3103(9) ("Violations of this subdivision shall not be subject to criminal law penalties.").  It is consequently routine for Virginia politicians to accept large gifts and donations, and the mere acceptance of such gifts cannot support an inference of corrupt intent.

Confirming as much, Governor McDonnell's predecessor, Democratic Governor Tim Kaine, likewise received substantial gifts while in state office.  Mr. Kaine also served as Chairman of the Democratic National Committee and now represents Virginia in the United States Senate.  The Virginia Public Access Project reveals that Mr. Kaine received $186,899 in gifts and travel, including Redskins tickets, cases of wine, and other similar benefits since

---

[23] Matea Gold, *Obama Visit to DreamWorks Animation Spotlights Studio Run by Top Hollywood Donor*, The Washington Post (Nov. 25, 2013).

[24] *Id.*

2001.[25]  That includes "an $18,000 Caribbean vacation" on the island of "Mustique—a private island playground for rock stars and royalty" that "was paid for by Albemarle County investor James B. Murray Jr.," and which helped put Mr. Kaine "atop the list of Virginia elected officials who in 2005 accepted nearly $315,000 in gifts, trips, concert tickets and other gratuities from corporations, interest groups and wealthy persons."[26]  Unlike Governor McDonnell, Senator Kaine has never been falsely accused of committing a federal crime, even though he conferred far more substantial government benefits on his benefactors than anything alleged here.  For example, he reappointed James B. Murray, Jr.—the person who gave him the Caribbean vacation, as well as $41,000 in campaign donations[27]—to the Virginia Commission on Higher Education Board Appointments, "which helps the governor vet candidates for much-sought-after slots on the boards that run Virginia's state-supported colleges and universities."[28]  Similarly, "in 2006, Kaine received gifts worth $3,237 for travel to the Northern Neck, Virginia horse country and the Shenandoah Valley from E. Scott Kasprowicz, a former telecom executive whom Kaine just happened to name as deputy secretary of transportation that very year."  *Id.*

This settled Virginia practice confirms that Governor McDonnell's conduct was well within the mainstream for Virginia public officials.  Because these are practices that the Commonwealth has affirmatively chosen to permit, there is no way that Governor McDonnell could have imagined that the federal government would suddenly declare his acceptance of

---

[25] *See* Jim Geraghty, *Virginia's Long Tradition of Expensive Gifts to Governors*, National Review (Aug. 9, 2013) (citing the Virginia Public Policy Access website), http://goo.gl/IBt5bs.

[26] *$18,000 Vacation Puts Kaine Atop Gift Recipients List*, The Washington Times (Feb. 4, 2006), http://goo.gl/LJHzcb.

[27] *See* Virginia Public Access Project, *All Receipts Reported by Tim Kaine Committees from James B Murray, Jr from 2000-2005*, http://goo.gl/umQQT5.

[28] *Rayner: The Trouble with Gifts*, Richmond Times-Dispatch (Nov. 15, 2013), http://goo.gl/46HrYZ.

lawful gifts to be a crime. There is thus likewise no way that Governor McDonnell could have possessed the corrupt intent required to commit bribery. Given these basic evidentiary deficiencies in the prosecution's case, discovery into how the prosecution instructed the jury on these elements of the charged crimes is warranted to determine whether it overcame these shortcomings by "seriously misstat[ing] the applicable law." *Stevens*, 771 F. Supp. 2d at 567.

**B.     The Federal Government Has No Evidence Showing That Governor McDonnell Knowingly Falsified A Loan Application.**

The federal government has likewise uncovered no evidence that Governor McDonnell "knowingly" made a false statement on a loan application. The Governor innocently did not include liabilities MoBo Real Estate and his wife owed to Starwood Trust, an entity owned by Mr. Williams, when submitting his personal financial statement in October 2012 to TowneBank as part of the process of renewing a loan. TowneBank, however, would have renewed the loan regardless of the Starwood liabilities.

Likewise, the Governor submitted several loan applications during 2013 as part of a process to obtain refinancing of various properties. One of the preliminary loan applications inadvertently omitted information related to a number of the McDonnell family's assets and liabilities, including loans from Starwood Trust. The credit union did not, however, approve any loans in reliance on incomplete financial information. To the contrary, at the time the credit union approved the loans, it had full knowledge of all Starwood loans but did not deem them sufficiently material to include all of them in the final loan documentation.

