**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **CRIMINAL NO. 3:14-CR-00012** |
| | ) | |
| **ROBERT F. MCDONNELL** | ) | **JUDGE JAMES R. SPENCER** |
| **MAUREEN G. MCDONNELL** | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT ROBERT F. MCDONNELL'S**
**MOTION # 10 — MOTION TO DISMISS**
<u>**COUNTS 1-11 OF THE INDICTMENT**</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ...................................................................................................... 1

ARGUMENT ............................................................................................................. 5

I.  The Indictment Fails To State A Claim For Honest Services Fraud, Extortion Under Color Of Official Right, Or Conspiracy ................................................. 7

    A.  The Government Must Allege That Gifts Or Loans Were Accepted In Exchange For An "Official Act" ................................................................. 7

        1.  An "Official Act" Is An Act That Exercises Governmental Power .......... 8

        2.  The Term "Official Act" Should Be Construed Narrowly ..................... 13

        3.  The Government's Apparent Belief That Everything A Public Official Does In His Official Capacity Constitutes An "Official Act" Is Wrong ......................................................................................... 16

        4.  The Government's Interpretation Of "Official Act" Would Criminalize The Routine Activities Of All Public Officials .................. 17

    B.  The Government Has Not Alleged That Mr. McDonnell Performed Or Promised To Perform Any "Official Act" .......................................... 19

        1.  The Indictment Does Not Allege That Mr. McDonnell Promised Any Specific Future "Official Acts" ....................................................... 19

        2.  None Of The Specific Actions Alleged By The Government Constitutes An "Official Act" .............................................................. 20

            (a)  Arranging Or Recommending Meetings With Other Government Officials.................................................................. 20

            (b)  Hosting And Attending Events At The Mansion ........................ 22

            (c)  "Contacting Other Government Officials In OGV" ................... 24

        3.  The Government's Broad Characterizations Of Mr. McDonnell's Conduct Do Not Cure This Deficiency .................................................. 25

II.  If "Official Act" Means What The Government Claims, Then The Honest Services Statute And Hobbs Act Are Unconstitutionally Vague.................................... 28

III.  The Constitution Forbids Federal Prosecution Of State Officials For Non-Corrupt Conduct That Is Legal Under State Law ................................................................ 29

CONCLUSION ........................................................................................................ 30

# TABLE OF AUTHORITIES

**Page**

**UNITED STATES CONSTITUTION**

U.S. Const. amend. X ................................................................................................29

U.S. Const. article IV, § 4 .........................................................................................30


**CASES**

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ................................................................................................2

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010) ................................................................................ passim

*Cleveland v. United States,*
    531 U.S. 12 (2000) ............................................................................................16

*Evans v. United States,*
    504 U.S. 255 (1992) .........................................................................2, 8, 19, 20

*FERC v. Mississippi,*
    456 U.S. 742 (1982) .....................................................................................6, 29

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ...........................................................................................7

*Jones v. United States,*
    529 U.S. 848 (2000) .........................................................................................15

*McNally v. United States,*
    483 U.S. 350 (1987) ...............................................................................8, 10, 30

*Rewis v. United States,*
    401 U.S. 808 (1971) .........................................................................................15

*Skilling v. United States,*
    130 S. Ct. 2896 (2010) ................................................................6, 8, 16, 28, 29

*Staples v. United States,*
    511 U.S. 600 (1994) .........................................................................................14

# TABLE OF AUTHORITIES
## (continued)

Page

*United States v. Bass*,
   404 U.S. 336 (1971)................................................................15, 16

*United States v. Biaggi*,
   853 F.2d 89 (2d Cir. 1988)........................................................ 12

*United States v. Birdsall*,
   233 U.S. 223 (1914)...................................................................11

*United States v. Brandon*,
   298 F.3d 307 (4th Cir. 2002) ......................................................5

*United States v. Carson*,
   464 F.2d 424 (2d Cir. 1972).......................................3, 5, 9, 12

*United States v. Engle*,
   676 F.3d 405 (4th Cir. 2012) ......................................................5

*United States v. Enmons*,
   410 U.S. 396 (1973)...................................................................16

*United States v. Hairston*,
   46 F.3d 361 (4th Cir. 1995) ........................................................3

*United States v. Jefferson*,
   674 F.3d 332 (4th Cir. 2012) .....................................2, 10, 11, 17, 27

*United States v. Jennings*,
   160 F.3d 1006 (4th Cir. 1998) ....................................................8

*United States v. Loftus*,
   992 F.2d 793 (8th Cir. 1993) .....................................................22

*United States v. Lopez*,
   514 U.S. 549 (1995)...................................................................30

*United States v. Mandel*,
   591 F.2d 1347 (4th Cir. 1979) ....................................................9

*United States v. Muntain*,
   610 F.2d 964 (D.C. Cir. 1979)................................................... 27

*United States v. Rabbitt*,
   583 F.2d 1014 (8th Cir. 1978) ...................................................10

## TABLE OF AUTHORITIES
### (continued)

Page

*United States v. Ring*,
706 F.3d 460 (D.C. Cir. 2013) .................................................................11, 12, 25

*United States v. Sun-Diamond Growers of Cal.*,
526 U.S. 398 (1999) ................................................................................ passim

*United States v. Urciuoli*,
513 F.3d 290 (1st Cir. 2008) .................................................................9, 10, 23, 24

*Valdes v. United States*,
475 F.3d 1319 (D.C. Cir. 2007) ................................................................ passim

*Ventimiglia v. United States*,
242 F.2d 620 (4th Cir. 1957) .........................................................................28

## STATUTES & RULES

18 U.S.C. § 201 ....................................................................................................8

18 U.S.C. § 201(a)(3) ......................................................................................7, 13

18 U.S.C. § 666 ...............................................................................................8, 30

18 U.S.C. § 1346 .............................................................................................8, 10

18 U.S.C. § 1951 ..................................................................................................3

18 U.S.C. § 1951(a)(2) ..........................................................................................7

Va. Code. § 2.2-3103(8) ....................................................................................3, 15

Va. Code § 2.2-3103(9) ........................................................................................15

Fed. R. Crim. P. 7(c)(1) .........................................................................................5

Fed. R. Crim. P. 12 ..............................................................................................5

## OTHER AUTHORITIES

Ashley Alman & Ryan Grim, *Obama Fundraiser in Philadelphia Sets Million-Dollar
Goal*, Huffington Post (Nov. 14, 2013, 10:34 AM), *available at*
http://tinyurl.com/memqogw ..................................................................................4

# TABLE OF AUTHORITIES
## (continued)

Page

Associated Press, *George Lopez Seeks Latino Vote for Obama in Nevada*, N.Y. Daily News (Aug. 4, 2008), *available at* http://tinyurl.com/p624yyl................................................18

*Criminal Resource Manual* § 2404.............................................................................................8

Laura Vozzella, *In Va., $100,000 Will Get You a Sit-Down with 'Policy Experts,' Governor's New PAC Says*, Wash. Post, *available at* http://tinyurl.com/lyctot8.....................4

Maria Elena Fernandez, *President Obama Shills for Comedian George Lopez*, L.A. Times (June 19, 2009), *available at* http://tinyurl.com/knve3f ...............................................18

Matthew Larotunda, *Obama Inauguration's Big Donor Packages Previewed*, ABC News (Dec. 8, 2012, 4:14 PM), *available at* http://goo.gl/97XaY1 ..................................................27

Norman Leahy & Paul Goldman, *McAuliffe Just Gave the McDonnell Defense a Hand*, Wash. Post (Mar. 18, 2014), *available at* http://tinyurl.com/qgc6rjz.......................................4

Peter Nicholas, *Administration Officials Double As Obama Campaign Speakers*, L.A. Times (Nov. 16, 2011), *available at* http://tinyurl.com/odqo7q4............................. 17, 18

## INTRODUCTION

Federal law does not prohibit state officials from accepting gifts from political patrons or friends.  To the contrary, a state official violates federal law only if he accepts something of value in exchange for performing or promising to perform an "official act."  Here, the Government's Indictment alleges five "official acts" in support of its claim that Mr. McDonnell corrupted the office of Governor of Virginia.  *See* Indictment ¶ 111(c).  But even if the Government's allegations were true (which they are not), none of these actions—which involve arranging or suggesting meetings with government officials or attending or hosting events—are "official acts."  The Indictment does not allege that Mr. McDonnell ever exercised governmental power on Star's behalf, that he promised or sought to influence any other government official to exercise such power, or that Star was the beneficiary of any official action taken by his Administration.  This Court should decline the Government's invitation to make new law by substantially expanding the well-worn Hobbs Act and wire fraud statute and should instead dismiss the corruption charges in the Indictment.

