```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         RICHMOND DIVISION

 3     -----------------------------------------

 4     UNITED STATES OF AMERICA,

 5
                                     Plaintiff;
 6     v.                                     Criminal Action
                                                 3:14CR12
 7     ROBERT F. McDONNELL and
       MAUREEN G. McDONNELL,
 8                                   Defendants.

 9     -----------------------------------------

10                         July 29, 2014
                          Richmond, Virginia
11                          10:00 a.m.

12                     JURY TRIAL - VOLUME II

13     BEFORE:         HONORABLE JAMES R. SPENCER
                       United States District Judge
14

15     APPEARANCES:   MICHAEL S. DRY, ESQ.
                      DAVID V. HARBACH, II, ESQ.
16                    JESSICA D. ABER, ESQ.
                      RYAN S. FAULCONER, ESQ.
17                         Counsel for Government;

18                    JOHN L. BROWNLEE, ESQ.
                      HENRY W. ASBILL, ESQ.
19                    JAMES M. BURNHAM, ESQ.
                      DANIEL I. SMALL, ESQ.
20                    CHRISTOPHER M. IAQUINTO, ESQ.
                           Counsel for Robert F. McDonnell;
21
                      WILLIAM A. BURCK, ESQ.
22                    HEATHER H. MARTIN, ESQ.
                      STEPHEN M. HAUSS, ESQ.
23                         Counsel for Maureen G. McDonnell.

24

25                       JEFFREY B. KULL
                       OFFICIAL COURT REPORTER
```

```
 1                    P-R-O-C-E-E-D-I-N-G-S
 2            THE CLERK:  Day two, Case Number 3:14CR12:
 3   United States of America versus Robert F. McDonnell and
 4   Maureen G. McDonnell.  The United States is represented by
 5   Michael Dry, David Harbach, Jessica Aber, and Ryan
 6   Faulconer.  Robert F. McDonnell is represented by John
 7   Brownlee, Daniel Small, Henry Asbill, James Burnham, and
 8   Christopher Iaquinto.  Maureen G. McDonnell is represented
 9   by Heather Martin, William Burck, and Stephen Hauss.  Are
10   counsel ready to proceed?
11            MR. DRY:  The United States is ready.
12            MR. BROWNLEE:  Mr. McDonnell is ready.
13            MR. BURCK:  Ms. McDonnell is ready.
14            THE COURT:  All right.  I understand we had some
15   issues before the jury.
16            MR. BURNHAM:  James Burnham on behalf of
17   Mr. McDonnell.  We just wanted to notify the Court we are
18   withdrawing our 17(c) request as to Ms. Fulkerson because
19   we have negotiated something with her counsel.  Also, I
20   will inform the Court that our understanding is that
21   Ms. Fulkerson may testify today, so that request has
22   become somewhat more urgent.  Also, I had some
23   correspondence from counsel for Star Scientific that he
24   asked that we share with the Court.  May I offer it?
25            THE COURT:  Sure.
```

1        MR. BURNHAM:  Of course, we are happy to address

2   the merits if you would like, but I'm sure you don't.

3   Thank you, Your Honor.  Mr. Asbill has one thing as well.

4        MR. ASBILL:  Thank you, Your Honor.  I just

5   wanted to tie up a loose end from yesterday's voir dire

6   and ask that the questions that I asked you to ask about

7   pretrial publicity be made part of the record in this

8   case.

9        THE COURT:  Sure.

10       MR. ASBILL:  Thank you, sir.

11       THE COURT:  All right.  Let's bring in the jury,

12  please.

13       MR. DRY:  I'm not sure about this, but defense

14  counsel has just raised that they believe one of the

15  witnesses might be in the courtroom right now.

16       THE COURT:  There is no rule on witnesses until

17  the testimony starts.  If they want to be in here, that's

18  fine.

19       MR. BURNHAM:  Thank you.

20       (The jury entered the courtroom.)

21       Mr. *** (Juror Number 0248), just raise your

22  hand.  Okay.  You should be down with the twelve.  You

23  were the first alternate.  I'm trying to see who is in the

24  wrong seat here.  We need Mr. *** (Juror Number 0012),

25  Ms. *** (Juror Number 117), and Ms. *** (Juror Number

1    0431) should be on the back row.  Okay.

2         And before I start with these preliminary

3    instructions:  Obviously, we lost a juror yesterday at the

4    eleventh hour.  That's why Mr. *** (Juror Number 0248) has

5    to move down to the panel.  And throughout the course of

6    these proceedings, the alternates -- the jury, you all can

7    sit anywhere you want down here among the twelve, but the

8    alternates will have to be on the back row.

9         Ladies and gentlemen, now that you all have been

10   sworn, it becomes my task to give you some preliminary

11   instructions to guide your participation in this trial.

12        It will be your duty to find from the evidence

13   what the facts are.  And you and you alone are the judges

14   of the facts.  You will then have to apply to those facts

15   the law as the Court will give it to you.  You must follow

16   that law whether you agree with it or not.

17        Nothing the Court may say or do during the

18   course of the trial is intended to indicate nor should it

19   be taken by you as indicating what your verdict should be.

20   That is a matter entirely up to you.

21        The evidence from which you will find the facts

22   will consist of the testimony of witnesses, who will be

23   sworn and have a seat in this witness box over here and

24   testify before you.  Evidence will also include documents

25   and other things received into the record as exhibits, and

1    any facts the lawyers agree or stipulate to or that the

2    Court might instruct you to find.

3         Certain things are not evidence, and must not be

4    considered by you.  I will list them for you now.

5    Statements, arguments, and questions by lawyers are not

6    evidence.  And I want to make that abundantly clear.  If

7    the lawyer is at the podium and propounds a question to

8    the witness, the question is not evidence.  It is the

9    answer that the witness gives that is evidence in the

10   case.

11        Objections to questions are not evidence.  Now,

12   the lawyers have an obligation to their client to make an

13   objection when they believe evidence being offered is

14   improper under the Rules of Evidence.  You should not be

15   influenced by the objection or by the Court's ruling on

16   it.  If the objection is sustained, you ignore the

17   question.  If it is overruled, then you treat the answer

18   like any other.

19        If you are instructed that some item of evidence

20   is received for a limited purpose only, you must follow

21   that instruction.  Testimony that the Court has excluded

22   or told you to disregard is not evidence and must not be

23   considered.

24        Anything you may have seen or heard outside of

25   the courtroom is not evidence and must be disregarded.

1    You are to decide the case solely on the evidence

2    presented here in open court.

3            Now, there are two kinds of evidence: direct and

4    circumstantial.  Direct evidence is direct proof of a

5    fact, such as the testimony of an eyewitness.

6    Circumstantial evidence is proof of facts from which you

7    may infer or conclude that other facts exist.  Now, I will

8    give you further instructions on these as well as other

9    matters at the end of the case.  But have in mind that you

10   may consider both kinds of evidence.

11           It will be up to you to decide which witnesses

12   to believe, which witnesses not to believe, and how much

13   of any witness's testimony to accept or reject.  I will

14   give you some guidelines for determining the credibility

15   of witnesses at the end of the case.

16           Now, as I told you earlier, and you certainly

17   know by now, this is a criminal case.  There are three

18   basic rules about a criminal case that you have to keep in

19   mind throughout these proceedings.  First, the defendants,

20   Mr. McDonnell and Ms. McDonnell, they are presumed

21   innocent until proven guilty.  The indictment against the

22   defendants brought by the government is only an

23   accusation, nothing more.  It is not proof of guilt or

24   anything else.  The defendants, therefore, start out with

25   a clean slate.

1              Second:  The burden of proof is on the

2    government until the very end of the case.  The defendants

3    have no burden to prove their innocence or to present any

4    evidence or to testify.  And since the defendants have the

5    right to remain silent, the law prohibits you in arriving

6    at your verdict from considering that a defendant may not

7    have testified.

8              Third:  The government must prove the

9    defendants' guilt beyond a reasonable doubt.  Now, I will

10   give you further instructions on this point later.  But

11   bear in mind that in this respect, a criminal case is

12   different from a civil case.

13             Now, in this case, the defendants are charged

14   with a number of counts, a multiple-count indictment.  The

15   offenses alleged in this indictment are as follows:

16   Conspiracy to commit honest services wire fraud, and then

17   honest services wire fraud.  That is, conspiracy to commit

18   an offense, and then the commission of that offense.  The

19   third charge is conspiracy to obtain property under color

20   of official right.  And then there are several instances

21   alleged in fact of obtaining property under color of

22   official right.  False statement to a financial

23   institution and obstruction of an official proceeding, to

24   wit: a grand jury.

25             Now, what I am going to do now is give you the

1    statute which undergirds these charges, and the elements

2    that the government must prove beyond a reasonable doubt.

3    Now, obviously, at the end of the case you will get far

4    deeper and far more of these instructions.  There will be

5    definitions that I'll explain to you in greater detail.

6    But I want you to have some general understanding as we go

7    forward.

8              Now, first, there is conspiracy to commit honest

9    services fraud.  Now, Title 18 U.S. Code Section 1349

10   provides in pertinent part:  Any person who conspires to

11   commit any offense under this chapter shall be subject to

12   the same penalties as those prescribed for the offense,

13   the commission of which was the object of the conspiracy.

14   And then Title 18 U.S. Code Chapter 63 Section 1343

15   provides in pertinent part:  Whoever, having devised or

16   intending to devise any scheme or artifice to defraud,

17   transmits or causes to be transmitted by means of wire

18   communication in interstate commerce any writing, signs,

19   signals, pictures, or sounds for the purpose of executing

20   such scheme or artifice shall be guilty of an offense

21   against the United States.  For purposes of this chapter,

22   the term "scheme or artifice to defraud" includes a scheme

23   or artifice to deprive another of the intangible right of

24   honest services.  That's the statute.  And believe me, I

25   will explain it to you in much greater detail later.

1        Now, the elements, that's what the government

2   has to prove to make out this offense:  To prove a

3   conspiracy as charged in Count One, the government must

4   prove three essential elements beyond a reasonable doubt.

5   First, that the conspiracy or agreement or understanding

6   to commit honest services fraud as charged in the

7   indictment was formed, reached, or entered into by two or

8   more persons.  Second, that at some time during the

9   existence or life of the conspiracy, agreement, or

10  understanding, the defendant you are considering knew the

11  purpose of the agreement.  And third, that with knowledge

12  of the purpose of the conspiracy, agreement, or

13  understanding, the defendant you are considering then

14  deliberately joined the conspiracy, agreement, or

15  understanding.

16       Honest services fraud I basically explained to

17  you just now under the conspiracy statute.  So the

18  statute, the part "Whoever having devised or intended to

19  devise any scheme or artifice transmits or causes to be

20  transmitted by means of wire communication in interstate

21  commerce any writing, signs, signals, pictures or sounds

22  for the purpose of executing such scheme or artifice shall

23  be guilty of an offense against the United States," that's

24  the statute.  Let me give you the elements.  This is the

25  elements of honest services fraud.

First, the government must show first that the defendant you are considering knowingly devised or participated in a scheme to defraud the public of its right to the honest services of a public official through bribery as charged in each count.  Second, that the defendant you are considering did knowingly and with an intent to defraud -- did so knowingly and with an intent to defraud.  Third, that the scheme or artifice to defraud involved a material misrepresentation, false statement, false pretense, or concealment of material fact.  And fourth, that in advancing or furthering or carrying out the scheme to defraud, the defendants transmitted or caused to be transmitted the writing, signs, signals, pictures, or sounds alleged by means of a wire communication in interstate commerce as charged in each count.

The next charge is conspiracy to obtain property under color of official right.  Title 18 U.S. Code Section 1951(a) provides in pertinent part that whoever conspires to in any way or degree obstruct, delay, or affect commerce or the movement of any article or commodity in commerce by extortion is guilty of an offense against the United States.  Title 18 U.S. Code Section 1951 (b)(2) provides in pertinent part:  The term "extortion" means the obtaining of property from another with his consent

1    under color of official right.  In addition, Title 18 U.S.

2    Code Section 1951(b)(3) provides in pertinent part:  The

3    term "commerce" means all commerce between any point in

4    any state, territory, possession, or the District of

5    Columbia, and any point outside thereof; all commerce

6    between points within the same state, through any place

7    outside such state, and all other commerce over which the

8    United States has jurisdiction.  The elements of this

9    conspiracy to obtain property under color of official

10   right are as follows:  The government must prove first

11   that the conspiracy, agreement, or understanding to obtain

12   property under color of official right as charged in the

13   indictment was formed, reached, and entered into by two or

14   more persons; second, that sometime during the existence

15   or life of the conspiracy, agreement, or understanding,

16   the defendants or defendant you are considering knew the

17   purpose of the agreement; and third, that with knowledge

18   of the purpose of the conspiracy, agreement, or

19   understanding, the defendant you are considering then

20   deliberately joined the conspiracy, agreement, or

21   understanding.

22          There are a number of counts, I believe it is

23   Six through Eleven, that charge substantive counts of

24   obtaining property under color of official right.  There

25   are two counts that charge making a false statement to a

1   financial institution.  Mr. McDonnell is charged in both

2   of those counts.  Ms. McDonnell is charged in one.  The

3   statute, Title 18 U.S. Code Section 1014 provides in

4   pertinent part:  Whoever knowingly makes any false

5   statement or report for the purpose of influencing in any

6   way the action of a Federal Credit Union or any banking

7   institution, the accounts of which are insured by the

8   Federal Deposit Insurance Corporation, upon application,

9   commitment, loan, or a guarantee any change or extension

10  of any of the same by renewal, deferment, or action or

11  otherwise, is guilty of an offense against the United

12  States.

13          The elements, that is, what the government must

14  prove, are as follows:  That the charged defendant or

15  defendants made a false statement or report; that the

16  charged defendant or defendants did so for the purpose of

17  influencing in any way the action of a Federal Credit

18  Union or any bank whose deposits are insured by FDIC as

19  charged in Counts Twelve and Thirteen, upon any

20  application, commitment, loan, or guarantee, or any change

21  or extension of any of the same, by renewal, deferment of

22  action, or otherwise; and third, that the charged

23  defendant or defendants did so knowingly.

24          Now, the final charge has to do with obstruction

25  of an official proceeding.  Title 18 U.S. Code Section

1    1512(c) provides in pertinent part:  Whoever corruptly

2    obstructs, influences, or impedes any official proceeding,

3    or attempts to do so, is guilty of an offense against the

4    United States.  And Title 18 U.S. Code Section 1515(a)(1)

5    defines an official proceeding for purposes of 1512 to

6    include a proceeding before a federal grand jury.

7            The elements, what the government must prove to

8    make out this count, are as follows:  First, that the

9    defendant obstructed, influenced, or impeded an official

10   proceeding or attempted to do so; and second, that the

11   defendant did so or attempted to do so corruptly.  That

12   is, voluntarily, deliberately, and for the purpose of

13   improperly obstructing, influencing, or impeding an

14   official proceeding, all while either knowing about an

15   official proceeding, or that the natural and probable

16   effect of the conduct would interfere with an official

17   proceeding.

18           Now, as I said, I will give you detailed

19   instructions on the law at the end of the case.  And those

20   instructions will control your deliberations and decision.

21   And I gave you this preliminary look at the charges and

22   the statute just to help you follow the evidence as it

23   comes in as we go forward.

24           Now, a few words about your conduct as jurors.

25   First, I instruct you that during the trial, you are not

1    to discuss the case with anyone or permit anyone to

2    discuss it with you.  Until you retire to the jury room at

3    the end of the case to deliberate on your verdict, you

4    simply are not to talk about this case.

5           Now, there has been substantial publicity about

6    this case prior to the beginning of this trial.  The

7    statements contained in some of the accounts may, of

8    course, not be accurate and may have come from individuals

9    who will not be present in court and who therefore cannot

10   be seen and evaluated by the jury like all of the other

11   witnesses, and will not be examined or cross-examined by

12   either of the parties under oath.  Press accounts may also

13   contain opinions instead of facts, and those opinions may

14   not be based on the evidence to be presented here in

15   court.  You, of course, must lay aside and completely

16   disregard anything you may have read or heard about the

17   case outside of the courtroom, because your verdict must

18   be based solely and exclusively on the evidence presented

19   here in court in accordance with my instructions to you at

20   the close of the case about the law you must apply to the

21   evidence.  To rely upon anything you see or hear outside

22   of the courtroom in reaching your verdict is a violation

23   of your oath as a juror.

24          Now, going forward, please do not read or listen

25   to anything touching on this case in any way.  If anyone

1    should try to talk to you about it, bring it to the

2    Court's attention promptly.  Third, do not try to do any

3    research or make any investigation about this case on your

4    own.  And this covers the spectrum.  No Internet, no

5    newspaper, no radio, no television, no reaching out into

6    cyberspace to try to get information to aid you.  That is

7    a complete no-no, and please don't do it.

8            Finally, do not form any opinion until all of

9    the evidence is in.  Keep an open mind until you start

10   your deliberations at the end of the case.

11           Now, obviously, we are going to make it possible

12   for you to take notes.  This is going to be a lengthy

13   case.  We will give you pads for that purpose as well as

14   pens with this caveat:  The notes you are making are for

15   yourself to help you with your recollection of what the

16   evidence was as it came in.  These notes are not to be

17   shared with other members of the jury.

18           Now, in a few minutes the trial will begin.

19   First, the government will make an opening statement,

20   which is simply an outline to help you understand the

21   evidence as it comes in.  Next, the defendants' lawyers

22   may, but does not have to, but I expect that they will,

23   make an opening statement.  Opening statement is neither

24   evidence nor arguments.  The government will then present

25   its witnesses, and counsel for the defendants may

1    cross-examine them.  Never forget that there are two

2    defendants in this case:  Mr. McDonnell and Ms. McDonnell.

3    And they are to be given separate consideration.  As you

4    will see, their lawyers will have separate opportunities

5    to examine and to cross-examine.  Always remember that you

6    are considering two separate defendants.

7           Now, once the government has presented all of

8    its witnesses and has rested, the defendants may, if they

9    wish, present witnesses whom the government may

10   cross-examine.  After all of the evidence is in, the

11   attorneys will present their closing arguments to

12   summarize and interpret the evidence for you.  And then

13   finally, the Court will instruct you on the law, the law

14   applicable to this particular case.  After that, you will

15   retire to begin your deliberations on your verdict.

16          Now, a few words about the logistics of the

17   Court, how we run things around here.  Normally, at the

18   end of the Court's day, trial day, which is normally 5:30,

19   I will let you know what time we will convene the

20   following morning.  It depends.  Sometimes I have short

21   matters set at 9 or 9:30, and it depends on what I have

22   set on my calendar.  Also, just by a show of hands, do we

23   have any folks from distance, Spotsylvania,

24   Fredericksburg, Mecklenburg, anybody from distance?  Okay,

25   we've got two, three.  I'll keep that in mind.  So we

```
 1    probably won't start any earlier than 9:30 on most days.
 2    All right?
 3            Now, what we do is we normally take a break of
 4    about 15 minutes' duration sometime in the morning,
 5    somewhere around 11:30 or thereabouts.  We normally stop
 6    for lunch somewhere around 1 o'clock.  And the luncheon
 7    recess is of one hour's duration.  I say somewhere around
 8    1 o'clock because it depends on what we are doing.  If we
 9    had a witness I thought we could finish, we might go to
10    1:10 or 1:15.  If we had a lengthy witness that was about
11    to take the stand at 12:50, we might stop at 12:50.  But
12    somewhere around 1 o'clock we will stop for lunch.
13            Then in the afternoon we take another break of
14    15 minutes' duration.  And this is somewhere around
15    between 4 and 4:30, somewhere in there, we will take a
16    break and then push on until 5:30.
17            Now, having said that, I don't want anybody to
18    feel captive in the box.  If you need a break, you just
19    let me know and we will take one.  It is that simple.
20            All right, government, are you ready to proceed?
21            MS. ABER:  Yes, Your Honor.
22            THE COURT:  All right.  Let's turn the lectern
23    around.
24            MS. ABER:  For more than 30 years, the
25    defendant, Robert F. McDonnell, has been a public servant.
```

1    He served in the military, he served as a Delegate, and he

2    served as an Attorney General of Virginia.  And for the

3    last four years of that service, he was the Governor, the

4    most powerful public official in this state.  And for

5    every day of those four years, Mr. McDonnell was paid by

6    the citizens of Virginia to do a job.  He got paid a

7    six-figure salary.  He got a mansion to live in.  He got a

8    chef, a butler, a security detail, all at taxpayer

9    expense.  And in return for all of that, he took a duty, a

10   duty to the citizens of this state, this Commonwealth, to

11   provide his honest services, a duty not to sell the power

12   and the influence of his office to the highest bidder.

13   And that means, ladies and gentlemen, that he could not

14   accept secret gifts in exchange for official actions that

15   should have just been his job.

16          But in this trial, we will prove that is exactly

17   what he did.  During this trial, we will prove to you that

18   Mr. and Ms. McDonnell conspired to violate this duty of

19   honest services by secretly accepting more than $150,000

20   of cash, loans, vacations, golf, and luxury goods in

21   exchange for doing what should have just been his job.

22          You will learn that the defendants accepted

23   those things of value from a man they didn't even know

24   before Mr. McDonnell ran for Governor; a man named Jonnie

25   Williams, a vitamin salesman.  And though the McDonnells

1    didn't know him before, we will prove to you that they

2    learned what Mr. Williams wanted pretty fast.  They

3    learned that Mr. Williams wanted the Governor and his

4    office to take official action to help Mr. Williams sell

5    his product.  And we will prove that Mr. Williams got just

6    that.

7            You will learn that Mr. Williams got to invite

8    state university researchers that he wanted to study his

9    product to an event at the Governor's Mansion designed to

10   encourage those state researchers to do those studies.

11   You will learn that Mr. McDonnell personally directed one

12   of his subordinates, a high-ranking state health official,

13   to have one of his deputies meet with Mr. Williams on less

14   than 12 hours' notice.

15           You will learn that Mr. Williams got to invite

16   doctors that he wanted to study his product to an official

17   event at the Governor's Mansion for Virginia healthcare

18   industry leaders, invitations that Mr. McDonnell's own

19   cabinet secretary refused to pay for.  And while

20   Mr. McDonnell did each of these things and more, and while

21   his wife helped him, we will prove that virtually nobody

22   knew about the more than $150,000 in cash and loans and

23   vacations and golf and luxury goods that the McDonnells

24   were putting into their own pockets in exchange.

25   Mr. McDonnell's subordinates, those researchers, the

1   citizens of Virginia, no one knew what was really going

2   on.

3          Now, members of the jury, as Judge Spencer

4   noted, you are going to hear a lot of evidence over the

5   next few weeks.  But this is really fundamentally a very

6   simple case.  And it won't be a short one, but I promise

7   you we are all going to do our very best to respect your

8   time and your summer and streamline this case as much as

9   possible.  You are going to hear from a lot of witnesses

10  and you are going to see a lot of documents on these

11  screens.  But because the McDonnells went to great lengths

12  to keep the extent of their relationship with Mr. Williams

13  secret, even from people very close to them, there is no

14  single witness who is going to be able to tell you this

15  entire story from soup to nuts.

16         But once you have heard everything and put it

17  all together, the United States will come back and ask you

18  to find the defendants, Robert and Maureen McDonnell,

19  former Governor and First Lady of Virginia, guilty of all

20  counts.

21         Now, part of my job here today, as the Judge

22  said, is to provide you with an overview of the evidence

23  you are going to hear, to provide you with a snapshot of

24  what things will look like at the end.  It is also part of

25  my job, I promise you, to keep this overview very short

1     and sweet.  And I'm not going to tell you every piece of

2     evidence that's going to come in.  I'm just going to sort

3     of hit the highlights, or we would be here for hours.  And

4     that is not my intention, Judge.  So I'm going to break

5     this up into three parts.  First, I'd like to give you a

6     very brief overview of the charges against Mr. and Ms.

7     McDonnell.  Second, I'm going to give you an overview of

8     the government's evidence.  And third, I will tell you

9     what this case is not about.

10              Now, first, Judge Spencer has given you a brief

11    overview of the charges.  But in summary, Counts One

12    through Four pertain to honest services wire fraud and

13    Counts Five through Eleven pertain to obtaining money

14    under color of official right.  Those are corruption

15    charges.  And you are going to hear, as we said, lots more

16    legalese about what that actually means in plain English.

17    But it really does boil down to one simple question:  Did

18    Mr. and Ms. McDonnell accept things of value from that

19    vitamin salesman, Mr. Williams, in exchange for

20    Mr. McDonnell using his position as Governor to help

21    Mr. Williams' company.

22              Now, I'm going to tell you right up front, let

23    it be known, the government does not have to show an

24    explicit agreement.  You are not going to hear, definitely

25    not going to hear a recording, see a video of any sort of

1    shady back alley deal in which Mr. Williams and

2    Mr. McDonnell meet and exchange a paper bag full of cash

3    in exchange for a state contract.  You are not going to

4    hear it, the law doesn't require it, and it is not a

5    movie.  Candidly, the defendants, you will hear, are way

6    too sophisticated for that.  And you are not going to hear

7    that Mr. McDonnell helped Mr. Williams get legislation or

8    a state job.  Mr. Williams does not, you will hear, under

9    the law, have to get a dime of state money.  You will

10   learn that those things are not necessary for the

11   defendants to be guilty.  The law simply requires that

12   Mr. McDonnell agreed to take official action on

13   Mr. Williams' behalf.

14          Now, the next two counts, Twelve and Thirteen,

15   pertain to bank loans that Mr. and Ms. McDonnell sought.

16   Count Twelve specifically alleges that Mr. McDonnell lied

17   on a personal financial statement to TowneBank by stating

18   that his liabilities had a number that did not include the

19   loans that Mr. Williams had given to him.  And Count

20   Thirteen alleges that both Mr. and Ms. McDonnell did the

21   same thing on bank applications to Pentagon Federal Credit

22   Union.  Finally, Count Fourteen alleges that Ms. McDonnell

23   obstructed the grand jury investigation of her by trying

24   to claim that those gifts from Mr. Williams of designer

25   clothes were really just loans to her.

1          So that takes us to part two, the facts and

2     evidence that you are going to hear in a little more

3     detail.  Now, this story starts back in 2009 when

4     Mr. McDonnell was elected Governor of Virginia.  He was

5     not a wealthy man.  And he was under a lot of financial

6     pressure, because like a lot of people, he bought rental

7     properties in 2007 at the height of the market and they

8     had gone down in value a lot.  And although Mr. McDonnell

9     was the Governor of Virginia, he was feeling the financial

10    strain like a lot of Americans have.  But, unlike a lot of

11    Americans, as Governor, Mr. McDonnell had a lot of wealthy

12    people that wanted to get to know him better.  And one of

13    those people was a man named Jonnie Williams.

14          Now, Jonnie Williams, who you will hear from, is

15    a wealthy businessman.  He is the former CEO of a

16    publicly-traded company called Star Scientific, or I'll

17    call it Star.  Star was headquartered here in Glen Allen,

18    Virginia, and Star manufactured health supplements that

19    come from a compound in the tobacco plant that's called

20    anatabine.  Mr. Williams had a product, which is basically

21    a vitamin, that he wanted to sell, and he wanted the

22    Governor's help to do so.

23          Now, to be clear, members of the jury, you are

24    going to hear evidence that Mr. McDonnell and Mr. Williams

25    were not friends, and they met for the first time during

1    Mr. McDonnell's campaign for Governor.  But even before

2    Mr. McDonnell took office, one of the very first times

3    they met, Mr. Williams agreed to buy a designer gown for

4    Ms. McDonnell to wear to the inauguration, the

5    gubernatorial inauguration.  Mr. McDonnell's staff put a

6    stop to that, but Ms. McDonnell was very upset and told

7    Mr. Williams that she would take a rain check.  So from

8    the outset, Mr. McDonnell knew that Mr. Williams was

9    willing to spend a lot of money on him and his family.

10            Now, why was Mr. Williams willing to do that?

11   Well, because he wanted to market Star Scientific's

12   product, which you will hear was called either CigRX or

13   Anatabloc, as a vitamin, and eventually have it become a

14   pharmaceutical or a prescription drug.  But Mr. Williams

15   had two basic problems.  The first being he had to get the

16   public to accept the vitamin.  Think about what like fish

17   oil has become.  And number two, he needed scientific

18   studies to pave the way for the vitamin to be approved as

19   a drug.

20            Now, Mr. Williams, you will hear, thought that

21   the Governor could help him solve those problems by

22   legitimizing, promoting, and obtaining research studies

23   for those products.  You see, as Governor, you will hear

24   that Mr. McDonnell was the most powerful public official

25   in Virginia.  He had a lot of authority, you will hear,

1    and a lot of influence over the very government officials

2    that Mr. Williams needed to get to sign off on his plans.

3              And you will hear that Mr. Williams told

4    Mr. McDonnell all of this.  You will learn that in October

5    of 2010, Mr. McDonnell flew on Mr. Williams' jet back from

6    California to Richmond.  So they had a couple hours

7    together.  And you will hear that on that night,

8    Mr. Williams explained what he needed.  He told

9    Mr. McDonnell all about his product, Anatabloc, that he

10   needed scientific testing of Anatabloc.  Mr. McDonnell,

11   you will hear, told Mr. Williams that he would set him up

12   with the Secretary of Health, Dr. Bill Hazel.  You will

13   hear from Dr. Bill Hazel, too.  He, like all cabinet

14   members, worked directly for Mr. McDonnell as the

15   Governor.  So Mr. Williams, after this plane ride, got his

16   meeting with Dr. Hazel.  But it did not go well.  Dr.

17   Hazel was skeptical about Mr. Williams' claims of the

18   benefits of Anatabloc because they weren't scientifically

19   validated.  In other words, "Go get those studies,

20   Mr. Williams."

21             Now, you may remember, as I just said a few

22   moments ago, that Ms. McDonnell had told Mr. Williams that

23   she would take a rain check on her designer gown.  And in

24   April of 2011, Ms. McDonnell called Mr. Williams.  You

25   will learn that was the very first call between their two

1    cell phones.  And Ms. McDonnell told him that now he could

2    take her shopping in New York City to buy those designer

3    clothes for her daughter, Cailin's, upcoming wedding.  And

4    then she would make sure that he was seated next to

5    Mr. McDonnell at a political event in New York.  And when

6    Mr. Williams went to New York City and met Ms. McDonnell

7    there, he bought her approximately $20,000 of designer

8    clothes.  And as promised, Mr. Williams got to sit at the

9    head table at the event that night next to Mr. McDonnell.

10   Mr. Williams, you will hear, began to understand that

11   buying things for the McDonnells had its benefits.

12            Now, at first blush you might be asking

13   yourselves, designer clothes for another man's wife?  And

14   later on you are going to hear evidence that Mr. Williams

15   and Ms. McDonnell talked on the phone a lot and they

16   exchanged a lot of text messages.  But make no mistake

17   about it, ladies and gentlemen:  You will hear that this

18   was always just a business relationship and nothing more.

19            Now, a few weeks later, the McDonnells invited

20   Mr. Williams and his wife, Celeste, over for dinner at the

21   Governor's Mansion.  This gave Mr. Williams the chance to

22   talk to the Governor about his product and his plans for

23   the future.  At the dinner, Mr. Williams briefly met the

24   McDonnells' daughter, Cailin, who happened to be coming

25   through for the first time.  Cailin McDonnell's wedding

1    was approximately five weeks away at the first weekend in

2    June of 2011, and the balance on the catering contract for

3    her reception was coming due.

4              Now, who signed that catering contract?

5    Mr. McDonnell.  Who owed the balance and had already made

6    the first two deposits on the catering contract?

7    Mr. McDonnell.  A couple of days after that dinner,

8    Ms. McDonnell asked to meet Mr. Williams at the Governor's

9    Mansion, and Ms. McDonnell told Mr. Williams that she and

10   Mr. McDonnell needed money.  She asked for a loan of

11   $50,000.  And she told Mr. Williams that she would help

12   him with his product if he would help the McDonnells.  She

13   also told Mr. Williams, you will hear, that the McDonnells

14   needed $15,000 to pay the balance of that catering

15   contract for their daughter Cailin's reception.

16             You will hear that Mr. Williams agreed to help,

17   but he wanted to speak with the Governor first.  And you

18   will hear that he did.  In that conversation,

19   Mr. McDonnell, you will hear, told Mr. Williams about

20   their money problems the same way.  And Mr. Williams

21   agreed to provide the $50,000 loan and that no written

22   loan agreement was necessary.  Mr. Williams made good on

23   his promise and on May 23rd, 2011, went to the Mansion and

24   hand-delivered a $50,000 check to Maureen McDonnell and a

25   $15,000 check made out in blank for the wedding catering

1    reception charges.  And Mr. McDonnell knew about it.

2            I'd like to show you an exhibit.  Now, this is

3    one of many exhibits that you are going to see in trial.

4    And this is not the only time you will see this, so don't

5    panic, this will be coming back at you.  This is an e-mail

6    from Mr. McDonnell to Mr. Williams dated Saturday, May

7    28th, 2011.  "Thanks so much for all your help with my

8    family.  Your very generous gift to Cailin was most

9    appreciated as well as the golf round tomorrow for the

10   boys.  Maureen is excited about the trip to Florida to

11   learn more about the products and to see Celeste.  Have a

12   restful weekend with your family.  Thanks."

