2534

```
1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                          RICHMOND DIVISION

3    ------------------------------------------

4    UNITED STATES OF AMERICA,

5
                                    Plaintiff;
6    v.                                        Criminal Action
                                                  3:14CR12
7    ROBERT F. McDONNELL and
     MAUREEN G. McDONNELL,
8                                   Defendants.

9    ------------------------------------------

10                         August 11, 2014
                           Richmond, Virginia
11                             9:45 a.m.

12                    JURY TRIAL - VOLUME XI

13   BEFORE:        HONORABLE JAMES R. SPENCER
                    United States District Judge
14

15   APPEARANCES:   MICHAEL S. DRY, ESQ.
                    DAVID V. HARBACH, II, ESQ.
16                  JESSICA D. ABER, ESQ.
                    RYAN S. FAULCONER, ESQ.
17                       Counsel for Government;

18                  JOHN L. BROWNLEE, ESQ.
                    HENRY W. ASBILL, ESQ.
19                  JAMES M. BURNHAM, ESQ.
                    DANIEL I. SMALL, ESQ.
20                  CHRISTOPHER M. IAQUINTO, ESQ.
                    OWEN T. CONROY, ESQ.
21                       Counsel for Robert F. McDonnell;

22                  WILLIAM A. BURCK, ESQ.
                    HEATHER H. MARTIN, ESQ.
23                  STEPHEN M. HAUSS, ESQ.
                    DANIEL KOFFMANN, ESQ.
24                       Counsel for Maureen G. McDonnell.

25                       JEFFREY B. KULL
                       OFFICIAL COURT REPORTER
```

1                    P-R-O-C-E-E-D-I-N-G-S

2          THE CLERK:  Day eleven, Case Number 3:14CR12:

3    United States of America versus Robert F. McDonnell and

4    Maureen G. McDonnell.  The United States is represented by

5    Michael Dry, David Harbach, Jessica Aber and Ryan

6    Faulconer.  Robert F. McDonnell is represented by John

7    Brownlee, Daniel Small, Henry Asbill, James Burnham, and

8    Christopher Iaquinto.  Maureen G. McDonnell is represented

9    by Heather Martin, William Burck, Stephen Hauss, and

10   Daniel Koffmann.  Are counsel ready to proceed?

11          MR. DRY:  The United States is ready to proceed.

12          MR. ASBILL:  Mr. McDonnell is ready to proceed.

13          MR. BURCK:  Ms. McDonnell is ready to proceed.

14          THE COURT:  All right.  Let's bring in the jury.

15      (The jury entered the courtroom.)

16      Good morning.  All right, government, call your next

17   witness, please.

18          MR. FAULCONER:  Your Honor, the United States

19   calls Martin Kent.

20                    MARTIN KENT,

21   called as a witness by and on behalf of the government,

22   having been first duly sworn by the Clerk, was examined

23   and testified as follows:

24                  DIRECT EXAMINATION

25   BY MR. FAULCONER:

**MARTIN KENT - DIRECT**                    2536

1    Q    Good morning.

2    A    Good morning.

3    Q    Could you please state your name and spell your last

4    for the court reporter?

5    A    Martin Kent, K-E-N-T.

6    Q    What city do you currently live in?

7    A    Bristol, Tennessee.

8    Q    Could you briefly tell the jury a little bit about

9    your educational background, Mr. Kent?

10   A    I can.  I graduated from the University of Richmond

11   and I attended law school at the Mercer University School

12   of Law in Macon, Georgia.

13   Q    Where are you currently employed?

14   A    At The United Company.

15   Q    What is The United Company?

16   A    It is a private diversified investment company

17   primarily focused on art, entertainment, and energy.

18   Q    Before working at the United Company, where did you

19   work?  I worked for Governor Bob McDonnell as his Chief of

20   Staff.

21   Q    How long did you work as Mr. McDonnell's Chief of

22   Staff?

23   A    Four years.

24   Q    Was that the entire Administration?

25   A    It was.

1    Q    Now, before Mr. McDonnell took office as Governor,

2    where did you work?

3    A    I worked at the Office of the Attorney General, and

4    started working there in 2001.

5    Q    By the time that Mr. McDonnell left the Office of the

6    Attorney General, what was your role?

7    A    When he left the Office of Attorney General in 2009

8    to run for Governor, I was then serving as Chief Counsel

9    to the Attorney General.

10   Q    As Chief Counsel to him while he was Attorney

11   General, what were your general responsibilities?

12   A    Primarily dealing with the General Assembly, dealing

13   with the Governor's Office, I was a directly liaison to

14   the Governor's Office, and then representation of state

15   boards and commissions.

16   Q    Now, as Chief of Staff for Mr. McDonnell when he was

17   Governor, what were your responsibilities then?

18   A    They are actually spelled out by an executive order,

19   Executive Order 3.  Primarily, I was the Deputy Budget and

20   Personnel Officer for the Commonwealth, and I was

21   responsible for overseeing sort of the daily work of the

22   Governor's Cabinet.

23   Q    Would it be fair to characterize you as sort of the

24   catch-all guy?

25   A    Pretty much, yeah.

**MARTIN KENT - DIRECT** 2538

1    Q    As Chief of Staff, who did you report to?

2    A    The Governor.

3    Q    Given that you reported to him directly, how often

4    would you say you spoke to him?

5    A    There were days we spoke multiple times, and then

6    when he was traveling there were days that we may

7    communicate by text message or e-mail, but at least daily

8    in some communication mode.

9    Q    If Mr. McDonnell told you to do something when he was

10   Governor, would you do it?

11   A    Absolutely.

12   Q    So was he your boss?

13   A    He was my boss, yup.

14   Q    I'd like to get a little bit of a sense, we have

15   heard some testimony about it, but since you were Chief of

16   Staff, I'd like to get a sense of who else was in the

17   office and how things were structured.  Can you explain

18   how many Cabinet Secretaries there were?

19   A    There were 12 official, and when I say official, the

20   Governor by executive order also made some appointments

21   that were Cabinet-level positions, but there were 12

22   primary Cabinet positions when we started in office.

23   Q    All those Cabinet Secretaries, did they have

24   subordinate staff of their own?

25   A    They did.

1  Q    Do you recognize the name Dr. Bill Hazel?

2  A    I do.

3  Q    Which Cabinet Secretary was he?

4  A    Health and Human Resources.

5  Q    Do you recognize the name Molly Huffstetler?

6  A    I do.

7  Q    Who was Molly Huffstetler?

8  A    She worked for Dr. Hazel.  We had, early on, actually

9  it predated the Administration, but the Affordable Care

10 Act was passed into law and we developed an initiative

11 called the Health Reform Initiative, which really the

12 design of that was sort of to oversee Virginia's

13 implementation of the Affordable Care Act.  And she was in

14 essence the director of that initiative.

15 Q    Do you recognize the name Lisa Hicks-Thomas?

16 A    I do.

17 Q    Who was Lisa Hicks-Thomas?

18 A    The Secretary of Administration.

19 Q    How about the name Sara Wilson?

20 A    I do.

21 Q    Who was Sara Wilson?

22 A    She was the Director of Human Resource Management.

23 Q    Who did Sara Wilson report to?

24 A    To Lisa.

25 Q    Ms. Hicks-Thomas?

1    A    Lisa Hicks-Thomas.  I apologize.

2    Q    Who did she report to?

3    A    She reported through me to the Governor.

4    Q    Each of these people -- sorry, you have talked a

5    little bit about Cabinet Secretaries.  Could you tell us

6    the difference between the Cabinet Secretaries and what

7    sort of is referred to as the Office of the Governor

8    itself?

9    A    Sure.  Probably it is easiest to give you sort of a

10   visual of the way the office is structured at the Patrick

11   Henry Building.  In what we called the pod, which was the

12   area directly where the Governor's Office was and my

13   office was, and then immediately on each side of that were

14   staff members.  They could be anything from our

15   communications shop to our policy and legal shop,

16   scheduling, anything legislatively-related.  Those were

17   staff members that were sort of contained within the unit

18   called the Governor's Office.  But the Governor's Office

19   is actually made up of not only those staff members, but

20   the secretariats which are around the building, so to

21   speak, at the Patrick Henry Building.

22   Q    Now, how did the Mansion staff relate to the

23   Governor's Office?

24   A    The Mansion staff also reported to the Governor's

25   Office ultimately.  But they were sort of self-contained

1    at the Mansion.  They had offices at the Mansion.  They

2    did not have offices at our office at the Patrick Henry

3    Building.

4    Q    The staff that were at the Mansion, were those state

5    employees?

6    A    They were.

7    Q    Would that include Mary-Shea Sutherland and Sarah

8    Scarbrough?

9    A    It did.

10   Q    All of those people, including those at the Mansion,

11   who did they ultimately report to?

12   A    Ultimately reported to the Governor.

13   Q    Now, in your job, was it also common for some of

14   those staffers to relay information to you from either

15   Mr. McDonnell or Ms. McDonnell?

16   A    That did happen, yes.

17   Q    I'd like to talk a little bit now about sort of what

18   happened on a routine basis within the office and some of

19   the Administration's priorities.  Based on your

20   interactions with Mr. McDonnell as his Chief of Staff, and

21   the things that he asked you to do, can you tell us where

22   on the Administration's list of priorities the matter of

23   Virginia business and economic development was?

24   A    It was at the top of the list.  I would say it was

25   probably only second to public safety.

1   Q    During your time in the Administration, how common

2   was it for Mr. McDonnell to talk about promoting Virginia

3   business and economic development?

4   A    Did it on a daily basis.

5   Q    How common was it for your day-to-day work to relate

6   to furthering those issues?

7   A    I did so on a daily basis as well.

8   Q    I'd like to take a couple examples about sort of

9   breaking down how that would work.  How common was it for

10  the Governor's Mansion to host events to promote Virginia

11  business and economic development?

12  A    It was very common.  I think staff, long time staff

13  members at the Mansion had commented to me that we

14  probably had more events at the Mansion than any other

15  administration they could recall.

16  Q    How common was it for you or other government

17  employees to participate in planning those events?

18  A    It was common.

19  Q    Would that include people like Sarah Scarbrough?

20  A    It would.  Actually, her primary job, or one of her

21  primary jobs as Mansion Director, was to coordinate that

22  to send out invitations, to ensure that the bills were

23  paid.  That was one of her main functions, yes.

24  Q    When those people had planned those events, as Chief

25  of Staff, did you expect them to take time off or was it

**MARTIN KENT - DIRECT**    2543

1   official time when they did that?

2   A    That was part of their job.

3   Q    How common was it for Mr. McDonnell to attend those

4   types of events?

5   A    Very common.

6   Q    Was part of your job to try to figure out which event

7   you should or shouldn't host or which events Mr. McDonnell

8   should or shouldn't attend?

9   A    At the Mansion, I would not say that was my primary

10  job.  We had, it was a little complicated, but to simplify

11  it, we had a scheduling process where events, invitations

12  to events outside of really Richmond, but more

13  specifically, outside of the Governor's Office, or the

14  Mansion, we had a scheduling process where we would review

15  those, if we got them in advance, and make a threshold

16  determination of whether it was something that seemed to

17  be gubernatorial in nature or something more appropriate

18  for a Cabinet member or staff member to attend on the

19  Governor's behalf.  But then on occasion there were events

20  at the Mansion where I may or may not be pulled in, but on

21  a day-to-day basis I was not pulled into the

22  decision-making process on the events at the Mansion.

23  That was primarily the Mansion staff that dealt with that.

24  Q    Was there a process in place to your awareness as

25  Chief of Staff for deciding which events to have and not

1    to have?

2    A    Yes, there was.

3    Q    How common was it for other government officials to

4    attend events at the Mansion and elsewhere?

5    A    Very common.

6    Q    How common was it for Virginia businesspeople to

7    attend those events?

8    A    Very common.

9    Q    How common was it for Ms. McDonnell to attend those

10   events?

11   A    She attended regularly.  She did not attend all.  If

12   she was in town and the Governor felt like it was

13   important for her to be there, she usually made an

14   appearance.

15   Q    Were there times where Mr. McDonnell couldn't attend

16   an event and a surrogate would be sent instead?

17   A    There were.

18   Q    Now, with all this process and all these events

19   potentially on the table, who was it who had the final

20   authority to decide whether or not an event would make it

21   onto the calendar or not make it onto the calendar?

22   A    Ultimately it was the Governor's call.

23   Q    We have talked a little bit about events.  I'd like

24   to talk just a little bit about meetings.  How common was

25   it for Mr. McDonnell to have meetings on his schedule?

**MARTIN KENT - DIRECT**

1    A    Very common.

2    Q    Was it part of your job to help figure out which

3    meetings he should and shouldn't attend?

4    A    There were meetings that were, yes, filtered through

5    me and that was part of my job.  But there was also sort

6    of a separate track where we are all extremely busy in the

7    office.  I mean, everyone in the office is really going

8    24/7.  There would be calls that would come in to the

9    Governor's scheduler, and there would be meetings between

10   the Governor and the scheduler with certain events and

11   then there were some that I was pulled into as well.  It

12   was really sort of hit or miss depending on the issue at

13   hand.

14   Q    How common was it for those meetings to relate to

15   promoting Virginia business and economic development?

16   A    Very common.

17   Q    How common was it for other Administration officials

18   like Cabinet Secretaries to attend meetings?

19   A    Scheduling meetings or --

20   Q    Just meetings in general.

21   A    Very common.

22   Q    At times, would those Cabinet Secretaries or other

23   Administration officials attend meetings instead of

24   Mr. McDonnell?

25   A    Yes, routinely.

1  Q    Now, would one of the types of meetings that

2  Mr. McDonnell would have on his schedule be Cabinet

3  meetings with his Cabinet Secretaries?

4  A    And that was one of the things that I was responsible

5  for.  We attempted to do that on a weekly basis.

6  Q    Would those include at times people like Lisa

7  Hicks-Thomas and Sara Wilson?

8  A    It did.

9  Q    Now, when Mr. McDonnell was in meetings like that,

10  was it common for him to ask his Cabinet officials to do

11  things?

12  A    It was.

13  Q    Would that include asking them to look into

14  something?

15  A    Absolutely.

16  Q    Would that include asking them to meet with people?

17  A    It did.

18  Q    Just to be clear, we have talked about meetings a

19  little bit.  Assuming it had nothing to do with an

20  emergency, like some sort of public safety issue, but they

21  were talking about a meeting with an outside third party,

22  would you typically try to give Administration officials

23  some notice so they could prepare for that meeting?

24  A    You tried to.  I would say more oftentimes than not

25  you did.  But inevitably, there were times when people

1    would call in and, just by the caller, you knew it was

2    probably an issue of statewide importance and you would

3    take those sometimes on the fly.

4    Q    How common was it on the spectrum for a meeting to be

5    arranged on less than 12 hours' notice?

6    A    Not common, but it happened.

7    Q    We talked about meetings and events, so now I'd like

8    to talk a little bit about interactions with other state

9    government entities and agencies.  In addition to hiring

10   staff and appointing Cabinet officials, did Mr. McDonnell

11   also have a role in appointing members of various state

12   boards and commissions?

13   A    He did.

14   Q    Did that include the Board of Visitors for Virginia

15   Commonwealth University?

16   A    It did.

17   Q    Could you tell us just sort of generally what the

18   Board of Visitors is in more common language?

19   A    Sure.  Each state university in Virginia, there is a

20   code section which spells out what the role of the Board

21   of Visitors would be, but generally speaking, they set

22   sort of the policy goals and initiatives for the

23   university.  One of the biggest things they do that gets

24   the most attention is they vote on any tuition increases

25   which occur at the university.  They are designed to set

2548

1  sort of the broad policy objectives of the university, and

2  the President of the university is then to carry out those

3  goals.

4  Q    For Virginia Commonwealth University, did that Board

5  of Visitors include 16 members?

6  A    I believe that's correct.  It was certainly more than

7  12.

8  Q    Were all of them appointed by the Governor?

9  A    To my knowledge, they were, yes.

10 Q    How about the University of Virginia?  Was it the

11 same process for UVA?

12 A    Generally speaking, yes.

13 Q    Did that Board of Visitors have about 17 people on

14 it?

15 A    That sounds right, yes.

16 Q    Did all of those, or were all of those individuals

17 appointed by Mr. McDonnell?

18 A    To my knowledge, yes, they were.

19 Q    Or whoever was Governor at the time.

20 A    Correct.

21 Q    Just to be up front with the jury, just because the

22 Governor appoints members to the Board of Visitors, does

23 that mean he controls every last thing that happens at the

24 university?

25 A    No, and particularly in the case of the University of

1   Virginia, the Board members sort of jealously guard their

2   role, and so there is no day-to-day communication with

3   them about what they should and shouldn't do.  However, we

4   did hold periodic meetings, particularly when new members

5   were appointed, and give them sort of the things that the

6   Governor had ran on, the initiatives he promised, an

7   example being lower tuition.  You know, Virginians spoke

8   loud and clear that they wanted lower tuition at state

9   schools, and that was an issue we did discuss with them.

10  But generally speaking, we didn't control their day-to-day

11  activities, no.

12  Q    Regardless of that, if the Governor wants to ask the

13  Board of Visitors to resign, can he do so?

14  A    He can ask them to resign.  There is some limitation

15  in the State Code as to whether he can force them to

16  resign, but he can certainly always ask them to resign,

17  yes.

18  Q    I'd like to show you what's been marked for

19  identification as Exhibit 619.  Mr. Kent, is this a letter

20  from Mr. McDonnell to the Board of Visitors of the

21  University of Virginia?

22  A    It does appear to be, yes.

23  Q    Is it dated June 22nd, 2012?

24  A    It is.

25  Q    Does this relate to a controversy surrounding the

1    resignation of the UVA President?

2    A    Yes, it does appear to.

3    Q    Turning just to the last page of this document, is

4    that Mr. McDonnell's signature at the bottom?

5    A    It is.

6              MR. FAULCONER:  We would offer Exhibit 619 into

7    evidence.

8              THE COURT:  It will be admitted.

9    BY MR. FAULCONER:

10   Q    Now, Mr. Kent, if we could turn back to the first

11   page briefly.  Do you recall actually being involved in

12   the preparation of this letter?

13   A    I do.  You know, it wasn't something -- we had a

14   Secretary of Education and our Secretary of the

15   Commonwealth that really dealt day in and day out with

16   board members and education issues.  But this was an issue

17   that got so much attention that I was part of this, yes.

18   Q    If we could turn to the third page.  Could you read

19   just the third-to-last paragraph there that starts with

20   "But let me be absolutely clear..."

21   A    It says, "But let me be absolutely clear; I want

22   final action by the Board on Tuesday.  If you fail to do

23   so, I will ask for the resignation of the entire Board on

24   Wednesday.  Regardless of your decision, I expect you to

25   make a clear, detailed, and unified statement on the

**MARTIN KENT - DIRECT**

1    future leadership of the University."

2    Q    We can take that down.  We have talked about VCU and

3    UVA.

4    A    We did.

5    Q    Does the Governor, whoever it is at the time, also

6    appoint individuals who sit on something called the

7    Tobacco Commission?

8    A    He does.  That is a bifurcated board that's appointed

9    in part by the Governor and in part by the legislature.

10   Q    Does it have approximately 31 members?

11   A    There are over 30.  But yeah, that sounds correct.

12   Q    Is it accurate that Mr. McDonnell either appoints or

13   one of his Cabinet secretaries appoints around 20 or so of

14   those?

15   A    That sounds about right, yes.

16   Q    The Tobacco Commission, I know that's sort of the

17   shorthand for it, is it actually called the Virginia

18   Tobacco Indemnification and Community Revitalization

19   Commission?

20   A    It is.  We referred to it, the acronym is TICR.

21   Q    T-I-C-R?

22   A    Yes.

23   Q    I'd like to show you what's been marked for

24   identification as Exhibit 93.  Is this an e-mail from an

25   individual named Gerard Robinson to you, Tucker Martin,

**MARTIN KENT - DIRECT**

1    and an individual named Kim Steinhoff?

2    A    It is.

3    Q    Is it dated April 5th, 2011?

4    A    It is.

5    Q    Who is Gerard Robinson?

6    A    Gerard Robinson at the time was Secretary of

7    Education.

8    Q    Who was Kim Steinhoff?

9    A    Kim was my executive assistant.

10            MR. FAULCONER:  We would offer Exhibit 93 into

11   evidence.

12            THE COURT:  93?

13            MR. FAULCONER:  Yes, 93.

14            THE COURT:  All right.  It will be admitted.

15   BY MR. FAULCONER:

16   Q    Now, Mr. Kent, could you explain just in general

17   terms what this e-mail is asking for from Gerard Robinson

18   to you?

19   A    It appears that Gerard was asking whether or not the

20   Governor was interested in writing a letter of support to

21   the Tobacco Commission for an application for the Virginia

22   Early Childhood Foundation.

23   Q    If we could turn to the second page of the

24   attachment.  Is that actually a draft letter that was sent

25   over to you?

1    A    It appears to be, yes.

2    Q    We can take that down.  Now, Mr. Kent, in your

3    experience, when interacting with state agencies, your

4    experience as Chief of Staff, if Mr. McDonnell encouraged

5    somebody else in state government to do something, would

6    it typically help or hurt the process?

7    A    I would say it helped the process.  Definitely helped

8    the process.

9    Q    All right.  Now, before we get to Mr. Williams and

10   Star Scientific, I just have a couple questions about some

11   things that came up before that.  Now, before Mr. Williams

12   or Star Scientific entered the picture, can you tell us

13   whether you ever saw a company associated with

14   Ms. McDonnell try to use Mr. McDonnell's image to promote

15   a product?

16   A    Yes.  We had a situation, it was either just before

17   or just after the Governor had left the Attorney General's

18   Office to run for Governor, where a company, my

19   recollection is a company tried to use his likeness to

20   promote their product, and it came to mine and Jasen

21   Eige's attention.  Jasen was also at the Attorney

22   General's Office at the time.  It came to our attention

23   through our Consumer Affairs Division at the Office of the

24   Attorney General.

25   Q    After that came to your attention, did you speak to

1    Mr. McDonnell about it?

2    A    We did.

3    Q    Could you tell us how that conversation went?

4    A    I believe the Governor had just left to run.  I think

5    I'm right on that.  And we brought it to his attention and

6    asked if he had ever authorized that.  And my recollection

7    is he said he had not.  And we asked what he wanted us to

8    do about it.  He said to handle it as we would in the

9    normal course, which would mean that the Attorney

10   General's Office, if it was fraudulent or done without the

11   other person's authorization, then we could take certain

12   action on their behalf.  And so Jasen and myself, we

13   reached out to the company and said, "You have used a

14   likeness of the Attorney General," at that time, former

15   Attorney General, "and it was unauthorized.  And if you

16   fail to take that down, then we will pursue legal action

17   to do so."

18   Q    Now, earlier you said that you worked for

19   Mr. McDonnell, and I think you were sort of just alluding

20   to it, not only when he was Governor but also when he was

21   Attorney General, right?

22   A    I did.  That's correct.

23   Q    Before Mr. McDonnell ran for Governor, did you know

24   who Jonnie Williams was?

25   A    I do not recall ever hearing the name Jonnie Williams

1    when he was Attorney General.  But candidly, I was not

2    involved in the political operation of the Attorney

3    General's Office.  I had been at the Attorney General's

4    Office since 2001, so I started out as a career Assistant

5    Attorney General and worked my way up through the office.

6    But no, I had not heard that name before.

7    Q    Before Mr. McDonnell ran for Governor, did you know

8    anything about Star Scientific?

9    A    No, I did not.

10   Q    Before he ran for Governor, did you know anything

11   about Anatabloc?

12   A    I did not.

13   Q    Before the investigation into Mr. McDonnell's

14   relationship to Mr. Williams sort of broke in the media,

15   had you ever heard Mr. McDonnell refer to Mr. Williams as

16   a longtime friend?

17   A    No.  We had never discussed it.

18   Q    And in fact, before sometime in 2011, do you actually

19   have any specific recollection of meeting Mr. Williams in

20   person?

21   A    I did not.  I have only met Mr. Williams one time.

22   Q    All right.  Let's focus in on late July of 2011.  I'd

23   like to show you what's been already admitted into

24   evidence as Exhibit 180.  Now, do you recognize what type

25   of e-mail this is?  From Katherine Harris, attaching RFM

**MARTIN KENT - DIRECT**

1  schedule.

2  A    It appears to be part of the Governor's daily

3  schedule.

4  Q    Was it common for Ms. Harris to send these out to

5  everybody on the staff?

6  A    She sent them out.  She actually had two schedules.

7  She had one schedule that was more detailed that went out

8  to sort of the senior leadership in the office, and a less

9  detailed version that went out to others in the office.

10  Q    I'd like to turn to the sixth page of this document.

11  All right, do you see there at 11:30 p.m., sort of at the

12  end of that day's schedule, where it says, "Home of Jonnie

13  Williams"?

14  A    I do.

15  Q    Do you recall Mr. McDonnell and his family

16  vacationing at Mr. Williams' home at Smith Mountain Lake

17  in this time frame of late July, 2011?

18  A    I do.

19  Q    We can take that down.  Leave it up for a second,

20  sorry.  At the time of this trip, were you aware that

21  Mr. Williams had gone on a shopping trip with

22  Ms. McDonnell in New York City in April of 2011?

23  A    I was not.

24  Q    At the time of this trip in late July, were you aware

25  of any loan from Mr. Williams to Mr. or Ms. McDonnell in

**MARTIN KENT - DIRECT**

1    May of 2011?

2    A    I was not.

3    Q    At the time of this trip, were you aware that

4    Mr. Williams had paid more than $2,300 for Mr. McDonnell

5    and his sons to play golf at Kinloch Golf Club in May of

6    2011?

7    A    I was not.

8    Q    I'd like to turn to Page 10 of this document.  There

9    at the bottom where it says, "Depart for Executive

10   Mansion," what time does it say on this schedule that

11   Mr. McDonnell was scheduled to leave Smith Mountain Lake

12   for the Executive Mansion?

13   A    It appears to be 7:00 to 7:30 p.m.

14   Q    We can take that down.  Now, before the McDonnells

15   went on this trip, did you know anything about

16   Mr. McDonnell potentially driving Mr. Williams' Ferrari on

17   that trip?

18   A    I did.

19   Q    Sorry?

20   A    I'm sorry, before or after?

21   Q    Before.

22   A    Before, no.  Sorry, I did not.

23   Q    Can you tell us whether, I think we have heard some

24   about it, Mr. McDonnell would usually drive himself

25   around?

**MARTIN KENT - DIRECT**

1  A    No, the protocol once you become Governor is that the

2  Executive Protection Unit will transport the Governor and

3  the spouse wherever they need to go during their term as

4  Governor.

5  Q    Now, after they got back from the trip to Smith

6  Mountain Lake, did you learn about Mr. McDonnell driving

7  Mr. Williams' Ferrari?

8  A    I did.

9  Q    Can you tell us a little bit about how you learned

10  about that?

11  A    It was probably a week or so, the following week

12  after he had returned, and the Executive Protection Unit's

13  office, I mentioned previously, sort of the layout of the

14  office, the Governor's Office and my office, my assistant,

15  his assistant, are in what is referred to as the pod.  It

16  is sort of a self-contained unit that's within the Patrick

17  Henry Building.  Immediately outside of that pod, that

18  door to the pod, is the Executive Protection Unit's

19  office.  And there was someone, I'm sure I passed him

20  going in and out of the hallway, and someone from the

21  Executive Protection Unit, I believe, brought to my

22  attention what had happened.  And it had had an effect on

23  some of the members of the Unit.

24  Q    What do you mean by that?

25  A    I think it had hurt morale.  You know, their primary

1   job is to protect.  And I think from their perspective,

2   they couldn't protect him if he is driving a vehicle and

3   they are behind him in their own vehicle.

4   Q    After the Executive Protection Unit, somebody in the

5   Unit, talked to you about this, did you talk to

6   Mr. McDonnell about it?

7   A    I did.

8   Q    What did you say?

9   A    I went into his office and told him that I understood

10  that he had driven a sports car, I'm not sure at the time

11  I knew it was a Ferrari, but that he had driven a sports

12  car.  And I reminded the Governor what the job was or the

13  duty of the Executive Protection Unit, and I told him that

14  it had had an impact on the morale of some members of the

15  Unit, which was very important, and I asked him not to do

16  it again.

17  Q    Do you recall what if anything he said or did in

18  response?

19  A    He didn't say a lot.  I don't recall there was any

20  specific -- he just sort of listened.

21  Q    Do you recall any sort of physical reaction or facial

22  reaction from him?

23  A    Yeah, I think he might have smiled when I asked about

24  the sports car.  But, you know, there wasn't a lot of

25  communication.  He heard me.  He listened to what I said

1  and didn't really push back in any way.

2  Q    All right.  I'd like to hand up, with the assistance

3  of the Court Security Officer, what's been marked for

4  identification as Exhibit 183.  This is a 21-page

5  document, Exhibit 183.  Have you had a chance to review

6  this before coming in to testify here today?

7  A    I have.

8  Q    And are each of those 21 pages a photograph?

9  A    They appear to be, yes.

10  Q    Do you recognize what individual is in each one of

11  those photographs?

12  A    It appears to be Governor McDonnell.

13         MR. FAULCONER:  We would offer Exhibit 183 into

14  evidence.

15         THE COURT:  It will be admitted.

16         MR. FAULCONER:  Your Honor, if we could just

17  have, with the assistance of Mr. Starnes, just flip

18  through each page briefly so the jury can see it?

19         THE COURT:  All right.

20      (Documents displayed to jury.)

21  BY MR. FAULCONER:

22  Q    All right, we can take that down.  Now, earlier we

23  looked at a schedule that said that they left Smith

24  Mountain Lake at 7 p.m., or at least were scheduled to.

25  A    Correct.

1    Q    I'd like to show you what's already been entered as

2    Exhibit 189.   Zooming in on the bottom e-mail, or on both

3    e-mails here, do you see the bottom e-mail dated July

4    31st, 2011 at 11:29 p.m.?

5    A    I do.

6    Q    Mr. Kent, were you copied on either of these e-mails

7    that were sent between Dr. Hazel and Mr. McDonnell?

8    A    I was not.

9    Q    At the time of this e-mail, did you know about this

10   meeting that Mr. McDonnell was contacting Dr. Hazel about?

11   A    I did not.

12   Q    We can take that down.   I'd like to move forward two

13   weeks to August 16th of 2011.   I'd like to show you what's

14   been marked for identification as Exhibit 635.

15           MR. ASBILL:   I object to this unless it is

16   redacted.   Same problem we had before.

17           MR. FAULCONER:   Could I lay a couple of

18   foundation questions and then we can approach to discuss

19   it?

20           THE COURT:   We will deal with the redaction

21   before it is published to anybody.   Go ahead.

22   BY MR. FAULCONER:

23   Q    Mr. Kent, is this a document with your handwriting on

24   it?

25   A    It does appear to be my handwriting, yes.

1    Q    Is it a printout of an e-mail dated August 16th,

2    2011?

3    A    It does appear to be, yes.

4    Q    After you wrote what you wrote in your handwriting on

5    this e-mail, can you tell the members of the jury what you

6    believe you did with this document?

7    A    Typically, what I would do when there was handwriting

8    on a document for the Governor's attention, as I mentioned

9    previously, my office was adjoining his in what we

10   referred to as the pod.  I would usually take whatever it

11   was that I had written on and place it on his desk in his

12   office.

13   Q    Do you believe that you either did that or handed it

14   to him personally with this document?

15   A    I can't remember with absolute certainty that I did

16   that, but that was certainly normally what I would do,

17   yes.

18            MR. FAULCONER:  May we approach briefly?

19            THE COURT:  Come on up.

20       (At Bench.)

21            MR. FAULCONER:  Your Honor, now that we have

22   laid the foundation, he believes he gave this document to

23   the Governor.  We would ask that it be entered into

24   evidence unredacted.

25            THE COURT:  All right.

1           MR. ASBILL:  This is the same document we dealt

2    with before that references the Attorney General's opinion

3    and summarizes it at the bottom of the e-mail and attaches

4    the opinion to it.

5           MR. FAULCONER:  Your Honor, as we understand it,

6    previously we said although it was obvious from the

7    document that it was intended to be given to the Governor,

8    we didn't previously lay a foundation that it was written

9    on by Mr. Kent, and his normal course would be to hand it

10   to the Governor or place it on his desk.  We offer it for

11   the fact that it was given to Mr. McDonnell but not for

12   the substance.

13          THE COURT:  You have established that this is

14   what he would normally have done.  We haven't established

15   that he did.  Which I think is --

16          MR. FAULCONER:  Doesn't that go to weight, Your

17   Honor?

18          THE COURT:  I agree with Mr. Asbill on this.

19   Unless we've got some direct testimony that he has this,

20   I'm not going to enter this into evidence.

21          MR. DRY:  One more fact.  That document was

22   produced by the defendant in the Statement of Economic

23   Interests, the draft.  So he got it.  He produced it to

24   us.

25          MR. FAULCONER:  It was mixed in with the other

**MARTIN KENT - DIRECT**

```
 1    pages of the SOEI.
 2              MR. ASBILL:  We produced what we had.  That
 3    doesn't mean he saw it or read it.  We produced what was
 4    in the Governor's files at their request.
 5              MR. FAULCONER:  If the question is whether or
 6    not he received it, if he produced it, then we know for
 7    certainty he received it.  How closely he read it is a
 8    matter of weight.
 9              THE COURT:  The objection is overruled.
10              (In Open Court.)
11              MR. FAULCONER:  Could we publish this document
12    to the jury?
13              THE COURT:  Go ahead.
14              MR. FAULCONER:  I assume this is admitted into
15    evidence now?
16              THE COURT:  It will be admitted.
17    BY MR. FAULCONER:
18    Q    Mr. Kent, could you read what you write in your
19    handwriting on this document?
20    A    Dated 8-16-11.  "Governor:  FYI.  As you can see, I
21    have asked for written guidance on this and other issues.
22    Thanks."  Those are my initials.
23    Q    Is that MLK?
24    A    MLK, yes.
25    Q    Then "P.S.," what do you write there?
```

1    A    "P.S., issued by Mary Sue Terry as Attorney General,

2    AG."

3    Q    If we could zoom out on this document.  The e-mail

4    you actually print out here, what's the subject line of

5    the e-mail?

6    A    It says:  "COIA, Personal Friend."

7    Q    Do you recall having had some conversation with

8    Mr. McDonnell leading up to this time frame about the

9    definition of a personal friend?

10   A    Vaguely.  I must have had some conversation, which is

11   why I would have assumed that I would have given this to

12   the Governor, yes.

13   Q    If we could scroll down, was there actually a part of

14   this document that you underlined before you took it in to

15   the Governor's Office?

16   A    It appears it is underlined.  That could very well

17   have been my underlining.

18   Q    Read what's underlined on that document.

19   A    It says:  "When the circumstances suggest a

20   relationship between the gift and the declarant's public

21   position, even when the relationship is relatively

22   distant, it is my opinion that the gift is required to be

23   disclosed in Schedule E."

24   Q    It says "Schedule E" there.  Is this referring to the

25   Statement of Economic Interests?

```
1    A     I believe it is, yes.

2    Q     We can take that down.  I'd like to show you what's

3    been marked for identification as Exhibit 206.  Mr. Kent,

4    is this an e-mail chain that is essentially a later set of

5    e-mails in this same thread of e-mail conversation?

6    A     It appears to be, yes.

7    Q     And is it between you and Jasen Eige?

8    A     It is.

9          MR. FAULCONER:  We would offer Exhibit 206 into

10   evidence.

11         THE COURT:  It will be admitted.

12   BY MR. FAULCONER:

13   Q     Now, first, looking, if we could zoom out a little

14   bit, and looking at Page 1 down at the bottom, do you see

15   there the e-mail, Tuesday, August 16th, 2011 at 10:18

16   a.m.?

17   A     I do.

18   Q     Could you read to us what you write to Jasen Eige?

19   A     It says:  "I talked to the Governor about it

20   yesterday.  Prompted this follow-up."

21   Q     Then turning to the next page, do you see in the

22   e-mail that preceded that that Mr. Eige wrote to you,

23   "This is the standard we have been using, no bright line,

24   but you and I need to discuss the matter we talked to JK

25   about."  Did I read that right?
```

**MARTIN KENT - DIRECT**                                    2567

1    A    You did.

2    Q    Based on your review of this e-mail, who do you

3    believe that JK is referring to here?

4    A    I believe that was Jerry Kilgore.

5    Q    Now, Jerry Kilgore, did both you and Mr. Eige know

6    Mr. Kilgore?

7    A    We did.  We both worked for him when he was Attorney

8    General.

9    Q    Did you interact with him being a lobbyist on a

10   number of different issues?

11   A    We did.  I probably did less than Jasen, because that

12   was Jasen Eige's primary role, but sure, we did.

13   Q    During this time frame, that being August of 2011,

14   did you know at some point that month that Mr. Kilgore

15   represented Jonnie Williams and Star Scientific?

16   A    I did.

17   Q    Did you also interact, to be clear, with Mr. Kilgore

18   on some other issues on something related to something

19   involving a bank?

20   A    I did, and it was all in that same time frame.

21   Q    Was that Bank of Mellon?

22   A    That's correct.

23   Q    Sitting here today, can you specifically recall the

24   conversation that Mr. Eige is referring to here?

25   A    I can't.  I have struggled to try to recall exactly

1    what that is, and the best I can think of, because there

2    were two separate issues that involved Jerry Kilgore, that

3    we were potentially conflating two issues in the same

4    e-mail.  That's the best I can come up with.

5    Q    Just to be clear, when you would interact with

6    Mr. Kilgore or any other lobbyist, was it common to have

7    conversations that would start on one topic and go on to

8    another?

9    A    Particularly with lobbyists, they try to get as many

10   issues as they could so they could bill as many clients as

11   possible.

12   Q    Take that down.  Regardless of the specifics of that

13   e-mail chain, when you wrote those e-mails on August 16th,

14   2011, were you aware that Mr. McDonnell and one of his

15   sons had been out to Kinloch Golf Club again on August

16   13th and spent more than $800 on Mr. Williams' account?

17   A    I was not.

18   Q    I'd like to move forward in time a little bit and go

19   to late August of 2011.  I'd like to show you what's been

20   entered into evidence as Exhibit 230.

21            MR. FAULCONER:  For identification as Exhibit

22   230, Your Honor.

23            THE COURT:  All right.

24   BY MR. FAULCONER:

25   Q    Mr. Kent, do you recognize this as a regular daily

1   schedule for Mr. McDonnell?

2   A     It appears to be, yes.

3   Q     Is it dated August 30th, 2011?

4   A     It is.

5             MR. FAULCONER:  We would offer Exhibit 230 into

6   evidence.

7             THE COURT:  It will be admitted.

8   BY MR. FAULCONER:

9   Q     Before we sort of walk through this document in a

10  little bit of detail, can you tell us whether late August

11  of 2011 was a busy time for you and the Governor's Office?

12  A     I believe it was probably one of the busiest times of

13  the four years we were in office.  As those I'm sure in

14  the room can recall, within a one-week span, we had an

15  earthquake, a sizeable earthquake in Louisa County; we had

16  a major hurricane, one of the most devastating hurricanes

17  that Virginia has had come up its east coast; and there

18  were fires in the Great Dismal Swamp and the Chesapeake

19  area which were affecting traffic up and down the

20  interstate in Virginia as far west as the Richmond area.