People make innocent mistakes on complex forms all the time. Those mistakes are not crimes unless they were intended to fraudulently secure a loan. The Supreme Court has clearly explained as much, holding that such statements are criminal "only if the speaker knows the falsity of what he says and intends it to influence the [lender]." *United States v. Wells*, 519 U.S.

482, 499 (1997) (citing 18 U.S.C. § 1014).  The government possesses no evidence which could enable it to satisfy that demanding burden, as its theory that the Governor hid his financial relationship with Mr. Williams because it was corrupt is—as shown above—totally meritless.  That deficiency, too, warrants disclosure of the prosecution's instructions to the grand jury.

## CONCLUSION

Governor McDonnell is a distinguished public servant who has given 21 years of active and reserve service as an officer in the United States Army, and has served the Commonwealth for 23 years as an assistant commonwealth attorney, state delegate, Attorney General and Governor.  He has spent many years in the glare of the public spotlight without a hint of scandal or impropriety.  As Virginia House of Delegates Speaker William J. Howell, Majority Leader M. Kirkland Cox, Caucus Chairman Timothy D. Hugo, and Majority Whip Jackson H. Miller—men who know the Governor very well—said in a recent public statement, Governor McDonnell "is known on both sides of the aisle as a man of character, integrity and good will."[29]  Senator Mark Warner (D-VA) likewise recently referred to Governor McDonnell as a "real friend and great Virginian."[30]  Before federal prosecutors are permitted to tear apart the life of a man who has so dedicated himself to faithful public service, discovery into how those prosecutors obtained their flawed indictment is appropriate.  Though much damage has already been done, far more could potentially be avoided.

---

[29] Statement of House Leadership, http://goo.gl/qzTNuv.

[30] Ali Weinberg, *Va. Gov. McDonnell Declines Questions About Investigation, Lawyers' Meetings*, NBC News, First Read, http://goo.gl/FNW9Qq.

Dated: January 21, 2014                    Respectfully submitted,


                                           /s/ John L. Brownlee
                                           John L. Brownlee (VSB No. 35378)
                                           Holland & Knight LLP
                                           800 17th Street N.W., Suite 1100
                                           Washington, DC 20006
                                           Telephone: (202) 828-1854
                                           Facsimile: (202) 955-5564
                                           Email: john.brownlee@hklaw.com

                                           Henry W. Asbill (*pro hac vice pending*)
                                           Jones Day
                                           51 Louisiana Avenue, N.W.
                                           Washington, DC 20001
                                           Telephone: (202) 879-3939
                                           Facsimile: (202) 626-1700
                                           Email: hasbill@jonesday.com

                                           *Counsel for Governor Robert F. McDonnell*

## CERTIFICATE OF SERVICE

I certify that on January 21, 2014, I caused to be served a true copy of the foregoing via electronic email on the following individual:

AUSA Michael S. Dry
United States Attorney's Office
600 E. Main Street, Suite 1800
Richmond, Virginia 23219-2447
Phone: (804) 819-5400
Facsimile: (804) 771-2316
Email: michael.s.dry@usdoj.gov

Dated: January 21, 2014                    Respectfully submitted,


/s/ John L. Brownlee
John L. Brownlee (VSB No. 35378)
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 828-1854
Facsimile: (202) 955-5564
Email: john.brownlee@hklaw.com

*Counsel for Governor Robert F. McDonnell*

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **V.** | ) | **CRIMINAL NO.** __3:14cr12____ |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | |
| **MAUREEN G. MCDONNELL** | ) | |

## [PROPOSED] ORDER

Upon consideration of Defendant Robert F. McDonnell's Motion for Discovery of Selected Recordings of Communications Between Prosecutors and Members of the Grand Jury and the memoranda filed in support thereof, it is hereby

**ORDERED** that the Motion is **GRANTED**.   It is further **ORDERED** that the Department of Justice shall produce to the Defense all recordings and transcripts of the instructions provided to the grand jury when securing today's indictment, as well as all other recordings of the prosecutors' statements to the grand jury about the legal validity of the charges.

## IT IS SO ORDERED.

Dated:_____                    _____

United States District Judge