The Supreme Court has long recognized the fundamental difference between public officials (1) exercising their official powers differently to favor donors, *i.e.*, making different official decisions on government policy, and (2) providing access that facilitates donor input to government officials but does not, without more, alter any official decisions on government policy.  Because "[i]ngratiation and access . . . are not corruption," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 360 (2010), only the former sorts of actions are "official" and thus illegal when offered in exchange for benefits.  Actions such as "receiving [] sports teams at the White House, visiting [a] high school, and speaking to [] farmers about USDA policy" are not "official acts" under the bribery laws because they do not involve the exercise of governmental power.  *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999).

- 1 -

Or as the Fourth Circuit recently explained, "the bribery statute does not encompass every action taken in one's official capacity"; rather, those actions "must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy,'" *i.e.*, they must be actions that exercise governmental power (or push another official to), such as awarding state contracts or voting for legislation. *United States v. Jefferson*, 674 F.3d 332, 356 (4th Cir. 2012) (citation omitted); *see also Evans v. United States*, 504 U.S. 255, 268 n.20 (1992) (adopting the "common-law" distinction "between payments for private services and payments for public services").

The criminal bribery provisions the Government invokes are limited to "the most blatant and specific attempts of those with money to influence governmental action." *Buckley v. Valeo*, 424 U.S. 1, 28 (1976). Because giving benefactors "influence over or access to elected officials does not mean that these officials are corrupt," *Citizens United*, 558 U.S. at 3597, the bribery laws do not criminalize merely providing access or meetings. Regulating *that* conduct—*i.e.*, conduct that does not abuse the sovereign power of government, even if it may appear unseemly or undermine the public trust—is the province of campaign finance laws, ethics regulations, and gift laws. *See, e.g.*, *id.* at 357 (explaining that "restrictions on direct contributions are preventative"). Here, since Mr. McDonnell was a state official, he was governed by the ethics laws of the Commonwealth of Virginia, which allow state officials to accept unlimited private gifts, subject to limited disclosure requirements (which the Indictment does not allege Mr. McDonnell violated). Virginia has, moreover, made it express in the state code that public officials "shall not be subject to criminal law penalties" even when an official accepts "a gift from a person who has interests that may be substantially affected by the performance of the officer's . . . official duties under circumstances where the timing and nature of the gift would

cause a reasonable person to question the officer's . . . impartiality in the matter affecting the donor." Va. Code. § 2.2-3103(8).  The federal government may feel that Virginia's gift laws are too lax, but that does not entitle it to convert the federal bribery prohibitions into a comprehensive code of ethics for state officials.

The distinction between providing access and exercising government power is not, moreover, some artificial or legalistic line that would shield corrupt conduct which falls within the spirit, if not the letter, of the bribery laws.  To the contrary, the criminal bribery statutes— and the stiff penalties they impose—seek to prevent actual misuse of official power:  "It is the corruption of official positions through misuse of influence in *governmental decision-making* which the bribery statutes make criminal." *United States v. Carson*, 464 F.2d 424, 434 (2d Cir. 1972) (emphasis added).  That purpose does not extend to criminalizing actions that are "assuredly 'official acts' in some sense," *Sun-Diamond*, 526 U.S. at 407, but which do not misuse the sovereign power of government.  That is why the Supreme Court has admonished that in "an area where precisely targeted prohibitions"—in the form of finely tuned campaign finance laws and ethics regulations—"are commonplace," a bribery statute "that can linguistically be interpreted to be either a meat axe or a scalpel should reasonably be taken to be the latter." *Sun-Diamond*, 526 U.S. at 412.  The courts "ought not expand [the bribery] piece of the regulatory puzzle so dramatically as to make many other pieces misfits." *Id.*

If the bribery statutes are not restricted to actual corruption, then federal prosecutors will wield enormous, unwarranted power over the political process.  Because a bribery "quid" can be either a campaign donation or, as alleged here, a personal benefit,[1] an over-broad construction of

---

[1] The law merely requires that a quid pro quo be established.  *See, e.g.*, *United States v. Hairston*, 46 F.3d 361, 372 (4th Cir. 1995) (explaining that the same "rationale[s]" apply "to campaign contributions [as] to other prosecutions for violation of § 1951").  Indeed, many

the bribery "quo"—*i.e.*, what federal law prohibits politicians from doing in exchange for those donations—risks criminalizing routine political practices.  If arranging or suggesting meetings with public officials, inviting a benefactor to an event at the Mansion (or allowing a benefactor to invite others to an event), or making favorable statements about a benefactor constitute criminal bribery, then virtually every political fundraiser would be a federal felony.[2]  Indeed, highlighting the breadth of the Government's construction, it would seem to criminalize the current fundraising solicitation of Mr. McDonnell's successor, Governor Terry McAuliffe:  "For $100,000, you can have a private dinner with Virginia Gov. Terry McAuliffe and the first lady, participate in a roundtable discussion with the governor and sit down every month with 'policy experts.'"[3]  This program provides donors with "special access to McAuliffe and the governor's policy advisers,"[4] which is indistinguishable from most of what is alleged here.  Neither that solicitation nor Mr. McDonnell's alleged conduct violate federal criminal law.

In short, despite alleging that virtually everything Mr. McDonnell did vis-à-vis Star was an "official act," *see* Indictment ¶ 111(c), the Government's allegations never cross the line between "[i]ngratiation and access"—*i.e.*, "not corruption," *Citizens United*, 558 U.S. at 360—and the "misuse of influence in governmental decision-making which the bribery statutes make

––––––––––––––––––––
(continued…)

political corruption prosecutions—such as that of former Illinois Governor Rod Blagojevich—arise from the solicitation or acceptance of otherwise-legal campaign donations.

[2] *See, e.g.*, Ashley Alman & Ryan Grim, *Obama Fundraiser in Philadelphia Sets Million-Dollar Goal*, Huffington Post (Nov. 14, 2013, 10:34 AM) ("Attendees of Thursday's event who contribute $32,400 . . . are entitled to a VIP Chair's reception, photo opportunity, dinner Q&A session with the president, and guest."), *available at* http://tinyurl.com/memqogw.

[3] Laura Vozzella, *In Va., $100,000 Will Get You a Sit-Down with 'Policy Experts,' Governor's New PAC Says*, Wash. Post, *available at* http://tinyurl.com/lyctot8.

[4] Norman Leahy & Paul Goldman, *McAuliffe Just Gave the McDonnell Defense a Hand*, Wash. Post (Mar. 18, 2014), *available at* http://tinyurl.com/qgc6rjz.

criminal." *Carson*, 464 F.2d at 434.  The defense is aware of no instance of the Government successfully prosecuting a public official on the basis of access-oriented acts like those alleged here.  The Court should therefore dismiss Counts 1-11.

## ARGUMENT

Under Federal Rule of Criminal Procedure 7(c)(1), the Indictment must contain a "statement of the essential facts constituting the offense charged."  It does not suffice to "simply parrot[] the language of the statute in the indictment."  *United States v. Brandon*, 298 F.3d 307, 310 (4th Cir. 2002).  "When the words of a statute are used to describe the offense generally, they must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged."  *Id.* (citation omitted)).  And if the alleged facts are insufficient to charge an offense as a matter of law, then the indictment must be dismissed.  *See, e.g.*, *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012) ("A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution . . . .") (citation omitted).