13           Let's take this line by line, ladies and

14   gentlemen.  "Jonnie, thanks so much for all your help with

15   my family."  "Your very generous gift to Cailin."  The

16   evidence will show, ladies and gentlemen, that

17   Mr. Williams was not giving a gift to Cailin.  That

18   $15,000 was a gift to Mr. McDonnell, who was on the hook

19   by contract to pay for the rest of his daughter's

20   reception.  "Golf round tomorrow for the boys."  You will

21   hear that the very next day, Mr. McDonnell and his sons

22   spent the day at Mr. Williams' gated private club, Kinloch

23   Golf Club, which is out in Goochland County.  Mr. Williams

24   wasn't present for that particular golf outing, but the

25   McDonnell family charged $2,380 on his tab.

"Trip to Florida" refers to Mr. Williams'
company having an event at a research institute in
Florida.  The event was for researchers, Star Scientific
investors, and stock analysts.  Mr. Williams had asked if
Mr. McDonnell could attend the event, but Ms. McDonnell
went in his place.  And only a few days after this e-mail,
you will hear that Ms. McDonnell flew down on
Mr. Williams' jet and made brief remarks at the event in
Florida.  You will learn that those remarks included
offering Star the use of the Governor's Mansion for the
official product launch of Anatabloc.

On the same day that Ms. McDonnell went to
Florida, she used $30,000 of Mr. Williams' $50,000 loan to
buy Star Scientific stock.  And the evidence will show
also that Mr. McDonnell knew about that.  The McDonnells
also used approximately $20,000 to pay down credit card
debt.

Now, after this Florida event, Mr. Williams
started to try to get things moving with the scientific
studies of Anatabloc at UVA and VCU, University of
Virginia, and Virginia Commonwealth University.  His plans
included not only having state universities conduct the
research, but also having something called the Virginia
Tobacco Commission fund the studies.  Now, the Tobacco
Commission, you will hear, is a state commission that

1    provides economic grants using money from the National

2    Tobacco Settlement.  The majority of the commissioners on

3    the Tobacco Commission are appointed by the Governor.

4    Now, Mr. Williams also wanted to use Virginia state

5    employees to voluntarily participate as subjects in

6    clinical studies.  Based on their conversations and the

7    money and the gifts that Mr. Williams had given to the

8    McDonnells, you will hear that Mr. Williams believed that

9    Mr. McDonnell as Governor would help carry out his plans.

10   So he spared no expense.  Mr. Williams invited

11   Mr. McDonnell to vacation at his waterfront estate on

12   Smith Mountain Lake, about three hours west of here.  From

13   July 28th through July 31st, 2011, the McDonnell family,

14   including all their children, spent four days at

15   Mr. Williams' estate.  Neither Mr. Williams nor his family

16   were at the estate.  The McDonnells had it all to

17   themselves.  Mr. McDonnell enjoyed Mr. Williams' Ferrari

18   during the vacation and used it for the three-hour drive

19   back to Richmond, back to the Governor's Mansion, on

20   Sunday, July 31st, 2011.

21          This is an e-mail from Maureen McDonnell to

22   Jonnie Williams on July 31st, 2011.  It appends an

23   attachment.

24          Now, Mr. Williams had wanted to meet with

25   someone from Dr. Bill Hazel's office the very next day,

1    Monday, August 1st, to effectuate his plans for Anatabloc.
2    While the McDonnells were vacationing at Mr. Williams'
3    estate, Mr. Williams called Ms. McDonnell to confirm that
4    the meeting would take place.  When Mr. McDonnell got back
5    to the Governor's Mansion at the end of the vacation, he
6    e-mailed Dr. Hazel at 11:29 p.m. and directed him to have
7    a staff member come to the Mansion the very next Monday
8    morning.  You can see the e-mail there from
9    Governor@bobmcdonnell.com at 11:29 p.m.  "Bill, would like
10   to have Keith or Matt attend a short briefing at the
11   Mansion about 10 a.m. with the First Lady on the Star
12   Scientific Anatabloc trials planned, UVA and VCU this
13   weekend."  At 6:28 a.m., Dr. Hazel responded, "Will do."
14          The next morning, that Monday, August 1st,
15   Mr. Williams showed up at the Governor's Mansion and he
16   got what he wanted.  He had a meeting with Ms. McDonnell
17   and one of Dr. Hazel's deputies.  You will learn that
18   neither Dr. Hazel nor his deputy knew anything about that
19   $65,000 in loans and gifts to date, the golf, the
20   vacation, or that Ferrari ride.
21          Later that same morning, August 1st, you will
22   hear that Mr. Williams got something else he wanted.
23   Ms. McDonnell scheduled on the Mansion calendar, the
24   official Mansion calendar, a lunch with Virginia
25   researchers, a product launch for his Anatabloc at the

1   Governor's Mansion on August 30th, 2011.  Mr. Williams saw

2   the event at the Mansion as an opportunity to prove to

3   those researchers at UVA and VCU that he had the

4   Governor's support for scientific studies of Anatabloc.

5   Mr. Williams was allowed to hand pick the list of invitees

6   of people that he believed would help Star Scientific.

7   And on August 30th, 2011, Mr. and Ms. McDonnell together

8   hosted Mr. Williams' event in the dining room of the

9   Governor's Mansion.  Mr. Williams brought over samples of

10  Anatabloc, and he and Ms. McDonnell put the samples at

11  each place setting.  Mr. Williams got what he paid for.

12  He got an event for Anatabloc at the Governor's Mansion

13  with the Governor attending, and joined by the very

14  researchers that Star was attempting to convince to

15  perform scientific studies.  Star Scientific even issued a

16  press release announcing this event at the Governor's

17  Mansion.  But again, you will learn that none of those

18  state researchers, people who are state employees at

19  universities whose boards the Governor had appointed, knew

20  about the $65,000, the golf, the vacation, and that

21  Ferrari ride.

22          Now, in January of 2012, Mr. McDonnell and his

23  sons again played golf at Kinloch, that golf club out in

24  Goochland County, this time racking up almost $1,400 on

25  Mr. Williams' tab.  But in early 2012, the McDonnells also

1    needed more money to keep their vacation properties

2    afloat.  And who did they turn to?  Jonnie Williams.  And

3    at the same time that Ms. McDonnell is asking for more

4    money from Mr. Williams, she asked him, "How are things

5    going on those studies at UVA and VCU regarding

6    Anatabloc?"  You will hear that Mr. Williams told

7    Ms. McDonnell they weren't going so well, and the state

8    universities still had not agreed to conduct the studies

9    he wanted.  So you will hear that Ms. McDonnell told

10   Ms. Williams that she would talk to the Governor about it.

11   And later, Mr. Williams, she told Mr. Williams that the

12   Governor was upset and wanted the names of those state

13   university officials that he had been dealing with.

14   Mr. Williams told her that he would forward the names, and

15   he did.

16         This is the first page of an e-mail from

17   Ms. McDonnell to the Governor at the top there, and she

18   cc'd Jasen Eige, the Governor's policy director.  Looking

19   at the bottom of what's being forwarded here, this is an

20   e-mail to Jonnie Williams, Jr.  That, not surprisingly, is

21   the son of Jonnie Williams, Sr., who we have been talking

22   about.  This lower e-mail here contains of names of

23   officials at UVA that Mr. Williams needed to convince to

24   do the studies.  That information was forwarded by

25   Mr. Williams, Jr., to Ms. McDonnell, and Ms. McDonnell, in

1    turn, forwarded that to two of Mr. McDonnell's e-mail

2    addresses and copying that policy director, Jasen Eige.

3            Ms. McDonnell informed Mr. Williams that she had

4    forwarded this information to the Governor, and he

5    believed that the Governor might get something done.

6            Now, Ms. McDonnell may have been the one who

7    initially asked for more money from Mr. Williams, but to

8    be clear, by mid-February of 2012, the Governor himself

9    was asking for money from Mr. Williams.  Government

10   Exhibit 318, from Mr. McDonnell to Jonnie Williams,

11   February 16th, 2012.  "Jonnie:  Know you have been

12   slammed.  Do you want me to call your lawyer on the

13   certificates and the documents?  Thanks for all your help.

14   Gov."

15           Now, their original plan, the certificates, was

16   for Mr. Williams to give Star Scientific stock

17   certificates to the McDonnells for deposit in their

18   brokerage account, and then the McDonnells could take a

19   loan against the stock certificates.  Now, six minutes

20   later, after that e-mail we just looked at, you will see

21   that Mr. McDonnell e-mailed Mr. Eige, "Please see me about

22   Anatabloc issues at VCU and UVA." at 12:02 a.m. on

23   February 17th, 2012.

24           Now, think about that, ladies and gentlemen.  If

25   you want to know whether Mr. Williams was providing money

1  and gifts in exchange for assistance from the Governor to

2  his company, just think about whether Mr. McDonnell

3  sending an e-mail to his policy director about Anatabloc

4  issues at UVA and VCU six minutes after he is e-mailing

5  Jonnie Williams to ask for more money.

6          Now, a week after this e-mail, Mr. and Ms.

7  McDonnell had a conference call with their stockbroker, a

8  man named John Piscitelli.  The McDonnells informed

9  Mr. Piscitelli, you will hear, that they actually had Star

10  Scientific shares that were being held by Star Scientific.

11  You will learn during trial that that was not true.  And

12  what they didn't tell their broker was that these shares

13  were really going to be a loan from Mr. Williams.

14          Now, at the same time that the McDonnells are

15  negotiating additional money from Mr. Williams, and

16  offering to help with his studies at UVA and VCU,

17  Mr. Williams was given the opportunity to have Star be

18  recognized as a healthcare leader in Virginia, a

19  healthcare leader, at an exclusive reception at the

20  Governor's Mansion.  Just like the Anatabloc launch event

21  I talked about earlier, Mr. Williams got to decide who he

22  wanted to invite to the Governor's Mansion to be

23  identified as healthcare leaders of Virginia, including

24  those researchers affiliated with Star Scientific and

25  doctors that Star was trying to convince to recommend

1    Anatabloc to their patients.

2            On February 29th, 2012, the same day as the

3    night reception at which Star Scientific invitees are

4    being recognized as healthcare leaders of Virginia, the

5    Governor and Mr. Williams, you will hear, had a private

6    meeting in the afternoon in the Governor's Office to

7    discuss ways in which Mr. Williams could secretly provide

8    the McDonnells with more money.  And through it all, that

9    event that night, that reception, no one attending the

10   event knew, other than the defendants and Mr. Williams,

11   about the earlier payments of the loan -- excuse me, the

12   earlier payments or the loan that Mr. McDonnell was

13   negotiating with Mr. Williams.  In the end, during the

14   week of March, 2012, the first week of March, 2012,

15   Mr. Williams simply wrote another $50,000 check.  And like

16   the other loan, there were no written loan documents.

17           Now, you will hear that Mr. Williams wrote that

18   check so the Governor would continue to assist Star

19   Scientific.  And it worked.  Because on March 21st, 2012,

20   Mr. McDonnell met with his cabinet secretary who was in

21   charge of the state healthcare plan for Virginia state

22   employees.  The meeting was about how to reduce healthcare

23   costs in Virginia for those state employees.  During the

24   meeting, Mr. McDonnell pulled out a bottle of Anatabloc

25   from his pocket and said he was taking the product and it

1    helped him.  Mr. McDonnell, you will hear, then told the

2    cabinet secretary she should meet with those Star

3    Scientific folks to discuss Anatabloc.

4            Now, into the following months past that March,

5    2012 meeting, the McDonnells continued to need additional

6    money for their beach rental properties.  And again, who

7    do they turn to for help?  Jonnie Williams.  But this

8    time, Mr. McDonnell initiated the loan.  This is a text

9    message in Government Exhibit 379 from Mr. McDonnell to

10   Mr. Williams.  "Jonnie:  Per voicemail would like to see

11   if you could extend another 20k loan for this year."

12           And only 12 minutes after the Governor sent this

13   text message, Mr. Williams responded by simply saying,

14   "Done," and asking who to make the check out to.  Four

15   days later Mr. Williams wire transferred another $20,000

16   to the McDonnells.  To Mr. Williams, this was a business

17   transaction.  He was paying for the Governor's assistance.

18           Now, I've mentioned throughout this story that

19   the McDonnells did not tell Mr. McDonnell's staff or those

20   university researchers what was really going on.  But we

21   will also prove during this trial, ladies and gentlemen,

22   that the concealment went much deeper than that.  You will

23   see, you are going to hear about something called a

24   Statement of Economic Interests.  It is a long name, but

25   it is pretty straightforward.  And each year,

1    Mr. McDonnell as a state officer had to fill out a
2    financial disclosure form.  This form asks a lot of
3    questions, but some of them include personal liabilities,
4    stock ownership more than $10,000, and gifts of more than
5    $50 from people other than personal friends.
6              Now, you may remember that the same day she
7    attended that event in Florida back in 2011, Ms. McDonnell
8    bought $30,000 worth of Star Scientific stock.  If she had
9    still owned that stock by the end of December of 2011, by
10   the end of the year, Mr. McDonnell, you will hear, would
11   have had to disclose it on his Statement of Economic
12   Interests.
13             In order to avoid having her husband have to
14   report the stock ownership, you will hear that
15   Ms. McDonnell spoke to their broker, John Piscitelli, the
16   man I mentioned earlier, and Mr. Piscitelli is going to
17   tell you that Ms. McDonnell told him that she wanted to
18   get the stock out of her name by the end of the year to
19   avoid reporting requirements.  Ms. McDonnell sold all of
20   her shares of Star Scientific in the nick of time on
21   December 20th, 2011.  But she was anxious to re-purchase
22   them, and on January 20th, 2012, approximately four days
23   after Mr. McDonnell filed that Statement of Economic
24   Interests, Ms. McDonnell repurchased another 6,600 shares
25   of Star Scientific stock.  And you will learn that

1    throughout 2012, after they repurchased that stock,

2    Mr. McDonnell sent text messages and e-mails to

3    Mr. Williams time and time again that Mr. McDonnell was

4    following the stock.  "Stock looking good," he wrote to

5    Mr. Williams.  But as the year drew to a close, the

6    McDonnells did as they did before.  They got rid of the

7    stock so they wouldn't have to report it.  On December

8    20th, 2012, you will hear that Ms. McDonnell asked her

9    family broker, Mr. Piscitelli, to transfer 1,000 shares to

10   each of her five children.  She was left with

11   approximately $4,500 of Star Scientific stock, below the

12   $10,000 reporting threshold at the end of the year.

13           But it wasn't just the stock, ladies and

14   gentlemen.  You will learn that none of the golf from

15   Mr. Williams showed up on Mr. McDonnell's disclosure

16   forms, the $15,000 from Mr. Williams to pay for the

17   wedding catering contract was nowhere to be found, and

18   none of the loans were disclosed in a way that anyone ever

19   could have tied back to Mr. Williams.  You will learn that

20   the only time Mr. Williams or his company showed up

21   anywhere on that form was when staffers knew about

22   expenses from two vacations that Mr. McDonnell couldn't

23   have hidden if he tried.

24           So the evidence will show that the disclosure

25   forms were not the only way in which the defendants tried

1    to conceal their relationship with Mr. Williams or the

2    only way that they concealed their true financial

3    condition.  Now, the McDonnells had bank lines of credit

4    and mortgages on their various properties.  In October of

5    2012, Mr. McDonnell submitted his personal financial

6    statement as part of required paperwork for a loan on one

7    of his beach house rentals down in Virginia Beach.  On

8    that personal financial statement, Mr. McDonnell

9    understated his liabilities.  You will see that he did not

10   include any of his loans from Mr. Williams.  So as the

11   calendar turned into 2013, law enforcement were

12   investigating allegations that the chef at the Governor's

13   Mansion was stealing food from the kitchen.  And as part

14   of that investigation, the Virginia State Police learned

15   about a $15,000 check that Mr. Williams had written to the

16   Mansion chef's catering company, because you will hear

17   that the Mansion chef also owned a catering company and

18   that's who was catering Cailin McDonnell's wedding.  On

19   February 15th, 2013, the Virginia State Police voluntarily

20   interviewed Ms. McDonnell in her office.  During that

21   interview, Ms. McDonnell told the investigators that her

22   husband had known Mr. Williams for many years and had

23   worked with him at a hospital supply company, when they

24   had not.  She also said that she had written loan

25   documents from the first $50,000 loan from Mr. Williams

1   back in May of 2011, and that she had been making periodic

2   payments on the loan, when she had not.

3            The Virginia State Police agents also asked her

4   questions about the wedding catering and the Anatabloc

5   launch at the Governor's Mansion.  Now, think about that,

6   ladies and gentlemen:  Why would Ms. McDonnell say these

7   things to the police if they weren't true?  You will hear

8   that after the agents left and Mr. McDonnell learned about

9   the interview, he was angry.  Now, February 15th, the day

10  of that interview, was the Friday before a three-day

11  weekend.  Monday was Presidents' Day.  So February 15th,

12  you will hear, is the day the McDonnells learned that the

13  government is investigating their relationship with Jonnie

14  Williams.  At this time, this February period, the

15  McDonnells were in the midst of trying to refinance their

16  rental properties.  Two weeks before the interview, the

17  defendants had submitted a loan application to Pentagon

18  Federal Credit Union.  This was for, as I said, a

19  refinance of rental property.  Again, just as before, you

20  will hear that they understated their liabilities, failing

21  to disclose any of the loans from Mr. Williams, even

22  though they had received almost, at least $120,000 from

23  Mr. Williams to date.

24            And so Monday, February 18th, Presidents' Day,

25  when the banks and the Governor's Office are closed, the

1    Monday after Ms. McDonnell was interviewed by the Virginia

2    State Police and asked about those loans from

3    Mr. Williams, then and only then did Mr. McDonnell go to

4    his Governor's Office, closed, and fax a revised loan

5    application to Pentagon Federal Credit Union on which he

6    had handwritten in the loans from Mr. Williams for the

7    very first time.

8              Think about that.  Before Mr. McDonnell thought

9    anyone would know about the loans from Mr. Williams, they

10   are nowhere to be found on his loan applications.  But

11   when he finds out that law enforcement is asking questions

12   about loans from Mr. Williams, all of a sudden corrected

13   loan applications are sent in.  And not too long after,

14   Ms. McDonnell also took her own steps to make things look

15   different than they really were.  She put all of those

16   designer New York City shopping clothes into a box, she

17   drove them over to Mr. Williams' house, and you will hear

18   that they left them there with a note thanking

19   Mr. Williams for the loan of those clothes and claiming

20   that they had previously discussed auctioning them off for

21   charity.  She tried to make it look like Mr. Williams had

22   merely loaned her the clothes and that she always intended

23   to return them.  You will hear that neither was true.

24              Seven months after learning about this

25   investigation, you will hear that the McDonnells returned

1    all of the money and gifts to Jonnie Williams.

2    Mr. Williams gave them to the FBI, and you will see them

3    all during this trial.

4              Now, the investigation into that Mansion chef

5    led law enforcement also to begin investigating Mr. Jonnie

6    Williams for certain transactions involving Star

7    Scientific stock -- excuse me, involving Star Scientific

8    stock, that's issue one; issue two is an investigation

9    regarding the financial relationship between Mr. Williams

10   and the McDonnells.  You will hear that Mr. Williams was

11   questioned by law enforcement about why he loaned all this

12   money to the McDonnells and paid for their daughter's

13   wedding reception.  Mr. Williams at first lied to the

14   investigators and claimed that he was personal friends

15   with the McDonnells and that he never expected anything in

16   return.  Mr. Williams is going to tell you that he lied.

17             Now, to be clear, Mr. Williams is not going to

18   be here testifying out of the goodness of his own heart.

19   He has received immunity from prosecution in exchange for

20   his truthful testimony.  Mr. Williams is going to tell you

21   that what he and the McDonnells were doing was wrong, and

22   that's why they tried to hide it.  He will tell you that

23   he believed in his product and he thought that making

24   these payments and providing these gifts would help his

25   business.  He viewed his relationships, you will hear,

1    with the McDonnells as a business deal.  And at the end of

2    the trial, you will see that it is not just Jonnie

3    Williams' testimony is the evidence.  Far from it.  You

4    are going to see e-mails, you are going to see business

5    records, you will hear from other witnesses, you are going

6    to see the timing of these events, and you are going to

7    have your common sense.

8              So those are the basic facts of the case.  Like

9    I said, it is not everything, but it is plenty for now.

10             So that takes us to the third thing I'd like to

11   tell you this morning while I have your attention, and

12   that is, briefly, what this case is not about.  This case

13   is not about Mr. McDonnell's performance as Governor.

14   This is not a case about anyone's personal feelings about

15   Mr. McDonnell as Governor, or his policies, or politicians

16   in general, about Congress, about Washington.  If you hate

17   politicians, it is not about that.  It doesn't matter if

18   you are an R, a D, or a Z.  This case is about the actions

19   of Mr. and Ms. McDonnell that you will hear about in this

20   courtroom.

21             This case is not about whether a Governor can

22   promote Virginia business.  Let us be clear:  There is

23   nothing wrong with a Governor promoting Virginia

24   businesses or assisting a company in business development.

25   You will hear many times I'm sure that Mr. McDonnell's

 1    campaign slogan was Bob's For Jobs.  It is what he was

 2    supposed to do.  But just not in exchange for money.

 3         And this case is not about politics as usual.

 4    You will learn that not one penny of those bribes that the

 5    McDonnells took was a campaign contribution.  This case is

 6    not about what Mr. Williams may have lawfully donated to

 7    campaigns.  This case is about the McDonnells lining their

 8    pockets with secret gifts and cash given to them.

 9         So by the end of this case, ladies and

10    gentlemen, we will prove three things to you beyond a

11    reasonable doubt.  First, Robert and Maureen McDonnell

12    accepted more than $150,000 in cash, loans, vacations,

13    golf, and luxury goods from Mr. Williams.  Number two:

14    Mr. and Ms. McDonnell knew what Mr. Williams wanted, and

15    they gave it to him.  And number three:  Mr. and Ms.

16    McDonnell went to great lengths to hide what they were

17    doing because they were breaking the law.

18         And once the evidence is finished, we will come

19    back to you and ask that you find the defendants, Robert

20    and Maureen McDonnell, guilty of all counts.  Thank you.

21         THE COURT:  All right.  Defendants in the order

22    you prefer.

23         MR. BURCK:  Thank you, Your Honor.  Your Honor,

24    ladies and gentlemen of the jury:  Like you, I was

25    listening very closely to Ms. Aber as she explained how

1  the government is going to try to prove beyond a

2  reasonable doubt that my client, Maureen McDonnell, is

3  guilty of accepting bribes in exchange for official acts.

4  But she forgot to mention a simple but very important fact

5  about Maureen McDonnell.  As First Lady of Virginia, she

6  had no power to perform official acts herself and no power

7  to order others to do them for her.  That's because, as

8  First Lady, she was not a public official of the

9  Commonwealth of Virginia.  She was not elected to office,

10  she was not an employee of the Commonwealth of Virginia,

11  and she did not receive a salary.  She had no official

12  duties, no state responsibilities.  Of course, like any

13  other First Lady of any other state in the Union, like the

14  First Lady of the United States of America herself,

15  Maureen McDonnell was expected to volunteer some of her

16  time to promote Virginia.  Her businesses, her

17  initiatives, her people.  That is all she was, a

18  volunteer.  Maureen McDonnell is sitting before you today

19  accused of corruption only because of who she is married

20  to.  This case at bottom is about whether or not Bob

21  McDonnell did anything to corrupt his office.

22          As you heard from Ms. Aber, the government wants

23  you to believe that Maureen McDonnell's actions as Bob's

24  wife and as a volunteer are proof that Bob McDonnell

25  corrupted his office, is a corrupt public official.  Bob

1    McDonnell is the government's ultimate target in this

2    case.  You heard a lot about Bob McDonnell, and you heard

3    something about Maureen McDonnell from Ms. Aber.  But he

4    is the ultimate target.  Maureen McDonnell is sitting here

5    today as the collateral damage.

6              Now, ladies and gentlemen of the jury, my name

7    is Bill Burck, and with me at counsel table are Heather

8    Martin and Steve Hauss.  And we have the great privilege

9    to represent Maureen McDonnell in this case.

10             The government has told you what they expect the

11   evidence will show in this case.  Their indictment alleges

12   that the McDonnells accepted money and gifts from Jonnie

13   Williams with full knowledge that those gifts were in

14   exchange for official acts from the Governor.  It alleges

15   a quid pro quo, which is just Latin for "I scratch your

16   back, you scratch mine."  So the government must have some

17   unbeatable dead-bang proof of that mutual back scratching,

18   right?  Some proof that will leave no real doubt on that

19   score.  Well, you heard yourself from Ms. Aber that you

20   won't see a videotape, you won't hear an audiotape, you

21   won't hear an audio recording.  You won't read an e-mail,

22   a text, some thing that proves there was a corrupt

23   arrangement between my client and Jonnie Williams.

24             So why does the government believe the

25   McDonnells are corrupt?  Well, as you will learn, that's

1    because they believe Jonnie Williams.  And they want you

2    to believe Jonnie Williams.  Because without him, there is

3    no evidence in this case against Maureen McDonnell.

4         But the real question is, which Jonnie Williams

5    are you supposed to believe?  Because there have been many

6    different versions of Jonnie Williams.  You know how there

7    are different versions of a cell phone, like the iPhone,

8    and you have Version 4, Version 5, and just when you are

9    getting used to that version they spring another one on

10   you and you have to get rid of that one and they tell you,

11   "Get rid of the old one, buy the knew one, it fixes the

12   bugs."  That's what Jonnie Williams' stories are like.

13        You are going to hear that the government didn't

14   think much of the original version of Jonnie Williams.

15   Jonnie Williams Version 1.0.  The evidence will show that

16   the government and Jonnie fixed the bugs over time, came

17   up with several new versions, each one better and better

18   for the government.  So what was the original Jonnie

19   Williams, Version 1.0, the one the government doesn't

20   like.

21        The very first time Jonnie Williams spoke to

22   investigators he was essentially cold-called.  He was at

23   home.  He was not expecting a visit from law enforcement.

24   He didn't know why they were there.  He was interviewed

25   all by himself.  When the investigators asked him about

1 the McDonnells, he had said he made a personal loan to

2 Maureen McDonnell. And you will hear that he told the

3 investigators he did not get anything in return for the

4 loan. He told them that he never paid her for anything.

5 He said the McDonnells were his friends and that Maureen

6 was into wellness and supported his product. Before the

7 interview wrapped up, Jonnie Williams went out of his way

8 to emphasize that he did not get anything in return for

9 the loans to the McDonnells. He emphasized again that he

10 did not ask for anything and he did not want anything.

11   The original Jonnie Williams, Version 1.0, was a

12 year-and-a-half ago in January of 2013. Then, about six

13 months later, in July of 2013, Jonnie's story changed.

14 Let's call it Jonnie Williams Version 2.0. At this second

15 meeting with law enforcement, Jonnie brings not one, not

16 two, but six lawyers with him to meet with investigators.

17 Together, Jonnie Williams and his fleet of lawyers all

18 meet up with the same prosecuting team you see here today.

19 Now, Jonnie Williams tells the government for the very

20 first time he did have an arrangement with the McDonnells.

21 Well, a kinda/sorta arrangement.

22   You see, the evidence will show Jonnie Williams

23 does not say at this meeting that he had an explicit

24 agreement with Maureen or Bob McDonnell. Instead, what he

25 tells the government is that he was looking for ways to

1     help Star Scientific, and he believed helping the

2     McDonnells would help the company.  And he basically

3     believed the McDonnells understood the arrangement.

4     That's what he tells them.  Ever since that second

5     meeting, 2.0, the bugs in Jonnie Williams' stories have

6     been ironed out.  Version 3.0 came out in September of

7     last year.  After that, the McDonnells were indicted in

8     January of this year.  Version 4.0 came out at the end of

9     May of 2014, of this year, two months ago.  Version 5.0 a

10    week later.  Version 6.0, two weeks after that.  7.0, a

11    couple weeks after that.  And less than two weeks ago,

12    right before this trial, comes versions 8 and 9.  That's

13    nine different versions in about a year-and-a-half.  And

14    each and every time it just keeps getting better and

15    better for the government.

16          Just to give you a taste of this, just last

17    month, in Version 5 or Version 6, I can't remember which

18    one it was, but Jonnie tells the government for the very

19    first time, and you heard this from Ms. Aber and

20    apparently this will be what Mr. Williams testifies to,

21    this is the very first time, last month, he says to the

22    government that Maureen McDonnell actually said the words

23    that she would help him in return for him helping her

24    family out financially.  The very first time he has ever

25    said that she said those words.  Before it was a wink and

1    a nod, it was an arrangement, that he understood they

2    understood.  But a week or so after he said that about

3    Maureen McDonnell just last month, a week or so later,

4    Jonnie tells the government that actually, Maureen said to

5    him that she and Bob would help him out in exchange for

6    his financial help.  But this version, of course, is a

7    whole lot better for the government than the sorta/kinda

8    arrangement the government got a year ago in Version 2.0

9    when Jonnie Williams showed up with his six lawyers.  Is

10   there an e-mail or a text or a recording to corroborate

11   this?  No.  It is just Jonnie Williams' word.

12           So what happened?  Why did Jonnie's story keep

13   changing?  Well, to understand that, you need to go back

14   to that original Jonnie Williams Version 1.0.  This is the

15   one where he told the investigators that he never asked

16   for anything from the McDonnells and he never

17   offered -- they never offered anything in return.  This is

18   back in January of 2013.  Back then, the investigators

19   didn't spend a whole lot of time asking Jonnie Williams

20   about the McDonnells.  No, back then, the investigators

21   were more interested in Jonnie Williams himself.  They

22   were interested in a bunch of things about Jonnie.  But in

23   particular, they wanted to know about a secret transaction

24   in which Jonnie Williams gave a friend stock in his

25   company, Star Scientific, and that friend gave him in

1   return $10 million.

2         Now, why was law enforcement interested in that

3   secret transaction?  Well, you see, Jonnie Williams, as

4   you heard, was the CEO of Star Scientific.  And there are

5   federal laws, federal criminal laws, that restrict what a

6   CEO can do with the stock he owns in his own company

7   without telling his investors.  We have all heard of some

8   of these laws: insider trading, securities fraud.  You

9   see, if Jonnie Williams secretly sold stock to a friend

10  without properly disclosing it, that could be a federal

11  crime, which could mean possible jail time and losing $10

12  million.

13        So put yourself in Jonnie's shoes back in

14  January of last year.  Law enforcement had just caught him

15  by surprise in his own home and they were asking a lot of

16  uncomfortable questions about stock transactions that

17  could land him in prison and also deprive him of $10

18  million.  Jonnie Williams had a problem.  And yet, the

19  investigators had also asked him about the McDonnells, not

20  as much, but a little bit.  And it didn't take a rocket

21  scientist to figure out from their questions that they

22  were interested in whether or not Jonnie had given

23  anything to the McDonnells in exchange for the McDonnells

24  helping his company.

25        The evidence will show that that's when Jonnie

1    Williams came up with the plan that he has executed.  You

2    will see, you will hear that he always thought of himself

3    as a big fish.  But he knew that Governor Bob McDonnell

4    was a bigger fish, especially to the government.  The

5    evidence will show that Jonnie needed a way out of a $10

6    million problem, and he found his way out through the

7    McDonnells.  So again, going back to July 1st, 2013, this

8    is Version 2.0, about six months after he was visited by

9    investigators all by himself, Jonnie shows up with his

10   army of lawyers to meet with the government.  He and his

11   lawyers sat down at a table across from the prosecutors.

12   The prosecutors pushed across the table an agreement to

13   Jonnie Williams and his lawyers.  The agreement promised

14   that the government would not use anything he told them at

15   that meeting against him in a prosecution.  But he could

16   still be prosecuted.  But they couldn't use anything he

17   said against him at that meeting.

18          But that meeting was only about the McDonnells.

19   It wasn't about the stock transaction.  The government

20   wasn't interested in asking Jonnie about the $10 million

21   worth of stock fraud or anything else for that matter.

22   They wanted to hear only what Jonnie had to say about the

23   McDonnells.  So Jonnie Williams had read the situation

24   right.  Now the evidence will show Jonnie tells the

25   government that he did have an arrangement with the

1    McDonnells.  This is Version 2.0, the kinda/sorta

2    arrangement.

3           This is what the government wanted to hear.

4    Because right after he was done talking with them, that

5    very same day, they gave him something called a full

6    immunity, a transactional immunity agreement.  So right

7    before the meeting, Jonnie got a promise in writing that

8    they wouldn't use his statements against him if he were

9    prosecuted, but he could still face prosecution.  Right

10   after the meeting, the same day, they gave him a much

11   better deal.  "Don't worry about it, we won't prosecute

12   you so long as you provide information and testimony

13   against the McDonnells."  This was a good start for Jonnie

14   Williams.  But the immunity deal Jonnie got last year did

15   not cover the $10 million stock fraud.  You will learn

16   that Jonnie Williams couldn't get that deal out of the

17   government just yet.  But Jonnie Williams, you will see,

18   is patient.  And Jonnie Williams, you will see, is very

19   smart.  Jonnie meets with the government again in

20   September of last year, that's Version 3.0.  Some of the

21   bugs are then worked out from 2.0, and Jonnie waits.  The

22   government then indicts Bob and Maureen McDonnell in

23   January of this year, and Jonnie waits.  He waits until

24   just two months before this trial, and then the evidence

25   will show that Jonnie Williams demanded from the

1    government full immunity for the $10 million problem and

2    all his other financial problems which had been his main

3    concern all along.

4           So who cares what Jonnie wants at this point?

5    He already had his deal.  What leverage has he got on the

6    government?

7           As I mentioned earlier, Jonnie could throw in

8    new details to embellish.  He could say Maureen McDonnell,

9    which she didn't say, "Quid pro quo, Mr. Williams."  Quid

10   pro quo.  That's what he is now saying.  Before it was

11   understanding, arrangement.  It was then "No, she said

12   this, not just about herself, but also Bob McDonnell."  He

13   was able to offer that in exchange.  But the evidence will

14   show that Jonnie Williams had a bigger ace in the hole

15   than any of that.  You see, Jonnie Williams knew that the

16   government had already indicted the McDonnells, a point of

17   no return for them.  He knew that a trial date was just

18   around the corner, only two months away.  And he knew the

19   government needed his testimony.  So Jonnie Williams held

20   out for a better deal than he had gotten a year before

21   when the government had all the leverage.