21  Q     So in that time frame, could you tell us what the

22  first thing is on Mr. McDonnell's schedule at 8:20 a.m.

23  that day?

24  A     Says depart for the helipad.

25  Q     Then that interview there, can you tell us what that

1    interview generally would have been?

2    A    There are two radio stations in Virginia, AM radio

3    stations, which have what we call a monthly Ask The

4    Governor.  It is WRVA in Richmond, and WTOP, which is in

5    Northern Virginia.  And typically, once a month, the

6    Governor will do both radio shows.  But this appears to be

7    an interview with Jimmy Barrett, the host of WRVA,

8    specifically about the hurricane, Hurricane Irene.

9    Q    Now, going down past the travel to the next item that

10   looks like reference is WTOP, that radio station you just

11   referenced, in that 9:30 to ten time frame, if we could

12   scroll down just a little bit.  Then actually at 10 to 11

13   where it actually has the show itself, could you tell us

14   what it says there under "Note"?

15   A    It says, "Note:  Governor O'Malley is scheduled to

16   call into the show regarding Hurricane Irene."

17   Q    Do you recall which state Governor O'Malley is from?

18   A    The Governor of Maryland.

19   Q    At the top of the second page of this document, can

20   you tell us what travel is listed there at the top?

21   A    At the very top, "11:30 a.m. to 12:30 p.m., Helo from

22   Northern Virginia to Richmond."

23   Q    Then what is listed from 12:35 to 1:30 p.m.?

24   A    From 12:35 to 1:30 p.m., it says, "Lunch with

25   Virginia researchers-Executive Mansion."

**MARTIN KENT - DIRECT**

1   Q    Do you see there the two little icons?  It looks like

2   a Word document and an Excel document?

3   A    I do.

4   Q    Can you tell us what significance those have in terms

5   of what those documents would typically be?

6   A    Typically, the scheduler will attach supporting

7   documentation to the Governor's calendar.  It could be a

8   list of attendees, it could be the request, the original

9   request for the event, and it could also be talking points

10  the Governor may or may not use at that event.

11  Q    When they were attached to the schedule, would they

12  ultimately be printed out and given to Mr. McDonnell?

13  A    They would, yes.

14  Q    Do you recall seeing him carry those documents around

15  at times?

16  A    He had what we referred to as The Notebook, and it

17  was a black binder which contained his daily schedule.

18  Q    To be clear, Mr. Kent, you said this was a busy time,

19  and we have seen entries about the hurricane.  Did

20  Mr. McDonnell have the authority to remove things from his

21  schedule?

22  A    He did.

23  Q    To your knowledge, did he remove this event from

24  12:35 to 1:30 p.m. from his schedule that day?

25  A    To my knowledge, he did not.

2572

1    Q    I'd like to show you what's been marked for

2    identification as Exhibit 231.  Do you recognize this as

3    what looks like an Outlook calendar entry for that lunch

4    with Virginia researchers?

5    A    It appears to be.

6    Q    Do those icons in this document appear to match the

7    icons we were just looking at?

8    A    I believe so.

9            MR. FAULCONER:  We would offer Exhibit 231 into

10   evidence.

11           THE COURT:  It will be admitted.

12   BY MR. FAULCONER:

13   Q    All right, now, if we could zoom out and go to the

14   second page.  Does that appear to be that Event Briefing

15   Form that you were talking about?

16   A    It appears to be a briefing form, and it looks to be

17   lunch with researchers and doctors, yes.

18   Q    Now, the handwriting towards the bottom of that page,

19   if we could just zoom in on that sort of box right there.

20   Could you tell us whether you recognize that handwriting?

21   A    That appears to be the Governor's handwriting.

22   Q    Could you tell us below the handwriting what name has

23   an asterisk next to it?

24   A    John Clore.

25   Q    At that time, did you know who John Clore was?

**MARTIN KENT - DIRECT**

1    A     I did not.

2    Q     If we could turn to the second page.  Do you

3    recognize the handwriting that's on this page?

4    A     I do.

5    Q     And whose is it?

6    A     It appears to be the Governor's.

7    Q     Could you walk us through what names have an asterisk

8    or handwriting by them on this page?

9    A     Jasen Eige, Office of the Governor has an asterisk.

10   John Lazo has an asterisk next to it.  Then there is

11   handwriting next to a name, Diane Roskamp.  Then

12   handwriting next to a name that says Bob Roskamp.  And

13   then there is handwriting next to the name Mary-Shea

14   Sutherland.

15   Q     We can go ahead and take that down.  Taking a step

16   back from the schedule and briefing form, did you actually

17   attend this event at the Mansion?

18   A     I did not.

19   Q     Do you recall some conversation and e-mail traffic

20   about a press release before the event occurred?

21   A     The night before, yes.

22   Q     I'd like to show you what's been marked for

23   identification as Exhibit 223.  Is this an e-mail from

24   Tucker Martin to you and other Governor's Office staff

25   members attaching a draft press release?

```
 1   A     It appears to be, yes.

 2   Q     Is it dated August 29th, 2011?

 3   A     It is.

 4              MR. FAULCONER:  We would offer Exhibit 223 into

 5   evidence.

 6              THE COURT:  It will be admitted.

 7   BY MR. FAULCONER:

 8   Q     All right.  Now, in that e-mail at the top, that's

 9   from Tucker Martin, right?

10   A     It is.

11   Q     Now, if we could turn to the third page of this

12   document.  Does that look like the draft press release

13   that you received?

14   A     I believe it is, yes.

15   Q     Could you read what it says in the first sentence of

16   the fourth paragraph?

17   A     "The Governor of the Commonwealth of Virginia, Robert

18   McDonnell, and First Lady Maureen McDonnell, are joining

19   with a group of physicians and healthcare providers in the

20   Richmond area today to learn more about the state of the

21   research."

22   Q     Then could you read the sentence there sort of a

23   little ways down that starts with "Jonnie R. Williams"?

24   A     "Jonnie R. Williams, Star Scientific CEO, expressed

25   his appreciation for Governor and First Lady McDonnell's
```

1   interest in the company's work.  'All of us at Star and

2   Rock Creek are very grateful to the Governor and

3   Ms. McDonnell for their interest in our research and

4   product development.'"

5   Q    Mr. McDonnell -- Mr. Kent, what was your reaction to

6   this press release when you saw it?

7   A    Well, if I could step back just a second and sort of

8   put it in context.  I had mentioned that there were

9   literally three natural disasters that were ongoing the

10  week prior and the weekend before this.  To make matters

11  more complicated, I actually was on my family vacation the

12  preceding week, actually had to leave my family vacation a

13  day early, partly due to the hurricane and partly because

14  of what had happened here in Richmond, to come back.  So

15  the weekend leading up to this, to say it was busy is an

16  understatement.  We were, I believe, at the Emergency

17  Operations Center, the Governor was as well, senior

18  members of the Administration, the Secretary of Public

19  Safety.  We had lost several lives in the hurricane that

20  took place.  There was a lot of wind, a lot of wind

21  damage, a lot of trees had fallen, and several people died

22  as a result of trees actually falling either on their

23  house or their car.  So there was a lot going on.

24          I had just come back from my vacation.  We were

25  dealing with the natural disasters that had occurred, and

 1    then that evening, the first full workday back from my

 2    vacation, is when we received this e-mail.  And when I

 3    received the e-mail from Tucker -- actually, it was sent,

 4    if I am not mistaken, it was sent by Mary-Shea to Tucker,

 5    and then Tucker replied to all and included Jasen Eige and

 6    myself on the response.  And when we saw the e-mail, I

 7    read the attachment, I believe I responded to Mary-Shea,

 8    "What is this, when is this, is the Governor aware of his

 9    inclusion in this," something to that effect.  I don't

10    recall specific conversation with her, although I'm sure I

11    probably had some conversation to try to get more

12    information about it.  And I believe I immediately went to

13    go see Jasen Eige about it at well.

14    Q    Why did you immediately go to see Mr. Eige?

15    A    Because I was concerned at first, the way this looked

16    to me to be a press release, the way it was worded.  And,

17    you know, I think it struck me as the press release and

18    what it appeared to be, I'm assuming I got this from

19    Mary-Shea because I didn't really talk to anybody else

20    about it, would appear to be an effort to actually hold a

21    press conference at the Mansion with regard to this.  And

22    that struck me as unusual.

23    Q    You were talking a little bit about your reaction.

24    If we could go to the first page, could you tell us sort

25    of at the bottom of that page, Mary-Shea Sutherland, could

1    you tell us what she wrote in that e-mail lower in the

2    thread?

3    A    It says:  "I just sent David a message - NO WAY this

4    can go as written.  You can call me," and it gives a

5    number.

6    Q    If we scroll up a little bit.  Can you tell us one

7    more e-mail past, can you tell us, you might have already

8    said this, but who forwarded it to Tucker Martin?

9    A    It appears that she did, yes.

10   Q    All right.  I'd like to show you what's already been

11   entered as Exhibit 224.  Zoom in on that top e-mail.  Is

12   that the response back to Mary-Shea that you referenced

13   just a moment ago?

14   A    It is.

15   Q    I'd like to show you what's been marked for

16   identification as Exhibit 226.  Zooming in on that top

17   e-mail, is this Mary-Shea Sutherland's response to you?

18   A    It appears to be, yes.

19   Q    Is that also dated August 29th, 2011?

20   A    It is.

21        MR. FAULCONER:  We would offer Exhibit 226 into

22   evidence.

23        THE COURT:  It will be admitted.

24   BY MR. FAULCONER:

25   Q    Mr. Kent, could you just read for us that one-line

1   response from Mary-Shea Sutherland?

2   A    It says, "I didn't know about release until an hour

3   ago.  Call me when you can."

4   Q    We can take that down.  Now, after you went and spoke

5   to Mr. Eige, can you sort of walk us through what happened

6   in the process after that?

7   A    We talked about it, he agreed that it was unusual,

8   and we were concerned about the way it was worded.  And I

9   believe he was the one that was aware of the fact that

10  Jerry Kilgore represented, I believe represented

11  Mr. Williams.  And we got on the phone immediately -- my

12  recollection is we got on the phone immediately and spoke

13  with Jerry Kilgore about it.

14  Q    How did that conversation go?

15  A    It went well.  My recollection is we explained to

16  Jerry what we had received and that we had some concerns,

17  and my recollection is, he understood and agreed with

18  those concerns and told us that he would address it with

19  his client.

20  Q    Now, after talking to Mr. Kilgore, do you recall

21  whether either you or Mr. Eige decided to attend the

22  event?

23  A    Yes.  As I mentioned, I had just returned from my

24  vacation, we were still in the midst of dealing with the

25  natural disasters that had taken place or were taking

 1    place.  And that was one of my many roles, was to

 2    basically coordinate that with the Secretary of Public

 3    Safety's office in the event of a natural disaster to make

 4    sure the Governor was issuing executive orders, emergency

 5    declarations, things of that nature that a Governor would

 6    typically do.  And Jasen and I discussed it and we agreed

 7    someone should go to make sure what we had discussed with

 8    Jerry was actually done.  And Jasen, his role didn't

 9    require that involvement in the natural disaster process,

10    so he agreed to go.

11    Q    To be clear, Mr. Kent, at that point, on August 29th,

12    2011, were you aware of the things of value that had been

13    provided by Mr. Williams to the McDonnells?

14    A    I was not.

15    Q    Now, after the event, did you become aware of how the

16    event was paid for?

17    A    At some point, I don't remember exactly when, I have

18    tried to go back and piece that together.  I'm not sure

19    there is any documentation to help with that.  But at some

20    point I learned that the Governor's PAC had paid for that

21    event.

22    Q    Just to be clear, do you remember any of that

23    conversation happening before the event or was it after?

24    A    No, I don't recall it.  It couldn't have happened

25    before because I don't believe I knew about the event

1    until the night before, so I think it had to have happened

2    after the event.

3    Q    To be clear, do you recall having any conversations

4    with Mr. McDonnell about the PAC paying for the event?

5    A    I do not recall that, no.

6    Q    All right.  I'd like to move forward to September of

7    2011, a few weeks later.  I'd like to show you what's been

8    marked or what's already been entered as Exhibit 245.  Is

9    this an e-mail exchange with you, Katherine Harris, and

10   Jasen Eige?

11   A    Yes, it is.

12   Q    If we could scroll down to see the first e-mail in

13   the exchange.  Katherine Harris is the scheduler; is that

14   correct?

15   A    That's correct.

16   Q    Scrolling back up again, do you recall getting this

17   e-mail forwarded from Katherine Harris to you and Mr. Eige

18   asking about a dinner related to Anatabloc in October of

19   2011?

20   A    I do.

21   Q    Can you tell us what happened once you got this

22   e-mail?

23   A    She forwarded it to myself and Jasen, it looks like,

24   about 11 a.m. on the 21st, and it looks like I responded

25   back to her at 2:22 p.m. on the same day and basically

1   said, "Yes, we should discuss."  I do recall this.  And

2   one of the parameters we talked a few moments ago about

3   the Governor attending events generally, one of the

4   factors that we look at is, has the Governor recently done

5   something with this person or something for this industry.

6   And I believe, I saw this, recalled the event that had

7   occurred three weeks prior, and I believe I told

8   Ms. Harris that we did not need to schedule the Governor

9   for this.

10  Q    All right.  I'd like to move to 2012.  Now, earlier

11  we saw a little bit of e-mail traffic about the SOEI or

12  Statement of Economic Interests.  Are you aware of when

13  each year that document would typically be filed?

14  A    I believe it has to be filed by the 15th of January

15  for the preceding year.

16  Q    And in January of 2012, were you aware that

17  Mr. McDonnell and his sons played golf at Kinloch on

18  Mr. Williams' tab on January 7th, 2012?

19  A    I was not.

20  Q    I'd like to move forward to February of 2012 and show

21  you what's been entered into evidence as Exhibit 319.

22  Now, is this an e-mail forward from Mr. Eige to you on

23  February 17th, 2012 at 12:06 a.m.?

24  A    It appears to be, yes.

25  Q    It looks like Mr. Eige says "FYI" there.

**MARTIN KENT - DIRECT**

```
 1   A      Yes.
 2   Q      Do you recall ever discussing this e-mail with
 3   Mr. McDonnell?
 4   A      No.  And I actually, when this was brought to my
 5   attention last year, I actually went first to Mr. Eige, to
 6   Jasen, and asked him if we had ever discussed this,
 7   because I did not recall this e-mail.  And he informed me
 8   that he did not recall we had ever discussed it.  So, you
 9   know, I'm not sure, given the time of day, although it was
10   not unusual to get e-mails all throughout the night, it
11   could have been that I just simply didn't see it, didn't
12   focus on it at the time.
13   Q      So sitting here today, do you have any specific
14   recollection of any conversation with either Mr. McDonnell
15   or Mr. Eige about this e-mail?
16   A      I do not, no.
17   Q      I'd like to ask you one quick question about this,
18   which is, do you see there where it says,
19   "rfmva09@gmail.com"?
20   A      Yes, I do.
21   Q      Was that a common e-mail address for Mr. McDonnell to
22   use while he was Governor?
23   A      It was, yes.
24   Q      Even though it is a gmail address, would he typically
25   use that for things that involved official government
```

1  business?

2  A    Yes.  He had at one point in time, I think we started

3  out with a BlackBerry, and then ultimately migrated to an

4  iPhone.  And the Governor, I think probably the only

5  person that received more e-mails than I did was probably

6  the Governor.  And it got to a point, I believe the

7  Governor's aide actually did this, and we didn't discuss

8  it until afterwards, but the Governor would get so many

9  e-mails, he would receive them on the same device.  He

10  would receive e-mails to his official account and e-mails

11  to a personal account, and oftentimes he would just look

12  at the e-mail and respond.  And the way the BlackBerry was

13  set up, you have to actually go out and go into the

14  particular e-mail system to make sure you are responding

15  on that e-mail server, if that makes sense.  And the

16  Governor would oftentimes respond to personal e-mails on

17  his state system, and respond to state e-mails on his

18  personal system.  So a decision somewhere along the way

19  was made to simplify it to give him one e-mail address

20  that he used as his primary e-mail address.

21  Q    You mentioned a couple different types of e-mail

22  addresses.  Do you recall him during the campaign using an

23  e-mail address rfmcandidate@bobmcdonnell.com?

24  A    That sounds familiar.  It was on the campaign.  I'm

25  not sure if I used it a lot, I didn't use it a lot.  But

1   that's possible, yes.

2   Q    Once he became Governor, do you recall him using the

3   e-mail address governor@bobmcdonnell.com?

4   A    Yes, he did.

5   Q    That bobmcdonnell.com sort of suffix on the end of

6   the e-mail, what did that refer to?

7   A    That was part of his campaign.

8   Q    Was that related to the PAC?

9   A    Initially it was the campaign and then ultimately I

10  think it became part of the PAC, yes.

11  Q    Did he also have an official governor.virginia.gov

12  e-mail address?

13  A    He did, yes.

14  Q    I'd like to show you what's been entered as Exhibit

15  318.  This is an e-mail, the lower one down there, that

16  was six minutes before the e-mail we just looked at.  To

17  be clear, were you aware of this e-mail from Mr. McDonnell

18  to Mr. Williams on February 16th, 2012?

19  A    No.

20  Q    All right.  I'd like to move forward a little bit

21  further into February and show you what's been marked or

22  what's been entered as Exhibit 345.  Does this appear to

23  be an Outlook calendar event?

24  A    It does.

25  Q    Now, can you tell us, where it says "PHB Governor's

1   conference room," what that refers to there?

2   A    As I mentioned previously, what I referred to as the

3   pod, in addition to my office, the Governor's Office, and

4   our executive assistants' offices, the Governor has a

5   conference room, which is connected to his office through

6   a door.  And that is what we referred to as the Governor's

7   conference room.

8   Q    This particular meeting on February 29th, 2012, what

9   does it list as the topic for that meeting?

10  A    "Healthcare Group Leaders Reception Tonight at the

11  Executive Mansion."

12  Q    To be clear, are you listed as a participant on this

13  meeting?

14  A    No.

15  Q    Did you attend this meeting?

16  A    No.

17  Q    Is Mary-Shea Sutherland listed as a participant on

18  this meeting?

19  A    No.

20  Q    To your knowledge, was Mary-Shea Sutherland even

21  working at the Mansion in February of 2012?

22  A    No, she was not.

23  Q    Is Ms. McDonnell listed as a participant?

24  A    No.

25  Q    Now, are you aware of what Mr. McDonnell and

1   Mr. Williams actually discussed in this meeting?

2   A     No.

3   Q     I'd like to show you what's been entered into

4   evidence as Exhibit 2.  Now, this document, do you

5   recognize the handwriting that's shown on this first page

6   of this document?

7   A     It appears to be the Governor's handwriting, yes.

8   Q     Now, could you read for us what it says where it says

9   "File Form 4" there down the second bullet point, it looks

10  like?

11              MR. ASBILL:  I object.  He has no knowledge of

12  this meeting.

13              THE COURT:  Overruled.

14              THE WITNESS:  It says:  "File Form 4 with the

15  SEC saying sold = doesn't disclose who sold to for

16  Jonnie."

17  BY MR. FAULCONER:

18  Q     Mr. Kent, at the time, any time in 2012, were you

19  aware of Mr. McDonnell and Mr. Williams discussing

20  anything about this?

21  A     No.

22  Q     I'd like to go to Page 3 of this document.  Actually,

23  Page 2 real quick.  Do you recognize that handwriting?

24  A     That appears to be the Governor's as well.

25  Q     Turning to Page 3.  Apart from the section that's

1  between the lines, do you recognize the handwriting at the

2  top of that document and below the line at the bottom?

3  A    Very top appears to be the Governor's handwriting as

4  well.

5  Q    Then down below?

6  A    I believe it is, yes.  That appears to be his

7  handwriting.

8  Q    If we could zoom back out and zoom in on that bottom

9  section, do you see where it says, "Loan of 50k shares to

10 Maureen"?

11 A    I do.

12 Q    Were you aware of anything about loaning shares to

13 Maureen McDonnell in this time frame?

14 A    No.

15 Q    All right.  I'd like to go to Page 4 of this

16 document.  Does this document appear to be, or do you

17 recognize the handwriting on this page?

18 A    It appears to be the Governor's handwriting.

19 Q    And have you had a chance to review this page of

20 handwriting before coming into Court?

21 A    I have.

22 Q    And any of this information that's referenced on this

23 document, were you aware of any of it in 2012?

24 A    No.

25 Q    I'd like to go to Page 5.  Do you recognize the

**MARTIN KENT - DIRECT**

1   handwriting on this page?

2   A    It appears to be the Governor's as well.

3   Q    Now, do you see where it says, could you read what it

4   says there starting with "Pay back" and down to "Maureen"?

5   A    "Pay back in cash at 50,000 times 1.90 =

6   $90,000 either return or 50-70 K shares."  It looks like

7   "Plan" to the left, "split into 10k shares certificates

8   for delivery to Maureen" or "son deliver to Maureen."

9   Sorry.

10  Q    Do you ever recall meeting Mr. Williams' son, Jonnie

11  Williams, Jr.?

12  A    No.

13  Q    At this time or any time in 2012, were you aware of

14  anything involving share certificates being delivered to

15  Maureen McDonnell by Jonnie Williams, Jr.

16  A    No.

17  Q    Turn to Page 6 of this document.  Do you recognize

18  the handwriting on this page?

19  A    It appears to be the Governor's handwriting.

20  Q    What's the date written there at the top?

21  A    3-12-12.

22  Q    If we could turn to the seventh page.  Do you

23  recognize what this seventh page of this document appears

24  to be?

25  A    This appears to be another copy of the Governor's

**MARTIN KENT - DIRECT**                    2589

1   daily schedule.

2   Q    Is that for March 12th of 2012?

3   A    It appears to be, yes.

4   Q    Now, I think we have sort of asked about it a little

5   bit, but before the investigation went public, were you

6   aware of either a $50,000 loan or a $20,000 loan from

7   Mr. Williams to the McDonnells in March or May of 2012?

8   A    I was not.

9   Q    All right.  I'd like to move forward and focus on

10  February of 2013.  Do you recall learning that month that

11  Ms. McDonnell was interviewed by law enforcement?

12  A    I do.

13  Q    And after that interview took place, do you recall

14  speaking to Mr. McDonnell about it?

15  A    I do.  Yes.

16  Q    And do you recall how close in time that was to the

17  interview?

18  A    My recollection is, it was either that day or the

19  next day.  It was within 24 hours.

20  Q    Could you tell the members of the jury what

21  Mr. McDonnell's reaction was to that interview when he

22  discussed it with you?

23  A    I can.  I should explain sort of how I was involved

24  in this.  I was contacted because I was the closest to the

25  Governor as far as staff is concerned, to --

1  Q    Sorry to interrupt, Mr. Kent, but just to make sure

2  we don't get into any problems with who said what to whom,

3  could you just focus in on what Mr. McDonnell's reaction

4  was and what he said after the interview?

5  A    Yes.  He was upset.  He was upset, and basically said

6  that the interview was not what it was purported to be

7  for.

8  Q    Did he describe at all what he meant in terms of what

9  the difference was?

10  A    No.  We didn't get into a lot of back and forth.  It

11  was a pretty short conversation.  But he was visibly

12  upset.

13  Q    Do you recall whether he said whether it was broader

14  or narrower than he thought it was going to be?

15  A    Broader, was the indication I got.

16  Q    Just to be clear, at that time, when you were talking

17  about the interview that Ms. McDonnell had with law

18  enforcement, did Mr. McDonnell tell you anything about a

19  $50,000 loan from Mr. Williams in May of 2011?

20  A    No.

21  Q    Did he tell you anything about a $15,000 payment for

22  a wedding?

23  A    No.

24  Q    Anything about a $50,000 second loan?

25  A    No.

**MARTIN KENT - DIRECT**

1  Q    Anything about a $20,000 third loan?

2  A    No.

3  Q    Anything about any of the golf at Kinloch?

4  A    No.

5  Q    Now, before, at some point before the press stories

6  broke, do you recall Mary-Shea Sutherland saying something

7  about credit card debt to you as it related to

8  Mr. Williams?

9  A    She did.  It was, it had to be sometime before she

10  had left, during a general conversation that we had.  And

11  there was some reference to credit card debt.

12  Q    Could you explain exactly what that was as it related

13  to Mr. Williams?

14  A    It was unclear at the time.  At that time, there

15  were, I'm assuming that's when it was, Mary-Shea had been

16  to my office several times just upset in general about her

17  situation.  And she did reference that.  There was some

18  vague reference to credit card debt, and I believe she

19  mentioned Maureen at the time when she said it.

20  Q    Did she mention something about Mr. Williams in that

21  context?

22  A    Yeah, I think she did.  It was, again, sort of not

23  something we spent a lot of time harping on.  It kind of

24  was out of sight, out of mind for several years.

25  Q    And did she tell you anything in that conversation

1   about what amount of credit cart debt she was talking

2   about?

3   A    I recall her mentioning, I believe, $20,000.  That

4   sounds right.

5   Q    Now, after the press stories broke about the

6   investigation or any of the press stories about the

7   relationship between Mr. Williams and Mr. McDonnell, did

8   you ask Mr. McDonnell about whether a loan from

9   Mr. Williams had anything to do with credit card debt?

10  A    I did.  It was sometime, probably early spring of

11  last year, and he corrected me quickly and said that, "No,

12  that was a loan."  And that was really the extent of the

13  conversation we had.

14  Q    Did he tell you whether the loan had anything to do

15  with credit card debt?

16  A    Well, I think I brought up the question of credit

17  card debt, and he responded that, "No, that was a loan."

18  My recollection is, that was pretty much the extent of the

19  conversation.

20  Q    Did you also have a conversation or during the

21  conversations that you had with Mr. McDonnell after the

22  press stories broke, did you ever talk to him about the

23  second $50,000 loan from Mr. Williams in May -- March of

24  2012?

25  A    No.  At some point he mentioned to me, it was during

1   the process of obviously he had, I believe, retained

2   counsel, and we were being inundated with requests on a

3   daily, sometimes hourly basis, by the media.  And at some

4   point I went into his office and asked, I believe, about,

5   generally about the loan or the loans.  And his response

6   to me was that it was a matter that he was discussing with

7   his counsel and we shouldn't get into it any further.

8           MR. FAULCONER:  One moment, Your Honor.

9       (Counsel conferring with co-counsel.)

10          MR. FAULCONER:  No further questions at this

11  time, Your Honor.

12          THE COURT:  Cross?

13                  CROSS-EXAMINATION

14  BY MR. ASBILL:

15  Q    Good morning, Mr. Kent.  How are you?

16  A    Just fine.

17  Q    I want to go back a little bit to the beginning of

18  your examination, of your direct examination.  And you

19  told us you went to the University of Richmond and then to

20  Mercer Law School; is that right?

21  A    Yes, sir, that's correct.

22  Q    You were at one point obviously the Chief of Staff to

23  my client, correct?

24  A    That is correct, yes, sir.

25  Q    Prior to that you were at the Attorney General's

1    Office?

2    A    Yes, sir.

3    Q    And was one of your assignments at the Attorney

4    General's Office heading the Criminal Division?

5    A    At one point I was in charge of what was referred to

6    as the Special Prosecutions Section, which was a subset of

7    the Criminal Division.  I was never the Deputy of the

8    Criminal Division, but I was the Chief of the Special

9    Prosecutions Section.

10   Q    Okay.  That was one of your many jobs at the Attorney

11   General's Office before you came over to the Governor's

12   Office; is that correct?

13   A    Yes, sir, it is.

14   Q    Okay.  I believe you testified early on this morning

15   that if my client said to you to do something, that you

16   would absolutely do it.  Is that correct?

17   A    Yes, sir.

18   Q    And obviously, that would not include doing something

19   that you thought was wrong or improper or unethical or

20   immoral, right?

21   A    Absolutely not.

22   Q    So if he asked you to do something that you thought

23   was a legitimate request, you would obviously do it.

24   A    That's what I was referring to, yes, sir.

25   Q    To your recollection, in all the time that you spent

1   with my client, in the Governor's Office, Attorney

2   General's Office, did he ever ask you to do something that

3   you didn't do because you thought it was wrong to do it?

4   A    No, sir.

5   Q    Now, I think you talked a little bit about Dr. Hazel

6   and Molly Huffstetler.  Both of those people are part of

7   the Governor's staff; is that right?

8   A    They are part of the Secretariat which ultimately

9   would be part of the Governor's staff, yes, sir, that's

10  correct.

11  Q    Ultimately, for example, Ms. Huffstetler reports to

12  Dr. Hazel but Dr. Hazel reports to the Governor?

13  A    Yes, sir.

14  Q    Anyone who works in a Cabinet position is viewed as

15  part of the Governor's staff?

16  A    Loosely, yes, sir, that's correct.

17  Q    And anyone who works in his office is part of his

18  staff, right?

19  A    Yes, sir.

20  Q    And with respect to the First Lady's office at the

21  Mansion, are those his staff or are they her staff or

22  what?

23  A    I guess to answer your question, they are, on a

24  day-to-day basis, viewed as part of her staff.  But at the

25  end of the day they are ultimately Governor's staff as

1   well.

2   Q    Those folks ultimately report to you before, I mean,

3   in the chain of command, they report to you before it

4   would get to the Governor?

5   A    Yes, sir.

6   Q    So they would go to you if they had a problem, at

7   least in the first instance?

8   A    Typically, yes, sir.

9   Q    All right.  Now, you said, I believe, that it

10  was -- that my client's primary interest and focus as the

11  Governor was jobs in Virginia; is that correct?

12  A    That was certainly the top of the priority list, yes,

13  sir.

14  Q    Other than public safety, and what did you mean by

15  that?

16  A    Well, obviously, public safety took priority over

17  everything.  Classic example would be if there is, you

18  know, an emergency, no matter what we were doing, even if

19  it was economic development, it would take a back seat to

20  public safety.  But other than public safety, the top

21  priority of the Administration was economic development.

22  Q    What were the third or fourth priorities?

23  A    Education was probably amongst the top three or four.

24  I would probably, if I had to rank them, I would say

25  public safety, followed closely by economic development,

1    education, and probably health.

2    Q    All right.  And you said it was very common for, at

3    the Mansion, or to host events at the Mansion; is that

4    correct?

5    A    Yes, sir.

6    Q    Do you have any sense of how many Mansion events

7    there were during the four years that you were with the

8    Governor's Office?

9    A    I couldn't give you an exact number, but there were

10   many.

11   Q    Would 1,150 or so ring a bell?

12   A    That's entirely possible, yes.

13   Q    At any point in time, did you ever try to figure out

14   after the investigation started, for example, how many

15   events there were at the Mansion?

16   A    I don't think I did at the Mansion.  The Governor and

17   I had discussed how many events, meetings he had taken and

18   Cabinet members and myself had taken, and at that point in

19   time, I did a very quick extrapolation by reaching out to

20   several Cabinet members just to get an idea of how many

21   meetings they felt they took, and I think the Governor

22   took that information and extrapolated from that.

23   Q    Okay.  I'm sorry, were you going to say something

24   else?

25   A    No, that's it.

1   Q    You talked about the scheduling process.  There was a

2   protocol or a process for scheduling the Governor for

3   various events?

4   A    Yes.  There were really two different processes.  The

5   first was sort of the day-to-day schedule, for lack of a

6   better explanation, and that was really more the

7   scheduler, Governor, occasionally myself, I was included

8   in some of those discussions.  But then there was a

9   separate weekly scheduling process which would be

10  typically invitations to go to Northern Virginia,

11  invitations to go to Roanoke, invitations to go to

12  Virginia Beach, events outside the office.  And

13  we -- staff had an initial meeting where we tried to sort

14  through some of those to try to narrow the scope a little

15  bit.

16  Q    Okay.  But there were constant requests being made

17  for his time and attention; is that fair to say?

18  A    Yes, it is.

19  Q    Whatever the scheduling process was or the protocol

20  was, sometimes it would get bypassed, either by mistake or

21  because there wasn't enough time to go through the normal

22  process?

23  A    That happened, yes.

24  Q    Would that -- would it ever be -- who would be people

25  that would potentially interfere with the protocol in

1    terms of trying to schedule something?

2    A    Well, people would call.  People would call, and

3    sometimes they would call the scheduler, sometimes they

4    would call me, or sometimes they would call the Governor

5    or he would run into them at particular events and ask to

6    meet with him.  Classic examples would be legislators.

7    Whenever they were in town your schedule was kind of out

8    of the window because they would come across the street

9    and ask to speak to the Governor and wanted to speak to

10   him immediately.  So that happened.

11   Q    How about family members?

12   A    Yes.

13   Q    And they have the ability at times to try to redirect

14   the schedule?  At least potentially to redirect the

15   schedule?

16   A    Yes.

17   Q    All right.  And do you know whether or not that was

18   in consultation with my client or was it just something

19   that they wanted him to do and he may or may not agree?

20   A    I'm sure it happened both ways, you know.  You could

21   ask about a specific example and I could try to answer

22   your question.  But generally speaking, I'm sure it

23   happened both ways.

24   Q    Okay.  Did you have any protocol in place for taking

25   a closer look at those sort of requests that were unusual

```
 1   or not the regular sort of process?

 2   A    No.  You know, a lot of reliance was placed on the

 3   Governor's scheduler to really sort of know what he had on

 4   his schedule and to deal with those.  If there was a

 5   question, an example was shown earlier about an event

 6   where she did bring it to to my attention and asked for my

 7   input.  But typically, she would handle that.

 8   Q    All right.

 9   ///

10   ///

11   ///

12   ///

13   ///

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///
```

1  Q    You talked about everybody in the office working

2  24/7.  Who led the pack in terms of hardest working?

3  A    The Governor did.

4  Q    Outworked everybody else on the staff?

5  A    No question.

6  Q    Now, you talked about meetings that would occur,

7  meetings on a weekly basis, or something, and these were

8  Cabinet members, I believe, you were discussing that?

9  A    Yes, sir.

10 Q    And at those meetings, sometimes the Governor would

11 ask somebody to look into something or to meet with

12 somebody?

13 A    He did.

14 Q    All right.  So, "Take a look at this and tell me what

15 you think," basically?  Is that the idea?

16 A    That's generally the idea.

17 Q    Or, "Meet with everybody and see if they got a good

18 idea, and if so, do what you need to do"?

19 A    Yes.

20 Q    As those meetings, was the Governor ever more

21 affirmative in terms of, "I want you to do this.  I want

22 you to take action on it.  I want you to get this done"?

23 A    No.  That was not the Governor's MO.  The Governor --

24 you know, you could sense when it was something -- and it

25 was typically in the realm of economic development.  You

1  could sense when it was something that he felt like we

2  should spend time and look at.  But no, there was never a

3  situation where he demanded a response and a response -- a

4  specific response at a specific time, no.

5  Q    Did he know how to make it plain that he wanted

6  something done?

7  A    I'm sure he could.  Sure.

8  Q    Now, at any of these meetings that you talked about,

9  that you talked about earlier today, did you ever hear my

10  client ask anything to be done for Jonnie Williams or Star

11  Scientific?

12  A    No.

13  Q    All right.  With respect to board, board members, did

14  you have any knowledge of my client ever appointing anyone

15  to any board or commission that was in any way related to

16  Star or related to Jonnie Williams?

17  A    Not to my knowledge, no.

18  Q    You talked about the UVA Board, I believe, and you

19  said, I think in reference to that Board in particular,

20  that those members of the Board, jealously guard their

21  independence, despite having been appointed by the

22  Governor?

23  A    Yes, sir.

24  Q    And there's some issue legally about whether or not

25  they can be fired by the Governor or there's some other

1   process that would be required --

2   A    There is.

3   Q    -- in order to fire -- there is another process?

4   A    No.  There is -- there has -- there's been debate

5   about how far the Governor's authority goes.  I think it's

6   pretty clear by the code that when there's -- when they

7   have taken an inappropriate act, certainly in that

8   situation he has the ability to act.  But it's a little

9   more gray when it comes to just general disagreement over

10  a policy position.

11  Q    If they did something illegal, he could fire them.

12  But if they did something that disagreed -- you know, they

13  disagreed with his policy on something, that would be a

14  harder decision or a harder issue?

15  A    Illegal or violate a university policy that's been

16  established by the Board.  But yes, that's generally

17  correct.

18  Q    With respect to -- so you were knowledgeable about

19  the people that -- that Governor McDonnell appointed to

20  boards and commissions?  You were in that process?

21  A    Not regularly.  But on particular instances, the UVA

22  example is a classic example, I was pulled into it because

23  of the high profile nature of it.  But typically, that

24  process, as I mentioned previously, was handled by the

25  Secretary of the Commonwealth.

1  Q     And that would be Janet Kelly?

2  A     Yes, sir.  That is correct.

3  Q     All right.  With respect to the -- when you were

4  involved in these issues like that, the high profile

5  situation you described, did you believe that the Governor

6  was appointing people to boards on merit?

7  A     The term he used throughout the administration, going

8  back to when we chose members of the Cabinet, all the way

9  through, was the best and the brightest.  Those are the

10  terms that he used.  He wanted the best and the brightest.

11  Q     How did it work in terms of hiring the staff?  Not

12  the Cabinet folks or people on boards, but in terms of --

13  obviously, he hired you.  Did you then hire all the people

14  under you or was the Governor involved in those hires as

15  well?

16  A     I never hired any high-level position without the

17  Governor signing off on it.  You know, there were

18  positions, clerical positions where we had a need and

19  quickly needed to fill it that I would make that decision

20  on.  But anything deputy agency head or higher, I asked

21  the Governor to weigh in and approve.

22  Q     And when you asked him to weigh in and approve, do

23  you believe that the two of you collectively, in that

24  situation, were hiring the best and the brightest you

25  could?

1   A    I believe so, yes.  We certainly tried to.

2   Q    Now, with respect to this UVA issue --

3            MR. ASBILL:  Can we pull up 619, please.

4   Government Exhibit 619.

5   BY MR. ASBILL:

6   Q    This is the letter to the Board members that you

7   talked about previously.

8   A    Okay.

9   Q    I don't want to get into the details of the letter.

10  I just want to talk to you generally about it.  The letter

11  is in evidence.  What was that controversy about, just in

12  a nutshell?

13  A    There was an effort by certain members of the Board

14  to remove President Sullivan as the President of the

15  University of Virginia, and they initially took steps to

16  do so.  I believe she initially agreed to step down.  Then

17  she rescinded that offer.  And it became a very high

18  profile, public situation, and ultimately, she was

19  reinstated as President.

20  Q    All right.  And that particular controversy occurred,

21  what, in June of 2012?  Is that when it occurred?

22  A    I don't remember the exact date.  But this is the

23  date of the letter.  So it must have been around that time

24  frame, yes.

25  Q    Do you recall the letter being contemporaneous with

1  the controversy?

2  A    I'm -- it was.  It was.  A decision was made --

3  because the matter had lingered for a period of time, I

4  think the Governor made a decision that he had to do

5  something to get the Board to make a decision one way or

6  the other, and basically told them that if they failed to

7  act, that they were not carrying out their

8  responsibilities as members of the Board of Visitors and

9  that he would take action.

10  Q    All right.  And he was very direct in terms of what

11  he was going to do if they failed to take action and deal

12  with this situation; is that right?

13  A    He was.

14  Q    Now, that particular controversy had nothing to do

15  with Jonnie Williams or Star Scientific in any way, did

16  it?