Here, the Government's allegations against Governor McDonnell fail to establish that he committed honest services fraud or extortion or, by extension, conspiracy to commit the same. This is clear for three reasons.  *First*, and most importantly, the Indictment fails to allege that Mr. McDonnell promised to perform, or did perform, any "official act."  The Government never claims that Mr. McDonnell or anyone on his staff exercised official governmental power on behalf of Star or Williams.  Nor does it contend that he improperly influenced any other official to exercise governmental power on behalf of Star or Williams.  The Government instead alleges that Mr. McDonnell, his wife, and Jonnie Williams agreed to a scheme in which Mr. McDonnell would take steps to "legitimize" and "promote" Star and its products.  Indictment ¶ 22.  But neither of these broad terms suggests any specific action or promise to exercise the power of the

Virginia Government—*i.e.*, to take *official* acts as opposed to *any* acts an official takes—and thus neither crosses the line between mere "[i]ingratiation and access," *Citizens United,* 558 U.S. at 360, and actual misuse of government power.

*Second*, if the statutes the Government invokes apply as broadly as the Indictment suggests, then they are unconstitutionally vague.  A law is unconstitutionally vague if it fails to "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 130 S. Ct. 2896, 2927-28 (2010) (citation omitted).  The Government's interpretation of "official act" produces both of these constitutional evils.  It fails to provide fair warning by expanding "official acts" beyond actions that exercise government power into the wholly indefinite category of actions that are merely "'official acts' in some sense." *Sun-Diamond*, 526 U.S. at 407.  Moreover, by expanding the legal definition of "official act" to include virtually everything a public official does vis-à-vis a benefactor, the Government's theory would make all elected officials potential prosecutorial targets.  Arbitrary enforcement would be inevitable.  If these statutes mean what the Government says they mean, then they are unconstitutional. *See Skilling*, 130 S. Ct. at 2927-28.

*Third*, the Government's prosecution of Mr. McDonnell violates basic principles of federalism.  "[H]aving the power to make decisions and to set policy is what gives the State its sovereign nature." *FERC v. Mississippi*, 456 U.S. 742, 761 (1982).  The Constitution forbids the federal government from interfering in a state official's political activity when that activity neither implicates federal interests nor constitutes "corruption." *Citizens United,* 558 U.S. at 360.  "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be

exclusive, and free from external interference, except so far as plainly provided by the Constitution of the United States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation omitted). The Government's unprecedented and far-reaching construction of the federal bribery laws violates these basic constitutional principles and for that reason is unconstitutional.

## I.    The Indictment Fails To State A Claim For Honest Services Fraud, Extortion Under Color Of Official Right, Or Conspiracy.

To state a claim for honest services fraud or Hobbs Act extortion, the Government must allege facts establishing that Governor McDonnell accepted gifts or loans in exchange for promising to perform an "official act." But the Government never alleges that Mr. McDonnell exercised, promised to exercise, or improperly sought to influence another official to exercise governmental power on behalf of Williams or Star. The Government has therefore failed to state a claim under these provisions. And because the Government's allegations cannot support those charges, its derivative conspiracy charges fail too.

### A.    The Government Must Allege That Gifts Or Loans Were Accepted In Exchange For An "Official Act."

The Government does not dispute that obtaining bribery convictions will require it to demonstrate that—at a minimum—Mr. McDonnell promised or performed an "official act" in exchange for personal benefits. *See, e.g.*, Gov't Opp'n to Deft's Mot. for Discovery of Selected Recordings of Grand Jury Commcn's (Feb. 3, 2014), Dkt. 41, at 8 (acknowledging that "the actions" must "be 'official'" (citing 18 U.S.C. § 201(a)(3)). Nor could it. As the Fourth Circuit has explained, even though the Hobbs Act does not itself use the term "official act,"[5] the Government must prove that the targeted official "obtained a payment to which he was not

---

[5] The Hobbs Act defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(a)(2).

entitled, knowing that the payment was made in return for *official acts*." *Evans*, 504 U.S. at 268 (emphasis added).[6]  Likewise, the Supreme Court held in *Skilling* that to obtain a conviction for honest services fraud, the Government must prove that the official engaged in a "bribery [or] kickback scheme[]," 130 S. Ct. at 2907, 2933-34 (citing § 201 and § 666), the "gravamen" of which "is a payment made to *corruptly* influence or reward an official act (or omission)," *United States v. Jennings*, 160 F.3d 1006, 1020 (4th Cir. 1998).[7]  The Government's case fails because it cannot allege (or prove) that Mr. McDonnell took or promised to take official acts on behalf of Williams or Star.

### 1.    An "Official Act" Is An Act That Exercises Governmental Power.

Not everything a public official does is an "official" act.  If it were, then public officials could not have substantive interactions with their political benefactors.  For example, all public officials who accept political donations in exchange for a photograph or some of their time would be federal felons.  That is not the law.

The Supreme Court has made this plain by carefully distinguishing between actions that "are assuredly 'official acts' in some sense"—such as "receiving [ ] sports teams at the White House, visiting [a] high school, and speaking to [ ] farmers about USDA policy"—and the narrower category of "official acts" that fall within the bribery laws.  *Sun-Diamond*, 526 U.S. at 407.  To be "official," an act must cross the line from merely providing "access," *Citizens United*, 558 U.S. at 360, into actually altering the actions of the government itself—that is, the

---

[6] The Department of Justice's Manual recognizes that the Hobbs Act requires a showing of an "official act."  *See Criminal Resource Manual* § 2404 ("[T]he courts will probably not extend the 'color of official right' clause of the Hobbs Act beyond the parameters of crimes of bribery and gratuities in relation to federal officials that are described in 18 U.S.C. § 201.")

[7] The wire fraud statute, 18 U.S.C. § 1346 reaches "a scheme or artifice to deprive another of the intangible right of honest services," which the Supreme Court has construed as criminalizing "*only* the bribe-and-kickback core of the pre-*McNally* case law." *Skilling*, 130 S. Ct. at 2931.

allegedly unlawful action must involve the exercise of governmental power.  This limitation makes sense, since "[i]t is the corruption of official positions through misuse of influence in governmental decision-making which the bribery statutes make criminal."  *Carson*, 464 F.2d at 434.  Or as the Fourth Circuit has explained:  "[T]he 'fraud' involved in the bribery of a public official lies in the fact that the public official is not exercising his independent judgment in *passing* on *official* matters."  *United States v. Mandel*, 591 F.2d 1347, 1362 (4th Cir. 1979) (emphases added).  The federal bribery prohibitions are thus not intended to police interactions between state officials and supporters when those interactions do not involve "governmental decision-making," *Carson*, 464 F.2d at 434, or exercising "official" government power, *Mandel*, 591 F.2d at 1362, but are rather mere issues of "access." *Citizens United*, 558 U.S. at 360.

Courts have faithfully followed this straightforward distinction, consistently vacating convictions of public officials when those officials did not improperly exercise governmental power.  For example, in *United States v. Urciuoli*, 513 F.3d 290, 295-96 (1st Cir. 2008), the First Circuit vacated a state senator's honest services fraud conviction when the senator was being paid to contact "mayors and other local officials urging them to comply with Rhode Island law governing patient entitlement to be taken by ambulance to the hospital of the patient's choice." *Id.* at 294.  The Government argued that "a legislator's informal duties commonly extend to representing constituents with local officials and engaging in oversight functions and so to this extent should be regarded as official."  *Id.* at 295-96.  The First Circuit rejected that position, holding that "there is no indication that [the senator] invoked any purported oversight authority or threatened *to use official powers in support of his advocacy*."  *Id.* at 296 (emphasis added).  Because the senator's advocacy did not "bias[] his judgment in making an official decision on a matter before him," *id.* at 295, he never improperly exercised his governmental powers.  The

court rejected the notion that "trad[ing] . . . on the reputation, network and influence that comes with political office" or using the "access and attention" that comes with a government title, or even the "(possibly improper) use of senate letterhead" were sufficient—standing alone—to transform that conduct into an improper exercise of official government power. *Id.* at 296.