22   ///

23   ///

24   ///

25   ///

1          The evidence will show that Jonnie Williams knew

2    that his testimony was more valuable right before trial

3    than it was a year ago.  So he renegotiated his deal.  And

4    he got full immunity for the ten million dollars for his

5    other financial issues for his participation in this case.

6    So why did Jonnie Williams' story change so much from the

7    original Version 1.0?  Because he got an out-of-jail free

8    card worth ten million dollars.

9          Now, Jonnie Williams is not the only person who

10   got immunity from the government in this case.  A woman

11   named Jerri Fulkerson got one too.  She got hers just last

12   week.  Who is she?  Well, she was Jonnie Williams'

13   personal assistant.  You'll hear her name a lot in this

14   case.  In fact, you may even see her on the witness stand

15   later today.  And you'll see her on the stand as a

16   government witness.  As the judge said, the government

17   starts first.  They put on their case.  It's their burden.

18         You'll hear the government gave her immunity

19   because she would sometimes sign Jonnie's name to

20   documents and then swear under oath that the signature was

21   his, not hers.  You may be thinking that sounds like

22   Ms. Fulkerson forged Jonnie Williams' signature.  Well,

23   the twist is that we expect Ms. Fulkerson will testify

24   that she forged his signatures on these documents at

25   Jonnie Williams' instruction, at his request.

1    So you'll hear that the government decided to

2  seek immunity from Ms. Fulkerson in a bit of a hurry

3  before they even knew what documents she may have forged

4  for Jonnie Williams.  So is Jonnie Williams now in trouble

5  with the government because of the forgery?  It's a

6  mystery.  I guess we'll all find out when Jonnie Williams

7  takes the stand for the government.

8    Let's pause for just a moment on Jerri

9  Fulkerson.  She worked for Jonnie Williams for years, and

10  she was dedicated and loyal soldier for Jonnie.  She

11  believed that Jonnie valued her and the work she did for

12  him.  But the evidence will show that what Jonnie Williams

13  really cared about was using her to get what he wanted

14  even if it got her in trouble.  I mention this because it

15  provides an important insight into what the evidence will

16  show about who Jonnie Williams is and how he operates.

17    He uses people.  He manipulates them to promote

18  his own agenda.  There's no question that Jonnie Williams

19  had an agenda in 2011 and 2012.  His agenda was to get

20  access to the Governor of Virginia to promote his company.

21  So how did he try to do that?  The evidence will show that

22  he found a woman who was close to the Governor.  He found

23  a woman who was not particularly happy or satisfied in her

24  role and was looking for something new.  The evidence will

25  show that Jonnie identified a woman who he could

1  manipulate and he duped her into helping him with his

2  agenda.

3         The indictment alleges that the conspiracy in

4  this case began in April of 2011.  That month Jonnie takes

5  this woman on a shopping trip in New York and buys her

6  expensive clothing.  Two months later, Jonnie flies this

7  woman on a private jet to Florida for a special event to

8  learn about Star Scientific's most promising product,

9  Anatabloc.

10        In Florida, Jonnie makes the woman a true

11 believer in the product.  She is convinced it has genuine

12 health benefits.  So she goes out and she buys stock in

13 Star Scientific.  Over the following weeks and months,

14 Jonnie has secret meetings with the woman one-on-one and

15 makes her promises worth tens of thousands of dollars.

16 Jonnie flies her on his private jet to various events, all

17 of them to promote his company.

18        And ultimately, Jonnie gets the woman to help

19 him plan a launch event for Anatabloc at the Executive

20 Mansion, all the while, the evidence will show, Jonnie

21 Williams is not telling this woman, "Hey, can you help me

22 out, give me access to the Governor so I can put my

23 product with his good name."  No.  Instead, he's telling

24 her how much he values her, how much he admires and

25 believes in her, how important she is to Star Scientific

and crucially to him.  And she believes him because Jonnie

Williams, you will hear, can be a very convincing

salesman.  Unfortunately, for this woman, Jonnie's real

motives for all the time and attention he has lavished on

her are revealed only too late to help that woman

understand what's really going on.

Now, you may be thinking I'm talking about my

client, Maureen McDonnell, but I'm not.  I'm talking about

a woman named Mary-Shea Sutherland.  Ms. Aber didn't

mention Mary-Shea Sutherland in her opening, which is

curious, because they interviewed her many times.

Mary-Shea Sutherland was the First Lady's Chief of Staff.

We expect she will also be a witness for the government in

this case.

The evidence will show Jonnie Williams duped

Maureen McDonnell in much the same way he duped Mary-Shea

Sutherland.  You see, he lavished time and attention on

them both and, yes, gave them things to make them think he

was interested in them, but all the while the evidence

will show he was really interested only in what he thought

they could do for him.

Jonnie took both of them shopping in New York

and bought both of them expensive clothing.  Jonnie flew

them both to Florida on his private jet to learn about

Anatabloc.  He got Maureen McDonnell and Mary-Shea

1   Sutherland excited about his company and his product.

2   Both immediately bought stock in the company.  Both became

3   sort of cheerleaders for Anatabloc and started using the

4   product themselves.  Both flew Jonnie's jet to various

5   Star Scientific events in support of the company and the

6   product.  Both did things to try to promote Anatabloc.

7           The evidence will show that Maureen McDonnell

8   and Mary-Shea Sutherland were both Jonnie's dupes.  He

9   used them both in pursuit of his ultimate goal, access to

10  the Governor, and he did it with exploiting their

11  vulnerabilities and without ever letting them in on his

12  true agenda.  So then why is Mary-Shea Sutherland, we

13  expect a government witness, who has not been accused of

14  any crime, while Maureen McDonnell sits before you accused

15  of public corruption?

16          Recall something very important.  Maureen

17  McDonnell was not a public official.  She was a volunteer.

18  You're going to hear that there's exactly one reference to

19  the First Lady of Virginia in the tens of thousands of

20  pages of laws in this Commonwealth.  She is the honorary

21  chairperson of the Citizens' Advisory Council on

22  Furnishing and Interpreting the Mansion.  That's it.

23          Maureen McDonnell was a private citizen.  She

24  was free to take a private job for private sector pay,

25  just like anyone else who doesn't work for the state or

1  federal governments.  In fact, you will hear evidence that
2  while she was First Lady, Maureen McDonnell was being paid
3  for work she did for a different nutraceutical company.
4  Ms. Aber refers to nutraceuticals as vitamins.  They are
5  also known as nutraceuticals.  And she was being paid for
6  sitting on the board of another company.  And there is no
7  allegation, none whatsoever, that those private jobs were
8  illegal.  You will hear evidence that even the
9  government's own investigators concluded very early on
10 that money to Maureen McDonnell was not illegal.
11        Now, the same cannot be said of Mary-Shea
12 Sutherland.  Yes, she was Chief of Staff for the First
13 Lady, but she was actually hired by and worked for the
14 office of the Governor.  Mary-Shea Sutherland was a public
15 official of the Commonwealth of Virginia.  She did receive
16 a government salary.  As you will hear, she was not free
17 to accept payment for services rendered to Jonnie Williams
18 or anyone else.
19        But the evidence will show that Mary-Shea
20 Sutherland, the government's own witness, was secretly
21 negotiating with Jonnie Williams for a job at the same
22 time she was employed by the Commonwealth as Maureen
23 McDonnell's Chief of Staff, at the time she was a public
24 official.  The evidence will show that Mary-Shea
25 Sutherland even had a handshake deal with Jonnie for a

1  job, all the while she was working for the Commonwealth.

2  In fact, you will hear that Mary-Shea Sutherland was

3  negotiating a written contract with Jonnie Williams and

4  his lawyers to hire her as an event planner for Star

5  Scientific.  And this was the same time that Mary-Shea

6  Sutherland, you will hear, was the principal person

7  planning the event for Anatabloc at the Executive Mansion

8  in August 2011.  This is the same event that the

9  government wants to say Maureen McDonnell corruptly

10  hosted.

11        And you'll learn that all of these negotiations

12  between Mary-Shea Sutherland and Jonnie Williams and his

13  lawyers were concealed from Maureen McDonnell and the

14  Governor.  You will hear in Mary-Shea Sutherland's own

15  words that Jonnie Williams was insistent that Mary-Shea

16  not tell the governor's office that she was leaving until

17  after the luncheon at the mansion.

18        So Mary-Shea Sutherland was secretly negotiating

19  for a job as an event planner, receiving gifts and being

20  flown around in Jonnie's private jet, all the while

21  receiving a salary from the Commonwealth and planning an

22  event for Jonnie Williams at the Executive Mansion.

23        So why does Maureen McDonnell, a private

24  citizen, stand accused and Mary-Shea Sutherland, a public

25  official, does not?  Did the government give Mary-Shea

1   Sutherland immunity like they did Jonnie Williams and

2   Jerry Fulkerson just last week?  Nope.  Have they cut some

3   kind of secret deal with Mary-Shea Sutherland?  Not that

4   we know of.  Has the government accused her of any

5   wrongdoing whatsoever?  No, they have not.

6          To the government, one thing makes all the

7   difference between Maureen McDonnell and Mary-Shea

8   Sutherland.  Only one is married to Bob McDonnell.  And

9   you will hear evidence that from very early on, long

10  before Jonnie Williams' Version 1.0 or the various

11  immunity deals, long before Maureen McDonnell was

12  interviewed by law enforcement, which you heard about from

13  Ms. Aber, the investigators in this case decided long ago

14  to go after the McDonnells.

15         But we believe the government made a fatal error

16  in charging this case.  It is the same mistake Jonnie

17  Williams made.  They thought they could use Maureen

18  McDonnell to get to the Governor.  Why did the government

19  make that mistake?  Well, they knew three things.  First,

20  they knew Maureen went around the Commonwealth and a few

21  other states talking about the benefits of Anatabloc.  No

22  surprise there really because Maureen McDonnell, you will

23  hear, talked about a lot of Virginia companies and that

24  was part of her job.  Second, they knew that Maureen took

25  a loan and certain gifts from Jonnie Williams, and

1  finally, they knew, of course, that Maureen was married to

2  Bob McDonnell.

3          However, the evidence will show that Maureen

4  McDonnell was herself free to take gifts and loans and

5  promote Anatabloc to her heart's content.  She could even

6  have a job, a salary from Jonnie Williams.  She was a

7  volunteer.  She wasn't a public official.  But not so

8  fast, the government will say.  She had a bad motive for

9  doing these things.  She was doing them in cahoots with

10 her husband to sell his office to Jonnie Williams.

11         But here's the reality of what the evidence will

12 show in this case.  Maureen has a passion, a deeply seeded

13 passion, for nutraceuticals -- again, what Ms. Aber

14 describes as vitamins -- that long predates her friendship

15 with Jonnie Williams by decades.  This passion arose from

16 serious health problems she had when she was a young

17 adult.  She had a breast cancer scare when she was a

18 teenager, and after that, she changed the way she lived

19 her life and started taking nutraceuticals.  And she

20 developed, as she saw friends and loved ones, benefit from

21 these vitamins, these nutraceuticals.  She even had her

22 children take nutraceuticals, including Anatabloc.  And

23 for 30-plus years Maureen McDonnell has marketed and sold

24 nutraceuticals to supplement her family's income.  You

25 will hear she was fortunate enough to work in a field in

```
 1   which she actually believed in the product.
 2           You will hear from multiple witnesses that
 3   Maureen truly believed in the health benefits of
 4   nutraceuticals and the promise of Anatabloc.  You will
 5   hear evidence that Maureen bought Star Scientific stock at
 6   the very beginning of the supposed conspiracy and she
 7   still owns it today, despite everything, despite the fact
 8   the stock collapsed.
 9           The evidence will show Maureen was not promoting
10   Anatabloc as part of a quid pro quo.  No.  You will hear
11   from the government's own witnesses that she was a true
12   believer who, quote, drank the Kool-Aid.  What Maureen did
13   for Jonnie Williams she did because she believed in his
14   product and his company and him, not as part of some
15   scheme she cooked up with her husband.
16           But there's another problem with the
17   government's story, and this one goes right to the heart
18   of the alleged conspiracy between my client and her
19   husband.  Now, this entire case has been a source of great
20   embarrassment and anxiety for my client, as you can, no
21   doubt, imagine, but sadly, we have no choice but to push
22   even further to the private lives and private difficulties
23   of my client and her husband because the government has
24   charged the couple as co-conspirators.
25           The government's version of events rests on an
```

1  important assumption; that Bob McDonnell and Maureen

2  McDonnell must have agreed to sell his office because,

3  well, they are married.  But at the time of the supposed

4  conspiracy, the McDonnells' marriage had broken down and

5  they were barely on speaking terms.  They put on a brave

6  face for the public.  After all, Bob McDonnell was the

7  Governor, and no one wants to make their own marital

8  problems the subject of gossip.

9          But the sad reality is the marriage was not

10  working.  It hadn't been for some time, and the pressure

11  of life in the Executive Mansion made things worse.

12  You're going to see e-mails to those effect.  You won't

13  have to take my word for it.

14          You will hear evidence that Maureen McDonnell

15  had a difficult time transitioning to her role as First

16  Lady.  It was never something that she wanted.  She had

17  never managed a staff before.  She had lived all of her

18  life out of the spotlight, raising her five kids and

19  managing all of it.  Now she was in this Executive Mansion

20  and she felt overwhelmed by the expectations of others and

21  she did not think she was up to the task of being the wife

22  of the Governor of Virginia.  She was deeply uncomfortable

23  and stressed in this new role and she became frustrated

24  and often angry.  Maureen oftentimes lost her temper with

25  her staff and with her husband.

1          All this was made worse by the extraordinary

2    demands on Bob's time and attention that this job

3    required.  He regularly worked 15, 16, 17 hours a day and

4    traveled all the time, usually leaving her back at home.

5    She felt alone.  The few times they had any private time

6    together, they spent almost none of it really

7    communicating the way a husband and wife should.  And it

8    was these feelings of isolation, anger and anxiety that

9    made it so easy for Jonnie Williams to swoop in and fill

10   the void in Maureen's life.

11          Maureen immediately gravitated toward Jonnie.

12   He showered her with attention she craved.  He gave her

13   personal gifts.  He helped her out financially.  He

14   listened to her.  He spent time with her.  He even shared

15   with her a genuine passion for nutraceuticals, or vitamins

16   as Ms. Aber refers to them.  She admired Jonnie Williams

17   and had affection for him.  You'll even hear evidence that

18   she had a crush on Jonnie Williams.

19          Jonnie Williams was larger than life to Maureen

20   McDonnell, but unlike the other man in her life, Jonnie

21   paid attention to her.  He seemed to respect her views on

22   things.  He seemed to respect her views on things that

23   were very important to both of them.

24          Maureen McDonnell came to genuinely care about

25   Jonnie Williams, and she believed Jonnie Williams

1  genuinely cared about her.  To Maureen, they were very

2  close friends and Maureen was proud of her friendship with

3  Jonnie Williams.

4        The government said that they hid this

5  relationship.  Well, Maureen traveled with Jonnie Williams

6  to public events.  It's part of their evidence of a

7  supposed quid pro quo.  She went on vacation with Jonnie

8  and their respective spouses.  Everyone on the staff, you

9  will hear, knew how much Maureen loved hanging out with

10 Jonnie Williams.  You will hear evidence that Maureen was

11 very protective, some might even say jealous of her

12 relationship with Jonnie Williams.  She would get prickly

13 when she thought others were encroaching on that

14 friendship or failing to appreciate that Jonnie Williams

15 was her friend first and foremost.

16        You'll hear from witnesses that Jonnie was a

17 frequent visitor to the mansion, that many of these visits

18 were spontaneous, that Maureen and Jonnie usually met

19 privately either upstairs in the mansion or in Maureen's

20 basement office, and we expect you'll hear one government

21 witness describe Jonnie Williams as Maureen's, quote,

22 favorite playmate.

23        To give you an idea of the extent of the

24 relationship, between April 2011 and February 2013, that's

25 the scope of the conspiracy alleged by the government, the

```
 1  evidence will be that Bob McDonnell and Jonnie Williams

 2  spoke by phone or text message about 60 times.  By

 3  contrast, during that same period, Maureen and Jonnie

 4  shared over 1,200 phone calls and texts, during the same

 5  period.  That averages out to 2 or so calls or texts every

 6  day, 7 days a week, 365 days a year.  And you'll hear that

 7  Maureen hid much of what Jonnie Williams gave her from her

 8  husband.  She didn't tell her husband about the clothing

 9  that Jonnie bought her in New York.  She didn't tell Bob

10  about the 50,000-dollar loan from Jonnie until after she

11  started spending the money.  And three times, three times

12  she hid from her husband her purchase of Star Scientific

13  stock.

14          Maureen McDonnell accepted gifts from Jonnie

15  Williams, who you'll hear from witness after witness,

16  loved to flaunt his wealth because she liked Jonnie

17  Williams quite a bit and she thought he liked her too.

18  The evidence will show that Maureen McDonnell and Jonnie

19  Williams had a relationship that some would consider

20  inappropriate for two people who are not married to each

21  other.

22          Maureen McDonnell helped promote Star Scientific

23  and Anatabloc because she believed in them, and as a

24  private citizen, there is nothing illegal about any of

25  that, and as a private citizen, she was free to live her
```

1  life in whatever way she liked so long as she did not

2  conspire with her husband to corrupt his office.

3         The government will not be able to prove a

4  conspiracy between Maureen and Bob McDonnell because there

5  is no credible evidence that a conspiracy existed because

6  you will hear the very foundation of their marriage was

7  broken long before Jonnie Williams appeared on the scene.

8         Now, before I wrap up, I want to touch briefly

9  on the other charges against my client.  First, the

10 government claims the McDonnells made a false statement to

11 a bank when they submitted a joint application and did not

12 list the loans from Jonnie Williams.  The evidence will

13 show that Maureen McDonnell barely had anything whatsoever

14 to do with preparing this loan application, nor will there

15 be any evidence that Maureen actually reviewed the

16 application.  The evidence will be that Maureen signed a

17 piece of paper that was put in front of her by her

18 husband.  That's it.

19        The government also alleges that Maureen

20 attempted to obstruct the grand jury investigation when

21 she returned clothing to Jonnie Williams.  Now, I want to

22 be clear about this.  You heard from Ms. Aber that there

23 was an interview conducted by the Virginia State Police of

24 my client in February of 2013, and they allege that she

25 made some false statements in that interview.  They do not

1   charge that in this case.  This case is not about whether

2   or not she told the truth in that interview.

3          You will actually hear, with respect to that

4   interview, that the claims that the police make about what

5   she said in a typed up document about having a written

6   contract, periodic payments are totally contradicted by

7   the handwritten notes that were taken contemporaneously

8   when she was being interviewed by the police and that she

9   never said written contract and she never said periodic

10  payments, that that was false.  What the police wrote in

11  the typed up notes that Ms. Aber referred to was false.

12  That's important for me to point out now.  You'll see it

13  and you'll hear it for yourselves.

14         But that's not what they charge here.  They are

15  charging something unrelated to that interview.  They are

16  talking about a handwritten note that Maureen McDonnell

17  sent to Jonnie Williams after this investigation became

18  known to them.

19         As part -- with that handwritten note, she

20  returned some dresses that Jonnie Williams had bought,

21  some of the dresses, for example, that he bought in New

22  York.  But Maureen McDonnell could not have intended to

23  obstruct the grand jury.  The evidence will show that when

24  Maureen returned the dresses, she had no idea a grand jury

25  had even started.  In fact, the evidence will show she was

told there was no grand jury or federal investigation at
all.

How could she intend to obstruct a grand jury
investigation that she was told didn't even exist?  And
you will learn that there was no grand jury investigation
at the time she sent this note.  But even if she had known
about it and the grand jury had existed, there's nothing
wrong with what Maureen McDonnell did, as you'll see in a
moment.  She returned the dresses that Jonnie Williams had
bought, and the government doesn't charge the return of
the dresses themselves as being the obstruction.  No.  The
government says again that it's the handwritten note that
Maureen wrote to thank Jonnie Williams for the dresses,
which falsely suggests that Jonnie and Maureen had agreed
all along that she would return them.  But it is plain as
day that the letter says no such thing.  The government
mentioned this letter, but they didn't show it to you.  So
I'm going to show it to you.  This is their evidence.

So this is the note.  And we'll blow up the --
you'll get to see this.  You won't have to take my word
for it.  You'll get to read it to your heart's content.
The letter does not say that Maureen McDonnell and Jonnie
Williams had talked about returning the dresses.  The only
thing it says they had talked about was charitable
organizations.

1    Can you blow it up?

2    It's a little hard to read because it's

3 handwritten, but please go ahead.  "If not, I'm sure there

4 are many exemplary charitable organizations like we talked

5 about who would welcome the opportunity to auction them

6 for a wonderful cause."

7    Their case on obstruction comes down to the

8 words "like we talked about."  Now, I'm not a

9 grammatician.  I'm not an English professor.  But if you

10 read that -- those lines and you read what it says, she

11 says, "many exemplary charitable organizations like we

12 talked about."  She doesn't say anything about having

13 agreed with him before to return dresses to charitable

14 organizations.  She's talking about charitable

15 organizations they talked about.  The evidence will show

16 that Maureen and Jonnie had not only talked about

17 charitable organizations, they had actually attended

18 events for charitable organizations together.

19    Can you take that down?

20    The government wants you to believe this case is

21 about a husband and wife who were partners in crime,

22 Bonnie and Clyde, trading the governor's office for money

23 and gifts, but once the evidence is in, you will see that

24 the government's theory of the case cannot be reconciled

25 with the facts.  No.  The government's case begins and

1  ends with the word of Jonnie Williams.  Ms. Aber went out

2  of her way to say it's not about Jonnie Williams, it's

3  about all this other stuff.  But you'll see, it's about

4  Jonnie Williams, a man with everything to gain and nothing

5  to lose by claiming that Maureen McDonnell's heart and

6  mind were infected by the same corruption that he now says

7  motivated him.

8          The government trusts Jonnie Williams, but that

9  doesn't mean you have to.  Jonnie Williams is very good at

10 using people to get what he wants.  Jonnie Williams duped

11 Jerri Fulkerson.  That's the woman who forged his

12 signature at his request, his personal assistant for many

13 years.  He duped Mary-Shea Sutherland, who we talked

14 about.  He duped Maureen McDonnell, and the evidence is

15 going to show that he even duped the Department of

16 Justice.

17         We are confident that after you have heard and

18 seen all the evidence in this case, Jonnie Williams will

19 not doop you and you will find that Maureen McDonnell is

20 not guilty on all of these charges.  Thank you.

21         THE COURT:  All right.  We're going to take a

22 15-minute break before the next opening statement.

23         Mr. Marshal, if you would take the jury.

24     (The jury left the courtroom.)

25     (Recess taken from 12:00 p.m. to 12:22 p.m.)

```
 1              THE COURT:  Bring in the jury, please.
 2              MR. DRY:  Judge, just one point.  I've been
 3  admonished before not to stand when the jury comes into
 4  the courtroom in this courthouse, and I just wanted to
 5  make sure that we knew what the rules of engagement were.
 6  I think defense counsel were standing up.  We have no
 7  problem with standing up when the jury comes in.  We just
 8  want to know what the rules of engagement are.
 9              THE COURT:  I don't have any rule.  If you want
10  to stand up when they come in, fine.  If not.
11              MR. DRY:  Thank you, Your Honor.
12         (The jury entered the courtroom.)
13              THE COURT:  All right.  Counsel for
14  Mr. McDonnell.
15              MR. BROWNLEE:  Good afternoon.  Bob McDonnell is
16  an innocent man.  The evidence at this trial will make it
17  clear that Bob McDonnell never entered into an illegal
18  agreement with Jonnie Williams, nor did he ever promise to
19  provide him any official benefits.
20              The evidence will show that the federal
21  government's case depends almost entirely on the testimony
22  of a dishonest man who they cut a deal with so that he
23  would change his story, and Mr. Williams now has been
24  fully immunized for multi-million-dollar securities and
25  tax crimes that have absolutely nothing to do with Bob
```

1  McDonnell.  At the end of the day, there will be no

2  evidence that Bob McDonnell, our former Governor, did

3  anything to corrupt his office or betray his oath to our

4  citizens.  Bob McDonnell is someone who has lived a life

5  of public service and governed with integrity and purpose.

6        After Bob graduated from Notre Dame, he joined

7  the Army.  He served 21 years in the United States Army

8  and Army Reserves, and his oldest daughter, Jeanine,

9  served in the Iraq war.  He was a state prosecutor, making

10  his community and our state safer and better.  He served

11  as Attorney General and Governor, earning the reputation

12  of being one of Virginia's most successful modern day

13  governors.

14        Bob helped pass important legislation.  Helped

15  grow the economy.  He and his team helped put nearly

16  80,000 unemployed Virginians back to work and he made

17  restoration of voting rights and prisoner re-entry a

18  cornerstone of his administration.  Bob worked 14 to 16

19  hours a day, practically every day, in order to do that,

20  and he did it all while living under the spotlight and

21  glare without a hint of scandal or impropriety.

22        These prosecutors are now asking you to ignore

23  all of it and simply assume because they cannot prove that

24  Bob McDonnell threw it all away so he could get part of a

25  catering bill paid for his daughter's wedding.  Ladies and

gentlemen, that did not happen.

Now, Ms. Aber told you this morning that their investigation began in 2013. As you will learn, that simply isn't true. Their investigation began in early 2012. In fact, let me take you back to May 23rd, 2012. From today's date, that's a little over two years ago.

On that date, the government's lead investigator, Agent Charles Hagan, had a meeting with his superiors and members of their team to discuss the progress of an investigation into a man named Todd Schneider, who had been the chef at the Governor's Mansion. Mr. Schneider had been accused of stealing some food.

During the meeting, Agent Hagan reviewed some of the evidence against Chef Todd and discussed his possible defenses. He also told his team that they had learned that Ms. McDonnell had developed a very close relationship with and had been taking gifts from a local wealthy businessman named Jonnie Williams. Agent Hagan's notes show that the meeting ended with the agents making some important conclusions about Bob and Maureen McDonnell's conduct and raised questions on how their investigation would proceed.

First, the lead investigator confirmed the McDonnells' innocence in writing when he wrote that money

1  and gifts to Maureen McDonnell were not illegal, that

2  there was a loophole and that the Governor was not

3  required to list on his disclosure form gifts to his wife.

4          Next, the investigators had real concerns about

5  Jonnie Williams, questioning whether there were possible

6  securities violations committed by Mr. Williams and that

7  he may have committed fraud in obtaining financing for his

8  company.  Lastly, the investigator's notes show that they

9  focused their attention on how they could use Williams to

10  go after the McDonnells.  Before you is an excerpt from

11  his notes.

12          Now, ladies and gentlemen, May 23rd, 2012, was

13  nearly eight months before federal investigators ever

14  talked with Jonnie Williams and it was nine months before

15  these agents interviewed Ms. McDonnell and it was long

16  before Bob McDonnell ever considered submitting a loan

17  application to these banks.

18          Now, the government's thinking, over two years

19  ago, about going after the McDonnells and to do so by

20  using Jonnie Williams, a man they had never even met,

21  raises serious doubts about their case.  Importantly, the

22  evidence will show that what was contemplated by the

23  government over two years ago became a reality when they

24  charged Bob McDonnell with crimes that he did not commit.

25          The evidence will show that during the past two

1    years the federal government has read nearly every single

2    e-mail Bob McDonnell either wrote or received during his

3    time in office.  They read scores of his text messages.

4    They studied his personal papers and his bank records.

5    They forced his five children, both his son-in-laws, and

6    his youngest sister into the federal grand jury for hours.

7    They interviewed his entire staff and cabinet on multiple

8    occasions, one as many as 15 times.  They subpoenaed his

9    accountant and had the IRS thoroughly review his tax

10   returns, searching for any possible problem.

11           They interviewed his neighbors, his closest

12   advisors.  They even traveled to California and

13   interviewed former Presidential Candidate Mitt Romney and

14   his wife Ann, hoping to find someone to say something bad

15   about Bob McDonnell.  And you know what?  They came up

16   empty.  They couldn't find a thing.

17           And to show their desperation in trying to find

18   something bad, anything bad about Bob, the prosecutor in

19   this case used the Governor's security detail, the people

20   whose job it was to protect Bob McDonnell and who were

21   with him every day of his governorship, they had him

22   eavesdrop on his private conversations and then report to

23   federal investigators what they saw and heard.  And do you

24   know how many crimes they reported about Bob McDonnell?

25   None.  Zero.  Nothing.

1              Ladies and gentlemen of the jury, my name is

2    John Brownlee and it is a distinct privilege and honor for

3    me, as well as my co-counsel, Hank Asbill, to appear

4    before you today on behalf of Bob McDonnell.  It is also

5    an honor for me to be in the courtroom of the

6    United States Judge -- United States District Judge James

7    Spencer.  And, Your Honor, thank you.

8              The federal government wants you to believe that

9    Bob McDonnell corrupted his office, betrayed his oath by

10   selling the governorship of Virginia to Jonnie Williams in

11   exchange for a wedding gift to his daughter, a couple of

12   golf matches with his sons, a few dinners, and a loan to a

13   business he owns with his youngest sister.  And they want

14   to try to do all of this while acknowledging, as they did

15   this morning, that Jonnie Williams got nothing from the

16   taxpayers of Virginia.

17             The evidence in this case is uncontested that

18   Jonnie Williams didn't get a state grant.  He didn't get a

19   state contract.  He didn't get a state loan.  He didn't

20   get a state board position.  He didn't get a special piece

21   of legislation.  He didn't get anything in the state

22   budget.  He didn't get any funds from this Tobacco

23   Commission.  In fact, the evidence will be, he never even

24   applied for any.

25             As taxpayers here in Virginia, you can all rest

1   assured that neither Jonnie Williams, nor any of his

2   companies, got one dollar from taxpayer money from the

3   administration of Bob McDonnell.  And the evidence will

4   show that not only did he not get anything from the

5   administration, he never really even asked for anything.

6   And yet despite the clear evidence that Mr. Williams

7   didn't get anything from the taxpayers of Virginia, the

8   federal government is going to try to convince you that he

9   got something.

10          So what have they come up with?  Setting up a

11  couple of meetings, attending an event at the Governor's

12  Mansion in which -- which is important -- the company gave

13  money to the state of Virginia and that Bob McDonnell said

14  nice things about Mr. Williams' company and his products.

15  And the supposed promise to do more that the government

16  talked about today for which there is no credible evidence

17  is simply not enough for a federal criminal corruption

18  case.

19          So first, the meetings.  The evidence will show

20  that referring constituents for meetings is what

21  politicians do.  It's why the politicians are there, to

22  help citizens get access to their government and a chance

23  to make their pitch.  Criminalizing this bedrock principal

24  of arranging meetings for constituents, for donors and

25  non-donors alike, would make felons virtually of every

1   person who has ever held a public office.  That is not the

2   law, and the evidence in this case will not support it.

3           In four years in office, Bob McDonnell asked

4   members of his staff and cabinet to meet with Mr. Williams

5   on just two occasions, once in 2010 and again in the

6   summer of 2011.  The request in 2010 occurred before

7   Mr. Williams gave the McDonnells any gifts or loans,

8   proving that Bob McDonnell didn't need a gift from Jonnie

9   Williams for him to be a supporter of his company.  Also,

10  the evidence will show that all Mr. McDonnell did was ask

11  that the meetings be held.  He didn't tell anyone to help

12  Mr. Williams, nor did he even follow up on the meetings.

13  What Bob McDonnell did, in asking his staff and cabinet to

14  meet with Williams, was routine, appropriate, and

15  perfectly legal.

16          Second, this mansion event.  Here, Mr. Williams

17  requested an opportunity to come to the Governor's Mansion

18  and give two state research universities, UVA and VCU,

19  each $25,000 in research grants.  Mr. McDonnell stopped by

20  the event for about 45 minutes, made some casual remarks

21  supporting medical research in Virginia, asked a few hard

22  questions and left before the event was over.  Again, the

23  evidence will show that Mr. McDonnell did not pressure

24  anyone to help Mr. Williams, nor did he follow up on the

25  event.

1          Lastly, the evidence will show that on a few

2    occasions Bob said nice things about Star Scientific, a

3    Virginia public company for which Jonnie Williams was CEO.

4          Ladies and gentlemen, saying positive things

5    about a Virginia business is what Bob McDonnell always

6    did.  That's who he was as Governor.  He was Bob's for

7    jobs, creating jobs, promoting Virginia businesses,

8    getting Virginians back to work.  That's what he was all

9    about, and Bob traveled all over the state, around the

10   country and to many foreign countries with that same

11   message.  It was come to Virginia.  We are the most

12   business-friendly state in America.

13         Now, the evidence will show that no one had to

14   pay Bob McDonnell to get him to use a Virginia product or

15   say nice things about a Virginia company.  Bob McDonnell

16   eats Virginia ham, he drinks Virginia wine, and my guess

17   is if the man smoked, he would smoke Virginia cigarettes.

18   His whole purpose of Governor was supporting and promoting

19   every Virginia business he could.  I'd like you to watch

20   just two short video clips to demonstrate that.

21        (Video Played.)

22        (Video Ended.)

23         MR. BROWNLEE:  Ladies and gentlemen, these two

24   examples of many show what Bob's job was as Governor.  It

25   was his mission.  It was his passion, and it helped

1  Virginia dig out of one of the biggest economic recessions

2  in 80 years.  The easiest thing for a Virginia business to

3  get was a kind word about its product from Governor Bob

4  McDonnell.  And the government's attempt to build a

5  corruption case based on Bob McDonnell's promotion of a

6  Virginia business is deeply flawed and cannot be

7  sustained.