17  A    Not to my knowledge.  No.

18  Q    All right.  Let's talk about the Tobacco Commission.

19  And I believe you talked that the appointees to that

20  commission, it's some sort of joint process?

21  A    It's a hybrid process.  Yes, sir.

22  Q    Okay.  And the Secretary of Agriculture is the only

23  person that the Governor appoints directly to that

24  commission?

25  A    No.  I believe he appoints, by statute, actually, the

1   Secretary of Agriculture, the Secretary of Finance, and I

2   believe it's the Secretary of Commerce and Trade.  And I

3   believe since that time, we may have even added

4   Secretary -- no.  That's, I'm sorry, a different board.

5   Those three other Cabinet members.

6   Q    Those are the Cabinet members --

7   A    I believe so.

8   Q    -- out of how many folks on the Board?

9   A    There are over 30 in total.  The Governor appoints a

10  number, and then the legislature appoints a number as

11  well.

12  Q    And then the Board does what it wants or it does what

13  the Governor tells them to do?

14  A    Well, the Tobacco Commission is a little more

15  complicated than that.  The Tobacco Commission has what's

16  referred to as an Executive Committee.  And the Executive

17  Committee, I think, makes a lot of preliminary decisions

18  and then meets with the full Board and basically adopts

19  those decisions.  But they are independent of our office.

20  Q    Okay.  And to your knowledge, did Governor McDonnell

21  ever appoint anyone to the Tobacco Commission Board that

22  had any connection whatever to Star Scientific or Jonnie

23  Williams?

24  A    Not to my knowledge, no.

25  Q    To your knowledge, did my client ever try to

1    influence the Tobacco Commission in any way either by

2    testifying in front of them, calling them up on the phone,

3    sending them an e-mail, whatever, to support anything that

4    Jonnie Williams or Star Scientific may have been trying to

5    get from the Tobacco Commission?

6    A     Not to my knowledge, no.

7    Q     I believe you said you didn't -- or you only met

8    Mr. Williams one time; is that correct?

9    A     Yes, sir.  That's correct.

10   Q     And did you ever talk to him on the phone or anything

11   like that?

12   A     I don't remember ever speaking with Mr. Williams but

13   one time.  And that was when we took a trip to New York.

14   Q     Okay.  Did you ever have discussions with my client

15   about Jonnie Williams before the start of the

16   investigation before the public knew about the existence

17   of the investigation?

18   A     Not specifically about Mr. Williams.  As we discussed

19   earlier, there was an incident driving his vehicle, which

20   the focus of that conversation was not Mr. Williams.  It

21   was the fact that the Governor had driven the vehicle.

22   But no, we, to my knowledge, did not have any

23   conversations about Mr. Williams.

24   Q     Prior to outside lawyers becoming involved when the

25   investigation became public, going all the way back,

1  however long you've known the Governor, did he ever refuse

2  to talk to you about anything you wanted to talk to him

3  about?

4  A    No.

5  Q    Now, I believe you said that there was a time, at

6  least one instance, when you were aware of somebody using

7  the Governor's likeness or name to try to promote

8  something without his permission, correct?

9  A    Uh-huh.

10 Q    And that related -- can you give me some more details

11 about that?  Did that relate to a product called Nu Skin

12 and --

13 A    I believe it did.  And I believe it involved a

14 company that Maureen -- at the time, she wasn't the First

15 Lady -- was involved in.

16 Q    And your understanding was that somehow his likeness

17 and the fact that he was the Attorney General was being

18 used to promote the product?

19 A    Yes, sir.

20 Q    And he was not aware of that?

21 A    I don't believe he was.  No, sir.

22 Q    And when it came to his attention or your attention,

23 then you all shut it down?

24 A    Yes, sir.

25 Q    No pushback from my client on that?

MARTIN KENT - CROSS - ASBILL        2610

1  A    No, sir.  I don't recall any pushback.

2  Q    Now, the Smith Mountain Lake trip.  That was the end

3  of July 2011, correct?

4  A    I believe that was what we saw.  Yes, sir.

5  Q    Okay.  And you were obviously aware of that trip,

6  correct?

7  A    I was aware of that trip.

8  Q    And you were aware that that was a gift from Jonnie

9  Williams?

10 A    I don't think I got into how it was valued and how it

11 was reported.  I did know that the Governor took a trip

12 and that the home was, I believe, Jonnie Williams' home.

13 I did know that.  Yes, sir.

14 Q    Okay.  So regardless of exactly how it was reported,

15 you knew that it was connected to Jonnie Williams and/or

16 Star --

17 A    I believe I did.

18 Q    -- at the time the event occurred?

19 A    I believe I did.  Yes, sir.

20 Q    All right.  And you knew that fact well before the

21 Mansion lunch, which was 30 days later, right?

22 A    Yes.  I would have.  That's correct.

23 Q    Okay.  Now, Mr. Faulconer, I believe, asked you about

24 were you aware of my client playing golf with Jonnie

25 Williams or playing at Kinloch, correct?

1  A     He did.  Yes, sir.

2  Q     And do you play golf or --

3  A     I'm not very good.  I play at golf.

4  Q     Miniature golf?

5  A     Better at miniature golf.  Yes, sir.

6  Q     And you say you were not aware of some of the golf

7  outings that my client may have had --

8  A     No, sir.

9  Q     -- with Mr. Williams at Kinloch?

10 A     No, sir.

11 Q     How would you have -- I mean, other than it coming up

12 in a conversation with my client, what are the other ways

13 that you generally might be aware of something like that?

14 A     Conversation.  If it did or didn't show up on his

15 calendar on any particular day, I may or may not have

16 noticed it.  But truthfully, if the Governor was away on

17 vacation, in particular, or out of the office for personal

18 things, I typically didn't focus on his calendar on any

19 given day or time.  It was only when he was acting as

20 Governor that I would.

21 Q     So if there were calendar events on a weekend, you

22 would not review those, generally?

23 A     They would typically have been sent.  But it was

24 rare.  Unless I needed the Governor.  If something came up

25 and I needed to get him and get him immediately, I would

1  refer back to his calendar, determine where he was, and

2  then try to track him down.

3  Q    Okay.  But you had transparency into his calendar, to

4  the extent things were calendared; is that correct?

5  A    That's a fair statement.  Yes.

6  Q    Okay.  And if something like a game of golf was not

7  on the calendar, are there reasons why that might be other

8  than trying to hide the game of golf?

9  A    I'm sure there could be.  Sure.

10 Q    It could come up at the last minute or --

11 A    Sure.

12 Q    Do you know whether or not people got information

13 from my client or from others that were, for some reason,

14 mistakenly not on the calendar?

15           MR. FAULCONER:  Objection, Your Honor.  He's

16 calling for him to speculate.

17           THE COURT:  Sustained.

18 BY MR. ASBILL:

19 Q    Now, the Ferrari.  You looked at the schedule and saw

20 that my client was scheduled to leave Smith Mountain Lake

21 at around 7 p.m. on the 31st of July?

22 A    Yes, sir.

23 Q    Do you know if that's exactly when he left or not?

24 A    No, sir, I do not.

25 Q    Okay.  But he was supposed to come back that night?

MARTIN KENT - CROSS - ASBILL          2613

1  A     Yes, sir.

2  Q     All right.  And then later on you find out, I guess,

3  I think you said within a week or so, that the EPU people

4  were upset about it?

5  A     Yes, sir.  It was sometime that week afterwards, I

6  believe.

7  Q     Okay.  And you -- I mean, I don't want to use this

8  word improperly, but you chastised the Governor for that?

9  A     I didn't -- I didn't chastise the Governor.  I

10  reminded the Governor of their job, and that was to

11  protect he and the First Lady, and stressed the fact that

12  they couldn't do that if he's driving a vehicle and they

13  are following behind.

14  Q     Okay.  And after you talked to him about that, he

15  never did it again?

16  A     To my knowledge, no, sir.  He did not.

17  Q     And prior to that time, had he ever driven himself

18  against the wishes of the EPU?

19  A     To my knowledge, no, sir.

20  Q     Had he ever done anything against the wishes of the

21  EPU that came to your attention?

22  A     No, sir.

23  Q     Ultimately, the decision to drive the car without the

24  EPU, whether it was over their objection or not, his call?

25  A     Yes, sir.

1   Q    Did you understand it was difficult to have EPU

2   people around you all the time?

3   A    Absolutely.

4            MR. FAULCONER:  Objection, Your Honor.

5            THE COURT:  Sustained.

6   BY MR. ASBILL:

7   Q    Did you know anything about the EPU eavesdropping on

8   my client's conversations --

9            MR. FAULCONER:  Objection, Your Honor.

10           THE COURT:  Sustained.

11  BY MR. ASBILL:

12  Q    Now, I believe you looked at Exhibit 189.

13           MR. ASBILL:  Can you pull that back up for me,

14  please.

15  BY MR. ASBILL:

16  Q    This is an e-mail that you are not copied on?

17  A    That's correct.

18  Q    From my client to Bill Hazel?

19  A    Yes, sir.

20  Q    And this is the night that he gets back from Smith

21  Mountain Lake?

22  A    That's what -- that's what I've been told.  Yes, sir.

23  Q    Okay.  It's at 11:29 p.m. on the 31st of July of

24  2011, right?

25  A    It appears to be.  Yes, sir.

1  Q    And you're not copied that.  Are you copied on

2  everything that my client sends to Cabinet officers?

3  A    No, sir.  Not everything.

4  Q    Do you have any reason to believe that you were not

5  copied on this on purpose for some bad reason?

6           MR. FAULCONER:  Objection.  Calls for

7  speculation.

8           THE COURT:  Sustained.

9  BY MR. ASBILL:

10 Q    With respect to why my client wanted Bill Hazel to

11 have Keith or Matt or somebody on his staff attend this

12 meeting the next day, do you have any transparency into

13 that?

14 A    This e-mail came to my attention when I was

15 conducting a review.

16          MR. FAULCONER:  Objection, Your Honor.  We're

17 getting into anything that came to his attention after the

18 investigation.  If he knew at the time, he can testify to

19 that.  But I object to any conversation about anything

20 after the investigation.

21          THE COURT:  You're talking about something you

22 learned later?

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right.  Objection sustained.

25 BY MR. ASBILL:

1  Q    So at the -- at the time that this -- that this

2  happened, basically, you don't know why my client wanted

3  Bill Hazel to do this, right?

4  A    No, sir.

5           MR. ASBILL:  Let's go to Exhibit 635 for a

6  minute.

7  BY MR. ASBILL:

8  Q    This is an exhibit with your handwriting on it; is

9  that correct?

10  A    It is.

11  Q    All right.  And you don't have any recollection about

12  ever talking to my client about that after you wrote those

13  notes?

14  A    It had to have occurred for me to have made the

15  request.  But specifics about a conversation, no, sir, I

16  do not recall that.

17  Q    Okay.  But, again, didn't try to talk to him and he

18  refused to talk to you, did he?

19  A    No, sir.  I can't say that.

20  Q    All right.

21           MR. ASBILL:  Let's go to Exhibit 206 that you

22  were shown on direct.  Can you blow that up, please.

23  BY MR. ASBILL:

24  Q    So this is on the 16th of August, and from you to

25  Jasen, right?

MARTIN KENT - CROSS - ASBILL          2617

1   A     Yes, sir.

2   Q     All right.

3          MR. ASBILL:  Scroll up.  Okay.

4          Let me go to 230.

5   BY MR. ASBILL:

6   Q     This is the Governor's schedule for 8/30, the day of

7   the Mansion lunch?

8   A     Yes, sir.  It appears to be.

9   Q     And he had a pretty busy day that day?

10  A     He did.

11  Q     And this was overlaid by the earth, wind and fire

12  events that everybody has talked about?

13  A     It was.

14  Q     You have no recollection, either on the 16th or

15  between the 16th and the 30th, ever talking to my client

16  about the Mansion lunch?

17  A     No.  I don't think I was aware of it until the 29th.

18  And I did not discuss it with him that night.

19  Q     All right.  And do you know when he first became

20  aware of it?

21  A     I do not.

22  Q     Do you have any reason to believe that he planned it

23  or he organized it?

24          MR. FAULCONER:  Objection, Your Honor.

25          THE COURT:  Sustained.

1   BY MR. ASBILL:

2   Q    You say you know Jerry Kilgore, right, and you talked

3   to him in August on an earlier occasion?  Was that the

4   12th of August?

5   A    I don't remember the exact date, but it was sometime

6   in the August time frame, middle August time frame.

7   Q    All right.  And whenever you and Jerry were talking,

8   who was with you, Jasen?

9   A    Well, for that discussion?

10  Q    Yeah.  For the August 12th discussion.

11  A    For that discussion, Jasen, myself.  There were

12  several members of the McGuireWoods legal team that were

13  there, and I believe at one point the Governor actually

14  was at that meeting as well.

15  Q    All right.  And so a lot of lawyers, outside lawyers?

16  There was inside counsel?

17  A    Yes, sir.

18  Q    And you have no recollection that that discussion had

19  anything at all to do with the Mansion lunch; is that

20  correct?

21  A    They were two separate discussions.

22  Q    All right.  So you learn about this Mansion lunch,

23  basically, on the 30th; is that correct?  One day before

24  the event or --

25  A    That would have been the 29th.

```
1   Q    29th.  Excuse me.

2   A    I believe so.  Yes, sir.

3   Q    All right.  And it comes to your attention how?

4   A    Through an e-mail that was forwarded to me by Tucker

5   Martin.

6   Q    All right.  And when that e-mail was forwarded to

7   you, you then -- you read it, obviously, and then you met

8   with Tucker; is that correct?

9   A    Actually, I met with Jasen.

10  Q    Jasen.  Excuse me.

11  A    Yes, sir.

12  Q    And did you meet with Tucker as well or just Jasen?

13  A    I'm assume we did discuss it.  He had sent it to us.

14  But I recall specifically meeting with Jasen.

15  Q    All right.  And before you all took action, did you

16  ever have a discussion with my client about it?

17  A    No.  It was the night before the event.  There was a

18  lot going on.  My recollection is we saw it, and we

19  attempted to address it as quickly as possible.

20  Q    All right.  And you thought that the -- you thought

21  that the press release was essentially -- that Star was

22  thinking about issuing was overaggressive or not

23  appropriate --

24  A    Yes.

25  Q    -- in terms of your view?
```

1    A     Yes, sir.

2    Q     All right.  So you all shut that down, correct?

3    A     We did.  Yes, sir.

4    Q     Did you have any reason at all to believe that you

5    were not doing something that my client would have wanted

6    you to do?

7              MR. FAULCONER:  Objection, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. ASBILL:

10   Q     Did you ever later talk to my client about what you

11   had done, in terms of revising the press release?

12   A     In 2013, yes, sir, I did.

13   Q     Pre -- pre the commencement of the investigation?

14   A     No, sir.

15   Q     Did my client, between the time of the lunch and the

16   start of the investigation, ever give you any pushback on

17   what you had done?

18   A     No, sir.

19   Q     Did you ever talk to Mary-Shea Sutherland about it?

20   A     As I mentioned previously, based on the e-mail

21   traffic, there had to have been some sort of conversation,

22   I assume, with her to get more information.  But beyond

23   that, I don't recall any conversation.  No, sir.

24   Q     Did you inquire of her whether or not she was aware

25   of whether or not my client knew about the existence of

 1  the press release?

 2  A    That would be logical, based on my question to her in

 3  the e-mail, and I'm assuming I had to get more information

 4  about the event from her.  But I can't sit here and tell

 5  you specifically how that conversation -- you know, how it

 6  played out.  I just don't recall that.

 7  Q    But in any event, after you talked to her, you didn't

 8  talk to my client about it, correct?

 9  A    It was the night before the event, and we moved as

10  quickly as possible, in the midst of everything else going

11  on, to try to deal with it.  No, sir, I did not.

12  Q    Okay.  Or at any time after the lunch itself?

13           MR. FAULCONER:  Your Honor, this has been asked

14  and answered.

15           THE COURT:  Sustained.

16  BY MR. ASBILL:

17  Q    Now, you talked about sort of a black book, some sort

18  of a briefing book that the Governor would get before

19  events, and it would be stuck in the elevator in the

20  Mansion?

21  A    He would get his schedule for the next day.  It would

22  typically either be given to him as he left, or if he had

23  already left, it would be left in the elevator at the

24  Mansion for him to get the night before the day.

25  Q    Okay.  And did you see the actual briefing memo that

1  he got about the Mansion lunch event before he went to the

2  lunch?

3  A    Did I review it or see it --

4  Q    Yeah.  Review the hard copy?

5  A    Honestly, I don't remember.  Again, there was so much

6  going on that day.  I just -- I can't say if I did or

7  didn't.

8  Q    Okay.  You looked at an exhibit in this courtroom

9  with that particular information on it, and there were

10 some stars or asterisks, et cetera?

11 A    Yes, sir.

12 Q    And you said -- I believe you said that you thought

13 that was my client's handwriting?

14 A    It appeared to be.  Yes, sir.

15 Q    And do you know when, in time, those asterisks were

16 placed on that document?

17 A    No, sir.

18 Q    All right.  That particular event, the Mansion lunch,

19 you did talk to Jerry Kilgore, you and Jasen did, on the

20 29th; is that correct?

21 A    I believe that's the case.  Yes, sir.

22 Q    And you just told him that, you know, this is not

23 something that was appropriate, from your perspective.

24 And you thought the meeting went well?

25 A    I do.  Yes, sir.

```
 1  Q     The conversation, I mean.

 2  A     I think he understood our concerns.  Yes, sir.

 3  Q     And did you ever tell my client, before the

 4  investigation began, about that conversation that you had

 5  with Kilgore?

 6  A     Before this occurred?

 7  Q     Yeah.

 8  A     No, sir.  I don't recall that.

 9  Q     Did you tell him about it afterwards that you had

10  talked to Kilgore?

11  A     Yes, sir.

12  Q     Before the investigation commenced?

13              MR. FAULCONER:  Objection, Your Honor, to

14  conversations post investigation.

15              THE COURT:  We don't know when -- in response to

16  this last question --

17              THE WITNESS:  Yes, sir.

18              THE COURT:  -- are you talking about before this

19  hit the media or sometime after?

20              THE WITNESS:  No, sir.

21              THE COURT:  The objection is sustained.  Ask

22  another question.

23  BY MR. ASBILL:

24  Q     With respect to concern about the press release that

25  you've been discussing or you've been describing in your
```

 1  conferences with Mr. -- or conference with Jerry Kilgore,

 2  would I be accurate in saying that your concern was with

 3  the press release, not about the Governor?

 4  A    The concern was the press release and the inclusion

 5  of the Governor and the First Lady in the press release,

 6  the way it was worded.

 7  Q    Okay.  But your concern was not about the Governor's

 8  conduct.  It was about Star's press release, right?

 9  A    It was about the press release, yes, sir.  That's

10  correct.

11  Q    Okay.  You talked about an e-mail.  I'm sorry.  I

12  don't even know the exhibit number.  February 17th, 2012,

13  with some -- that you didn't have any knowledge of, but

14  you were cc'd on the e-mail.

15       Did that kind of thing happen often; that even if you

16  were on an e-mail, you missed it, you overlooked it?

17  A    It did.  I mean, I probably averaged 3 or 400 e-mails

18  a day, in addition to phone calls and personal visits.

19  And I did my best to read as many of the e-mails I

20  received on days I could, but inevitably, there were some

21  e-mails that I just did not get to in the next day's work.

22  Q    Do you have any knowledge of whether the Governor got

23  more or fewer e-mails than you?

24            MR. FAULCONER:  Objection, Your Honor.

25            THE COURT:  He can answer that.

1  A    It wouldn't surprise me if the Governor received as

2  many or more.

3  BY MR. ASBILL:

4  Q    All right.  The Healthcare Leaders Reception in the

5  end of February 2012.  I want to focus on that.

6          MR. ASBILL:  Exhibit 345, please.

7  BY MR. ASBILL:

8  Q    This is a calendar entry; is that correct?

9  A    Appears to be.  Yes, sir.

10  Q    Reflecting a meeting between my client and Jonnie

11  Williams that same day for 25 minutes?

12  A    Appears to be.  Yes, sir.

13  Q    Okay.  And that's in advance of the reception that

14  night; is that correct?

15  A    I'm not sure what time of day the reception was.  But

16  that appears to be in the afternoon.  The reception was

17  likely in the evening.

18  Q    Okay.

19  A    I did not attend the reception.  So --

20  Q    All right.  No.  I know you said you didn't attend

21  the reception.  But this meeting is scheduled, is on the

22  record at the Governor's Office, correct?

23  A    It appears to be.  Yes, sir.

24  Q    All right.  And you were asked about a lot of

25  handwritten notes by my client, four or five pages of

1   handwritten notes.

2        Do you know when those notes were prepared?  In other

3   words, do you know whether they were all in one day or in

4   multiple days?

5   A    No, sir, I do not.

6   Q    Do you know whether they were all in one meeting or

7   all about one meeting or they were about several

8   discussions?

9   A    Do not.

10  Q    Do you know whether those notes reflect my client's

11  views, opinion, analysis, as opposed to writing down what

12  someone else said?

13            MR. FAULCONER:  Objection, Your Honor.

14            THE COURT:  Sustained.

15  BY MR. ASBILL:

16  Q    You just don't really have any idea about the

17  contents of that exhibit; is that right?

18  A    Other than what I testified to, no, sir.

19  Q    Okay.  The event that you've described briefly, the

20  February 13th, 2013, you say you learned that Maureen

21  McDonnell was going to be talked to by the Virginia State

22  Police; is that right?

23  A    Yes, sir.

24  Q    And how is it that you learned that that was going to

25  occur?

MARTIN KENT – CROSS – ASBILL          2627

```
 1  A    I believe I received a call from the Superintendent.
 2  Q    And what was your understanding of the purpose of the
 3  meeting?
 4          MR. FAULCONER:  Objection, Your Honor.
 5  Relevance as to his understanding.
 6          THE COURT:  Sustained.
 7  BY MR. ASBILL:
 8  Q    Did you talk to my client about the meeting before it
 9  occurred?
10  A    Yes, sir.
11  Q    Did you tell him the meeting had anything to do with
12  Jonnie Williams?
13  A    No, sir.
14  Q    You talked to him after the meeting, correct?
15  A    Yes, sir.
16  Q    And you say he seemed upset at that point?
17  A    Yes, sir.
18  Q    Do you know why?
19  A    The only thing I recall him saying was that the
20  interview was not what it was purported to be about.
21  Q    With respect to my client's personal finances, was
22  that something that he discussed with you at any time
23  during the years you worked for him?
24  A    No, sir.
25  Q    With respect to his marriage and any issues between
```

MARTIN KENT - CROSS - ASBILL          2628

```
 1  himself and his wife, are those things that he discussed
 2  with you?
 3  A    No, sir.
 4  Q    Correspondingly, are those the types of things that
 5  you ever brought up or raised with him and discussed with
 6  him?
 7  A    Only if I felt like it somehow spilled over into
 8  state government.
 9         MR. ASBILL:  Court's indulgence one moment, Your
10  Honor.
11  BY MR. ASBILL:
12  Q    Going back to the discussion with Jerry Kilgore about
13  the Mansion lunch.  Did Kilgore ever report to you in that
14  discussion that my client had somehow promised Star that
15  they could have a launch event at the Mansion?
16         MR. FAULCONER:  Objection, Your Honor.
17         THE COURT:  Sustained.
18  BY MR. ASBILL:
19  Q    After the investigation became public -- that's,
20  what, Easter March 2013?
21  A    I couldn't tell you the exact date, but it was
22  sometime around that time frame.  Yes, sir.
23  Q    And at that point, did you do anything to look into
24  the allegations?
25         MR. FAULCONER:  Objection, Your Honor.
```

```
 1                    THE COURT:  Sustained.

 2   BY MR. ASBILL:

 3   Q    Were you legally authorized to do anything --

 4                    MR. FAULCONER:  Objection, Your Honor.

 5   BY MR. ASBILL:

 6   Q    -- to look into it?

 7                    THE COURT:  Sustained.

 8   BY MR. ASBILL:

 9   Q    Did you take any action after the investigation

10   broke --

11                    MR. FAULCONER:  Objection, Your Honor.

12   BY MR. ASBILL:

13   Q    -- with respect to the subject matters of the

14   investigation?

15                    THE COURT:  Sustained.

16   BY MR. ASBILL:

17   Q    That was in March 2013 when the investigation broke

18   or the public knew there was an investigation?

19   A    It was sometime in that time frame.  March, April

20   time frame.

21   Q    And you stayed until the following January; is that

22   right?

23   A    Yes, sir, I did.

24                    MR. ASBILL:  I have no further questions.

25                    THE COURT:  All right.  We're going to stop now
```

MARTIN KENT – CROSS – BURCK        2630

```
1  for the morning break.  We'll take 15 minutes.
2          (The jury left the courtroom.)
3          MR. DRY:  Judge, I just wanted to apprise the
4  Court.  The government anticipates calling witnesses
5  Skunda and Bridge tomorrow.  And there's a pending motion
6  to exclude filed by the defendants, and we filed a
7  response.  I don't know when the Court wants to take that
8  up, but I just wanted to apprise the Court of that.
9          THE COURT:  So I guess that means I'll have to
10 look at it during lunch today.  I'll deal with it.
11         MR. DRY:  Thank you, Your Honor.
12         (Recess taken from 11:38 a.m. until 11:55 a.m.)
13         THE COURT:  Hold up.  We need the witness.
14         (The jury entered the courtroom.)
15         THE COURT:  All right.  Cross for Ms. McDonnell?
16         MR. BURCK:  Thank you, Your Honor.
17                    CROSS-EXAMINATION
18 BY MR. BURCK:
19 Q   Good morning, Mr. Kent.
20 A   Good morning.
21 Q   My name is Bill Burck, and I represent Ms. McDonnell.
22 I have a handful of topics that I want to go through with
23 you as fast as possible.
24 A   Okay.
25 Q   First, I just want to start with when Ms. McDonnell
```

1  was the First Lady of Virginia, she was not a state

2  employee, right?

3  A    That is correct.

4  Q    She did not receive a salary?

5  A    She did not.

6  Q    And she was not a public official?

7  A    That is correct.

8  Q    She had no authority to hire or fire anyone, did she?

9  A    That is correct.

10  Q    Mary-Shea Sutherland, she left the Mansion in October

11  of 2011; is that right?

12  A    I believe that's correct.  Yes.

13  Q    And I think that technically, you fired her; is that

14  right?

15  A    She was involuntarily separated.

16  Q    Involuntarily separated.  And that was your -- your

17  authority that she was voluntarily separated, right?

18  A    That is correct.

19  Q    It wasn't Ms. McDonnell that -- that involuntarily

20  separated her?

21  A    That is correct.

22  Q    Now, in fact, Ms. McDonnell didn't ask you to

23  terminate her at all, did she?

24  A    No, she did not.

25  Q    You were asked about an incident involving Nu Skin.

MARTIN KENT - CROSS - BURCK          2632

1  This is back when the Governor was the Attorney General.

2  Do you remember that testimony?

3  A    I do.

4  Q    And the -- the incident that you described was that

5  Nu Skin was using Mr. McDonnell's likeness without his

6  permission; is that right?

7  A    That was my understanding.  Yes.

8  Q    And you guys put an end to that?  "You" the staff.

9  A    That is correct.

10  Q    Did Ms. McDonnell, in any way, object or complain

11  about that?

12  A    I do not recall that.  No.

13  Q    Okay.  Now, during the time that you were Chief of

14  Staff, which is, I guess, the entire period of the

15  Governor's time in office, you testified that he was the

16  busiest person in the -- in the administration?

17  A    No question.

18  Q    And there were times that Ms. McDonnell came to you

19  to try to get times scheduled with him; isn't that right?

20  A    She didn't come to me.  I think she came to the

21  scheduler.

22  Q    She came to the scheduler?

23  A    She did.  Yes, sir.

24  Q    And you were aware of the times that she would come

25  to the scheduler looking for time to be with

MARTIN KENT - CROSS - BURCK          2633

1  Mr. McDonnell?

2  A    I was aware of several.  I'm not sure if I was aware

3  of all.  But I was aware of several.  Yes.

4  Q    And you were aware that she found that it was very

5  difficult to find time with him; isn't that right?

6  A    That is probably correct.  Yes.

7  Q    Let's talk a little bit about the summer of 2011 and

8  Mary-Shea Sutherland and your interactions.

9  A    Sure.

10  Q    Now, you were asked about a shopping trip, I think,

11  by the prosecutor that you didn't know about at the time

12  in April 2011?

13  A    (Nodding head.)

14  Q    You -- please, can you just answer --

15  A    That's correct.

16  Q    Thanks.

17  A    I'm sorry.  I was waiting for you to finish your

18  question.  I apologize.

19  Q    No.  That's okay.

20       Did Mary-Shea Sutherland ever tell you about the

21  shopping trip?

22  A    I do not recall her ever telling me about that.  No.

23  Q    And did she ever tell you about the wedding gift to

24  Cailin that Mr. Williams provided?

25  A    I do not believe she did.  No.

MARTIN KENT - CROSS - BURCK          2634

1   Q     Now, you testified that you recall that she said

2   something about credit card debt of about $20,000?

3   A     That's my recollection, yes.

4   Q     And "she" being Mary-Shea Sutherland.  She told you

5   about this?

6   A     Referencing the First Lady.

7   Q     Referencing the First Lady.  And also Jonnie Williams

8   came up in the same conversation?

9   A     I believe it did.  Yes.  Yeah.  It was -- again, it

10  was in the midst of a very long protracted conversation

11  about other issues, but I do believe she did.  Yes.

12  Q     So to you -- sitting here today, your best

13  recollection is that Mary-Shea Sutherland told you

14  something about $20,000 worth of credit card debt that

15  Jonnie Williams may have paid for the First Lady?

16  A     That was the gist of it.  Yes.

17  Q     Okay.  And, again, this is while Mary-Shea Sutherland

18  was actually employed by the Mansion; isn't that right?

19  A     That is correct.

20  Q     Did Mary-Shea Sutherland tell you that she received a

21  dress as a gift from Mr. Williams in April 2011?

22  A     No, she did not.

23  Q     Did she tell you that she was negotiating for a job

24  or a position of some sort with Mr. Williams during the

25  summer of 2011?

MARTIN KENT – CROSS – BURCK          2635

1   A      No, she did not.

2   Q      You testified about --

3           MR. BURCK:  Can you please publish Government

4   Exhibit 226, which is already in evidence.

5   BY MR. BURCK:

6   Q    This is -- take a moment to look at it.

7           MR. BURCK:  If you could blow it up a little bit

8   so it's easier to read.

9   BY MR. BURCK:

10  Q    This is a series of e-mails you testified about on

11  direct concerning the press release, leading up to the

12  launch?

13  A    Yes.

14  Q    Now, do you recall if Maureen McDonnell had any

15  involvement at all, as far as you knew, in the press

16  release?

17  A    No.  I have no specific knowledge of that.

18  Q    And these -- this e-mail chain has -- Maureen

19  McDonnell is not on it at all, is she?

20  A    No, she's not.

21  Q    Do you recall if, when the press release was changed,

22  to make it more acceptable to the Mansion, to the Office

23  of the Governor, that Ms. McDonnell complained in any way,

24  pushed back in any way?

25  A    No.

MARTIN KENT - CROSS - BURCK          2636

1    Q    Okay.

2          MR. BURCK:  You can take that down.  Thank you.

3  BY MR. BURCK:

4    Q    Do you recall that there was supposed to be a press

5  conference of some sort in front of the Mansion for the

6  launch event?

7    A    That was my understanding.  Yes.

8    Q    Or the lunch or the launch event, whichever?

9    A    Yes.  That's my understanding.

10   Q    And that was also canceled, right?

11   A    That's -- that's what we focused on.

12   Q    That's what you focused on.  You and Jasen Eige --

13   A    Yes.

14   Q    -- and Tucker Martin?

15   A    Tucker to a lesser extent, but primarily Jasen Eige

16  and myself.  Yes.

17   Q    Okay.  And did you ever hear any kind of pushback or

18  complaint from the First Lady when that was canceled?

19   A    No.

20   Q    In December of 2011, there was SOEI training provided

21  for the staff; isn't that right?

22   A    December of 2011?

23   Q    Yes.

24   A    There was some provided at some point in time.  I'm

25  not sure of the exact date.  But yes, there was.

MARTIN KENT – CROSS – BURCK          2637

1  Q    Do you recall that the First Lady was provided

2  training as part of that SOEI training?

3  A    She –– I believe she was.  Yes.

4  Q    Do you recall why she was included in the training?

5  A    I do.  And I think the timing, in large measure, had

6  to do with the change in transition of staffs.  And she ––

7  we –– several new hires were made after Mary-Shea had left

8  and a few other folks had left.

9      And I believe I spoke with my Deputy Chief Of Staff,

10  Matt Conrad, who, I believe, is the one who conducted the

11  training, and we felt like it was important for multiple

12  reasons.  One, to try to ensure there was some cohesion

13  within the Governor's –– I mean the Mansion Office with

14  staff, you know.  And it was sort of the –– the unknown,

15  and we felt like it was better to be safe than sorry and

16  to have her, along with the staff at the Mansion, included

17  to make sure that everyone was on record as to what the

18  requirements were.

19  Q    Okay.  And the SOEI training, at some point you

20  concluded that the First Lady did not have to file an SOEI

21  because she's not a state employee, right?

22  A    I believe our counsel's office did make that

23  determination.  Yes.

24  Q    But the staff were employees of the –– of the state?

25  A    They were.  Yes.

1   Q     So they would have to file SOEIs?

2   A     Yes.  They should.

3   Q     Okay.  So the First Lady was present for the reasons

4   you mentioned, not because she had to file an SOEI?

5   A     That's correct.

6   Q     Okay.  And you -- there was a transition in staff,

7   you talked about, after Mary-Shea left --

8   A     Yes.

9   Q     -- or was terminated?

10        Can you tell us a little bit about that?  There was

11  three people that replaced Ms. Sutherland?

12  A     No.  There weren't three that replaced her.  There

13  was one individual that technically replaced her.  There

14  was another individual that was hired for a different

15  purpose.  That was -- part of her job was to deal with the

16  First Lady's initiative dealing with military spouses.

17  And so she, by default, was sort of folded into the work

18  of the Mansion, but she was not really hired to replace

19  Mary-Shea per se.

20  Q     Okay.  But when Mary-Shea left, is it fair to say

21  that the First Lady's -- the people, the number of staff,

22  that reported technically to the First Lady grew in

23  number?

24  A     There were more individuals.  That is correct.

25  Q     And was that partially because there was concern

MARTIN KENT - CROSS - BURCK          2639

1   about the First Lady's ability to manage her office?

2   A    Well, one individual was a request of the First Lady,

3   someone that she had known personally and was a personal

4   aide to her.  And she -- we hired her primarily at the

5   First Lady's request.

6        There was an individual who, I would say, to answer

7   your question, was the primary replacement for Mary-Shea.

8        And then there was another individual that I

9   mentioned to you that was sort of morphed into part of the

10  First Lady's initiatives that was actually working at the

11  time, initially, for Public Safety and Commonwealth

12  Preparedness.

13  Q    Okay.  I want to talk about the -- briefly, about the

14  Virginia Health Leaders event.

15  A    Okay.

16  Q    Was it -- is it fair to say that it was not uncommon

17  for any kind of event that was going to be held at the

18  Mansion for the Governor's staff to ask the First Lady's

19  staff whether or not they wanted to invite people to an

20  event?

21  A    I didn't get involved in that level of granularity,

22  but that wouldn't surprise me if that request was made.

23  Q    And not just for that event, but I'm talking more

24  generally.  That was a typical --

25              MR. FAULCONER:  Objection, Your Honor.  He said

1   he's not familiar.

2           THE COURT:  Sustained.

3   BY MR. BURCK:

4   Q    Going to February of 2013.  There was a -- an

5   interview conducted by -- by the Virginia State Police of

6   Ms. McDonnell?

7   A    Ms. McDonnell.  Yes.

8           MR. BURCK:  Please show the witness only, for

9   identification purposes, RM-2028.  And can you blow it up

10  and then start at the bottom.

11  BY MR. BURCK:

12  Q    Now, Mr. Kent, you testified that you recalled that

13  you received a phone call from Virginia State Police in

14  advance of that -- that interview.  Do you recall that?

15  A    I did.

16  Q    Is this an e-mail from a Steven Flaherty to yourself,

17  dated February 13, 2013?

18  A    It appears to be.  Yes.

19  Q    Do you know who Mr. Flaherty or Colonel Flaherty is?

20  A    He's the Superintendent of the Virginia State Police.

21          MR. BURCK:  Your Honor, we would offer RM-2028.

22          THE COURT:  It will be admitted.

23          MR. BURCK:  Could you blow it up entirely so we

24  can see the whole page?

25  BY MR. BURCK:

MARTIN KENT - CROSS - BURCK          2641

1   Q    So starting at the bottom, this is an e-mail, again,

2   from Mr. Flaherty to you on February 13th.  It says,

3   "Martin.  We want to wrap up the Chef Todd case.  Plan to

4   go to the grand jury next week.  If the First Lady is

5   available Friday and can block off about two hours

6   (probably won't need that long) to talk to Charlie Hagan

7   and Tyler Kennedy, we would appreciate it.  Thanks,

8   Steve."

9        Do you see that?

10  A    I do.

11  Q    And above that, you respond, "Will talk with her

12  tomorrow.  Thanks, Steve," from Martin?

13  A    That's correct.

14  Q    And then immediately above that, it says, "Thanks."

15       Now, what was the Chef Todd case?

16  A    That was a separate matter in the City of Richmond

17  involving some alleged misappropriation of state assets,

18  mainly, food, by the former chef of the Mansion.

19  Q    And was that your understanding of what the agents

20  were there to interview Ms. McDonnell about?

21  A    That -- that was my understanding, yes.

22  Q    Do you recall if they had mentioned to you that they

23  wanted to talk with Jonnie Williams?

24  A    No.

25  Q    If you look at the top of the e-mail just briefly, it

MARTIN KENT – CROSS – BURCK        2642

1  says -- this is from you to Colonel Flaherty on the next

2  day, February 14th.  "She is pulling together her notes so

3  she can refresh her memory for tomorrow.  Go ahead and

4  work through her office to schedule.  Thanks, Martin."

5       And then above, that Colonel Flaherty says, "Thanks,

6  Martin," right?

7  A    Yes.  That's correct.

8  Q    So as of -- this is the day before the interview,

9  which is on February 15th, as of that point, you

10 understood that this interview was about the Chef Todd

11 case, correct?

12 A    That's correct.

13 Q    And you had no idea it was also about the Jonnie

14 Williams issue?

15           MR. FAULCONER:  Objection, Your Honor.

16           THE COURT:  He's already answered that.

17 BY MR. BURCK:

18 Q    Now, prior to -- on the day of the interview on

19 February 15th, did you -- were you planning to attend this

20 interview with Ms. McDonnell?

21 A    I had initially offered to attend the interview with

22 her.