Similarly, in *Valdes v. United States*, a policeman took payments in exchange for performing searches (for license plates, outstanding warrants, and the like) on the police department database. 475 F.3d 1319, 1321-22 (D.C. Cir. 2007) (en banc). The Government argued "that the bribery . . . statute should be construed broadly, to encompass essentially any action which implicates the duties and powers of a public official." *Id.* at 1322. The en banc D.C. Circuit rejected the Government's broad construction, noting that the Supreme Court's opinion in *Sun Diamond*, "like the rule of lenity, [ ] works to protect a citizen from punishment under a statute that gives at best dubious notice that it has criminalized his conduct." *Id.* at 1323. The court held that the "official act" concept does not subsume "officials' moonlighting, or their misuse of government resources, or the two in combination"; rather, the Government must allege and prove that the defendant exerted "inappropriate influence on decisions that the government actually makes." *Id.* at 1324-25. Or as one of the cases cited in Defense Motion #1 explained in vacating a Hobbs Act conviction, that statute does not apply to an official who "promised only to introduce the [bribe-payer] to influential persons" and "did not promise to use his official position to influence those persons." Def.'s Mem. in Supp. of Mot. #1 (Jan. 21, 2014), Dkt. 8, at 7-8 (discussing the Eighth Circuit's decision in *United States v. Rabbitt*, 583 F.2d 1014 (8th Cir. 1978), *abrogated on other grounds by* 483 U.S. 350 (1987), *superseded by* 18 U.S.C. § 1346).

The Fourth Circuit recently reiterated the principle that not all acts falling within the range of official duty are "official acts." In *Jefferson*, a congressman was convicted of using his

office to obtain government financing and regulatory approval for various business ventures of numerous bribe-paying companies.  *See generally* 674 F.3d at 341-51.  Congressman Jefferson argued that *Sun-Diamond* limited official acts solely to his formal legislative duties, *id.* at 355, such as voting on bills or introducing legislation.  The Fourth Circuit rejected that argument, making clear that public officials take "official acts" only when they exercise governmental power or lobby other officials to do so.  In so holding, the court carefully explained that "the bribery statute does not encompass every action taken in one's official capacity."  *Id.* at 356. The court held that the "inquiry does not end" with the question of whether the official's conduct was "within the range of official duty"; rather, such an "act must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy,'" such that juries cannot "rely exclusively on [ ] settled practices."  *Id.* at 356-57.

Countless cases confirm that acts are "official" only when they involve the exercise of governmental power.  For example, the Supreme Court long ago explained in *United States v. Birdsall*, 233 U.S. 223 (1914), that officials engaged in "official acts" when they accepted bribes "to influence their reports and recommendations" to an ultimate government decision-maker.  *Id.* at 235.  Those acts were "official" because they sought to improperly influence another official's exercise of governmental power.  *Id.* at 235-36.  Or in a more recent example, *United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013), the D.C. Circuit held that a government attorney who "himself lacked independent authority to expedite visa applications" performed an official action when he "acted in his official capacity to *influence* the visa application process."  *Id.* at 470.  The court distinguished between interfering with specific visa applications (an official act because it sought to improperly influence a governmental decision) and "making a purely informational inquiry" (an official act in some sense but not one that sought to influence governmental action).

*Id.* Likewise, in *United States v. Biaggi*, 853 F.2d 89, 96-99 (2d Cir. 1988), the Second Circuit upheld the conviction of a congressman for using his office to secure Navy contracts for a ship repair firm—conduct that was "clearly covered by the [bribery] statute because [the conduct] concern[ed] inappropriate influence on *decisions that the government actually makes*," *Valdes*, 475 F.3d at 1325 (emphasis added) (explaining the holding in *Biaggi*). And in *Carson*, 464 F.2d at 434, the court affirmed the conviction of a Senator's administrative assistant for accepting a bribe in exchange for using his influence "to alleviate, if not altogether quash, pending Justice Department action or bring about lenient post-conviction treatment."

The legal rule that unifies these decisions is the limitation of "official" acts to those actions relating to the exercise of actual government power. As the defense explained in its Memorandum in Support of Discovering the Grand Jury Instructions, that basic limitation likewise underlies every published Fourth Circuit decision upholding a bribery conviction. *See* Def.'s Mem. in Supp. of Mot. #1 (Jan. 21, 2014), Dkt. 8, at 8-9. The Fourth Circuit's decisions invariably involved public officials who sought to exercise governmental power by doing things like awarding government funding, selling a formal legislative act, or actively lobbying other public officials to take specific governmental action on an official matter.

In sum, the line is clear: Public officials perform "official acts" only when they exercise actual governmental power or improperly lobby other officials to exercise such power. The bribery statutes are not concerned with whom officials meet, how often officials have meetings, or why officials have meetings. *See, e.g.*, *Citizens United*, 558 U.S. at 360. Rather, they criminalize only efforts by those officials to control the *outcomes* of those meetings and thereby produce tangible action by *the government itself*. Returning a supporter's phone call, asking a subordinate to meet with a supporter, attending a supporter's event, inviting a supporter to a

reception, or saying nice things about a supporter are not "official acts"—even if they enhance that supporter's actual or perceived stature—because none of those actions deploy the sovereign power of government.  Because the Government has not alleged that Mr. McDonnell improperly influenced an actual governmental decision or action or that he promised to do so, its federal bribery charges fail as a matter of law.

### 2.    The Term "Official Act" Should Be Construed Narrowly.

The Government concedes that—at a minimum—it must satisfy the definition of "official act" in 18 U.S.C. § 201(a)(3) in order to convict the defendants of its honest services fraud and Hobbs Act charges.  *See* Gov't's Opp'n to Def.'s Mot. for Discovery of Selected Recordings of Grand Jury Commc'ns (Feb. 3, 2014), Dkt. 41, at 8.  That provision defines the term "official act" as: "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity."  18 U.S.C. § 201(a)(3).  The statutory text and well-established canons of construction confirm what the cases uniformly hold: that the Government must allege and prove that Mr. McDonnell exercised (or promised to exercise) actual governmental power in order to sustain its criminal charges.

*First*, the text expressly limits "official acts" to conduct that involves exercising actual governmental power.  "[T]he six-term series" of words in the statute "refers to a class of questions or matters whose answer or disposition is determined by *the government*."  *Valdes*, 475 F.3d at 1324 (emphasis added).  This text does not reach '"the misuse of public office and contacts gained through that office to promote private ends."'  *Id.* (citation omitted).  The text is, rather, limited to '"the corruption of official decisions through the misuse of influence in *governmental* decision-making."'  *Id.* (citation omitted) (emphasis added).

This textual limitation is consistent with the reality that the federal bribery statutes do not

establish a comprehensive code of ethics for state officials.   The bribery laws exist, rather, to prevent a precise problem: "'the corruption of official decisions through the misuse of influence in governmental decision-making.'"   *Id.* (citation omitted).   The Supreme Court was clear about this in *Sun Diamond*, explaining that "a narrow, rather than a sweeping, prohibition is more compatible with the fact that [the bribery and gratuity laws are] merely one strand of an intricate web of regulations, both administrative and criminal, governing the acceptance of gifts and other self-enriching actions by public officials."   526 U.S. at 409.   Here, Mr. McDonnell was a state official subject to the regulatory framework of Virginia ethics law, which included rules governing what gifts he or his family could receive, how (if at all) those gifts needed to be reported, and what penalties (civil or criminal) attach for failing to comply with those rules.   The federal government may dislike Virginia's ethics laws, but it cannot selectively expand the federal bribery laws to fill perceived gaps in the Virginia code of ethics.   To the contrary: "Absent a text that clearly requires it, we ought not expand this one piece of the regulatory puzzle so dramatically as to make many other pieces misfits."   *Id.* at 412.   "[N]ot only does the text here not require that result; its more natural reading forbids," *id.*, extending it to capture conduct that is "not corruption."   *Citizens United*, 558 U.S. at 360.