8          Now, Ms. Aber talked about concealment.  The

9  government's case alleges that Bob McDonnell concealed his

10  relationship with Jonnie Williams.  Ladies and gentlemen,

11  Bob McDonnell never hid anything from anyone.  In fact,

12  he's the only major player in this entire drama who has

13  been completely open about everything.

14          You aren't going to see Jonnie Williams' text

15  messages.  You're not going to see Mary-Shea Sutherland's

16  either.  You're going to see his, and you'll see the

17  thousands of documents, personal notes, schedules, logs

18  that he had.  He turned over everything they asked for,

19  and the evidence at trial will make it completely clear

20  that Bob isn't hiding anything.

21          Now, you won't have to take my word for it

22  because Bob McDonnell is going to tell you that himself.

23  You see, Bob McDonnell is going to take that chair right

24  there and he is going to tell you what happened, what he

25  did and why he did it.  Bob is going to take the stand and

1  swear on everything that is holy and dear to him and tell

2  you the truth about these false accusations.  He will

3  answer every single question that Judge Spencer deems

4  appropriate.  He was not hiding anything before, and he

5  will not hide anything now.

6          Now, remember, he has no obligation to take that

7  stand.  He has no obligation to say anything in response

8  to these allegations.  It is the prosecutor's burden to

9  show that he is guilty.  It is not his burden to show that

10 he is innocent, but he is going to take that stand anyway

11 because that's who he is.  He will not hide from their

12 false accusations.  That's because Bob McDonnell is a man

13 of integrity.  And his integrity, his character, and his

14 testimony will convince you that he is an innocent man.

15         In this trial you are going to hear from

16 impressive people who grew up with Bob McDonnell.  People

17 who have known Bob his entire life.  People who have

18 worked alongside Bob in the trenches of political

19 campaigns in the governing of our Commonwealth.  People

20 who have seen Bob when he was physically and emotionally

21 exhausted and at the times of maximum stress, when even

22 the most disciplined person's true character is exposed.

23 These people will be your X-ray machine into Bob's soul,

24 and they will tell you that Bob McDonnell is truthful,

25 law-abiding, decent, and totally dedicated to public

1  service.  Bob McDonnell is not a perfect person, but they

2  will tell you he is an honest man and the most -- least

3  cynical person they know.

4         Now, the prosecutors have to convince every

5  single one of you beyond a reasonable doubt that Bob

6  McDonnell is guilty of the crimes that they have accused

7  him.  That is the highest standard in American law.  But I

8  submit, we will prove to you that the prosecutors are

9  wrong about who Bob is and that they have made a grievous

10 mistake in accusing this man of these crimes.

11        The evidence will show that Bob McDonnell

12 doesn't care about material possessions.  He's not greedy.

13 He was not financially desperate and Mr. Williams was not

14 his only option for a loan.  Witness after witness will

15 tell you that.  He is a humble man of great faith who is

16 thankful every day for the incredible opportunity he had

17 had to serve the people of Virginia.  He is a trusting man

18 who gives the benefit of the doubt to every person he

19 meets and you will see that that trait, that very trait,

20 that honorable trait is a major reason now that he faces

21 the biggest challenge of his life.

22        The government's case is remarkable for what it

23 lacks because there will be no credible evidence offered

24 in this case that Bob McDonnell promised Jonnie Williams

25 anything.  There is not a document, an e-mail, a text

 1  message, a recording, a photo, a video or anything that

 2  shows any agreement or promise between Jonnie Williams and

 3  Bob McDonnell.  There's nothing.  Even Jonnie Williams, in

 4  an unguarded moment of candor, denied emphatically that

 5  any such agreement or corrupt relationship existed between

 6  himself and Bob McDonnell.

 7          Now, as Mr. Burck told you, on January 23rd,

 8  2013, federal agents traveled to one of Mr. Williams'

 9  homes in Florida to interview him.  At that time he had no

10  lawyer.  Mr. Williams made it clear that Bob promised him

11  nothing.  Williams told the investigators that he never

12  asked for anything from Bob and never expected anything

13  from him.  And in May 2013, just a few months later, Star

14  Scientific put out a public statement reaffirming

15  Mr. Williams' admission to the FBI that Bob McDonnell had

16  done nothing wrong or illegal.

17          But that's not all.  The evidence will also show

18  that Bob never asked a single person in Virginia

19  government to do anything for Jonnie Williams except hear

20  him out.  Bob never twisted arms.  He never banged on

21  doors.  He didn't put the screws to anyone.  He didn't do

22  anything besides let Jonnie Williams make his pitch to the

23  experts on his staff who Bob knew would make an

24  independent and professional judgment about what to do

25  with Jonnie Williams and his products.  Bob hired these

1  people for their integrity and independence, and that is

2  exactly what they gave him in return, and the evidence in

3  this case will make that crystal clear.

4          The evidence will also show that the reason

5  Jonnie got nothing and the reason Bob never tried to make

6  anyone give Jonnie anything is because there was simply no

7  conspiracy.  There was no plan.  There was no agreement.

8  There was no under-the-table deal.  There were no secret

9  conspiratorial meetings or phone calls and there was no

10  scheme to defraud.  That, ladies and gentlemen, is what

11  the evidence will show.

12          The evidence will also show that Jonnie was nice

13  to Bob and generous to his family and that that generosity

14  was perfectly legal under Virginia law.  Now we know that

15  Williams' generosity was all a sham and he was actually a

16  false friend.  The evidence will show that Jonnie is lying

17  if he claims that Bob ever promised him everything or gave

18  him anything in exchange for that generosity.  Plain and

19  simple, ladies and gentlemen, Jonnie deceived Bob.  Jonnie

20  deceived and manipulated Maureen.  Jonnie deceived and

21  manipulated Mary-Shea Sutherland, and Jonnie did it again

22  to his long-time personal aid, Jerri Fulkerson.  Jonnie

23  deceived his companies and its lawyers.  Jonnie misled the

24  thousands of investors who entrusted his company with

25  their hard-earned money.  And the evidence will show that

1  Jonnie Williams, the master manipulator, deceived these

2  prosecutors and agents who brought this case and convinced

3  them to think the worst about Bob McDonnell.

4       And he did it to save himself from losing

5  millions of dollars and potentially going to prison for

6  securities and tax crimes that have nothing to do with Bob

7  McDonnell and for which now the federal government has

8  provided him total and full immunity, the value of which

9  is immense to Jonnie Williams.

10       Now, Bob McDonnell was a good Governor because

11  he was one of the hardest working people in Virginia.  He

12  was always working, always at events, always traveling,

13  always on the go.  And over his four years as Governor,

14  according to his staff, he held over 3,600 meetings, spent

15  4,600 hours away from home.  I think that's about half of

16  the entire four-year term.  He gave hundreds of speeches,

17  attended even more events, worked 14 to 16 hours a day all

18  through the year.  Bob McDonnell hired an extraordinarily

19  hardworking and talented staff and cabinet and empowered

20  everyone on that talented staff to do their very best too,

21  all following his example.

22       But, ladies and gentlemen, his hard work and his

23  dedication, and particularly his time away, it took a

24  toll.  It took a toll on his family, and it took a

25  terrible toll on his wife.  Bob McDonnell, by all

accounts, was a good Governor.  He was good at raising or

helping to raise his five children and he loves them

immensely, but the evidence will show he was not nearly as

successful as a husband.  In his life, something had to

give and it was his marriage.  The only thing that the

government now offers to prove that he was conspiring with

his wife.

Bob did try to keep private, while he was

Governor, the most personal and difficult aspects of his

marriage.  Bob tried to shield the dysfunction of his

marriage from his youngest children and from the public.

But now you will hear evidence about what happened behind

closed doors with Maureen.  You will hear that no matter

how hard it got or how hard he struggled, he did his level

best to help his wife.  Bob never criticized his wife in

public.  He never humiliated her.  He never scorned her,

and he never did anything to diminish her.  He did

everything he could to help Maureen to give her confidence

and self-esteem.  He did everything he could to give her

initiatives she could promote and tried to help her be the

best First Lady she could be.

He hired a team of professionals, including

someone he thought was highly competent, Mary-Shea

Sutherland, as Maureen's Chief of Staff.  He thought

Mary-Shea would help Maureen, would guide her and protect

```
 1  her in this new role.  He trusted Mary-Shea to steer
 2  Maureen wisely and responsibly and to help Maureen cope
 3  with the demands of a public life that had caused her
 4  tremendous stress and anxiety.  That's why Bob asked
 5  Mary-Shea not to leave.
 6          But no matter what he did to hold everything
 7  together, it was never enough.  As Mr. Burck alluded to,
 8  Bob and Maureen's communications broke down almost
 9  entirely and Ms. McDonnell's resentment and anger and
10  sadness grew as their marriage fell apart.  Bob reached
11  out to try to bridge this gap and he wondered why, why
12  this happened.
13          She said she hated him.  She was angry for not
14  having what she thought was enough money.  She was angry
15  at him for not spending enough time at home with her, and
16  she hated him for not being around, for serving the public
17  night and day, and having nothing left for her.  And this
18  broke their marriage apart.  And it created a rift so wide
19  that an outsider, in this case another man, could invade
20  and poison the marriage.
21          I want to let you know how difficult this is for
22  Bob McDonnell.  Although he has been in public life for
23  many years, you will hear he is and remains a very private
24  man.  As you can imagine, to be forced to discuss his
25  troubled marriage in public with total strangers goes
```

1   against every fiber of his being as a man and as a husband

2   and as a father.  But Bob has agreed to open up his

3   marriage and his life to you so you can properly assess

4   for yourself his character and their charges.

5           Bob McDonnell will invite all of you to evaluate

6   his life, both successes and sorrows, all so that you can

7   see for yourselves that the government's allegation that

8   he was conspiring with his wife, and later with

9   Mr. Williams, is simply not true.

10          Back in September of 2011, Bob sent Maureen a

11  long e-mail after a weekend in which she was extremely

12  angry at him.  The e-mail shows him begging her to help

13  save the marriage.  You are going to read this e-mail, an

14  e-mail, quite frankly, that no one besides a husband and

15  wife should ever read.  It will show you just how broken

16  things were in their marriage.  An e-mail he sent right in

17  the middle of their supposed conspiracy.  But that e-mail,

18  which Bob will read to all of you, fell upon blind eyes

19  and deaf ears for that evening Maureen was distracted with

20  other interests.

21          The prosecutors in this case are going to attack

22  Bob's integrity and character at every turn, claiming that

23  he's entitled, claiming that he's greedy, claiming that he

24  was financially desperate.  You will hear a lot of

25  evidence about disclosure in this trial and you will hear

1  innuendo about Bob hiding things, but the evidence will

2  show that Bob was hiding in plain sight.  As Governor of

3  Virginia, as head of the Republican Governor's Association

4  and as a possible running mate for Mitt Romney, Bob had no

5  privacy, none.  All day, everywhere, people were watching

6  him, scrutinizing him, paying attention to everything he

7  said and to everything he did.

8         Now, ladies and gentlemen, over the next several

9  weeks, we are going to address head-on each of the

10 government's allegations.  One by one, we will show you

11 why everything they accuse Bob McDonnell of doing was

12 wrong.

13        For instance, Ms. Aber, this morning, said that

14 Bob lied to two banks when he was seeking refinancing on a

15 couple of properties.  She claimed that Bob intentionally

16 left off Mr. Williams' loans.  What she forgot to tell you

17 is that Bob has been friends with the president of

18 TowneBank for 20 years and started doing business with

19 PenFed when he was a young soldier in the Army nearly 40

20 years ago.

21        She also didn't tell you that neither bank ever

22 claimed it had been lied to or that any of the forms

23 submitted were false.  In fact, the very bank that the

24 government alleges Bob supposedly lied to renewed that

25 very loan a month after the government returned its

1    indictment.   The evidence will show that at the time Bob

2    submitted the applications, numerous people knew that

3    Williams had loaned them money.   His youngest sister knew.

4    His youngest sister's estranged husband knew.   Jerri

5    Fulkerson knew.   And Bob's bookkeeper and accountant had

6    full and direct access to his accounts, which clearly

7    showed Williams' loans.

8         The idea that Bob would suddenly, in the third

9    year of his governorship, in the full glare of the public

10   spotlight, lie on bank applications because he didn't want

11   a few bankers to know that he had taken loans from Jonnie

12   Williams defies all logic and common sense.

13        The evidence will also show that Bob McDonnell

14   never hid or tried to hide Mr. Williams' support,

15   generosity or friendship.   In fact, while Bob McDonnell

16   was Governor -- Ms. Aber discussed this morning these

17   statements of economic interest.   While Bob McDonnell was

18   Governor, he publicly reported nearly $170,000 in

19   donations, gifts, and loans from Mr. Williams and his

20   company.   All, all of them perfectly legal under Virginia

21   law.   And Bob McDonnell complied with Virginia law in

22   every respect.   In fact, there will be no suggestion at

23   this trial that Bob McDonnell ever violated Virginia

24   disclosure laws or reporting requirements, ever.

25        You will see that for every year, from 2009

1  through 2012, Bob McDonnell disclosed publicly for all to

2  see that Mr. Williams had donated to his campaign, had

3  given to his Political Action Committee and had provided

4  him and his family some gifts and loans.  And Bob did

5  nothing to hide his friendship with Mr. Williams.  They

6  golfed together.  They ate together.  In fact, on one

7  occasion, their families went on a vacation together.  Bob

8  McDonnell never hid anything or tried to hide anything

9  about Mr. Williams, and, ladies and gentlemen, any

10  assertion to the contrary is simply not true.

11          I have thought a lot about today and this moment

12  and how I would like you to think about Bob McDonnell as

13  we begin to hear the evidence in this case.  As I think

14  about Bob McDonnell, I am reminded of one of my favorite

15  quotes from a book I read as a young Army officer, now

16  some 26 years ago.  The book, Once an Eagle, was written

17  by Anton Myrer.  It is a novel about a young soldier in

18  World War I who rose to the rank of general officer in

19  World War II.  Toward the end of the book, on learning

20  that his own son had been killed in action, he recalls

21  what he said to his son some years ago.  "That's the whole

22  challenge of life, to act with honor and hope and

23  generosity no matter what you've drawn.  You can't help

24  when or what you were born and you may not be able to help

25  how you die, but you can and you should try to pass these

1    days between as a good man."

2          Ladies and gentlemen, the evidence will show in

3    this case that Bob McDonnell is a good man who always

4    acted with honor and hope and generosity.

5          Now, as this trial goes on, some of you may be

6    surprised at how aggressively we are defending Bob

7    McDonnell.  We are not going to apologize for that.  It is

8    a tremendous privilege and honor for each of us to defend

9    Bob McDonnell, to defend his freedom, to defend his

10   family, to defend his reputation, and to defend his future

11   against accusations by the federal government that the

12   evidence simply will not support.

13         We are going to defend Bob McDonnell with every

14   ounce of energy we can muster and with every single

15   witness you will hear.  And at the end of this trial, when

16   all the chips are on the table, all the hands have been

17   played, and there is no more evidence to hear, my

18   co-counsel, Hank Asbill, will have the privilege of

19   speaking to you personally in his closing argument.  And

20   when that day comes, Hank will not hesitate to ask each of

21   you to return the only just verdict in this case and that

22   is not guilty on all counts.  Thank you.

23         Thank you, Your Honor.

24         THE COURT:  All right.  We are at 1:07, or

25   thereabouts.  We are going to stop now for lunch, and I

```
1   would like for you to come back at ten minutes past 2, a
2   little over an hour from now.  And you're going to be on
3   your own today.  So remember the admonition:  Be careful.
4   Don't let anybody talk to you, and as I said before, if
5   anybody attempts to discuss this case with you, please let
6   me know.  If you all would follow the marshal, we'll see
7   you at 2:10.
8        (The jury exited the courtroom.)
9   ///
10  ///
11  ///
12  ///
13  ///
14  ///
15  ///
16  ///
17  ///
18  ///
19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
```

```
1              (Luncheon recess taken from 1:10 p.m. to 2:10 p.m.)

2              THE COURT:  All right, let's bring in the jury,

3    please.  All right, let me invoke the rule on witnesses.

4    All of those who expect to be called as a witness in this

5    case, except for the government's representative, and

6    defense expert as appropriate, will have to leave the

7    courtroom to await their call.

8              MR. DRY:  Just to confirm, that's only one

9    government representative witness, case agent?

10        (The jury entered the courtroom.)

11             THE COURT:  Let's approach on that.

12        (At Bench.)

13             MR. DRY:  The defense has not objected to having

14   the case agents in the courtroom, it is my understanding.

15             THE COURT:  How many do you have?

16             MR. DRY:  Two.

17             THE COURT:  That's fine.

18             MR. DRY:  Yes, sir, thank you.

19        (In Open Court.)

20        All right, government, call your first witness.

21             MR. HARBACH:  Thank you, Your Honor.  The

22   government calls Ryan Greer.

23                       RYAN GREER,

24   called as a witness by and on behalf of the government,

25   having been first duly sworn by the Clerk, was examined
```

**RYAN GREER - DIRECT**

1    and testified as follows:

2                        DIRECT EXAMINATION

3    BY MR. HARBACH:

4    Q    Mr. Greer, please state your name and spell your last

5    name for the court reporter, please.

6    A    Ryan Greer, G-R-E-E-R.

7    Q    What do you do for a living?

8    A    I'm a food and beverage manager.

9    Q    Did you used to work for a company called Seasonings

10   Fine Catering?

11   A    Yes, sir.

12   Q    It is probably obvious, but what kind of company is

13   that?

14   A    It is a catering company.

15   Q    When was it that you worked there?

16   A    2008 through 2011.

17   Q    During your time working for Seasonings Fine

18   Catering, were you personally involved in catering a

19   wedding for the daughter of Mr. and Ms. McDonnell?

20   A    Yes, sir.

21   Q    When was that wedding, do you recall?

22   A    It was June, 2011.

23   Q    In connection with doing your planning for that

24   wedding, did you have occasion to meet personally with

25   both Mr. and Ms. McDonnell?

**RYAN GREER - DIRECT**

1    A    Yes.

2    Q    Tell us about that.  Where did it happen?

3    A    We had a dinner at the Governor's Mansion.

4    Q    Who was present at the dinner besides yourself?

5    A    That would have been Mr. and Ms. McDonnell, Cailin,

6    and Chris.

7    Q    Chris being the groom-to-be?

8    A    Yes.

9    Q    What was the purpose of the dinner meeting at the

10   Mansion?

11   A    To discuss planning for the wedding, plates, glasses.

12   Q    Who was it who negotiated the price of the catering

13   and the contracts terms?

14   A    Todd Schneider.

15   Q    Who is Todd Schneider?

16   A    He was the owner of Seasonings.

17   Q    Was he your boss?

18   A    He was.

19   Q    Was there a draft contract prepared for the

20   McDonnells' event?

21   A    There was.

22   Q    Who prepared that?

23   A    Myself and Todd.

24   Q    If we can please show to the witness only Government

25   Exhibit 80.  Do you recognize the document that's on your

1    screen there, sir?  Can you see it okay?

2    A    Yes.

3    Q    What is that that we are looking at there?  Just

4    identify the document, please.

5    A    That's an e-mail that was sent to Cailin.

6    Q    Who sent the e-mail to Cailin McDonnell?

7    A    Myself.

8    Q    Have you reviewed this document in preparation for

9    your testimony here today, sir?

10   A    Yes, I have seen this document.

11   Q    Are there attachments to the document?

12   A    There are.

13   Q    And are the attachments paperwork related to the

14   catering job you were going to do for Cailin McDonnell's

15   wedding?

16   A    Yes.

17            MR. HARBACH:  The government offers Government

18   Exhibit 80.

19            MR. ASBILL:  No objection.

20            THE COURT:  It will be admitted.  Are you saying

21   8 or 80?

22            MR. HARBACH:  80.

23            THE COURT:  All right.

24   BY MR. HARBACH:

25   Q    Could we take a look at Page 2 of Government's 80?

**RYAN GREER - DIRECT**

1   What are we looking at here, Mr. Greer?

2   A    That would be an invoice that was prepared for the

3   wedding.

4   Q    And a couple questions about this.  First of all,

5   there is a gray box around the word "Sales Rep," about a

6   third of the way over from the left.  Do you see that?

7   A    I do.

8   Q    It has the initials RPG.

9   A    Correct.

10  Q    Who is that?

11  A    That's me.

12  Q    Let's take a look at Page 3, please.  What is this?

13  A    That would be the menu.

14  Q    This was the proposed menu for the wedding that you

15  all were catering?

16  A    Correct.

17  Q    Who prepared this thing?

18  A    Todd Schneider.

19  Q    Could we please take a look at Page 3 of Government's

20  Exhibit 80.  Is this a continuation of the menu, talking

21  about the details of the pricing?

22  A    Yes, sir.

23  Q    Okay.  Finally, Page 4 of Government's 80.

24  A    That would be the contract.

25  Q    And I note on the top right-hand corner, the first

**RYAN GREER - DIRECT**

1   page, it says Page 1 of 3.  Before we go on to the last

2   two pages of the document, I want to note if we could blow

3   up where it says "Total Cost" down there at the bottom,

4   those four lines or so.  Thank you, sir.  Total cost is

5   listed at just under $16,000.  Do you see that there, sir?

6   A    Yes.

7   Q    And then there are two 25 percent installments that

8   are due.  Was that standard practice at Seasonings, to

9   require deposits in advance like that?

10  A    Correct.

11  Q    Then briefly if we could look at Page 5, excuse me,

12  Page 6 of Government's 80, this is good, Page 2 of 3, a

13  continuation of the draft contract that you sent to Cailin

14  McDonnell, sir?

15  A    Yes.

16  Q    And then finally the last page of Government's 80, a

17  signature page?

18  A    Correct.

19  Q    Okay.  After you -- you can take that exhibit down,

20  please.  After you e-mailed the paperwork we just looked

21  at to Cailin McDonnell, did you eventually hear back from

22  Mr. McDonnell?

23  A    Yes, sir.

24  Q    If we could pull up for identification, please,

25  Government Exhibit 81.  Are you able to see the page on

1   that screen, sir?

2   A    Yes, sir.

3   Q    Okay.  Do you recognize this document?

4   A    I do.

5   Q    Is this the documentation you received back from

6   Mr. McDonnell?

7   A    Yes, sir.

8           MR. HARBACH:  The government offers Government's

9   81.

10          MR. ASBILL:  No objection.

11          THE COURT:  It will be admitted.

12          MR. HARBACH:  Your Honor, would you like me to

13  ask to publish to the jury each time or is it okay to

14  publish once it is admitted?

15          THE COURT:  Once it is admitted it can be

16  published.

17          MR. HARBACH:  Thank you.

18  BY MR. HARBACH:

19  Q    Okay, Mr. Greer, the first thing I'd like to identify

20  is the handwriting at the bottom of the page there.  Could

21  we blow that up?  Whose handwriting is that, Mr. Greer?

22  A    That's my handwriting.

23  Q    And could we walk through it briefly, where it says

24  "Do LED lights," what was that about?

25  A    That would have been for the tables at the wedding.

1    To put lights on the table.

2    Q    Then can you read the next few lines of your notes?

3    A    "Electricity very limited, bring power from garage.

4    How many fans and what the pull," and then to "Doug and

5    Rich."

6    Q    Do you recall what the issue was surrounding the

7    electricity  and the power from the garage?

8    A    I felt that it wasn't going to be enough power to

9    power everything.

10   Q    It was going to be needed for the reception?

11   A    Correct.

12   Q    Okay.  Zoom back out, please.  Now, there's some more

13   handwritten notes on the right-hand side of the page

14   there.  And are you able to make out who it appears signed

15   that handwritten note to you?

16   A    Yes.

17   Q    What does it say?

18   A    "Bob McDonnell."

19   Q    Now, I'm going to read this into the record and ask

20   you if I've read it correctly, okay?  Can you follow along

21   with me?

22   A    Sure.

23   Q    It says:  "Ryan, I have made a few reasonable changes

24   to the contract which I hope you find acceptable.  Left a

25   voicemail as well.  Likely final head count closer to

1    200-200-" something, "and will advise in advance.  Thanks,

2    Bob McDonnell."  There is a phone number.  "P.S.  Thanks

3    for all your help with Cailin to get this set up."

4            As best you could tell, did I read that

5    correctly, sir?

6    A    Yes, sir.

7    Q    Now, let's take a look at Page 2 of Government's 81,

8    please.  And Page 3.  On this one there's some other

9    handwritten notations.  Do you recognize that handwriting

10   or know who wrote that, sir?  By that, I mean the $757

11   that's handwritten in there, and the total.

12   A    I'm not 100 percent sure of whose handwriting that

13   is.

14   Q    Let's look at Page 4, please.  And if we could just

15   blow up right there, thank you, this area where some other

16   handwritten notations have been made.  To your

17   recollection, sir, when you received this document that we

18   are looking at now, that is Government's 81, back from,

19   eventually back from Mr. McDonnell, to your knowledge, had

20   anyone else marked it up?

21   A    Not to my knowledge.

22   Q    Did Mr. Schneider tell you that he marked it up by

23   hand?

24   A    I don't recall.

25   Q    Okay.  If you could back out, please.  Let's go to

1    the next page of Government's 81.  There is some line

2    editing on this page.  Appears to say, "The deposit will

3    be refunded if an act of God or death occurs which

4    prevents the wedding reception from occurring."  Did I

5    read that correctly?

6    A    Yes, sir.

7    Q    What was your understanding of who made that change

8    to the document when you received this thing?

9    A    Bob McDonnell.

10   Q    Please back out, Mr. Starnes.  Then also, thank you,

11   the bottom half, we don't need to go through all of these

12   details, the jury can read them.  But would your answer be

13   the same on these other handwritten notations to the

14   contract, namely, that it was your understanding that it

15   was Mr. McDonnell who made them?

16   A    Yes, sir.

17   Q    And finally, the last page of the draft contract,

18   which is also the last page of Government's 81, one of

19   those signature lines has a name on it.  Next to the word

20   "Client," you see the signature there that appears to be

21   Robert McDonnell's signature?

22   A    Yes.

23   Q    What's the date that he apparently signed it?

24   A    December 29th, 2010.

25   Q    Thank you.  You can take the exhibit down,

1   Mr. Starnes.  Earlier in your testimony, Mr. Greer, we

2   talked about a couple of deposits that were going to be

3   due before the event.  Do you recall that testimony?

4   A    I do.

5   Q    Do you recall whether Seasonings received deposits

6   like that from the McDonnells?

7   A    We did.

8   Q    Take a look with me at Government's 79, please.  Do

9   you recognize that document, sir?

10  A    Yes.

11  Q    What is it?

12  A    That would have been the first deposit check from the

13  Governor.

14          MR. HARBACH:  The government offers Government's

15  79.

16          MR. ASBILL:  No objection.

17          THE COURT:  It will be admitted.

18  BY MR. HARBACH:

19  Q    What's the amount of this check, sir?

20  A    $3,974.25.

21  Q    And the names at the top left of the check, whose

22  names are on this check, sir?

23  A    Robert McDonnell and Maureen McDonnell.

24  Q    Did you deposit this check for Seasonings?

25  A    Yes, sir.

**RYAN GREER - DIRECT**

```
1    Q    Could we see for identification Government's 82,

2    please.  Is this the deposit slip with which you deposited

3    the check we were just looking at, sir?

4    A    Yes, sir.

5              MR. HARBACH:  The government offers Government's

6    82.

7              THE COURT:  It will be admitted.

8    BY MR. HARBACH:

9    Q    I don't know if you can turn your head to the side

10   and read when you deposited that check, sir.

11   A    December 31st, 2010.

12   Q    There we go.  Thank you, sir.

13   A    You are welcome.

14   Q    That's it for that exhibit, Mr. Starnes.  Could we

15   please pull up for identification Government's 156.  Do

16   you recognize this document, sir?

17   A    I do.

18   Q    What is it?

19   A    That would be an invoice history statement from

20   QuickBooks.

21   Q    Is that a Seasonings record?

22   A    It is.  That's where we enter the payments.

23             MR. HARBACH:  The government offers Government's

24   156.

25             MR. ASBILL:  No objection.
```

1          THE COURT:  It will be admitted.

2     BY MR. HARBACH:

3     Q    Okay, Mr. Starnes is blowing this up for you,

4     Mr. Greer.  First question is, what's the entry next to

5     "Customer"?

6     A    "Governor Bob McDonnell."

7     Q    And down there, what's the purpose of this record?

8     Sorry, that was a bad question.  Let me just ask you,

9     what's the purpose of an invoice history document like we

10    are looking at here?

11    A    So we would know how much payment or what's due by

12    the time the wedding comes.

13    Q    Okay.  And in this case, the first payment there

14    that's marked December 31st of 2010 of $3,974.25, is that

15    the check we were just talking about a moment ago?

16    A    Yes, sir.

17    Q    Was there a second deposit in identical amount a

18    couple of months later?

19    A    There was.

20    Q    Let's take a look for identification, please, at

21    Government's 85.  Do you recognize this to be the check

22    for that second deposit, sir?

23    A    Yes, sir.

24          MR. HARBACH:  The government offers Government's

25    85.

**RYAN GREER - DIRECT**

1    THE COURT:  It will be admitted.

2  BY MR. HARBACH:

3  Q    What's the date of this check, Mr. Greer?

4  A    January 22nd, 2011.

5  Q    And what's the name on the upper left corner of the

6  check?

7  A    Robert McDonnell.

8  Q    And an identical amount to the first deposit check?

9  A    Yes, sir.

10  Q    Did you deposit this one?

11  A    I do believe I did.

12  Q    Could we look for identification at Government's 86.

13  Is this the deposit slip for the second check we were just

14  looking at, Mr. Greer?

15  A    Yes, sir.

16    MR. HARBACH:  The government offers Government's

17  86.

18    THE COURT:  It will be admitted.

19  BY MR. HARBACH:

20  Q    When did you deposit the second deposit -- excuse me,

21  the second check, sir?

22  A    February 3rd, 2011.

23  Q    Take that exhibit down, Mr. Starnes.  Mr. Greer, do

24  you recall how the balance of the amount due and owing on

25  the contract was paid?

1    A    I do.

2    Q    How was it paid, sir?

3              MR. ASBILL:  Objection, based on hearsay.

4              THE COURT:  Overruled.

5    BY MR. HARBACH:

6    Q    Go ahead, sir.

7    A    It was paid for by a check made out to Seasonings for

8    $15,000.

9    Q    If we could take a look for identification at

10   Government's 121, please.  Is this the check you were just

11   describing, sir?

12   A    Yes, sir.

13             MR. HARBACH:  The government offers Government's

14   121.

15             THE COURT:  It will be admitted.

16   BY MR. HARBACH:

17   Q    What's the amount of the check, sir?

18   A    $15,000.

19   Q    And what's the name on the top left of this check,

20   the account holder?

21   A    Starwood Trust.

22   Q    In the pay line where it says "Pay To The Order Of,"

23   it says "Great Seasons Catering."  Is that your

24   handwriting, sir?

25   A    No, sir.

**RYAN GREER - DIRECT**

| | |
|---|---|
| 1 | Q    Do you know whose handwriting it is? |
| 2 | A    No, sir. |
| 3 | Q    When you received the check, was that filled in with |
| 4 | Great Seasons Catering? |
| 5 | A    It was. |
| 6 | Q    Do you recall how you received, you personally |
| 7 | received this check, sir? |
| 8 | A    I know I received it at the restaurant, and to be |
| 9 | honest, it was either Todd Schneider handed it to me or |
| 10 | Mary-Shea.  I don't know 100 percent who gave it to me. |
| 11 | But I received it at the restaurant. |
| 12 | Q    You think it was one of those two people? |
| 13 | A    One of those two. |
| 14 | Q    But you don't remember which? |
| 15 | A    I don't. |
| 16 | Q    When you say "the restaurant," what are you talking |
| 17 | about? |
| 18 | A    Seasonings Fine Catering.  We also had a restaurant. |
| 19 | Q    Here in Richmond? |
| 20 | A    Yes, in Midlothian. |
| 21 | Q    Okay.  Back to the check that's displayed on |
| 22 | Government's 121.  Did you deposit this one? |
| 23 | A    I did. |
| 24 | Q    Did you receive any different instructions about your |
| 25 | deposit of this check? |

**RYAN GREER - DIRECT**

1    A    Yes.  I was asked to cash the check.

2              MR. HAUSS:  Objection, hearsay.

3              THE COURT:  Overruled.

4              THE WITNESS:  I was asked to cash the check.

5    BY MR. HARBACH:

6    Q    By whom?

7    A    Todd Schneider.

8    Q    Did you take it to the bank?

9    A    I did.

10   Q    What happened?

11   A    They wouldn't cash it because it is a business

12   account so they made me deposit it.

13   Q    If we take a look for identification at Government

14   Exhibit 133, please.  Is this the deposit slip for the

15   check we have just been talking about?

16   A    Yes, sir.

17             MR. HARBACH:  The government offers Government's

18   133.

19             THE COURT:  It will be admitted.

20   BY MR. HARBACH:

21   Q    Now, this deposit slip looks different from the

22   others.  What happened here, Mr. Greer?

23   A    I went to the bank and had intentions on cashing the

24   check, so I didn't have a deposit slip with me.  So the

25   teller, when she refused to cash the check, she filled out

1    a deposit slip for me.

2    Q    If you could look in the bottom right hand of the top

3    portion of Government's 133, there is a date there that's

4    on the far right that's kind of typed in there.  Can you

5    see that date, sir?

6    A    May 26th.

7    Q    Of what year?

8    A    2011.

9    Q    You can take that exhibit down, sir.  One other

10   question about when you received this check, Mr. Greer.

11   Around the time that you received the check, did you

12   receive any other instructions about what -- about how to

13   handle it?