23 Q    I'm sorry.  Who did you offer that to?

24 A    I believe I offered that to the Governor.

25 Q    Okay.  And what did the Governor say to you?

MARTIN KENT - CROSS - BURCK          2643

```
1   A    At the time, I think he thought it was okay.  And,
2   you know, that was kind of the end of that conversation.
3   I think the understanding was is that I would attend with
4   her.
5   Q    Okay.  And did you attend with her?
6   A    No.
7   Q    What happened?
8   A    I was contacted by Deputy Superintendent of State
9   Police and notified that I would not be -- I would not be
10  needed at the interview.
11  Q    You would not be needed at the interview.  But did
12  you still have a choice to attend the interview?
13  A    I don't think so.
14  Q    You did not have a choice?
15  A    It was made clear to me that I was not invited.
16  Q    And that was made clear to you by whom?
17  A    By the Deputy Superintendent.
18  Q    Do you know if Ms. McDonnell took anyone with her
19  into the interview?
20  A    I do not know that she did.
21  Q    Do you know if she took a lawyer with her into the
22  lawyer?
23  A    I do not believe she did.
24  Q    Just a few last questions for you.
25            MR. BURCK:  Just pulling up Government Exhibit
```

1  231.  This has already been admitted into evidence.

2  BY MR. BURCK:

3  Q    If you look at the second and third pages of that

4  exhibit, you were asked about the handwriting.  You

5  thought you believed that it looked like the Governor's

6  handwriting?

7  A    That's correct.

8  Q    And you were asked about stars that were placed next

9  to people's names?

10  A    Uh-huh.

11  Q    And one of the stars is John Clore, and another one

12  is Carrie Cantrell?

13  A    Yes.

14  Q    And the next page, Jasen Eige, John Laso.  And then I

15  think Roskamp and Roskamp are written down on the third

16  page --

17  A    Yes.

18  Q    -- next to Diane Roskamp and Bob Roskamp.  And

19  Mary-Shea Sutherland has "1st Lady Office," right?

20  A    Yes.

21  Q    Do you see Jonnie Williams and Jonnie Williams, Jr.

22  below Mary-Shea Sutherland on that list?

23  A    Yes, I do.

24  Q    Do you see any stars next to their names?

25  A    I do not.

1  Q     If you look, top of the page, above John Laso, Paul

2  Ladenson?

3  A     I do.

4  Q     Do you see a star next to that name?

5  A     I do not.

6  Q     And prior page, David Dean, and Fiona Crawford.  Do

7  you see stars next to those names?  It says Roskamp and

8  Star Scientific?

9  A     I do not.

10        MR. BURCK:  You can take that down.  Thanks.

11  BY MR. BURCK:

12  Q     And then just some final questions for you.  Are you

13  aware of any -- during your time as Chief of Staff to the

14  Governor, are you aware of any budget money going to Star

15  Scientific or Jonnie Williams?

16  A     No.

17  Q     Are you aware of any economic grants going to Jonnie

18  Williams or Star Scientific?

19  A     No.

20  Q     Are you aware of any Board appointments made to Star

21  Scientific or Mr. Williams?

22  A     No.

23  Q     Are you aware any of legislation provided to or on

24  behalf of Star Scientific or Mr. Williams?

25  A     No.

1          MR. BURCK:  Your Honor, just a moment.

2     (Counsel conferring with co-counsel.)

3          MR. BURCK:  No further questions, Your Honor.

4          THE COURT:  Redirect?

5          MR. FAULCONER:  Yes, Your Honor.

6                    **REDIRECT EXAMINATION**

7 BY MR. FAULCONER:

8 Q    Now, Mr. Kent, just to follow up real quick on

9 something that Mr. Burck was just asking about with

10 respect to state funds.  Are you aware of what the default

11 is for an event held at the Mansion in terms of what pays

12 for an event at the Mansion?

13 A    Who pays for an event at the Mansion?

14 Q    Yeah.  So if Sarah Scarbrough, for example, doesn't

15 invoice anybody for an event, are you aware of what the

16 default is of where that's paid out of?

17 A    I would assume it would probably be the Governor's

18 PAC.

19 Q    Sorry.  An event held at the Mansion, is that paid

20 out of Mansion funds?

21 A    No.  You said the default if it wasn't paid for out

22 of the Mansion.

23 Q    I'm sorry.  Let me rephrase the question --

24 A    I may have misunderstood your question.

25 Q    -- to be a little bit more accurate.

1   A     Yeah.

2   Q     If an event is just held at the Mansion --

3   A     Yeah.

4   Q     -- and no invoicing is done to the PAC or to any

5   outside groups, what's your understanding of what the

6   default is of who pays for?

7   A     Typically, it would be paid for by the Cabinet

8   secretary that has requested the event or the agency head

9   that's requested the event.

10  Q     And if no agency head pays for it, does it then come

11  out of the Mansion budget?

12  A     Yes.  It would typically come out of the Mansion

13  budget.

14  Q     And is the person who would typically be monitoring

15  that typically be Sarah Scarbrough?

16  A     She would.

17  Q     Now, you were asked a few questions about the

18  interview with law enforcement on February 15th of

19  Ms. McDonnell.  And you discussed potentially going or you

20  potentially offering to go?

21  A     Uh-huh.

22  Q     Just to be clear, were you offering to go as

23  Ms. McDonnell's private personal attorney?

24  A     No.

25  Q     You were also asked some questions about Mary-Shea

1  Sutherland on cross-examination.

2  A    Uh-huh.

3  Q    And you were asked about whether or not she told you

4  about any conversations she had with Jonnie Williams about

5  employment.

6  A    Uh-huh.

7  Q    To be clear, in the summer of 2011, did Mary-Shea

8  Sutherland tell you that she was looking for outside

9  employment?

10  A    She, most likely, did, in the midst of everything,

11  but she never mentioned Jonnie Williams.

12  Q    But was it a surprise to you that she was --

13          MR. BURCK:  Objection, Your Honor.

14  BY MR. BURCK:

15  Q    -- potentially looking for outside employment?

16          THE COURT:  Overruled.

17  A    No, it was not a surprise.

18  BY MR. FAULCONER:

19  Q    And shortly before she left, do you recall whether or

20  not Mr. McDonnell wanted, based on his conversations with

21  you, wanted Mary-Shea Sutherland to stay on staff or

22  whether he wanted her to leave?

23  A    He initially wanted her to stay.

24  Q    You also were asked about a couple of conversations

25  involving Nu Skin, the product endorsement type thing that

1   happened before Mr. McDonnell took office as Governor.

2   And I believe either Mr. Asbill or Mr. Burck asked you

3   about whether or not you got any pushback from

4   Ms. McDonnell about that.  Do you remember that question?

5   A    I do.

6   Q    To be clear, did you have any conversation with

7   Ms. McDonnell about the Nu Skin, whatever that event was?

8   A    No.

9   Q    You were also asked about -- I'd like to go back for

10  just a moment to the interview with law enforcement --

11  A    Uh-huh.

12  Q    -- of Ms. McDonnell.  Did Mr. McDonnell or

13  Ms. McDonnell, to your knowledge, ever ask you about

14  having a personal attorney there for Ms. McDonnell in that

15  interview?

16  A    I don't remember they ever asked me about it.

17  Q    So going back to -- past the Nu Skin, and then now

18  into the press release for the event at the Mansion in

19  late August of 2011.  And you were asked about whether or

20  not Ms. McDonnell pushed back on you, whatever you and

21  Mr. Eige did with that press release?

22  A    Uh-huh.

23  Q    To be clear, did you have any conversation with

24  Ms. McDonnell in which she would have pushed back?

25  A    No.

```
 1  Q    You were also asked about Mr. McDonnell and whether
 2  he pushed back.  Again, did you have any conversation with
 3  Mr. McDonnell about that?
 4  A    No.
 5           MR. FAULCONER:  One moment, Your Honor.
 6       (Counsel conferring with co-counsel.
 7           MR. FAULCONER:  No further questions.
 8           THE COURT:  All right, sir.  You may stand down.
 9  Thank you very much.
10           THE WITNESS:  Yes, sir.  Thank you.
11       (Witness stood aside.)
12           THE COURT:  Call your next witness, please.
13           MS. ABER:  The United States calls Sara Wilson.
14                    SARA WILSON,
15   called as a witness by and on behalf of the government,
16   having been first duly sworn by the Clerk, was examined
17                and testified as follows:
18                DIRECT EXAMINATION
19  BY MS. ABER:
20  Q    Good afternoon, Ms. Wilson.
21  A    Good afternoon.
22  Q    Please state your name, and spell your first and last
23  for the record.
24  A    Sara Redding Wilson.  And it's S-A-R-A, W-I-L-S-O-N.
25  Q    What is your current title?
```

1    A     I am the Virginia Department of Human Resource

2    Management Director.

3    Q     Tell the jury, please, what that involves.

4    A     I'm head of human resources.  That -- one of the

5    things I manage is healthcare, EEO, any type of fairness

6    and equity type of issues, human resource policy for the

7    state.  Any kinds of things like that that relate to

8    people.  Worker's compensation.  Various human resource

9    issues.

10   Q     Do you work within the office of a Cabinet secretary?

11   A     I do.  I work within the Office of the Secretary of

12   Administration.

13   Q     How long have you had this job?

14   A     I've had this job since April 1998.  This is my fifth

15   governor.

16   Q     So does that mean you worked in the administration of

17   Governor Robert McDonnell?

18   A     Yes, it does.

19   Q     And during that administration, to which Cabinet

20   secretary did you report?

21   A     Secretary of Administration.

22   Q     And what was her name?

23   A     Lisa Hicks-Thomas.

24   Q     Is it fair to say that you oversee, in part of your

25   many hats, the health plan for the employees of the

1  Commonwealth of Virginia?

2  A    Yes, ma'am.

3  Q    Now, are you familiar with a company called Star

4  Scientific?

5  A    I am.

6  Q    Did you have a meeting with someone from Star

7  Scientific on February 29th, 2012?

8  A    I did.

9  Q    And who was that?

10 A    David Dean.

11 Q    And did he make an appointment or did he just sort of

12 swing by?

13 A    He was a cold call.  Just walked in, asked if I had

14 time to meet with him, and I did.  So I met with him.

15 Q    Is it common for folks to just knock on your door,

16 swing by?

17 A    Has it been done?  Yes.  Is it the most common?  No.

18 But it's not unheard of.

19 Q    Now, at that time --

20 A    And it was his lucky day.  He didn't have to wait.

21 Q    At that time, what did you understand that David Dean

22 did for Star Scientific?

23 A    He was involved in sales and marketing for Star

24 Scientific.

25 Q    And, in essence, what did David Dean want from you in

SARA WILSON – DIRECT                2653

1  that meeting?  What was his ask?

2  A    He walked into the meeting.  I said, "What can I do

3  for you?  What is it you want?"

4       And he said, "I would like Anatabloc to be covered by

5  the employee health plan."

6       And I said, "Well what is this?  Is this a drug?  Is

7  it covered by the FDA?  What is it?"

8       And he said, "Oh, no.  No.  No.  This is a dietary

9  supplement."

10      And I said, "Well, that's going to make this meeting

11  really short because we don't cover dietary supplements in

12  the state health plan."

13  Q    Did you ask Mr. Dean about studies of Anatabloc,

14  scientific studies?

15  A    Oh, yes.  Yes.  Because he's a salesman.  He's a good

16  salesman.  And he talked about who was taking it and all

17  the people interested in it.  And I wanted to see studies.

18  I wanted to see the scientific research behind this.  Even

19  though we didn't cover it, I was very interested in

20  results.  And we have a lot of employees that have -- that

21  need things that would be anti-inflammatory.  So I looked

22  for detailed scientific information.

23  Q    Did he say anything about having state employees

24  participate in a pilot research study?

25  A    At some point in time, I've talked to him several

SARA WILSON - DIRECT            2654

1   times, he may have mentioned it.  But employees can

2   participate in any kind of study.  There's that 1 800 on

3   the billboard, "If you have these kind of symptoms, call."

4   They are free to participate, but it's not anything that

5   we would sponsor.

6   Q    Okay.  So after you sent Mr. Dean on his way, did you

7   see him later that evening?

8   A    Yes, I did.

9   Q    And where did that happen?

10  A    At the Executive Mansion.

11  Q    For what kind of event at the Executive Mansion?

12  A    I believe it was called Health Leaders meeting or

13  Leaders in Healthcare.  Something along that line.

14  Q    Did you also briefly meet a gentleman named Jonnie

15  Williams at that reception?

16  A    Briefly.

17  Q    Okay.  Now, moving forward in time, almost a couple

18  weeks, were you present at a meeting with Mr. McDonnell on

19  March 21st, 2012?

20  A    21st.  Yes.  Yes, ma'am.

21  Q    On or about?

22  A    Yes.  21st.

23  Q    Who else was at this meeting?

24  A    Lisa Hicks-Thomas, Martin Kent.  And others may have

25  come and gone, but those two were there for the duration.

SARA WILSON - DIRECT                    2655

1  Q    And Lisa Hicks-Thomas was your boss at the time,

2  right?

3  A    Yes, ma'am.

4  Q    Where did the meeting take place?

5  A    Governor's Office.

6  Q    So the Governor was present?

7  A    The Governor was present.

8  Q    Okay.  What was the purpose of this particular

9  meeting?

10 A    We were talking about healthcare.

11 Q    Was there any particular aspect that related to your

12 job and the Virginia healthcare plan for employees?

13 A    Yes.  He was very interested in implementing a

14 consumer-driven health plan, and we were always giving him

15 updates on that particular item.  Of course, I always try

16 to get in employee compensation and other issues when I

17 have an audience with the Governor, but the primary

18 meeting was for healthcare.

19 Q    In a nutshell, can you tell the jury what a

20 consumer-driven healthcare plan is?

21 A    A consumer-driven healthcare plan is a plan that

22 we've put in place to try and get employees to really know

23 their numbers and be much more engaged in their health,

24 taking care of themselves.  And we give them tools so that

25 they can understand the quality and cost from their

1   providers where you can go look it up on-line to see what

2   certain procedures cost or what providers charge.  So they

3   have the tools.

4        And then the big difference from a regular plan is

5   that they pay more out of pocket.  But to offset that, the

6   employer gives them cash.  So that we give them cash for

7   them and for their spouse, and then they can earn

8   additional funds, what we call do rights.  Like if you go

9   to the doctors, you can get a reward.  If you get your flu

10  shot, you can get a reward.  So would get additional

11  rewards to put into your account.  And anything you don't

12  spend rolls over for your own account for the next year

13  and keeps rolling over and over and over.  So it's your

14  money to spend on healthcare.

15       So the concept is is that if you're an employee

16  spending your money, you're going to be a good shopper.

17  And that's what we're looking for the consumer to be a

18  good shopper.  Because if they are, then they win and so

19  does the state plan, which also means all other state

20  employees would win too because hopefully the cost would

21  drop.

22  Q    Now, based on your conversations with Mr. McDonnell

23  during the administration, would you say that he was a

24  proponent of this consumer-driven plan?

25  A    Oh, he was very much in -- very, very interested in

SARA WILSON - DIRECT                    2657

1  the consumer-driven plan.  Yes.

2  Q    Now, at this meeting on March 21st, did Mr. McDonnell

3  make any reference to Anatabloc?

4  A    At the end of the meeting, he did.

5  Q    Okay.  Tell the jury what exactly happened, to the

6  best of your --

7  A    He was mentioning -- we were talking about all these

8  issues, and he pulled out a bottle, you know, one of those

9  small bottles, of Anatabloc and talked about how much it

10 had helped him and his wife.

11 Q    Did you try to respond to him?

12 A    I did try to respond to tell him that I had already

13 met with these people.  But there was a lot of

14 conversation, and so I just didn't finish the -- I didn't

15 finish my thought with him to tell him I had already met

16 with these people.

17 Q    Had you ever seen Mr. McDonnell bring out a product

18 during a meeting like this?

19 A    No.

20 Q    Now, after the meeting had finished, did you walk out

21 with your boss, the Secretary of Administration, Lisa

22 Hicks-Thomas?

23 A    I did.

24 Q    Did you two ladies have a conversation?

25 A    We did.

1  Q    And tell the jury what you recall about that

2  conversation.

3            MR. BROWNLEE:  Objection, Your Honor.  Hearsay.

4            THE COURT:  Overruled.

5  A    I participated in this conversation.  And when we

6  left the meeting, Lisa turned around and looked at me and

7  said, "He wants us to meet with these people."

8        And I said, "I didn't hear that.  He never asked" --

9  "there was no specific ask in the meeting."

10       And she said, "Well, let's go down and" -- and she

11  said, "Well, trust me.  That's what he wants."

12       And we walked down to her office and we Googled it,

13  because I understood from David Dean that it was being

14  sold by GNC, but I had never scoped it out.  So we pulled

15  it up and looked at the price and looked at how it was

16  being sold.  And I explained to Lisa the kinds of things

17  that I mentioned with David Dean; that, no, we wouldn't

18  cover it, but I did offer to him a chance to give -- if

19  it's marketed publicly, if he wanted to give an employee

20  discount, we'd post it on the website, if employees wanted

21  a discount, and I never heard back from them on that.

22  Q    Okay.

23            MS. ABER:  One moment, please, Your Honor.

24       (Counsel conferring with co-counsel.)

25            MS. ABER:  I have no further questions, Your

1  Honor.  Thank you.

2          THE COURT:  All right.  Anything for

3  Mr. McDonnell?

4                  **CROSS-EXAMINATION**

5  BY MR. BROWNLEE:

6  Q    Good afternoon, Ms. Wilson.

7  A    Good afternoon.

8  Q    My name is John Brownlee.  I represent Bob McDonnell,

9  and I have a few questions for you today.

10 A    All right.

11 Q    Just to review, you were first appointed to the

12 government by Governor Gilmore in 1998; is that correct?

13 A    That's correct.

14 Q    And I believe you've testified that you're now on

15 your fifth governor?

16 A    Yes, sir.

17 Q    Okay.  And is it fair to say that with regard to

18 healthcare policy and this consumer-driven policy that you

19 talked about, that this was something that Governor

20 McDonnell was very interested in from the very beginning

21 of his administration?

22 A    Absolutely.

23 Q    Okay.  And I believe you testified that you met with

24 him regularly on budget issues; is that right?

25 A    Well, if I met with the Governor, generally, it was

SARA WILSON - CROSS - BROWNLEE          2660

1  budget, but the topic was always involving healthcare

2  because it is a big driver for us for the budget.

3  Q    Okay.  Just to talk about this first meeting, this

4  meeting with David Dean.  I believe you testified this was

5  a cold call.  So he just --

6  A    Cold call.  Just walked in.

7  Q    Wanted to talk?

8  A    "Can we talk?"  And I said, "Okay."

9  Q    All right.  And is it fair to say within -- because

10 you are the Director of Human -- let me make sure I get

11 this right -- the Human Resources Management, that this

12 happens somewhat frequently that you meet with these types

13 of sales reps?

14 A    I get vendors all the time.  Call all the time.  And

15 we will meet with everybody.  Usually they make an

16 appointment.

17 Q    Okay.

18 A    But I do meet with anybody that asks to have a

19 meeting.

20 Q    All right.  And you see part of your job is to kind

21 of hear them out?

22 A    That's part of my job, to listen to them.  And

23 anything that looks like it has merit to further along,

24 then we move it up to the healthcare team.

25 Q    Okay.  And Mr. Dean, according to your testimony,

SARA WILSON - CROSS - BROWNLEE        2661

```
 1   wanted Anatabloc added to the state employee health plan;
 2   is that correct?
 3   A    That's what he asked for.
 4   Q    All right.  And you told him no?
 5   A    And I said, "Well, this will be a short meeting."
 6   Yes, I told him no.
 7   Q    Okay.  And at that point he said he would try to -- I
 8   think you -- is it true that you told him that you needed
 9   to see some science behind this?
10   A    I was interested in hearing -- I mean, he was an
11   engaging fellow.  I was interested in hearing the details.
12   And if -- you know, somebody has to come up with a new
13   product sometime, and so I wanted to see the research.  It
14   sounded like it was not ready for prime time, but I was
15   really interested in the scientific evidence that would
16   support it --
17   Q    Okay.
18   A    -- to keep my eye on it.
19   Q    Okay.  And so as the meeting left, he said he would
20   try to follow up with you at some later date; is that
21   correct?
22   A    He would give me additional information at a later
23   date.  Yes, sir.
24   Q    Okay.  Now, with regard to that meeting, best of your
25   knowledge, Bob McDonnell didn't have anything to do with
```

SARA WILSON - CROSS - BROWNLEE          2662

1   that; is that correct?

2   A    No.  From best of my knowledge, this was a salesman

3   trying to do his job, cold call on a -- somebody with the

4   health plan where his product could be -- he thought could

5   be benefited.

6   Q    Okay.

7   A    No.  I had no idea -- I didn't -- never assumed it

8   was from the Governor.

9   Q    Okay.

10  A    Thought it was a cold call from the company.

11  Q    Okay.  Let me move to this Healthcare Leaders

12  Reception.  You said that you attended that evening --

13  A    I did.

14  Q    -- in February?

15       That you saw Mr. Dean that evening?

16  A    I did.

17  Q    This was the gentleman who had just dropped in on

18  you --

19  A    Yes.

20  Q    -- a few hours before?

21  A    He must have been killing time or something.  He came

22  to see me.  I don't know.

23  Q    Okay.  And did you see Bob McDonnell that night?

24  A    I did.

25  Q    Okay.  Did he come by and talk to you?  Do you

SARA WILSON – CROSS – BROWNLEE          2663

1   recall?

2   A    I don't know if I talked to him.  But I saw him.  He

3   was busy.

4   Q    All right.  He didn't come by and --

5   A    It could easily have.  I don't recall.  But it would

6   not be uncommon for him to acknowledge your presence and

7   say hello.

8   Q    Okay.

9   A    But I cannot recall specifically whether he did at

10  that time or not.

11  Q    Okay.  Let me -- now, you had a second meeting with

12  Mr. Dean; is that correct?

13  A    I did.

14  Q    Okay.  And this is, I guess, the follow-up to his

15  original; is that correct?

16  A    That's correct.

17  Q    Okay.  And at this second meeting, did he bring some

18  slides?

19  A    He brought a PowerPoint presentation.

20  Q    Okay.  And let me --

21         MR. BROWNLEE:  Could we pull up, please,

22  RM-1448 -- just for the witness -- 0001.

23  BY MR. BROWNLEE:

24  Q    And does this look like at least the front slide and

25  the other slides of the --

SARA WILSON – CROSS – BROWNLEE       2664

```
 1  A      These slides.  Yes.

 2  Q      Okay.  And there was a --

 3  A      Yes.

 4  Q      These are these other folks.

 5  A      Uh-huh.

 6          MR. BROWNLEE:  Your Honor, we would move

 7  RM-1448-01 through 31 into evidence.

 8          THE COURT:  It will be admitted.

 9          MR. BROWNLEE:  Thank you, Your Honor.

10  BY MR. BROWNLEE:

11  Q      And so this is the package of materials that he left

12  for you to take a look at; is that correct?

13  A      That was his leave behind, yes, sir.

14  Q      Okay.  And fair to say that you reviewed these?

15  A      I did.

16  Q      Okay.  And --

17  A      We reviewed them together.

18  Q      Okay.  And after that, did you, once again, tell him

19  that -- first of all, State of Virginia, your office, this

20  kind of stuff doesn't go on your formulary; is that

21  correct?

22  A      Oh, he knows that.

23  Q      Okay.

24  A      He knew that.

25  Q      Okay.
```

SARA WILSON - CROSS - BROWNLEE        2665

1   A    I think he was just following up that -- I had asked
2   for specific details, and this was his -- this was his
3   specific detail, I think.
4   Q    Okay.  Fair to say this didn't convince you to --
5   A    No.  This is not what I had in mind.  I was looking
6   for a scientific document, you know, where there were
7   studies done and research done and the probabilities and
8   percentages of the study.  I consider this more marketing
9   material.
10  Q    Okay.  So once again, he left without getting any of
11  your assistance?
12  A    That's correct.
13  Q    Okay.  And Bob McDonnell didn't have anything to do
14  with this meeting?
15  A    Not that I'm aware of.  Not to my knowledge at all,
16  huh-uh.
17  Q    Okay.  I mean, he never asked you --
18  A    Never.
19  Q    Now, I want to touch, finally, on this meeting that
20  Ms. Aber talked about in the Governor's Office.
21  A    Yes.
22  Q    And this was on March 21; is that correct?
23  A    That's correct.
24  Q    Okay.  And this meeting talked about this rollout of
25  this consumer-driven healthcare plan; is that correct?

1    A      Yes, sir.

2    Q      Okay.  And I think you testified that at some point

3    at the end of the meeting Mr. McDonnell pulled out a

4    bottle of Anatabloc and talked about the fact that he took

5    it and that it had helped him; is that --

6    A      That's correct.

7    Q      And you testified that you were talking about

8    numbers.  Were those numbers, like cholesterol numbers and

9    blood numbers?  Things that people refer to in their own

10   health?

11   A      Yes.  We were trying to get employees -- one of the

12   things about a consumer-driven health plan is to get

13   employees to know their numbers.  Whether it's their blood

14   pressure, their BMI, their --

15   Q      What is BMI, for the record?

16   A      We have -- it's -- it is the measure, really, of

17   whether you're overweight or not.

18   Q      Okay.

19   A      And so that's -- we are really interested in that

20   because if you are, it has a collateral impact on a lot of

21   other diseases --

22   Q      Okay.

23   A      -- which raises the cost of the healthcare.  So we're

24   trying to get everybody to do right and do all the things

25   to help them be healthier.  And if they're healthier, then

1  they're at work more, and they are -- we get the work

2  done, and they are better and healthier.

3  Q    All right.  Do you remember, if you recall, one of

4  the numbers that was discussed was something called

5  C-reactive protein?  Do you recall that?

6  A    I don't recall that, but it could easily have been

7  discussed.  But I am familiar with C-reactive protein.

8  Q    All right.  And is that a number or a marker --

9  A    That's an inflammatory piece to -- that goes with

10 that, that measures that.

11 Q    All right.  And that has some indication of the

12 status of your heart.  Is that fair?

13 A    Yes.

14 Q    Okay.  Now, I believe you stated before that it was

15 your view that when he pulled this out, that it was like

16 someone would pull out and say, "I like an Advil gel cap

17 over Tylenol"; is that correct?

18 A    He pulled it out.  I didn't know why he pulled it

19 out.  I mean, for me, it could say -- I would say, "I like

20 Advil gel caps over Aleve."  I had no idea why he pulled

21 it out because there was no ask.  There was nothing there.

22 He did pull it out of his pocket, though, and talk about

23 it.  It was personal.

24 Q    Okay.  Now, Ms. Aber talked with you about -- after

25 the meeting you had this conversation with Ms. Hicks --

SARA WILSON – CROSS – BROWNLEE        2668

1  Secretary Hicks-Thomas; is that correct?

2  A    Yes.

3  Q    And there was some confusion between the two as to

4  whether or not -- exactly what Mr. McDonnell had said in

5  the meeting?

6  A    Well, I don't know if there was -- I did not hear him

7  ask for anything, and she thought that -- it was my -- my

8  recollection that she said, "He wants us to contact them."

9  And that wasn't my recollection at all because he didn't

10 say that.

11 Q    Okay.

12 A    And I had already met with these people.

13 Q    Okay.  And so then you went and --

14 A    Googled them.

15 Q    -- you looked it up on -- on Google?

16 A    We Googled them.

17 Q    And Googled them.  Okay.  Fair enough.  Now, you did

18 have on your calendar, did you not, just scheduled for the

19 next day, this meeting with Dean that you just talked

20 about?

21 A    That was just a follow-up meeting from our first

22 meeting.

23 Q    Okay.  But that didn't have anything to do with Bob

24 McDonnell?

25 A    No.

SARA WILSON - CROSS - BROWNLEE        2669

1  Q    Okay.  All right.  And after that, were there ever

2  any other follow-up or any additional meetings or anything

3  about Anatabloc or -- or Star Scientific with you?

4  A    The only issue that I -- when we went down, as we

5  walked down to Secretary Lisa Hicks-Thomas' office, I

6  explained the history I had had with learning about Star

7  Scientific, and I explained to her that David Dean had

8  been to see me, that I told him it was not covered, that

9  I -- I did offer an employee discount if they wanted to

10 offer that, and I had not heard back.

11     We Googled them, and I said, "I'll keep you posted if

12 I hear anything more about it.  And to date, we've not

13 even heard back on the discount for state employees.  So

14 we've really not talked about it since.

15 Q    Okay.

16 A    I mean, other than related to something like that.

17 But no.  Never followed up.

18        MR. BROWNLEE:  All right.  Great.

19     Thank you, Your Honor.

20     Thank you.

21        THE COURT:  All right.

22        MR. KOFFMANN:  Nothing for Ms. McDonnell.

23        THE COURT:  All right.  Cross for Ms. --

24        MR. KOFFMANN:  Nothing for Ms. McDonnell.

25        THE COURT:  All right.  Any redirect?

1           MS. ABER:  Yes, Your Honor.

2                  **REDIRECT EXAMINATION**

3    BY MS. ABER:

4    Q    Two questions.  Although every lawyer says that and

5    it's four.  Why, Ms. Wilson, did you have an instinct to

6    say that you had already met with the Star Scientific

7    folks if you didn't think that Mr. McDonnell was asking

8    for anything?

9    A    Because he was mentioning about a product, and I

10   didn't think anybody else in the room knew about it.  I

11   wanted him -- I had an instinct to say, "Yes, I was

12   familiar with the product."

13   Q    Okay.  Second question.

14   A    If you mentioned something to me, I would tell you if

15   I knew about it or not.

16   Q    Yes, ma'am.  Second question.  I believe on

17   cross-examination you said you didn't know why

18   Mr. McDonnell pulled the bottle out of his pocket.

19   A    That's correct.

20   Q    Were you aware that Mr. McDonnell had received a

21   50,000 loan from --

22           MR. BROWNLEE:  Objection, Your Honor.

23   BY MS. ABER:

24   Q    -- Mr. Williams?

25           THE COURT:  Sustained.

1           MS. ABER:  Then I have no further questions,

2    Your Honor.  Thank you.

3           THE COURT:  All right.  Thank you, ma'am.  You

4    may stand down.

5        (Witness stood aside.)

6           THE COURT:  All right.  I think we're going to

7    go ahead and stop now for lunch.  If you all could come

8    back at 2:00.  It's about a quarter of now.  Come back at

9    2:00, and we'll get started with the afternoon session.

10        (The jury left the courtroom.)

11           THE COURT:  I'm going to resolve this Skunda and

12    Bridge matter at the end of the day.  We'll probably send

13    the jury home, and then we'll take a few minutes to deal

14    with it.  And I -- we didn't get a written reply from the

15    defendants, I don't believe, but we'll --

16           MR. BURNHAM:  We just filed it.

17           THE COURT:  You just filed it?

18           MR. BURNHAM:  Yes, sir, Your Honor.  Twenty

19    minutes ago.

20           THE COURT:  Oh, okay.  Well, I haven't seen it

21    yet.  Then that will save us some time this afternoon,

22    then.  So, you know, I'll give you all a few minutes to

23    say whatever you have to say, and then I'll resolve it so

24    we'll know what we're doing tomorrow.  All right.  Thank

25    you.

1          (Luncheon recess taken from 12:42 p.m. to 2:00

2    p.m.)

3              THE COURT:  Let's bring in the jury, please.

4          (The jury entered the courtroom.)

5              All right, government?

6              MS. ABER:  The United States calls Lisa

7    Hicks-Thomas.

8                       LISA HICKS-THOMAS,

9    called as a witness by and on behalf of the government,

10   having been first duly sworn by the Clerk, was examined

11   and testified as follows:

12                       DIRECT EXAMINATION

13   BY MS. ABER:

14   Q    Good afternoon.

15   A    Good afternoon.

16   Q    Please state your name and spell it for the record.

17   A    It is Lisa Hicks-Thomas, L-I-S-A, H-I-C-K-S -

18   T-H-O-M-A-S.

19   Q    Did you previously serve in the Administration of

20   Governor Robert McDonnell?

21   A    Yes, I did.

22   Q    In what capacity?

23   A    I was the Secretary of Administration.

24   Q    Can you tell the jury briefly what a Secretary of

25   Administration does?

1   A     Sure.  The Secretary of Administration is a member of

2   the Governor's Cabinet, tasked with basically the

3   responsibility of running the back office of state

4   government.  And I had a number of agencies that reported

5   to me, including the Department of Human Resource

6   Management, the Department of General Services, the State

7   Board of Elections, the State Compensation Board, the

8   Department of Employee Dispute Resolution, the Department

9   of Minority Business Enterprise, and the State

10  Compensation Board.  I think I said that.

11  Q     Did a woman named Sara Wilson report to you?

12  A     Yes, she did.  She was the head of the Department of

13  Human Resource Management.

14  Q     And to whom did you report?

15  A     I reported to the Governor.

16  Q     So fair to say you are part of or were part of the

17  Cabinet?

18  A     Yes.

19  Q     Could the Governor fire you?

20  A     Yes.

21  Q     Just to be clear, you don't work in state government

22  anymore, right?

23  A     No.

24  Q     All right.  In your capacity as Secretary of

25  Administration, did you have a hand in administering the

1  health plan for the employees of the Commonwealth of

2  Virginia?

3  A    Yes, I did.  As I said, the workforce, state

4  employees, about 105,000 employees, were under our state

5  health plan, and that fell under the purview of the

6  Department of Human Resource Management and then

7  ultimately up to me as the Secretary.

8  Q    Who administers the health plan for Virginia state

9  employees?

10 A    The company, you mean?

11 Q    I mean --

12 A    We are self-insured.  The state is self-insured, but

13 we have a third-party administrator and that is Anthem.

14 Q    Approximately how much money during your tenure did

15 the State of Virginia spend on the healthcare plan for

16 state employees?  Ballpark?

17 A    Definitely in the millions of dollars.

18 Q    Now, did the state employee health plan authorize

19 certain drugs that could be used and not used by state

20 employees?

21 A    Yes.

22 Q    And who made the decision about what drugs would be

23 covered and which ones would not?

24 A    Well, it was a joint decision.  I mean, the

25 Department of Human Resource Management and the folks that

1   were directly assigned to look at the healthcare plan,

2   they would do research over the year as well as with our,

3   we had different advisors, different companies that worked

4   with us, like Aon, for example, and they would make

5   calculations as to what was more effective or what was,

6   you know, not being utilized or what would be, you know,

7   less expensive, for example, and so they would make

8   recommendations to Sara.  And then Sara would bring those

9   to me and we would look over the plan and then we would

10  sit down ultimately during the budget cycle when we were

11  going over the state budget, we would sit down with the

12  Governor and folks from the Department of Planning and

13  Budget and make those decisions together.

14  Q    Did you periodically have meetings with the Governor

15  about the state employee healthcare plan?

16  A    Yes.

17  Q    Did you have such a meeting back in the spring of

18  2012?

19  A    Yes.

20  Q    Who was present at the spring meeting?

21  A    I was present, Sara Wilson was present, I believe

22  Martin Kent was there, and the Governor was there.

23  Q    And where did the meeting take place?

24  A    I believe that meeting took place in the Governor's

25  office.

1    Q    In general, what was the topic of that particular

2    meeting?

3    A    We were talking about the state employee health plan.

4    Q    In very short terms, how would you describe a

5    consumer-driven health plan?

6    A    We were talking about implementing a consumer-driven

7    health plan, which just to be brief, it is really

8    empowering state employees or whoever is covered by the

9    plan to have more information about their healthcare

10   costs, and it is a way to drive down healthcare costs for

11   the Commonwealth of Virginia and ultimately for the

12   taxpayers.

13   Q    During this particular meeting, did Mr. McDonnell

14   make any reference to Anatabloc?

15   A    Yes.  At some point in the meeting, he reached in his

16   pocket and pulled out, he showed us the pills and he said

17   that he had been taking them and that they were working

18   well for him, and that he thought it would be good for

19   like state employees, and then he said that, he asked us

20   if we would meet with them, meet with the people.

21   Q    In that meeting, did you respond?

22   A    I'm sure we said, "Sure."  I can't remember.  I

23   really don't remember word for word what I said.  But that

24   was pretty much the gist of it.

25   Q    And after the meeting finished, what did you do?

1   A      After the meeting finished, Sara and I left the

2   office, and I'm not sure if she told me at that point that

3   she had already met with the folks, but we went down to my

4   office and we went and looked it up on the computer to see

5   what it was.

6            MS. ABER:  If I could have one moment, please,

7   Your Honor.

8            THE COURT:  Sure.

9        (Counsel conferring with co-counsel.)

10           MS. ABER:  Thank you, Your Honor.  I have no

11  further questions.

12           THE COURT:  Cross?

13                    CROSS-EXAMINATION

14  BY MR. BROWNLEE:

15  Q    Good afternoon, Secretary Hicks-Thomas.  My name is

16  John Brownlee, and I'm an attorney for Bob McDonnell And I

17  just have a few questions for you this afternoon.  You

18  worked for Governor McDonnell when he was Attorney

19  General; is that correct?

20  A    Yes.

21  Q    What was your duties or title when you worked in the

22  Attorney General's Office?

23  A    When I worked for him or when I first started?

24  Q    When you worked for Governor McDonnell.

25  A    Okay, when Governor McDonnell became the Attorney

1   General, I was originally the Chief of the Computer Crime

2   Unit for the Attorney General's Office.  And then in 2006

3   or 2007, he appointed me as his Deputy Attorney General

4   for the Transportation, Real Estate, Environmental and

5   Technology Division.

6   Q    Okay.  And so, then when I guess he left for a brief

7   period to run for Governor and then when he was elected

8   Governor, you joined his Cabinet; is that correct?

9   A    Right.  He appointed me as the Secretary in 2010, in

10   January.

11   Q    When he was inaugurated?

12   A    Right.

13   Q    You served in that position for four years?

14   A    Yes.

15   Q    You stayed until the end of his Administration?

16   A    I did.

17   Q    Just a couple of questions about this meeting.  I

18   think you said that Martin Kent was there?

19   A    That's correct.

20   Q    Ms. Wilson was there?

21   A    Yes.

22   Q    And yourself and Governor McDonnell.

23   A    Right.

24   Q    At some point -- and the purpose of the meeting was

25   to talk about this consumer-supported or consumer-driven

1  kind of healthcare plan.

2  A    That's right.

3  Q    This is something that had been part of the

4  Administration's drive since he started; is that correct?

5  A    It is something we had been looking at doing right

6  for the entire Administration.

7  Q    I think you testified at some point during this, he

8  pulled out an Anatabloc pill or something and said he took

9  it and thought it helped him; is that correct?

10 A    That's correct.

11 Q    Okay.  And then there was some other conversation,

12 and I think you testified that you can't remember word for

13 word, but at some point after the meeting, you and

14 Ms. Wilson had a discussion about what he actually said,

15 and whether or not he wanted you all to meet with him; is

16 that right?  Do you remember that?

17 A    I don't recall that.  I know at some point after the

18 meeting, Sara and I left and she said that she had already

19 met with the people, the Anatabloc folks.  And then we

20 walked down to my office and looked it up on the Internet.

21 Q    Okay.  You looked up the company?

22 A    Right.  We looked up Anatabloc.

23 Q    Okay.  Now, if it was after that -- was there any

24 other follow-up?

25 A    No.

1   Q    Governor McDonnell never came back to you and said

2   "Did you meet with them?  Did you take care of that?"

3   A    Never.

4   Q    Okay.  Now, Ms. Aber asked you about whether or not

5   the Governor could fire you.  I just want to be clear, he

6   didn't fire you, right?