*Second*, it is a cardinal legal principle under the Rule of Lenity that any ambiguity in a criminal statute must be resolved in favor of the accused.   *See, e.g.*, *Staples v. United States*, 511 U.S. 600, 619 n.17 (1994) ("an ambiguous criminal statute is to be construed in favor of the accused").   This principle reflects the importance our legal system places on fair warning and ensuring that individuals are not criminally convicted on the basis of a novel construction of criminal law.   Any residual ambiguity concerning the breadth of "official act" must therefore be resolved in favor of Mr. McDonnell and against the Government.

*Third*, the Hobbs Act and honest services fraud provisions—which apply to state officials—should be construed especially narrowly given the critical federalism issues at stake. Nothing in the Constitution or common sense charges the federal government with policing the ethical codes in all fifty states via vague federal criminal laws. *See, e.g.*, *Citizens United*, 558 U.S. at 357 (explaining that "26 States do not restrict independent expenditures by for-profit corporations" and that "[t]he Government does not claim that these expenditures have corrupted the political process"). It is Virginia's prerogative to set its own ethical standards and, if it chooses, to allow unlimited campaign contributions or gifts to its officials. During the relevant period, Virginia permitted state officials to accept gifts in any amount and—critically here— *explicitly rejected criminal penalties* for accepting too many gifts. Virginia law explains that officials should refrain from accepting "gifts from sources on a basis so frequent as to raise an appearance of the use of his public office for private gain" while simultaneously mandating that "[v]iolations of this subdivision *shall not be subject to criminal law penalties*." Va. Code § 2.2-3103(9) (emphasis added); *see also id.* § 2.2-3103(8) (no criminal sanctions for the acceptance of gifts "where the timing and nature of the gift would cause a reasonable person to question the officer's or employee's impartiality in the matter affecting the donor"). The federal government tramples Virginia's exclusive right to regulate its officials when it uses vague laws to criminalize non-corrupt conduct that Virginia has affirmatively chosen not to criminalize.

The Supreme Court has repeatedly cautioned against giving an expansive interpretation to a federal criminal statute when doing so would "alter sensitive federal-state relationships," *Rewis v. United States*, 401 U.S. 808, 812 (1971). It has accordingly rejected sweeping interpretations of the Travel Act, *id.*, the precursor to the current federal felon-in-possession statute, *United States v. Bass*, 404 U.S. 336, 348-350 (1971), the federal arson statute, *Jones v.*

*United States*, 529 U.S. 848, 858 (2000), the mail fraud statute, *Cleveland v. United States*, 531 U.S. 12, 24-25 (2000), and the Hobbs Act, *United States v. Enmons*, 410 U.S. 396, 411-12 (1973).  As the Court has explained, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance."  *Bass*, 404 U.S. at 349.  For that reason too, this Court should reject "the Government's less constrained construction," *Skilling*, 130 S. Ct. at 2933, of the "official act" requirement in the Hobbs Act and honest services fraud provision, given that Congress has not come close to clearly endorsing it.

### 3.     The Government's Apparent Belief That Everything A Public Official Does In His Official Capacity Constitutes An "Official Act" Is Wrong.

The Government's construction, by contrast, would convert almost everything an official does into an "official act," and would make criminal liability dependent upon each particular official's political priorities and public commitments.   The Government alleges that Mr. McDonnell engaged in "official acts" "on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products, including Anatabloc®."   Indictment ¶ 22.  The Government suggests that these activities were "official" acts, not because they exercised government power (which they plainly did not), but rather because Mr. McDonnell's campaign slogan was "Bob's for Jobs" and because he made economic development in Virginia a top priority during his time as Governor.  Indictment ¶ 7.  In the Government's myopic view, those public priorities apparently transformed anything Mr. McDonnell did that "legitimized" or "promoted" a Virginia businesses into an "official act."

There is no legal support for this novel theory, and simply considering its converse demonstrates that it cannot be correct.  If "Bob's for Jobs" converted all business-promotion activities into "official acts," it would mean that any public official who did *not* campaign on economic development does not take an "official act" when he does the exact same things

- 16 -

alleged here to "promote" or "legitimize" home-state businesses.  But the bribery laws plainly do not metamorphose with every election and have a different meaning for every official depending on his campaign slogans or political priorities.

Consequently, it is no surprise that there appears to be no case holding that public officials commit the crime of bribery when they do things that "legitimize or promote" a constituent or his home-state company.  Whether or not promoting economic development is a "settled practice" of Virginia Governors, the Fourth Circuit has made clear that not all "settled practices" are "official acts."  Rather, "[s]ettled practices" are "official acts" *only* if they involve deploying official government power.  *Jefferson*, 674 F.3d at 356 ("[T]he bribery statute does not encompass every action taken in one's official capacity . . . such an act must yet adhere to the definition confining an official act to a pending 'question, matter, cause, suit, proceeding or controversy.'").  The Government's construction thus contravenes *Jefferson*.

### 4. The Government's Interpretation Of "Official Act" Would Criminalize The Routine Activities Of All Public Officials.

If the Government were correct that every meeting referral for a donor,  statement to third parties supporting a benefactor, or party invitation for a supporter and a supporter's associates constitutes federal bribery, then countless current and routine political practices are now felonies.  That includes conduct that has never been considered criminal, such as exchanging access to officials for campaign contributions.  The Government's theory would, for example, criminalize President Obama's practice of providing campaign donors with access to administration officials during his 2012 campaign.[8]  Nobody has ever suggested, though, that the bribery laws prohibited

---

[8] "The Obama campaign's 'Speaker Series' program turns Cabinet secretaries and top White House advisors into fundraising surrogates.  For $5,000, a donor can get a kind of season pass to see [Cabinet Secretaries and White House advisors] when they come to town."  Peter Nicholas, *Administration Officials Double As Obama Campaign Speakers*, L.A. Times (Nov. 16,

cabinet secretaries from trading time and access in exchange for contributions to the President's re-election campaign.[9]

For better or for worse, elected officials routinely promote the private or corporate interests of their constituents and political backers in ways that do not exercise actual governmental power. It was not long ago, for example, that the President appeared in a promotional spot for George Lopez's late-night talk show, which featured the President endorsing Mr. Lopez's show as "the kind of change I can believe in."[10] Mr. Lopez had played a major role in "the effort to get out the Latino vote for Barack Obama" a few months earlier.[11] There is thus little question that the President endorsed Mr. Lopez's show to repay Mr. Lopez for his financial and political support.

Under the Government's theory, the only thing standing between these officials and a criminal conviction is prosecutorial discretion. Individuals paid money; they received access; some had a public official saying "favorable" things about them or their business (in some instances even directly promoting their business); and these individuals were able to leverage that access or those favorable comments into increased credibility, a better shot at achieving private and public goals, or whatever else they wanted. Criminalizing that conduct has never

---

(continued...)

2011), *available at* http://tinyurl.com/odqo7q4.

[9] Which is precisely what the Obama campaign was (lawfully) doing. As has been reported, the Administration's Cabinet Secretaries routinely engaged with donors on substantive matters of official policy. *See, e.g., id.*; *see also* Def.'s Mem. in Supp. of Mot. #1 (Jan. 21, 2014), Dkt. 8, at 11-14.

[10] Maria Elena Fernandez, *President Obama Shills for Comedian George Lopez*, L.A. Times (June 19, 2009), *available at* http://tinyurl.com/knve3f.