14            MR. HAUSS:  Objection, calls for hearsay, Your

15   Honor.

16            THE COURT:  He can answer the question.

17            THE WITNESS:  I was instructed not to tell

18   anybody about the check.

19   BY MR. HARBACH:

20   Q    By whom?

21   A    By Todd Schneider.

22   Q    Okay.  After the $15,000 check that we have been

23   talking about was deposited, was there a difference

24   between the amount that was due and owing on the contract

25   and the amount of the $15,000 check when you received it?

**RYAN GREER - DIRECT**

1    A    Yes.

2    Q    Which is to say there was a refund due?

3    A    Yes, sir.

4    Q    Did you receive any instructions about how to handle

5    the refund?

6    A    I was instructed by Mr. Schneider to issue a refund

7    check in the difference to Maureen McDonnell.

8    Q    Okay.  What did you do to take care of that?

9    A    I advised Sarah, who issued the checks, to issue the

10   check for the difference.

11   Q    Okay.  Let's take a look at Government's 159, please.

12   Is this the refund check you just mentioned?

13   A    Yes, sir.

14        MR. HARBACH:  The government offers Government's

15   159.

16        MR. HAUSS:  No objection, Your Honor.

17        THE COURT:  It will be admitted.

18   BY MR. HARBACH:

19   Q    Now, Mr. Greer, were you personally involved in

20   setting the exact amount of this check, sir?

21   A    I was instructed by Mr. Schneider on what the refund

22   would be.

23   Q    Okay.  And so as far as you are aware, it was

24   Mr. Schneider who selected the amount?

25   A    Yes.

1  Q    What is the amount of this check, sir?

2  A    $5,266.50.

3  Q    Okay.  Do you recall having any discussions

4  personally with Maureen McDonnell around the time that the

5  refund check was issued?

6  A    I recall one conversation in regards to a generator

7  that I had to order.

8  Q    Tell us what you recall about that.

9          MR. HAUSS:  Your Honor, that's irrelevant.

10         THE COURT:  Overruled.

11         THE WITNESS:  That there was an issue because

12  the generator was ordered for the power, and she refused

13  to pay.  She didn't want to pay for it.  So she did call

14  me, but I discussed it with Mr. Schneider and we decided

15  to adjust the way the gratuities were paid out for the

16  wedding to cover the cost of the generator.

17         MR. HARBACH:  May I have one moment, please,

18  Judge?

19         THE COURT:  Sure.

20         MR. HARBACH:  Thank you, Your Honor.  No further

21  questions at this time.

22         THE COURT:  Cross?

23                  CROSS-EXAMINATION

24  BY MR. ASBILL:

25  Q    Good afternoon, Mr. Greer.

```
1    A     How are you?
2    Q     I see you getting a glass of water.  I'll do the
3    same.  Where is Chef Todd these days?
4    A     Last I heard was Florida, but the last I spoke with
5    Mr. Schneider was probably back in 2011.
6    Q     Do you have any reason to believe he is not alive and
7    well?
8    A     Couldn't tell you.
9    Q     Any reason or any understanding of why he may not be
10   here today instead of you?
11   A     Good question.
12   Q     Now, let me go back to these, just in reverse order,
13   the things the government was asking you about.  With
14   respect to this refund of what, approximately $5,200?
15   A     Yes, sir.
16   Q     And that refund check, what did you do with that?
17   Did you deliver that?
18   A     I did not deliver that.
19   Q     What did you do with it?  How did you get it to
20   somebody?
21   A     I gave it to Todd.
22   Q     You gave it to Todd.  You have no personal knowledge
23   of what happened to it after that, do you?
24   A     I do not.
25   Q     Who was the check made out to?
```

1    A    Maureen McDonnell.

2    Q    And I believe you said that this contract or the

3    person who signed as client was Bob McDonnell; is that

4    right?

5    A    There was a signature.  I do believe it said Robert

6    McDonnell.

7    Q    This was for Cailin McDonnell's wedding, right?

8    A    Yes, sir.

9    Q    Initially you sent Cailin McDonnell the contract

10   itself and you deemed her to be your client, correct?

11   A    That's correct.

12   Q    All right.  So you thought Cailin and Chris Young,

13   her fiance', were your clients for the wedding, right?

14   A    Yes.

15   Q    At some point Bob McDonnell signs the contract and

16   sends in some deposits, right?

17   A    Yes.

18   Q    And you send a check back to Maureen McDonnell.

19   A    That's correct.

20   Q    Who was never a client, right?

21   A    Right.

22   Q    And it was never her wedding, correct?  Right?

23   A    Correct.

24   Q    You said that Todd tells you, "Don't tell anyone

25   about this check."  Correct?

```
 1   A    Yes, sir.
 2   Q    Did my client ever tell you not to tell anyone about
 3   anything?
 4   A    Sorry, your client is?
 5   Q    My client is Bob McDonnell.  Did he ever tell you not
 6   to tell anyone about anything?
 7   A    No, sir.
 8   Q    Now, with respect to the check for $15,000 made out
 9   to Seasons that you have testified about, you say you took
10   that to the bank and tried to cash it, correct?
11   A    Yes.
12   Q    And you wanted to get cash money, dollar bills or
13   hundred-dollar bills in hand for that check; is that
14   right?
15   A    That's what I was instructed to do by Mr. Schneider,
16   yes.
17   Q    And Mr. Schneider wanted you to do that why?
18   A    Couldn't tell you.
19   Q    Well, can you tell me whether or not at this time
20   Mr. Schneider was bouncing checks to employees at your
21   company or to vendors?
22   A    Yes.
23   Q    Did it ever occur to you that maybe he wanted the
24   cash so nobody could cash a check against the 15,000?
25            MR. HARBACH:  Objection, argumentative.
```

```
 1                    THE COURT:  Sustained.

 2   BY MR. ASBILL:

 3   Q    You tried to cash the check.  I take it there was not

 4   enough money in the Seasonings account to cover that check

 5   if it bounced; is that right?

 6   A    No, sir.  I wasn't on the account.  It was a business

 7   account, so they wouldn't cash it for me.

 8   Q    They couldn't cash it for you because it was a

 9   business --

10   A    It is a business account and a business check, it was

11   deposit only.  That was explained to Mr. Schneider prior

12   to me going to the bank.

13   Q    Then why did you go to the bank and try to cash it

14   then?

15   A    Because I was doing what I was told.  He was my boss.

16   Q    Okay.  And you say a business account.  The account

17   in fact was a trust, Starwood Trust.

18   A    No, speaking of the Seasonings account.

19   Q    The Seasonings account.  I'm talking about the check

20   itself.

21   A    The check, I didn't know about the -- the check was

22   the check.  It wouldn't have mattered if it was a personal

23   check or anything, I still wouldn't have been able to cash

24   it.

25   Q    Because they were going to wait five days?
```

| | |
|---|---|
| 1 | A    Because I wasn't on the account. |
| 2 | Q    So you couldn't cash the check. |
| 3 | A    I explained that, but he wanted me to try anyways. |
| 4 | Q    Any reason why he didn't go try himself? |
| 5 | A    I couldn't answer that. |
| 6 | Q    All right.  And this check, I know it was shown on |
| 7 | the screen, it had the full information about the trust |
| 8 | that wrote the account; isn't that right?  It has been |
| 9 | blocked out on what Mr. Harbach showed you. |
| 10 | A    There was an address on it. |
| 11 | Q    There was a name of a trust and an address and a |
| 12 | phone number for the trust on the account, wasn't there? |
| 13 | A    I don't recall. |
| 14 | Q    Take a look at the check again.  Do you want to see a |
| 15 | copy of it? |
| 16 | A    Yeah, sure. |
| 17 | MR. ASBILL:  May I approach the witness, Your |
| 18 | Honor? |
| 19 | (Document proffered to witness.) |
| 20 | BY MR. ASBILL: |
| 21 | Q    Does that refresh your recollection? |
| 22 | A    There is a phone number on there. |
| 23 | Q    There is a name of a trust, Starwood Trust, right? |
| 24 | A    Uh-huh. |
| 25 | Q    There is an address in Bradenton, Florida, correct? |

1    A    Correct.

2    Q    There is a phone number, correct?

3    A    Yes.

4    Q    Okay.  And the account information, the numbers that

5    were blocked out for privacy reasons, those are all

6    visible, in terms of what Mr. Harbach showed you, those

7    are all visible on the check itself, correct?

8    A    They are.

9    Q    Okay.  Now, this check, you say you received it from

10   either Todd or Mary-Shea; is that correct?

11   A    Correct.

12   Q    So was that at the restaurant?

13   A    That was at the restaurant.

14   Q    Right.  And you can't tell which one?

15   A    I don't recall.

16   Q    Do you ever recall talking to the government in this

17   case and telling them you didn't recall, aside from

18   whether it was Mary-Shea or whether it was Todd, you

19   didn't recall whether you got it at the restaurant or

20   picked it up at the Mansion?

21   A    I don't understand.

22   Q    Do you ever recall telling the government that you

23   got the check from the Mansion, not from an individual at

24   the Mansion, but it wasn't at the restaurant, it was at

25   the Mansion; do you recall that?

1    A    I do not.

2    Q    Are you sure about it coming to the restaurant and

3    being given to you there as opposed to it being left at

4    the Mansion for you?

5    A    It was delivered to me at the restaurant.

6    Q    All right.  And you never told the government

7    otherwise; is that correct?

8    A    Correct.

9    Q    All right.  Now, the deposits, the initial deposits,

10   one of those was at the end of December of 2010, correct?

11   A    Yes.

12   Q    And that was on time in accordance with the contract,

13   wasn't it?

14   A    Yes, sir.

15   Q    And the second one was not several months later, as

16   Mr. Harbach suggested.  It was in fact at the end

17   of -- excuse me, the 22nd of January, less than a month

18   later in the beginning of 2011, correct?

19   A    I think it was in February.  But I don't remember the

20   exact date.

21   Q    Do you need to take take a look at the deposit slips

22   again?

23   A    Sure.

24        (Document proffered to witness.)

25   Q    Here is a check and deposit slip.

1    A     February 3rd.

2    Q     February 3rd you deposited it?

3    A     Yes.

4    Q     And the check was written when?

5    A     The check was dated January 22nd.

6    Q     So again, less than a month later from the time you

7    got the first check, and in accordance with the terms of

8    the contract and on time, correct?

9    A     Yes.

10   Q     Now, the balance due, so the totals of the deposits

11   that are made at the end of December in 2010 and the end

12   of January in 2011, rough total, $8,000 towards a

13   15-and-change or $16,000 contract, correct?

14   A     Correct.

15   Q     So there's $8,000 remaining to be paid going forward

16   to the wedding, correct?

17   A     Correct.

18   Q     And per the contract, that $8,000 was due within ten

19   days of the date of the wedding, which was June 4th, 2011.

20   Am I right?

21   A     That's correct.

22   Q     And in between the end of January and June of 2011 in

23   comes this $15,000 check, correct?

24   A     Correct.

25   Q     Okay.  Now, with respect to the contract itself, I

1   believe when Mr. Harbach was talking to you, he started

2   with a dinner that you had at the Mansion with my client

3   and his wife and Chris Young and Cailin McDonnell.  That

4   was in December or November of 2010?

5   A     I don't remember the exact date.  I know the dinner

6   occurred.

7   Q     I know.  It was at the end of the year of 2010; is

8   that correct?

9   A     I'm not 100 percent sure.  It was in 2010.

10  Q     Okay.  And at that time, and shortly thereafter that,

11  there was a contract, a proposed contract that you sent to

12  Cailin McDonnell, correct?

13  A     Correct.

14  Q     And that, again, was for 15,000 and change or $16,000

15  total, for the entire catering bill, correct?

16  A     Uh-huh.

17  Q     Earlier, go back to October, go back to the early

18  fall in 2010, you had a meeting at your restaurant with

19  Chris and Cailin about their wedding plans, correct?

20  A     I don't recall.

21  Q     You don't recall the date or you don't recall meeting

22  with Chris and Cailin about the wedding in the fall, early

23  fall, well before December when you had the dinner at the

24  Mansion?

25  A     I don't recall.

1    Q    You don't recall having any meeting with them?

2    A    I mean, the meeting may have occurred, but I don't

3    recall.  It was 2010.  Sorry.

4    Q    Okay.  Well, do you recall that there was an initial

5    contract proposal for more money than $16,000?  For

6    something over 20,000 or $23,000?

7    A    There was a few that Todd Schneider dealt with that

8    had different prices on them.

9    Q    Higher prices, correct?

10   A    Correct.

11   Q    And Cailin and Chris, to your understanding, pushed

12   back against that price because they wanted something that

13   they could afford, which was in the $15,000 range.

14   Correct?

15   A    And that's why I received the price, the lower

16   contracted price.

17   Q    Okay.  And so did you have any knowledge of how the

18   original, earlier $23,000 contract proposal came into

19   being in terms of the gap between the two contract prices?

20   A    That was all dealt with by Mr. Schneider.

21   Q    Do you have any knowledge that Chris and Cailin were

22   trying to set up a catering event for their wedding with a

23   budget that they could afford, and Todd and Mary-Shea

24   were, "Oh, no, no, that's not good enough for the

25   Governor's daughter, you've got to have fancier stuff at

1     the wedding"?

2                 MR. HARBACH:  Objection.

3                 THE COURT:  Sustained.

4     BY MR. ASBILL:

5     Q    The handwriting on the final contract by my client,

6     aside from the signature and aside from the date, those

7     all related to legal terms, not price terms, am I right?

8     A    That's correct.

9                 MR. ASBILL:  And I know that it was taken down

10    pretty quickly, but maybe we can pull the government's

11    exhibit up again.

12                MR. HARBACH:  I would be happy to.  Which

13    exhibit would you like?

14                MR. ASBILL:  The one with the handwriting on

15    Page 2, the contract, the final contract.

16          (Document displayed.)

17                MR. ASBILL:  Next page, please.  There we go.

18    Can you blow up the handwriting, please?

19    BY MR. ASBILL:

20    Q    You see the handwriting on the terms and conditions

21    page?

22    A    Yes, sir.

23    Q    All right.  And the interlineation by my client goes,

24    "The deposit will be refunded if an act of God or death

25    occurs which prevents the wedding reception from

1   occurring."  And then his initials, R.M., at the bottom,

2   right?

3   A     Yes.

4   Q     Okay.  And the next one, three paragraphs down,

5   reads:  "Seasonings is not liable for any damage to goods,

6   personal property or injury to guests at the event or

7   elsewhere resulting from theft or any other cause, unless

8   caused by its own negligence or intentional acts."  Then

9   that's initialed by my client?

10  A     Yes, sir.

11  Q     Is that right?

12  A     Yes, sir.

13  Q     At the very bottom of that page there is another

14  edit, "Seasonings agrees to pay 33-and-a-third percent of

15  the total claims of client if Seasonings fails to perform

16  as noted in the contract."  Correct?

17  A     Correct.

18  Q     All right.  And my client basically asked, "I hope

19  you will find these changes, these legal changes to the

20  contract, acceptable."  Right?

21  A     I do believe that's what was on Page 1.

22  Q     Okay.

23  A     Of the e-mail.

24  Q     So at the end of the day, why no refund was made to

25  Cailin or no refund was made to her father is something

1    you don't have any idea about; is that correct?

2    A    No.

3         MR. ASBILL:  Thank you.  I have no further

4    questions.

5         THE COURT:  Anything else for this witness?

6         MR. HAUSS:  Very briefly, Your Honor.

7                    CROSS-EXAMINATION

8    BY MR. HAUSS:

9    Q    Good afternoon, Mr. Greer.  How are you?

10   A    Good.

11   Q    I'm going to be very, very brief.  You mentioned,

12   with regard to the $15,000 check, you got that from either

13   Todd Schneider or Mary-Shea; is that correct?

14   A    Correct.

15   Q    And when you say Mary-Shea, is that Mary-Shea

16   Sutherland?

17   A    Yes.

18   Q    And Mary-Shea Sutherland was the First Lady's Chief

19   of Staff; is that correct?

20   A    Yes, sir.

21   Q    And then you also mentioned a refund check that was

22   made out to Maureen McDonnell?

23   A    Yes.

24   Q    And Maureen McDonnell did not instruct you to make

25   that out to her, did she?

```
 1   A     No.

 2              MR. HAUSS:   Thank you.   Nothing further.

 3              THE COURT:   Any redirect?

 4              MR. HARBACH:   No.   May Mr. Greer be excused?

 5              THE COURT:   Absolutely.

 6         (Witness stood aside.)

 7              MS. ABER:   The United States calls Cailin

 8   McDonnell Young.

 9                    CAILIN McDONNELL YOUNG,

10   called as a witness by and on behalf of the government,

11   having been first duly sworn by the Clerk, was examined

12   and testified as follows:

13                    DIRECT EXAMINATION

14   BY MS. ABER:

15   Q    Good afternoon, Ms. Young.

16   A    Good afternoon.

17   Q    Please state your name and spell it for the court

18   reporter.

19   A    Cailin McDonnell Young, C-A-I-L-I-N,

20   M-C-D-O-N-N-E-L-L, Y-O-U-N-G.

21   Q    Is it correct that you are the daughter of the

22   defendants here today?

23   A    Yes, I am.

24   Q    And you have how many brothers and sisters?

25   A    There's is five of us altogether.  I have an older
```

1    sister, myself, my younger sister, and then the twin baby

2    boys.

3    Q    Now, I'd like to turn your attention back to your

4    wedding in 2011.  On what date did you get married?

5    A    June 4th, 2011.

6    Q    And to whom did you get married?

7    A    Christopher Young.

8    Q    Approximately when did you get engaged?

9    A    It was December of 2009.

10   Q    And so going forward in time from that engagement, I

11   assume you began planning your wedding?

12   A    We did.

13   Q    And did you and your fiance', Mr. Young, have any

14   discussions about who would be paying for that wedding?

15   A    We did.  My husband and I really were excited and we

16   wanted to pay for the wedding ourselves.

17   Q    And why did you want to pay for yourself?

18   A    It was something we felt very strongly about.  We

19   thought it spoke a lot about us as a couple, and my

20   parents had done the same thing and we really admired

21   that.

22   Q    Were you planning to pay for the entire wedding or

23   bits and pieces of it?

24   A    The entire wedding.

25   Q    Did you have discussions with your parents about your

1    intention to pay for the wedding?

2    A    We did.  Shortly after we got engaged, we had to

3    schedule a meeting to have dinner with my parents, and we

4    went and spoke with them and told them that this was our

5    desire and that we wanted to pay for it ourselves.

6    Q    What was your parents' reaction to that?

7    A    You know, they respected it.  They thought it was,

8    you know, admirable that we wanted to do something like

9    that.  But I knew my dad wasn't that thrilled about it.

10   Q    What did your father say that led you to believe that

11   he was not thrilled with it?

12   A    I don't know if it was at that time exactly, but you

13   know, he would make comments, "Okay, Cailin," you know,

14   that kind of thing.

15   Q    That suggested to you that your father did not want

16   you to pay for your wedding; is that right?

17   A    Well, I know being his first daughter, I mean, I

18   can't tell you exactly what he was thinking, but being his

19   first daughter, of course, you know, I would think that he

20   would want to pay for it.

21   Q    Where was your wedding going to be held?

22   A    We got married, the ceremony was at St. Patrick's

23   Church, and then we had the reception at the Executive

24   Mansion.

25   Q    And did you have to find a caterer to prepare food

1   for the reception?

2   A    We did.

3   Q    Who did you use?

4   A    We used -- well, we first spoke to Todd Schneider and

5   we used his, who was the Mansion chef at that time, and we

6   used his catering company, Great Seasonings.

7   Q    I'd like to bring up Government Exhibit 76, please.

8   Government Exhibit 76, is that an e-mail from you to

9   Mr. Schneider and your fiance' on November 9th, 2010?

10  A    Yes, it is.

11          MS. ABER:  I'd like to move that into evidence.

12  My copy is yellow.

13          THE COURT:  It will be admitted.

14          MS. ABER:  For the record, it is yellow for

15  everyone, Your Honor.

16  BY MS. ABER:

17  Q    Tell the jury, please, what exactly this e-mail says.

18  Can you read it to them, please?

19  A    It says -- it says:  "Todd:  Christopher and I are

20  meeting with mom and dad on Thursday to go over a few more

21  things.  After that we will be able to get the deposit to

22  you.  Thank you for being patient with us."

23  Q    And what is the subject of your e-mail?

24  A    "Wedding."

25  Q    Now, what were the few more things that you needed to

1    go over with your mom and dad?

2    A    If I remember correctly, at this time we had already

3    received the contract and things like that.  So I wanted

4    to go over with my parents the terminology in the

5    contract.  My dad being a lawyer, it had a lot of legal

6    mumbo-jumbo in it that I didn't understand.  I'd never

7    planned a big event like this, so I wanted to go over

8    everything in that and make sure I knew what I was

9    signing.  As well as in the invoice, everything was

10   affected by the guest list and how many people we were

11   having at the wedding.  And the guest list was constantly

12   changing and we were going back and forth with my parents,

13   and so it was months and months of trying to figure out

14   how many people were going to be invited.

15   Q    So at this point in time when your e-mail says, "we

16   will be able to get the deposit to you," who is the "we"

17   in that sentence?

18   A    My husband and myself.

19   Q    Okay.  I'd like to bring up what's already been

20   admitted as 80, please.  Now, Ms. Young, let's start at

21   the bottom here, please.  Is it fair to say this is an

22   e-mail from Mr. Greer to you with attachments?

23   A    Yes.

24   Q    Okay.  Scrolling upward, please, is it fair to say

25   that Mr. Greer forwarded this back to you a couple days

1    later?

2    A    He did.

3    Q    And then you in turn sent this to whom?

4    A    I sent it to my father.

5    Q    Okay.  If we could back up, Ms. Taylor, please.

6    Let's look at Government Exhibit 77, please.  That has not

7    been admitted.  If we could zoom in, please, on the top.

8    Now, Ms. Young, is it fair to say this is an e-mail from

9    you to your parents on December 3rd, 2010?

10   A    Yes, with my husband cc'd.

11   Q    Great.  Thank you.

12        MS. ABER:  I'd like to move 77 into evidence,

13   please.

14        THE COURT:  It will be admitted.

15   BY MS. ABER:

16   Q    What is it that you are attaching to this e-mail for

17   your parents?

18   A    It is the invoice for the reception.

19   Q    As well as the contract?

20   A    I can't tell from this, but the title just says

21   "Invoice."

22   Q    So that makes sense.  Ms. Taylor, could we flip

23   through this document briefly to show the attachments to

24   Ms. Young.  It is hard when it is all electronic.  Is it

25   correct now that the contract was appended to this e-mail?

1    A    Yes, ma'am.

2    Q    Okay.  Why are you sending your father the catering

3    contract at this point in time?

4    A    Like I stated earlier, I wanted him to look at it,

5    all the terms on there, make sure everything was correct

6    so I knew what I was signing.  And also, I had never had

7    an event at the Mansion.  They have held events there, and

8    I wanted to make sure that we were following protocol for

9    everything that was done at the Mansion.

10   Q    Okay.  Let's look at Government Exhibit 81, please.

11   That's already been admitted.  And specifically, Page 4.

12   Is this the completed contract for your wedding catering,

13   Ms. Young?

14   A    Yes.

15   Q    And turning to Page 5, if we could go down to the

16   bottom there, excuse me, Page 4, head on back.  Thank you.

17   One more page back.  Thank you.  Let's go to the bottom

18   there where it indicates the total cost.  Now, at the time

19   the contract was being executed, were you aware of the

20   cost of your wedding catering?

21   A    I was.

22   Q    Okay.  Were you aware of the installments that were

23   going to be due?

24   A    I was.

25   Q    Now, flipping forward, please, two pages.  Towards

1    the end, Ms. Taylor.  Page 6, please.  When did you find

2    out that your father signed this wedding catering

3    contract?

4    A    It was after he had made the second payment.  I don't

5    know the day, though.

6    Q    Okay.  What was your reaction to that?

7    A    I was furious.

8    Q    Did you tell him?

9    A    I did.  My mother told me that he had done this.  I

10   immediately called my father and yelled at him.

11   Q    Let's turn to Government Exhibit 79, please.  This

12   has already been admitted.  This is a check, Ms. Young,

13   dated December 29th from your father to Seasonings Fine

14   Catering.  Is it fair to say that's the first payment?

15   A    Yes.

16   Q    Let's look at 85, please.  So this is the second

17   payment dated January 22nd of 2011?

18   A    Yes, ma'am.

19   Q    Okay.  As you sit here today, you are saying you

20   learned sometime after January 22nd that this payment had

21   been made.

22   A    Yes, ma'am.

23   Q    Do you remember how far after January 22nd?

24   A    I don't.

25   Q    Do you remember how far back in time from your

1    wedding in June this was?

2    A    I cannot accurately give you a time.  I'm not sure.

3    Q    Let's look at Government Exhibit 111, please.  Is it

4    fair to say this is an e-mail from your father to you and

5    then you in response on May 1st and May 2nd of 2011?

6    A    Yes.

7    Q    Okay.

8              MS. ABER:  I would move 111 into evidence.

9              THE COURT:  It will be admitted.

10   BY MS. ABER:

11   Q    Can you please read for the jury your father's e-mail

12   to you on May 1st?

13   A    "Please advise me on May 20th or so the final count

14   and final payment amount for the wedding so I can make

15   payment on time ten days out.  Thanks, Dad."

16   Q    On the top, what is your response?

17   A    "I will, everyone has asked RSVP by the 20th."

18   Q    Is it fair to say your father seems to be suggesting

19   he would be making the final payment for the wedding in

20   this e-mail or is that not how you understood it?

21   A    He is saying that he wanted to, yes.  But that was

22   not our desire, and I was not going to send him the bill

23   to pay that.

24   Q    After your father sent this e-mail on May 1st, did

25   you communicate to him, say, "Hey, dad, you got this all

1   wrong, I'm paying?"

2   A    I had done that numerous times ever since that first

3   time that we sat down with him shortly after we got

4   engaged, and time and time and time again we had told

5   them.  He was aware that that's how we felt.

6   Q    As of this date, do you think you knew your father

7   had signed the catering contract?

8   A    I can't say 100 percent whether I did or not.  I

9   might have, but I don't know.  Because I don't know when I

10  found out.

11  Q    But as of this date, May 1st, how much money did you

12  owe on the catering contract?  I don't mean an exact

13  number; math is not my thing.  Would it have been the

14  total balance minus the two payments your father had made?

15  A    That depends if I knew he had made them or not.  So I

16  can't answer that question.

17  Q    Okay.  Let's talk about instead, enough with the

18  wedding for a moment, Jonnie Williams.

19  A    Okay.

20  Q    When did you first meet Mr. Williams?

21  A    The first time I remember meeting Mr. Williams was, I

22  think it was April 29th.

23  Q    Of what year?

24  A    2011.

25  Q    And how far before your wedding was that?

1    A    I think it was about five weeks.

2    Q    What were the circumstances of your meeting?

3    A    That day, my mother and I had actually gone

4    skydiving.  One of her initiatives was military families

5    and appreciating the military and all of that.  So the

6    Golden Knights had asked her to go skydiving.  And they so

7    graciously included me in that.  So we got to do that that

8    morning.  And then I went back to work.  If I remember

9    correctly, it was a Friday.  I went back to work, and then

10   when we had jumped, they had gentlemen that jumped with us

11   to videotape and take pictures.  So they told us that they

12   were going to have that video ready for us.  I was over

13   the moon about it.  I was really excited.  I wanted to go

14   get that video, and I had heard that it had been dropped

15   off at the Mansion.  So after work I went, or I'm not sure

16   what time, but sometime that evening I went to the Mansion

17   to retrieve that video and I wanted to stop in and say hi

18   to my parents.  And as I was calling around upstairs I

19   walked in and my parents were having dinner with Mr. and

20   Ms. Williams.

21   Q    So what room of the Mansion were they in?

22   A    It was the far back right room.  It is called like

23   the library-office.  But we had kind of turned it into our

24   own little family dining room when we got the dining room

25   set after my grandparents passed away.

1    Q    How long did you speak with Mr. Williams?

2    A    It was about ten, fifteen minutes.

3    Q    What did you talk about?

4    A    Well, first we were talking all about skydiving, and

5    my mother and I were reenacting and explaining everything

6    that happened.  And she had actually had a faulty

7    parachute before she jumped out, so we were talking about

8    that.  And they were asking all about it.  And then we

9    started talking about my wedding.  And I don't remember

10   specifics of everything that was said, but I remember

11   there was a window in the back room that looks out into

12   the garden, the back yard, and that's where we were going

13   to have the reception.  And it has a staircase that my

14   husband Christopher and I were going to be first

15   introduced as man and wife as we come in.  So I was

16   explaining that to them.

17   Q    Did you stick around for dinner?

18   A    I did not.  I kind of walked in as they were eating.

19   Q    Okay.  Did you say that was the first time you met

20   Mr. Williams?

21   A    The first time I remember meeting him, yes, ma'am.

22   Q    So then you leave.  After that evening, did you

23   receive a call from your mother stating that Mr. Williams

24   wanted to pay for your wedding reception?

25   A    I did.

1    Q    Can you tell the jury what your mother said?

2    A    My mother called me and told me that Mr. Williams was

3    so impressed by me and really enjoyed meeting me, and as a

4    wedding gift he wanted to pay for our reception.

5    Q    What was your reaction to that?

6    A    I was shocked.  I mean, it was a hugely generous

7    gift.

8    Q    How far after that dinner do you think your mom

9    called you to tell you this?

10   A    I can't say accurately, but it would have been

11   possibly a couple days, maybe a week.  But I don't know

12   the day that I got the phone call.

13   Q    Okay.  I'd like to bring up Government Exhibit 121

14   that's been admitted.  Had you seen this check before,

15   Ms. Young?

16   A    Not until the first time I met with you.

17   Q    All right.  Do you know how this check got to the

18   caterer?

19   A    It was delivered to the Mansion.

20   Q    Who told you that?

21   A    It was my mother.

22   Q    Did you talk to your father at all about this $15,000

23   check?

24   A    I'm sure we did at some point in time, but I don't

25   remember a conversation about it.

1  Q    Okay.  But somebody had to pay for the balance of the

2  wedding contract, right?

3  A    It was going to be Christopher and I, yes, ma'am.

4  Q    Is it fair to say that the final payment was due ten

5  days before your wedding?

6  A    Yes.

7  Q    So as of May 1st, 2011, somebody had to pay for this.

8  A    Correct.

9  Q    Okay.  Did other folks, "folks" isn't the right word,

10  did other guests or friends or family give you wedding

11  gifts?

12  A    They did.

13  Q    Did any of them give you money?

14  A    They did.

15  Q    Family members, I assume?

16  A    Yes.

17  Q    Friends?

18  A    Yes.

19  Q    Did anyone else give you a gift close to $15,000?

20  A    No, ma'am.

21  Q    What was the next largest gift you received from

22  anybody else?

23  A    I can't say accurately.  I'm not sure what everything

24  cost.  But my husband's family gave us an amount towards,

25  to use for the rehearsal dinner.

1    Q     How much was that?

2    A     I think it was $4,200.

3    Q     Those were family members of Mr. Young's?

4    A     Yes.

5    Q     Now, during the time period in which you are planning

6    the wedding, I assume you put together a guest list.

7    A     We did, and it was changing up until probably a day

8    or two before the wedding.

9    Q     Did you consult with your parents when putting this

10   list together?

11   A     We did, tried to.  It was a very painful process

12   working with them on my guest list.

13   Q     Was Mr. Williams on that guest list before he gave

14   you or your family, whomever, $15,000 for the catering?

15   A     He gave it to me as a wedding gift to me and my

16   husband, and no, he was not on there before that.

17   Q     Why did you add him to the list?

18   A     Obviously because of the generous gift he gave us.

19   We added multiple people that were helping us in our

20   wedding and contributing.

21   Q     Do you recall seeing Mr. Williams at your reception?

22   A     I do not.  Unfortunately, we didn't get to see a lot

23   of people at the wedding.  So I'm not sure if he was there

24   or not.  He did respond, yes, that he was coming.

25   Q     Is it fair to say that the caterer had been paid a

| 1 | sufficient amount of money between your father's deposits |
| 2 | and the $15,000 check that there was an overage? |
| 3 | A    Yes.  That was not my understanding of what happened, |
| 4 | but that's ended up what happened, yes, ma'am. |
| 5 | Q    So the catering company, what did they do with that |
| 6 | overage, to your knowledge? |
| 7 | A    What I found out later is they gave a reimbursement |
| 8 | check to my mother. |
| 9 | Q    And when did you find out about that? |
| 10 | A    It was February of 2012 -- 2013.  I don't know the |
| 11 | year.  2013. |
| 12 | Q    As you sit here today, which year are you going with? |
| 13 | I don't mean that sarcastically.  I'm sorry.  As you sit |
| 14 | here today, which year do you think it was that your |
| 15 | mother told you about this? |
| 16 | A    It was February of 2013. |
| 17 | Q    Okay.  And how did your mother bring this up?  What |
| 18 | was the conversation? |
| 19 | A    She called me and asked me if she could come over and |
| 20 | chat with me and have dinner.  So she did.  And she told |
| 21 | me that she had had a conversation with the FBI and they |
| 22 | had asked about Jonnie, and the wedding, and my dad found |
| 23 | out about this reimbursement check, a check that I didn't |
| 24 | even know about.  I didn't know it existed, either.  And |
| 25 | he was very upset with her, very upset that she had taken |

1    this money and said, "This is Cailin's gift.  Go take it

2    to her.  This is hers."  So she came and gave me that

3    check.

4    Q    So for the sake of the record, let's look at

5    Government Exhibit 159, please.  This is the check from

6    Seasonings to your mother in May of -- June of 2011.  Have

7    you seen this before?