7   A    No, he did not.

8   Q    You stayed until the very last day; is that right?

9   A    Until the very last day.

10  Q    Okay.  Fair to say that if you had the opportunity

11  you would go work for him again?

12          MS. ABER:  Objection.

13          THE COURT:  She can answer it if she wants.

14          THE WITNESS:  Well, yes.  I guess if he was the

15  Governor again, I guess I would work for him again.  Yes.

16  Although I like where I work now, I will say.

17          MR. BROWNLEE:  Thank you very much.

18          THE COURT:  Anything?

19          MR. KOFFMANN:  No questions, Your Honor.

20          THE COURT:  Anything else based on that?

21          MS. ABER:  No, Your Honor, thank you.

22          THE COURT:  You may stand down.

23      (Witness stood aside.)

24      Call your next witness, please.

25          MR. HARBACH:  Thank you, Your Honor, the

```
 1    government calls Michael Uncapher.

 2                        MICHAEL UNCAPHER,

 3    called as a witness by and on behalf of the government,

 4    having been first duly sworn by the Clerk, was examined

 5    and testified as follows:

 6                        DIRECT EXAMINATION

 7    BY MR. HARBACH:

 8    Q    Good afternoon, sir.

 9    A    How are you?

10    Q    All right, thanks.  Could you please state your full

11    name and spell your last name for the reporter?

12    A    Michael David Uncapher, U-N-C-A-P-H-E-R.

13    Q    What do you do for a living?

14    A    I own a crossfit gym and do muscle therapy.

15    Q    Tell us about your educational background.

16    A    Graduated from Ohio State University with a degree in

17    exercise science, and then have a certification in muscle

18    activation techniques.

19    Q    At one time in your life, were you married to Maureen

20    C. McDonnell?

21    A    Yes.

22    Q    How was that person related to Mr. Robert McDonnell,

23    if you know?

24    A    Maureen is Bob's sister.

25    Q    Are you still married to her?
```

1    A    No.

2    Q    During what time frame were you married to your

3    former wife?

4    A    2006, June, 2006 to the divorce was just final this

5    year, 2014.

6    Q    Okay.  You said the divorce was finalized in 2014?

7    A    Right.

8    Q    Was there a time prior to the divorce during which

9    you were separated from your ex-wife?

10   A    Separated starting October of 2012.

11   Q    Are you familiar with a business entity called MoBo

12   Realty LLC?

13   A    Yes.

14   Q    What is that?

15   A    It was a partnership between Bob and Maureen that

16   managed the rental properties that they had.

17   Q    And you are talking about Maureen, your ex-wife, his

18   sister?

19   A    Yes.

20   Q    The rental properties that the company managed were

21   located where?

22   A    Sandbridge, in Virginia Beach.

23   Q    How many properties were there that the company

24   managed in Virginia Beach?

25   A    Two.

1    Q    Do you recall whether those properties had names?

2    A    Yes.  East Coast Palace and Sunseeker.

3    Q    Do you recall approximately when the first of those

4    two homes was purchased by the partnership?

5    A    Sunseeker was 2005, and East Coast Palace was 2006, I

6    think.

7    Q    Are those two houses physically close to one another

8    in Virginia Beach?

9    A    Across the street from each other.

10   Q    You mentioned that the company was formed by

11   Mr. McDonnell and his sister.  Do you know what the

12   division of ownership was between them in terms of

13   proportion?

14   A    50/50.

15   Q    I take it then that you yourself were not an owner?

16   A    No.

17   Q    Did you perform any services on behalf of MoBo?

18   A    I did, kept track of bookkeeping, kept track of the

19   statements that the realty company or the management

20   company for the two properties sent, and paid bills.

21   Q    During what time period did you perform those

22   services?

23   A    2005 until our separation in 2012.

24   Q    Which you said was in October of 2012; is that right?

25   A    Yes.

1   Q     Is 2005 when this business entity was first created?

2   A     Yes.

3   Q     So you started performing these services from the

4   get-go until your separation from your ex-wife?

5   A     Right.

6   Q     Were you paid for the duties that you performed?

7   A     At the beginning, I was.  I don't know exactly when I

8   stopped being paid, but --

9   Q     Are you a CPA, sir?

10  A     No.

11  Q     Did you do any formal accounting work for MoBo?

12  A     No.

13  Q     Did you prepare the taxes for MoBo?

14  A     No.

15  Q     Did you work with any accounting or tax professionals

16  to accomplish those tasks?

17  A     Yes.

18  Q     Who do you recall working with?

19  A     Dan Cook and Brenda Chamberlain.

20  Q     Who is Mr. Cook?

21  A     He is the accountant that we used.

22  Q     What about Ms. Chamberlain?

23  A     She was the bookkeeper.

24  Q     How frequently would you interact with them to help

25  them do their jobs?

1    A    Dan Cook, at tax time, to give him all the

2    information, make sure he had all the information or

3    answer any questions that he had.  And then Brenda, a few

4    times throughout the year I would send her just the bills

5    and numbers or statements that we got from Sandbridge

6    Realty.

7    Q    For her work as the bookkeeper?

8    A    Right.

9    Q    From time to time, would Ms. Chamberlain or Mr. Cook

10   provide you with copies of work product they did, whether

11   it was tax returns in the case of Mr. Cook, or copies of

12   QuickBooks and the like in the case of Ms. Chamberlain?

13   A    She usually sent them directly to Dan Cook, and then

14   he would give us the tax return at the end of the year.

15   Q    Who is "us"?

16   A    Maureen and I.

17   Q    Just so we are clear in the record, your wife at the

18   time?

19   A    Right.

20   Q    Let's go back to 2005 or thereabouts when Sunseeker,

21   the first of the two, was purchased.  In retrospect, where

22   was the market then, if you recall generally?

23   A    At the height.

24   Q    And have real estate values fallen since Sunseeker

25   and later East Coast Palace was purchased?

1    A     Yes.

2    Q     In fact, did the real estate values begin to fall

3    shortly after those homes were purchased?

4    A     Yes.

5    Q     What is your recollection of how the properties did

6    in terms of rental income versus expenses year to year?

7    On that metric, did they make money, to your recollection,

8    or did they lose money?

9    A     Lost money.

10   Q     And again, on an annual basis in terms of cash flow,

11   say during the last five years you were working there,

12   2008 to, I guess, 2012, do you have any recollection of

13   the approximate amount of money that the properties lost

14   in terms of cash flow each year?

15   A     Between the two of them?

16   Q     Yes, sir.

17   A     50 to $60,000.

18   Q     Now, to be fair, was your understanding that a

19   business purpose for MoBo was to make a bunch of money on

20   these homes?

21   A     It was always to -- for long term investment.  It was

22   for long term investment and enjoyment.  We knew out of

23   the gate that they weren't going to make money.

24   Q     Okay.  And in fact, they didn't.

25   A     Right.

1   Q    Now, did there come a time, let's say approximately

2   2009, when there were some discussions about trying to

3   sell the homes?

4   A    Yes.

5   Q    Could we put the first exhibit for identification up

6   on the screen, which is Government's 48.  Mr. Uncapher,

7   take a look at that screen there, and we will blow up the

8   top and scroll down to the bottom form, please, so he can

9   identify the document.  Can you see this okay, sir?

10  A    Yes.

11  Q    Go back to the top, please.  My question for you,

12  sir, is whether this is an e-mail exchange in the 2009

13  time frame concerning putting the homes on the market.

14  A    Yes.

15       MR. HARBACH:  The government offers Government's

16  48.

17       THE COURT:  It will be admitted.

18  BY MR. HARBACH:

19  Q    Let's start at the bottom, please, with at least the

20  beginning of the e-mail from someone named Tom Bucker.

21  Who is that?

22  A    Real estate agent at Sandbridge Realty.

23  Q    The e-mail that Mr. Bucker has addressed his e-mail

24  to, mcdonnell71@cox.net, do you know whose

25  retail -- e-mail address that was?

1    A    My wife, Maureen.

2    Q    Your wife, Maureen.

3    A    Yes.

4    Q    Let's scroll up, please, to the next e-mail.  It

5    says, the signature block on this one is from Maureen

6    McDonnell Uncapher.  That's your then wife, right?

7    A    Right.

8    Q    And do you recall what her reference to the Seibert

9    folks means?

10   A    Seibert was just the competing real estate company.

11   Q    Okay.  Then if we could scroll up to the top, the

12   e-mail from Mr. McDonnell, and what's the date of the

13   e-mail that Mr. McDonnell sends to his sister?

14   A    April 24th, 2009.

15   Q    If we could take that one down.  The next one is

16   Government's 49 for identification.  Same drill.  If you

17   could blow it up for him a little bit.  Take a look at

18   that, sir, then I'll scroll down for you.  Go ahead,

19   Mr. Starnes.  Thank you.

20            MR. HARBACH And with the Court's indulgence, we

21   will show him Page 2 just so he can identify it, please.

22   BY MR. HARBACH:

23   Q    Mr. Uncapher, do you recognize this as an e-mail

24   exchange in August of 2009, again, about the attempts to

25   sell the homes?

```
1    A    Yes.
2              MR. HARBACH:  The government offers Government
3    Exhibit 49.
4              THE COURT:  It will be admitted.
5    BY MR. HARBACH:
6    Q    I'd like to start at Page 2, the very first e-mail on
7    the chain, at the bottom.  Could you just blow that one up
8    for us.  This is an e-mail from your then wife to
9    Mr. McDonnell and you; is that right?
10   A    Yes.
11   Q    Okay.  And she is talking about dropping the price on
12   Sunseeker to 1.399k from a higher price.  Is it your
13   recollection that the Sunseeker property was actually on
14   the market at this time in August of 2009?
15   A    I believe so.
16   Q    All right.  Then a little bit later in the paragraph
17   there is a sentence that begins "For ECP."  Is that East
18   Coast Palace, the other house?
19   A    Yes.
20   Q    And in this one, your then wife is reporting that she
21   recommended listing at 900,000.  Does that mean that folks
22   were contemplating putting ECP on the market at that time
23   or do you remember whether it was in fact already on the
24   market?
25   A    I don't remember.
```

1   Q    Then finally, in that e-mail, she says, "We will

2   either need to take a hit on the sales price or come up

3   with 60k in a few months to make it through another off

4   season."

5        What was significant about the off season to your

6   recollection?

7   A    Less rental.

8   Q    Say again?

9   A    Less rental income.

10  Q    Did that make it more difficult to get through?

11  A    Yes.

12  Q    Financially speaking?

13  A    Well, it was definitely not even throughout the year

14  as far as income.

15  Q    Then if we could just go back to Page 1 just to see

16  how this turns out.  The second e-mail from the top is the

17  one I care about, please, Mr. Starnes.  Now, the second

18  one on the screen from your then wife, Mr. McDonnell's

19  sister, she mentions somebody called Gail, and says she is

20  going to go ahead and lower the price.  Was Gail a real

21  estate agent, I take it?

22  A    Yes.

23  Q    That's it for 49.  Next document is Government's 51

24  for identification.  Again, scroll down so he can see the

25  whole thing to identify it, please.  Mr. Uncapher, do you

```
 1    recognize this to be an e-mail exchange involving, among

 2    other people, you, your then wife, and Mr. McDonnell

 3    involving sale of the house?

 4    A    Yes.

 5              MR. HARBACH:  The government offers Government's

 6    51.

 7              THE COURT:  It will be admitted.

 8    BY MR. HARBACH:

 9    Q    On this one, the first e-mail chronologically is from

10    you, and what's the date on there?

11    A    December 4th, 2009.

12    Q    It is sent to Mr. and Ms. McDonnell and in addition,

13    your then wife; is that right?

14    A    Yes.

15    Q    You say, "Any luck finding a magical partner?"  What

16    does that mean?

17    A    We were looking for, or had talked about finding

18    somebody that was interested in either buying or becoming

19    an investor in the properties.

20    Q    When you say "we," we are talking about that, who do

21    you mean, sir?

22    A    Bob, Maureen, Maureen, and myself.

23    Q    Bob, meaning Mr. McDonnell?

24    A    Right.

25    Q    Both Maureens?
```

1    A      Yes.

2    Q      And you.

3    A      And myself.

4    Q      The next e-mail, that's from the Governor's sister,

5    right, your then wife?

6    A      Right.

7    Q      And could you read just the first couple of sentences

8    that she writes there, please, beginning with "In other

9    words..."?

10   A      "In other words, we are in trouble and need to act

11   now.  We can look into a short sale, but we need to come

12   up with a buyer first.  I understand short sales will not

13   hurt our credit, unlike bankruptcy."

14   Q      That's enough, sir.  Thank you.  First question is,

15   what is your recollection of why you were in trouble?

16   A      Just there was a shortfall every year.  That's what I

17   believe she is talking about.

18   Q      Financially speaking?

19   A      Just the shortfall for income versus revenue of the

20   properties.

21   Q      Okay.  She then states, "We can look into a short

22   sale but we need to come up with a buyer first."  Do you

23   know what a short sale is?

24   A      Vaguely.

25   Q      Tell us your best understanding then.

1    A    That the property is sold for less than it's worth,

2    or less than is owed on it.

3    Q    Okay.  Then the next sentence is:  "I understand

4    short sales will not hurt our credit, unlike bankruptcy."

5    Do you have a recollection of bankruptcy being discussed

6    among this group of people at the time as a possibility?

7    A    No.

8    Q    The very end of her e-mail, she states:  "From what

9    Mike indicated last month, we need money now to make

10   December payments."  What did you understand that to mean?

11   What are the December payments that needed to be made?

12   A    Mortgage, mortgages of the properties.

13   Q    Then if we could scroll up to the top, Mr. McDonnell

14   responds and says, "We are working on a couple of ideas."

15   Please, could you just note for us the date of his e-mail?

16   A    December 4th, 2009.

17   Q    Was that after he had won the election to become

18   Governor?

19   A    Yes.

20   Q    But before he was inaugurated?

21   A    Right.

22   Q    That's it for 51.  Did the houses sell in 2009?

23   A    No.

24   Q    You have testified a couple times in reference to

25   these e-mails about a cash shortfall that you all

```
1   encountered from year to year, I think you said; is that

2   right?

3   A    Yes.

4   Q    Generally speaking, how did the -- how did the

5   business deal with that cash shortfall each year?  In

6   other words, what sorts of arrangements would be made to

7   overcome those issues?

8   A    Maureen and Bob put money into the -- personal money

9   into the account.  We had a line of credit that we used

10  for expenses.  And then we got a couple of loans from

11  other people.

12  Q    All right.  So when you say, "Bob and Maureen could

13  invest further themselves in the business," you are

14  talking about the business owners, Mr. McDonnell and his

15  sister.

16  A    Yes.

17  Q    Now, the loans that you mentioned a moment ago, do

18  you recall someone named Dr. Davis?

19  A    Yes.

20  Q    Was he among the people that a loan was obtained from

21  to deal with these cash shortfalls?

22  A    Yes.

23  Q    Who is Dr. Davis?

24  A    He was a friend of Bob and Maureen's.

25  Q    Do you recall what sort of doctor he was?
```

1    A    Radiologist.

2    Q    Did you ever meet him?

3    A    I did.

4    Q    Tell us about that.

5    A    I first met him at a Christmas party.

6    Q    Do you recall when that was?

7    A    It was Scott Rigell's Christmas party, I think, in

8    December of 2010.

9    Q    And how did you learn that Dr. Davis was going to

10   provide a loan?  If you recall?

11   A    I don't remember.

12   Q    Okay.  Did you ever have any conversation with

13   Mr. McDonnell about that possibility, to your

14   recollection?

15   A    I don't remember a specific conversation.  But, I

16   mean, I was told either by him or Maureen --

17   Q    Which Maureen, sir?

18   A    My wife at the time.

19   Q    That?

20   A    That we were going to go to Dr. Davis' house to talk

21   to him.

22   Q    And did you in fact do that?

23   A    Yes.

24   Q    Do you recall when it was that you went to meet with

25   Dr. Davis?

1    A    I don't know the exact month.

2    Q    Okay.  We will get to a document that can help you

3    with the date in a moment.  Let me ask you this before we

4    get there.  Who went over there besides yourself?

5    A    My wife, Maureen.

6    Q    The two of you?

7    A    Yes.

8    Q    What happened when you got there?

9    A    We talked with him and had lunch, and it was more

10   social for most of it, and most of the time.  I think we

11   were there for about an hour.

12   Q    What else happened besides lunch?

13   A    And then talked about the loan, him giving us money

14   for a loan.

15   Q    Did he in fact do that at that meeting?

16   A    Part of it, I think.

17   Q    Now, how long would you say it was after you met Dr.

18   Davis at the Christmas party that you went to his house?

19   A    A few months.

20   Q    Could we take a look for identification at

21   Government's 55, please?  Take a look at that,

22   Mr. Uncapher.  Do you recognize these documents?

23   A    Yes.

24   Q    Is this a check and deposit slip related to monies

25   that Dr. Davis provided at that meeting at his place?

```
1    A    It looks like it.
2              MR. HARBACH:  The government offers Government's
3    55.
4              THE COURT:  It will be admitted.
5    BY MR. HARBACH:
6    Q    Let's start at the bottom with the check, please.
7    Could we blow that up?  What's the date on this check,
8    sir?
9    A    December 19th.
10   Q    What year?
11   A    2009.
12   Q    You said a moment ago that you thought the Christmas
13   party may have been in 2010.  Does this change your view
14   of that?
15   A    Yes.
16   Q    What year do you think the Christmas party was?
17   A    2009.
18   Q    Okay.  And did Dr. Davis provide this check to you
19   and your sister at his home that day?
20   A    I believe so.
21   Q    All right.  Now, let's scroll up to the top, please,
22   and see the very first document.  This appears to be a
23   deposit slip to a bank called TowneBank, and the name up
24   there, it says MoBo Real Estate Partners.  Is that your
25   handwriting, by chance?
```

1   A    Yes.

2   Q    And then on the right-hand side of the slip, it

3   indicates $100 is in the cash block, and $9,900 for a

4   check.  Is this the deposit slip for monies you received

5   from Dr. Davis, sir?

6   A    Yes.

7   Q    Now, did he give you a check for $9,900 and $100

8   cash?

9   A    I don't remember.

10  Q    Do you remember where the $100 cash came from?

11  A    No.

12  Q    In any event, all $10,000 was deposited to MoBo's

13  account on the same day; is that right?

14  A    Right.

15  Q    And just so we can show the jury, the last part of

16  this document, scroll down a little bit, that's the teller

17  receipt for $100 cash, right?

18  A    Right.

19  Q    Let's take down Government's 55, please.  A moment

20  ago you said that at the meeting at his house, Dr. Davis

21  advanced part of the monies that he ultimately loaned

22  MoBo.  Did there come a time after that where he provided

23  additional funds, additional loan proceeds?

24  A    Yes.

25  Q    Let's take a look at Government's 59, please.  Blow

1    this up for the witness.  Do you recognize this to be a

2    later check that Dr. Davis provided for MoBo?

3    A    Yes.

4    Q    And the associated deposit slip.

5    A    Yes.

6          MR. HARBACH:  Your Honor, the government offers

7    Government's 59.

8          THE COURT:  It will be admitted.

9    BY MR. HARBACH:

10   Q    Now, the check at the bottom of the screen here, this

11   one is dated February 6th of 2010.  And it looks as if it

12   was deposited on the 8th.  Do you recall the circumstances

13   of how you all received this check?

14   A    I don't remember.

15   Q    You don't remember?  So now we are up to in the

16   neighborhood of $30,000, correct?

17   A    Right.

18   Q    Was this the end of the line or were there additional

19   funds after this to your recollection?

20   A    There was a total of 50.

21   Q    A total of $50,000?

22   A    Right.

23   Q    Now, let's take a look then, actually, you can take

24   59 down.  Let's take a look at Government's 61, please.

25   Do you recognize this document, sir, to be an additional

| | |
|---|---|
| 1 | check that Mr. Davis -- Dr. Davis provided to MoBo? |
| 2 | A    Yes. |
| 3 | Q    And the associated deposit slip? |
| 4 | A    Yes. |
| 5 | MR. HARBACH:  The government offers Government's |
| 6 | 61. |
| 7 | THE COURT:  It will be admitted. |
| 8 | MR. HARBACH:  Can I have just a second, please? |
| 9 | THE COURT:  Yes. |
| 10 | (Counsel conferring with co-counsel.) |
| 11 | BY MR. HARBACH: |
| 12 | Q    Now, the date on this check, sir, is March 15th of |
| 13 | 2010.  It appears that it was deposited five days later on |
| 14 | the 15th.  Do you have a recollection of how you all |
| 15 | obtained this check from Dr. Davis? |
| 16 | A    I believe we went to -- I went to his house, but I |
| 17 | don't exactly recall. |
| 18 | Q    And the handwriting on this deposit slip at the top, |
| 19 | is that you again? |
| 20 | A    Yes. |
| 21 | Q    Before we go on, because I forgot to ask you this, |
| 22 | could we take a look at Government's 59, which is in |
| 23 | evidence, just for a second?  Blow up that top deposit |
| 24 | slip for the witness, please.  Thank you, Mr. Starnes.  Do |
| 25 | you recognize the handwriting on this deposit slip, sir? |

```
1    A    No.
2    Q    You can take that down.  So to this point, we have
3    two checks for $20,000, correct?
4    A    Yes.
5    Q    And then one check for $9,900, correct?
6    A    Yes.
7    Q    So that's a total of $49,900; am I right about that?
8    A    Yes.
9    Q    You said a moment ago that the total amount that was
10   loaned by Dr. Davis was $50,000.  Do you recall that?
11   A    Yes.
12   Q    Does that help you remember whether that additional
13   hundred dollars in cash was part of the Dr. Davis loan?
14   A    I assume it is.
15   Q    Okay.  Let's take a look -- actually, before we look
16   at the next exhibit, I think you said that the March 15th
17   of 2010 check that we just looked at, that was
18   Government's 61, did you say that you think you got that
19   at Dr. Davis' house again?
20   A    I think so.
21   Q    Who was there that day, if you remember?
22   A    I don't remember.
23   Q    Do you remember anything else that happened that day
24   besides picking up the check?
25   A    No.
```

1   Q    At any time, was there a promissory note signed as to

2   any portion of these loan proceeds?

3   A    We did sign a promissory note.

4   Q    Let's take a look at Government's 60, please.   Is

5   this the promissory note you just mentioned?

6   A    Yes.

7           MR. HARBACH:   The government offers Government's

8   60.

9           THE COURT:   It will be admitted.

10  BY MR. HARBACH:

11  Q    What's the date on this promissory note, sir?

12  A    March 15th, 2010.

13  Q    That's the same day that was on the check that was on

14  Government's 61 we looked at a minute ago, right?

15  A    Right.

16  Q    Do you recall whether this promissory note, was that

17  also signed at Dr. Davis' home or done later in the day or

18  what's your memory of that?

19  A    It was signed by Maureen and I on that day.

20  Q    Okay.  Do you know when your brother-in-law, your

21  ex-brother-in-law, Mr. McDonnell, signed it?

22  A    No.

23  Q    That is your signature that appears at the bottom?

24  A    Yes.

25  Q    Do you recall yourself, do you recall having any

1   discussions with Dr. Davis about the promissory note or

2   the necessity for it?

3   A     No.

4   Q     What was, according to the promissory note, if we

5   could blow up the text of the note, please, without the

6   signature blocks.  Thank you, Mr. Starnes.  The principal

7   sum is how much money?

8   A     $50,000.

9   Q     What's the interest rate on this loan?

10  A     Seven percent.

11  Q     The repayment term?  How many years?

12  A     Five years.

13  Q     Thank you, sir.  It indicates a monthly payment of

14  how much, sir?

15  A     $1,001.90.

16  Q     Say that again.

17  A     $1,001.90.

18  Q     Thank you, sir.  Could we take a look for

19  identification now at Government's 622.  Do you recognize

20  this, sir?

21  A     Yes.

22  Q     This is an amortization schedule for the Dr. Davis

23  loan.

24  A     Right.

25  Q     Did you prepare this thing?

1    A     Yes.

2              MR. HARBACH:   The government offers Government's

3    622.

4              THE COURT:   It will be admitted.

5    BY MR. HARBACH:

6    Q     Blow up the top of the form so we can explain this to

7    the jury.   What's this document, sir?   What's its purpose?

8    A     To see how each payment is broken down and what the

9    balance is at the end of each month.

10   Q     Okay.   And so the interest and principal together

11   should be that $1,001.90 that was reflected in the

12   promissory note?

13   A     Right.

14   Q     Thank you.   You can take down 622.   That's it for the

15   Dr. Davis loan.

16         Do you recall whether there was another person who

17   provided -- withdrawn.   Do you recall whether

18   Mr. McDonnell's father ever provided a loan to the

19   business?

20   A     Yes.

21   Q     What do you know about that?

22   A     I don't even remember how much it was, but Maureen

23   and Bob talked with their sister because she was in charge

24   of their dad's money.

25   Q     When you say Maureen and Bob, you mean --

```
1   A     My wife.

2   Q     Your wife, and then yet another sister that they

3   talked to?

4   A     Right.

5   Q     Do you recall her name?

6   A     Eileen.

7   Q     Okay.  And I heard you say you don't remember much

8   about it.  Do you remember even approximately how much it

9   was, sir?

10  A     No.

11  Q     Were you interviewed by the FBI approximately a year

12  ago about this?

13  A     Yes.

14  Q     And did you answer their questions?

15  A     Yes.

16          MR. SMALL:  I have a running objection to the

17  prior loans from the father just as to relevance.  I will

18  stipulate that they were loans.

19          THE COURT:  Overruled.

20          MR. HARBACH:  Can I tender the report to the

21  witness, Judge?

22          THE COURT:  Go ahead.

23      (Document proffered to witness.)

24  BY MR. HARBACH:

25  Q   Mr. Uncapher --
```

1    MR. HARBACH:  Just for the record, I've tendered

2    to the witness a copy of the Report of Interview from his

3    meeting with the FBI that he just talked about.

4    BY MR. HARBACH:

5    Q    If I could direct your attention, sir, to Page 3, the

6    second paragraph.  It begins with the word "Regarding."

7    Do you see that there?

8    A    Yes.

9    Q    Just read that paragraph to yourself, let me know

10   when you are done, and then I'll ask you a question.

11   (Witness perusing document.)

12   A    Okay.

13   Q    My question to you is whether that refreshes your

14   recollection at all about the approximate amount of the

15   loan that was obtained from Mr. McDonnell's father.

16   A    Yes.

17   Q    And what was that approximately, to your

18   recollection?

19   A    Over a hundred thousand dollars.

20   Q    Thank you, sir.  You can put that down.  Now, the Dr.

21   Davis promissory note that we saw a little while ago was

22   signed in March of 2010.  I'm going to ask you to fast

23   forward with me to early 2011.  Okay, so nearly a year

24   later.  Do you recall an effort to refinance various bank

25   loans for the rental properties in early 2011?

1   A    I remember trying to refinance.  I don't exactly

2   remember dates.

3   Q    Okay.  Let's take a look for identification at

4   Government's 84, please.  Just blow the content up for the

5   witness.  Take a look at this for a minute and then I'll

6   ask a question.  Can you see that okay?

7   A    Yes.

8   Q    Do you recognize this to be an e-mail exchange about

9   refinancing the loans on the rental properties?

10  A    Yes.

11           MR. HARBACH:  The government offers Government's

12  84.

13           THE COURT:  It will be admitted.

14  BY MR. HARBACH:

15  Q    Let's start with the e-mail at the bottom.

16  Mr. Starnes, if you could go out and zoom back in a little

17  bit because that's small text.  It would be useful.  Thank

18  you.  This first e-mail is dated January 5th of 2011.  It

19  is from Mr. McDonnell.  And it begins with "Ted and I had

20  a good meeting."  Do you recall who Ted is, sir?

21  A    Ted Yoder.

22  Q    Who is that?

23  A    He was with Monarch Mortgage.

24  Q    He worked for a mortgage company?

25  A    Right.

1    Q    Next sentence says:  "He has a plan to refinance all

2    five loans as interest only at five percent," and so on.

3         When Mr. McDonnell says "all five loans," do you have

4    a recollection about what that refers to?

5    A    I believe three loans for Sunseeker, one loan for

6    ECP, and one loan for a house in Wintergreen.

7    Q    Okay.  Which we will talk about in just a second.  A

8    little bit further down in that paragraph, there is a

9    sentence that says:  "This gets us halfway to savings we

10   need."  My question for you is, do you have a recollection

11   of what you understood Mr. McDonnell to mean by that, what

12   the savings was that you all needed?

13   A    I would be guessing at what his --

14   Q    I don't want you to guess.  My question is, do you

15   remember whether you had any conversations with him on

16   that issue around that time or have any recollection of

17   what you understood him to be talking about?

18   A    Just getting a better rate for the loans.

19   Q    Okay.  Let's scroll up a little bit.  This is your

20   response to Mr. McDonnell's e-mail on January 5th, same

21   day.  And you say here:  "We need to talk about BRH."

22   What's that?

23   A    Blue Ridge Heaven.

24   Q    Could you explain to the jury what Blue Ridge Heaven

25   is, please?

1    A     That's a house in Wintergreen.

2    Q     This is the same home you mentioned a moment ago?

3    A     Right.

4    Q     Do you recall who owned that vacation home?

5    A     Bob and his wife and Maureen, my wife, and their

6    sister, Eileen, bought in later.

7    Q     So in addition to Mr. McDonnell and his wife,

8    Mr. McDonnell's sister, Maureen, and you, were you an

9    owner as well or no?

10   A     I was on the deed but not on the mortgage.

11   Q     Okay.  Then a new party, an additional sister of

12   Ms. McDonnell, Eileen and her husband; have I got that

13   right?

14   A     Right.

15   Q     Okay.  So last question at the top of this e-mail,

16   there is a reference to Wintergreen.  That's the same

17   house as BRH, right?

18   A     Right.

19   Q     So the partnership that you described just now with

20   respect to Wintergreen, was that just a single property?

21   A     Yes.

22   Q     Were you involved yourself at all in handling the

23   finances for Blue Ridge Heaven?

24   A     In the same capacity as I did for the beach

25   properties.

1    Q    For MoBo.

2    A    Right.

3    Q    Okay.  You can take that down.  Next document I'd

4    like to show you is Government Exhibit 90 for

5    identification, please.  Scroll down for him so he can see

6    the rest.  Thank you, Mr. Starnes.  Do you recognize this

7    to be an e-mail exchange among you, your then wife, and

8    Mr. McDonnell about loan payments related to MoBo?

9    A    Yes.

10            MR. HARBACH:  The government offers Government's

11   90.

12            THE COURT:  It will be admitted.

13   BY MR. HARBACH:

14   Q    And we can start at the bottom.  This e-mail bleeds

15   on to the next page, but let's start here.  What date did

16   you send this e-mail, sir?

17   A    March 9th, 2011.

18   Q    You say, "Here is the breakdown for what is owed for

19   February and March."  What's NFCU?

20   A    Navy Federal Credit Union.

21   Q    TB 1?

22   A    TowneBank.

23   Q    TB 2?

24   A    TowneBank as well.

25   Q    And then Bank at Lantec.  Is that just another loan?

1    A    Right.

2    Q    At least on this page, that's four different loans?

3    A    Right.

4    Q    Okay.  And then let's look at the next page.  You

5    tally up those payments for February and March there.  And

6    then it says Bob and Mo.  Who is the Mo there?

7    A    My wife.

8    Q    That's split in half because they were 50/50

9    partners?

10   A    Right.

11   Q    Now, you say, "Regular payments for mortgages only

12   are," and then the four different mortgages listed there.

13   Have I got that right?

14   A    Yes.

15   Q    So that total that's listed there, $11,557.23 on the

16   second page of Government's 90, what does that represent?

17   A    The total for the mortgages of the two beach

18   properties.

19   Q    That's a monthly payment?

20   A    Right.

21   Q    And that's what you say in the next sentence.  Now,

22   you also say, "I sent an e-mail to TB..." is that

23   TowneBank?

24   A    Yes.

25   Q    "...this morning letting them know I would be getting

1   both loans up-to-date by this Friday."  Were you a little

2   behind on those payments at this stage?

3   A    Yes.

4   Q    Now, finally, if we could go back to Page 1 of

5   Government's 90, down here, same e-mail, your opening

6   sentence, you say, "Here is the breakdown for what is owed

7   for February and March."  Why were you doing this?  Why

8   did you prepare and send this e-mail to Mr. McDonnell and

9   your wife?

10  A    So that they could put money into the bank to pay the

11  mortgages.

12  Q    Take down Government's 90.  Next document is

13  Government's 91, please.  We are still in March of 2011,

14  but take a look at this one for identification, please.

15  Do you recognize this to be an e-mail exchange that you

16  and others were on concerning the attempt to refinance the

17  loans on the homes?

18  A    Yes.

19  Q    Or some of the loans.

20       MR. HARBACH:  The government offers Government's

21  91.

22       THE COURT:  It will be admitted.

23  BY MR. HARBACH:

24  Q    Let's start at the bottom, please.  We will just

25  scroll up.  You can see what Mr. McDonnell says, it is an

1   e-mail to Mr. Yoder on March 21st, Mr. Yoder's response.

2   And the date of this e-mail is March 24th of 2011.  My

3   question for you, sir, is Mr. Yoder refers in his second

4   sentence there, "I recommend that you let Bruce and I work

5   on a private solution for you."  What did you understand

6   that to mean?

7   A    I didn't know.

8   Q    Do you recall having any discussions with

9   Mr. McDonnell about a private solution or a private

10  proposal, as he refers to it in the next e-mail?

11  A    He directed me to talk to or call Bruce Thompson.

12  Q    Who is that?

13  A    A developer in Virginia Beach.

14  Q    For what purpose?

15  A    Just to get his advice.

16  Q    On?

17  A    On I didn't know what at the time.

18  Q    Did you have a conversation with Bruce?

19  A    I did.

20  Q    Did it concern an alternative financing proposal?

21  A    It wasn't about financing, it was more marketing.

22  Q    Okay.  Were you involved in any way with discussions

23  with Mr. Yoder about the refinance issue?

24  A    No.

25  Q    Okay.  If we could look at the e-mail at the top of

1   the screen right now, which is the one from Mr. McDonnell.

2   A little bit later on, he refers to someone named Will,

3   says, "Will is helping with 2.75 percent on both loans for

4   a year."  Do you recall who Will is?

5   A    Will Sessoms, President of TowneBank.

6   Q    Okay.  And then finally, the e-mail at the top, this

7   is from your ex-wife, correct?

8   A    Yes.

9   Q    Could you read to us what she says there?

10  A    "What an unfortunate waste of time.  Thanks for all

11  you are doing, Bob.  Mike--can you get on the phone with

12  John Bishard tomorrow.  I can participate a few times

13  during the day if desired."

14  Q    Who is John Bishard?

15  A    He is a developer in Virginia Beach.

16  Q    Is that you, are you the Mike she is directing to get

17  in touch with him?

18  A    Yes.

19  Q    What was that all about?

20  A    I don't know.  I never talked to him.

21  Q    Finally there is an e-mail at the top that says

22  mmem1@mac.com.  Is that your e-mail address, sir?

23  A    Yes.

24  Q    That's it for 91.  Did you ever meet Mr. Jonnie

25  Williams?

1   A     No.

2   Q     Did you ever speak to him?

3   A     Yes.

4   Q     Tell us what you recall about that, the first time

5   you spoke to Mr. Williams.

6   A     I talked first with Maureen, Bob's wife, and I don't

7   recall if she called me or I called her, and there was

8   phone calls back and forth to try to get in touch, so I

9   talked to her first and Jonnie was with her at the time.

10  Q     Okay.

11  A     And she passed the phone to him to talk to me.

12  Q     And do you recall what your conversation with

13  Ms. McDonnell was during that call?

14  A     She said that Jonnie was there to talk about either

15  buying or investing in the properties, the beach

16  properties.

17  Q     Did you, tell us what you recall about your

18  conversation with Mr. Williams after she put him on the

19  phone.

20  A     I told him what we owed on each property and what the

21  approximate revenue and expenses or shortfall was for the

22  property.

23  Q     Okay.  Do you recall approximately when this

24  telephone call took place, sir?

25  A     I don't.  I don't remember.

1  Q    Take a look at that document that's in front of you.

2  I'm going to direct your attention to Page 3, please.

3  There is a paragraph in the middle of the page that

4  begins, "Regarding the loans..."  Do you see that, sir?

5  A    Yes.

6  Q    Just take a minute, read that paragraph to yourself

7  and let me know when you are done.

8       (Witness perusing document.)

9  A    Okay.

10 Q    Does that refresh your recollection about when this

11 first time you talked to Mr. Williams was, approximately?

12 A    In 2011.

13 Q    Approximately when in 2011, sir?

14 A    Summer.

15 Q    Thank you.  Now you can put that down.  Focusing on

16 this conversation that happened sometime in the summer of

17 2011, do you recall whether Mr. Williams asked you any

18 questions during that call?

19 A    Just about the information that I gave him.

20 Q    And did a similar incident to the one you have just

21 described occur again several months later?

22 A    Yes.

23 Q    Tell us what you remember about that.

24 A    It was basically the exact same conversation.  I had

25 talked to Maureen first, and she passed the phone to

```
 1   Jonnie Williams, and I explained the financial situation
 2   of the two properties.
 3   Q    And do you recall anything about your conversation
 4   with Ms. McDonnell before she passed the phone to
 5   Mr. Williams?
 6   A    Same thing.  She said that he was basically following
 7   up from the previous conversation, and just wanted an
 8   updated version.
 9   Q    And based on your conversations on the two occasions
10   with Ms. McDonnell, what did you understand from her to be
11   Mr. Williams' interest?
12   A    Either buying or investing.
13   Q    Okay.  Now, same question as before:  Do you recall
14   approximately when this second phone conversation was?
15   A    Early, 2012.
16   Q    And do you recall, other than asking the questions
17   that prompted you to provide the same information as
18   before, do you recall any other comments or questions by
19   Mr. Williams during that call, sir?
20   A    No.
21   Q    How long would you say you talked to him on each of
22   these occasions?
23   A    10 or 15 minutes.
24   Q    Between the two or each?
25   A    Between the two.  I'm sorry, each phone call, is that
```

1   what you are asking?

2   Q    Yes, sir.

3   A    The same for each phone call.

4   Q    Let's take a look for identification at Government's

5   295, please.  Just scroll down for him so he can see the

6   e-mail at the bottom.  Sir, do you recognize this to be an

7   e-mail that you sent to Mr. and Ms. McDonnell and some

8   additional e-mail traffic between them?

9   A    Yes.

10              MR. HARBACH:  The government offers Government's

11   295.

12              THE COURT:  It will be admitted.

13   BY MR. HARBACH:

14   Q    Let's start at the bottom, please, which is what's on

15   the screen right now.  Your first paragraph there, you

16   say, "I just wanted to follow up from our meeting."  Do

17   you recall what that meeting was about?

18   A    Not specifically.  No, I don't.

19   Q    Okay.  The date of this e-mail that you are sending

20   is January 25th of 2012; is that right?

21   A    Right.

22   Q    The next paragraph says:  "Could you please send a

23   check for $1,000 for your portion of past pay-in for BRH?"