[11] Associated Press, *George Lopez Seeks Latino Vote for Obama in Nevada*, N.Y. Daily News (Aug. 4, 2008), *available at* http://tinyurl.com/p624yyl; *see also id.* (noting that "[i]t took a personal call from Obama . . . to get Lopez on board with the Democratic presidential candidate's campaign").

been—and is not suddenly now—the consequence of the long-unchanged Hobbs Act and wire fraud statute.   Just as President Obama did not take an "official act" when he promoted a supporter's talk show or exchanged private meetings with his cabinet officials for high-dollar donations, Mr. McDonnell did not take an "official act" when he allegedly asked subordinates to meet with Williams or said favorable things about Star, a Virginia-based public company.

**B.      The Government Has Not Alleged That Mr. McDonnell Performed Or Promised To Perform Any "Official Act."**

Once the Government's allegations are measured against the underlying legal standards, its corruption charges fail as a matter of law.   The Government does not allege Mr. McDonnell promised or performed any "official acts," as that term has long been defined.   It does not and cannot allege that either Star or Williams was promised or received any government funds, contracts, appointments, legislation, regulatory action or any other governmental benefit.   The Government's honest services fraud and extortion charges should be dismissed.[12]

**1.      The Indictment Does Not Allege That Mr. McDonnell Promised Any Specific Future "Official Acts."**

The Government has suggested in filings that, even if Mr. McDonnell performed no "official" acts, he is criminally liable because Williams believed he would someday perform such acts.   In order to convict Mr. McDonnell without proving a completed official act, however, the Government would need to allege and prove that he "receive[d] a payment in return for his agreement to perform specific official acts."   *Evans*, 504 U.S. at 268.   The Indictment never alleges any such agreement or even any identifiable types of future official acts.

The Government comes closest in asserting that *Mrs.* McDonnell—who is not a public official and thus cannot violate the bribery laws on her own—"told JW that *she* could help Star

---

[12] To the extent the Court determines that any of the Government's alleged official acts are legally sufficient, it should strike the acts which are not from the Indictment.

Scientific but that she needed JW's financial assistance." Indictment ¶ 26 (emphasis added). But tellingly, the Indictment does not allege that Mrs. McDonnell told Williams that *the Governor* would do anything, that Mr. McDonnell knew about his wife's alleged statement, or that Mrs. McDonnell promised to somehow deploy official government power on Star's behalf. The Indictment's vague assertions do not satisfy the threshold requirement of an "agreement to perform *specific* official acts." *Evans*, 504 U.S. at 268 (emphasis added).

### 2. None Of The Specific Actions Alleged By The Government Constitutes An "Official Act."

The conduct that the Government alleges constituted "official acts" falls within three broad categories: (1) arranging or recommending meetings with government officials about Anatabloc®, (2) hosting and attending events at the Mansion involving Star Scientific, including allowing Williams to suggest invitees to events, and (3) "contacting other government officials in the OGV as part of an effort to encourage Virginia state research universities to initiate studies of anatabloc." *See* Indictment ¶ 111(c). None of these allegations suffice to sustain the Government's charges under the Hobbs Act or honest services fraud statute.

#### (a) Arranging Or Recommending Meetings With Other Government Officials

The Indictment broadly asserts that Mr. McDonnell took "official acts" by arranging meetings for Williams with Virginia government officials "to discuss and promote Anatabloc®," and by recommending "that senior government officials in the OGV meet with Star Scientific executives to discuss ways that the company's products could lower health care costs." Indictment ¶ 111(c)(i), (v). The Indictment's factual allegations, in turn, describe only two incidents that involve such conduct. Neither qualifies as an "official act."

First, in the evening of July 31, 2011, Mr. McDonnell allegedly emailed the Virginia Secretary of Health to say that he "'would like to have [one of the Secretary of Health's

Deputies] attend a short briefing at the mansion about 10am with first lady on the Star Scientific anatablock [sic] trials planned in va at vcu and uva.'" Indictment ¶ 48. The next morning, Williams met with Mrs. McDonnell and a senior policy advisor from the Department of Health. *Id.* ¶ 49. Williams allegedly stated at the meeting that "research scientists at UVa and MCV were interested in doing clinical trials," and that those researchers "would get small planning grants to develop test protocols so that large grant proposals could be submitted to the Tobacco Commission." *Id.* Williams allegedly stated that he "anticipated Tobacco Commission funding for these studies and that he had discussed this" with Mr. McDonnell. *Id.* Williams also allegedly discussed the possibility of using Virginia government employees as the control group for these studies. *Id.* The policy advisor subsequently sent Williams a polite note explaining that "'it is necessary for us to make policy recommendations and decisions off of sound data'" and that she was "'grateful that [Williams] [was] making strides to validate the incredible anecdotes and stories that result from your work.'" *Id.* ¶ 52. The Government does not claim that the policy advisor promised or took any official action benefiting Star (or that she even had jurisdiction over the meeting's topic). Nor does it allege that she spoke to Mr. McDonnell about the meeting. Nor is there any allegation that Mr. McDonnell attempted to influence the outcome of this meeting or that the meeting actually yielded anything. Simply put, nothing happened.

Second, on March 21, 2012, Mr. McDonnell allegedly met with the Virginia Secretary of Administration "to discuss the Virginia state employee health plan and ways to reduce healthcare costs in Virginia." Indictment ¶ 88. The Government contends that Mr. McDonnell pulled some Antabloc® from his pocket during this meeting and told the Secretary that he used it personally and that it "was working well for him." *Id.* Mr. McDonnell then allegedly asked her "to reach out to the 'Anatabloc people' and meet with them" to discuss "ways that the company's products

could lower healthcare costs." *Id.* ¶¶ 88, 111(c)(v).  The Government does not allege that the Secretary of Administration ever followed up on Mr. McDonnell's alleged suggestion.  Nor does it claim that Mr. McDonnell ever asked the Secretary to take governmental action to assist Star, or that she ever did so.  Once again, nothing happened.

Arranging meetings without attempting to control their outcomes does nothing more than provide "access" and is therefore "not corruption."  *Citizens United*, 558 U.S. at 360.  Public officials routinely refer supporters and other constituents for meetings with other government officials.  But as the Eighth Circuit has explained, introducing a benefactor "to influential persons" is not an official act if the official providing the introduction does "not promise to use his official position to *influence* those persons."  *United States v. Loftus*, 992 F.2d 793, 796 (8th Cir. 1993) (emphasis added).  So too here.[13]

### (b)   Hosting And Attending Events At The Mansion

The Indictment alleges the Mr. McDonnell took "official acts" by "hosting, and . . . attending, events at the Governor's Mansion designed to encourage Virginia university researchers to initiate studies of anatabine and to promote Star Scientific's products to doctors for referral to their patients."  Indictment 111 ¶ (c)(ii).  It further alleges that Mr. McDonnell "promot[ed] Star Scientific's products and facilitat[ed] its relationships with Virginia government officials by allowing [Williams] to invite individuals important to Star Scientific's business to exclusive events at the Governor's Mansion."  *Id.* ¶ 111(c)(iv).  These allegations appear to relate to two events:  (1) a lunch at the Mansion on August 30, 2011, and (2) a

---

[13] Although not alleged to be part of the conspiracy, the Government also claims that in 2010 Mr. McDonnell "put [Mr. Williams] in contact with the Virginia Secretary of Health and Human Resources," Indictment ¶ 17, and that he appeared at a  Star event in February 2011 where he "made brief remarks in support of Star Scientific to the doctors and health professionals in attendance," *id.* ¶ 20.  For the same reasons detailed above, these alleged actions would not qualify as official acts.

Healthcare Leaders Reception at the Mansion on February 29, 2012.   Neither event qualifies as an "official act."