8    A    I had not.

9    Q    Okay.  So let's look at Government Exhibit 493 that

10   has not been moved into evidence.  If we could zoom in on

11   the check.  Is that the check that your mother wrote back

12   to you in February of 2013?

13   A    Yes, ma'am.

14   Q    Okay.  Did you ever reimburse your father --

15            MS. ABER:  Your Honor, let me move Government

16   Exhibit 493 into evidence.

17            THE COURT:  It will be admitted.

18   BY MS. ABER:

19   Q    What is the memo line on this, Ms. Young?

20   A    "Wedding Reception Reimbursement."

21   Q    Thanks.  Did you ever reimburse your father for his

22   two deposits on the front end?

23   A    I did not.  Because my understanding of what happened

24   was, Mr. Williams wanted to pay for the reception.  And

25   when my mother asked me how much that cost and who to make

1    it out to, I told her it was around $15,000, and so my

2    understanding was that he was paying for the entirety of

3    the reception since that's what I was told he wanted to

4    do.  So I thought my father would get his money back since

5    Mr. Williams wanted to pay for the entire reception.  So I

6    thought my dad was made whole with his money.  So I didn't

7    know that there was any outstanding money left over at the

8    end.

9    Q    So why did you accept that reimbursement check from

10   your mother?

11   A    There was no point fighting at that point with them

12   about it.  They were very adamant, "This was your money,

13   this was left over."  You know, after my dad's math that

14   he did, this is what was left over of Mr. Williams's gift,

15   which was the gift to my husband and I, so they gave us

16   that check.

17   Q    In terms of other wedding expenses, did you and your

18   fiance', now husband, pay for other wedding expenses?

19   A    We did.

20   Q    What about the location?  You had the reception at

21   the Mansion.  Did you have to pay a fee for that venue?

22   A    No, we did not.

23   Q    How many guests did you have at the wedding?  At the

24   reception.  Let's talk about that.

25   A    I think it was somewhere between 200 and 250.  I

1   can't remember exactly at this point.  I'm sorry.

2   Q    Did you serve alcohol at the reception?

3   A    We did.

4   Q    And did you pay for that?

5   A    We paid for most of it, yes, ma'am.

6   Q    What did you pay for, exactly?

7   A    We paid for the beer, liquor, and wine, and then we

8   had some wine that was also donated.

9   Q    Do you remember how much wine was donated?

10  A    I can't remember exactly.  I know Ms. Kluge wanted to

11  donate some, and as I have thought more on it, I think

12  what ended up happening is she was just able to donate a

13  bottle of champagne and Mr. Morris, who was her security,

14  he donated three boxes of red wine.  Then we ended up

15  buying the rest from different vineyards.  And then we had

16  a stock-the-bar party, too, to help for that, and then we

17  bought all the beer and liquor, also.

18  Q    Okay.  So you used the liquor provided at the

19  stock-the-bar party by your friends and relatives at your

20  wedding; is that right?

21  A    This was a couple bottles.  We went out and bought

22  much, much more, also.  There was just a couple bottles.

23  It was a small engagement party that we had, so we got a

24  couple bottles, yes, ma'am.

25  Q    How did your wedding party travel from the church to

```
 1    the reception at the Mansion?

 2              MR. ASBILL:  Objection, relevance.

 3              MS. ABER:  I can make a proffer that Ms. Young

 4    didn't pay for several expenses out of her wedding.

 5              THE COURT:  All right.  Go ahead.

 6    BY MS. ABER:

 7    Q    How did you all travel from the church to the

 8    reception?

 9    A    A friend of ours, when he travels, travels in his

10    limo.  And he was invited to the wedding and he came up

11    and so he let us use his limo.  He was staying at the

12    hotel next-door where all the guests were staying.  So he

13    let the limo drive us down the street to the church and

14    back.

15    Q    What kind of limo was it?

16    A    I think it was an Excursion, if I remember correctly.

17    Q    Where did you purchase your wedding dress?

18    A    It was at Maya Couture down in Virginia Beach.

19    Q    Did you pay for that?

20    A    We paid --

21              MR. ASBILL:  I object, relevance.

22              THE COURT:  I've heard enough.

23              MS. ABER:  Your Honor, if I may?  Your Honor,

24    Ms. Young respectfully is saying she paid for a bunch of

25    her wedding and in fact the evidence is that she did not
```

1    pay for several high ticket, big ticket expenses in this

2    wedding.  And further, the statements about the wedding

3    dress go further to representations her father made to the

4    media.

5              THE COURT:  Go ahead and answer the question,

6    but so far, every answer is she paid for it or most of it.

7    If you've got something that indicates that she didn't pay

8    for stuff, let's get to it.

9              MS. ABER:  I'm sorry, Your Honor, that she did

10   or did not?

11             THE COURT:  That she did not.

12   BY MS. ABER:

13   Q    Did you pay for the wedding dress?

14   A    We paid $43, yes, ma'am.

15   Q    What was the original value of your wedding dress?

16   A    I don't remember the actual cost.  It was somewhere

17   over a thousand dollars.  And I had a friend that worked

18   at a wedding store and she called me and said -- and they

19   do this for a lot of people -- they called and said that

20   they wanted to give me a thousand dollars' gift

21   certificate off for any wedding dress that I wanted.  So I

22   decided I was down in Virginia Beach, just driving back,

23   we decided to stop in and look.  I didn't even know what

24   style I liked.  And me and my girlfriends tried on a bunch

25   of dresses and we tried on this one and we all started

1   crying when I had it on because it ended up being the

2   dress.  And the dress at the time was a little bit over a

3   thousand.  It was on sale that day.  So when we went to

4   the checkout, it ended up being $43 and I don't know how

5   many cents.

6   Q    That was the sales tax, right?

7   A    I'm assuming.

8   Q    Did you and your fiance' pay for your wedding rings?

9   A    We have not, no.

10  Q    They were a gift from someone else as well?

11  A    They were not supposed to be a gift, and I have asked

12  the gentleman to please send us, multiple times, to send

13  us the bill for them, and he has not.

14  Q    Did you give jewelry to your bridesmaids?

15  A    I did.

16  Q    Did you pay for that?

17  A    I did not.

18  Q    Did you give favors to your wedding guests?

19  A    I did.

20  Q    Did you pay for that?

21  A    We paid for some of them, yes, ma'am.

22  Q    Is it fair to say you did not pay for the engraved

23  silver picture frames provided to the guests?

24  A    We did not.

25  Q    I'd like to show you Government Exhibit 549, please.

1    Do you recognize this photo, Ms. Young?

2    A    Yes, ma'am.

3    Q    Is it fair to say this is a picture of your mother

4    and your brothers at your wedding?

5    A    It is.

6             MS. ABER:  I'd like to move 549 into evidence.

7             THE COURT:  It will be admitted.

8    BY MS. ABER:

9    Q    So that's your mother in the middle.  Can you

10   identify your brothers on the sides, please?

11   A    Looking at it, the one on the right is Sean and the

12   one on the left is Bobby.

13   Q    Do you know how your mother's dress was purchased?

14   A    I do now.

15   Q    At the time of your wedding, did you know where it

16   came from?

17   A    I don't remember.  I don't believe so.  I'm not sure.

18   Q    Okay.  When did you find out?

19   A    I don't remember when I actually found out.  I found

20   out a lot of information over the past couple years that I

21   don't know.

22   Q    As you sit here today, do you believe you found out

23   about the purchaser of this dress before the media started

24   publicizing these stories or after?

25   A    I can't say accurately.  I'm not sure.

1  Q    Okay.  Let's look at Government Exhibit 548, please.

2  Is this also a picture from your wedding, Ms. Young?

3  A    Yes.

4  Q    Let's zoom in, please.

5         MS. ABER:  And I move to admit 548.

6         THE COURT:  It will be admitted.

7  BY MS. ABER:

8  Q    Do you see your parents in this picture, Ms. Young?

9  A    Yes.

10  Q    On your screen, if you touch, you can identify where

11  they are in the back.  Is it fair to say they are sort of

12  in the center of the picture?

13  A    Yes.

14  Q    Okay.  Then turning to Page 2 of the exhibit, do you

15  see your mother in this picture?

16  A    Yes, I do.

17  Q    Okay.  You can take that down, Ms. Taylor.  I'd like

18  to direct your attention actually away from the wedding

19  and to the following month of July of 2011.  Did you

20  attend a family vacation -- would you like some water?

21  A    I have some.

22  Q    Okay.  Did your family take a vacation to Smith

23  Mountain Lake that summer?

24  A    Yes, we did.

25  Q    Can you tell the jury where Smith Mountain Lake is?

1   A    I don't know, it is like two hours away.

2   Q    And who went on this family vacation?

3   A    My whole entire family.

4   Q    Where did you guys stay?

5   A    We stayed at Mr. Williams's house.

6   Q    Can you tell the jury --

7   A    I'm sorry.

8   Q    That's okay, take your time.  Can you tell the jury a

9   little bit about what the house looks like?

10  A    It is on the point.  It is on the lake.  It is on the

11  water.

12  Q    Could we bring up Government Exhibit 181, please?

13            THE COURT:  Do you need a break?  We can take a

14  break.  Let's take ten minutes.  Just take the jury out.

15        (The jury left the courtroom.)

16        We will be back in ten minutes.

17        (Recess taken from 3:27 p.m. to 3:36 p.m.)

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

 1                THE COURT:  All right.  Ms. Young, are you ready

 2    to proceed?

 3                THE WITNESS:  Yes, sir.  Thank you.

 4                THE COURT:  All right.  Let's bring in the jury,

 5    please.

 6          (The jury entered the courtroom.)

 7                THE COURT:  All right.  Government.

 8    BY MS. ABER:

 9    Q    Ms. Young, I'm going to bring up Exhibit 181, just

10    the second page of it.  Do you recognize this photograph?

11    A    Yes, ma'am, I do.

12    Q    And what is it?

13    A    It's Mr. Jonnie's -- or Mr. Williams' house on Smith

14    Mountain Lake.

15                MS. ABER:  Your Honor, I'd like to move the

16    second page of 181 into evidence.

17                THE COURT:  What's the number?

18                MS. ABER:  181.

19                THE COURT:  All right.  It will be admitted.

20    BY MS. ABER:

21    Q    And so how long did you all stay?

22    A    It was just a weekend.  I came Friday after work, so

23    sometime that evening, and I left Sunday after brunch.  So

24    early afternoon, I think.

25                MS. ABER:  Let's bring up Government Exhibit

CAILIN McDONNELL YOUNG – DIRECT        336

1  198, please.  Can you zoom in, Ms. Taylor, please.

2  BY MS. ABER:

3  Q    Is this an e-mail from your husband to you with

4  copies to your brothers and your parents and your sisters?

5  A    Yes, ma'am.

6  Q    On August 4th, 2011?

7  A    Yes, ma'am.

8         MS. ABER:  Okay.  I'd like to move Government

9  Exhibit 198 into evidence.

10        THE COURT:  It will be admitted.

11 BY MS. ABER:

12 Q    And what is the subject of this e-mail?

13 A    Mom and dad in Ferrari.

14 Q    And is there a picture attached?

15 A    Yes.

16 Q    Let's look at page 2, please.  Does that depict both

17 of your parents in a Ferrari?

18 A    Yes, ma'am.

19 Q    Do you know where this photograph was taken?

20 A    It was taken in the driveway of Mr. Williams' house.

21 Q    Do you know whose Ferrari that is?

22 A    Mr. Williams'.

23 Q    Did your father drive that Ferrari during your

24 weekend at Smith Mountain Lake?

25 A    On that Sunday I think he drove it down the street,

1   and I -- from the best of my memory, I think he drove it

2   to brunch that Sunday.

3   Q    Now, while serving as Governor, did your father

4   typically drive himself?

5   A    No, ma'am.

6   Q    Who drove him?

7   A    The Executive Protection Unit with the state police.

8   Q    Were you with your parents when they returned from

9   Smith Mountain Lake to Richmond?

10  A    No, ma'am.

11  Q    Did you leave early?

12  A    Yes, ma'am.

13  Q    Changing subjects yet again.  I'd like to go back to

14  2011 before the wedding.  We're not talking about the

15  wedding.  Did your mother ever discuss her ownership of

16  Star Scientific stock with you?

17  A    I don't remember a conversation about that, no,

18  ma'am.

19  Q    At the time of your wedding, did your mother offer to

20  give you and your husband Star Scientific shares as a

21  wedding gift?

22  A    She told us about it, yes, ma'am, and --

23  Q    And when did she do that?

24  A    It was June 6th, that Monday.  It was about 4 in the

25  morning.  My parents drove us to the airport to take us to

1  our honeymoon.  And on the car ride there, we were going

2  over all the logistics and giving them all the information

3  for our honeymoon, where we're going to be so in case

4  something bad happened, they would have that information.

5        And as we got to the airport, my mom gave us

6  this little makeshift kind of certificate, telling us that

7  she had gotten these thousand shares of Star Scientific to

8  give to us for our wedding gift.

9  Q    So she made up a -- like a little handwritten

10 certificate for you guys?

11 A    Yes, ma'am.

12 Q    Do you still have that certificate?

13 A    I do not.

14 Q    Did your mother indicate whether she presently owned

15 the stock?

16 A    Not to my memory.  I don't think -- I don't know if

17 she said it one way or another.

18 Q    Let me step back for a moment.  This trip to the

19 airport, who was driving?

20 A    The EPU.

21 Q    Okay.  So folks from the Executive Protection Unit

22 are driving?

23 A    Yes, ma'am.

24 Q    And who else is in the vehicle with you?

25 A    There -- there was two EPU, I remember -- if I

CAILIN McDONNELL YOUNG – DIRECT        339

1  remember correctly.  There was always two.  Then my

2  husband and I and my parents.

3  Q    And when your mother is handing you this certificate,

4  did she say anything about the quality of this investment,

5  that it was a good one?

6  A    What do you mean?  I'm sorry.

7  Q    Did your mother say, "Hey, this is a great stock"?

8  Did she say anything about what she believed in stock --

9  in Star?

10  A    Oh, yeah.  She thought it was, you know, going to be

11  really good.  You know, she believed in it.  And she had

12  told me about Anatabloc previously, thinking that it would

13  help me because I have a lot of joint and body issues.  So

14  she thought -- she had told me about Anatabloc previously.

15  Q    At some point in time in reference to this stock gift

16  to you, did your mother reference using money from her

17  father's passing to purchase the stock?

18  A    She did.  I don't know if it was at that point or

19  when she said that to me, but she did say that she used

20  the inheritance she got after my grandfather passed away

21  to buy the stocks.

22  Q    Now, you were the first McDonnell child to get

23  married, right?

24  A    Yes, ma'am.

25  Q    And did your mother indicate whether she was going to

1  provide similar gifts for your siblings when and if they

2  got married?

3  A   She did.  And, again, I'm not sure when she said

4  this.  I don't think this was in the car because the car

5  was very, very brief when she was giving them to me.  But

6  she did she did say that, excuse me, it was her plan to

7  give a thousand shares to each child when they got

8  married.

9  Q   Did you actually get the Star shares in the June of

10 '11 time period?

11 A   No, ma'am.

12 Q   When did you actually get them?

13 A   It was December of 2012 when we were filling out the

14 forms.

15      MS. ABER:  Okay.  Let's bring up Government

16 Exhibit 446, please.

17 BY MS. ABER:

18 Q   Is this the form you were talking about, a brokerage

19 opening account at Davenport & Company?

20 A   Yes, ma'am.

21      MS. ABER:  Okay.  I'd like to move Government

22 Exhibit 446 in evidence.

23      THE COURT:  It will be admitted.

24      MS. ABER:  Ms. Taylor, if we could back out for

25 a second so the jury can see it.  Thank you.

1  BY MS. ABER:

2  Q    So this is your particular form?

3  A    Correct.

4  Q    Do you know if your siblings filled out similar

5  forms?

6  A    To my knowledge, yeah -- I'm not sure.

7  Q    Yeah, that's all.  Your knowledge.

8  A    I don't know.

9  Q    Okay.  Why did you open this Davenport account at

10 this time period, in December of '12?

11 A    To put the stocks into that account, to set up an

12 account for it.

13 Q    So you were opening this Davenport account

14 specifically for the Star Scientific shares your mother

15 was going to give to you?

16 A    Correct.

17 Q    Now, why were you doing this at the end of December

18 of 2012?

19 A    My mother had told us that the -- well, it was

20 already our gift.  We just never went about exchanging it.

21 But she had told us that the tax laws were changing and

22 that obviously it needed to be in our name for us to

23 either reap the benefits or not have -- I don't remember

24 exactly what the -- the tax laws were changing with the

25 administration or with the -- the new law that was taking

1  effect in January 1st.

2  Q     Of 2013?

3  A     '13, yes, ma'am.

4  Q     And so what were the circumstances of your mother

5  telling you about these tax laws changing?  Were you with

6  your family?

7  A     It was Christmas Day, Christmas evening.  It was

8  after dinner.  We had had dinner and we cleaned up, were

9  doing the dishes, all that kind of thing, and my mother

10 was speaking to some of us kids and explaining this.  I

11 don't know if the other kids knew about the stock yet.

12 Q     Who else was present?

13 A     No one else was married at this point in time.  So I

14 don't know if the rest of the children else knew about the

15 stock.  But I remember Rachel, Bobby, and Sean being there

16 at the table when my mother was telling us about this and

17 giving us these forms.

18 Q     So was your father there?

19 A     I'm sorry?

20 Q     Was your father there?

21 A     I'm not sure.

22 Q     Christmas dinner, you're not --

23 A     This was not Christmas dinner.  This was way after

24 Christmas dinner.  We had already cleaned up everything.

25            I'm not saying that he wasn't there.  I just

CAILIN McDONNELL YOUNG – DIRECT        343

1   don't recall.  I just remember the three siblings sitting

2   across the table from me as we're talking about the form.

3   Q    What about your older sister Jeanine, was she there?

4   A    I'm not sure.  At that point they were going back and

5   forth between her and her fiance at the time's house.  His

6   family lives in Richmond also.  And I just don't recall

7   whether they were sitting there.  I just remember the

8   three little siblings sitting there.

9   Q    Did your mother hand you all documents, these account

10  opening forms for you all to fill out?

11  A    Yes, ma'am.  She had already printed them out and

12  gave them to us.

13  Q    And did you fill them out while you were there?

14  A    My husband and I did not, no, ma'am.

15  Q    What about your other siblings?

16  A    I don't remember what they did.

17  Q    Okay.  When did you complete your form?

18  A    I honestly think it was New Year's Eve.  I think we

19  were rushing to get it in.  Because my husband wanted to

20  look into it and talk to Mr. Piscitelli, who we were

21  opening this with, and do some of his own research before

22  we just jumped in.

23  Q    And who is Mr. Piscitelli?

24  A    He works with Davenport and he's also a very close

25  family friend of ours and he's my little sister's God

1    Father too.

2    Q    Ultimately, did you, in fact, have a Davenport

3    account opened?

4    A    Yes, ma'am.

5    Q    And your mother gave you those thousand shares of

6    Star stock?

7    A    Correct.

8         MS. ABER:  I'd like to bring up Government

9    Exhibit 455, please.  And if we could zoom in, sort of on

10   the bottom so Ms. Young can –– take it from the bottom and

11   go and back up to the top.  If we could scroll so she

12   could see that, please.

13   A    Can you go down now?  I don't ––

14   BY MS. ABER:

15   Q    And I have a paper copy, actually, if that's easier,

16   Ms. Young.  I don't mean to rush you.

17   A    Either way.  I just –– I don't remember seeing this.

18   So I was just trying to read it.  Okay.

19   Q    Is it fair to say this is an e-mail chain between you

20   and Mr. Piscitelli and you and your husband at the end of

21   the year of 2012, in the beginning of 2013?

22   A    Yes, ma'am.

23        MS. ABER:  Your Honor, I'd move 455 into

24   evidence.

25        THE COURT:  It will be admitted.

1   BY MS. ABER:

2   Q    Can you explain, starting at the bottom there, why

3   you were sending Mr. Piscitelli an e-mail on

4   December 31st, 2012?  What were you sending to him?

5            MS. ABER:  Up one page, Ms. Taylor.

6   A    It says, "ID."  So I guess I was sending him my ID.

7   BY MS. ABER:

8   Q    Was that to go with your Davenport opening account

9   forms?

10  A    To the best of my memory, yes, ma'am.

11  Q    Okay.  And moving up a little bit, on January 2nd at

12  8:49 a.m. you are writing to Mr. Piscitelli; is that

13  correct?

14  A    Yes, ma'am.

15  Q    Okay.  And then zooming -- scrolling up, scrolling up

16  a little more, can you read for the jury what you're

17  writing at 9:16 to your husband and Mr. Piscitelli?

18           THE COURT:  I'm having a problem hearing you.

19  Could you --

20           MS. ABER:  Oh, I apologize, Your Honor.

21  BY MS. ABER:

22  Q    Ms. Young, there's a top e-mail on there at 9:16.

23  Could you please read it to the jury?

24  A    It says, "Did we miss the deadline now for last year?

25  I know mom really wanted it done last year.  Sorry we're

1  so late."

2  Q    And why did your mom really want it done last year?

3  A    Because of the tax laws is what she told us.

4  Q    And why were you rushing to get these forms done on

5  New Year's Eve?

6  A    Because it was the end of the year.

7         MS. ABER:  Thank you.  You can take that down,

8  Ms. Taylor.

9  BY MS. ABER:

10  Q    Now, was the Star Scientific stock your parents'

11  primary wedding gift to you and your husband?

12  A    No, ma'am.  They gave us -- they gave us some

13  furniture and things also.

14  Q    And do you know whether your parents also gave the

15  thousand shares to each of your siblings at this time, at

16  the end of December 2012?

17  A    I can't answer that.

18  Q    Now, before the media started reporting on the

19  investigation into your parents in March of 2013, were you

20  aware that Mr. Williams had loaned your mother $50,000 in

21  May of 2011?

22  A    I found out, it was Easter weekend.  It was right

23  before the first article broke on Easter Sunday.

24  Q    In 2013?

25  A    Yes, ma'am.

1   Q    And from whom did you learn that information?

2   A    My mother.

3   Q    And before the media started reporting on this --

4   these matters in March of '13, were you aware of

5   Mr. Williams' 50,000-dollar loan to your parents in March

6   of 2012?

7   A    No, ma'am.

8   Q    And before the media started reporting, were you

9   aware of Mr. Williams' 20,000-dollar loan to your parents

10  in May of 2012?

11  A    No, ma'am.

12       MS. ABER:  One moment, please, Your Honor.

13  Thank you, Your Honor.  I have no further questions.

14       THE COURT:  All right.  Cross.

15                    **CROSS-EXAMINATION**

16  BY MR. ASBILL:

17  Q    Good afternoon, Ms. Young.  How are you?

18  A    Good.  How are you?

19  Q    With respect to the last series of questions that you

20  were just asked; namely, were you aware of a 50,000-dollar

21  loan to your parents, of another 50,000-dollar loan to

22  your parents, et cetera, you don't have any idea whether

23  or not the loans were to your parents or to a company or

24  to your mother independently, do you?

25  A    I have no idea --

1  Q    So --

2  A    -- or had no idea.

3  Q    With respect to the stock certificate or the stock,

4  the thousand shares of stock in 2012 at Christmastime,

5  your parents didn't give you that gift.  Your mother gave

6  you that gift; isn't that correct?

7  A    Correct.

8  Q    Your father never indicated to you that he had

9  anything to do with it or knew anything about it; is that

10  correct?

11 A    Yes, sir.

12 Q    Now, when your mother told you that she -- she wanted

13 to open -- you to open an account at Davenport and the tax

14 laws were changing or whatever, Chris, your husband,

15 wanted to investigate this; is that correct?

16 A    Yes, sir.

17 Q    All right.  So he wanted to investigate whether

18 Davenport was an appropriate company with which to deposit

19 stock, basically?

20 A    Yes.

21 Q    And did he want to investigate whether or not owning

22 this stock was something that was worth doing, or as

23 opposed to selling it or --

24 A    Correct.  He wanted to --

25 Q    -- some kind of investment?

 1  A    I had never had stock before.  And so he had a lot of

 2  the knowledge that I didn't, and he wanted to look into

 3  that and ask a bunch of questions about this firm compared

 4  to others and that sort of thing.

 5  Q    Okay.  Going back to the day you left your -- left

 6  Richmond to go on your honeymoon, that was June 6, 2011;

 7  is that correct?

 8  A    Yes, sir.

 9  Q    All right.  And you said you went to the airport at

10  approximately 4 a.m. in the morning?

11  A    It was -- I think our flight was around 6 or so in

12  the morning.  So I think we were on the way at 4 --

13  Q    Okay.

14  A    -- ish.

15  Q    You and Chris and your mom and dad, and the EPU was

16  driving --

17  A    Yes.

18  Q    -- is that correct?

19       All right.  And how long is the trip from the

20  mansion to the airport?

21  A    I would estimate, I don't know, 15, 20 minutes maybe.

22  I'm not sure.  Not that far.

23  Q    And how awake were you all?

24  A    Well, Christopher and I were on cloud nine because we

25  were finally getting to go to our honeymoon after planning

1  this entire wedding.  My parents, on the other hand, were

2  half asleep.  We -- we drove there to my parents' house

3  from our home, and I think they were still in bed and so

4  we were not exactly happy with them because we were going

5  to be late.  So we were yelling at them to kind of get

6  moving.  And my dad is not the greatest in the morning.  I

7  get that from him.  So we were kind of dragging them out

8  to get in the car so we could go.

9  Q    Okay.  And on the -- on the way to the airport for

10 this 15-minute trip, you were trying to tell your mom and

11 dad about the logistics, like where you were going and how

12 you can get in touch with me if you need me, et cetera?

13 A    Correct.  First, we talked a couple minutes about the

14 wedding and just recapping, because I hadn't seen them

15 since we left the wedding night.  And then my husband had

16 a whole folder worth of every kind of document you can

17 think of having to do with our honeymoon and everywhere we

18 were going and location and all that kind of thing.  So we

19 were going over piece by piece with my parents.

20 Q    Okay.  And at some point during the trip your mom

21 took out a piece of paper and drew like a CigRx stock,

22 1000 shares, on the piece of paper?

23 A    Correct.  She was scribbling in the back, I didn't

24 know what she was doing, as we were going over these

25 documents.

CAILIN McDONNELL YOUNG – CROSS – ASBILL     351

1  Q     So this was not a stock certificate.  It was a mock

2  stock certificate?

3  A     Correct.  It was just like a white piece of printer

4  paper that she wrote on.

5  Q     Okay.  And did you have any idea, you know, what this

6  was worth or anything of that nature at that time?

7  A     I don't know if she told me at that time, but I found

8  out what it cost.

9  Q     Well, do you know whether she owned the stock at the

10  time or not or whether this was to be purchased and given

11  to you?

12  A     I have no idea.

13  Q     Okay.  And it took a year and a half for you to -- or

14  more, for you to get the certificates?

15  A     Yes.

16  Q     Actual stock certificates?

17  A     Correct.

18  Q     And between June of 2011 and the end of December 2012

19  when you opened this account at Davenport, did you have

20  any more discussions about this with anyone?

21  A     I don't remember having a discussion about it.  Kind

22  of slipped my mind.  I didn't -- didn't really think about

23  it.

24  Q     Was it particularly important to you and Chris

25  financially or for any other reason over the next year and

1  a half?

2  A    We weren't dependent on it financially, no, sir.

3  Q    Now, the Smith Mountain Lake trip, the pictures of

4  your dad in the Ferrari.  You say he never drove as a

5  Governor, generally?

6  A    Not really.  I mean, when my sister got her new car,

7  he drove it around the block and little things like that,

8  but --

9  Q    Okay.

10  A    But I also wasn't with him all the time.  So I can't

11  tell you what he did every day, but --

12  Q    Well, when you got to Smith Mountain Lake, was this

13  Ferrari there?

14  A    To the best of my knowledge, yes, it was already

15  there.

16  Q    Do you have any idea how it got there or when it got

17  there?

18  A    I have no idea.

19  Q    Do you have any idea what discussions there may have

20  been with Jonnie Williams and with him about it?

21  A    I have no idea.

22  Q    Do you have any understanding of whether or not

23  Mr. Williams asked your father to bring it back as a favor

24  to him, bring it back to Richmond?

25  A    No, sir.

1  Q    Was it a nice car?

2  A    Yeah.  I mean, I particularly like my Ford Escape.

3  That's -- so I'm happy with that.

4  Q    Seemed like a fun thing to drive for a couple hours

5  back to Richmond?

6  A    I'm sure it would have been.

7  Q    How about the -- you said three days you were there

8  at Smith Mountain Lake at Jonnie Williams' house; is that

9  correct?

10 A    It was maybe 48 -- well, I got there Friday evening

11 and left Sunday afternoon.  So --

12 Q    Do you have any idea how that trip was set up?

13 A    I was not involved in it.  I was just given the

14 information.

15 Q    And who was there?

16 A    It was the -- the five siblings, my mother and

17 father, and then that was the first time that my husband

18 Christopher was able to go on a family vacation.  It's

19 something my family does.  We don't have anyone else

20 outside of our family go on vacations until you're married

21 in the family.  So it was pretty exciting because that was

22 the first one he could go on.

23 Q    Okay.  And was this the first time you had any real

24 opportunity to have any sort of family time with your mom

25 and dad in a while?

1   A     Yeah, it had been.

2   Q     Particularly with your father?

3   A     Yeah.  I didn't -- during the election and during his

4   time as Governor and even AG, barely ever saw my father.

5   Q     Now, with respect to the wedding gifts that you were

6   asked about, the limo ride, who was that from?

7   A     Dr. Davis.

8   Q     Who is Dr. Davis?

9   A     Well, he's recently passed away, but he's a good

10  family friend of my family's.

11  Q     And how long has Dr. Davis known your family?

12  A     Oh, I don't even know how long.  Since we lived back

13  in Virginia Beach they've been friends.  I don't know

14  exactly how long.

15  Q     All right.

16  A     I think it was my mom's doctor for years and years

17  and years.

18  Q     Did you ask him to give you, you know, a limo or use

19  his limo for 10 or 12 hours or whatever?

20  A     No, sir.

21  Q     Do you know whether -- did your dad ask him to lend

22  you the limo or use the limo?

23  A     Not to my knowledge.  He said, "I'm driving up there

24  in it.  I'd love for you to use it, and it's just going to

25  sit there otherwise, you know."

1  Q    With respect to the other gifts, the engraved frames

2  or -- those were, what, bridesmaids' gifts?

3  A    The frames were gifts for the people invited to the

4  wedding.  It was one per family.

5  Q    All right.  And those were from whom?

6  A    Mr. Ramadan.

7  Q    And who is Mr. Ramadan?

8  A    He's -- he's a friend of ours.  He's -- he's a

9  jeweler.  And as part of the jewelry company, they had

10 different gifts like that, like the picture frames.  And

11 he's now a state delegate.

12 Q    Is he a personal friend of yours and Chris'?

13 A    Yes, he became one.

14 Q    Before the wedding?

15 A    Yes, sir.

16 Q    Did your father have anything to do with whatever

17 Mr. Ramadan wanted to give you as a wedding gift?

18 A    No, sir.  I had meetings with Mr. Ramadan.

19 Q    With respect to the wedding dress, did your father

20 have anything at all to do whatsoever with the wedding

21 dress in terms of how you got that or --

22 A    No, sir.

23 Q    -- or the cost or anything else?

24 A    No, sir.  That was through me.

25 Q    Did you ever talk to your father about the wedding

1  dress before 2013, in terms of the cost of the wedding

2  dress or how you got it?

3  A    I don't remember a specific conversation.

4  Q    I mean, did you ever -- do you remember in 2013,

5  after the investigation began, do you remember talking to

6  your father about the wedding dress?

7  A    I can't -- I can't think of a specific conversation.

8  But if there was one, I would have told him exactly what

9  happened.

10  Q    Okay.  And did you -- did you -- is that -- would

11  that be the first time he would have knowledge of whatever

12  the issues, the cost was or gift certificates or anything

13  of that nature?

14           MS. ABER:  Objection.

15           THE COURT:  Sustained.

16  BY MR. ASBILL:

17  Q    Do you know whether he had any independent knowledge,

18  before talking to you in 2013, about anything relating to

19  the dress?

20           MS. ABER:  Objection.

21           THE COURT:  Sustained.

22  BY MR. ASBILL:

23  Q    You never had any discussions with him about it that

24  you can recall?

25  A    No, sir.  My dad was not involved in any of the

1    wedding planning whatsoever except for I wanted him to

2    look over the contract and the guest list.

3    Q    And the person who ran this store, the wedding dress

4    store, is that somebody that's a friend of your father's?

5    A    No, sir.

6    Q    Whose friend is it?

7    A    The young lady that works there is my friend, and

8    she -- she doesn't own it, but it's a friend of mine.  And

9    she called me and made the offer.

10   Q    Were you surprised that when you got married in the

11   mansion and you were the Governor's daughter at the time

12   that folks wanted to give you gifts?

13   A    It was -- I mean, it was very flattering.  I was not

14   going out asking for any -- any gifts or anything from

15   anybody.  You know, it was flattering that people wanted

16   to help us because they liked us or liked my parents.

17   Q    Did you think that any of it had anything to do with

18   any return promise from your father as Governor?

19   A    No, sir.

20   Q    You wanted to pay for the wedding yourself; is that

21   correct?

22   A    I did.

23   Q    And how much of the wedding did you and Chris

24   actually pay for?

25   A    I think it was somewhere over $12,000.  My husband

1  did a lot of the money so he -- he knows that better than

2  I do.  He was the bookkeeper, so to speak.

3  Q    But your understanding is that you and Chris yourself

4  paid $12,000 for your wedding; is that correct?