24   That's the property in Wintergreen?

25   A    Right.

```
 1   Q    It says Mo and Boo have both put money in and so
 2   forth.  Is Mo your ex-wife?
 3   A    Yes.
 4   Q    Who is Boo?
 5   A    Eileen, their sister.
 6   Q    The other sister.
 7   A    Right.
 8   Q    Okay.  Then a little bit down, further down there,
 9   the last line on the screen says:  "For MoBo, I talked
10   with your Mo..."  Who is that?
11   A    Maureen, his wife.
12   Q    "...last week and she had me talk to the guy who is
13   helping us."  Who were you referring to when you said "the
14   guy who was helping us"?
15   A    Jonnie Williams.
16   Q    It then says, "He said he was going to call me the
17   next day to get an address so he could send the first
18   check."  Who is the "he" in that sentence?
19   A    Jonnie Williams.
20   Q    Had he in fact said that to you?
21   A    Apparently.
22   Q    Do you have a recollection of it, sir?
23   A    No.
24   Q    And then the e-mail says, "I did not hear from him
25   and I left Mo..." and which Mo is that?
```

1    A     Maureen, his wife.

2    Q     "...a message yesterday.  We will need to get that in

3    the next week so we can keep up-to-date."  You need to get

4    what, sir?

5    A     The check.

6    Q     Now, if we can go back to Page 1.  Well, just

7    let -- you are not on either of these e-mails, are you,

8    sir?

9    A     No.

10   Q     We will let the jury take a look at them for a second

11   and then I'll move on.  Okay, you can take down 295,

12   please.

13         Now, at the time that you sent the e-mail we were

14   just looking at, which to remind you was January 25th of

15   2012, did you know the amount of money that Mr. Williams

16   was going to be providing?

17   A     No.

18   Q     To your recollection, did MoBo eventually receive

19   some money from Mr. Williams?

20   A     Yes.

21   Q     How much?

22   A     I don't recall the total.

23   Q     Do you recall a $50,000 amount in approximately March

24   of 2012?

25   A     Yes.

1   Q    And then a $20,000 amount in approximately May of

2   2012?

3   A    That sounds right.

4   Q    Do you recall, specifically with respect to the

5   $50,000 payment, how you learned about that?

6   A    No.

7   Q    What about the $20,000 payment?

8   A    No.

9   Q    Do you recall at all being involved in communications

10  concerning some wire instructions?

11  A    Yes.

12  Q    Let's take a look at those.  We can start with

13  Government's 381 for identification, please.  This looks a

14  little strange.  I'm going to represent to you that it is

15  a text message from Mr. McDonnell to you.  Okay?

16  A    Right.

17  Q    And does it concern the wiring instructions that we

18  were just -- that you just testified about?

19  A    Yes.

20          MR. HARBACH:  The government offers Government's

21  381.

22          THE COURT:  It will be admitted.

23  BY MR. HARBACH:

24  Q    Can you just read to us the text there, sir, from

25  what Mr. McDonnell sends to you?

```
1    A    "Can you send wiring instructions to Jonnie Williams

2    for sending 20k to MoBo account."

3    Q    You don't need to read the phone number.  It just

4    says, "Thx, Bob" there at the bottom?

5    A    Yes.

6    Q    What's the date of that one according to the time

7    stamp?

8    A    May 18th, 2012.

9    Q    Finally, take a look at Government's 385.  Just blow

10   that one up for the witness, please.  Same deal here, this

11   is, I'm going to represent to you that this is a text

12   message, okay, from Mr. McDonnell to you.  All right?

13   A    Right.

14   Q    Does this also concern those wiring instructions?

15   A    Yes.

16        MR. HARBACH:  The government offers Government's

17   385.

18        THE COURT:  It will be admitted.

19   BY MR. HARBACH:

20   Q    Looking at the bottom, sir, what's the date on this

21   one?

22   A    May 18th, 2012.

23   Q    Could you read to us just what the text says?

24   A    "Michael, Jonnie's instructions.  Can you do Monday,

25   Bob.  Hi Michael, call my secretary Monday early afternoon
```

1   she returns and will promptly wire money.  Jerri

2   Fulkerson."

3   Q    You can skip the number.  Thank you.  Do you recall

4   having any conversations with Mr. McDonnell about any of

5   the terms regarding this money from Mr. Williams?

6   A    He said he was working out the terms.  That's all

7   I --

8   Q    Do you recall what the duration of the loans was

9   going to be?

10  A    No.

11  Q    What about whether there were any payments due on a

12  monthly basis for the loans?

13  A    I don't know.

14  Q    Okay.  Could you take a look with me, please, at Page

15  4 of that same report that's in front of you, sir.  There

16  is a paragraph -- are you on Page 4, sir?

17  A    Yes.

18  Q    There is a paragraph near the top that begins "Over

19  the next few months..."  Do you see that there?

20  A    Yes.

21  Q    Same drill.  Could you just read that paragraph to

22  yourself and then I'll have a question for you, okay?

23       (Witness perusing document.)

24       Let me know when you are finished.

25  A    Okay.

**MICHAEL UNCAPHER - DIRECT**                    2724

```
1    Q    Are you finished reading?

2    A    Yes.

3    Q    First question is, do you recall having read that now

4    whether you had an understanding at the time about whether

5    these monies received from Mr. Williams were gifts or

6    loans?

7    A    It was a loan.

8    Q    And do you recall based on conversations with

9    Mr. McDonnell, among other things, and your ex-wife, what

10   the term of the loans was; in other words, how long the

11   loan term was going to be for?

12   A    No payments due for three years.

13   Q    Okay.  And then finally, do you recall any -- whether

14   any provision was made for Mr. Williams to use the

15   properties from time to time?

16   A    Yeah, he could use it and that would offset some

17   payments.

18   Q    Do you know -- you can put that down.  Do you know

19   whether Mr. Williams in fact ever used either Sunseeker or

20   East Coast Palace?

21   A    Not to my knowledge.

22              MR. HARBACH:  Can I have a moment, please,

23   Judge?

24              THE COURT:  Sure.

25        (Counsel conferring with co-counsel.)
```

1   BY MR. HARBACH:

2   Q    Last couple of questions, Mr. Uncapher.  Do you

3   recall whether there there was any loan paperwork that you

4   saw related to the $70,000 in proceeds from Mr. Williams

5   in 2012?

6   A    No.

7   Q    Do you have any recollection of whether MoBo in fact

8   made any loan payments to Mr. Williams or Starwood Trust

9   while you were handling payments for MoBo?

10  A    No.

11          MR. HARBACH:  Thank you, Your Honor.  I have no

12  further questions at this time.

13          THE COURT:  Cross?

14                  CROSS-EXAMINATION

15  BY MR. SMALL:

16  Q    Good afternoon, Mr. Uncapher.  I'm Dan Small.  I

17  represent Bob McDonnell.  A few questions for you.  You

18  said that MoBo was an entity, an LLC; is that correct?

19  A    Yes.

20  Q    And it was owned jointly by Mo and Bob.  That was the

21  reason for MoBo, right?

22  A    Right.

23  Q    The name.  Could we call up just for the witness

24  RM-0502, please?  Do you recognize this as the certificate

25  for MoBo LLC, MoBo Real Estate Partners, LLC?

1   A    Yes.

2               MR. SMALL:  I offer that into evidence, Your

3   Honor.

4               THE COURT:  It will be admitted.  What's the

5   number on it, again?

6               MR. SMALL:  0502, RM-0502.

7               THE COURT:  All right.

8   BY MR. SMALL:

9   Q    Now, so there were just two partners, correct?

10  A    Right.

11  Q    Mo and Bob.  And if I call your wife Maureen, Mo,

12  that's what you called her, right?

13  A    Yes.

14  Q    So maybe that will make it a little easier.

15  A    Yes.

16  Q    So, and we talked about the fact that there may be a

17  gap between expenses and income, right?

18  A    Right.

19  Q    In fact, that was the understanding you said right

20  from the beginning, correct?

21  A    Right.

22  Q    And so if there was a gap, it would be up to Mo and

23  Bob to decide whether to fill it and how to fill it,

24  correct?

25  A    Right.

```
1    Q    And --
2              THE COURT:  I have a question.  It was the
3    understanding from the beginning that they were going to
4    be looking at 50 and $60,000 --
5              THE WITNESS:  That there was a shortfall, yes.
6              THE COURT:  All right.  Go ahead.
7    BY MR. SMALL:
8    Q    Am I correct that the reason for that is that this
9    was viewed more as a family gathering place than as a
10   day-to-day profit/nonprofit investment, right?
11   A    Yes.
12   Q    Bob McDonnell, there are five siblings, right?
13   A    Right.
14   Q    And at one time or another, all five of them and
15   their families came to these properties to use them?
16   A    Yes.
17   Q    And you and Mo used them?
18   A    Yes.
19   Q    And other members of the family would use them?
20   A    Yes.
21   Q    Now, most of the costs were covered by rents; is that
22   correct?
23   A    Yes.
24   Q    The overwhelming majority of the costs were covered
25   by rents each year, right?
```

1   A     Yes.

2   Q     And we saw the mortgage numbers.  Most of the

3   mortgage payments were covered by rents, right?

4   A     Yes.

5   Q     But there was always going to be a gap, correct?

6   A     Right.

7   Q     So, and that gap, you testified, was also somewhat

8   aggravated by the season; is that correct?  It is going to

9   be bigger during the winter.

10  A     It wasn't even through the year.

11  Q     Got you.  When MoBo was started in 2005, Bob

12  McDonnell was running for and became Attorney General,

13  correct?

14  A     Right.

15  Q     And your wife, Mo, chose a different career path,

16  right?

17  A     Right.

18  Q     And she became a very successful executive in the

19  private sector, right?

20  A     Yes.

21  Q     Earning a large salary?

22  A     Yes.

23  Q     Had a large amount of money in stock accounts and

24  other savings accounts?

25  A     Yes.

1   Q    And in fact, you are aware that in 2012 she had over

2   half a million dollars in income?

3   A    Yes.

4   Q    In the seven years that you were involved in managing

5   MoBo's books, did you ever have any concern that the

6   partners were not going to be able to come up with the

7   money to pay the bills?

8   A    No.

9   Q    Okay.  That was a given, right?

10  A    Right.

11  Q    The question only was, how would they do it; is that

12  fair?

13  A    Right.

14  Q    And in some years, so in those seven years, there

15  were loans from three different people; is that correct?

16  A    Yes.

17  Q    The father, John McDonnell, and Dr. Davis, and Jonnie

18  Williams, right?

19  A    Yes.

20  Q    So I assume that means that in some years there were

21  no loans, right?

22  A    Right.

23  Q    So from about 2005 through about 2008, things went

24  pretty smoothly in the management of MoBo, correct?

25  A    Yes.

1    Q    In that four or five-year time there wasn't a single

2    late fee, correct?

3    A    Right.

4    Q    In 2009, in addition to what we talked about, the

5    fact that the market crashed, right?  But there were some

6    other things that changed, weren't there?

7    A    Yes.

8    Q    Tell the jury what those were.

9    A    In 2008, Mo and I had a baby.  During her pregnancy

10   she was on bedrest for six-and-a-half months.  And then my

11   business, I closed my business in September of 2009.  And

12   then after having our baby, she was, she had a significant

13   amount of health concerns that we were in and out of the

14   hospital, or she was in and out of the hospital right

15   after our daughter was born, and then up to and including

16   going to the Mayo Clinic for ten days.

17   Q    With all of this going on, where did MoBo fit on your

18   list of priorities?

19   A    At the bottom.

20   Q    Okay.  And is it fair to say that you started to have

21   problems just with managing the cash?

22   A    Right.

23   Q    And there started to be a lot of late fees.

24   A    Yes.

25   Q    And those late fees reflected your mismanagement of

```
1    the money, didn't they?

2    A    Right.

3    Q    They didn't reflect problems with finances, right?

4    A    Right.

5    Q    Mo had plenty of money, she just needed to know when

6    to put it up, right?

7    A    Right, she did.

8    Q    I'm not going to go into the details, Mr. Uncapher,

9    but isn't it fair to say that there were also problems

10   with your having moved some money out of the MoBo account

11   to other accounts?

12   A    Yes.

13   Q    And that also made the finances of MoBo a little more

14   difficult.

15   A    Right.

16   Q    But that all got resolved, right?

17   A    Right.

18   Q    So the loan from the father, John McDonnell, that was

19   back in 2007; is that right?

20   A    Right.

21   Q    And then the Dr. Davis loan was in 2009, correct?

22   A    Yes.

23   Q    Okay.  And then we talked about the Jonnie Williams

24   loans in 2012, correct?

25   A    Yes.
```

1   Q    The Jonnie Williams loan, the first loan, I think we

2   saw, was in March of -- I'm sorry, in May of 2012; is that

3   correct?

4   A    Yes.

5   Q    Now, I was right the first time.  It was in March of

6   2012.  Right?

7   A    Uh-huh.

8   Q    And you are aware -- and so, again, they made a

9   decision that they would use a loan to fill that gap.

10  A    Right.

11  Q    But there was plenty of other money available to fill

12  that gap, right?

13  A    Right.

14  Q    And in fact, you are aware, aren't you, that within

15  literally days of that $50,000 loan in March of 2012, Mo

16  got a bonus of $70,000 from her company, right?

17  A    Right.

18  Q    So there was never any desperation, was there?

19  A    No.

20           MR. HARBACH:  Objection.

21           THE COURT:  Sustained.

22  BY MR. SMALL:

23  Q    You knew the bills were going to be paid one way or

24  the other, right?

25  A    Yes.

1          MR. HARBACH:  Objection.

2          THE COURT:  Sustained.

3          MR. SMALL:  Nothing further.

4          THE COURT:  Mr. Burck?

5                    CROSS-EXAMINATION

6    BY MR. BURCK:

7    Q    Good afternoon, Mr. Uncapher.

8    A    Hi.

9    Q    My name is Bill Burck, and I represent Maureen

10   McDonnell, your former sister-in-law.

11   A    Right.

12   Q    I just want to focus on the two phone calls that you

13   had with Jonnie Williams.  One, you testified you recall

14   it was in the summer of 2011, and the other one you recall

15   was in the early part of 2012.  Remember that testimony?

16   A    Right.

17   Q    Is it possible that -- you had to be shown a document

18   to refresh your recollection on the timing of the first

19   call.  Do you remember that?

20   A    Yes.

21   Q    Is it possible that the call actually occurred in the

22   spring of 2011?

23   A    It is possible, yes.

24   Q    It is possible?

25   A    Yes.

1    Q    Please call up Government Exhibit 110.  This has

2    already been admitted into evidence.  So I don't believe

3    you have ever seen this before, but this is a Mansion log,

4    May 2nd, 2011.

5    A    Yes.

6    Q    And if you will blow up the 9:24 time in the middle.

7    It says, "John Williams."  I'll proffer to you that's

8    Jonnie Williams.

9    A    Yes.

10   Q    And he entered the Mansion at 9:24 and left at 11:25.

11   102, I will also let you know, is a term for

12   Ms. McDonnell, the First Lady.

13   A    Right.

14   Q    101 being the Governor, 102 being the First Lady.

15   I'd like to show just the witness RM-0106.  And it would

16   be a specific page, which is 220.  Could you blow up the

17   bottom part there?  Actually, I'm sorry, just blow up the

18   top first just to identify it.  Sir, these are phone

19   records of Maureen McDonnell, the former First Lady.  And

20   these are from Verizon Wireless.  If you go to the bottom

21   of that page, highlighted, you will see a series of phone

22   calls.  Your cell phone number at the time, the last four

23   digits only, were 2465?

24   A    Right.

25   Q    And do you recall that your then wife's phone number

1    at the time, the last four digits, was 0673?

2    A    Yes.

3    Q    Do you recall that the Governor's cell phone at the

4    time was 0714?

5    A    Yes.

6              MR. BURCK:  We would offer RM-0106-220, 221, and

7    287 into evidence.  I would offer all of the phone

8    records, Your Honor, but we don't have them all redacted

9    yet.

10             THE COURT:  All right.  220, 221, and 287 will

11   be admitted.

12   BY MR. BURCK:

13   Q    Sir, you will see there that there are, there is a

14   call starting at 9:57 a.m., this is from Ms. McDonnell to

15   2465 on May 2nd.  Do you see that?

16   A    Yes.

17   Q    That's your phone number?

18   A    Yes.

19   Q    You will see that it is for one minute.

20   A    Right.

21   Q    Then you will see below that there is a phone call

22   from Ms. McDonnell to 0673, which I think you have

23   testified is your former wife's number?

24   A    Yes.

25   Q    That's for one minute.

1   A     Right.

2   Q     You will see below that there is a call from

3   Ms. McDonnell, two minutes after that, to 0714, which you

4   testified is the Governor's cell phone, correct?

5   A     Right.

6   Q     Right after that, you see that there is, one minute

7   later, there is another call to 0673, which is Maureen,

8   your wife's, phone number?

9   A     Yes.

10  Q     Another one a minute later again to your wife, and

11  then another one a minute later to you.

12  A     Yes.

13  Q     So that's six phone calls to your former wife, the

14  Governor, and yourself in that roughly five-minute period.

15  A     Yes.

16  Q     Then you will see on the next page, turn the page to

17  221, please, the very top.  There is a phone call at

18  10:44, this time from you to Ms. McDonnell.  Do you see

19  that?

20  A     Yes.

21  Q     And that is actually for 13 minutes.

22  A     Right.

23  Q     So that looks like you actually had a conversation

24  with her in that period, right?

25  A     Right.

1   Q    I showed you in the Mansion log earlier that

2   Mr. Williams was present at the Mansion on May 2nd from

3   9:24 to approximately 11:30 that day, remember that?

4   A    Yes.

5   Q    So does this help refresh your recollection as to

6   when you had this phone call with Maureen McDonnell that

7   she put Jonnie Williams on the call?

8   A    Yes.

9   Q    You think it was May 2nd, 2011?

10  A    Yes.

11  Q    Now, focusing on that conversation, you testified

12  that you got a call, you called or received a phone call

13  from Maureen.

14  A    Right.

15  Q    It looks like that you actually called her back,

16  right?

17  A    Right.

18  Q    And you said that Maureen gave you the phone to talk

19  to Jonnie Williams?

20  A    Gave Jonnie the --

21  Q    I'm sorry, excuse me, gave Jonnie Williams the phone

22  to talk to you.

23  A    Right.

24  Q    Because she was present with Jonnie Williams; that's

25  what you understood?

1   A      Right.

2   Q      Can you tell us, what did Maureen McDonnell say to

3   you describing Jonnie Williams?  The best you recall.

4   A      Just that he was interested in buying or investing in

5   the properties.

6   Q      Okay.  Did she mention to you that he has been

7   looking for property in Virginia Beach?

8   A      Not that I remember.

9   Q      Okay.  And when you talked to Jonnie Williams about

10  the properties, what did you say to him, to the best of

11  your recollection?

12  A      I just told him what we owed on each property and

13  what the average expenses were for the mortgages.

14  Q      Did you tell him what the annual deficit was?

15  A      Yes.

16  Q      What was that?

17  A      Between 50 and $60,000.

18  Q      The words 50, $60,000 came out of your mouth?

19  A      Yes.

20  Q      Then Mr. Williams handed the phone back to Maureen?

21  A      Yes.

22  Q      And when you said 50 or $60,000 to Mr. Williams, was

23  Maureen McDonnell on the phone?

24  A      Was she on the phone?

25  Q      Was she on the phone?

1    A    I was talking to Jonnie.

2    Q    He didn't have it on speaker or anything like that?

3    A    Not that I know of, no.

4    Q    Okay.  Now turning to page RM-0106-287.  Actually,

5    before we do that, can you call up Government Exhibit 290?

6    It is already admitted into evidence.  If you could blow

7    up the 11:05 period.  You will see that there is a

8    reference there, this is again a Mansion log, and this is

9    dated January 19th, 2012.  You will see there is a

10   reference to Williams, Bobby is crossed out, it says, "To

11   see 102."  I'll proffer to you that's Jonnie Williams to

12   see the First Lady.  He comes in at 11 o'clock and leaves

13   at 1300, 1 o'clock.

14   A    Yes.

15   Q    If you could show Government Exhibit 295.  This is

16   already admitted into evidence.  And the bottom e-mail.

17   This is from you, you testified a bit about this e-mail,

18   from you on January 25th, 2012, so about six days later,

19   to Bob and Maureen McDonnell.  It is actually to Bob

20   McDonnell, I think you testified, "Dear Bob."  The last

21   sentence you say on that page, "For MoBo, I talked with

22   your Mo last week and she had me talk to the guy who is

23   helping us."  Right?

24   A    Right.

25   Q    And "your Mo," you testified, was Maureen McDonnell,

1    the First Lady, right?

2    A     Right.

3    Q     You were telling him that you had spoken to Maureen

4    McDonnell the prior week, right?

5    A     Yes.

6    Q     Going back to, please put up the phone records for

7    RM-0106-0287.  Blow up the middle there for me, please.

8    You will see, these are phone records of Maureen

9    McDonnell.  Again, there are two calls, one to you and one

10   from you.  One is at 12:01 p.m. on January 19th.  This is

11   to you from Maureen McDonnell.  And there is one on

12   January 19th at 12:11, which is from you back to Maureen

13   McDonnell, 12 minutes.  Does this help refresh your

14   recollection as to when you had the call with Jonnie

15   Williams the second time?

16   A     Yes.

17   Q     So January 19th, 2012, fair to say?

18   A     Yes.

19   Q     And during that call, you testified that it was more

20   or less sort of a replay of the first phone call; is that

21   right?

22   A     Right.

23   Q     And you discussed in that call the financial

24   situation of MoBo?

25   A     Yes.

1   Q     And you told him again about a 50 to $60,000 deficit?

2   A     Yes.

3   Q     And those words again came out of your mouth, right?

4   A     Yes.

5           MR. BURCK:  Your Honor, no further questions for

6   us.

7           THE COURT:  All right.  Redirect?

8           MR. HARBACH:  Yes, Your Honor, thank you.

9                    REDIRECT EXAMINATION

10  BY MR. HARBACH:

11  Q     Mr. Uncapher, during either of these phone calls

12  where you spoke with Jonnie Williams, did he say to you,

13  "Sounds great, Michael, I'm going to loan MoBo $70,000"?

14  Did he tell you that?

15  A     No.

16  Q     Do you recall how you learned that Mr. Williams was

17  going to be helping you out?

18  A     I don't recall specifically.  I just heard it from

19  either Bob or Maureen, my wife.

20  Q     You testified on cross-examination to Mr. Small with

21  respect to the loan from Mr. McDonnell's father.  He asked

22  you, "That was in 2007, correct?"  And you said, "Right."

23  My question for you is, do you actually remember that that

24  loan was in 2007?

25  A     It was early on.  I don't exactly remember what the

1  date was.

2  Q    Okay.  How many times did you meet with Mr. Small

3  before you testified here today, sir?

4  A    Three.

5  Q    And after the one interview that you have testified

6  about you had with the FBI that was approximately a year

7  ago, how many times have you met with government counsel?

8  A    None.

9  Q    You testified on cross-examination about the

10  anticipated shortfall for MoBo year to year, and I think

11  His Honor asked you a question about the 50, $60,000

12  amount.  Do you recall that exchange?

13  A    Yes.

14        MR. HARBACH:  Could I show the witness for

15  identification, please, Page 8 of Government's 513?

16  BY MR. HARBACH:

17  Q    Do you recognize this document, sir?

18  A    I don't know who did it.

19  Q    Does this look like the type of document that

20  Ms. Chamberlain prepared based on the books of the

21  business?

22  A    Again, I never saw this.  She sent those directly to

23  Dan Cook.

24  Q    Okay.  Then we will leave it up just for the witness,

25  please, and look at Page 9.  I'm sorry, take that down for

1    a second, please.  Do you recall exactly how much the

2    shortfall was for each of the years of 2008 through 2012?

3    A    I don't know exactly.  It was an estimate of 50, that

4    was what we banked on, an estimated 50 to 60.

5    Q    Now, let's take a look now at Page 9 of Government's

6    513 just for the witness's review.  Blow that up for him.

7    Are you able to see that okay, sir?

8    A    Yes.

9    Q    Does that refresh your recollection about whether in

10   fact for the years from 2008 to 2012, at least, and in

11   three of those five years, the shortfall was substantially

12   in excess of $60,000?

13   A    Again, I never saw those things, I was always going

14   off the estimate.  I see what's written there.

15   Q    All I can ask you is what your recollection is.  Do

16   you recall --

17   A    No --

18   Q    Let me ask the question first, please.  Do you recall

19   in 2009, 2010 --

20          MR. SMALL:  Your Honor, may we approach?  He is

21   talking about depreciation and paper losses.  I object to

22   the use of a document this witness knows nothing about.

23          THE COURT:  That objection will be sustained.

24          MR. HARBACH:  You can take the document down,

25   please.

```
1    BY MR. HARBACH:
2    Q    Did you know at the time, do you have any
3    recollection of knowing in 2009, 2010, 2011, what in fact
4    the cash shortfall was year to year?  Did you know?
5    A    No.  For me it was always an estimate of 50 to
6    $60,000.
7    Q    And what was that based on?
8    A    Just rough guesses of handing over the numbers to
9    Brenda.
10   Q    And then my last question is, did I understand your
11   testimony correctly on cross-examination to be that when
12   the business was formed, it was anticipated that there
13   would be a cash shortfall year to year of 50 to $60,000;
14   is that your testimony?
15   A    That was the rough estimate, yes.
16             MR. HARBACH:  Thank you, Your Honor.
17             THE COURT:  I have a question.
18   BY THE COURT:
19   Q    Were the loans, and I guess we have identified three,
20   were the loans to fill the shortfall?
21   A    Yes.
22   Q    So at one time there was a $100,000 shortfall?
23   A    Apparently.  Like I said, I've never seen that
24   document.
25   Q    All right.  Thank you.
```

**MICHAEL UNCAPHER - REDIRECT**

1        THE COURT:  You may stand down, sir.

2      (Witness stood aside.)

3      All right, we will go ahead and take a break.  15

4  minutes.

5      (Recess taken from 3:41 p.m. to 3:55 p.m.)

6      ///

7      ///

8      ///

9      ///

10     ///

11     ///

12     ///

13     ///

14     ///

15     ///

16     ///

17     ///

18     ///

19     ///

20     ///

21     ///

22     ///

23     ///

24     ///

25     ///

```
1                    MR. BROWNLEE:  Your Honor --

2                    THE COURT:  Yes.

3                    MR. BROWNLEE:  -- before we bring the jury in,

4    can we -- Ms. Krueger is next?

5                    MR. DRY:  Yes.

6                    MR. BROWNLEE:  Yeah.  Can we just -- can we

7    raise one issue with this next witness before she comes

8    in, Your Honor?

9                    THE COURT:  Okay.

10                   MR. BROWNLEE:  Do you want us to --

11                   THE COURT:  Come on up.

12        (At Bench.)

13                   MR. BROWNLEE:  Judge, I think that the

14   government is going to try to introduce an e-mail, going

15   to try to introduce that.

16                   MR. FAULCONER:  Let me double-check.  It may be

17   an e-mail depending on her recollection.

18        Which one is that?

19                   THE COURT:  What's -- who's the witness?

20                   MR. FAULCONER:  The witness' name is Sharon

21   Krueger, Your Honor.  K-R-U-E-G-E-R.

22        What's the date of that one, John?

23                   MR. BROWNLEE:  It's 11/22/11.

24                   MR. FAULCONER:  Can I see that?

25                   MR. BROWNLEE:  Sure.
```

```
 1              MR. FAULCONER:  Is this the one that has a photo
 2    on it, the other version?
 3              MR. BROWNLEE:  No.
 4              MR. FAULCONER:  I don't think we currently
 5    intend to offer it, but it's possible.
 6              MR. BROWNLEE:  Just to raise this, Your Honor.
 7    Basically, this is an e-mail that summarizes a call she
 8    had with John Lazo.  Mr. Lazo has already testified.  So
 9    when he was on the stand, this particular subject
10    wasn't -- they didn't go into it so we didn't cross on it.
11        And now what I think they are going to try to do is
12    ask her about this conversation, about what he told her.
13    And we just can't confront him now.  He's come and gone.
14    He was here.  And so we just wanted to raise this.  If
15    they are not going to do it, that's fine, but I just
16    wanted to do it before the witness got in the seat.
17              THE COURT:  I don't see any particular problem
18    with that.  If -- if you have to use it, you'll have an
19    opportunity to deal with whatever he does here.  That's an
20    objection that will be overruled at this time.
21              MR. FAULCONER:  Thank you, Your Honor.
22        (In Open Court.)
23        (The jury entered the courtroom.)
24              THE COURT:  All right.  Government, call your
25    next witness.
```

```
 1              MR. FAULCONER:  Yes, Your Honor.  The
 2   United States calls Sharon Krueger.
 3              THE COURT:  All right.
 4                      SHARON KRUEGER,
 5    called as a witness by and on behalf of the government,
 6    having been first duly sworn by the Clerk, was examined
 7                  and testified as follows:
 8              MR. FAULCONER:  May I inquire, Your Honor?
 9              THE COURT:  Go ahead.
10                    DIRECT EXAMINATION
11   BY MR. FAULCONER:
12   Q     Good afternoon.
13   A     Good afternoon.
14   Q     Could you please state your name, and spell your last
15   for the court reporter.
16   A     It's Sharon Ann Krueger.  K-R-U-E-G-E-R.
17   Q     And, Ms. Krueger, what city do you currently live in?
18   A     I live in Earlysville, Virginia.
19   Q     And where do you currently work?
20   A     I work for the University of Virginia.
21   Q     And how long have you worked at UVA?
22   A     I have worked at UVA since July of 2003.
23   Q     And what is your current title at UVA?
24   A     My current title is I'm the Program Director for
25   Innovation Grants & Relationships.
```

1    Q     Now, prior to taking on that role and focusing in on

2    the time frame of August to December of 2011, what was

3    your role during that time frame?

4    A     I oversaw strategic partnerships.  Basically, I'm

5    still doing the same that I did then, but I have added

6    responsibilities that just started in May.

7    Q     And which office within UVA are you working in?

8    A     I work for the Vice President for Research, and I

9    have a cross appointment in an initiative out of the VPR

10   Office called UVA Innovation.

11   Q     Now, the VPR Office is that the Vice President for

12   Research?

13   A     Correct.

14   Q     And could you tell us, just briefly, what exactly is

15   UVA Innovation?

16   A     UVA Innovation is primarily the technology transfer

17   arm of the university.  And part of that involves -- in

18   addition to the technology transfer arm, it involves

19   oversight on our internal proof-of-concept Translational

20   Research funds.  Industry partnerships that advance

21   research.

22   Q     And so during that time frame of about August to

23   December of 2011, what were your day-to-day

24   responsibilities, generally speaking?

25   A     I serve as a point person for research industry --

1   serve as a point person for industry interactions for R&D,

2   for research and development.  I also partner with people

3   across the university to plan and manage and run

4   entrepreneurial and innovation events, be it at the

5   university level, the community level, and all the way up

6   to the national level.

7   Q    Now, Ms. Krueger, UVA, is that a state school or a

8   private school?

9   A    We are a state school.

10  Q    As a UVA employee, do you receive certain e-mails

11  addressed to all state employees?

12  A    Yes, I do.

13           MR. FAULCONER:  I'd like to show the witness

14  what's already been admitted as Exhibit 525.  And if we

15  could zoom in just on sort of the top half of that.

16  BY MR. FAULCONER:

17  Q    Ms. Krueger, does this look like one of the types of

18  e-mails that you would get on the state employees's

19  ListServ?

20  A    Yes, it does.

21  Q    Is this dated during a time period when you were

22  employed by UVA?

23  A    Yes, it is.

24  Q    And would some of the e-mails that you received have

25  this seal and Office of Governor Bob McDonnell at the top

SHARON KRUEGER - DIRECT            2751

1  of them?

2  A    Yes.  They all do.

3  Q    All of them at least that come from the Governor's

4  Office?

5  A    That come from the Governor's Office.  Yes.

6  Q    Now --

7         MR. FAULCONER:  We can go ahead and take that

8  down.

9  BY MR. FAULCONER:

10 Q    Now, as someone working within UVA Innovation as part

11 of the Vice President for Research, do you interact with

12 state government officials who aren't UVA officials?

13 A    Yes, I do.

14 Q    And, generally speaking, would you prefer to have

15 good relationships or bad relationships with those people?

16 A    Good relationships.

17 Q    Now, while working at UVA Innovation, have you also

18 helped plan events related to UVA research initiatives?

19 A    Yes, I have.

20 Q    And have those included events in which you have

21 invited public officials to attend them?

22 A    Yes.

23 Q    Has that included the Governor?

24 A    Yes.

25 Q    Did that include when Mr. McDonnell, when he was

1   Governor?

2   A     Yes.

3   Q     And have those included events in which Mr. McDonnell

4   declined to attend, despite having been invited?

5   A     Yes.

6   Q     I'd like to show you what's been marked for

7   identification as Exhibit 517.  Now, Ms. Krueger, is this

8   a fairly lengthy e-mail exchange between you and other

9   individuals at UVA?

10  A     Yes.

11  Q     And does this pertain to an invitation for

12  Mr. McDonnell to attend an event in 2013?

13  A     Yes, it was.

14          MR. BROWNLEE:  Your Honor, I'm going to object.

15  This is an invitation that was declined in May of 2013.  I

16  don't know what the relevance to this case would be.

17          THE COURT:  Overruled.

18          MR. FAULCONER:  Your Honor, we'd offer Exhibit

19  517 into evidence.

20          THE COURT:  It will be admitted.

21  BY MR. FAULCONER:

22  Q     Now, without going through the whole e-mail exchange,

23  can you just tell us, if you recall, what the event was

24  that you invited Mr. McDonnell to attend?

25  A     Charlottesville and UVA, as the host school, was

SHARON KRUEGER - DIRECT          2753

1  selected by the Association of Public and Land-Grant

2  Universities to host a summer meeting for one of their

3  Councils and Commissions on graduate studies, and the

4  Commission on Innovation and Economic Prosperity.

5       Last year -- or the prior year, when the conference

6  was at the University of Nebraska, the Governor spoke.  So

7  we were just following the protocol that Nebraska

8  followed, did the year before.

9  Q    And when you say the Governor spoke at the prior

10 year, was that the Governor of Nebraska?

11 A    The Governor of Nebraska.

12 Q    And why did you want Mr. McDonnell to attend the

13 event?

14 A    More so, we were just following the protocol that if

15 Nebraska had their Governor when the event was in

16 Nebraska, we wanted our Governor at the event when it was

17 held in Virginia.

18 Q    To your recollection, did Mr. McDonnell actually

19 attend this event?

20 A    No, he did not.

21 Q    Did he send someone in his place?  Do you recall?

22 A    Yes, he did.

23 Q    And who was that?

24 A    That was Secretary Jim Cheng.

25 Q    Do you know which secretary he is?

SHARON KRUEGER - DIRECT            2754

```
 1   A     Oh, of Trade and Commerce.

 2              MR. FAULCONER:  All right.  We can take that

 3   down.

 4   BY MR. FAULCONER:

 5   Q     Now, before 2011, had you heard of the company either

 6   Star Scientific or Rock Creek Pharmaceuticals?

 7   A     No, I had not.

 8   Q     How about Anatabloc or anatabine?

 9   A     No, I had not.

10   Q     Do you recall learning, at some point in 2011, about

11   an event at the Governor's Mansion involving Star

12   Scientific and its Anatabloc product?

13   A     Yes, I did.  From one of my colleagues.

14   Q     Was that individual Dr. John Lazo?

15   A     Yes, it was.

16   Q     Did you also talk about it with some other people?

17   A     Really, pretty much it was John -- the best I can

18   recall, it was just Dr. Lazo.

19   Q     Now, do you recall actually having both some e-mail

20   correspondence and a couple of phone conversations with

21   various people in 2011 about Star Scientific and Rock

22   Creek Pharmaceuticals?

23   A     Yes, I do.

24   Q     And in the course of that process, did you learn

25   about a number of UVA doctors who had received planning
```

SHARON KRUEGER - DIRECT          2755

1  grants from Star Scientific for the purpose of creating

2  study proposals?

3  A    Yes, I did.

4  Q    And I'd like to show you what's been marked for

5  identification as Exhibit 268.  Ms. Krueger, do you

6  recognize this as a chart of essentially doctors and --

7  that received grants?

8  A    Yes.

9  Q    And is this a document that you actually had in your

10  files as you were looking into this?

11  A    Yes.  This is created by our Office of Sponsored

12  Programs.  It's a standard research document.

13         MR. FAULCONER:  Your Honor, we'd offer Exhibit

14  268 into evidence.

15         THE COURT:  It will be admitted.

16         MR. FAULCONER:  All right.  Now, if we could

17  zoom in on the first five columns there.  I guess it

18  doesn't get that.  If we could zoom in on sort of the top

19  half to start.  Thank you, Mr. Starnes.

20  BY MR. FAULCONER:

21  Q    Now, do you see the names there, Ronald Turner, Brian

22  Annex, and Eugene Barrett?

23  A    Yes, I do.

24  Q    And do you know who those individuals are?

25  A    Yes, I do.

1    Q    Who are they?

2    A    Well, they are all clinicians in the School of

3    Medicine, clinician researchers in the School of Medicine.

4    Q    And do you know why they ended up on this chart?

5    A    They received a pilot grant from Star Scientific.

6              MR. FAULCONER:  And if we could scroll down a

7    little bit.

8    BY MR. FAULCONER:

9    Q    Do you see there also the name Jonathan Truwit?

10   A    Yes, I do.

11   Q    Is that another UVA researcher, who, to your

12   understanding, had a grant from Star Scientific?

13   A    Based on this document, yes.

14   Q    Now, when you were looking into this, what was your

15   understanding of what the purpose of the -- I think you

16   said pilot grant was?

17   A    Yes.  My understanding was that it was just to start

18   to do -- to test the potential compound in different

19   disease states.

20   Q    And was it your understanding of whether there would

21   be any follow-on funding from any alternative source later

22   on?

23   A    No, not to my -- not to my knowledge.

24   Q    Well, do you recall what the size of the initial

25   planning grants were that came in?

SHARON KRUEGER - DIRECT          2757

1    A    Yeah.  They were $25,000 each.

2    Q    And was that all the money to fund all the research

3    or would there need to be an application made at some

4    point for additional funding?

5    A    Via e-mail conversation, I know a request for

6    proposals went out for the -- for the researchers to apply

7    to get the money.

8    Q    Okay.  And was that to apply for a larger amount of

9    funding to actually do the studies themselves?

10   A    No.  That was to apply to get the $25,000 each.

11   Q    All right.  Well, let me show you what's been marked

12   for identification as Exhibit 259.  Do you recognize this

13   as an e-mail from an individual named Jeffrey Blank to

14   you?

15   A    Yes.

16   Q    Is this dated November 8th, 2011?

17   A    Yes.

18   Q    And is this towards the beginning of when you started

19   to look into these grants?

20   A    Yes.

21        MR. FAULCONER:  Your Honor, we'd offer Exhibit

22   259 into evidence.

23        THE COURT:  It will be admitted.

24   BY MR. FAULCONER:

25   Q    Now, can you start by telling us who Jeffrey Blank

SHARON KRUEGER - DIRECT          2758

1   is?