On August 30, 2011, Mr. and Mrs. McDonnell allegedly "hosted an event for the launch of Star Scientific's Anatabloc® product at the Governor's mansion."[14]   Indictment ¶ 60.   The Government alleges that the "invitees included some of the same UVa and VCU research scientists whom Star Scientific was attempting to convince to perform clinical trials of Anatabloc®."   *Id.*   Williams presented several $25,000 planning grants to UVa and VCU researchers to fund the preparation and submission of research proposals for the study of anatabine.   *Id.*   According to the Indictment, Mr. McDonnell attended the event and "spoke favorably to the attendees regarding further study of anatabine."   *Id.*

As discussed above, however, a public official does not perform an "official act" simply by attending or hosting a luncheon and making supportive remarks.   The Government does not claim that anything that happened at this lunch influenced any public official to perform any "official act."[15]   Just like the legislator in *Urciuoli*—whose conviction the First Circuit vacated—

---

[14] Notably, the Indictment does not allege that Commonwealth funds paid for this lunch (to the contrary, Mr. McDonnell's PAC footed the bill), that this lunch was a public event, or that media were present.   The only difference between the Government's allegations and  the private events Governor McAuliffe is offering to six-figure donors, therefore, is the *absence* of any allegation here that there was an explicit quid pro quo arrangement between Williams and the accused.

[15] Even if it had occurred, encouraging Star to donate money  to state universities could not possibly constitute corrupt official action.   But in any event, the Indictment itself refutes the claim that the lunch had any impact on the decision of UVA and VCU researchers to study anatabine.   According to the Indictment, UVA and VCU representatives attended a Star symposium at Gibson Island on July 23, 2011 to discuss research on anatabine.   Indictment ¶ 45. The Indictment does not allege that Mr. or Mrs. McDonnell knew about—much less played a role in—that event.   The Indictment alleges that one week later, on August 1, Mr. Williams reported that "research scientists at UVa and MCV were interested in doing clinical trials of the potential health benefits of Anatabloc®."   *Id.* ¶ 49.   Again, the Indictment does not allege that Mr. McDonnell had any contact—or authorized anyone else to have contact—with any university researcher regarding anatabine research prior to the August 30 lunch, at which Star

"there is no indication that [Mr. McDonnell] invoked any purported oversight authority or threatened to use official powers in support of [any] advocacy." 513 F.3d at 296.

The same is true of the Healthcare Leaders reception at the Mansion on February 29, 2012. Indictment ¶ 84. The Indictment alleges that Mrs. McDonnell "allowed [Williams] to invite dozens of individuals, including . . . doctors whom Star Scientific was trying to convince to recommend Anatabloc® to their patients." Indictment ¶ 74. The Government does not allege that Mr. McDonnell did anything at the event to influence any official action on Star's behalf or that Star received any official benefit through being invited to the event. While the Government alleges that Mr. McDonnell "wanted to make sure that the 'Head officers at VCU/MCV, UVA, EVMS, [and the] Massey Cancer Center' were included on the [invitation] list," there is no allegation that any of these healthcare leaders were invited to benefit Star or that any of them even spoke with Star representatives at the event. *Id.* ¶ 75. Nothing relating to the Healthcare Leaders Reception thus comes close to meeting the requirements of an "official act."

### (c)      "Contacting Other Government Officials In OGV"

The Indictment also vaguely alleges that Mr. McDonnell took "official acts" when he "contact[ed] other government officials in the OGV as part of an effort to encourage Virginia state research universities to initiate studies of anatabine." Indictment 111 ¶ (c)(iii).   The Indictment does not identify who those officials were or how this alleged "contact" related to encouraging  research at Virginia state universities.   Certainly, the Indictment does not allege that Mr. McDonnell ever contacted VCU or UVA to request that they conduct research on

---

(continued…)

awarded research grants based on previously submitted applications.   And finally, the Government does not allege that any attendee was in fact influenced to do anything as a consequence of the lunch.

anatabine or that they apply for Tobacco Commission funding.   Nor does it allege that Mr. McDonnell asked anyone else to make such contacts on his behalf.

Indeed, other than the events described above, the Government's only apparent basis for this allegation is a cryptic email that Mr. McDonnell sent to his Chief Counsel, Mr. Eige, in February 2012.  On February 9, 2012, Mrs. McDonnell allegedly emailed Mr. McDonnell, with a courtesy copy to Mr. Eige, stating that VCU and UVA were not returning calls from Williams regarding potential anatabine studies.   Indictment ¶ 76.   The Government alleges that on February 17, Mr. McDonnell emailed Mr. Eige stating "'Pls see me about anatabloc issues at VCU and UVA.'"   *Id.* ¶ 80.   Mr. Eige responded "will do.   We need to be careful with this issue."  *Id.*  The Government does not allege that Mr. McDonnell instructed Mr. Eige to take, or that Mr. Eige did take, any action to assist Star as a consequence of this exchange.   Indeed, there is no allegation that Mr. McDonnell ever actually followed up with Mr. Eige or sought to get UVA and VCU to return Williams' phone calls (which, even if it had occurred, still would not have constituted an "official act, *see also Ring*, 706 F.3d at 470 ("purely informational inquiry" not an official act)).  Thus, yet again, absolutely nothing happened.

The Government is mistaken that a public official can commit the federal felony of bribery by merely asking his lawyer to "see" him.   The role of in-house attorneys is to help public officials comply with the law.   Mr. McDonnell's solicitation of advice from his attorney cannot possibly constitute an "official"—and therefore criminal—act.

### 3.      The Government's Broad Characterizations Of Mr. McDonnell's Conduct Do Not Cure This Deficiency.

Finally, the Government's amorphous characterization of the alleged "scheme" does not cure its failure to allege any official acts.  According to the Government, Williams and Star paid bribes to the McDonnells in order to obtain three things:  (1) a research study using Virginia state

employees as subjects; (2) Tobacco Commission funding for research studies to be performed by Johns Hopkins University, UVA, and VCU; and (3) encouragement of physicians to prescribe anatabine to their patients. *See* Indictment ¶¶ 41-45, 60, 63, 65, 74, 76.  Notably, with respect to the first two alleged objectives, the Government never actually claims that Mr. McDonnell did anything (or promised to do anything) to assist Star with these supposed goals, neither of which Star achieved.  The Indictment does not allege that any research study of Virginia employees was ever promised, authorized, or conducted.  Nor does the Indictment claim that Mr. McDonnell ever promised—much less provided—any assistance with Star's plan to seek funding from the Tobacco Commission.[16]   Indeed, the Indictment does not even claim that Mr. McDonnell had any discussions with Williams about these supposed objectives,[17] much less that Mr. McDonnell promised to do anything for Williams in exchange for gifts or loans.

As for the third alleged objective, encouraging physicians to prescribe Anatabloc to their patients is not an "official act."  What private physicians prescribe to their private patients has nothing to do with "decisions that the government actually makes." *Valdes*, 475 F.3d at 1325. Whether or not the presence of Star executives at a reception at the Governor's Mansion somehow imbued Star with additional credibility or legitimacy in the eyes of those physicians, extending party invitations is  not an official act because it does not cross the line between "[i]ngratiation and access," *Citizens United,* 558 U.S. at 360, and exercising government power. It is not materially different from the 2013 presidential inauguration package:  "Corporations and

---

[16] The Indictment does not even claim that an application for funding was actually filed with the Tobacco Commission or that such funding was ever provided.  Neither event happened.