5  A    Yes, sir.

6  Q    All right.  Are you embarrassed that other folks gave

7  you gifts for the wedding?

8  A    I am now.  You know, at the time, I thought people

9  were wanting to just do something nice and help us out,

10  and if I could go back, obviously, I wouldn't have taken

11  anything.  I would have done like Christopher and I wanted

12  to do and just have a small backyard wedding and just have

13  our friends and family together and pay for everything

14  ourselves and not let anyone else get involved.  Because,

15  you know, our wedding is now -- has this black cloud over

16  it, you know, with all of this that's gone on and you

17  can't look back at it with a happy memory.

18  Q    Your plans basically, and Chris' plans, got hijacked?

19  A    They did.

20  Q    Is that fair to say?

21  A    Yes, sir.

22  Q    Partly by Chris' mom and dad.  They wanted to give

23  you the rehearsal dinner?

24          MS. ABER:  Objection.  Relevance.

25          THE COURT:  Overruled.

1  A    Yes, they wanted to pay for the rehearsal dinner.

2  They came up with the $4,200 and they said, "This is what

3  we can give you for that."  Obviously, if we went over

4  that, it would have been coming from us.  But, I mean, at

5  that point it just wasn't worth the fight anymore with --

6  with them.

7  BY MR. ASBILL:

8  Q    And your dad paid 8 grand towards the catering?

9  A    Yeah.  He did that behind my back.  I did not know he

10  had paid that.  I asked him strictly just to look at the

11  contract and make sure that everything looked right

12  legally and all of that.  And he told me that he had made

13  some corrections and sent it back to Mr. Greer.  He did

14  not tell me that he signed it or that he started writing

15  checks.  I found out later, and I was very upset with him

16  because he was not supposed to do that.

17  Q    In terms of planning to pay for your own wedding, you

18  said you started doing that and started trying to put that

19  together after you were engaged?

20  A    Correct.  My husband had been saving way before he

21  ever proposed.  He paid for my ring in cash because he had

22  been saving for such a long time, and then he had his own

23  money set aside.  And you would have to ask him, but I --

24  it was several -- several thousands of dollars set aside

25  for the wedding.  And then him and I started what we

1   called the wedding fund, and every paycheck we had a

2   certain amount that went straight into this wedding fund.

3   At one point I was doing -- I got paid biweekly.  So it

4   was 300 every paycheck.  So 600 a month, and I think my

5   husband was 800 a month that we put straight into this

6   wedding fund so that we would have the money saved there

7   to pay for everything.

8   Q    So if I understand you correctly, Chris started

9   saving for the wedding before he even knew you would marry

10  him?

11  A    Yeah.  I guess he was pretty hopeful.  But yeah, he

12  had been saving way before.

13  Q    And Chris saved on his own even before you were

14  married, $10,000 for the wedding.  Is that your

15  understanding?

16  A    I think that's what it was about.  You'd have to ask

17  him.  I don't know the exact price, but yes, sir.

18  Q    And then the two of you saved together for the next

19  year and a half?

20  A    Yes, sir.

21  Q    Before your wedding?

22  A    Correct.

23  Q    And by the way, what kind of job does Chris have?

24  A    He's a civil engineer.  He does transportation

25  design.  He designs bridges and roads.

1  Q     All right.  And where do you work?

2  A     I work for the Henrico Commonwealth Attorney's

3  Office.  I'm a victim advocate.  I'm in the juvenile and

4  domestic court.  So I deal with victims of domestic

5  violence, sexual assault, murder, that kind of thing.

6  Q     And prior to working in that office, tell us a little

7  bit about your educational background.

8              MS. ABER:  Objection, Your Honor.

9              THE COURT:  No, you can go ahead and answer the

10  question.

11  A     I went to Old Dominion and got my undergrad in -- I

12  got a bachelor of science in criminal justice.  And I

13  immediately -- that was when we moved up here, when my dad

14  became AG.  And I went back to VCU and I got my master's

15  in criminal justice.  And during that time, I was a

16  full-time master student and I was a graduate teacher's

17  assistant at VCU and then I was also working at the

18  National White Collar Crime Center.

19              And then after that, I worked on my father's

20  Governor campaign.  I was the youth outreach coordinator.

21  So I was going around speaking to high schools and

22  colleges and the young professionals, and then I started

23  and I've been at the Commonwealth Attorney's Office for a

24  little over four years now.

25  Q     Did you pay for any of your education?

1   A     I did.

2   Q     What did you pay for?

3   A     My father started a savings program before, when we

4   were younger, and then we took out some loans and I'm

5   paying all of those back.

6   Q     Now, aside from your testimony about wanting to --

7   you and Chris wanting to pay for our own wedding because

8   you -- that's what you understood your parents had done

9   and you thought that was admirable and you wanted to do

10  it, were there other reasons why you wanted to pay for or

11  control your own wedding?

12  A     We didn't really want this wedding to get out of

13  control and become some big political mess, and I was very

14  firm with my father that I did not want him working at my

15  wedding.  No matter where he is, people are always coming

16  up to him and, you know, talking work and he never gets to

17  just relax.

18        So we were -- we wanted control over it because

19  we didn't want it to turn into something that it wasn't.

20  And it was also, we thought it spoke a lot of us as a

21  couple and we didn't want it to be this big fancy thing.

22  We really just wanted to dance in the backyard with our

23  close family and friends.

24  Q     Is it fair to say that you really wanted to have some

25  personal family time with your mom and dad at this

1  wedding?

2  A    I did.  I did.  I didn't want them to be off working

3  or doing who knows what.  I wanted them to be on the dance

4  floor with us and enjoying themselves.  You know, I

5  never -- didn't really get to see my dad that much or my

6  mother.  I mean, I had to put this on his -- I'm sorry,

7  put this on his schedule.  Whenever we first picked the

8  date, I had to e-mail his scheduler and get the wedding

9  date on there to make sure this they saved that.

10         And, I mean, that's how it was.  Anytime I ever

11  wanted to see my father, I had to go through a scheduler

12  and weeks and weeks and weeks, you know, before I could

13  set something up with him.  And days to call back.  I

14  mean, he was just extremely busy.

15  Q    And you didn't want this wedding to be with a lot of

16  folks, a lot of political people or other people that you

17  didn't know?

18  A    Correct.  We wanted people that Christopher and I

19  knew as a couple together.  We didn't want to be meeting

20  people at our wedding.

21  Q    Now, going back to the -- to the wedding contract

22  itself, did you ever meet with Ryan Greer to discuss the

23  terms of the catering?

24  A    Yeah.  We met with him a couple times.

25  Q    And when did -- when you say "we," you mean you and

```
 1  Chris?
 2  A    Yes.
 3  Q    And when did you meet with Ryan?
 4  A    I don't know the exact dates.  We met with him a few
 5  times, and there's numerous e-mails and phone calls and
 6  texts going back and forth through this whole process.
 7  Q    And did that start in the fall of 2010?
 8  A    Yeah -- yes.
 9  Q    And where is the first time -- do you recall where
10  the first time is that you met with Ryan?
11  A    We first met with Mr. Schneider to ask him --
12  Q    Okay.
13  A    -- and that was at his restaurant.
14          I think the first time we met with Mr. Greer --
15  I'm -- I think it might have been the mansion.  I'm not
16  sure.
17  Q    Okay.  And this correspondence back and forth or
18  phone calls and stuff, I mean, was your dad involved in
19  this?
20  A    No, sir.
21  Q    And did you make it very plain to Chef Todd and Ryan
22  what your budget was?
23  A    Yeah.  We -- that was another thing with the contract
24  and why it kept -- why it was so long that it took to get
25  back because we kept chopping, chopping, chopping.
```

1   Because I think the first time they came back to us it was

2   $24,000, and that was just outrageous.  You know, they --

3   Todd and other people were saying that I'm the governor's

4   daughter.  I have to have this certain level of, you know,

5   what everyone sees and all this kind of stuff.  And so

6   they were all telling us what we needed to have and what

7   things needed to look like.  And so we just kept chopping

8   and chopping.  I mean, we really just wanted chicken and

9   mashed potatoes, you know, something very simple.

10  Q    When you say they were telling you what you needed to

11  have, who's "they"?

12  A    It was Todd and Mary-Shea.

13  Q    Had Mary-Shea previously been married herself in the

14  mansion?

15  A    At the first meeting that we had with her, I'm not

16  sure.  I think it might have been before she was married.

17  Q    Was she married before you?

18  A    She was.

19  Q    And did she get married at the mansion?

20  A    She had her ceremony there.  She got married in a

21  church.

22  Q    And in terms of sort of fancying up the wedding, the

23  push was from those two?

24  A    Yes.

25  Q    Is that correct?

1  A    Yes, sir.

2  Q    So whatever kind of modest menu you wanted, it

3  started getting more elaborate?

4  A    It did.  I didn't even get to see all the food at the

5  wedding.  I didn't eat any of it, but we -- one of the

6  things was we wanted fruit.  And I've seen pictures since

7  of -- it was a watermelon carved into a swan and all this

8  fancy kind of stuff when that's not what we had asked for.

9  We really just wanted fruit on a plate.

10 Q    Did you view yourself as the client with respect to

11 the wedding contract?

12 A    Yes, sir.  Everything -- all the conversations,

13 everything going back and forth, it was all through

14 Christopher and myself.

15 Q    When you found out at some point after January in

16 2011 that your father had made two initial payments on the

17 contract, you said you were furious with him?

18 A    I was.

19 Q    And you yelled at him?

20 A    I called him and yelled at him, yes, sir.

21 Q    And his reaction was what?

22 A    I don't remember exactly what he said, but I think he

23 kind of felt like he got a one-up on me because he had

24 control over it and he wanted to pay for something, but I

25 didn't want him to.  So I think --

1  Q     All right.  Eventually you got this -- eventually

2  another check from Mr. Williams, apparently, $15,000 was

3  sent to the caterer --

4  A     Correct.

5  Q     -- is that correct?

6            And you found that out when, roughly?

7  A     What do you mean?  I'm sorry.

8  Q     When did you find out that that had happened?

9  A     That the check went in?

10 Q     Yeah, that Mr. Williams was making -- was giving a

11 wedding gift.

12 A     It would have been after I met him.  So sometime

13 in -- let's see.  I met him April -- sometime early May.

14 Q     Of 2011?

15 A     Yes, sir.

16 Q     All right.  And you understood that he was making a

17 payment towards your wedding or making a gift towards your

18 wedding of $15,000; is that correct?

19 A     Yeah.  Well, he -- my understanding was that he

20 wanted to pay for the reception.

21 Q     All right.  And whatever the total cost was, he

22 actually made a payment of $15,000; is that correct?

23 A     Correct.

24 Q     Did you thank Mr. Williams for that gift?

25 A     I did.  We -- my husband and I sent him a thank you

1    card and then we also saw him in July and thanked him

2    personally for the gift.

3    Q    All right.  And you -- you fully believed it was a

4    gift to you from him; is that correct?

5    A    I did.  That's what I was told.

6    Q    All right.  And you talked about, in connection with

7    that, and there was an overage or there's a refund of

8    5,000, $6,000, whatever it is.  I think there's a

9    7,000-dollar check to you that you talked about --

10   A    Yes.

11   Q    -- from your mother that was given to you by her in

12   the middle of February --

13   A    Correct.

14   Q    -- is that correct -- of 2013?

15   A    Correct.

16   Q    And you said that she came over to your house and

17   said she wanted to talk to you, and that's when she gave

18   you the check?

19   A    Yes, sir.

20   Q    All right.  And did she tell you at that time that

21   she had talked about having that refund for a long time,

22   for a year or so, or a year and a half or whatever, and

23   had not given it back to you and she said that her husband

24   was very upset about that?  That's basically what she said

25   to you?

CAILIN McDONNELL YOUNG – CROSS – ASBILL    369

1  A    I mean, I don't think she made any comments as to how

2  long she had it, but she told me my dad found out about it

3  and was very upset with her, yes, sir.

4  Q    Did she tell you your dad found out about it before

5  the Virginia State Police had interviewed your mom?

6              MS. ABER:  Objection.

7              THE COURT:  Overruled.

8  A    My understanding was that he found out right before

9  she came to my house.

10 BY MR. ASBILL:

11 Q    And you took that check and you kept it?

12 A    I did.

13 Q    Because you believed that the gift was to you,

14 correct?

15 A    Correct.  Yes, sir.

16 Q    Ms. Aber referenced speaking to you in the past.

17 Have you met with the prosecutors in this case?

18 A    Yes, I have.

19 Q    Where was that?

20 A    It was at Hunton & Williams was the first time.

21 Q    All right.  And why at Hunton & Williams?

22 A    Because that's where my attorneys are and that's

23 where we met.

24 Q    All right.  Did you testify in the grand jury in this

25 case?

1  A    I did.

2  Q    You were subpoenaed to the grand jury?

3  A    I think we went in voluntary -- I'm not sure.  But we

4  weren't opposed to it.  We went and answered all their

5  questions.

6  Q    Were you asked to provide pictures from your wedding

7  to the government for use in this trial?

8  A    I was.

9  Q    And did you do that?

10 A    I did.

11 Q    And how do you feel about having your wedding be the

12 subject of testimony here today?

13 A    It's extremely painful.

14         MS. ABER:  Objection.

15         THE COURT:  Sustained.

16         MR. ASBILL:  Court's indulgence.  One second.

17 BY MR. ASBILL:

18 Q    The April 29th dinner with Jonnie Williams and

19 Celeste Williams, that's who was there, and your parents?

20 A    Yes, sir.

21 Q    And that's when you came in to get the video of you

22 skydiving?

23 A    Yes, sir.

24 Q    And is it fair to say that you were real excited when

25 you came in the door?

1   A    I was very excited.

2   Q    And were you equally as excited talking to them about

3   your wedding and your wedding plans?

4   A    I was.  I was very --

5   Q    And pointing out the stairs and --

6   A    Yeah.  I got up and was showing them out the window,

7   and everyone was all very excited.

8   Q    Do you recall whether or not you said anything to the

9   Williams about you and Chris doing this or your planning

10  it, paying for it, et cetera?

11  A    I can't recall.  It wasn't something that we were

12  hiding.  It was something we were very proud of and we

13  were telling people.  But I just cannot recall exactly if

14  that conversation happened or not.

15  Q    Do you know whether there were any further

16  conversations between your parents or your mom alone or

17  your dad alone with Mr. Williams about your plans to pay

18  for your wedding yourself?

19  A    I have no idea.

20  Q    Did you also thank Jonnie Williams personally --

21  A    I did.

22  Q    -- for the wedding gift?

23  A    I did.  It was at my parents' anniversary party,

24  which was in July.  My husband and I went up, after the

25  dinner, went up and chatted with him for a while and

1  thanked him again for –– for the very generous and kind

2  gift.

3              MR. ASBILL:  That's all the questions I have,

4  Judge.

5              THE COURT:  All right.  Ms. McDonnell?

6              MR. BURCK:  Thank you, Your Honor.

7                        **CROSS-EXAMINATION**

8  BY MR. BURCK:

9  Q    Good afternoon, Ms. Young.  How are you?

10 A    Good.  How are you?

11 Q    I'm going to start where Mr. Asbill left off.

12 A    Okay.

13 Q    The –– you testified about this dinner on April 29th,

14 you came to the mansion and your parents were having

15 dinner with the Williamses, right?

16 A    Yes, sir.

17 Q    And was that a business dinner, from your

18 perspective?

19 A    It looked like a very friendly dinner.  I didn't

20 see –– I don't remember seeing any documents or anything.

21 They were ––

22 Q    Did it seem like a social dinner?

23 A    Yes, sir.

24 Q    Was everyone having a good time?

25 A    They seemed to be.  Everyone was in smiles when I got

1  there.

2  Q    Did the subject of who was going to pay for your

3  wedding come up while you were there talking to

4  Mr. Williams and your parents?

5  A    I cannot remember.  I don't remember all the exact

6  conversations during that time, but it very well might

7  have.  It's not something that, like I said, that we

8  had -- we had told numerous people about it because we

9  were proud of ourselves for being able to do that.

10 Q    And your mother, you testified, called you a couple

11 days later and told you about this gift that Mr. Williams

12 wanted to give you, the $15,000?

13 A    Correct.

14 Q    And did your mother tell you that she had asked

15 Mr. Williams to give you that gift?

16 A    She did not.

17 Q    What did she tell you?

18 A    She told me that Mr. Williams was so impressed by me

19 and really enjoyed meeting me and wanted to pay for our

20 reception as a wedding gift to my husband and I.

21 Q    And you added Mr. Williams to the invite list?

22 A    We did.

23 Q    And why did you do that?

24 A    We wanted to add him for, obviously, his generous

25 gift.  We added other people that helped us at the time,

1  and we were very honored for him to do that for us.  We
2  wanted him to be a part of our special day.
3  Q    So you were grateful to him?
4  A    Very much.
5  Q    And did you understand Mr. Williams to be your
6  mother's friend?
7  A    It was my understanding that he was both of my
8  parents' friend.
9  Q    And did your mother tell you that?
10 A    I mean, my parents said this is our friend, and they
11 were all together having dinner.
12 Q    So both of your parents, you understood that
13 Mr. Williams was your parents' friend?
14 A    My parents' friend, yes, sir.
15 Q    Now, you testified also about the stock certificate
16 that your mother drew up?
17 A    Yes, sir.
18 Q    The day -- I guess it was the -- two days after your
19 wedding?
20 A    Yes.  It was that Monday morning.
21 Q    And your mother told you that she had -- she wanted
22 to give you a thousand shares of stocks as a wedding
23 present?
24 A    Correct.
25 Q    And it was in Star Scientific?

1  A     Right.

2  Q     And you said at some point, maybe then, maybe later,

3  she told you that she wanted to gift stock to all the

4  children as presents, as wedding presents?

5  A     Correct.

6  Q     And she did that in December of 2012; is that right?

7  A     Yes, at that Christmas.

8  Q     And you testified that she said that she wanted you

9  to make sure the stock was in your name before the end of

10 the year?

11 A     Because of the tax law changing, yes, sir.

12 Q     This is December 2012?

13 A     Yes.

14 Q     Did she mention anything about disclosure laws to

15 you?

16 A     She did not.

17 Q     I want to talk to you -- you mentioned that she had

18 talked to you a bit about Anatabloc?

19 A     Yes.

20 Q     And did you understand that Anatabloc was the product

21 of Star Scientific, Mr. Williams' company?

22 A     I did.

23 Q     Did you believe your mother when she said that she

24 wanted you to take Anatabloc, that it was for your health?

25 A     I did.  My mother has been very active in nutritional

1    health care since she was 19 and sold different

2    nutritional health care products and had us all on them.

3    And so she did -- I did believe her that it would help me.

4    Q     You mentioned 19.  What was so special about 19?

5    A     My mother had a -- had a breast tumor when she was

6    19.  It was very, very scary for her to go through that

7    and she had surgery, and ever since then, she became very

8    involved in nutritional health care and vitamins and being

9    healthy and all that kind of stuff.  And so she's always

10   taught that to us and wanted all of her children to be

11   healthy and have these certain vitamins and things.

12   Q     Is that something she told you about your whole life?

13   A     Yes, sir, our whole entire lives.

14   Q     I think you also mentioned -- was she in the business

15   of nutraceuticals as well?

16   A     Yes.  My mother, very admirably, stayed at home to

17   raise all of -- all of -- five children, kind of played

18   chauffeur for -- and still is, 33 years now, and during

19   that time, she had her business that she would sell the

20   nutritional health care products.

21   Q     And did she make some money to supplement the

22   family's income?

23   A     Yes, sir.

24   Q     But she was at home?

25   A     Correct.

1    Q    You testified, I think, that you had to contact your

2    father's scheduler to find time to meet with him; is that

3    right?

4    A    Yes, I did.

5    Q    And did that start, when he was Governor, or did that

6    happen before?

7    A    No.  That happened way before.

8    Q    This was for many years?

9    A    Many, many years.

10   Q    Did you ever speak to your mother about the

11   difficulty of having time with her husband?

12   A    I'm sure we had conversations.  I mean, it was hard

13   for all of us.  My mom had -- wore many hats at home,

14   taking care of everything, raising -- running everyone

15   around, doing all the grocery shopping, everything.  So, I

16   mean, I knew it was hard and I could see that.

17            MR. BURCK:  Your Honor, may I just confer?

18            THE COURT:  Go ahead.

19            MR. BURCK:  That's it, Your Honor.  Thank you.

20            THE COURT:  All right.  Anything else from the

21   government?

22            MS. ABER:  Yes, Your Honor.

23                    **REDIRECT EXAMINATION**

24   BY MS. ABER:

25   Q    Ms. Young, you've said it was difficult to get on

1   your father's schedule.

2   A    Yes, ma'am.

3   Q    How often do you talk to your father -- when he was

4   Governor, how often did you talk to him by telephone?

5   A    Sometimes I'd call him and wouldn't get a call back

6   for days, and sometimes he'd answer in a meeting.  You

7   know, if I'd call once or twice and he'd, "Hey, I'm in a

8   meeting.  Is everything okay?  Is it an emergency?"  Or

9   send a text, "All okay?  In meeting.  Love dad."

10            So, I mean, that's kind of hard to say on

11  average because it was so scattered.  And usually when we

12  did talk, it was a very quick conversation.  "How are you

13  doing?  I love you.  Can I do anything to help you?

14  Good-bye."

15  Q    Would you say that was once a day, once a week, once

16  a month?

17  A    It wasn't always once a day, no, ma'am.  Sometimes it

18  was days without talking to him.

19  Q    But at least once a month?

20  A    Yes, ma'am.

21  Q    Once a week?

22  A    Yeah, I would say at least once a week.

23  Q    Now, I think you said that you and Mr. Young paid

24  approximately $12,000 out of pocket for your wedding.  Did

25  I catch that right?

1   A    I think that's what it was.  I'd have to go back and
2   look, and my husband was more the money keep-tracker
3   person, but I think it was around 12.
4   Q    It's been a few years.  But roughly how much of that
5   would you say constituted the rehearsal dinner?
6   A    That's without the rehearsal dinner.  With the
7   rehearsal dinner, it was over 16.
8   Q    And how much of that was the honeymoon?
9   A    I think the honeymoon was right around upper 3,000s.
10  My husband did the honeymoon.  That was his job.  So --
11  but I think it was around 4.
12  Q    Okay.
13  A    I'm not exactly sure.
14  Q    So of the 12, roughly 4 is the honeymoon, thousand
15  dollars?
16  A    Around 4, yeah.  I would -- maybe a little less.
17  Q    Now, you had made some observations, I think, about
18  when you came through the mansion and saw your parents
19  having -- having dinner with Mr. and Ms. Williams; is that
20  right?
21  A    Yes, ma'am.
22  Q    How long were you there?
23  A    It was about 10, 15 minutes.
24  Q    Now, when we met with you and your attorneys at
25  Hunton & Williams last year --

1    A      Uh-huh.

2    Q      -- which you voluntarily came, did you have a proffer

3    agreement?

4    A      What do you mean?

5    Q      Did you sign something with the government in advance

6    saying that whatever you said wouldn't be used against

7    you?

8    A      No.  I don't -- I don't -- I don't remember.

9    Q      Have you met with your parents' defense attorneys to

10   prepare for today?

11   A      I have.

12   Q      How many times?

13   A      Three times.

14   Q      And you testified before the grand jury probably

15   about eight, ten months ago; is that right?

16   A      Yes.

17   Q      But you refused to meet with the government after

18   that date; is that correct?

19   A      Correct.

20   Q      And finally, when you learned that your father had

21   paid those $8,000 in deposits and you called him and you

22   yelled at him, did you try to pay him back?

23   A      I did not.  We were going to clean up at the end.

24   Once everything was said and done, we were going to pay

25   him back.

1              MS. ABER:  Thank you.  I have no further

2    questions.

3              THE COURT:  All right.  Thank you, ma'am.  You

4    may stand down.

5         (Witness stood aside.)

6              THE COURT:  All right.  We're going to take our

7    15-minute break and then we'll push on.  We'll stop at

8    around 5:30.  So we may have one more witness that we may

9    get in.  But you all take these 15 minutes and we'll be

10   back in a few minutes.

11        (The jury exited the courtroom.)

12             THE COURT:  All right.  Fifteen minutes.

13        (Recess taken from 4:31 p.m. until 4:44 p.m.)

14        (The jury entered the courtroom.)

15             THE COURT:  All right.  Government.

16             MR. HARBACH:  Thank you, Your Honor.  The

17   government calls Jerri Fulkerson.

18

19                      **JERRI FULKERSON,**

20    called as a witness by and on behalf of the government,

21    having been first duly sworn by the Clerk, was examined

22                   and testified as follows:

23

24             MR. HARBACH:  May I inquire, Your Honor?

25             THE COURT:  Go ahead.

**DIRECT EXAMINATION**

BY MR. HARBACH:

Q    Good afternoon, Ms. Fulkerson.

A    Good afternoon.

Q    Would you please state your full name and spell your

last name for the record?

A    Jerri Fulkerson, F, like in Frank, U-L-K-E-R-S-O-N.

Q    If you could please pull that microphone down a

little bit for you.  That's better.  Thank you, ma'am.

        Tell us about your educational background.

A    High school education, and everything else has been

on-the-job training.

Q    In the course of your career, have you worked for a

company called Star Scientific?

A    Yes.

Q    When did you start working for Star?

A    July 1995.

Q    What were you hired to do at that time?

A    Receptionist.

Q    What kind of company is Star, generally?

A    They were manufacturing in the beginning.  Now they

are research and development, I guess you would call it.

Q    What sorts of products?

A    They make a product called Anatabloc now.

Manufacturing, they made cigarettes, smokeless tobacco

1  products?

2  Q    Do you recall meeting somebody shortly after you

3  started at Star named Jonnie Williams?

4  A    Yes.

5  Q    When did you meet him?

6  A    The day I started.

7  Q    Did there come a time during your tenure at Star that

8  you came to work for Mr. Williams?

9  A    Yes.

10 Q    About how long after you started would you say you

11 started working for him?

12 A    Couple years, maybe two.

13 Q    What did you start out doing for Mr. Williams?

14 A    Writing his checks, paying his bills, the regular

15 household bills.

16 Q    Was this in addition to your Star duties at the time?

17 A    Yes.

18 Q    What were your Star duties at the time you started

19 paying Mr. Williams' personal bills?

20 A    Accounts receivable and invoicing.

21 Q    Did there come a time a few years later when you

22 started to assume a more official role as Mr. Williams'

23 executive assistant?

24 A    Yes.

25 Q    About when was that?

1  A    Best of my memory, '98, '99.

2  Q    And how did your duties change when you assumed that

3  more official role, if at all?

4  A    I became his secretary, his executive assistant and

5  more personal assistant also.

6  Q    Are you familiar with an entity called Starwood

7  Aviation?

8  A    I am.

9  Q    What's that?

10 A    It's a company that owns the jet that -- or -- yeah.

11 It owns the jet that Jonnie owns, Jonnie Williams owns.

12 Q    Mr. Williams owns a jet?

13 A    Yes.

14 Q    And Starwood Aviation is the company that officially

15 owns it?

16 A    Yes.

17 Q    Is Starwood Aviation affiliated at all with the

18 company Star that we've been talking about?

19 A    Only through Jonnie Williams.

20 Q    What was your role with respect to Starwood Aviation?

21 What sorts of things would you do?

22 A    Take requests for the jet, invoicing for the jet,

23 keeping up with the regular maintenance, invoices and the

24 bills, paying bills.

25 Q    Whose decision was it about who and when the jet

1  would be used, who the jet would be used for and when it

2  would be used?

3  A    Jonnie Williams.

4  Q    Did you have the authority to decide to book the

5  plane on your own?

6  A    No.

7  Q    Did you ever book the plane without Mr. Williams'

8  permission?

9  A    No.

10  Q    Are you familiar with a company called -- excuse me,

11  not a company, an entity called Starwood Trust?

12  A    Yes.

13  Q    What's that?

14  A    It's the trust Mr. Williams set up for the benefit of

15  his wife and children.

16  Q    And what was your role with respect to Starwood

17  Trust?

18  A    Just to pay the monthly bills, the household bills or

19  bills generated by Starwood Trust.

20  Q    Did you have signing authority over the bank accounts

21  for Starwood Aviation and Starwood Trust?

22  A    Yes.

23  Q    In other words, you were authorized to write checks?

24  A    Yes.

25  Q    And was that authority, meaning the authority to

1  write checks, did you exercise that independently or with

2  Mr. Williams' permission all the time or a mix?  Tell us

3  about that.

4  A    It was a mix.  If it was a regular monthly bill for

5  the same amount or a regular household bill, I had the

6  authority to go ahead and write the checks and sign them.

7  Anything out of the ordinary had to be cleared through him

8  or through Donnie.

9  Q    Who's Donnie?

10 A    Oh, I'm sorry.  Donnie is the trustee of Starwood

11 Trust.

12 Q    What's Donnie's last name?

13 A    Williams.

14 Q    Is he related to Jonnie Williams?

15 A    Yes.  He's --

16 Q    How so?

17 A    He's Jonnie's brother.

18 Q    Now, besides the -- oh, on the checks that we've been

19 talking about for Starwood Trust or for Starwood Aviation,

20 when we say that you have authority to sign checks, would

21 you sign your own name?

22 A    Yes.

23 Q    In other words, you're a signatory on those accounts?

24 A    I am.

25 Q    Now, in addition to those types of examples where you

1  would sign your own name to checks on those accounts, were

2  there occasions, during your work for Mr. Williams, where

3  you would actually sign Mr. Williams' name for him?

4  A    Yes, at his expressed direction.

5  Q    Do you have Mr. Williams' permission each time you

6  did that?

7  A    Yes.

8  Q    How did that practice come about?

9  A    In the beginning, when I first started working for

10  him, he told me to sign his name on a document and

11  thereafter, every time he needed something signed with his

12  name, he would tell me when to do it.

13  Q    I want you to focus now, please, on the time frame,

14  if you can, from approximately 2009 through 2012.  Okay?

15  And my question for you is:  During that time frame, how

16  frequently would you say you had contact with

17  Mr. Williams?

18  A    If he was in town, I had daily contact with him.  If

19  he wasn't, it was at least by telephone once or twice a

20  week at least.

21  Q    Did you know how to get ahold of him if you needed

22  to, for the most part?

23  A    Yes.

24  Q    How would you characterize your relationship with

25  Mr. Williams as you sit here today?

1  A    It's employee/boss, but we're -- we're friendly.  We

2  can talk.

3  Q    Do you still work for him?

4  A    I do.

5  Q    Have you ever met Mr. McDonnell, the former Governor,

6  who's a defendant here today?

7  A    No.

8  Q    What about Mr. McDonnell's wife, Ms. McDonnell, have

9  you ever met her?

10 A    No.

11 Q    Now, from time to time in your experience, did

12 Mr. Williams allow various politicians to use his jet?

13 A    Yes.

14 Q    Do you recall an occasion in the fall of 2010 when

15 Mr. Williams allowed Mr. McDonnell to use his plane to

16 travel back and forth from Virginia to California?

17 A    Yes.

18 Q    And in general, before we get to that specific

19 example, can you tell us, in general, what would the

20 process be if a politician was interested in using

21 Mr. Williams' plane?  How would the process work?

22 A    Generally, I would either get a telephone call or an

23 e-mail requesting the use of the plane, and they would

24 generally tell me from point A to point B and what time it

25 had to be there.

1  Q    What would you do once you had that information?

2  A    I would then call Mr. Williams or contact him some

3  way, give him the request and find out if it was okay or

4  not.  And then at that point call the politician's office

5  back, or e-mail them.

6  Q    And let's assume that -- that Mr. Williams were to

7  approve the flight we're talking about.  What would happen

8  next?

9  A    I would get the details, hopefully who was going to

10 be on the plane, where they needed to go, what airport

11 they needed to land at, what time they needed to be there.

12 I would turn that information over to the pilots.  They

13 would figure out the times that it would take to get there

14 and then send me back the itinerary to send to the --

15 whatever politician's office.

16 Q    Now, let's focus on the occasion in the fall of 2010

17 that we were talking about a moment ago where the -- where

18 the then-Governor, Mr. McDonnell, went to California and

19 back.  Okay?

20 A    Okay.

21 Q    Do you recall how that specific trip came to your

22 attention?

23 A    I don't know if it was a phone call or -- I think it

24 was an e-mail, but I can't really remember, telling me

25 they needed to go I believe to San Fran- -- Sacramento.

1  Q    And when you say "they," you mean someone on the

2  Governor's staff?

3  A    Someone -- the Governor and probably someone on his

4  staff.  They normally travel with people.

5  Q    What was Mr. Williams' reaction to that possibility?

6  Did he approve that trip?

7  A    He did.

8  Q    So did you make the arrangements for it?

9  A    I did.

10       MR. HARBACH:  Will you please pull up for

11  identification Government's 64?

12  BY MR. HARBACH:

13  Q    Can you see that on your screen, ma'am?

14  A    Nothing.

15       THE COURT:  It didn't come up?

16  A    Okay.  It's kind of blurry, but I can see it.

17  BY MR. HARBACH:

18  Q    Okay.

19       MR. HARBACH:  Mr. Starnes, can you blow up the

20  top half of that for us, please.  Excuse me.  For the

21  witness at least.

22  BY MR. HARBACH:

23  Q    Can you see that, ma'am?

24  A    It just needs to scroll down a little bit.

25       MR. HARBACH:  Scroll down a little bit,

1  Mr. Starnes.

2  A    Okay.

3  BY MR. HARBACH:

4  Q    Ms. Fulkerson, is this paperwork related to the

5  flight that we've been talking about, the one in the fall

6  of 2010, to California?