2   A    Jeffrey Blank also works in the Vice President for

3   Research Office.  He primarily is -- he's not on the

4   research end like I am.  He primarily takes care of a lot

5   of the HR issues.  He works with gathering a lot of the

6   information for reports that are due to the President of

7   our university.

8   Q    Now, do you see there where -- do you see what the

9   subject line of this e-mail says?

10  A    Yes.

11  Q    And what is the subject line?

12  A    "Star Scientific and State Tobacco Commission

13  Collaboration" with a question mark.

14  Q    And in the body of the e-mail that's forwarded to

15  you, do you see a reference to planning grants of $25,000

16  each?

17  A    Yes, I do.

18  Q    And those doctors' names, Gene Barrett, Ron Turner,

19  and Brian Annex, are those some of the doctors we saw on

20  the prior page?

21  A    Yes, they are.

22  Q    Now, can you tell us -- where the sentence says, "At

23  UVA they went to," what does it say after "to support" in

24  terms of where the larger amount of money was supposed to

25  come from?

```
 1   A     "To support planning work in advance of what was to

 2   be a larger award expected from the" -- "from the Virginia

 3   Tobacco Commission that Rock Creek indicated to the

 4   schools they would secure."

 5   Q     All right.

 6            MR. FAULCONER:  Now, if we could scroll down a

 7   little bit.

 8   BY MR. FAULCONER:

 9   Q     Could you read for us just the first two sentences of

10   that second paragraph?

11   A     "Peggy mentioned these planning awards were announced

12   by the Governor of Virginia at a public event.  In

13   addition, the Governor's wife has publicly disclosed that

14   she is a happy user of the company's products and perhaps

15   the Governor as well."

16   Q     Do you know who Peggy is that's referred to in

17   that --

18   A     Yes.  Peggy Shupnik is the Dean of Research in the

19   School of Medicine and also an endocrinologist researcher.

20   Q     All right.

21            MR. FAULCONER:  We can take that down.

22   BY MR. FAULCONER:

23   Q     Now, after learning this information and getting

24   these e-mails forwarded to you, did you actually do some

25   due diligence or looking into Rock Creek Pharmaceuticals
```

SHARON KRUEGER - DIRECT          2760

1  and Star Scientific?

2  A    Yes.

3  Q    And did you keep individuals who worked with you in

4  the VPR's Office apprised of what you found?

5  A    Yes, I did.

6  Q    And was one of those supervisors or individuals

7  someone named Mark Crowell?

8  A    Yes.

9  Q    And is his name actually Wriston Mark Crowell?

10 A    That -- legally, yes.  But he professionally goes by

11 Mark Crowell.

12 Q    And was he the predecessor to the position you're now

13 in?

14 A    No.  He was actually my boss.

15 Q    Got it.

16 A    And he has since retired from the university.

17 Q    Got it.  Now, I'd like to show you what's been marked

18 for identification as Exhibit 261.  Is that an e-mail

19 exchange between you and Mr. Crowell the following day, on

20 November 9th, 2011?

21 A    Yes.

22 Q    And is this discussing what you were looking into?

23 A    Yes.

24       MR. FAULCONER:  Your Honor, we'd offer Exhibit

25 261 into evidence.

1          THE COURT:  It will be admitted.

2     BY MR. FAULCONER:

3     Q    Now, Ms. Krueger, could you read the bottom e-mail,

4     the one that you sent to Mr. Crowell on November 8th,

5     2011, at 8:17 p.m.  Just that first paragraph there.

6     A    "So got more information, interesting.  I'm going to

7     do a bit of diligence as well and let you know what I

8     found out.  Personally, I think the Governor's wife or

9     assistant may look like the Governor is influencing UVA to

10    a potential action.  Just odd in my opinion."

11    Q    And what does Mr. Crowell write in response to you?

12    A    "Great reports.  Kind of agree that the Rock Creek

13    thing - this makes me uncomfortable."

14    Q    All right.

15         MR. FAULCONER:  We can take that down.

16    BY MR. FAULCONER:

17    Q    Now, I'd like to show you what's been marked for

18    identification as Exhibit 262.  Is this another e-mail

19    from you to Mr. Crowell dated November 9th, 2011?

20    A    Yes, it is.

21    Q    And is this another e-mail where you're forwarding

22    some of the information that you've obtained?

23    A    Yes, it is.

24         MR. FAULCONER:  Your Honor, we'd offer Exhibit

25    262 into evidence.

1              THE COURT:  It will be admitted.

2              MR. FAULCONER:  Now, if we could zoom out and

3    then go to the second page of this document.

4    BY MR. FAULCONER:

5    Q    Can you tell us what that photo is that is embedded

6    within this e-mail?

7    A    This is a photo of Governor McDonnell with a

8    microphone, speaking at an event with a company logo

9    behind him.

10   Q    And do you recall where you obtained this photograph

11   from before you put it in the e-mail?

12   A    I captured it from a Facebook page.

13   Q    And do you know if that was a Facebook page

14   affiliated with Star Scientific or Rock Creek?

15   A    You know, honestly, I don't remember, because it was

16   taken down almost immediately.  I honestly don't remember.

17   Q    All right.

18              MR. FAULCONER:  Well, if we could go to the

19   first page of the e-mail.

20   BY MR. FAULCONER:

21   Q    Could you read the last bullet point in that e-mail,

22   just at the very bottom under --

23              MR. FAULCONER:  Yeah.  Right there.

24   BY MR. FAULCONER:

25   Q    Just that last e-mail where it says, "Virginia State

1    Government."

2    A    "Set up visit to UVA by Curtis Wright from Rock

3    Creek.  UVA:  You, me, Tom" -- that's referring to the

4    Vice President for Research -- "Peggy, Ron and maybe Phil.

5    Rock Creek:  Curtis Wright.  Virginia State Government:

6    Yes/no -- this is the awkward part -- as Governor

7    McDonnell has publicly announced his support for the

8    parent company Star Scientific."

9    Q    Now, that statement there about Mr. McDonnell, what

10   was your basis for making that statement?

11   A    The photo and just the press release.

12   Q    Now, I'd like to ask you about as part of your due

13   diligence, did you also have some phone conversations with

14   Dr. Lazo?  I think you referenced him earlier.

15   A    Yes, I did.

16   Q    And what was your understanding of his role within

17   this whole process as it unfolded?

18   A    So he attended a luncheon at the Governor's Mansion,

19   and we talked about what that event was like.

20   Q    During at least one of -- did you have just one

21   conversation with him or do you think you had several?

22   A    According to his testimony, it looked like he called

23   me when he was driving back.  But I think he called my

24   boss because I was --

25   Q    Ms. Krueger, just focusing on your recollection and

1  not commenting on anything else.  Do you recall having any

2  conversations with Dr. Lazo?

3  A    Yes, I do.

4  Q    And do you recall one of those being in November of

5  2011?

6  A    Yes, I do.

7  Q    All right.  I'd like to show you what's been marked

8  for identification as Exhibit 264.  In looking at this

9  page, and then flipping briefly to the second page, are

10 these handwritten notes that you took during your

11 conversation with Dr. Lazo, at least whatever one occurred

12 in November 2011?

13 A    Yes, they are.

14        MR. FAULCONER:  Your Honor, we'd offer Exhibit

15 264 into evidence.

16        MR. BROWNLEE:  Just note our objection, Your

17 Honor.

18        MR. KOFFMANN:  Same objection.

19        THE COURT:  They will be admitted.

20 BY MR. FAULCONER:

21 Q    Now, what are the -- after you write down, "Call with

22 John Re: Meeting at Gov - lunch," do you know what you're

23 referring to when you say, "Gov" there, before the word

24 "lunch"?

25 A    Governor.

SHARON KRUEGER - DIRECT          2765

1  Q    And what do you write underneath that on sort of the

2  first line where there are two lines on either side?

3  A    "Governor Mansion for lunch."

4  Q    Do you recall that coming up in your conversation

5  with Dr. Lazo?

6  A    Yes, I do.

7          MR. FAULCONER:  Now, if we could go to the

8  second page, and the bottom right-hand portion.

9  BY MR. FAULCONER:

10  Q    Do you see there --

11          MR. FAULCONER:  Yep.  There we go.

12  BY MR. FAULCONER:

13  Q    Do you see there what you write on the first two

14  lines that are being shown here?

15  A    Yes.

16  Q    What do you write?

17  A    "Governor wants to get something good out of tobacco

18  - grow - harvest - medical."

19  Q    And do you recall that coming up in your conversation

20  with Dr. Lazo?

21  A    Yes.

22  Q    Now, going over to the left of this document, do you

23  see where you say -- there's something.  Am I reading this

24  correctly?  It says, "It's transparent and not put us in

25  comprised position."  Do you see that?

1   A     Yes.

2   Q     What are you talking about there?

3   A     We were talking about if we would put in a Tobacco

4   Commission grant, to make sure that everything is

5   completely transparent and not to put UVA in a compromised

6   position with doing research -- how can I describe this?

7   We didn't want to be put in a position that we were being

8   told to do or directed to do research.

9   Q     By whom?

10  A     By the company.

11  Q     Just the company or did it also include politics?

12  A     To the best that I can remember, probably both.

13  Q     All right.

14          MR. FAULCONER:  We can go ahead and take that

15  down.

16  BY MR. FAULCONER:

17  Q     Now, at some point after your conversation with

18  Dr. Lazo, did you participate in a conference call with

19  some individuals affiliated with Rock Creek and Star?

20  A     Yes, I did.

21  Q     And do you recall, was that later on, towards the end

22  of November 2011?

23  A     Yes, it was.

24  Q     Do you recall who was on that call?

25  A     It was myself from -- from UVA was myself, Mark

1    Crowell, and Phil Parrish, another colleague and the Vice

2    President for Research Office, and he's our Tobacco

3    Commission liaison.

4    Q    And did you actually take handwritten notes during

5    this call as well?

6    A    Yes, I did.

7              MR. FAULCONER:  Your Honor, we'd offer -- sorry.

8    Show the witness for identification what's been marked as

9    269.

10        Now, if we can flip to the second page of this

11   document, and then to the third page.

12   BY MR. FAULCONER:

13   Q    Are these handwritten notes that you took on an

14   e-mail and then the back of the e-mail for this call?

15   A    Yes, they are.

16             MR. FAULCONER:  Your Honor, we'd offer into

17   evidence Exhibit 269.

18             THE COURT:  It will be admitted.

19             MR. FAULCONER:  Now, if we could go to the

20   second page of this document.

21   BY MR. FAULCONER:

22   Q    Do you see about two-thirds of the way down where you

23   say, "Consider grant process by gov"?  Do you know what

24   "gov" is referring to there?

25   A    I have -- I have read this over and over again, and

1  based on my other abbreviations from Governor, that's the

2  only thing I can think of that I wrote down was that "gov"

3  meant Governor.

4  Q    All right.

5          MR. FAULCONER:  Well, zooming back out and going

6  to the second page.  Sorry.  I guess I meant third.

7  BY MR. FAULCONER:

8  Q    Looking on the portion, sort of the upper right-hand

9  corner that's between those lines, can you read for us

10 what you wrote there?

11 A    "Let McDonnell know about Tobacco Commission

12 proposal.  Look favorable on Commonwealth.

13 Proof-of-concept funds."

14 Q    Can you explain -- can you sort of decode that for

15 us?  What are you --

16 A    So that was just a little note to myself that if we

17 would decide to go ahead with a proposal, that their

18 current -- at that time, there was an initiative worked on

19 by many different universities to create a

20 proof-of-concept research fund.  And so just doing some

21 internal thinking, you know, I was trying to maybe connect

22 the two.

23 Q    And when you say, "Let McDonnell know about Tobacco

24 Commission proposal," what are you contemplating doing

25 there?

1  A    That would be probably -- well, it wouldn't be me

2  letting him know.  It would be probably the Vice President

3  for Research.

4  Q    And when you say, "Favorable on Commonwealth POC

5  funds," is that referring to Star or an entirely

6  separate --

7  A    Oh, this is entirely separate.

8  Q    Now --

9          MR. BROWNLEE:  We can go ahead and take that

10 down.

11 BY MR. FAULCONER:

12 Q    Now, as you sort of did your due diligence and you

13 were participating in these calls with Dr. Lazo and Star

14 and Rock Creek, did you also brief one of the individuals

15 I think we've referenced named Tom Skalak?

16 A    Only one.

17 Q    And does Mr. Skalak, to your knowledge, interact with

18 government officials in his job?

19 A    Yes, he does.

20 Q    Now, before you briefed Mr. Skalak, did you put

21 together a list of pros and cons in your -- as part of

22 your due diligence?

23 A    So that was a document I created just for myself.

24 When you -- when -- personally, when I'm wrestling with

25 making some decisions, it's easier if I write down pros

SHARON KRUEGER - DIRECT          2770

```
 1  and cons.  So it was a document I created for myself, to
 2  be seen by no one except myself.  And yes, I did.
 3          MR. FAULCONER:  I'd like to show the witness
 4  what's been marked for identification as Exhibit 267.
 5  BY MR. FAULCONER:
 6  Q    And is that the pros/cons list that you created?
 7  A    Yes, it is.
 8          MR. FAULCONER:  Your Honor, we'd offer Exhibit
 9  267 into evidence.
10          THE COURT:  It will be admitted.
11  BY MR. FAULCONER:
12  Q    All right.  Now, we won't be long on this, but could
13  you just read for us the first thing that's listed in the
14  "Pro" column there?
15  A    "Perception to Governor that UVA would like to work
16  with local companies to support future economic
17  development."
18          MR. FAULCONER:  And if we could scroll over to
19  the right.
20  BY MR. FAULCONER:
21  Q    What is the first thing written in the "Cons" column?
22  A    "Political pressure from Governor and impact on
23  future UVA requests from the Governor."
24  Q    All right.
25          MR. FAULCONER:  We can go ahead and take that
```

 1  down.

 2  BY MR. FAULCONER:

 3  Q    Now, we've talked a lot about the process that

 4  unfolded.  In the end, did the UVA researchers end up

 5  making any applications to the Tobacco Commission?

 6  A    No, they did not.

 7  Q    At the time of your various deliberations and due

 8  diligence and these conversations, did you have any

 9  knowledge of any payments or things of value given from

10  Mr. Williams to the McDonnells?

11          MR. BROWNLEE:  Objection, Your Honor.

12          THE COURT:  Overruled.

13  A    No, I did not.

14          MR. FAULCONER:  One moment, Your Honor.

15      (Counsel conferring with co-counsel.)

16          MR. FAULCONER:  No further questions, Your

17  Honor.

18          THE COURT:  All right.  Cross?

19                    **CROSS-EXAMINATION**

20  BY MR. BROWNLEE:

21  Q    Good afternoon, Ms. Krueger.  My name is John

22  Brownlee, and I represent Bob McDonnell.  I've got a few

23  questions for you here today.  Thank you.

24          MR. BROWNLEE:  If we can begin with 267,

25  Government's Exhibit 267.

1  BY MR. BROWNLEE:

2  Q    This is this pros and cons that you've testified you

3  prepared.  Now, government counsel asked you, on the cons,

4  it says, "Political pressure from Governor and impact on

5  future UVA requests from Governor."

6       You never spoke with Bob McDonnell about Star or Rock

7  Creek; isn't that correct?

8  A    That is correct.

9  Q    Okay.  So whatever you're referring to here, it

10  didn't come from this man, right?

11  A    That is correct.

12  Q    Okay.

13          MR. BROWNLEE:  All right.  You can take that

14  down.

15  BY MR. BROWNLEE:

16  Q    Now, I want to start back one step as we begin here.

17          MR. BROWNLEE:  If we could pull up -- well,

18  let's take a look at Government's Exhibit Number 261.

19  BY MR. BROWNLEE:

20  Q    All right.  And I believe the government showed this

21  e-mail to you.  Do you remember that?

22  A    Yes.

23  Q    Okay.  So this is an e-mail, we'll start at the

24  bottom, from you to Mr. Crowell on November 8th.  And this

25  is at 8:17 p.m.  Okay?

1   A    Yes.

2   Q    And you're saying, "So got more information.

3   Interesting.  I'm going to be" -- "I'm going to do a bit

4   of diligence as well.  Let you know what I find out."  And

5   then you talk about the governor's wife and all this.

6        Now -- and then you forwarded it up and it says,

7   "Great reports.  Kind of agree on the Rock Creek thing."

8        And this is what the government showed you; isn't

9   that right?

10  A    This is correct.

11  Q    Okay.  And they just showed it to you just a few

12  moments ago?

13  A    This is correct.

14  Q    Okay.

15          MR. BROWNLEE:  Let's pull up Government's

16  Exhibit 260.

17          MR. FAULCONER:  Your Honor, I don't think this

18  one has been entered.

19          MR. BROWNLEE:  If we could just show the

20  witness.  If we'd go down below.

21  BY MR. BROWNLEE:

22  Q    Okay.  Now, this is an e-mail that has got your name

23  on it that was sent to you.  You're in the cc block, from

24  Mr. Crowell; isn't that correct?

25  A    Yes.

1   Q    Okay.  And it's on November 8th?

2   A    Yes.

3   Q    Same date as the other one, except this one is at

4   5:04 a.m., correct?

5   A    Correct.

6        MR. BROWNLEE:  Your Honor, we move Government's

7   Exhibit 261 -- 261 -- 260 into evidence.

8        THE COURT:  It will be admitted.

9        MR. BROWNLEE:  Thank you.

10       Okay.  Now, if we scroll up.

11  BY MR. BROWNLEE:

12  Q    The e-mail that sets up the one that was shown to you

13  by government counsel is from Mr. Wright.  And who is

14  Mr. Wright?

15  A    He is from Rock Creek Pharmaceuticals.

16  Q    So he's a Star guy?

17  A    Yes.

18  Q    Okay.  And he sends this e-mail, and you're on it.

19  And it says, "We do not know yet.  It is one of the

20  following three."  And then it has three people,

21  "Assistant to the Governor, Attorney General, wife of

22  Governor.  I will try to find out more."

23       Now, this is who Star is telling you might show up at

24  some meeting?

25  A    That is correct.

1  Q    Okay.  And Bob McDonnell is not on this e-mail,

2  right?

3  A    That is --

4  Q    No one from the government is on this e-mail?

5  A    That is correct.

6  Q    Okay.

7          MR. BROWNLEE:  And then it scrolls up.

8  BY MR. BROWNLEE:

9  Q    Okay.  And then Wriston responds, and you're cc'd.

10 And then it says, "Mark, I will call Peggy and see what

11 are the compelling time-related issues she sees at this

12 point."

13     Now, Peggy is Peggy Shupnik; is that correct?

14 A    That is correct.

15 Q    And Ms. Shupnik, if you know, attended this Star

16 event at Gibson Island in July; isn't that right?

17 A    That is right.

18 Q    Okay.  And so when she went to Gibson Island, she got

19 the full pitch from Star about Anatabloc; isn't that

20 correct?

21 A    That is correct.

22 Q    Okay.  And it was at that time, after that, that

23 Ms. Shupnik decided that they would accept this $25,000

24 planning grant from Star; isn't that right?

25         MR. FAULCONER:  Objection, Your Honor, as to

1  what Ms. Shupnik decided.

2         THE COURT:  Sustained.

3  BY MR. BROWNLEE:

4  Q    Well, do you know when UVA, Ms. Shupnik, decided to

5  accept this money from Star?

6  A    No, I do not.

7  Q    Okay.  All right.  So if we take this down and then

8  bring up 261, Government's Exhibit 261, and we blow this

9  up, this is a continuation of the e-mail I just showed

10 you, right?

11 A    That's correct.

12 Q    Okay.  Because those were starting in the morning,

13 and now we're in the evening?

14 A    Right.

15 Q    Okay.  And so this is a follow-on.  And so when

16 you're talking here about -- when you say, "I think

17 involving the Governor's wife or assistant may look like

18 the gov is influencing UVA," that information came from

19 Star, didn't it?

20 A    That is correct.

21 Q    Okay.

22        MR. BROWNLEE:  You can take that down.

23     Can we pull up Government's Exhibit 262?  And go to

24 the next page.  If we could blow up that photograph.

25 BY MR. BROWNLEE:

SHARON KRUEGER - CROSS - BROWNLEE        2777

```
 1  Q    Now, Ms. Krueger -- am I pronouncing it right, by the
 2  way?
 3  A    Krueger.
 4  Q    Krueger.  I apologize.  Ms. Krueger, you testified
 5  that you -- at some point you decided to do some due
 6  diligence and you went on I think the Star website, or
 7  somewhere, and pulled this photograph?
 8  A    I pulled it off of Facebook.
 9  Q    Off the Facebook.  Okay.  And you said that in seeing
10  this photograph, that influenced one of your later
11  statements that you thought he supported this product; is
12  that correct?
13  A    That is correct.
14  Q    Okay.  Were you aware that this picture went through
15  the channels in the Office of the Governor and was
16  actually approved by staff to be released?
17  A    No, I do not.
18  Q    Okay.  All right.
19        MR. BROWNLEE:  We can take that down.
20  BY MR. BROWNLEE:
21  Q    Now, I think you were -- you met with government
22  counsel, I believe; is that correct?
23  A    Yes.
24  Q    Yes.  Okay.  And at some point you testified that you
25  attended an event for a company called MicroAire; is that
```

1  correct?

2  A    That's correct.

3  Q    Okay.  And tell us what that event was about.

4  A    So MicroAire is a -- a small surgical supply company

5  located in Charlottesville, Virginia.  And in -- gosh, it

6  was in the spring, and I can't remember the year, they

7  actually moved to a much larger facility.  And the

8  Governor and his wife were at the grand opening at that

9  facility.

10 Q    All right.

11       MR. BROWNLEE:  Let me show you, just for the

12 witness, RM-0166-0001.  No.  0166-0001.  There you go.  If

13 you could blow that up.

14 BY MR. BROWNLEE:

15 Q    Is this the event you're referring to?

16 A    Yes, it is.

17       MR. BROWNLEE:  All right.  Your Honor, we move

18 RM-0166 into evidence.

19       THE COURT:  It will be admitted.

20       MR. BROWNLEE:  Thank you.

21    If we could just publish this.

22 BY MR. BROWNLEE:

23 Q    And so this is Governor McDonnell at MicroAire, and

24 they are expanding and they make apparently -- I think you

25 said surgical --

1    A      Orthopaedic equipment.

2    Q      Like saws and things?

3    A      Yes.

4    Q      Okay.

5               MR. BROWNLEE:  You can take that down.

6    BY MR. BROWNLEE:

7    Q      And one other thing.  I won't pull it up again, but

8    you -- in one of your notes, you say, "This is the awkward

9    part as Governor McDonnell has publically announced his

10   support for the parent company, Star Scientific."

11       And I think you testified one of the reasons you

12   wrote that is because of the picture; is that right?

13   A      That is correct.

14   Q      But up to that point, you had never had a

15   conversation with Bob McDonnell about Star or Rock Creek

16   or any of that?

17   A      That is correct.

18   Q      Okay.  You talked a little bit about your

19   conversations with Dr. Lazo; is that correct?

20   A      Yes.

21   Q      Okay.  And you mentioned something.  You said his

22   testimony was -- he asked you a question, and you said

23   something about his testimony was different or something.

24   What did you mean by that, "his testimony"?

25   A      I guess I'm kind of unclear of -- was it the

1  conversation John and I had?  John Lazo and I had are you

2  talking about?

3  Q    No, ma'am.  You just referenced Dr. Lazo's testimony.

4  And I was just wondering --

5  A    Oh.  Oh.  He -- just following the trial, the media

6  portrayal on the trial.

7  Q    I see.

8  A    It was mentioned that John spoke to a senior

9  researcher official at the university on his drive home.

10  Q    I see.

11  A    And I don't think that he meant me.

12  Q    Okay.  All right.  And so -- I just wanted to make

13  sure.  So when you referenced his testimony, you're just

14  following the press accounts?

15  A    Yes.

16  Q    Okay.  Now, counsel asked you about Dr. Lazo and some

17  of his thoughts on these research principles.  I believe

18  you have some reference to that in your notes; is that

19  correct?

20  A    Yes.

21  Q    Okay.  Were you aware that Dr. Lazo has testified --

22  you obviously know that, correct?

23  A    Yes.

24  Q    And he was asked whether or not Bob McDonnell -- if

25  there's anything Bob McDonnell had done that would have

1    violated any of those principles?

2            MR. FAULCONER:  Objection, Your Honor, as to

3    commenting on Dr. Lazo's testimony.

4            THE COURT:  Sustained.

5    BY MR. BROWNLEE:

6    Q    All right.  And in those notes, in your conversations

7    with Dr. Lazo, would you agree that Dr. Lazo's in court,

8    under oath testimony is a better reflection of what he

9    actually saw and said than your notes of a conversation

10   you had with him?

11           MR. FAULCONER:  Objection, Your Honor.

12           THE COURT:  Sustained.

13           MR. BROWNLEE:  Thank you, Your Honor.

14   BY MR. BROWNLEE:

15   Q    Now, you testified that Star, or Rock Creek, never

16   actually responded or got back to you guys about applying

17   for any of these tobacco grants; is that correct?

18   A    That is correct.

19   Q    Okay.  So there was some discussions.  I think you

20   had a phone call with some of the folks at Star, and then

21   after that, nothing ever happened?

22   A    The day after the call, I was sent, and maybe Mark

23   Crowell was cc'd on it, just a follow-up, scientific

24   journal article and a poster from a research presentation

25   from Rock Creek.  And then that was it.

SHARON KRUEGER - CROSS - BROWNLEE      2782

```
1   Q    That was it.  And did you ever have any conversations
2   with Bob McDonnell about Rock Creek or Anatabloc or
3   anything?
4   A    No, I did not.
5   Q    Okay.  So fair to say that all this -- these e-mails
6   and notes and all -- all of it comes from someone else
7   other than Bob McDonnell?
8   A    That is correct.
9   Q    Okay.
10        MR. BROWNLEE:  And let me just do one last
11  thing, Your Honor, and I'm just about done.
12        Can you pull up Government's Exhibit 268 and just
13  look at the far two left, the left-hand side.
14  BY MR. BROWNLEE:
15  Q    It's kind of hard to see, but I think the first one,
16  it says, "Date Letter Received."  One of them says
17  August 1.  Number 2 says August 11th.  Number 3 says
18  August 15th.  Number 4 says August 17th.  Number 5 says
19  August 18th maybe.
20        MR. BROWNLEE:  If you'll go down.
21  BY MR. BROWNLEE:
22  Q    Then 6 is August 18th.  The 7th is the 19th.
23        Are those accurate dates, ma'am?
24  A    So I -- you know, this is a document that's created
25  by our Office of Sponsored Programs.  So I never saw the
```

SHARON KRUEGER - CROSS - BROWNLEE       2783

1  request for proposals.  So this is how they track either

2  when letters were submitted or funding was granted.  But I

3  never -- I wasn't aware of anything at this time, in

4  August.

5  Q    Okay.

6           MR. BROWNLEE:  You can take that down.

7  BY MR. BROWNLEE:

8  Q    And then lastly, they asked you about some event in

9  May of 2013 with the Governor of Nebraska.

10 A    Yes.

11 Q    Okay.  Did that event have anything to do with Star

12 or --

13 A    No.  No.  No.  That did not.

14 Q    Okay.  And I believe at that event Secretary Cheng

15 attended?

16 A    Yes, he did.

17 Q    Okay.  And has Governor McDonnell, in prior times,

18 attended those types of events at Virginia?

19 A    Yes.

20 Q    Okay.  So he has --

21 A    Yes.

22 Q    He has, I guess, positively responded to your

23 invitations on occasion?

24 A    Not necessarily mine, but the -- from the Office of

25 the Vice President for Research.  Yes.

```
 1  Q    Okay.  Good.  All right.

 2            MR. BROWNLEE:  Thank you, Judge.

 3            THE COURT:  All right.  Ms. McDonnell.

 4                    CROSS-EXAMINATION

 5  BY MR. KOFFMANN:

 6  Q    Good afternoon, Ms. Krueger.  My name is Dan

 7  Koffmann, and I'm an attorney for Maureen McDonnell.

 8       Ms. Krueger, you testified -- you were shown a

 9  picture by Mr. Brownlee of you at a -- or Governor

10  McDonnell at a MicroAire event?

11  A    Correct.

12  Q    And you attended that event, right?

13  A    Yes.

14  Q    To your knowledge, did Maureen McDonnell attend that

15  event?

16  A    Yes, she did.

17  Q    And did you have an opportunity to speak with her at

18  that event?

19  A    No, I did not.

20  Q    Have you ever had an opportunity to speak with

21  Ms. McDonnell?

22  A    No, I have not.

23  Q    So Maureen McDonnell has never pressured you to do

24  anything?

25  A    No, she has not.
```

1  Q    And she's never even spoken to you about Anatabloc?

2         MR. FAULCONER:  Objection, Your Honor.  Asked

3  and answered.

4         THE COURT:  Overruled.

5  A    That is correct.

6         MR. KOFFMANN:  Thank you.

7         THE COURT:  Any redirect?

8         MR. FAULCONER:  Very briefly, Your Honor.

9                    **REDIRECT EXAMINATION**

10 BY MR. FAULCONER:

11 Q    Ms. Krueger, you were shown the dates on that -- on

12 that form --

13 A    Yes.

14 Q    -- that originally was sent to you.

15       As of the time that you were on the conference call

16 in late November 2011 talking about the potential

17 applications to the Tobacco Commission, was it your

18 understanding that that application had already been made

19 to the Tobacco Commission or that that was something that

20 was being considered?

21 A    So this actually was an exploratory call to discuss

22 the early opportunity of -- or to discuss potentially

23 putting in a Tobacco Commission grant.

24 Q    So those dates on the form, are those referring to

25 the planning grants or to the Tobacco Commission grants?

1  A    Those are referring to the pilot study grants.

2           MR. FAULCONER:  One moment, Your Honor.

3       No further questions, Your Honor.

4           THE COURT:  All right.

5       Thank you, ma'am.  You may stand down.

6       (Witness stood aside.)

7           THE COURT:  Call your next witness, please.

8           MR. DRY:  The United States calls Jerry Kilgore

9  to the stand, Your Honor.

10                    **JERRY KILGORE,**

11  called as a witness by and on behalf of the government,

12  having been first duly sworn by the Clerk, was examined

13                and testified as follows:

14                  **DIRECT EXAMINATION**

15  BY MR. DRY:

16  Q    Mr. Kilgore, can you state your full name for the

17  record, sir.

18  A    Yes.  Jerry W. Kilgore.

19  Q    And what city and state do you currently live in?

20  A    I live in Glen Allen, Virginia.

21  Q    And how are you currently employed?

22  A    I work at McGuireWoods Consulting.

23  Q    And what is McGuireWoods Consulting?

24  A    It's a -- it's a lobbying firm, for lack of a better

25  description.

1   Q     Okay.  And how long have you been with McGuireWoods

2   Consulting?

3   A     For five years.

4   Q     And specifically, what do you do at McGuireWoods

5   Consulting?

6   A     I co-chair the National Practice Team, which is the

7   team that goes out and -- and works with state Attorneys

8   General and state Governors.

9   Q     Okay.  And who are you interacting with these state

10  Governors and state Attorney Generals on behalf?

11  A     On behalf -- business clients, usually.

12  Q     Okay.  So business clients hire you to do what?

13  A     They hire me to -- to go to meetings with state AGs

14  or governors and work on their issues, whether it's

15  consumer protection issues or -- or just dealing with

16  various investigations by state Attorneys General.  So

17  just a whole gamut of things.

18  Q     And when did you first meet Mr. McDonnell?

19  A     It would have been in '93, '93 when I was working

20  with the George Allen campaign, but then became Secretary

21  of Public Safety for then Governor George Allen in January

22  '94.

23  Q     Okay.  I'm sorry.  Who was Secretary of Public

24  Safety?

25  A     I was Secretary of Public Safety, and became

1   Secretary of Public Safety in January of 1994.

2   Q    Okay.  And that was in whose administration?

3   A    Governor George Allen.

4   Q    Since the time you met him, how would you describe

5   your personal relationship with -- or your relationship

6   with Mr. McDonnell?

7   A    Right.  It was, you know, a political relationship.

8   He was a member of the General Assembly on the Courts of

9   Justice Committee, which was the committee that the

10  Secretary of Public Safety had to deal with and get

11  legislation passed out of.  He handled a lot of our

12  legislation from -- from the Governor Allen administration

13  on pro abolition, juvenile justice reform.

14       And then over time, you know, I would say we became

15  personal friends.  He ran for -- after I served as

16  Attorney General, he ran for Attorney General with me

17  running for Governor on the same ticket.

18  Q    Okay.  And let's just unpack that a little bit.  When

19  did you run for Attorney General of Virginia?

20  A    I ran twice, actually.  First in 1997, in a four-way

21  primary, and I didn't quite make it then.  And then I won

22  in 2001 and started service in January of 2002.

23  Q    And during your campaign for Attorney General, did

24  you use private airplanes of political donors?

25  A    When we could.  Yes.

1   Q     Okay.

2   A     It made it easier to get to Southwest Virginia or

3   other areas of the state.

4   Q     Okay.  And was Mr. Williams one of your political

5   contributors?

6   A     Yes.

7   Q     And you rode on his plane?

8   A     Yes.

9   Q     When did you first meet Mr. Williams?

10  A     It would have been during the Attorney General's

11  campaign.

12  Q     And what was the context of your meeting him?

13  A     He was a political supporter.

14  Q     Okay.  And what did you know about Mr. Williams at

15  that time?

16  A     Just that it was Star Tobacco at the time, Star

17  moving into Star Scientific, and that he was one of the

18  independent tobacco marketers, if you will, in Southside

19  Virginia.

20  Q     When you say "independent," what does that mean?

21  A     Well, it's not one of the big five, like Philip

22  Morris and some of those.  But one of the more independent

23  tobacco manufacturers and growers in Southside Virginia.

24  Q     And how would you describe your relationship with

25  Mr. Williams during your campaign for Attorney General?

JERRY KILGORE – DIRECT          2790

1  A    It would -- it would have been political supporter.

2  Candidate, political supporter.

3  Q    Okay.  And did Mr. Williams ever donate actual money

4  to your campaign for Attorney General?

5  A    Yes.  I believe so.

6  Q    And were these all in the context of campaign

7  contributions?

8  A    Yes.

9  Q    Okay.  Did you ever receive any personal money or

10 loans from Mr. Williams while you were running for

11 Attorney General?

12 A    No.

13 Q    Okay.  And when did you serve as Attorney General of

14 Virginia?

15 A    From 2002, January 2002, until the beginning of 2005.

16 Q    And during that time, how would you describe your

17 relationship with Mr. Williams?

18 A    Political supporter, candidate for Governor then, you

19 know, running for Governor during some of that time.

20 Q    And while you were Attorney General, did you receive

21 any personal loans or money from Mr. Williams?

22 A    No.

23 Q    Did he ever offer you any?

24 A    No.

25 Q    Now, you stepped down as Attorney General in 2005, I

1  believe you said?

2  A    Correct.

3  Q    And what did you do after you stepped down from your

4  role as Attorney General?

5  A    Unfortunately, I ran for Governor.

6  Q    Okay.  And while you were running for Governor, I

7  believe -- you alluded to this.  I just want to make sure

8  I'm clear on it.

9        Who was also running on your ticket, I guess?

10 A    Governor McDonnell was running for Attorney General.

11 Q    And did you make joint campaign appearances with

12 Mr. McDonnell, who was running for Attorney General?

13 A    Oh, yes.  Absolutely.  Plenty of those.

14 Q    Okay.  And what's your relationship like with

15 Mr. McDonnell at that point?

16 A    I -- I would say personal friend, political ally.

17 All of the above.

18 Q    Now, did Mr. Williams ever make campaign

19 contributions for your campaign for Governor?

20 A    Yes.

21 Q    And do you have any idea how much those would be?

22 Was he the largest contributor?

23 A    He wasn't the largest, but I would say he and Star

24 together were probably around $100,000.

25 Q    Okay.  And at the time you're running -- I'm sorry.

```
 1   I know this is going to be painful, but I'll ask.  What
 2   were the results of your race for Governor?
 3   A    I did not win.
 4   Q    And what were the results of Mr. McDonnell's race for
 5   Attorney General?
 6   A    He did win.
 7   Q    Okay.  Now, after -- and that was in 2005, I believe?
 8   A    Correct.
 9   Q    After that, where do you go next?
10   A    I went to Williams Mullen and basically did the same
11   thing there that I'm doing at McGuireWoods.
12   Q    You were a lobbyist?
13   A    I was a lobbyist.
14   Q    And then --
15   A    And attorney.  Sort of a mix, a hybrid there.
16   Q    Okay.  And then when did you -- what year did you go
17   to McGuireWoods?
18   A    I went to McGuireWoods in -- in January 2010.
19   Q    Okay.  Now, in 2009, Mr. McDonnell is running for
20   Governor; is that right?
21   A    Correct.
22   Q    Did you assist in his campaign?
23   A    Yes.  I was on the Finance Committee.
24   Q    And what do you do -- what was your role as being on
25   the Finance -- first of all, can you explain what a
```

1  Finance Committee does?

2  A    Finance Committee is a group of people that assist a

3  candidate in raising money for their race.

4  Q    When you say "raising money," what is that?

5  A    Contacting donors, contacting businesses that might

6  contribute to a candidate and bringing those dollars in

7  for the campaign to be used on advertisements and -- and

8  campaign expenses.

9  Q    All right.  Can you distinguish between a campaign

10 contribution and somebody giving personal money?

11 A    Well, I mean, a campaign contribution is to be used

12 solely for that campaign.  You know, expenses of the

13 campaign, like you have staff or you -- you want to save

14 as much money as possible to -- to buy those ads at the

15 end, in September and October, that go on TV or the radio

16 and things like that.

17      Personal would just be outside of the campaign.  It

18 would have nothing to do with the campaign.

19 Q    Okay.  And you mentioned briefly what a campaign

20 contribution is.  Can you describe what an in-kind

21 contribution is?

22 A    That would be a contribution of services, whether

23 it's a plane.  You mentioned that earlier.  It could be an

24 in-kind.  Somebody giving you an office space, buying --

25 buying dinners for -- for everybody at an event or

1    something.  Those could be in-kind.  You just put the

2    value, to the best of your ability, down on the campaign

3    finance report and report it.

4    Q    Okay.  And you mentioned a "campaign finance report."

5    If somebody makes a campaign donation, how is that tracked

6    and reported?

7    A    Well, you -- you're obligated, under state law, to

8    file with the State Board of Elections every so often,

9    every -- you know, and it gets shorter and shorter as your

10   race is getting shorter and shorter in days.  So you may

11   start out reporting every six months, and then you'll file

12   reports every 30 days.  And then at the end, you're filing

13   them every ten days, and then maybe every day if you get

14   large enough donations.

15   Q    And are you reporting just money in or are you

16   required to report money out?

17   A    You're reporting money in and money out.  You're

18   reporting the money you've raised and the expenditures

19   you've made.

20   Q    Okay.  So during the Governor's -- Mr. McDonnell's

21   campaign for Governor in 2009, how would you describe your

22   relationship with Mr. McDonnell at this point?

23   A    Great relationship.  Just working to raise the

24   dollars necessary to be competitive.

25   Q    Okay.  And you're out of politics at this point --

1    A     I'm --

2    Q     -- as a candidate?

3    A     As a candidate for sure.  Yes.

4    Q     Okay.  And how is -- what's your relationship with

5    Mr. Williams like at this point?

6    A     I mean, just, you know, good.  I mean, it's a -- he's

7    a political person.  He's a donor I would call to -- to

8    raise money for candidates.