[17] While the Government alleges that *Star employees* represented to various people that Mr. Williams had discussed the plan to seek Tobacco Commission funding with the Governor, Indictment ¶ 49, and that Mr. McDonnell had "expressed his support," *id.* ¶ 76, it does not allege that *Mr. McDonnell himself*—or anyone on his staff—ever made such a statement to *anybody*. Certainly, if the Government had any evidence that Mr. McDonnell ever made such a statement, it would have alleged as much in the Indictment.

other organizations that donate in the highest bracket—$1 million—will have access to a . . . 'benefactors reception,' and four tickets to the official inaugural ball, among other perks."[18]

The D.C. Circuit's decision in *United States v. Muntain* illustrates the point.  There, the Government convicted a HUD official for allegedly accepting illegal gratuities after selling group automobile insurance policies to labor unions that he met as part of his official duties.  The official "frequently combine[d] the promotion of the automobile insurance with trips taken at government expense for the purpose of conferring with labor officials across the United States concerning official business."  610 F.2d 964, 966-67 (D.C. Cir. 1979).  The official argued that selling insurance policies was not an "official act" because it did not "involve[] any question, matter, cause, suit, proceeding or controversy which by law might have been brought before [him]."  *Id.* at 967.  The Government, by contrast, contended that "any acts within the range of an official's public duties" are "official acts," including any meetings "to discuss matters of interest to the unions."  *Id.*  The D.C. Circuit rejected the Government's construction and vacated the conviction, explaining that the Government's interpretation went "beyond permissible bounds."  *Id.*  "To the extent that [the defendant's] use of his official position to promote a purely private venture created an appearance of impropriety, his conduct is reprehensible, *but it is not criminal.*"  *Id.* at 967-68 (emphasis added).[19]

\*       \*       \*

---

[18] Matthew Larotunda, *Obama Inauguration's Big Donor Packages Previewed*, ABC News (Dec. 8, 2012, 4:14 PM), *available at* http://goo.gl/97XaY1.

[19] The Government may argue that the Fourth Circuit's decision in *Jefferson* departed from *Muntain* and adopted a definition of "official act" that subsumes hosting an event for private doctors, but that would be mistaken.   There was no question that Mr. Jefferson was accepting kickbacks in exchange for promoting bribe-payers' interests to *government* officials or *government* entities who were making decisions on government contracts.  Mr. Jefferson was "promoting and facilitating lucrative deals between . . . iGate *and the Army*, or between iGate, Mody, or Arkel and various African *governments*," *Jefferson*, 674 F.3d at 359 (emphases added), and was thus plainly using his office to influence "decisions the government actually makes."

In sum, all the Government alleges is that Mr. McDonnell provided a personal benefactor with access to himself and his staff. Whatever the appearance of such conduct, it is "not corruption," *Citizens United*, 558 U.S. at 360, because providing access does not, without more, exert "inappropriate influence on decisions that the government actually makes." *Valdes*, 475 F.3d at 1325. The Government's corruption charges—and its derivative conspiracy charge, *Ventimiglia v. United States*, 242 F.2d 620, 622 (4th Cir. 1957)—should therefore be dismissed.

## II.     If "Official Act" Means What The Government Claims, Then The Honest Services Statute And Hobbs Act Are Unconstitutionally Vague.

If the Government's construction of the statutes it invokes is correct, then those statutes are unconstitutionally vague and the Indictment should be dismissed for that reason. "To satisfy due process, a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling*, 130 S. Ct. at 2927-28 (citation omitted). The Government's construction of the wire fraud statute and the Hobbs Act fails both tests. For that reason too, the Government's corruption charges should be dismissed.

*First*, interpreting "official act" to dispense with proof that the official sought to exercise governmental power will leave officials guessing about the legality of standard courtesies extended by politicians to supporters, benefactors, and the general public. The Government's interpretation of official act would potentially criminalize any interaction with a benefactor, such as facilitating a meeting, hosting or appearing at an event, or speaking favorably about that benefactor. It would even raise questions about the legality of offering photo opportunities at fundraisers, or organizing private events wherein donors obtain special access to officials in exchange for specified contributions. All such acts potentially "promote" or "legitimize" or lend "credibility." Such an amorphous and uncertain standard fails to provide fair notice in

accordance with *Skilling*.  It would also create a chilling effect on the rights of individual citizens to donate to their favored political candidates and participate in electoral politics.

*Second*, such a broad construction of "official act" would lead to arbitrary prosecutions. If providing "access" is criminal, then prosecutorial discretion is the only thing standing between most public officials and federal indictment.  The danger of arbitrary prosecution is particularly clear here, given that Mr. McDonnell's gubernatorial predecessors and his current successor (all of whom are Democrats) engaged in similar conduct without even prompting an investigation. *See* Def.'s Mem. in Supp. of Mot. #1 (Jan. 21, 2014), Dkt. 8, at 16-17.

In short, the Government asks this Court to expand  the "official act" concept beyond its settled scope.  Should the Hobbs Act and honest services fraud provision be revised as the Government requests, then those statutes will be rendered unconstitutionally vague.  The Court should "resist the Government's less constrained construction absent Congress' clear instruction otherwise."  *Skilling*, 130 S. Ct. at 2933.

**III.    The Constitution Forbids Federal Prosecution Of State Officials For Non-Corrupt Conduct That Is Legal Under State Law.**

Finally, the Government's broad legal theory criminalizes political activity of state public officials that has no impact on federal funds and is "not corruption."  *Citizens United,* 558 U.S. at 360.  Extending the federal criminal law into that core province of state self-governance violates the Tenth Amendment and the principles of federalism it embodies.  "[H]aving the power to make decisions and to set policy is what gives the State its sovereign nature."  *FERC v. Mississippi*, 456 U.S. at 761.  State officials have constitutionally protected latitude to perform their duties free from undue federal interference.  *See id.* at 769 (improper for the federal government to "set a mandatory agenda to be considered in all events by state legislative or administrative decisionmakers").  The federal government is permitted to interfere with State

- 29 -

self-governance in only limited circumstances, such as when federal funds are at stake, *see* 18 U.S.C. § 666—which the Government does not allege here—or when federal intervention is necessary to discharge the Government's obligation to "guarantee . . . a Republican Form of Government," U.S. Const. art. IV, § 4.   The States are otherwise entitled to set their own rules governing the political activity of their officials.   That is why the Supreme Court has warned against adopting over-broad constructions of the federal bribery laws that would  improperly "involve[ ] the Federal Government in setting standards of disclosure and good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 (1987).   That is precisely what the Government is attempting to do here.

This prosecution is ultimately no different from the federal government setting fixed limits on campaign donations to state officials because, in the judgment of the federal government, unlimited campaign donations corrupt state governance.   But such an intrusive prohibition would, of course, "upset[] the federal balance to a degree that renders it . . . unconstitutional." *United States v. Lopez*, 514 U.S. 549, 580 (1995) (Kennedy, J., concurring).

## CONCLUSION

The political corruption charges leveled against former Governor McDonnell are based on an unprecedented interpretation of federal law that would, if adopted by this Court, criminalize many basic practices of democratic politics.   That would, in turn, convert federal prosecutors into the ultimate arbiters of public ethics for state officials.   But the wire fraud statute and Hobbs Act do not accord federal prosecutors such broad-ranging power.   The Government's attempt to charge Mr. McDonnell under those provisions without alleging that he abused the official power of Virginia's government therefore fails, and its corruption charges (Counts 1-11) should be dismissed.

Dated: March 25, 2014

Respectfully submitted,


/s/ Jonathan A. Berry
Henry W. Asbill (*pro hac vice*)
Mary Ellen Powers (*pro hac vice* pending)
Noel J. Francisco (*pro hac vice* pending)
Ryan D. Newman (*pro hac vice*)
James M. Burnham (*pro hac vice*)
Jonathan A. Berry (VSB No. 81864)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700


John L. Brownlee (VSB No. 37358)
Timothy J. Taylor (VSB No. 84529)
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Telephone:  (202) 828-1854
Facsimile:  (703) 720-8610

*Counsel for Robert F. McDonnell*

## CERTIFICATE OF SERVICE

I, Jonathan A. Berry, am a member of the Bar of this Court.  I hereby certify that on this 25th day of March, 2014, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, causing it to be served on all registered users.


Dated:  March 25, 2014                    Respectfully submitted,


                                          /s/ Jonathan A. Berry
                                          Jonathan A. Berry (VSB No. 81864)
                                          JONES DAY
                                          51 Louisiana Avenue, N.W.
                                          Washington, D.C. 20001
                                          Telephone: (202) 879-3939
                                          Facsimile: (202) 626-1700
                                          Email: jberry@jonesday.com

                                          *Counsel for Robert F. McDonnell*