7  A    Yes.

8           MR. HARBACH:  Your Honor, the government offers

9  Government 64.

10          THE COURT:  It will be admitted.

11  BY MR. HARBACH:

12  Q    Publishing for the jury the first page of Government

13  64.  In the description box under there, Ms. Fulkerson,

14  what's the date of this trip?

15  A    October 3rd, 2010.

16  Q    Okay.

17          THE COURT:  We're having problems?

18          THE CLERK:  The jury can see it, right?  They're

19  on.

20          MR. HARBACH:  Shall I continue, Judge?

21          THE CLERK:  The jury can see it.

22          THE COURT:  Go ahead.  The jury has seen it.

23          MR. HARBACH:  Very good, Your Honor.

24  BY MR. HARBACH:

25  Q    Okay, Ms. Fulkerson.  The question was:  In the

1   description box there, what was the date of the trip to

2   California?

3   A    October 3rd, 2010.

4   Q    And as best you can tell from what's written here on

5   this document, was the return trip the same day?

6   A    It appears to be.

7   Q    Okay.

8        MR. HARBACH:  Thank you, Mr. Starnes.  You can

9   take that down.

10  BY MR. HARBACH:

11  Q    Now, Ms. Fulkerson, did part of your duties for

12  Mr. Williams, when you were his executive assistant,

13  include monitoring his e-mail?

14  A    Yes.

15  Q    How many e-mail addresses did Mr. Williams have with

16  Star?

17  A    Two.

18  Q    And did you have access to both of those accounts?

19  A    Yes.

20  Q    What was the difference between the two?

21  A    One was very public.  You could find it on the

22  Web site or anywhere.  The other one was a more private

23  e-mail that the general public didn't have access to.

24  Q    Do you recall which address was which?

25  A    One was jwilliams@starscientific.  The other one --

1   Q      And --

2   A      The other one was Jonnie Williams.

3   Q      And the one that was jwilliams@starscientific, was

4   that the public one or the more private one?

5   A      Yes.  It was the more public one.

6   Q      Okay.  And then the one that was Jonnie Williams was

7   the more private one?

8   A      It was, yes.

9   Q      How did that system get started?  Do you remember?

10  A      I -- Mr. Williams didn't read a lot of e-mails.  He

11  just got -- he just got really overwhelmed with all the

12  e-mails going to JWilliams.  So it was just kind of to

13  filter out what he needed to see for the other one, for

14  the Jonnie Williams.

15  Q      In your experience, in general, did Mr. Williams have

16  difficulty reading?

17  A      Yes.

18  Q      I'm sorry?

19  A      Yes.

20  Q      Do you recall whether he has any particular condition

21  that makes reading hard for him?

22  A      I believe he's dyslexic.

23  Q      Now, when Mr. Williams started getting overwhelmed

24  with all the e-mails to the public account, what was the

25  solution?  What was the arrangement that you all worked

1  out?

2  A    That I would filter through the e-mails, the real

3  junk mail, the ads, the -- you know, life insurance,

4  whatever it was.  The important ones then, I would send

5  them to the Jonnie Williams e-mail address and I would

6  normally text him if he had something he needed to see.

7  Q    How would you decide whether an e-mail was important

8  enough to forward to Mr. Williams' private account?

9  A    In the beginning -- well, naturally, if it's an ad

10  for weight loss or it's somebody who's in a foreign

11  country wanting money, that's obviously junk mail.

12  Q    Okay.  The --

13  A    The other ones, if I recognized the name, if I

14  thought it was a -- a business practice, he would

15  automatically get it.  If I had a question, I would send

16  it to him and text him.

17          MR. HARBACH:  Okay.  Can we pull up for

18  identification Government 66, please?

19  BY MR. HARBACH:

20  Q    This is a new subject, Ms. Fulkerson.

21  A    I see it.

22  Q    Can you see it a little better now?

23  A    Yes.

24  Q    Okay.  Now, is this an example of you forwarding an

25  e-mail from Mr. Williams' public account to some other

1  people?

2  A    Yes.

3            MR. HARBACH:  Okay.  Your Honor, government

4  offers Government 66.

5            THE COURT:  It will be admitted.

6  BY MR. HARBACH:

7  Q    Now, let's start with the e-mail on the bottom.  It's

8  from someone called Sara Machir to three different

9  offices.  Do you see that there?

10 A    I do.

11 Q    Do you know who Sara Machir is?

12 A    She was public relations and communications director

13 for Star Scientific.

14 Q    All right.  Now, at the top it says "From:  Jonnie

15 Williams, Sr.," and then it has that JWilliams address

16 there, and I hope the horse isn't dead, but is that the

17 public or private address for Mr. Williams?

18 A    The public.

19 Q    Okay.  And then I note in the body of the e-mail,

20 whose signature block is there?

21 A    Mine.

22 Q    So is this you forwarding something from

23 Mr. Williams' e-mail account?

24 A    Yes.

25 Q    The date of this e-mail is October 8th at 10:39.  And

1   the first addressee there, Monica Block, do you recall who

2   Ms. Block was?

3   A    She works in the Governor's office.

4   Q    Do you recall what her job was?

5   A    I'm not positive, but I think she was a scheduler.

6   Q    Okay.  Now, the body of this e-mail says, "Jonnie

7   asked that I forward this press release and the next one

8   to Governor McDonnell and AG Cuccinelli."

9   A    Yes.

10  Q    My question for you is:  Would you have written

11  something like if Mr. Williams had not, in fact, asked you

12  to do so?

13  A    No.

14          MR. HARBACH:  If we could now take a look for

15  identification at Government 68, please.

16  BY MR. HARBACH:

17  Q    Ms. Fulkerson, can you see that okay on the monitor?

18  A    Yes.

19  Q    Is this another e-mail in the same exchange involving

20  your forwarding press releases?

21  A    Yes.

22          MR. HARBACH:  Your Honor, the government offers

23  Government 68.

24          THE COURT:  It will be admitted.

25  BY MR. HARBACH:

1  Q    And the first thing I want to note is, what is the

2  date and time that the e-mail at the top was sent,

3  Ms. Fulkerson?

4  A    October 8th, 2010, at 10:39 a.m.

5  Q    So about 40 minutes after the one we just saw?

6  A    Yes.

7  Q    And the -- is there an attachment to this e-mail?

8  A    It doesn't appear that it --

9  Q    Well, look under the Subject line there.

10 A    It does say attachment, "Star Scientific's Comments

11 on Roskamp Institute."

12 Q    And you wrote, indeed, "Star's Press Release" in the

13 body of the e-mail?

14 A    I did.

15 Q    Now, is Ms. Block among the folks who this e-mail is

16 sent to?

17 A    Yes.

18         MR. HARBACH:  Now if we could show page 2 of --

19 actually before we do that, Mr. Starnes.

20 BY MR. HARBACH:

21 Q    What does it say in the attached field at the top of

22 the email, what does it say there?

23 A    "Star Scientific's Comments on Roskamp Institute."

24         MR. HARBACH:  Can we look, just briefly, at page

25 2 of Government 68, Mr. Starnes?

1  BY MR. HARBACH:

2  Q    Is this the press release that was attached to that

3  e-mail, ma'am?

4  A    Yes.

5  Q    The next exhibit I'd like to show you for

6  identification is Government 69, please.  Ms. Fulkerson,

7  is this another e-mail in the same exchange involving

8  press releases that we've been talking about?

9  A    Yes.

10           MR. HARBACH:  Your Honor, the government offers

11  Government 69.

12           THE COURT:  It will be admitted.

13  BY MR. HARBACH:

14  Q    Okay.  Ms. Fulkerson, this one is sent at what time

15  at the top there?

16  A    10:40.

17  Q    So one minute after the e-mail we were just looking

18  at a moment ago?

19  A    Yes.

20  Q    And is this one also to Ms. Block?

21  A    Yes.

22  Q    And other people, of course?

23  A    Yes.

24  Q    Now, the subject line on this one and the attachment

25  refers to what?

1  A    "Roskamp Institute Press Release."

2  Q    Is this a different press release from the one we

3  were just looking at a moment ago?

4  A    I believe so, yes.

5  Q    All right.  Let's take a look at page 2, briefly, of

6  Government 69.

7          MR. HARBACH:  Could you blow up the text,

8  please, Mr. Starnes, just the whole thing.  Thank you,

9  sir.

10 BY MR. HARBACH:

11 Q    Is this the press release that you forwarded in

12 connection with the e-mail we've been looking at?

13 A    Yes.

14 Q    All right.  We're going to come back to Roskamp

15 Institute in a few minutes.  Okay?

16 A    Okay.

17 Q    Finally, if we could take a look at Government 70 for

18 identification, please.  Is this the conclusion of the

19 e-mail communication about the press releases,

20 Ms. Fulkerson?

21 A    Yes.

22          MR. HARBACH:  Your Honor, the government offers

23 Government 70.

24          THE COURT:  It will be admitted.

25 BY MR. HARBACH:

1  Q    Okay.  And now, at the top, who's this e-mail from,

2  Ms. Fulkerson?

3  A    Monica Block.

4  Q    And the date and time that this one is sent?

5  A    October 8, 2010 at 10:42 a.m.

6  Q    A couple minutes after the e-mail that we were

7  looking at a moment ago that was Government 69?

8  A    Yes.

9  Q    And who's it addressed to?

10 A    Myself.

11 Q    What does Ms. Block say to you in the e-mail?

12 A    "Got it, Jerri" -- "got it.  Thank you, Jerri.  I

13 will print this for the Governor."

14        MR. HARBACH:  Okay.  Thank you, Mr. Starnes.

15 You can take that down.

16 BY MR. HARBACH:

17 Q    Different subject, Ms. Fulkerson.  Do you recall

18 being involved in helping to arrange a meeting between

19 Mr. Williams and a Dr. Bill Hazel?

20 A    I remember the meeting was set and it was just the

21 fact to confirm the date and time.  I mean -- yeah, the

22 date, time, and place.

23 Q    And do you recall how you found out that the meeting

24 was set?

25 A    I believe Mr. Williams told me.

1  Q    Do you recall, as you sit here today, when exactly

2  that meeting was?

3  A    I -- I couldn't tell you when the dates were.  I

4  believe it was in October sometime, maybe November.

5  Q    Do you remember what year?

6  A    2010.

7  Q    Do you --

8  A    I don't really remember.

9  Q    Okay.  Let's move on, then.  Next subject.  Do you

10 recall being involved in a request to help make

11 arrangements for the Governor and Ms. McDonnell to travel

12 to the Final Four in Houston, Texas?

13 A    Yes.

14 Q    Tell us what you remember about how you learned of

15 that request.

16 A    I believe I got an e-mail from Monica Block stating

17 that VCU had made it to the Final Four and that the

18 Governor was invited to attend and could Starwood Aviation

19 do the flight.

20 Q    And do you recall what Mr. Williams' reaction was to

21 that prospect?

22 A    I remember it being a difficult flight because he was

23 in Michigan, I believe.

24 Q    "He" who?

25 A    Mr. Williams, and the jet would take Mr. Williams

1  back and forth to Michigan for meetings concerning

2  Anatabloc.  It was a difficult trip, but Mr. Williams

3  agreed to do it.

4  Q    Okay.  Let's take a look at, for identification,

5  please, at Government's 92.

6         MR. HARBACH:  If you could, just maybe blow up

7  the top half so she can see it better, Mr. Starnes.

8  BY MR. HARBACH:

9  Q    Ms. Fulkerson, is this an e-mail exchange concerning

10 the flight arrangements to Houston that you've been

11 talking about?

12 A    Yes.

13         MR. HARBACH:  Your Honor, government offers

14 Government's 92.

15         THE COURT:  It will be admitted.

16         MR. HARBACH:  Okay.  I'd like to start,

17 Mr. Starnes, on page 2 of the exhibit.  And just blow up

18 the e-mail at the bottom of the page, the one from

19 Ms. Fulkerson to Ms. Block.  Thank you, sir.

20 BY MR. HARBACH:

21 Q    And what's the date of this e-mail, Ms. Fulkerson?

22 A    March 29th, 2011.

23 Q    All right.  And could you just read the first

24 sentence for us?

25 A    "I just talked to JW.  This is a really hard trip for

1   us to do, but Jonnie will never turn the Governor down if

2   he can help it" -- "at all help it."

3   Q    Okay.  Now, same question as I asked you before.  Is

4   that something that you would have written if Mr. Williams

5   had not told you to say that?

6   A    No.

7          MR. HARBACH:  And if we could back out to page

8   1.  Actually, take the exhibit down for just a minute,

9   please, before we go to page 1.

10  BY MR. HARBACH:

11  Q    Do you remember whether, after the initial

12  arrangements were made, there was a change?

13  A    Yes.

14  Q    What do you recall about that?

15  A    Ms. McDonnell was going to the Final Four with him,

16  but she had to come back early.  The same day, I believe.

17  Q    And --

18  A    And it threw a wrench in everything.

19  Q    Okay.  Was Mr. Williams able to accommodate that

20  requested change in plans?

21  A    Yes.

22  Q    All right.  Now let's take a look at the first page

23  of Government's 92, which is in evidence.

24          MR. HARBACH:  And if we could blow up that

25  e-mail from Ms. Fulkerson at the top there, please,

1    Mr. Starnes.  Yeah, that's fine.  Both of them.  Okay.

2    Thank you, sir.

3    BY MR. HARBACH:

4    Q    Okay, Ms. Fulkerson.  I'd like to look at the one at

5    the bottom that's from you.  Okay?

6    A    Yes.

7    Q    Is what's the date on that one, your e-mail to

8    Ms. Block?

9    A    March 30th, 2011.

10   Q    So the next day from what we were looking at before?

11   A    Yes.

12   Q    All right.  Now, this one says -- actually, I'll ask

13   you to read up to that first smiley face, please.

14   A    "Okay.  Jonnie said that just because it's the

15   Governor's wife, they" -- which should have been "the" --

16   "pilots will stay in Houston and bring her back after the

17   game."

18   Q    All right.  Is that -- were those -- is that what

19   Mr. Williams asked you to convey?

20   A    Yes.

21            MR. HARBACH:  You can take that exhibit down,

22   please.

23            THE COURT:  What's the number on that list

24   exhibit, please?

25            MR. HARBACH:  That's 92, Your Honor.

```
 1                THE COURT:  Thank you.  All right.
 2   BY MR. HARBACH:
 3   Q    Next topic.  Do you recall, at some point, receiving
 4   word of an invitation for Mr. and Ms. Williams to have
 5   dinner at the Governor's mansion with Mr. and
 6   Ms. McDonnell?
 7   A    Yes.
 8   Q    Could we take a look at, for identification,
 9   Government's 103, please, and --
10           MR. HARBACH:  Thank you, Mr. Starnes.  Just so
11   she can see what we're talking about.
12   BY MR. HARBACH:
13   Q    Ms. Fulkerson, do you recognize this to be an e-mail
14   exchange about that invitation?
15   A    Yes.
16           MR. HARBACH:  Your Honor, the government offers
17   Government's 103.
18           THE COURT:  It will be admitted.
19           MR. HARBACH:  Okay.  Can I please start on page
20   2, Mr. Starnes, and the bottom half, just the e-mail from
21   Ms. Fulkerson there.  Okay.  My mistake.
22   BY MR. HARBACH:
23   Q    The e-mail at the very bottom of this page is
24   actually from Ms. Block; is that right?
25   A    Yes.
```

1  Q    It's addressed to you?

2  A    Yes.

3  Q    And it's obviously an invitation to have dinner at

4  the mansion.  Do you see that there?

5  A    Yes.

6  Q    My question for you is:  At the end of the first line

7  there where it says, "The Governor and the First Lady

8  would like to invite Jonnie," do you see that?

9  A    Yes.

10  Q    Is that the correct spelling of Mr. Williams' first

11  name?

12  A    Yes.

13  Q    Okay.  Now let's go back to page 1, please.  I think

14  we saw this a moment ago, but did Mr. Williams and

15  Ms. Williams accept the invitation?

16  A    Mr. Williams accepted.

17  Q    Understood.  Now, do you recall whether there were

18  any additional invitations related to the dinner?

19  A    He was invited to spend the night at the mansion.

20          MR. HARBACH:  Okay.  Let's take a look at the

21  middle of 103, the e-mail from Ms. Block, please,

22  Mr. Starnes.  There you go.

23  BY MR. HARBACH:

24  Q    Is that what you were just referring to?

25  A    Yes.

1   Q    Did you have any conversations with Mr. Williams

2   about whether he would take the Governor and Ms. McDonnell

3   up on the offer to stay overnight in the mansion?

4   A    Yes.

5   Q    What did he say about that?

6   A    He said he had a perfectly good house in Goochland,

7   there was no reason for him to spend the night.

8   Q    And then just to finish this off, if we could scroll

9   up a little bit and see how you responded on Mr. Williams'

10  behalf.  What did you say to him?

11  A    "I just talked to JW.  He is not bringing anyone with

12  him, and thank you for the offer to stay overnight, but he

13  said he'll go home to the house in Goochland."

14  Q    All right.  Let me ask you, do you recall one way or

15  the other whether or not Ms. Williams went to the dinner?

16  A    No, she did not.

17  Q    Okay.  And if we could go back to page 2 of

18  Government's 103.  I want to make sure I spoke correctly.

19  The invitation at the bottom there, if we could blow up

20  Ms. Block's invitation.  That is, in fact, only to Jonnie.

21  Am I right about that?

22  A    Yes.

23  Q    Thank you, ma'am.  It was my mistake.

24        Do you have any idea what precipitated the

25  invitation from the Governor and Ms. McDonnell to

1  Mr. Williams to have dinner with them at the mansion?

2  A    No.

3  Q    Do you recall any conversations with Mr. Williams

4  about the dinner afterward?

5  A    No.

6  Q    Okay.  Now, a moment ago I told you we were going to

7  come back to the idea of Roskamp.  Do you recall that?

8  A    I do.

9  Q    Do you know what the Roskamp Institute is?

10 A    It's research center on Alzheimer's, for Alzheimer's.

11 Q    Do you know where it's located?

12 A    Sarasota, Florida.

13 Q    And do you know what relationship, if any, it has

14 with Star?

15 A    It has a working relationship.  Star Scientific was

16 working with Roskamp to develop Anatabloc with the help --

17 for the help of Alzheimer's.

18         MR. HARBACH:  Could we take a look, for

19 identification, please, at Government's 114.  And maybe

20 blow up the bottom half of the page for her to be able to

21 identify it, Mr. Starnes.  Thank you, sir.

22 BY MR. HARBACH:

23 Q    Can you see that okay, Ms. Fulkerson?

24 A    Yes.

25 Q    Is this an e-mail exchange concerning the possibility

1  of Mr. McDonnell going to Roskamp?

2  A    Yes.

3           MR. HARBACH:  Your Honor, the government offers

4  Government's 114.

5           THE COURT:  It will be admitted.

6           MR. HARBACH:  And I think -- you can leave it

7  right there, Mr. Starnes.  That's good.

8  BY MR. HARBACH:

9  Q    The e-mail that's on display for the jury right now,

10 Ms. Fulkerson, right there in the middle, the one that's

11 dated May 4, '11, at 12:55 p.m., do you see that there?

12 A    I do.

13 Q    It says, "Jonnie said that gov is going to Sarasota

14 to Roskamp Institute on the 1st."  Would that be June 1st?

15 A    I believe so.

16 Q    "And we are providing the transportation."

17 Meaning -- does that mean Mr. Williams' plane?

18 A    Yes.

19 Q    "Roskamp is the company working with Jonnie on

20 Anatabloc, et cetera."  Did you -- did you -- would you

21 have, in fact, had a conversation with Mr. Williams on

22 this subject --

23 A    Yes.

24 Q    -- prior to sending this e-mail?

25 A    Yes.

```
 1   Q    All right.

 2          MR. HARBACH:  Now, if we could scroll down.

 3   Actually, leave it right there, Mr. Starnes.  We're good.

 4   BY MR. HARBACH:

 5   Q    What does Ms. Block say in reply to your e-mail one

 6   minute later at the top?

 7   A    "The 1st of June?"

 8          MR. HARBACH:  And then if we could scroll up a

 9   little bit.  Very good.

10   BY MR. HARBACH:

11   Q    You say to her, "Let me know after you check with

12   him"?

13   A    Yes.  "Let me know after you check with him."

14   Q    All right.  Now, let's go on to Government's 118,

15   please, for identification.  Is this an e-mail exchange a

16   few days later on this same subject?

17   A    Yes.

18          MR. HARBACH:  Your Honor, the government offers

19   Government's 118.

20          THE COURT:  It will be admitted.

21   BY MR. HARBACH:

22   Q    Okay.  Let's start at the bottom, please, with the

23   e-mail from Ms. Block, and could you read the -- the first

24   paragraph there?

25          MR. HARBACH:  Maybe you could blow that up for
```

```
 1  her, Mr. Starnes.  The one that begins "I spoke."
 2  A    "I spoke with the Governor regarding flying down to
 3  speak to the Roskamp Institute on June 1st.
 4  Unfortunately, after checking with his daughter, she is
 5  getting married that Saturday.  He doesn't believe he will
 6  be able to attend due to some dad commitments that day.
 7  I'm so sorry this won't work out."
 8  BY MR. HARBACH:
 9  Q    Okay.  And then at the bottom, why don't you read the
10  rest of this, please?
11  A    "What else we can do to fix this?  The Governor is
12  planning on being in Florida in December.  Could we tie
13  something in then?  When is their next event?"
14  Q    All right.  And then if we could scroll up to see how
15  you all concluded your conversation.
16  A    I replied to her, "I will let JW know.  Dads and
17  daughters come first."
18  Q    All right.  Now, that second sentence, is that
19  Mr. Williams or is that you?
20  A    That's me.
21  Q    That's your observation?
22  A    Yes.
23  Q    Okay.  Now, do you recall one way or the other
24  whether the -- Ms. Block's reference to the event in
25  Florida in December, do you recall whether anything ever
```

1  happened with that?

2  A    I don't remember.

3  Q    Did you inform Mr. Williams when you learned from

4  Ms. Block that the Governor wasn't going to be able to go?

5  A    Yes.

6  Q    What was his reaction?

7  A    He was very disappointed.

8  Q    Do you recall anything specific that he said or just

9  his demeanor?

10          MR. BROWNLEE:  Objection.  Hearsay.

11          MR. HARBACH:  I expect the answer to be no,

12  Judge.

13          THE COURT:  You can go ahead and answer the

14  question.

15  A    I just remember him being upset, that he really

16  wanted the Governor there.

17  BY MR. HARBACH:

18  Q    Okay.  Did you yourself attend the Roskamp meeting on

19  June 1st?

20  A    No.

21  Q    Do you recall whether you and/or Mr. Williams was

22  giving out samples of Anatabloc early in 2011?

23  A    I believe so.

24  Q    Do you recall how you all would decide who would get

25  the samples?  How did that work?

1   A     Mr. Williams decided.  If people requested them, I

2   had to get permission from Mr. Williams.

3   Q     And were there some people that you were authorized

4   to send samples to?

5   A     Did he authorize me to send them to?

6   Q     Yes, ma'am.

7   A     Yes.

8   Q     Do you remember how early in 2011 you all were doing

9   that?

10  A     I really don't know without seeing something.

11        MR. HARBACH:  Okay.  Let's show the witness

12  Government's 94 for a refreshment only, please.

13  A     Okay.

14  BY MR. HARBACH:

15  Q     Just take a look at it, especially all the way down

16  at the bottom there.

17        MR. HARBACH:  It's the bottom e-mail that I'm

18  interested in, Mr. Starnes.

19  A     Okay.

20  BY MR. HARBACH:

21  Q     The date range at the bottom.  Ms. Fulkerson, does

22  taking a look at this refresh your memory about how early

23  in 2011 you were sending samples out to various people of

24  Anatabloc?

25  A     Yes.

JERRI FULKERSON - DIRECT                    414

1   Q    Okay.

2          MR. HARBACH:  Mr. Starnes, can you take it down,

3   please.

4   BY MR. HARBACH:

5   Q    As early as when?

6   A    January.

7   Q    Next subject.  I'm going to start this one with a

8   document.  It's Government's 120, please.  Do you

9   recognize this document, Ms. Fulkerson?

10  A    Yes.

11  Q    Is this a check that you prepared?

12  A    It is.

13          MR. HARBACH:  Your Honor, the government offers

14  Government's 120.

15          THE COURT:  It will be admitted.

16  BY MR. HARBACH:

17  Q    Publishing 120 to the jury, this check is written on

18  the account of whom?

19  A    Starwood Trust.

20  Q    Who asked you to prepare this check?

21  A    Jonnie Williams.

22  Q    Is that your signature that appears on it?

23  A    Yes, it is.

24  Q    Whose decision was it to make this check out to

25  Maureen McDonnell?

1   A      Jonnie Williams.

2   Q      Did he tell you to do that?

3   A      Yes.

4   Q      What's the date on the check?

5   A      May 23rd, 2011.

6   Q      What about the decision to write the check on the

7   account of Starwood Trust, was that your call?

8   A      No.

9   Q      Whose call was it?

10  A      Jonnie asked me to write the check on Starwood Trust.

11  I had to get Donnie Williams', the trustee's permission.

12  Q      Did you do that?

13  A      I did.

14  Q      Let's take a look now at Government's 121, please.

15  Oh, I'm sorry.  Before we take that one down, same

16  question about the amount.  The $50,000, was that amount

17  selected by Mr. Williams?

18  A      It was.

19  Q      Okay.  And so now if we could look for

20  identification, at Government's 121, please.  Do you

21  recognize this to be a check that you prepared?

22  A      It is.

23          MR. HARBACH:  Your Honor, the government offers

24  Government's 121.

25          THE COURT:  It will be admitted.

```
 1  BY MR. HARBACH:

 2  Q    This check is written on the account of whom?

 3  A    Starwood Trust.

 4  Q    Did you go through the same process with respect to

 5  this check that you just described?

 6  A    Yes.

 7  Q    Getting Donnie Williams' permission?

 8  A    Yes.

 9  Q    What's the date on this check?

10  A    May 23rd, 2011.

11  Q    Now, at the time you prepared this check, was the

12  payee part, the pay to the order of, was that filled in

13  yet?

14  A    No.

15  Q    Did you receive any instructions from Mr. Williams

16  about that?

17  A    He told me to leave it blank.

18  Q    What about the memo line that says, "Wedding gift,"

19  whose idea was it to put that there?

20  A    Mr. Williams.

21  Q    Do you recall what Mr. Williams said about that,

22  about why he wanted you to put "wedding gift" in the memo

23  line?

24  A    It was to pay for one of the McDonnell daughter's

25  wedding reception.
```

1  Q    Did Mr. Williams, when he asked you to prepare these

2  checks, did Mr. -- and incidentally, can you -- well,

3  withdrawn.

4         When Mr. Williams asked you to prepare these

5  checks, did he say why he wanted them?

6         MR. BROWNLEE:  Objection.  Hearsay.

7         THE COURT:  Sustained.

8  BY MR. HARBACH:

9  Q    Did you have any conversation with Mr. Williams about

10 whether the 50,000-dollar check was to be a loan or a

11 gift?

12 A    I believe he told me it was a loan.

13        MR. BROWNLEE:  Objection.  Hearsay.

14        THE COURT:  She's already answered it now.  Go

15 ahead.

16 BY MR. HARBACH:

17 Q    To your recollection, did Mr. Williams say anything

18 to your about the terms of the loan, if you recall?

19        MR. BROWNLEE:  Objection.  Hearsay.

20        THE COURT:  Sustained.

21 BY MR. HARBACH:

22 Q    Looking at Government's 121 where it says, Great

23 Seasons Catering," is that your handwriting, ma'am?

24 A    No.

25 Q    What did you do with the checks after you prepared

 1  them?

 2  A     Handed them to Mr. Williams.

 3  Q     You all were together in person?

 4  A     Yes.

 5  Q     When you handed the checks to Mr. Williams, did he

 6  make any comments about any concerns he had about the

 7  checks?

 8             MR. BROWNLEE:  Objection.  Hearsay.

 9             THE COURT:  Sustained.

10  BY MR. HARBACH:

11  Q     Did Mr. Williams tell you what he plans to do with

12  them?

13             MR. BROWNLEE:  Objection.  Hearsay.

14             THE COURT:  Sustained.

15  BY MR. HARBACH:

16  Q     Okay.  If we could look at the next exhibit, which is

17  Government's 122, please.  And before we zoom in,

18  Ms. Fulkerson, do you recognize this document?

19  A     It's the general ledger that, when you enter checks

20  or bills into the QuickBooks system, this is what's

21  generated.

22  Q     Okay.  And were you involved with entering this data?

23  A     Yes.

24             MR. HARBACH:  The government offers Government's

25  122.

```
1              THE COURT:  It will be admitted.
2              MR. HARBACH:  Okay.  Now, if we could blow up.
3  Mr. Starnes has it blown up already.  That's good.  Is
4  there a way to zoom in on --
5  A    I can see it.
6              MR. HARBACH:  Sure.  Just the left-hand side for
7  now.
8  BY MR. HARBACH:
9  Q    Okay.  Now, about midway down the screen there you
10 see there are a couple of checks, number -- thank you,
11 there you go -- number 1001 and 1002.  Do you see that
12 there?
13 A    I do.
14 Q    And the name that's associated with those in this
15 paperwork is who?
16 A    Maureen McDonnell.
17 Q    And then, if we could -- there you go.  Thank you.
18             Now, the top line, the one that's associated
19 with check number 1001, in the column there, does that
20 say, "loan receivable"?
21 A    It does.
22 Q    In the amount of $50,000?
23 A    Yes.
24 Q    And then the second line, gift in the amount of
25 $15,000?
```

1   A    Yes.

2   Q    Let's take a look now at Government's 123 for

3   identification, please.  Do you recognize this to be

4   another page from the ledger we've been discussing?

5   A    Yes.

6           MR. HARBACH:  Your Honor, the government offers

7   Government's 123.

8           THE COURT:  It will be admitted.

9           MR. HARBACH:  All right.  And if we could just

10  look at the top line there.  Thank you, Mr. Starnes.

11          You can -- let's do the same thing like last

12  time, please.  Left side first so it gets a little bigger.

13  Thank you.

14  BY MR. HARBACH:

15  Q    Now, this entry says, "Loan receivable Maureen

16  McDonne," and then the Ls are cut off.  Is this for that

17  check number 1001, is that the 50,000-dollar check we've

18  been talking about?

19  A    It is.

20  Q    And what does it say in the memo column?

21  A    "Two-year loan at 5 percent.  Okayed by Donnie."

22  Q    Now, would you have put "two-year loan at 5 percent"

23  in the memo line?  Would you have just decided that on

24  your own?

25  A    No.

1  Q    Where did you learn that from?

2  A    Jonnie.

3  Q    Okay.  And now, if you could scroll to the right,

4  please, on the same entry.  There's the amount of $50,000,

5  correct?

6  A    Yes.

7  Q    And finally, there's Government's 124.  Another page

8  from the ledger we've been talking about?

9  A    Yes.

10        MR. HARBACH:  Your Honor, the government offers

11 Government's 124.

12        THE COURT:  It will be admitted.

13        MR. HARBACH:  And we're going to blow up just

14 the first line, which is -- there it is.

15 BY MR. HARBACH:

16 Q    This is for the second check, which was numbered

17 1002; is that right?

18 A    Yes.

19 Q    And what's written in the memo column on this one?

20 A    "Wedding gift for caterer and flowers for daughter."

21 Q    All right.  And if we could scroll over to the right.

22 In the amount of --

23 A    -- $15,000.

24 Q    Thank you, ma'am.

25        MR. HARBACH:  Your Honor, that's a good place to

1   stop, if you'd like to stop for the day, or I can keep

2   going.

3          THE COURT:  No.  We're going to go ahead and

4   stop here.  It's about 5:35, thereabouts, and looking at

5   the pile of papers there, he's not even close to being

6   finished.  So let me give you all the admonition that I

7   will give you every day about not talking to anybody about

8   this case.

9          Now, I've been doing this a long time so I know

10  a lot about how these things work.  This is the toughest

11  day.  Today there will be 6:00 news, 11:00 news, 6 a.m.

12  tomorrow, front page.  So the pressure will come today,

13  the biggest pressure.  Your friends and your family,

14  they'll want to talk about it.  So please, don't -- don't

15  succumb to that temptation.  I guarantee you, you'll find

16  out I'm right.  You'll face this tonight.  It gets easier

17  as we go along.  After two or three days, that pressure

18  will subside.

19         And I know you're thinking, as you're sitting

20  there, I'm going to be in this courtroom for the rest of

21  my natural life, but again, things will start to move.

22  The first week is the slowest.  The first, you know,

23  important witnesses, things will move a little slowly.

24  But as we start to go along, we'll get a better clip and

25  we will get through this.  I am thanking you in advance

1   for your patience in this matter.  I know it's a tough

2   deal.

3          We will wish you God's blessing this evening and

4   hope that everybody will be fine.  We'll see you

5   tomorrow -- let me just check.  Let's make it 9:30.  9:30

6   tomorrow morning and we will get started and hopefully

7   we'll move a little quicker tomorrow.  You all be blessed.

8   All right.  Follow the marshal, please.

9        (The jury left the courtroom.)

10          THE COURT:  All right.  We'll be in adjournment

11  until 9:00 -- or 9:30 in this case, but I have another

12  matter at 9.

13       (The trial adjourned at 5:33 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    I N D E X

2                     WITNESSES

3
   Examination By:                              Page
4                     RYAN GREER

5  Direct      - MR. HARBACH                    277
   Cross       - MR. ASBILL                     296
6  Cross       - MR. HAUSS                      309

7              CAILIN McDONNELL YOUNG

8  Direct      - MS. ABER                       310
   Cross       - MR. ASBILL                     347
9  Cross       - MR. BURCK                      372
   Redirect    - MS. ABER                       377
10
              JERRI FULKERSON
11
   Direct      - MR. HARBACH                    382
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```