9    Q     Okay.  Now, when do you first start having a business

10   relationship with Mr. Williams?

11   A     In -- during the summer of 2011.

12   Q     Okay.  So this is after Mr. McDonnell has been

13   elected Governor?

14   A     Correct.

15   Q     And you've worked on his campaign committee, or

16   his --

17   A     Finance.

18   Q     -- Finance Committee?

19   A     Correct.

20   Q     Was there any other committee after he won the

21   election that you worked on?

22   A     Yes.  The Higher Education Board Appointments

23   Committee.  I worked on that with the Governor and his

24   staff.

25   Q     How about the Inaugural Committee?

JERRY KILGORE - DIRECT          2796

1   A    Yes.  I'm sorry.  Yes, I did.  I worked on -- I was

2   the co-chair of the inauguration.

3   Q    Okay.  Now, going to -- I believe you said the summer

4   of 2011, you started having a business relationship with

5   Mr. Williams.  Can you -- just tell us, how did that come

6   about?

7   A    He called me in the summer of 2011, July time frame,

8   and asked me to meet him for lunch in town, and we met for

9   lunch.  And he wanted to talk about getting research

10  dollars from the State for his product.

11  Q    And what product was that?

12  A    Anatabloc.  And he, you know, was describing

13  anatabine and all that -- the good it could do.  And he

14  needed it researched in Virginia, and he thought I and the

15  consulting firm would be the place to go to make sure that

16  we helped him get the research dollars through -- he

17  mentioned first the Tobacco Commission and --

18  Q    Okay.  So he brought that up in that meeting?

19  A    He brought up the Tobacco Commission, going after

20  Tobacco Commission funding for this research.  And I

21  brought up that, you know, you should look broadly at

22  state government for research dollars, that, you know,

23  just don't rely on the Tobacco Commission.  You should

24  look at other ways to get those dollars, whether through

25  the budget or through grants.  And you just got to look at

JERRY KILGORE - DIRECT          2797

1   all of state government to figure out if there are

2   research dollars out there.

3   Q    And when you mention "the budget," what exactly are

4   you discussing with him about potential funding sources?

5   A    Well, when I'm -- when I mention the budget, I mean

6   the biannual budget that the Commonwealth passes every two

7   years, but it amends every year.  So it's like dealing

8   with a budget every year, technically.

9        And you try to, on behalf of clients, get support

10  for, if you will, a line item in the budget for particular

11  research or for a particular product or for a particular

12  item.

13  Q    Okay.  And this meeting was July 6th of 2011; is that

14  right?

15  A    That sounds right.  Correct.

16  Q    What did Mr. Williams tell you during this meeting

17  regarding his relationship with Mr. McDonnell?

18  A    During that meeting, he did say that the Governor and

19  the First Lady both supported his product and supported --

20  would support getting research on his product.

21  Q    And did he mention their support for state funding

22  for the research?

23  A    He mentioned that they would be supportive of that,

24  yes.

25  Q    Now, was anyone else present during your meeting with

JERRY KILGORE – DIRECT          2798

1  Mr. Williams on July 6th?

2  A     No.

3  Q     It was just you and he?

4  A     Just the two of us.

5  Q     Now, can you kind of -- first of all, were you aware

6  of the process -- he mentions the Virginia Tobacco

7  Commission, right?  Were you aware of the process of the

8  Virginia Tobacco Commission?

9  A     Yes.  I mean, for the most part, I'm aware of the

10 Virginia Tobacco Commission process.  But I do know they

11 have deadlines and they have specific funding cycles, you

12 know, whether it's research cycle or other types of

13 cycles.  They have defined cycles at the Tobacco

14 Commission.

15 Q     And can you just briefly describe what the Virginia

16 Tobacco Commission is?

17 A     It was -- the Virginia Tobacco Commission was

18 established by the large -- what we call the master

19 settlement agreement with the five large tobacco companies

20 back before I was AG that sends a stream of money into

21 each state that was -- into each state, now all 50 states.

22 But Virginia chose to use their stream of dollars in two

23 ways.  One would be to give 90 percent of those dollars to

24 the Tobacco Commission to give out through grants to

25 regions of the Commonwealth that grew tobacco to diversify

JERRY KILGORE - DIRECT          2799

1   those economies and to make sure they are no longer

2   tobacco dependent.

3        The other 10 percent goes to the Virginia Healthy

4   Youth Foundation to deal with anti-smoking campaigns.

5   Q    Okay.  And who serves as commissioners?

6   A    The -- it's a 31-member committee -- commission.  You

7   would have -- members of the House and the Senate would

8   probably be -- I think 11 of those members are -- 11 or 12

9   are members from the House and the Senate.  The rest are

10  appointed by the Governor or the Governor's designates.

11  Q    Okay.  And, in fact, do you have a family relation

12  that works on --

13  A    Yes, I do.

14  Q    -- that?

15  A    My brother is the Chairman.  He's in the House of

16  Delegates, and he's the Chairman of the Tobacco Commission

17  at this point.

18  Q    And to be clear, the Governor didn't appoint him to

19  the Tobacco Commission?  That's --

20  A    No.  He's appointed by the House of Delegates.  And

21  the House and the Senate have to appoint members from

22  those tobacco growing areas.  So since he represents

23  the -- the far western corner of state, then he represents

24  the Burley tobacco area.

25  Q    Okay.  Now, as a result of your meeting on July 6

JERRY KILGORE - DIRECT            2800

1  with Mr. Williams, what resulted?  What was your
2  relationship?  He had been a political donor.  Now what is
3  he?
4  A    He became a client.
5  Q    All right.
6  A    So I just go back and --
7  Q    Yeah.
8  A    -- talk with my staff, mainly Chris Nolen, in my
9  office to, "Let's come up with a plan, how do you want to
10 deal with" -- "how do we want to deal with approaching the
11 Tobacco Commission and looking for other funding sources."
12 And I immediately said, "Well, I better call and see if
13 there's a deadline coming up."
14      So I called my brother to see if there was a deadline
15 coming up, and there was one coming up for research.  And
16 it was coming up in August.
17 Q    Okay.  You just mentioned "research."  Could the
18 Virginia Tobacco Commission use Tobacco Commission funds
19 for research?
20 A    Yes, they could.  And they have a cycle for research
21 and development.  And that's the cycle I'm referring to
22 that was going to come up in August, in the August time
23 frame of 2011.
24 Q    Okay.  And that cycle, the August time frame, is that
25 for the pre-applications for the final application?

1    A    That's for the application.

2    Q    Okay.  Were you able to make that August deadline as

3    far as submitting grants applications?

4    A    No, we did not.  We were working with Bob Pokusa, who

5    is the general counsel, at the time, at Star, and we were

6    pushing them, "If you're going to do this, we've got

7    to" -- "if you're going to do it for this cycle, we've got

8    to it quickly.  We've got to get all of our information

9    together."

10        And we had some problems with how they wanted to do

11   it because Mr. Williams had suggested that the partnership

12   needed to be with Johns Hopkins, and I totally advised

13   against that because I did not believe that -- that the --

14   this Tobacco Commission would partner with a University of

15   Maryland.

16   Q    So what did you recommend that he do?

17   A    I told him you have to get a Virginia research

18   institution to deal with this.  And we suggested VCU or

19   UVA, to go for research folks at those facilities because

20   that would make it more palatable to the Commission.

21   Q    And just so I'm clear.  Why is it going to be more

22   palatable to have UVA or VCU rather than Johns Hopkins?

23   A    Because they are in the Commonwealth of Virginia.

24   And this money, the commissioners would -- I'm convinced

25   the Commission likes to spend money on Virginia projects,

1  not see Marylanders getting the money.

2  Q    And did you mention that to Mr. Williams?

3  A    Mr. Pokusa.

4  Q    Mr. Pokusa?

5  A    Yes.

6  Q    And did Mr. Williams, in your conversations with him,

7  did he agree, "All right.  UVA and VCU sounds great"?

8  A    Eventually, yes.  They -- they all agreed that we

9  should be focusing on UVA and VCU.

10 Q    Now, in July of 2011, were you aware -- after your

11 meeting with Mr. Williams, were you aware that Star

12 Scientific was going to hold a conference at Gibson

13 Island?

14 A    Yes.  I was invited to that conference originally by

15 Mr. Williams.  He said that I should go to the conference

16 and learn more about Anatabloc and learn more about the

17 benefits and hear the researchers talk about it.

18      And I was like, "Okay.  I can go."  And then

19 Mr. Pokusa called me and told me I should not go.  I did

20 not need to go.

21 Q    Okay.  Were you excited about listening to more about

22 Anatabloc?

23 A    No.  I was happy not to go, actually.

24 Q    After the Gibson Island event, did you have any

25 conversations with Mr. Williams about it?

1    A     After the Gibson Island?

2    Q     Yep.

3    A     Yes.  At a lunch.

4    Q     Okay.  And what did Mr. Williams tell you regarding

5    the Governor's support?

6    A     That the Governor was very supportive of -- of

7    Anatabloc and that the First Lady was attending -- going

8    to attend the Gibson Island.

9    Q     And did you subsequently learn that the First Lady

10   didn't attend, but somebody else attended?

11   A     I did learn that she did not attend, and that

12   Ms. Sutherland, instead, attended for her.

13   Q     Okay.

14         MR. DRY:  I'd like to bring up Government's

15   Exhibit 202, please.

16   BY MR. DRY:

17   Q     Do you do you recognize this e-mail sir?

18   A     Yes, I do.

19   Q     And just to be clear, Mr. Nolen works for you?

20   A     He works with me.  I don't think he'd like me to say

21   he works for me.

22   Q     And this is to Bob Pokusa?

23   A     Yes.

24   Q     And you authorized Mr. Nolen to send this e-mail?

25   A     Yes.  We worked on this together.

1    MR. DRY:  Government moves for the admission of

2  Government's Exhibit 202, please.

3    THE COURT:  It will be admitted.

4  BY MR. DRY:

5  Q    Sir, basically, what is the purpose of this e-mail?

6  A    It's to outline for Mr. Pokusa the activities that we

7  believe needs to be done to ensure that we have the

8  opportunity to get research dollars for the testing of

9  Anatabloc.

10  Q    And there's an attachment with a memo?

11  A    Yes.  Correct.

12    MR. DRY:  Can we go to the second page of this.

13  BY MR. DRY:

14  Q    And did you and Mr. Nolen author this memo to Bob

15  Pokusa?

16  A    Yes, we did.

17  Q    And at this point, to be clear, who's your primary

18  point of contact at Star Scientific?

19  A    At this point, it had become Mr. Pokusa only.

20  Q    Okay.  And Mr. Pokusa was what?

21  A    He was the general counsel.

22  Q    Okay.  And can you -- what's the subject line of

23  this?

24  A    It's the "Draft Timeline of Activities to Obtain

25  Tobacco Indemnification and Community Revitalization

1  Commission, TICRC, Grant Funds."

2  Q    And going to the second paragraph, you talk about, "A

3  pivotal aspect of the proposed activities is to know the

4  decision-making process at UVA to pursue grants of this

5  nature."

6     Walk us through what had to happen before you could

7  make an application to the Tobacco Commission.

8  A    Well, the Tobacco Commission rarely would give a

9  grant to a private entity.  I mean, it would -- it's just

10 rare.  I mean, they prefer to have localities or

11 universities, someone with a governmental function to

12 apply for those grants on behalf of a company.

13    And that's why we were pushing UVA or VCU, and at

14 this -- and we wanted to understand -- because it wasn't

15 part of our job to get -- to locate these researchers at

16 UVA -- what is the decision-making process at UVA.  "We

17 need to know that, Bob, so that we can project a timeline

18 with you."

19 Q    Okay.  Just so I understand.  You're going to be

20 responsible for putting together the grant application or

21 submitting it to the Tobacco Commission, right?  That's

22 what McGuireWoods is hired to do?

23 A    Yes.  And working with the Commission staff and

24 working with the commissioners, if we get that far.

25 Q    But before that happens, what does UVA have to decide

1  to do under this plan?

2  A    They have to decide to be a partner with Star, and

3  they have to decide to take the lead on applying with the

4  Tobacco Commission.

5  Q    Now, is part of your role to call the UVA

6  administrators up or the scientists and start that

7  process?

8  A    This was not our role in this case.  No.

9  Q    Who was responsible for doing that?

10 A    That was Star's role.

11 Q    Okay.  And on the third paragraph where it says,

12 "Additionally, we think it is worth exploring whether the

13 McDonnell Administration would consider allocating some

14 additional funds to UVA's state appropriations for use as

15 matching funds to leverage TICRC funds."

16     First of all, TICRC, that's the Tobacco Commission

17 acronym?

18 A    Correct.

19 Q    Okay.  Sometimes it's VTC for that?

20 A    I have.

21 Q    Okay.  Now, what are you talking about "matching

22 funds"?

23 A    Well the Tobacco Commission, on their

24 pre-application, their application, like to see others

25 have skin in the game, if you will, to other entities to

1   be supporting this as well.  Whether it's the private

2   entity or the locality or the other state entity, they

3   like to know that others are supporting this project

4   through some funding or through giving all the staff --

5   you know, to quantify, if you will, that process.

6   Q    Now, your next sentence you write, "We need to

7   determine whether this is possible and if so, make the ask

8   directly to the Governor."

9        Why did you want to make the ask directly to the

10  Governor?

11  A    So that it would be included in the Governor's budget

12  or the budget amendments.

13  Q    Going to the third page of this exhibit, sir, is this

14  the draft timeline that you put together?

15  A    Yes.

16  Q    All right.

17            MR. DRY:  Let's go to the first block.

18  BY MR. DRY:

19  Q    In August, it says, "Determine extent of interested

20  researchers/partners.  Determine UVA internal approval

21  process.  Initiate UVA approval process."

22       Who's going to be doing that?

23  A    The -- Star is supposed to do that.

24  Q    Okay.  And then going down, the September time

25  frame -- and these are -- is it fair to say this is like a

 1  timeline proposal to your client where you're saying, hey,

 2  these are what needs to be checked off?

 3  A    Yes.  This is our wish list of things we want Star to

 4  accomplish with us.

 5  Q    Okay.  And then it talks about, "Prepare advocacy

 6  materials for use in meetings with government officials.

 7  Complete a pre-application.  Schedule a meeting with

 8  Tobacco Commission staff.  Initiate drafting of the

 9  application."

10       But this next bullet point, you have, "Schedule

11  meeting with Governor McDonnell and Governor's policy

12  staff," and you write "J. Williams and J. Kilgore required

13  to request Governor to include state appropriation to UVA

14  for specific research, which could be eligible for the

15  match."

16       Why did you want -- I think we talked about why you

17  wanted to have a meeting with Mr. McDonnell.  Why did you

18  want Mr. Williams to be at that meeting?

19  A    Because generally, if you're making an ask for the

20  state Budget, you want the principal in the room to ask

21  the other principal, which would be the Governor, and to

22  express why it's needed and what the background is.

23       I mean, I would submit that just having me in the

24  room wouldn't possibly get the job done because we're --

25  we're in the Governor's Office on so many other things.

JERRY KILGORE - DIRECT            2809

1  Q    And did Mr. Williams express to you anything about

2  the Governor's support of his product by this point?

3  A    Yes.  I mean, he had said that the Governor and First

4  Lady strongly supported Anatabloc.

5  Q    Now, at the time of this memorandum -- Mr. Williams

6  has told you about the Governor's support.  Did he tell

7  you anything about taking the First Lady shopping in New

8  York City?

9  A    No.

10 Q    And had he told you anything about writing a $50,000

11 check made payable to her?

12 A    No.

13 Q    Had he told you anything about paying $15,000 for the

14 Governor's daughter's wedding reception?

15 A    No.

16 Q    Anything about the Governor playing golf at Kinloch

17 on his tab?

18 A    No.

19 Q    Now, have you known Mary-Shea Sutherland for a while?

20 A    Yes.

21 Q    Okay.

22 A    I have.

23 Q    I'd like to move to the meeting that you had.  I

24 believe it was at The Berkley Hotel on August 1st of 2011.

25 Do you remember that meeting?

1    A    Yes.

2    Q    Okay.  And how did that come about?

3    A    Originally scheduled by Mary-Shea as just a catch-up

4    time.  We do this occasionally to catch up with each

5    other.  She worked with me back in '94 through '97.

6    Q    And in what context did Ms. Sutherland work with you?

7    A    She was -- I was Secretary of Public Safety, and she

8    worked in my inner office.  And she was the grants

9    administrator for the entire Secretary of Public Safety.

10   Q    And did you know her while she was working at

11   Benedetti & Farris in any context?

12   A    Yes.  I knew her as a fundraiser that I worked with

13   on various campaigns.

14   Q    Okay.  Now, let's go to this Berkley Hotel meeting.

15   You said it was originally scheduled, it was just going to

16   be with Ms. Sutherland?

17   A    Right.

18   Q    It was kind of a typical thing, every now and then?

19   A    Right.

20   Q    Who else shows up at this meeting?

21   A    Jonnie Williams.

22   Q    And who -- it's Ms. Sutherland, Mr. Williams, and

23   you.  Anybody else at it?

24   A    That's it.

25   Q    Just walk me through what's discussed at this

1  meeting.

2  A    Catching up first.  But then, you know, Mary-Shea and

3  Mr. Williams start talking about getting her a job and

4  finding her another job because she's telling me she's

5  totally unhappy at the Mansion and does not want to work

6  for the First Lady anymore and wants a new job and wants

7  out of there.

8       And immediately they bring up that she wants to go to

9  work for Jonnie, and they are talking this back and forth.

10  And Jonnie turns to me and asks me if -- if we would hire

11  her at -- at McGuireWoods Consulting and make a place for

12  her and he would find a way to -- to give her business.

13      And I'm like, "We just don't have a position like

14  that that's open right now, and I'm not sure we're going

15  into that area."

16      So then they started talking about other ways to make

17  it happen.  And they -- I think Mary-Shea -- Mary-Shea

18  brought up, you know, going back to Benedetti & Farris,

19  with Jonnie being a client of hers at Benedetti & Farris.

20  Q    And what's -- what's Ms. Sutherland's demeanor as

21  she's telling you that she's unhappy on the First Lady's

22  staff?

23  A    Oh, she's very emotional that day about her work at

24  the Mansion.

25  Q    Was it -- did she make it clear to you that she was

```
 1  leaving the Mansion no matter what?
 2  A    Oh, I left there thinking she was leaving the
 3  Mansion.
 4  Q    Okay.  What did Mr. Williams say as you're -- as the
 5  meeting is discussing Ms. Sutherland's employment, what is
 6  Mr. Williams saying regarding whether he's going to hire
 7  her or not?
 8  A    Well, it seems to me like during that meeting, it's
 9  a -- a job negotiation lunch more than anything.  Here I
10  thought I was going to this lunch just to causally meet up
11  with Mary-Shea, and it becomes a job negotiation lunch.
12       And he -- at the end of it, as we're leaving, he's
13  asking her to get with Benedetti & Farris and put a
14  proposal together.  And then he says send it to me, which
15  I didn't know I was going to be involved in that until
16  that very moment, to send that proposal to me.  And that's
17  how we left that lunch.  And then I got the proposal a few
18  weeks -- or a week or so later.  Two weeks later, I think.
19  Two or so weeks later.
20  Q    Okay.  And --
21  A    Maybe longer than that.  I'm trying to -- longer than
22  that.
23  Q    Okay.  And are they talking about salary at this
24  meeting?  When you say a job negotiation, are they sitting
25  there saying, "This is what you've got to pay" or
```

1  anything?

2  A    No.  No.  We did not get into that detail.  But we

3  got into, you know, she would work -- you know, her

4  proposal was she would work for him.  He would be a client

5  of Benedetti & Farris.

6  Q    Okay.  And he says, "Send a proposal to Jerry

7  Kilgore"?

8  A    Correct.

9  Q    Okay.  And were you negotiating on behalf of

10 Mr. Williams this proposal that came over later?

11 A    No.  I mean, I got the proposal from Abby Farris at

12 Benedetti & Farris.  And I've known her for a -- for

13 almost my entire -- my entire political career.  So, you

14 know, Abby called me about it, sent it over.  And I said,

15 "Well, I'll just get it on to Mr. Williams."  And so I

16 tried to call him, tried to reach out to him several

17 times, and actually never reached him about this

18 particular contract.  And -- or this proposal.

19      And they kept calling.  Abby would call.  And then I

20 got a call from -- one day from Tom Benedetti.  And I

21 eventually talked with Chris Nolen, who also works with

22 me, and we decided we best just ship that off to

23 Mr. Pokusa and ask Mr. Pokusa, since he was general

24 counsel to Star, and that's who would be using her, I

25 would -- we thought.  So just have Mr. Pokusa take care of

```
 1  it.
 2  Q    Before you sent the proposal that you received from
 3  Benedetti & Farris to Mr. Pokusa, did you have any
 4  conversations with Mr. Williams about it?
 5  A    I tried to call him about it, but never really had a
 6  conversation or reached him about it.
 7  Q    But after you sent it to Mr. Pokusa, did you
 8  subsequently have a conversation with Mr. Williams about
 9  the proposal?
10  A    Yes.
11  Q    And tell us what happened then.
12  A    That would have been in September of -- after we had
13  sent it to Mr. Pokusa.  And I asked Mr. Williams about it.
14  I said, you know, "It was" -- "I thought, you know" -- I
15  said, "I thought, you know, you all were going to hire
16  her, and what happened?"  He said he just could not hire
17  her.  It was poaching on the First Lady's Office, and he
18  was not going to do that.
19  Q    Did he explain why he didn't want to do that?
20  A    He needed -- he told me he needed the support of the
21  First Lady for his product and did not want to make her
22  mad.
23  Q    What did he ask you to do after that call?
24  A    I didn't deal anything with that issue because I had
25  already shipped it off to Pokusa.
```

1  Q    All right.  Let's take a step back.  Because that --

2  I believe that was in September of 2011.  Let's take a

3  step back.

4  A    Right.

5  Q    At some point do you learn that there's going to be

6  an event at the Mansion related to Anatabloc?

7  A    Yes, I do.

8  Q    How do you learn that?

9  A    Well, I had -- I learned it from Mr. Eige and Mr. --

10 and Martin Kent called me to come to a meeting at their

11 office.  And I went to the meeting.  I had other business

12 there as well, and I was glad to get a quick meeting.  And

13 they had major concerns about this launch that was going

14 to happen at the Mansion.

15            MR. DRY:  Can we bring up Government's Exhibit

16 4, please.

17 BY MR. DRY:

18 Q    Do you recognize this document, sir?

19 A    Yes.

20 Q    And this is basically a time sheet for you and

21 Mr. Nolen at McGuireWoods?

22 A    Correct.

23            MR. DRY:  Government moves for Government's

24 Exhibit 4 into evidence, Your Honor.

25            THE COURT:  It will be admitted.

1  BY MR. DRY:

2  Q     And just to be clear, how great of a timekeeper are

3  you?

4  A     Well, we normally -- on the consulting side, which is

5  why I want to be on the consulting side, we don't have to

6  do time sheets that are -- account for every tenth of an

7  hour that the law firm has to do.  And we generally don't

8  do work on an hourly basis.  We do work on a project basis

9  or a monthly retainer basis.

10 Q     So it's more of a -- either like a flat fee or --

11 A     It is a -- it's a flat fee.  That's how I would

12 describe it.

13 Q     Okay.

14           MR. DRY:  Can we go down to August 12th of 2011.

15 BY MR. DRY:

16 Q     And right there, it shows an hour -- or .9?

17 A     Right.

18 Q     Is that the length of time?

19 A     Right.

20 Q     And then that's how much it cost?  Not to be rude.

21 A     Yes.

22 Q     Okay.  And then here -- what are you referring to,

23 "Discussions with C. Nolen on strategies at Tobacco

24 Commission"?  Do you recall what that --

25 A     We -- Chris and I met before I went to this meeting.

JERRY KILGORE - DIRECT          2817

1  Q    Okay.  And then it says, "Meeting with J. Eige and M.

2  Kent, Chief of Staff, regarding rollout issues"?

3  A    Correct.

4  Q    Do you recall Mr. Williams informing you of concerns

5  by Eige and Kent before you had the meeting?

6  A    Yes.

7  Q    What did he tell you?

8  A    That they were concerned about the launch of

9  Anatabloc being at the Mansion, that they didn't want it

10 at the Mansion.

11 Q    And what did he tell you to do?

12 A    He said, "Well, the First Lady and the Governor want

13 it at the Mansion.  So we're going to have it at the

14 Mansion."

15 Q    And did he ask you to reach out to Eige and Kent

16 about this?

17 A    They reached out to me.

18 Q    Okay.  And what did they tell you?

19 A    They were opposed to having a launch at the Mansion,

20 that it was -- they did not believe that it was

21 appropriate to have this launch at the Mansion, that --

22 and they suggested that any launch of the project be at

23 the -- at the BioTech Park here in Richmond and not at the

24 Mansion.

25 Q    Did they --

1  A    And they asked me to pass that back on to

2  Mr. Williams.

3  Q    Did they say anything about whether they were

4  familiar with any other similar event like this?

5  A    I mean, they just went on that we don't do those

6  rollout -- we don't do announcements like that at the

7  Mansion.  We should not do those announcements at the

8  Mansion.

9  Q    And they ask you to talk to Mr. Williams.  Do you?

10 A    I do.

11 Q    And what do you tell Mr. Williams?

12 A    I told him that they did not want it at the Mansion

13 and that, you know, he needed to look at the BioTech Park

14 as a potential place to do a rollout.

15 Q    And what was his reaction?

16 A    His reaction was he didn't want to do that.  He

17 needed the Mansion.  He wanted the Mansion because that

18 would be a great place, get better press, he said, so that

19 he could rollout his product.

20 Q    Is he talking about the Governor and Ms. McDonnell's

21 support of this?

22 A    Yeah.  He always would say that they support this

23 project and that we need -- he needs to have this at the

24 Mansion because they want to have it at the Mansion.

25 Q    Now, were you actually involved in the planning of

1  the Anatabloc event at the Mansion?

2  A    I was not.

3  Q    Were you invited to the event?

4  A    I was not.

5  Q    Okay.  At this point, after your conversations with

6  Mr. Eige and Kent and then your conversation with

7  Mr. Williams -- first of all, I believe you -- your time

8  sheet says August 12th, 2011.  How long after that do you

9  think that you relayed Mr. Eige and Mr. Kent's message to

10 Mr. Williams?

11 A    I would have tried to call that day.  So I would have

12 reached him that day or the very next day.

13 Q    Okay.  And from your call with Mr. Williams, let's

14 ballpark it, August 12th, August 13th, up to August 30th,

15 did you know whether there was actually going to be an

16 event at the Mansion?

17 A    I did not.

18 Q    Okay.

19 A    Up until August 29th.

20 Q    Okay.  Well, let's talk about that.  How do you find

21 out that the event is -- there's going to be an event and

22 it's going forward at the Mansion on August 30th?

23 A    That Mr. Eige, again, calls to say, "Have you seen

24 this press release that Star wants to put out with the

25 Governor's statement in it?"

1    I was like, "I don't know now what you're talking

2    about."  And he was reading it to me.  And I said, "Well,

3    you know, I didn't write it.  I didn't" -- "I don't know

4    anything about this.  It's not what they have hired me to

5    do, but I will call.  I will deal with it."

6        And so I called Mr. Williams, who -- to say,

7    "They're" -- "they're not going to" -- "they don't want

8    you to put out a statement that the Governor hasn't

9    approved on your letterhead."

10   Q    Okay.  And what was his reaction?

11   A    Well, he just said he would call in to Star, in to

12   Star.

13   Q    Did you -- well, how certain are you that you talked

14   to Mr. Williams or Mr. Pokusa about that?  I just want

15   your best recollection.

16   A    No.  It could have been Mr. Pokusa, because we were

17   working with him on all the other issues.

18   Q    Okay.  All right.  Did you attend the event at the

19   Mansion?

20   A    I did not.

21   Q    After the August 30th, 2011, event at the Mansion,

22   was -- did you discuss with Mr. Williams whether he wanted

23   to go forward with the studies at UVA and VTC -- or

24   Tobacco Commission funding?

25   A    We discussed that with Star.

```
 1   Q      Okay.

 2   A      But Mr. Pokusa significantly.

 3   Q      And what was --

 4   A      We had another conference call.  I mean, we were

 5   trying to move this forward, do a conference call.  We had

 6   another conference call in November of that year to sort

 7   of, you know, get moving on the research.

 8   Q      Well, let me ask you about that.  You said originally

 9   that there was like this deadline of August that you

10   missed.

11   A      Right.

12   Q      Now you're talking about a conference call in

13   November.  Why didn't you move the ball forward from

14   August to November?

15   A      Well, the August -- you know, Star wasn't ready in

16   August, and our view was Star wasn't moving forward with

17   the researchers until that November phone call when we had

18   a phone call scheduled with the researchers at UVA and

19   VCU.

20   Q      And did you actually participate in that call, sir?

21   A      I opted out of that call, and Chris Nolen

22   participated in the call because it was going to be a

23   research call.

24   Q      Okay.  Now, from the time of that call through

25   February of 2012, what's going on with this grant
```

JERRY KILGORE - DIRECT            2822

1  application process?  Did you make a submission?

2  A    We did not.  The -- Star is supposed to be working

3  with the researchers, getting the researchers on board so

4  that we can submit for the next deadline.

5  Q    And were they --

6  A    They were not being successful at that time.

7  Q    Okay.  And in February of 2012, did you discuss the

8  fact -- did you discuss with Mr. Williams UVA and VCU not

9  moving the ball forward?

10  A    Yes.  He was wondering why we weren't moving forward

11  with the Tobacco Commission, and I said, "Well, UVA and

12  VCU haven't stepped up to the plate yet.  So we can't move

13  forward."

14  Q    And what was Mr. Williams' reaction with UVA and VCU?

15  A    Well, he -- he was not happy about that.

16  Q    And in that conversation with Mr. Williams, did he

17  bring up Mr. McDonnell and Ms. McDonnell?

18  A    He again reminded me that they supported his research

19  and they wanted to find a way to help the research.

20  Q    From your perspective, if the Governor does support

21  this idea of the research, as the lobbyist, was that going

22  to be helpful for you doing what you needed to do?

23  A    Well, it's always helpful to have the Governor

24  support something you're doing as a lobbyist.

25  Q    Why?

1  A    Well, I mean, the Governor is the Chief Executive of

2  the Commonwealth.  He has this bully pulpit, if you will,

3  to go out and talk about issues.  Whatever the issue is,

4  he has the power of that office to go out.

5  Q    But to be fair, I mean, the commissioners of the

6  Tobacco Commission make the decisions on the Tobacco

7  Commission funding?

8  A    Absolutely.

9  Q    So why does it matter to you whether you have the

10 Governor's support?

11 A    It's always helpful to have the Governor on the front

12 of your -- or in your application materials, to say the

13 Governor supports a project.

14 Q    All right.  After your conversation with Mr. Williams

15 about things not moving forward with UVA and VCU, do you

16 have a subsequent conversation with Mr. Eige about this?

17 A    Yes.  Yes, I do.  Jasen Eige called me about it again

18 to say that, you know, "I don't think we should be

19 pressuring UVA and VCU on this research."  And I'm like,

20 "What are you talking about?"

21      And he's again saying, "Well, I've been asked by the

22 Governor to call and put" -- "you know, show support for

23 this research, and I'm just" -- "I just don't think we

24 should be doing it."

25      And I'm thinking, "It's Jasen being Jasen," and just

1   say, "Well, you know it doesn't hurt to have the

2   Governor's support for these projects, and we'd like to

3   have his support for the research."

4   Q    Well, I mean, at this point did you see anything

5   wrong with the Governor supporting the research?

6   A    Oh, I thought it would be helpful.  I wanted the

7   Governor's support.

8   Q    But there was nothing inherently illegal about the

9   Governor supporting the research?

10  A    Oh, absolutely not.  I wouldn't be asking if it were.

11  Q    Okay.  Fair enough.

12       Did Mr. Eige say that the Governor had asked him to

13  call you or was he calling you on his own from your call?

14  A    He said the Governor had made an inquiry.

15  Q    An inquiry of him?

16  A    To him, yes.

17  Q    What did you tell Mr. Eige -- well, what did you tell

18  Mr. Eige?

19  A    That, you know, "We'd like to have the support.  We'd

20  like to have the Governor's support, that the Governor

21  can" -- "can voice support with" -- "with any of

22  Virginia's universities about research he may support."

23  Q    Did Mr. Eige specifically ask you to do anything as a

24  result of his call?

25  A    No.  Not at that time.

JERRY KILGORE - DIRECT          2825

1  Q    But did you have a feeling about what he was hoping

2  you would do?

3  A    Well, I certainly passed it back to -- to Star and

4  Mr. Williams to say that, you know, the -- that Jasen

5  isn't confident that the Governor should weigh in here.

6  Q    Are you telling Mr. Williams, "Hey, the Governor has

7  said" -- "personally said he's not going to do this"?

8  A    I didn't say the Governor -- no.  The Governor didn't

9  say -- Jasen did not tell me the Governor wasn't going to

10 do this.  Jasen said he was uncomfortable with the

11 Governor doing it.  And I passed that back on to

12 Mr. Williams.

13 Q    Well, what is Mr. Williams' reaction when you tell

14 him, "Hey, Eige is saying that he's uncomfortable"?

15 A    Well, he again said they support his research, and he

16 would like their help.

17 Q    When you're having any of these conversations with

18 Mr. Eige or Mr. Williams, at any of these points is he

19 telling you about the things of value that he had given to

20 the Governor and the First Lady?

21 A    No.

22 Q    Okay.  We can do this fairly quickly.

23      You said that you were --

24            THE COURT:  Mr. Dry, are you almost finished?

25            MR. DRY:  I think I've got about 15 more

1   minutes, Your Honor.

2           THE COURT:  All right.

3       Well, Mr. Kilgore, it looks like you're going to have

4   to come back tomorrow.  Obviously, we've got two

5   cross-examinations, and you're not even close.  So we

6   might as well look out for the comfort of our jury and

7   allow you all to leave now.

8       As I've said over and over again, please don't review

9   any media items regarding this case.  Don't allow anyone

10  to discuss it with you.  And you all be safe, and we'll

11  see you tomorrow morning at -- just a second.  Let's make

12  it 9:45 again.  All right.

13          (The jury left the courtroom.)

14          THE COURT:  I'm going to go down for about five

15  minutes and come right back in, and we'll have a hearing

16  on this -- this witness issue.  So I'll be right back.

17          (Recess taken from 5:32 p.m. until 5:39 p.m.)

18          THE COURT:  All right.  Let's approach this in

19  this way.  I know this is the defendants' motion, but I

20  think I understand the defendants' position completely.

21  I'll hear from the government, and then from the

22  defendants if they feel it's necessary.

23          Government.

24          MR. COOKE:  Thank you, Your Honor.  I'll try to

25  be brief.  As I understand the defendants' position,

 1  particularly through their reply brief, they are

 2  emphasizing the comparison between the testimony --

 3  proposed testimony of Mr. Skunda and Ms. Bridge with that

 4  that was excluded from Mr. Earley.

 5      And the testimony is very different.  The essence of

 6  Mr. Earley's testimony was to give an opinion about the

 7  legality of conduct, and in particular, the legality of

 8  the McDonnells' conduct, and tell the jury when an

 9  official can be paid personal funds for performing acts

10  that --

11           THE COURT:  Let's save some time.  I don't need

12  to hear that.

13      Tell me what it is that you're going to present

14  through these witnesses, why it's relevant, and --

15           MR. COOKE:  Sure.

16           THE COURT:  -- what is fact and what is opinion.

17           MR. COOKE:  Okay.  I'll start with Ms. Bridge,

18  who was Mansion director from 2002 to 2010 for Governor

19  Mark Warner and Tim Kaine.  And she could testify about

20  the types of events that were held at the Governor's

21  Mansion.  She would not be saying what -- she wasn't --

22  did not have a role in selecting what events would be held

23  at the Mansion, but she had personal experience and

24  knowledge about what was done at the Mansion.

25      And that's relevant because under the definition from

1   JEFFERSON and BIRDSALL for an official act, the Fourth

2   Circuit has a firm instruction that said, "Official acts

3   include those activities that have been clearly

4   established by settled practice as part of a public

5   official's position."

6      And we think it's helpful to the jury to understand

7   the types of events, meetings, and the promoting a

8   Virginia business that have been the subject matter of

9   this case are the types of things that other governors

10   have done and, therefore, are part of a settled practice

11   that's been clearly established.

12      I also would emphasize, this is going to be very

13   short testimony.  We expect that both Ms. Bridge and

14   Mr. Skunda, combined, that their direct examinations would

15   take less than a half an hour.

16         THE COURT:  All right.  And Mr. Skunda, what

17   is -- he's just going to do the same thing?

18         MR. COOKE:  Essentially.  He was Secretary of

19   Commerce from 1994 to 1997, and so he would testify about

20   meetings that were held to promote Virginia businesses and

21   events.

22         THE COURT:  Okay.  Thank you.

23         MR. COOKE:  Sure.

24         THE COURT:  Okay.  The McDonnells.

25         MR. BURNHAM:  Just very quickly, Your Honor.

1   All I would emphasize is that the reason that Mr. Cooke

2   gave for this being relevant -- these are not fact

3   witnesses, of course, since they don't have any personal

4   knowledge of the facts in this case.  And that sounded to

5   me like classic expert testimony.

6       Other than that, I think the Court understands our

7   position.  So thank you.

8           THE COURT:  All right.  As to Mr. Skunda, the

9   defense motion will be granted.  As to Ms. Bridge, the

10  Mansion executive, that motion will be denied.

11      And let me say this as to Skunda.  Just so we're

12  clear, it is possible that the defendants, in putting on

13  their case, could make Skunda relevant and material.  Just

14  so you know, I mean, if this comes back for rebuttal,

15  there might be another look at that.  But at this point,

16  I'm not going to allow Skunda and his testimony about the

17  meetings.  All right.

18      (The trial adjourned at 5:43 p.m.)

19

20

21

22

23

24

25

2830

```
1                      I N D E X

2
                     WITNESSES
3

4  Examination By:                              Page

5              MARTIN KENT

6  Direct         - MR. FAULCONER              2535
   Cross          - MR. ASBILL                 2593
7  Cross          - MR. BURCK                  2630
   Redirect       - MR. FAULCONER              2646
8
               SARA WILSON
9
   Direct         - MS. ABER                   2650
10 Cross          - MR. BROWNLEE               2659
   Redirect       - MS. ABER                   2670
11
             LISA HICKS-THOMAS
12
   Direct         - MS. ABER                   2672
13 Cross          - MR. BROWNLEE               2677

14           MICHAEL UNCAPHER

15 Direct         - MR. HARBACH                2681
   Cross          - MR. SMALL                  2725
16 Cross          - MR. BURCK                  2733
   Redirect       - MR. HARBACH                2741
17
             SHARON KRUEGER
18
   Direct         - MR. FAULCONER              2748
19 Cross          - MR. BROWNLEE               2771
   Cross          - MR. KOFFMANN               2784
20 Redirect       - MR. FAULCONER              2785

21             JERRY KILGORE

22 Direct         - MR. DRY                    2786

23

24

25
```