2831

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         RICHMOND DIVISION

 3    -----------------------------------------

 4    UNITED STATES OF AMERICA,

 5
                                    Plaintiff;
 6    v.                                        Criminal Action
                                                  3:14CR12
 7    ROBERT F. McDONNELL and
      MAUREEN G. McDONNELL,
 8                                  Defendants.

 9    -----------------------------------------

10                         August 12, 2014
                          Richmond, Virginia
11                            10:25 a.m.

12                    JURY TRIAL - VOLUME XII

13    BEFORE:        HONORABLE JAMES R. SPENCER
                     United States District Judge
14

15    APPEARANCES:   MICHAEL S. DRY, ESQ.
                     DAVID V. HARBACH, II, ESQ.
16                   JESSICA D. ABER, ESQ.
                     RYAN S. FAULCONER, ESQ.
17                        Counsel for Government;

18                   JOHN L. BROWNLEE, ESQ.
                     HENRY W. ASBILL, ESQ.
19                   JAMES M. BURNHAM, ESQ.
                     DANIEL I. SMALL, ESQ.
20                   CHRISTOPHER M. IAQUINTO, ESQ.
                     OWEN T. CONROY, ESQ.
21                        Counsel for Robert F. McDonnell;

22                   WILLIAM A. BURCK, ESQ.
                     HEATHER H. MARTIN, ESQ.
23                   STEPHEN M. HAUSS, ESQ.
                     DANIEL KOFFMANN, ESQ.
24                        Counsel for Maureen G. McDonnell.

25                        JEFFREY B. KULL
                       OFFICIAL COURT REPORTER
```

```
 1              P-R-O-C-E-E-D-I-N-G-S
 2         THE CLERK:  Day twelve, Case Number 3:14CR12:
 3  United States of America versus Robert F. McDonnell and
 4  Maureen G. McDonnell.  The United States is represented by
 5  Michael Dry, David Harbach, Jessica Aber, and Ryan
 6  Faulconer.  Robert F. McDonnell is represented by John
 7  Brownlee, Daniel Small, Henry Asbill, James Burnham, and
 8  Christopher Iaquinto.  Maureen G. McDonnell is represented
 9  by Heather Martin, William Burck, Stephen Hauss, and
10  Daniel Koffmann.  Are counsel ready to proceed?
11         MR. DRY:  The United States is ready to proceed.
12         MR. BURCK:  Maureen McDonnell is ready to
13  proceed.
14         MR. ASBILL:  Mr. McDonnell is ready to proceed.
15         THE COURT:  All right.  Let's bring in the jury.
16      (The jury entered the courtroom.)
17         All right, good morning, ladies and gentlemen.
18  For the record, Juror Number 0356 has been excused.  First
19  alternate, Juror Number 12, Mr. ***, has been moved up to
20  the active jury.  Mr. Dry?
21              DIRECT EXAMINATION (Cont'd.)
22  BY MR. DRY:
23  Q    Mr. Kilgore, you know you are still under oath?
24  A    Yes.
25  Q    Okay.  Upon further reflection, I only have two
```

```
 1    questions for you, I think.

 2    A    That's good.

 3    Q    Now, without getting into the substance of the

 4    conversation, on March 15th of 2013, did you receive a

 5    call from Mr. Williams regarding a package he had received

 6    from Ms. McDonnell?

 7    A    Yes, I did.

 8    Q    And as a result of that call, what did you do?

 9    A    I was out of town, so I directed my assistant to go

10    to the Star office here in Glen Allen, Virginia, and pick

11    up all the material.

12    Q    Okay.

13              MR. DRY:  No further questions.

14              THE COURT:  Cross?

15                        CROSS-EXAMINATION

16    BY MR. BROWNLEE:

17    Q    Good morning, Mr. Kilgore.  My name is John Brownlee.

18    I represent Bob McDonnell and I have a few questions for

19    you this morning.

20    A    Good morning.

21    Q    Thank you.  I believe you started your testimony

22    indicating that you had a meeting with Mr. Williams here

23    in Richmond on July 6th; is that correct?

24    A    In July, yes, correct.

25    Q    And Mr. Williams apparently flew up here from his
```

1    home in Florida and you all met at one of the local hotels

2    and had breakfast or some meal; is that correct?

3    A    I'm not sure how he got here, Mr. Brownlee, but I

4    know we met at the Berkeley Hotel for lunch.

5    Q    Okay.  And Mr. McDonnell was not there; is that

6    right?

7    A    That's correct.

8    Q    Okay.  Let me pull up just for the witness, if I can,

9    RM-0520.  Mr. Kilgore, this is a receipt or an invoice for

10   Mr. Williams' trip that day to meet with you on July 6th.

11   A    Okay.

12   Q    It indicates that Governor McDonnell was at that

13   meeting with you; do you see that there, sir?

14   A    I see meetings with Governor McDonnell and former

15   Governor Kilgore.

16   Q    Right.  He was not at that meeting with you, correct?

17   A    Correct.  Nor was I Governor.

18   Q    Thank you.

19           MR. BROWNLEE:  We move RM-0520, Your Honor.

20           THE COURT:  It will be admitted.

21   BY MR. BROWNLEE:

22   Q    Now, you indicated that -- you can take that down.

23   Thank you.  You had indicated that at this meeting,

24   Mr. Williams decided to retain you to assist him in trying

25   to get some state funding for the research of his product,

1   Anatabloc.

2   A    Correct.

3   Q    Okay.  And it is my understanding that what you kind

4   of laid out on the table for him at that time were really

5   two options for him; is that correct?

6   A    Correct.  Tobacco funds through TICR, the TICR

7   organization, or Virginia -- I think you are calling it

8   Virginia Tobacco Commission; and then or, a state budget

9   line item for research.

10  Q    Okay.  So just so I'm clear, the Tobacco funding is

11  the process, and I think you and Mr. Dry went through some

12  of it; that's where you have to get some public entity to

13  kind of apply on your behalf.

14  A    Yes.

15  Q    And if this whole Commission approves it, then you

16  could get some of their tobacco money.

17  A    Correct.

18  Q    Okay.  And I think you testified that from the

19  tobacco side, your brother, Terry Kilgore, who is a member

20  of the House of Delegates, correct?

21  A    Correct.

22  Q    He is the Chairman of that Tobacco Commission.

23  A    Yes, he is now.  Yes.

24  Q    Okay.  And did you inform Mr. Williams that you had

25  this connection with the Tobacco Commission?

1    A    I'm sure I said that Terry was on the Commission.

2    But I just can't -- I would normally say that.  I can't

3    recall for sure that I said that.

4    Q    That's a pretty big deal.

5    A    I would normally say that.

6    Q    To hire you as lobbyist for this project, and you

7    happen to have your brother kind of running it.  That's a

8    pretty big deal, right?

9    A    Well, I mean, I'm glad he is there.

10   Q    Fair enough.  Now, I understand that your wife,

11   Marty, also has some relationship with the Tobacco

12   Commission; can you let us know that?

13   A    It is not the Commission.  She runs the, what's now

14   called the Healthy Use Initiative for the Commonwealth,

15   which is the other side of the tobacco settlement funding,

16   if you will, and their mission is to stop smoking in

17   teenagers, and the mission of that, just because I know

18   from Attorney General days, is to spend those dollars on

19   advertising campaigns, to deal with smoking cessation in

20   kids and youth.

21   Q    Okay.  So at that meeting when you are discussing

22   those two, Mr. Williams is now aware that you have this

23   relationship, these relationships with the Tobacco

24   Commission, and that's one option for him to try to get

25   some state dollars?

```
 1              MR. DRY:  Objection, Your Honor.  That's not
 2   what the witness testified to.  He said he may have said
 3   something about his relationship, but he didn't say he
 4   could say, it was normal.
 5              THE COURT:  Sustained.
 6   BY MR. BROWNLEE:
 7   Q    You believe you informed Mr. Williams that your
 8   brother was head of this Commission?
 9   A    I can't say for sure, but I think I did.  But I can't
10   say for sure.
11   Q    So that's the Tobacco Commission.  There was another
12   option that you discussed with him, which is this line
13   item.
14   A    Correct.
15   Q    Is it accurate that that's a process where the
16   Governor can simply insert into the state budget a line
17   item for a particular project?
18   A    Correct.  Yes, can insert it, and submit it as part
19   of the Governor's budget or budget amendments, depending
20   on the year you are in.
21   Q    And it is my understanding that the biennial budget
22   is about $99 billion; am I in the ballpark?
23   A    Yes.  Used to be, when I got here in Richmond, it was
24   $20 billion.
25   Q    So it is a lot of money.
```

1    A    Right.

2    Q    What we are talking about here for this research is

3    about three to $4 million.

4    A    I think so.

5    Q    Is that what Mr. Williams was thinking it might cost?

6    A    I never got to an exact amount because we were still

7    pursuing UVA and VCU.

8    Q    All right.  Now, of those two, I think that -- well,

9    let me move forward a little bit.  You then prepared kind

10   of a memorandum for him; is that right?

11   A    Correct.

12   Q    And I believe that's been put into evidence as

13   Government Exhibit 202.  If we could pull that up.  If we

14   go to the next page.  This is kind of the main body of the

15   memo where you are kind of outlining for Star the options

16   that you think or the schedule you believe you would have

17   to do to get what he wanted; is that correct?

18   A    Correct.

19   Q    Okay.  So this is kind of your plan for him.

20   A    Yes.

21   Q    If you look at the next page, it is actually kind of

22   a checklist of things that need to be done for them to be

23   successful; is that correct?

24   A    Correct.

25   Q    Okay.  So the first three, those in August, you

1    stated that those were kind of up to Star themselves to

2    do.

3    A    Yes.  We weren't designated to deal with UVA and that

4    process, finding the researchers and things like that.

5    Q    Okay.  So that would be Star.  And it is your

6    understanding that that just never got done.

7    A    It was on the slow roll, that's for sure.

8    Q    Okay.  Let's look at September.  This memorandum is

9    dated August 10th.  So now in September we have another, I

10   think it is seven items there, action items to do.  And so

11   the Number 1, "Prepare advocacy materials."  Who was to do

12   that?

13   A    We would do that.

14   Q    Did you all ever do that?

15   A    No.

16   Q    Okay.  The second one is the "Complete the tobacco

17   pre-application for funds and submit to staff."  Who was

18   to do that one?

19   A    Chris Nolen with me was going to do that.  He

20   gathered information but did not complete it.  He met with

21   staff or talked to staff.

22   Q    But that never happened.

23   A    No.

24   Q    The next one, "Schedule meeting with staff."

25   A    Mr. Nolen did do that, yes.

1    Q    "Initiate the drafting of the grant."  Was that ever

2    done?

3    A    No, because we needed to do the pre-application.

4    Q    Okay.  Now the next one here says, "Schedule meeting

5    with Governor McDonnell and Governor's policy staff to

6    request Governor to include state appropriation to UVA for

7    specific research which could be eligible for match."

8    This is what we talked about earlier where you would just

9    sit down with the Governor and ask for the money.

10   A    Correct.

11   Q    And then if he supported this, then he would just put

12   it in his budget?

13   A    He could, yes.

14   Q    And if the General Assembly supported it, boom, it is

15   done.

16   A    Right.  Correct.

17   Q    All right.  The next one is "Determine professional

18   economic impact analysis."  That wasn't done.

19   A    No.

20   Q    And then, "Develop list of supporters for use,

21   southside-based businesses."  That wasn't done, either,

22   right?

23   A    No.

24   Q    Let's go to the next ones quickly.  We've got

25   October, "Schedule meeting with Chairman."  Was that done?

```
 1    A    No.

 2    Q    "Meetings with the Chair of subcommittees"?

 3    A    No, it was not.

 4    Q    Were any of the other ones done?

 5    A    No, sir.

 6    Q    Okay.  So none of the other stuff was done.  So you

 7    put this plan out in August.  There's really two options:

 8    You have the Tobacco Commission, and then the other one is

 9    just to go straight to the Governor and ask for the money.

10    A    Correct.

11    Q    Let me talk about that one.  I think you testified --

12    you can take that down -- I think you testified that when

13    you proposed this, that the meeting with the Governor and

14    Star to make that ask just never happened; is that right?

15    A    It did not.

16    Q    And it didn't happen, it is my understanding, because

17    Star never authorized you to set up that meeting.

18    A    They weren't ready to -- right.  They didn't have the

19    researchers at UVA lined up at that point.

20    Q    But if you were just going to make the ask to the

21    Governor, you didn't need all the researchers, right?  All

22    you would need to --

23    A    You would need the researchers to take the money to

24    research.  I would think you would.  I wouldn't ask for

25    the meeting if I didn't have VCU or UVA on board.
```

1    Q    But you said that you had advanced this out for Star

2    and Star had never come back to you and asked for this

3    meeting.

4              MR. DRY:  Asked and answered.

5              THE COURT:  Overruled.

6              THE WITNESS:  No, they did not.

7    BY MR. BROWNLEE:

8    Q    Fair to say that between the two options, going

9    through the Tobacco Commission and getting the public

10   entity to approve and all that, just going straight to him

11   and asking for the money is a lot easier, right?

12   A    Oh, yes, than dealing with 30-some members of the

13   Tobacco Commission.

14   Q    That's just a direct route right then.  He is the

15   Governor.  He can just do it if that's what he wants to

16   do.

17   A    Correct.

18   Q    Okay.  Let's move to this event at the Mansion.  Fair

19   to say that when this was coming up, Jasen Eige and Martin

20   Kent contacted you at some time and basically had two

21   issues with what was going on; is that correct?

22   A    They had the issue with it being at the Mansion, yes.

23   Q    Well, let me ask you this:  Is it accurate that when

24   Jasen first called you, he said, "It is my understanding

25   there is a lunch and the launch and we don't like the

```
 1    launch," and you agreed, "Fine, we will move that to an

 2    off site"?

 3    A    He said he didn't like the -- it was the launch.  He

 4    didn't like the launch at the Mansion.  He did not

 5    distinguish on that day between lunch and launch.

 6    Q    That you recall.

 7    A    That I recall.

 8    Q    But he didn't like the launch or whatever, and that

 9    was not done, apparently?

10    A    He suggested that it be moved to the Biotech Park,

11    and I called Mr. Williams to pass that on.

12    Q    Okay.  And then with the press release, there were

13    some issues with it, and you got that changed.

14    A    Yes.  Jasen complained about some of the language in

15    the press release.

16    Q    Okay.  And when you heard that from Jasen, you

17    believed that was a legitimate concern and you helped him

18    change that.

19    A    I did.  Absolutely.

20    Q    Okay.  Now, let me just step back.  How long have you

21    known Jasen Eige?

22    A    Oh, probably -- his mother-in-law was the Clerk of

23    the Court in the Western District of Virginia, so I've

24    known him since he married into the family.

25    Q    So a long time.
```

```
 1    A     A long time.

 2    Q     He worked with you?

 3    A     He came to Richmond as one of the Assistant Attorney

 4    Generals when I was Attorney General.

 5    Q     Okay.  So fair to say you have known him for a long

 6    time and you have worked with him as well?

 7    A     Yes, absolutely.

 8    Q     And you have respect for him and you trust his

 9    judgment on things?

10    A     Yes, I do.

11    Q     When he worked for you, he was loyal and he looked

12    after your best interests; is that correct?

13              MR. DRY:  Objection, Your Honor.

14              THE COURT:  Overruled.

15    BY MR. BROWNLEE:

16    Q     When he worked with you, you believe that he acted in

17    your best interests when you were Attorney General?

18    A     Yes, I did.

19    Q     Now, you have testified that sometime in February, he

20    contacted you and said, "Hey, you all need to back off

21    here, okay?"  And it is my understanding what he said was,

22    "Listen, the Governor supports all this, but we don't

23    think it is appropriate, and so we are asking you to back

24    off," and it is our understanding you followed up with

25    that and did that.
```

1    A    He contacted me to say he didn't think it was

2    appropriate for a Governor to weigh in with research

3    institutions on research.  I pushed back some to say,

4    "Well, governors weigh in on things all the time."  But I

5    passed that on to Star.

6    Q    But he also was, fair to say that he also told you in

7    that same conversation, "But I want to let you know that

8    the Governor supports this"?

9    A    Yes.

10   Q    Right?

11   A    Yes.

12   Q    And so let me ask you this:  Because you know Jasen,

13   is there any chance, Mr. Kilgore, that what he was doing

14   to you, what he was communicating, was what we have

15   referred to as a polite no?  That "Listen, Jerry, I want

16   to let you know the boss really supports this, but we just

17   can't do this," and so that's what he was really

18   communicating to you?

19             MR. DRY:  Objection, calls for speculation.

20             THE COURT:  Sustained.

21   BY MR. BROWNLEE:

22   Q    You do know what a polite no is, right?

23   A    I do.

24   Q    When Jasen was talking to you, he made it pretty

25   clear that whatever Mr. Williams wanted was not going to

1   happen.

2   A    You know, I didn't leave the conversation that it was

3   not going to happen.  I left the conversation with it was

4   Jasen being Jasen, Jasen was concerned, and didn't know

5   that the Governor could or should call and weigh in with

6   university researchers.  And I pushed back some to say,

7   "Well, the Governor can make a statement on whatever the

8   Governor wants to make a statement on."

9   Q    But despite your pushing back, nothing ever happened

10  after that, right?

11  A    I passed that on to Mr. Williams and Star.  And I

12  don't know that the researchers ever got on board at that

13  point.

14  Q    Well, let's pull up Government Exhibit -- where did I

15  put that, the one we just had up?  Government Exhibit 202.

16  Go to the last page.  We just went through this,

17  Mr. Kilgore.  Once you hit September here, none of this

18  ever happened.  So when he calls you in February and tells

19  you, "I think this is a bad idea, it is not going to

20  happen."  It never happened, right?

21  A    It was not happening at that time, correct.  The only

22  thing that had happened from like September to November

23  was the November conference call with the research

24  institutions.

25  Q    Okay.  That was in November.

| | |
|---|---|
| 1 | A     Correct. |
| 2 | Q     We are talking now in February. |
| 3 | A     Correct. |
| 4 | Q     So nothing ever happened. |
| 5 | A     I didn't know of anything happening between November |
| 6 | and -- I mean, that wasn't my job, to deal with UVA and |
| 7 | VCU.  And I hadn't gotten an update on it. |
| 8 | Q     Let's pull up Government Exhibit Number 4.  Let's go |
| 9 | to the second page.  These are your billing records that |
| 10 | were put into evidence; is that correct? |
| 11 | A     Correct. |
| 12 | Q     Let's look at -- and these are all the records that |
| 13 | the government has given us from you all. |
| 14 | A     Right.  Correct. |
| 15 | Q     How much time have you billed or did you bill on this |
| 16 | matter after February of 2012? |
| 17 | A     Just under -- oh, after February, none. |
| 18 | Q     Zero, right? |
| 19 | A     Correct. |
| 20 | Q     Nothing. |
| 21 | MR. DRY:  Objection, asked and answered. |
| 22 | THE COURT:  Last I checked, zero was nothing. |
| 23 | Why are you asking three questions in one?  He has |
| 24 | answered it. |
| 25 | MR. BROWNLEE:  Thank you, Judge. |

**JERRY KILGORE - CROSS - BROWNLEE**          2848

```
1    BY MR. BROWNLEE:
2    Q    We can take that down.  Now, you had talked a little
3    bit about when you were brought on to the case.  Were you
4    aware that it was Attorney General Cuccinelli who
5    recommended you to Mr. Williams?
6    A    Not at the time, I was not.
7    Q    You now know that?
8    A    I now know that.
9    Q    Okay.  And when you were first spoken to,
10   Mr. Kilgore, Mr. Dry asked you where you presently work.
11   And that's at McGuireWoods; is that correct?
12   A    That is correct.
13   Q    And McGuireWoods represents Mr. Williams; is that
14   correct?
15   A    Yes, they do.
16   Q    Okay.  If we pull up Exhibit 530.  This is
17   Mr. Williams' immunity agreement with the United States.
18   And if you look at just the address on the top, Mr. Cullen
19   from McGuireWoods, that's the Chairman of your firm; is
20   that correct?
21   A    That is correct.
22              MR. BROWNLEE:  Court's indulgence for one
23   moment, Your Honor.  You can take that down.
24        (Counsel conferring with co-counsel.)
25              MR. BROWNLEE:  That's all, Judge.  Thank you.
```

```
 1              THE COURT:  Mr. Burck?

 2                     CROSS-EXAMINATION

 3   BY MR. BURCK:

 4   Q    Good morning, Mr. Kilgore.

 5   A    Good morning.

 6   Q    My name is Bill Burck and I represent Maureen

 7   McDonnell.

 8   A    Yes.

 9   Q    I want to focus on the summer of 2011.  You were

10   asked questions about the 2012, period but I'm just going

11   to focus on 2011.

12   A    Okay.

13   Q    You testified about the lunch meetings you had with

14   Mr. Williams in the summer of 2011.  Remember that

15   testimony?

16   A    Yes.

17   Q    And you talked to him about the various universities

18   that could support the clinical trials, right?

19   A    Correct.

20   Q    And he had come to you with Johns Hopkins; isn't that

21   right?

22   A    He did.

23   Q    As one of the options.

24   A    Yes.

25   Q    And you testified that --
```

1   A    That was his option.

2   Q    Because that's in Maryland principally, right?

3   A    Right.

4   Q    You testified that you were telling him to focus on

5   the Virginia options.

6   A    Correct.

7   Q    VCU, UVA, places like that?

8   A    Correct.

9   Q    So that suggestion, as far as you know, came from

10  you, right?

11  A    It did.

12  Q    As far as you know, it didn't come from Governor

13  McDonnell, right?

14  A    No, I suggested VCU and UVA.

15  Q    Ms. McDonnell, it didn't come from her, either,

16  right?

17  A    Not that I know of.

18  Q    Let's talk about the August 1st lunch you had with

19  Mary-Shea Sutherland and Mr. Williams.

20  A    Yes.

21  Q    I think you testified that this was in fact a lunch

22  that Mary-Shea Sutherland had set up, that you were going

23  to meet her for a regular lunch?

24  A    Correct.

25  Q    And you met with her a couple times a year; is that

1    what you said?

2    A    Like every year.  Once a year.

3    Q    Once a year.  So when she showed up with

4    Mr. Williams, that was a surprise to you.

5    A    Right.  Well, they called right beforehand to say he

6    would be joining us.  Right.

7    Q    When she called and said she was bringing

8    Mr. Williams, you hadn't known that before?

9    A    I did not know that, yes.

10   Q    When she showed up, did they mention, did either

11   Mr. Williams or Ms. Sutherland mention to you that they

12   had been at the Mansion together before the lunch?

13   A    They did not.

14   Q    Did they mention to you that Ms. Sutherland had been

15   in a meeting with a Dr. Clore and Maureen McDonnell?

16   A    Not to my knowledge.  I don't remember that, no.

17   Q    Did Mr. Williams say anything about being at the

18   Mansion with Maureen McDonnell and anyone from the

19   Virginia Health Department?

20   A    On that day?

21   Q    On that day.

22   A    No.

23   Q    So as far as you knew, they just showed up together

24   for lunch.

25   A    For lunch.

1  Q    Then I think you described the lunch as a job

2  negotiation.  That was your takeaway.

3  A    Yes.

4  Q    And you said that, I think did you feel it was a

5  little bit strange that you were there witnessing a job

6  negotiation?

7  A    Well, I was trying to figure out my purpose then at

8  the lunch.  Was I going to be the -- going to negotiate

9  between the two.

10 Q    You are a lobbyist, right?

11 A    Correct.

12 Q    And you had been hired by Mr. Williams to look into

13 research opportunities for Anatabloc for Star Scientific,

14 right?

15 A    Star Scientific, right.

16 Q    You are not an employment lawyer?

17 A    No.

18 Q    You don't negotiate employment agreements, right?

19 A    Not normally.  I have in the past.

20 Q    You have in the past.  But that was not something you

21 had been hired, as far as you knew, by Mr. Williams to do?

22 A    Correct.

23 Q    So you were there feeling a little uncomfortable with

24 the situation?

25 A    As the lunch progressed and Ms. Sutherland was

1   talking about her issues, yes.

2   Q    Okay.  You testified that she had mentioned that you

3   rejected the idea that McGuireWoods could hire her.  You

4   testified about that.

5   A    Right.

6   Q    But that she raised the idea that he could be a

7   client of hers at Benedetti & Farris?

8   A    Correct.

9   Q    And did she use the term "anchor client"?

10  A    "A client" is all I remember.

11  Q    "A client"?

12  A    "A client."  Yes.

13  Q    And did you understand that her -- that this was

14  something that was important to her, to go back to

15  Benedetti & Farris?

16  A    I understood that she wanted to leave and go back to

17  Benedetti & Farris.

18  Q    Okay.  And you testified that Mr. Williams, it seemed

19  that there was -- let me ask you this:  Did it seem that

20  they had an agreement in principle by the end of that

21  lunch?

22  A    I wasn't sure how to read it.  I mean, she really

23  wanted to leave, and he wanted to, seemed like he wanted

24  to find her a place to go.  And when we were leaving, he

25  asked her to just send me a proposed contract.

1    Q    Okay.  This is the Benedetti & Farris contract that

2    you received in September?

3    A    Correct.

4    Q    Okay.  Now, did the topic of the August event, the

5    Mansion event, come up at that lunch?

6    A    I do not remember that.

7    Q    You don't remember that?

8    A    No.

9    Q    Do you recall at any point learning that Mary-Shea

10   Sutherland was involved in helping set up the launch or

11   lunch?

12   A    Not until the press -- the call from Mr. Eige about

13   the press issue.

14   Q    So it was when you got the press releases from Mr.

15   Eige, when he was asking you "What are we doing with this?

16   This is not something we can do," that's when you learned

17   that Mary-Shea Sutherland was involved in the lunch?

18   A    I figured out she was involved with the lunch.

19   Q    You figured out -- okay.  So at this point you

20   understood that she was involved with the lunch, and of

21   course you knew that on August 1st, that she had been

22   present for a job negotiation with Mr. Williams.

23   A    Right.

24   Q    Okay.  Now, you testified that after the lunch

25   occurred, and you received the Benedetti & Farris contract

1   in early September, that thereafter, nothing ever happened

2   between Mr. Williams and Ms. Sutherland, hiring her.

3   A     Correct.

4   Q     And you testified that Mr. Williams told you that he

5   couldn't do that because it would upset the First Lady,

6   couldn't hire Mary-Shea because it would upset the First

7   Lady?

8   A     His words, he wasn't going to poach on the First

9   Lady.

10  Q     Did Mr. Williams tell you that Mr. Perito had told

11  him that hiring Mary-Shea Sutherland would present a

12  conflict of interest?

13  A     He did not tell me that.

14  Q     He never said that?

15  A     No.

16  Q     Okay.  So the only thing you understood was that he

17  was worried about poaching; is that right?

18  A     Correct.

19  Q     Did you have any response to him being concerned

20  about poaching?

21  A     No, I just, it is his decision.  It wasn't -- I had

22  already forwarded on to Mr. Pokusa to deal with it.

23  Q     Did you say anything to him about the poaching idea?

24  When he said "poaching," did you say anything back?

25  A     I did say, did reply that "It happens all the time.

1   People leave state government for other jobs all the

2   time."  And I was always happy if somebody got a better

3   job, better opportunity.

4   Q    Right.  Okay.  By the way, did you ever hear Jonnie

5   Williams say to Mary-Shea Sutherland in the August 1st

6   lunch, or I guess any time after that, that she should not

7   tell the Governor's Office that she was leaving until

8   after the event?  Do you remember hearing that?

9   A    No, because I didn't know about the event.

10  Q    Right.  Until at the end of the month.

11  A    Right.

12  Q    Now, is it fair to say that your understanding was

13  that Mary-Shea Sutherland was genuinely interested in

14  leaving the Mansion and going to work for, in some

15  capacity, for Mr. Williams or Star Scientific?

16  A    Yes.

17  Q    That her interest was genuine?

18  A    Yes.

19  Q    And you didn't think, putting you in September of

20  2011, this is after you have learned that she is involved

21  in the lunch, and also you know that she is negotiating a

22  job with Mr. Williams, you didn't think that she was

23  negotiating a job in order to help Mr. Williams with the

24  launch, right?

25  A    Didn't cross my mind.  No.

1    Q    Didn't cross your mind because you thought she had a

2    genuine interest.

3    A    Right.

4              MR. DRY:  Asked and answered.

5              THE COURT:  Sustained.

6    BY MR. BURCK:

7    Q    After speaking to Mr. Williams, did you believe that

8    his interest in her coming to work for him had been as

9    genuine as her interest in working for him?

10             MR. DRY:  Objection, relevance.

11             THE COURT:  Sustained.

12   BY MR. BURCK:

13   Q    It never occurred to you that, given what you

14   understood about the conversation that you witnessed, and

15   your discussions with Mr. Williams and your discussions

16   with Mary-Shea Sutherland, you never thought that she was

17   looking for some kind of quid pro quo?  Is that right?

18             MR. DRY:  Objection, relevance.

19             THE COURT:  Sustained.

20             MR. BURCK:  No further questions, Your Honor.

21             THE COURT:  All right.  Redirect?

22                    REDIRECT EXAMINATION

23   BY MR. DRY:

24   Q    Bring up Government's Exhibit 202, please.  Can we go

25   to the second page?  I'm sorry, third page.  Can we blow

1    up the second block, the September block?  Sir, in this,

2    you write "Schedule meeting with Governor McDonnell and

3    Governor's policy staff, J. Williams J. Kilgore required,

4    to request Governor to include state appropriation to UVA

5    for specific research which could be eligible for match."

6    Right?

7    A    Right.

8    Q    Would it be possible for you to have a meeting --

9              MR. BROWNLEE:  Objection, calls for speculation.

10             THE COURT:  Let him finish the question first.

11   BY MR. DRY:

12   Q    In order to discuss with the Governor what state

13   appropriation you would want and how much and what

14   research it was related to, didn't UVA have to be on board

15   before that meeting could occur?

16             MR. BURCK:  Objection, Your Honor.

17             THE COURT:  The "wouldn't it be possible"

18   question is sustained.

19   BY MR. DRY:

20   Q    What was the reason you didn't have the meeting with

21   the Governor?

22   A    Because UVA wasn't on board yet.

23   Q    And without UVA being on board, did you know what to

24   ask the Governor for?  How much money, specifics?

25   A    I did not.  I did not know the specifics.

**JERRY KILGORE - REDIRECT**

1   Q     Now, regarding the line items in the state budget,

2   the Governor can put the line items in; is that right?

3   A     Correct.

4   Q     But who ultimately has to approve it?

5   A     The General Assembly.

6   Q     Let's go to, I believe you were asked questions about

7   this August 1st, 2011 lunch.  And I believe Mr. Burck

8   asked you about finding out that Ms. Sutherland was

9   involved with the, I think he said "launch," and then

10  corrected himself and said "lunch."  Exactly what was your

11  knowledge of Ms. Sutherland's involvement in the lunch?

12  A     Not any until the August phone call, the late August

13  phone call from Mr. Eige about the press statements.

14  Q     In your conversations with Mr. Williams, I think you

15  testified that there were several conversations about this

16  lunch and event at the Mansion, right?

17  A     Right.

18  Q     At any point in that, did Mr. Williams ever, ever say

19  that Mary-Shea Sutherland, it was her idea to have this

20  event?

21            MR. BURCK:  Objection, Your Honor.

22            THE COURT:  Overruled.

23            THE WITNESS:  He did not.

24  BY MR. DRY:

25  Q     And in those conversations, who was he telling you

**JERRY KILGORE - REDIRECT**                    2860

1   supports his product?

2   A    The Governor and the First Lady.

3           MR. DRY:  Nothing further.  Thank you, sir.

4           THE COURT:  All right.

5           MR. BROWNLEE:  Could we have just one question?

6           THE COURT:  No, sir.  All right.  Thank you,

7   sir.  You may stand down.

8       (Witness stood aside.)

9       Call your next witness, please.

10          MS. ABER:  Emily Rabbitt.

11          MR. ASBILL:  May we approach for a minute?

12          THE COURT:  Sure.  Come on up.

13      (At Bench.)

14          MR. ASBILL:  The 302's for this witness contain

15  an incredible amount of hearsay and gratuitous personal

16  opinion and irrelevant material about the kids and whether

17  they were looking for gifts and things of that nature.  I

18  don't want to constantly be objecting in front of the jury

19  about these issues.  But it is certainly, based on the

20  302, I'm really worried about that kind of information

21  coming in constantly in this case.

22          THE COURT:  I don't know how I can help you.  I

23  can't resolve your objection to any question until the

24  question is asked.  But I'm alerted.

25          MR. ASBILL:  Thank you.

**EMILY RABBITT - DIRECT**

```
 1          (In Open Court.)
 2                      EMILY RABBITT,
 3   called as a witness by and on behalf of the government,
 4   having been first duly sworn by the Clerk, was examined
 5   and testified as follows:
 6                   DIRECT EXAMINATION
 7   BY MS. ABER:
 8   Q    Good morning, Ms. Rabbitt.  Please state and spell
 9   your name for the record.
10   A    Emily Rabbitt, E-M-I-L-Y, R-A-B-B-I-T-T.
11   Q    Did you previously work in the Administration of
12   Governor Robert McDonnell?
13   A    I did.
14   Q    When did you start working there?
15   A    I started in June, 2011 as Deputy Scheduler.
16   Q    Did you subsequently gain an additional job?
17   A    I did.  In late November, early December, 2012, I
18   became Deputy Director of Scheduling and Travel Aide.
19   Q    Does that mean that you picked up where Adam Zubowsky
20   left off?
21   A    Yes.
22   Q    You took over for him?
23   A    Yes.
24   Q    And so is it fair to say that you maintained your job
25   as Deputy Director of Scheduling, but added additional
```

1　duties as Travel Aide?

2　A　　Yes.

3　Q　　Okay.　How long did you continue working for

4　Mr. McDonnell?

5　A　　I stayed until the end of his Administration in

6　January, 2014.

7　Q　　If you were the Deputy Scheduler, who was the

8　Principal Scheduler?

9　A　　Katherine Harris.

10　Q　　Is it fair to say you started roughly when Monica

11　Block was on her way out the door?

12　A　　Yeah.　I think we had just a couple-day overlap.

13　Q　　In a very brief summary, can you tell the jury about

14　what your job as Deputy Scheduler entailed?

15　A　　I was responsible for the briefing information for

16　the Governor's briefing book.　Every day we assembled a

17　binder for him that had a divider for each event that he

18　needed briefing information for, whether it was talking

19　points or just background information on what he was

20　supposed to be doing.　So it was my responsibility to go

21　in and work with the appropriate contacts to make sure he

22　had the information he needed for the book.

23　Q　　If I can stop you there, Ms. Rabbitt, we will talk

24　about that in a little bit.

25　A　　Okay.

1   Q    Tell the jury how Mr. McDonnell's schedule was

2   determined from your perspective.  How did things get on

3   the calendar?

4   A    Well, I wasn't totally involved in the actual, like

5   complete process, but basically we would receive

6   scheduling requests.  Our rule was they had to be in

7   writing.  And then we would determine if it would work

8   with his schedule, and if it seemed like a good event for

9   him to do, and then it would be put on a log for

10  consideration with a larger group of members of his staff.

11  Q    Who had final approval over Mr. McDonnell's schedule?

12  A    He did.

13  Q    Now, I'd like to talk about that briefing book you

14  started to talk about.  Let's bring up Government Exhibit

15  230.  This has been admitted, Your Honor.  Okay.  So

16  assuming we are talking about a day like August 30th, what

17  would be in the briefing book that you would provide to

18  the Governor?

19  A    Typically, let's see --

20  Q    Would this document be in it?

21  A    Yes, definitely.  It would be the first page in the

22  book.

23  Q    Okay.  What else would be in there?

24  A    Based on the events, he had maybe something for WTOP

25  if he needed it, or for the Legislator Call Time further

1    down the page if he needed specific background information

2    for that call.

3    Q    If I could direct your attention, please, to Page 2

4    of the exhibit.  For example, the 12:35 event.

5    A    Yes.  We had a set briefing for the Executive Mansion

6    events that he would have for each event.

7    Q    Okay.  So you would print all those Word documents

8    and the Excel document out and put it in the binder?

9    A    Uh-huh.

10   Q    Were you able to leave for the day if the binder was

11   not complete?

12   A    No.

13   Q    So you had to stay until it was done?

14   A    I guess I could have left, but I chose to see it

15   through to the end.  It was my job to complete it.

16   Q    I understand.  So Government Exhibit 234, please,

17   that's been admitted.  Is this the sort of item that you

18   would include in the binder as the specifics of an event?

19   A    Yes.

20   Q    Okay.  How did you get -- you can take that down.

21   How did you get this binder to the Governor?

22   A    Every night I would drop it off at the guardhouse of

23   the Executive Mansion, and I would give it to a member of

24   the Capitol Police, who would then put it on the elevator

25   for him to see.

1   Q    Based on your experience, when did Mr. McDonnell

2   review his briefing book?

3   A    It depended.  He had the opportunity to see it the

4   night before, but in some instances he was just reviewing

5   what he needed to be doing before he would go into an

6   event.  So --

7   Q    Now, I'd like to talk a little bit more about the

8   e-mail schedules.  Let's bring up not-admitted Government

9   Exhibit 291, please.  Now, the jury has seen quite a few

10  of these, but can you tell them more precisely when they

11  were sent out, to whom they were sent out, and why they

12  were sent out?

13  A    It was -- the schedule was sent out to the Governor's

14  security detail, the Executive Protection Unit, as well as

15  members of his senior staff.

16  Q    Let me stop you there.

17            MS. ABER:  I'd like to move 291 into evidence,

18  please.

19            THE COURT:  It will be admitted.

20  BY MS. ABER:

21  Q    So it went to those folks.  When was it sent out?

22  A    Typically at the end of the day.  Sometimes we were

23  waiting for things to be finalized, but between six, any

24  time after six p.m., really, I would say.

25  Q    Even though this e-mail shows To: Katherine Harris

1    From: Katherine Harris, are there other folks who are

2    blind carbon copied on this?

3    A    Yes.

4    Q    Whose responsibility was it to send out the final

5    scheduling e-mail?

6    A    Katherine's.

7    Q    Did there come a point in time when you took that

8    over?

9    A    Katherine left the Administration in December of 2013

10   and I just assumed that duty as well.

11   Q    Now, did you rely on these schedules from your

12   perspective to determine where Mr. McDonnell was located

13   at a given time?

14   A    Yes.

15   Q    And did Mr. McDonnell largely follow the schedules?

16   A    Yes.

17   Q    Now, for the sake of moving this along, I'm going to

18   hand you a stack of schedules that are Government Exhibit

19   552, 553, 305, 310, 317, and 378.  Have you had an

20   opportunity to take a look at those before coming to

21   court?

22   A    Yes.

23   Q    Okay.  Are they all schedules from various dates in

24   the Administration?

25   A    Yes.

1    MS. ABER:  I'd like to move those into evidence,

2  that being 552, 553, 305, 310, 317, and 378, please.

3    THE COURT:  They will be admitted.

4  BY MS. ABER:

5  Q    Okay.  Now, I'd like to direct your attention back to

6  Government Exhibit 234.  Do you remember anything about

7  this particular lunch with Virginia researchers?

8  A    Well, just that I remember when I went to go get the

9  briefing information for it, because each morning I would

10  touch base with Katherine about what events would need

11  information, what the status of things was, because she

12  had worked to get it on the calendar.  She, I remember

13  that I went and I said, "Sarah, what about the briefing

14  form?"  And then I had also heard there might be a press

15  release involved with the event.  And I would typically,

16  if an event had a press release, I liked to include it

17  just as additional background information for the Governor

18  to make sure he had everything.  But I remember hearing

19  that there was some, as best I can recall, that there was

20  some issue with the press release, so I was like, okay, I

21  won't worry about that until I hear more about it.

22  Q    Did you attend this event?

23  A    No.

24  Q    Were you aware in general that before this event, a

25  couple months before, that Mr. Jonnie Williams had given

**EMILY RABBITT - DIRECT**

```
 1    some money, $50,000, to Ms. McDonnell?
 2              MR. ASBILL:  Objection.
 3              MS. ABER:  Your Honor, she worked in the
 4    Administration.  It is relevant to know whether she was
 5    aware of the loans that Mr. McDonnell was providing.
 6              THE COURT:  Go ahead and answer.
 7              THE WITNESS:  I was not aware of it.
 8    BY MS. ABER:
 9    Q    Is it fair to say you didn't know about any of these
10    gifts or loans until after the media stories broke in
11    2013?
12    A    Yeah.  I mean, I think, I guess at that point in time
13    I had known about like flights maybe and that kind of
14    thing had been donated.
15    Q    But not anything other than flights?
16    A    Yeah, I don't think so.  As best I can recall.
17    Q    Okay.  You can take that down, please.  I'd like to
18    bring up Government Exhibit 627, please.  That has not
19    been admitted.  Is this an e-mail exchange between you and
20    Adam Zubowsky in January of 2013?
21    A    Yes.
22              MR. ASBILL:  I object to this.
23              THE COURT:  Come on up.
24         (At Bench.)
25              THE COURT:  So state your objection.
```

1          MR. ASBILL:  It is not relevant.  It is

2     extraordinarily prejudicial.

3          MS. ABER:  Your Honor, the defendants have made

4     an issue about Mr. McDonnell's thriftiness and suggesting

5     that Mr. Williams foisted these gifts upon him.  The

6     government would like to introduce this evidence to show

7     that he was willing to accept other folks' gifts and other

8     free items if available.

9          THE COURT:  This is an e-mail from?

10          MS. ABER:  From Mr. -- it is a chain between Mr.

11     Zubowsky and Ms. Rabbitt in January of 2013.  The witness

12     is on it.

13          THE COURT:  Okay.  So how does the Governor fit

14     into this?

15          MS. ABER:  The e-mail makes reference to

16     Zubowsky's prior experiences as Travel Aide, the new

17     position that Ms. Rabbitt assumed, and his practice was to

18     seek out free golf and free vacations for the Governor.

19          THE COURT:  Not through this witness.  The

20     objection is sustained.

21        (In Open Court.)

22     BY MS. ABER:

23     Q    Okay.  Moving along.  Let's look at Government

24     Exhibit 458, please, which has not been admitted.  Is this

25     a January of 2013 exchange between you and Katherine

1    Harris?

2    A     Uh-huh.

3    Q     You have to say yes.

4    A     I'm sorry, yes.

5              MS. ABER:  Your Honor, I would move Government

6    Exhibit 458 into evidence, please.

7              THE COURT:  It will be admitted.

8    BY MS. ABER:

9    Q     Is it fair to say this e-mail pertains to a P.O. Box?

10   A     Yes.

11   Q     Okay.  And in the top part there, you write to

12   Ms. Harris that "Apparently he has a P.O. Box, a personal

13   P.O. Box that Pam checks."  And that lists P.O. Box 406;

14   is that right?

15   A     Yes.

16   Q     Who is the "he" in that sentence?

17   A     The Governor.

18             MS. ABER:  I'd like to bring up already-admitted

19   452, please.

20   BY MS. ABER:

21   Q     Ms. Rabbitt, is that the same P.O. Box number on the

22   top left there that we just saw in Government Exhibit 458?

23   A     Yes.

24   Q     Okay.  Thank you.  You can take that down.  We would

25   like to change subjects entirely, directing your attention

**EMILY RABBITT - DIRECT**

1   to February of 2013.  So at that point, what job did you

2   have?

3   A    I was Deputy Director of Scheduling as well as Travel

4   Aide at that time.

5   Q    And as Travel Aide, did you accompany Mr. McDonnell

6   to various events?

7   A    Yes.

8   Q    Did you attend an event with Mr. McDonnell at the

9   SunTrust Building here in Richmond?

10  A    Yes.

11  Q    Do you remember roughly when in February that was?

12  A    I would say, I don't remember the exact date, but I

13  think early February.

14  Q    And what was this particular event at the SunTrust

15  Building?

16  A    I think we went to several, but it was either an

17  event for, I think it was an event for the Thomas

18  Jefferson Institute.  I believe that was the one.  We went

19  to several in a row there, but I think that might have

20  been the one.

21  Q    When you were finished with the event, did you exit

22  via elevator?

23  A    Yes.

24  Q    Who was in the elevator with you?

25  A    Myself, the Governor, First Lady, a member of EPU,

1    and a security guard from the SunTrust Building.

2    Q    While you were in the elevator, did Mr. McDonnell say

3    anything in particular that stood out to you?

4    A    I did hear him, I believe I may have heard him say

5    something about stock with the First Lady.  But I didn't

6    hear much beyond that.

7    Q    Did Mr. McDonnell remove anything from his pocket

8    when making this statement?

9    A    Yes.  It appeared he had taken something from his

10   bottle and was about to take something with it, took

11   something from his pocket and was about to take something.

12   Q    Could you identify what item he pulled out of his

13   pocket?

14   A    I'm assuming it was --

15            THE COURT:  Sustained.

16            THE WITNESS:  I think it might have been

17   Anatabloc, but I can't say with certainty.

18   BY MS. ABER:

19   Q    To whom was Mr. McDonnell making this statement?

20   A    The First Lady.

21   Q    Did Ms. McDonnell say anything in return?

22   A    I think she -- I'm not entirely certain what she

23   said.  She may have said, "Okay."

24            MR. HAUSS:  Objection, Your Honor.

25            THE COURT:  Sustained.  She doesn't know what

1   she said.

2   BY MS. ABER:

3   Q    You can only say what you know.

4   A    I'm sorry.

5   Q    Let's change subjects again.  Let's talk about in

6   general your experiences in the Administration.  Okay?

7   A    Yes.

8   Q    How common was it for the Governor to have meetings

9   on his schedule?

10  A    Very common.

11  Q    Did any of those meetings pertain to business and

12  economic development?

13  A    Yes.

14  Q    In your experience, did Administration officials

15  other than Mr. McDonnell ever attend those meetings?

16  A    Yes.

17  Q    How common was it for you to participate in planning

18  the logistics of those meetings?

19  A    Fairly common, especially with the briefing

20  information on the back end.

21  Q    How common was it, if you know, for other

22  Administration officials like Cabinet Secretaries or

23  Deputies to have meetings on their schedules?

24  A    Common.  Very common, yes.

25  Q    How common was it for you to facilitate in some way

1    getting those meetings on those Cabinet Secretaries'

2    schedules?

3    A    Common.  Not incredibly common, but yeah, pretty

4    common, I guess.  I would get, if a request came to me and

5    the Governor was not able to take the meeting for

6    scheduling purposes, sometimes we would say, "You can meet

7    with the Cabinet member on his behalf, on behalf of the

8    Governor."

9           MS. ABER:  One moment, please, Your Honor.

10      (Counsel conferring with co-counsel.)

11           MS. ABER:  I have no further questions.

12           THE COURT:  Cross?

13    ///

14    ///

15    ///

16    ///

17    ///

18    ///

19    ///

20    ///

21    ///

22    ///

23    ///

24    ///

25    ///

```
 1            MR. ASBILL:  Court's indulgence one second,
 2   please.
 3                      CROSS-EXAMINATION
 4   BY MR. ASBILL:
 5   Q    Good morning.  How are you?
 6   A    Good.
 7   Q    You've talked a little bit about the Governor's
 8   schedule and how he would learn about his schedule.  Isn't
 9   it true that he often didn't know what to expect on his
10   schedule or didn't know what his exact schedule was going
11   to be until the morning of the day that was scheduled?
12            MS. ABER:  Objection.  Speculation.
13            THE COURT:  No.  She can answer.
14   A    I -- it just depended when he would look at his book.
15   He received it the night before, but I'm sure some days he
16   wouldn't look at it until the day of.
17   BY MR. ASBILL:
18   Q    And would there be any possible changes overnight or
19   early morning on his schedule?
20   A    Yeah.  Certainly.
21   Q    Okay.  And is it fair to say that many meetings for
22   the Governor were set without somebody personally asking
23   him whether or not it was okay with him to set the
24   meeting?
25   A    I do not know.
```

EMILY RABBITT - CROSS - ASBILL        2876

1  Q    All right.  And during the day, would schedules often
2  get changed and substitutions on the schedule be made?
3  A    Yes.
4  Q    Okay.  With respect to the number of meetings that
5  the Governor had while you were in this job, did you ever
6  estimate that number?
7  A    No.
8  Q    Do you have any idea how many hours he worked during
9  the day or during a year?
10 A    He worked very long days.  I do know that.
11 Q    Would you have any idea whether -- how many hundreds,
12 thousands of meetings he might have had during the four
13 years?
14              MS. ABER:  Objection.  Asked and answered.
15              THE COURT:  Overruled.
16 BY THE COURT:
17 Q    He's asking you if you know a number, the number of
18 meetings he might have had.
19 A    I --
20 Q    If you have any idea.
21 A    No, I do not.
22 BY MR. ASBILL:
23 Q    Okay.  With respect to your testimony about the P.O.
24 Box, do you know the details of that, where the box was
25 and when it was opened and why it was open?

1   A    Not -- no, not with certainty.

2   Q    Okay.

3            MR. ASBILL:  I have no further questions.

4            THE COURT:  All right.

5        Anything for Ms. McDonnell?

6            MR. HAUSS:  Very briefly, Your Honor.

7                        **CROSS-EXAMINATION**

8   BY MR. HAUSS:

9   Q    Is it fair to say that Mr. McDonnell had a very busy

10  schedule?

11  A    Yes.

12  Q    Frequently would work 14, 15, 16-hour days?

13  A    Yes.

14  Q    Was it common for Mr. McDonnell to travel?

15  A    Yes.

16  Q    And would he often travel without Ms. McDonnell?

17  A    Yes.

18           MR. HAUSS:  Nothing further, Your Honor.

19           THE COURT:  Any redirect?

20           MS. ABER:  No, Your Honor.

21           THE COURT:  All right.  Thank you, ma'am.  You

22  may stand down.

23       (Witness stood aside.)

24           THE COURT:  Call your next witness, please.

25           MS. ABER:  One moment, Your Honor.  I'm sorry.

```
 1              MR. DRY:  Can we approach, Your Honor?

 2         (At Bench.)

 3              MR. DRY:  Your Honor, we were told that

 4    Kilgore's cross would take an hour and a half for

 5    Mr. Asbill and a half hour for Mr. Burck.  Obviously, that

 6    didn't happen.  We can put -- we have a witness, Hagan,

 7    Special Agent Hagan, who's ready to go.  That would be out

 8    of the order that we'd given it to you.  So we're

 9    basically --

10              MR. FAULCONER:  Vetrovec and Bridge are on their

11    way, but they're not here quite yet.

12              THE COURT:  Why don't we take our 15 minutes,

13    and we'll see where we're at.

14              MR. FAULCONER:  Thank you, Your Honor.

15         (In Open Court.)

16              THE COURT:  All right.  We are going to go ahead

17    and take 15 minutes now.

18         (The jury left the courtroom.)

19         (Recess taken from 11:17 a.m. until 11:36 a.m.)

20              THE COURT:  All right.  Let's bring in the jury,

21    please.

22         (The jury entered the courtroom.)

23              THE COURT:  All right.  Call your next witness,

24    please.

25              MR. FAULCONER:  Yes, Your Honor.  The
```

```
 1  United States calls Dr. George Vetrovec.
 2                      DR. GEORGE VETROVEC,
 3   called as a witness by and on behalf of the government,
 4   having been first duly sworn by the Clerk, was examined
 5                    and testified as follows:
 6          MR. FAULCONER:  May I inquire, Your Honor?
 7          THE COURT:  Go ahead.
 8                     DIRECT EXAMINATION
 9  BY MR. FAULCONER:
10  Q    Good morning.
11  A    Good morning.
12  Q    Could you please state your name, and spell your last
13  for the court reporter.
14  A    George Wayne Vetrovec, V, like in Victor, E-T-R-O, V
15  again like in Victor, E like in Edward, C like in cat.
16  Q    What city do you currently live in Dr. Vetrovec?
17  A    Richmond, Virginia.
18  Q    And what do you currently do for a living?
19  A    I am a cardiologist at VCU Medical Center.
20  Q    How long have you worked at VCU?
21  A    Since -- I've been on the faculty since July of 1976.
22  Q    And what is your current title at VCU?
23  A    Professor of Medicine, and I direct the adult
24  catheterization laboratory.
25  Q    What sort of educational background do you have?
```

DR. GEORGE VETROVEC – DIRECT        2880

1   A    I have an undergraduate degree from the University of

2   Virginia and a medical degree from the University of

3   Virginia, postgraduate medical training at VCU Medical

4   Center in internal medicine and cardiology.

5   Q    And how do your day-to-day duties break down in terms

6   of patients, research, admin stuff?

7   A    Well, the majority of my work is patient care, but an

8   awful lot is also teaching.  Now, when I say that, I think

9   you have to understand that our teaching is more

10  apprentice, on-job training.  So much of the clinical work

11  I do is in conjunction with the trainee who's learning to

12  do procedures that I do and so forth.  So it's hard to

13  separate out entirely teaching and patient care.  And then

14  I do probably 10 percent research, and I do some

15  administration.

16  Q    Now, as a VCU employee, do you receive certain

17  e-mails that are addressed to all state employees?

18  A    Yes, I do.

19  Q    And do those include e-mails from whoever is Governor

20  at the time?

21  A    Yes, I do.

22  Q    I'd like to show you what's been already admitted as

23  Exhibit 271.  And zooming in on the top there, does this

24  look like one of those types of e-mails that you would

25  generally get?

```
 1  A    Yes.

 2           MR. FAULCONER:  We can take that down.

 3  BY MR. FAULCONER:

 4  Q    All right.  Now, I'd like to shift gears and talk

 5  about an individual named Jonnie Williams, and I'd like to

 6  show you what's been marked for identification as Exhibit

 7  248.  Zooming in on that top portion there, does that

 8  appear to be a calendar entry to you for a meeting with

 9  Jonnie Williams and yourself?

10  A    Yes, it does.

11           MR. FAULCONER:  Your Honor, we'd offer Exhibit

12  248 into evidence.

13           THE COURT:  It will be admitted.

14  BY MR. FAULCONER:

15  Q    All right.  Now, Dr. Vetrovec, I see that this says,

16  "Jonnie Williams, Founder of Visx Laser Vision, CEO of

17  Star Scientific."  And the date of this dated October 3rd,

18  2011.  And it says, "Location:  Lobby of Gateway."

19      Could you orient us about sort of how this meeting

20  came to be and got to your attention?

21  A    Yes.  It entirely came through scheduling by my

22  assistant at the time, Cindy Dutilly, who was contacted by

23  Mr. Williams, who said he had a new drug, he needed to

24  talk to me about it and potential studies.  And that was

25  what the crux of the meeting was.  But I never talked to
```

1  him before I actually met with him at this time.

2  Q    In that year at least?

3  A    That's right.

4  Q    Now, before 2011, before this meeting got put on your

5  calendar, had you heard of the compound anatabine?

6  A    No.

7  Q    Had you heard of Anatabloc?

8  A    No.

9  Q    But had you met Mr. Williams prior to this meeting?

10 A    Yes.

11 Q    How long before it, approximately, had you met him?

12 A    A number of years.  Maybe ten.  But that's a guess.

13 He -- the first time I met him, he brought a patient to my

14 office that was scheduled, but he came with the patient

15 and introduced the patient to me not as a family care

16 member or anything like that.  He simply introduced the

17 patient, said he was a very important person to him and he

18 wanted me to take care of him, and then he just -- he

19 left.  So that's the first time I saw Jonnie.

20 Q    And was there one interim time between the first time

21 you saw him and then this meeting?

22 A    I saw him some years later, it's like three or four

23 or five, in the Atlanta airport one evening.  We were

24 waiting for a flight to Richmond, and he reintroduced

25 himself.  I, frankly, wouldn't have probably remembered

DR. GEORGE VETROVEC – DIRECT          2883

1  him.  Reintroduced himself about the patient and so forth.
2  And so I saw him in the Atlanta airport.
3  Q    Now, on this particular occasion in October of 2011,
4  did you ultimately meet Mr. Williams at the lobby of the
5  Gateway building?
6  A    I did.
7  Q    And just for anybody who's not from Richmond, do you
8  know where the Gateway building is?
9  A    The Gateway building is meant to be the main entrance
10  into the hospital for inpatient and outpatient activities.
11  It fronts onto Marshall Street, approximately where 12th
12  Street intersects.
13  Q    Do we need to move that microphone?
14  A    Am I too close to it?
15  Q    I think if you sit back just a little bit.  Thanks.
16       All right.  So that's -- is that on -- you said the
17  main entrance to the hospital.  Is that the VCU Medical
18  Center?
19  A    Correct.
20  Q    Now, when you met Mr. Williams at that location,
21  where did you go from there?
22  A    Well, Mr. Williams said to me, "How much time do you
23  have?"  And I said, "Thirty minutes."  And he said, "Make
24  it 45."  He said, "The Governor's wife makes really good
25  cookies, and I asked her to make us some cookies.  We're

```
 1   going over there."
 2       So I got in his car, and we drove over to the
 3   Mansion.
 4   Q   And before that time in 2011, had you been to the
 5   Governor's Mansion before?
 6   A   Not that I can recall.
 7   Q   And do you recall what kind of car he was driving?
 8   A   I don't recall the car, and I hesitate to say, but
 9   it -- it is fair to say that I couldn't open the door.  It
10   was sort of embarrassing.  So I --
11   Q   Was that because it was an old car or --
12   A   No.  It was a different kind of lock that I wasn't
13   used to.
14   Q   Okay.  Now, during your ride over from the Gateway
15   building to the Governor's Mansion, did Mr. Williams talk
16   about this new product that he had?
17   A   Yes.  He did talk about the drug Anatabloc and what
18   its potential, he thought, was.  And he said it, you know,
19   was just still sort of in its infancy.  That's my term,
20   but it's new.  He was excited to have physicians get
21   involved and perhaps do some studies with it.
22   Q   And did he tell you that he was interested in you
23   potentially being one of those physicians?
24   A   I can't remember, but that certainly, over time,
25   became clear that he wanted me involved if I was
```

1  interested in doing studies with it.

2  Q    And did he say anything about the relationship

3  between the product and tobacco?

4  A    Yes, he did.

5  Q    Do you recall what he said?

6  A    Well, he basically said that if -- I think the

7  background was there were many -- obviously, a lot of bad

8  things related to tobacco, but there were some conditions,

9  medical conditions where patients maybe did better if they

10 had smoked at some time or had had tobacco contact, and

11 that what he was doing was trying to use -- utilize the

12 positive or good agents out of the tobacco for potentially

13 medical use.

14 Q    Now, when you got to the Governor's Mansion, do you

15 recall where Mr. Williams parked?

16 A    He parked on the lawn of the Governor's Mansion.

17 Q    And once he parked the car, where did you guys to go?

18 A    We went into the Mansion.

19 Q    And do you recall what sort of event was going on, if

20 any, out on the lawn.

21 A    Yes.  This was a large event there, which was -- it

22 turned out to be the official state recognition, I guess

23 is the best description, for Steven Spielberg when he was

24 here for the movie Lincoln.

25 Q    And did you actually meet Mr. Spielberg at the event?

1  A     I did.

2  Q     And can you describe -- I think you said earlier you

3  only had 45 minutes.  Could you describe how that

4  happened?

5  A     Well, after the official introductions and so forth,

6  I said to Mr. Williams that I needed to get back, and he

7  said, "Wait a minute.  Before you go," he said, "let me

8  get you to meet Mr. Spielberg."  And he spoke to the

9  Governor's wife, who took me over and introduced me to

10 Mr. Spielberg.

11 Q     Now, was there a line of people or how exactly did it

12 work for you to walk --

13 A     It looked like -- as I recall, it looked like there

14 was starting to be sort of a receiving line, if you will,

15 that was gathering.  And she just sort of took me to the

16 head of that, and I spoke to Mr. Spielberg for a few

17 minutes.

18 Q     Now, just to be clear, do you recall whether you

19 spoke to Mr. McDonnell at that event?

20 A     I do not recall speaking to him at all.

21 Q     Now, after -- or as you left the event and got back

22 in Mr. Williams' car, do you recall whether he continued

23 to talk about this product that he had?

24 A     He did.

25 Q     And coming away from the event, what was sort of your

DR. GEORGE VETROVEC - DIRECT          2887

```
1   impression of why you had gone to this thing?
2   A    I thought it was someone who was using an opportunity
3   that -- an event that was going on to help enhance my
4   interest in potentially being involved in the product.
5   Q    And when you say "someone," do you mean Mr. Williams?
6   A    Mr. Williams.
7   Q    Now, after this meeting, or after this going over to
8   the Mansion, sorry, did you tell any of your colleagues or
9   anybody about sort of what had happened?
10  A    Of course.
11  Q    What did you tell them, in general?
12  A    I just told them, "You can't imagine.  This was the
13  most unusual event that you can imagine.  You just never
14  know what's going to happen every morning when you get
15  up."
16  Q    And do you recall ever discussing it with a colleague
17  of doctors named Dr. Abbate?
18  A    Now, that was a little bit different approach.  The
19  reason I spoke with Dr. Abbate, he's a junior faculty
20  member at Virginia Commonwealth University in cardiology.
21  He is originally from Italy, Italian trained.  An
22  excellent young scientist.  And I actually talked to him
23  about, "Let's look at this and think about whether this is
24  worth exploring as a new entity and new drug."
25  Q    Got it.  Now, after your visit to the Mansion, did
```

DR. GEORGE VETROVEC - DIRECT          2888

1  you also attend an event related to Star Scientific or its

2  company Rock Creek Pharmaceuticals later in October at the

3  Westin Hotel?

4  A    I can't confirm the date, but it was after that that

5  I did attend an event at the Westin Hotel, which was

6  sponsored by, as you say, Rock Creek Pharmaceuticals or

7  Star Scientific.  It's unclear to me.

8  Q    All right.  I'd like to show you what's been marked

9  for identification as Exhibit 251.  And zooming in on

10  this, is this an e-mail chain between someone named

11  Caroline Birgmann and it looks like yourself; is that

12  right?

13  A    Yes.  That's certainly my name.

14  Q    And does this appear to be dated October 18th, 2011,

15  at least the top e-mail?

16  A    Yes.

17  Q    Does this appear to be discussing this event that --

18  A    I believe so.

19         MR. FAULCONER:  Your Honor, we'd offer Exhibit

20  251 into evidence.

21         THE COURT:  It will be admitted.

22  BY MR. FAULCONER:

23  Q    Now, where it says there at the top, "I plan to

24  attend and am bringing Dr. Antonio Abbate with me.

25  Thanks.  Looking forward to event," is that the e-mail

```
 1  that you wrote here?
 2  A      I assume that's mine.
 3  Q      And do you recall if Dr. Abbate also went to the
 4  event?
 5  A      He did.
 6          MR. FAULCONER:  We can take that down.
 7  BY MR. FAULCONER:
 8  Q      Now, when you went to the event, do you recall
 9  whether you were there the whole time or were you only
10  there for part of it?
11  A      My recollection is is I got there somewhat late, as
12  the program was starting.
13  Q      And what do you recall about the part of the event
14  that you were there for?
15  A      There were -- I recall, really, the science of it.
16  And there were at least two or three lectures.  One
17  specifically talking about the animal studies that had
18  been done with this drug in patient or animal models of
19  Alzheimer's.  There were two or three, quote, scientific
20  presentations that were there.  And that's what I
21  basically remember from it.
22  Q      All right.  Now, I'd like to move forward from
23  October to the end of February of 2012.  And I'd like to
24  show you what's been marked for identification as Exhibit
25  342.  And, Dr. Vetrovec, does this appear to be a calendar
```

1   entry for an event that you attend at the Executive

2   Mansion on February 29th, 2012?

3   A    Yes.  I went to such an event.  I can't recall the

4   specific date.  But the -- in that time frame, yes.

5   Q    Okay.  In the late February time frame?

6   A    Yes, sir.

7            MR. FAULCONER:  Your Honor, we'd offer Exhibit

8   342 into evidence.

9            THE COURT:  It will be admitted.

10  BY MR. FAULCONER:

11  Q    All right.  Now, Dr. Vetrovec, you said that you

12  attended an event at the Executive Mansion in February of

13  2012; is that right?

14  A    Correct.

15  Q    When you arrived at that event, or at some point when

16  you were there, did you meet Mr. McDonnell?

17  A    Yes, I did.

18  Q    And do you recall what you spoke about with him?

19  A    Yes.  The conversation turned around -- at that time

20  frame, there was some issue going on in the legislature

21  relative to his getting passed, his budget.  And he spoke

22  to myself, and there was someone else, I can't remember

23  who it was, about he would like to -- he said, you know,

24  "I will need your support with this perhaps, and I hope

25  you would be willing to come down and help by supporting

1   it because it could be important to your institution."  It

2   was the entire state budget that he was referring to.

3   Q    And just to be clear, in that conversation with

4   Mr. McDonnell, did Mr. Williams' name come up?

5   A    No, not that I can recall at all.

6   Q    But at that event at the Mansion, did you see

7   Mr. Williams there?

8   A    Yes.  He was there.

9   Q    And could you tell us what you spoke about with

10  Mr. Williams when you were at that event?

11  A    I can't remember specifically, but we talked about

12  potential studies with the drug.  He was still saying,

13  "Are you" -- "are you interested in doing some studies?"

14  Q    And do you ever recall Mr. Williams saying anything

15  specifically about Virginia schools doing a study, as

16  opposed to other types of schools?

17  A    His only reference at one time, and I don't know if

18  it was that night or at some point, said, you know, this

19  is a Virginia drug, and it's sort of disappointing that I

20  don't have better scientific support coming out of the

21  schools here.  I have somebody doing studies at Johns

22  Hopkins as a -- and, you know, I'd like to see more in the

23  Commonwealth."

24  Q    And do you recall whether Mr. Williams ever said

25  anything to you about potential state funding for studies

DR. GEORGE VETROVEC - DIRECT          2892

1  of his product?

2  A    You know, I don't recall anything about the source of

3  funding.  I recall -- and the fact was that I never got

4  far enough with developing a research protocol to

5  basically say to him, "Okay.  Where do I apply for money

6  for this?  Is it through your company," et cetera.  So I

7  really never had that discussion with him because I never

8  got that far research wise.

9  Q    Do you ever remember him saying anything about it,

10 though?

11 A    I don't clearly recall anything.

12 Q    All right.  Now, I'd like to show you, sorry, what's

13 been already admitted as Exhibit 309.  Now, Dr. Vetrovec,

14 is this a -- just zooming in on the list towards the

15 bottom, sorry, is this a list of names and individuals

16 that you've had a chance to review before coming into

17 court?

18 A    I believe you've shown me this before.

19 Q    And we've heard some testimony about these

20 individuals not being invited to that event.  Do you

21 recognize -- I guess maybe it's easiest to put this way.

22 Are there any companies on this list that you don't

23 recognize?

24 A    I don't know what AmeriHealth Mercy or CGI are, or

25 Generic Pharmaceutical.  There are some of these I don't

 1  know what they are.  Majority of them I do recognize as --

 2  such as Amgen and Sanofi-Aventis, Medtronic, Merck, so

 3  forth.

 4  Q    And the ones that you do recognize, are those ones

 5  that you interact with as a cardiologist fairly regularly?

 6  A    Yes.

 7  Q    Other --

 8  A    In general.

 9  Q    Oh, sorry.

10  A    In general, yes.

11  Q    And other than the discussions that we've been

12  talking about with Mr. Williams, had you interacted with

13  Star Scientific before 2011 in your practice?

14  A    No.

15  Q    And at the time of the event that you went to in late

16  February of 2012, were you aware of any conversations

17  between Mr. McDonnell and Mr. Williams about any financial

18  transactions between the two of them?

19  A    No.

20  Q    All right.  I'd like to shift gears just a little bit

21  forward and talk about early March of 2012.  And I'd like

22  to show you what has been either marked or admitted as

23  Exhibit 353.

24            MR. STARNES:  It's not admitted.

25  BY MR. FAULCONER:

1    Q    All right.  What's been marked as Exhibit 353.

2    Dr. Vetrovec, is this an e-mail from Dr. Abbate to an

3    individual named John Clore, with a blind carbon copy to

4    yourself?

5    A    Yes.

6    Q    And is this dated March 7th of 2012?

7    A    No.  It looks like it's March 3rd -- March 3rd.

8    Q    I'm sorry.  I guess in the upper right-hand corner

9    does it say 3/7/2012?

10   A    Okay.  Okay.  That's correct.

11   Q    Okay.

12            MR. FAULCONER:  Your Honor, we'd offer Exhibit

13   353 into evidence.

14            THE COURT:  It will be admitted.

15   BY MR. FAULCONER:

16   Q    All right.  Now, you've told us who Dr. Abbate is.

17   Can you tell us who Dr. Clore is?

18   A    Dr. Clore is head of what I guess would be called the

19   Clinical Research Center at VCU and is significantly

20   involved in clinical research.

21   Q    And I see there on -- it looks like the fourth line,

22   it says, "George Vetrovec and I were exploring the use of

23   anatabine in patients with CAD or CHF."

24       At this time, were you and Dr. Abbate still

25   discussing the possibility of doing some studies on

DR. GEORGE VETROVEC - DIRECT          2895

1  anatabine?

2  A    Yes.  We had on and off.  We sort of had outlined, I

3  don't know if written, but verbally and in our

4  discussions, a list of potential studies that might be of

5  interest to do with this compound.  We were operating on

6  the idea that it had anti-inflammatory properties based on

7  some of the science that had been -- has been written

8  about it.

9  Q    Got it.  Well, I'd like to fast-forward now to May of

10  2012 and show you what's been marked for identification as

11  Exhibit 391.  And, Dr. Vetrovec, is this a -- it looks

12  like a page to you from somebody on your staff at VCU?

13  A    Yes.  Michele is an assistant in the general cath

14  office staff pool.

15  Q    And is this dated, it looks like May 30th, 2012?

16  A    Yes.

17         MR. FAULCONER:  Your Honor, we'd offer Exhibit

18  391 into evidence.

19         THE COURT:  It will be admitted.

20  BY MR. FAULCONER:

21  Q    Now, Dr. Vetrovec, do you recall being alerted that

22  Mr. Williams had reached out to you again in May of 2012?

23  A    I do not recall this specifically.

24  Q    Okay.  But do you recall at some point later in that

25  year, late 2012, Mr. Williams reaching out to you?

DR. GEORGE VETROVEC - DIRECT          2896

1   A    Yes.  I mean, I -- I don't know the specific dates,
2   but I know he continued to have intermittent contact with
3   me about potentially doing studies with the drug.
4   Q    And did that extend at least sometime into sort of
5   late spring, summer of 2012?
6   A    I believe so.  I think in addition to that, because
7   we had not offered an individual proposal, he had some
8   type of one or more center studies going, and he had also
9   asked if we wanted to join an existing group of centers.
10  I'm saying group.  I don't really recall how many or what
11  that was, but to be a multicenter, part of a multicenter
12  experience with the drug.
13  Q    All right.  One moment.
14          MR. FAULCONER:  One moment, Your Honor.
15      (Counsel conferring with co-counsel.)
16  BY MR. FAULCONER:
17  Q    Dr. Vetrovec, it says on here, "Personal call Jonnie
18  Williams," and it gives a phone number.  Do you recall
19  having a phone conversation sometime in this general time
20  frame with Mr. Williams?
21  A    I must say I don't.  I know I had phone calls with
22  him, but I can't pinpoint it to the time.
23  Q    And when you did have phone calls with him, would he
24  generally be bringing up the studies that he was talking
25  about?

DR. GEORGE VETROVEC – CROSS – ASBILL     2897

1  A    Yes.

2  Q    Is it fair to say -- do you recall a conversation

3  with him in which he wasn't referring to the studies?

4  A    No.  I don't recall any.

5        MR. FAULCONER:  No further questions, Your

6  Honor.

7        THE COURT:  All right.

8  Cross?

9                 **CROSS-EXAMINATION**

10 BY MR. ASBILL:

11 Q    Good morning, Doctor.  How are you?

12 A    Thank you.

13 Q    My name is Hank Asbill, and I represent Bob

14 McDonnell.  You briefly described your credentials.  You

15 said you were at VCU, and you're a cardiologist, and

16 you're on the faculty; is that correct?

17 A    Correct.

18 Q    And you said you -- am I correct in thinking that

19 you're also an internist, in addition to being a

20 cardiologist?

21 A    Well, my credentialing is -- to become a

22 cardiologist, you have to be an internist, and then you do

23 specialized training in cardiology.

24      So I am board certified in internal medicine,

25 cardiology, and interventional cardiology, which is

DR. GEORGE VETROVEC – CROSS – ASBILL     2898

1  putting in stents and the like.  But I don't really

2  practice internal medicine except as it interrelates with

3  cardiology.

4  Q    All right.  And you said you're the head of the cath

5  lab at VCU; is that correct?

6  A    Right.

7  Q    And are you -- aside from being board certified, are

8  you on any boards or do you hold any positions within

9  medical societies?

10  A    Yes.  I have, over the years, been on the National

11  Board of the American Heart Association, the Board of

12  Trustees of the American College of Cardiology.  Been on

13  the Board of Trustees of the Society for Cardiac

14  Angiography and Interventions.  Been President of that.

15  President of several other organizations.

16  Q    All right.  Now, government counsel put up Exhibit

17  271.

18          MR. ASBILL:  Could we bring that back up,

19  please.

20  BY MR. ASBILL:

21  Q    This, I believe you described, is a -- is a general

22  e-mail you received from my client?

23  A    Well, to qualify that appropriately, I -- the

24  question was do I receive these, and I said yes.  Do I

25  recall this one?  No.

DR. GEORGE VETROVEC - CROSS - ASBILL      2899

```
1   Q    Okay.  Whether or not you recall it, in realtime have
2   you had a chance to read it before you came into court
3   today?
4   A    I don't recall reading it.
5   Q    You don't recall reading it.  All right.  I don't
6   want to go through it with you.  I just want to ask you
7   this question.  Do you have any recollection of receiving
8   these kind of e-mails from my client, or letters from my
9   client, to state employees that mentioned Jonnie Williams
10  or Anatabloc or Star Scientific?
11  A    No.
12  Q    Okay.
13        MR. ASBILL:  You can take that down.  Thank you.
14  BY MR. ASBILL:
15  Q    The next exhibit they showed you was Exhibit 248.
16        MR. ASBILL:  Would you please pull that up
17  again.
18  BY MR. ASBILL:
19  Q    This was an e-mail that you described, and this was
20  Jonnie Williams wants to discuss some interesting
21  cardiology topic.  And apparently he has set up a meeting
22  with you for the 3rd of October; is that correct?
23  A    That's correct.
24  Q    Okay.  And this is something that was set up with
25  your assistant --
```

DR. GEORGE VETROVEC - CROSS - ASBILL     2900

```
 1   A     Correct.

 2   Q     -- is that correct?

 3         And --

 4   A     And she did tell me that it was about -- it may say a

 5   "cardiology topic."  But she did tell me it was about a

 6   new drug.

 7   Q     Okay.  And she also told you that Jonnie Williams,

 8   presumably, told her that he was the founder of Visx Laser

 9   Vision and the CEO of Star Scientific?

10   A     I assume that's where she got that.

11   Q     I mean, do you have any reason to believe she'd look

12   him up and put that in there?

13   A     I think she probably did whatever he told her, or

14   maybe he sent her something.  I don't know.

15   Q     Okay.  And with respect to -- to this meeting, at

16   least this message doesn't say anything about my client,

17   Governor McDonnell, right?

18   A     No.

19   Q     Okay.  And, in fact, you met with Jonnie Williams on

20   that evening of October 3rd, 2011 --

21   A     Yes.

22   Q     -- at approximately 6:30?

23   A     Yes.

24   Q     And that's when you told him, basically, you got 30

25   minutes, and he said how about 45?
```

1  A    Correct.

2  Q    Okay.  Now, prior to -- between the time of this note

3  to you about scheduling the meeting and the meeting

4  itself, do you recall another e-mail that you received

5  from your scheduler suggesting to you that Jonnie Williams

6  told her -- or your assistant telling you that Jonnie

7  Williams was going to bring the Governor with him to come

8  see you?

9  A    She made some reference to that, saying -- she was

10 sort of puzzled is the way to say it.  She said, "I'm not

11 quite sure what's involved in all of this."  She said, you

12 know, "He said he might bring the Governor with him."

13 Q    Okay.  But --

14 A    I didn't --

15 Q    All right.

16 A    I didn't go too far with that.

17 Q    But, in fact, he did not?

18 A    He did not.

19 Q    Okay.  And then you two met and you talked about

20 Anatabloc, et cetera, and whatever his story was about

21 that.

22 A    Right.

23 Q    And would I be accurate in saying that you were very

24 interested in what he was describing to you?

25 A    Well, as someone who's been involved in scientific

DR. GEORGE VETROVEC – CROSS – ASBILL     2902

```
 1  studies over the years and development, you know,
 2  opportunities to get something early are a good
 3  opportunity if it's a valuable potential product or study
 4  and so forth.  So I was interested, if this had any
 5  potential, because it looked like an opportunity to get in
 6  on the ground floor.
 7  Q    So it was an opportunity, in your view, if it was
 8  real, essentially, to get in on the cutting edge of a
 9  potential very serious breakthrough in medicine.  Is that
10  fair?
11  A    Correct.
12  Q    All right.  So after Mr. Williams talked to you, you
13  all drove over to the Mansion; is that correct?
14  A    Correct.
15  Q    All right.  And this was to, supposedly, get some
16  cookies that my client's wife makes?
17  A    That's correct.
18  Q    Did you ever get a cookie?
19  A    No.
20  Q    And on that night, this was the Spielberg event for
21  the Lincoln movie; is that correct?
22  A    Correct.
23  Q    All right.  And you drove over in the car.  You
24  described you couldn't open the door; is that right?
25  A    That's correct.
```

DR. GEORGE VETROVEC - CROSS - ASBILL     2903

1  Q    And that's because it was a very fancy, expensive car

2  that was sort of complicated?

3  A    That's correct.

4  Q    And you thought it was a Maserati, or something like

5  that?

6  A    I'm not sure what it was.

7  Q    All right.  So --

8  A    I'm not good on expensive cars.

9  Q    So up until this point, Mr. Williams had said, "Well,

10  I'm going to bring the Governor over, and he did.  And

11  he's got this fancy car.  And did you get the sense --

12        MR. FAULCONER:  Objection, Your Honor.  There's

13  been testimony as to what --

14        THE COURT:  Sustained.  Don't editorialize.

15  Just ask a question.

16  BY MR. ASBILL:

17  Q    Did you think Mr. Williams was trying to impress you?

18  A    I guess so.  I guess I didn't think about it too

19  much.  I mean, it seemed to me that it was far more than I

20  expected to discuss a drug.

21  Q    All right.  Let me go back to when you first met

22  Mr. Williams.  When you first met Mr. Williams, this is

23  when he brought a patient to you that he said was of

24  interest to him; is that correct?

25  A    That's correct.

DR. GEORGE VETROVEC - CROSS - ASBILL    2904

```
 1  Q    All right.  And I take it you helped the patient out?
 2  A    We took care of the patient.  I will --
 3  Q    All right.  And later, some ten years or whatever,
 4  you see Mr. Williams in an airport in Atlanta; is that
 5  correct?
 6  A    I don't know if it's ten years or five years.
 7  Probably closer to five years.  But I don't --
 8  Q    Okay.  And he recognizes you?
 9  A    Correct.
10  Q    All right.  And when he recognizes you, he says hi
11  again to you; is that correct?
12  A    He came up and reintroduced himself to me, reminded
13  me of the previous incident with the patient --
14  Q    Okay.
15  A    -- and sort of --
16  Q    And he does something else as well, does he not?
17  A    That's correct.  We had our brief discussion for a
18  few minutes.  I went off to the side, still waiting for
19  the airport -- for the airplane, and I got paged by the
20  person at the gate, who said, "Mr. Williams has upgraded
21  you to first class."
22  Q    And you thought that was a gracious gesture?
23  A    I did.
24  Q    Okay.  Now, going back to the Spielberg event.  When
25  you arrive at the Spielberg event in Mr. Williams' car,
```

DR. GEORGE VETROVEC – CROSS – ASBILL     2905

```
 1  you say that you parked on the grass there --

 2  A    Correct.

 3  Q    -- at the Mansion?

 4       And were there cars parked everywhere for this event?

 5  A    I don't recall.

 6  Q    And you were not on the guest list, were you?

 7  A    What he said to the -- I guess it's the gate guard

 8  that was there.

 9  Q    Right.

10  A    He said, "I'm Jonnie Williams, and this is my guest

11  for tonight, Dr. Vetrovec."

12  Q    Okay.  And the guard happened to know you, right?

13  A    Well, the guard looked into the car and he looked at

14  me, and he said, "Oh, I think I know him.  He did my

15  brother," referring to a procedure.

16  Q    Did you do his brother well?

17  A    I hope so.

18  Q    So you go into this event, and there are hundreds of

19  folks at this event.  Is that fair?

20  A    That's correct.

21  Q    All right.  And you don't recall talking to my client

22  at all during that event?

23  A    No, I do not.

24  Q    But you did get to meet Mr. Spielberg?

25  A    I did.
```

DR. GEORGE VETROVEC - CROSS - ASBILL     2906

1  Q     And the two of you had some California connection

2  that you talked about for a second.  Is that fair?

3  A     That is true.  It turned out that he was very

4  personable and he funds research for a cardiologist in Los

5  Angeles at Cedars-Sinai that I know, and so we had a

6  little discussion.

7  Q     Okay.  And do you recall whether you talked to Jonnie

8  Williams at that event about Anatabloc or Star?

9  A     I don't recall at all, at the Governor's Mansion

10 event, speaking about Anatabloc.  We talked about it in

11 the car coming over, in the car going back.

12 Q     Okay.  And then I believe, going forward in time --

13           MR. ASBILL:  I'd like to see Exhibit 251.

14 BY MR. ASBILL:

15 Q     -- you were invited to an event at the Westin Hotel

16 mid-October of 2011?

17 A     That's correct.

18 Q     Okay.  And up to this point in time, and with respect

19 to any e-mails or documents other than my client's letter

20 to Virginia employees, my client is not on any of these

21 exchanges relating to you and Mr. Williams; is that

22 correct?  Not cc'd or not copied in or directed to or

23 from?

24 A     None that I can recall.

25 Q     Okay.  And this is from Carolyn Birgmann.  And who

1    did you understand her to be?

2    A    An employee of Rock Creek Pharmaceuticals or Star

3    Scientific.  I'm not sure what -- what particular agency,

4    but that she worked for --

5    Q    I'm sorry.  Well, did you understand that Rock Creek

6    Pharmaceuticals and Star were essentially one in the same?

7    A    Well, I thought they were somehow separate entities,

8    but -- but would not be surprised to think they were

9    somehow closely associated.

10   Q    Okay.  And this is inviting you to attend the Westin

11   event; is that correct?

12   A    Correct.

13   Q    All right.

14          MR. ASBILL:  And can we pull up the invitation,

15   please.  I think it's attached.  Is it not attached?  Try

16   RM-1232.  Can you pull up the invitation from that

17   document.

18          MS. TARAKTCHIAN:  It's not attached.

19          MR. ASBILL:  Not there.  We'll try to find it in

20   a second.

21   BY MR. ASBILL:

22   Q    Do you recall what the invitation said?

23   A    No.

24   Q    All right.  You attend the event, correct?

25   A    Correct.

DR. GEORGE VETROVEC - CROSS - ASBILL     2908

```
1   Q    And there are two or three lectures talking about

2   studies and anatabine or Anatabloc's effects on

3   Alzheimer's?

4   A    There was at least one on its effects on Alzheimer's.

5   Q    Okay.  And my client wasn't there, right?

6   A    No.  I do not recall seeing him at all.

7   Q    Okay.  And to your knowledge, he was not advertised

8   on the invitation; is that correct?

9   A    I don't recall that.

10  Q    All right.  Now, going forward to the Healthcare

11  Leaders event.

12          MR. ASBILL:  And I believe this is Exhibit 342.

13  Would you please pull that up, Victoria.  And is there an

14  attachment to that.  Don't worry about it if there's not.

15          MS. TARAKTCHIAN:  No.

16  BY MR. ASBILL:

17  Q    With respect to this event, this was on what -- this

18  is, what, leap year, right?  2/29/2012; is that correct?

19  A    That's the --

20  Q    The event was on --

21  A    -- date on that exhibit.

22  Q    Okay.  And that, in fact, was the date of the event;

23  is that correct?

24  A    Correct.

25  Q    Okay.  And you go to the Healthcare Leaders event.
```

```
 1  You're invited to that.  And would I be correct in

 2  saying -- and I'm not asking you to brag -- that you

 3  viewed yourself as a healthcare leader in Virginia?

 4  A    Well, when I got the invitation, you say, Why am I

 5  invited to this?

 6           MR. FAULCONER:  Objection, Your Honor.

 7  A    And at that time, I was on the --

 8           MR. FAULCONER:  I'm sorry, Your Honor.  Just

 9  objection as the witness speculating as to why he was

10  invited.  If he doesn't know.

11           THE COURT:  Overruled.

12      Go ahead.

13  A    Okay.  Well, my speculation was that I was invited

14  because I was on the VCU Health System Board at the time,

15  which I thought would qualify for that recognition.

16  BY MR. ASBILL:

17  Q    So you thought you were qualified to be at a

18  Healthcare Leaders event --

19  A    Right.

20  Q    -- correct?

21      All right.  And I believe you said that you -- you

22  met my client at the event, and you all talked about

23  budget issues?

24  A    That's correct.

25  Q    And that related to the entire state budget; is that
```

```
 1  correct?

 2  A     That's correct.  That's how I recall.

 3  Q     Do you have any sense of what the health component,

 4  healthcare component part of the total budget is?  Do you

 5  have any idea what the percentage is?

 6  A     No.

 7  Q     Would you think it's large or small or somewhere --

 8  A     Large.

 9  Q     Large.  Okay.  And there was no discussion at all

10  with my client or in the presence of my client about

11  Anatabloc or Star Scientific?

12  A     None that I can recall.

13  Q     Okay.  You say you had a side conversation at some

14  point with Jonnie Williams at the event about his

15  interests; is that correct?

16  A     Correct.

17  Q     All right.  Now, you looked at Exhibit 309, which is

18  a list of the attendees at the event.

19          MR. ASBILL:  Could we pull that back up, please.

20  BY MR. ASBILL:

21  Q     And I think you said you recognized some of the names

22  there, et cetera.

23          MR. FAULCONER:  Just -- Your Honor, objection

24  real quick.  It's not a list of attendees to the event.  I

25  think the prior testimony established none of these people
```

 1  attended.

 2            THE COURT:  Sustained.

 3  BY MR. ASBILL:

 4  Q    You looked at the -- you looked at this list, and you

 5  said you recognized some of the names, right?

 6  A    Correct.  I really did not recognize the people, but

 7  really recognized the companies.

 8  Q    You recognized the companies.  Okay.  And were there

 9  folks at the event that you did recognize personally?

10  A    There were a handful of people.  There were some VCU

11  people.  I can't remember who they were.  But I remember

12  seeing people that I knew.

13  Q    How many -- can you give me an estimate of how many

14  people actually attended that event?

15  A    I think I probably can't.  Because I got there late.

16  I realize that's a little bit of a pattern.  But I got

17  there late, and so when I got there, a lot of people, I

18  think, had already left at that point.  So there were

19  probably 25 people when I was there.

20  Q    At the time you got there?

21  A    Yeah.

22  Q    And did you go through all the various rooms where

23  people might be mingling?

24  A    I don't think I went -- it seemed to me there were

25  just like two rooms or something.  I didn't see an

DR. GEORGE VETROVEC - CROSS - ASBILL      2912

1  expansive.  But maybe I didn't figure it out.

2  Q    Okay.  Going forward to early March 2012, and you

3  talked about that time frame with respect to Exhibit 353,

4  which is an e-mail from Mr. Abbate to Mr. Clore, or visa

5  versa, and you're copied in on it?

6  A    Yes.  That's Dr. Abbate to Dr. Clore.

7  Q    Right.  Okay.  And you're cc'd on that e-mail?

8  A    Correct.

9  Q    And I believe you said that in that time frame in

10  early March you and Dr. Abbate were discussing a list of

11  potential studies; is that correct?

12  A    Correct.

13  Q    Had you focused in on that point in terms of how much

14  the studies might cost?

15  A    No, we had not.  Well, only to the extent of saying

16  if we plan a study, how long should the follow-up be.

17  Because the longer the follow-up, the more cost.  How

18  complicated is the study.  Because all of that does affect

19  money, and we, frankly, didn't think that was going to be

20  a high budget study.

21  Q    All right.  But you hadn't pinpointed any particular

22  dollar amount --

23  A    No.

24  Q    -- or anything like that?

25  A    No.  Not at all.

DR. GEORGE VETROVEC - CROSS - ASBILL     2913

1  Q    And no discussions with Jonnie Williams about that at

2  all?

3  A    Not anything about dollar amount.

4  Q    Okay.  And then you say sometime later in May or end

5  of May, that there was a note that he had called you?  You

6  got some note in, I believe, the 30th of May.

7             MR. ASBILL:  Exhibit 391.  Can we pull that up.

8  BY MR. ASBILL:

9  Q    You get a message to call Jonnie Williams, right?

10 A    Right.  I affirm that that's there.  I don't remember

11 what we talked about, when I actually returned the call,

12 et cetera.

13 Q    Okay.  And at some point later you return -- do you

14 know whether it's shortly after this or months after it or

15 what that you talked to him again or talked to him in

16 response to this?

17 A    I don't know.  I assume it was fairly soon, but I

18 don't know.

19 Q    All right.  And at that point he wanted to talk to

20 you about joining a different group of some sort of

21 centers or something?  I wasn't quite sure what you said.

22 A    Well, I think -- he had some type of ongoing study,

23 and he said, "Since you're not currently involved in this,

24 maybe you would want to join another group and you could

25 pool your data."

1  Q    Okay.  And --

2  A    That's what I mean by multi-center study.  And I

3  don't recall whether there were other centers grouped

4  already or whether it was just one other center that he

5  was offering for us to join.

6  Q    And that was the -- basically, the end of your

7  conversations with Jonnie Williams about all this?

8  A    I think so.  I can't -- I can't remember.

9         I know that there was also a time when someone

10 contacted me from Rock Creek Pharmaceuticals.  And,

11 actually, when we -- and I assume this is after we didn't

12 participate in this study.  They wanted me to review the

13 data from a study, which I didn't do.  But they wanted me

14 to review it.

15 Q    Did he offer to pay you to do that?

16 A    Yes.

17 Q    And you didn't accept it?

18 A    I didn't.

19        MR. ASBILL:  Thank you, sir.  I have no further

20 question.

21        THE COURT:  All right.

22    Ms. McDonnell, cross?

23        MS. MARTIN:  Thank you, Your Honor.  Briefly.

24                    **CROSS-EXAMINATION**

25 BY MS. MARTIN:

1  Q    Dr. Vetrovec, my name is Heather Martin, and I

2  represent Ms. McDonnell.

3       Directing your attention back to the Steven Spielberg

4  event.

5  A    Yes.

6  Q    Do I correctly understand your testimony that your

7  only interaction with Ms. McDonnell that night is that

8  Jonnie Williams asked you -- or asked her, rather, to

9  introduce you to Mr. Spielberg?

10  A    That's correct.

11  Q    And at that time, you did not get the impression that

12  Mr. Williams and Ms. McDonnell had previously discussed

13  who you were, correct?

14  A    No.  I thought -- not at all.

15  Q    And then moving forward a couple of weeks to the

16  Westin Hotel event.  You testified that you attended that

17  event, correct?

18  A    Yes.

19  Q    An event sponsored by Star Scientific or Rock Creek

20  Pharmaceuticals, correct?

21  A    Correct.

22  Q    And you do not recall Ms. McDonnell speaking at that

23  event, correct?

24  A    I do not recall her speaking at the event.  Recall, I

25  said I came late.  But I have some recollection that she

1   was leaving as I came or had been there in some way.

2   Q    You don't recall having seen her at the event?

3   A    I can't say that.  I know she was there, and if I saw

4   her leaving or something to there, that I probably did see

5   her.  But I didn't -- I don't recall hearing her speak.

6   Q    And then moving forward to the Healthcare Industry

7   Leaders event in February of 2012.  This is an event you

8   attended, correct?

9   A    Yes.

10  Q    And you did not speak to Ms. McDonnell at that event,

11  correct?

12  A    I do not recall.  In fact, I do not recall seeing her

13  at the event.  That doesn't say she wasn't there.  I just

14  don't recall.

15  Q    Now, you stated that you and Dr. Abbate periodically

16  talked about the possibility of participating in a study

17  of Anatabloc, correct?

18  A    Correct.

19  Q    And is it fair to say that your interest in

20  participating in such a study had nothing to do with

21  Ms. McDonnell?

22  A    That's correct.

23            MS. MARTIN:  No further questions.

24            THE COURT:  Redirect?

25            MR. FAULCONER:  Very briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. FAULCONER:

Q    Without getting into the full number, Dr. Vetrovec, was one of the numbers -- phone numbers associated with you in this time frame a number that ended in 2968?

A    Correct.

Q    All right.

          MR. FAULCONER:  No further questions, Your Honor.

          THE COURT:  All right.  Thank you, Doctor.  You may stand down.

     (Witness stood aside.)

          THE COURT:  Call your next witness, please.

          MS. ABER:  Amy Bridge.

**AMY BRIDGE,**

 called as a witness by and on behalf of the government,

 having been first duly sworn by the Clerk, was examined

               and testified as follows:

**DIRECT EXAMINATION**

BY MS. ABER:

Q    Good afternoon.

A    Good afternoon.

Q    Please state your name, and spell your last for the court reporter.

A    Amy Bridge.  B-R-I-D-G-E.

AMY BRIDGE - DIRECT                2918

1  Q    How are you currently employed, Ms. Bridge?

2  A    I work for the Library of Virginia Foundation.

3  Q    Previously, did you work at the Executive Mansion?

4  A    I did.

5  Q    And when did you do so?

6  A    From August of 2002 until January 2010.

7  Q    So which Governors did you work for?

8  A    Governor Mark Warner and Governor Tim Kaine.

9  Q    Is it fair to say you helped with the transition, a

10 little bit, when Governor McDonnell took office in 2010?

11 A    I did.  I stayed for one month.

12 Q    Is it also fair to say that you had roughly the same

13 job that a woman named Sarah Scarbrough had in the

14 McDonnell administration?

15 A    Yes.

16 Q    Okay.  Now we will turn your attention back, please,

17 to your time as a Mansion Director in both the Warner and

18 Kaine administrations.

19 A    Uh-huh.

20 Q    I'm going to ask you these questions lumping them

21 together.  If they are appropriately separated, please

22 answer the question in that way.  Does that make sense?

23 A    Yes.

24 Q    Okay.  In those administrations, how common was it

25 for the Mansion to host events?

AMY BRIDGE - DIRECT            2919

1  A    We had events, on average, about twice a week.

2  Q    And how much of your day-to-day job involved event

3  planning?

4  A    About half of my time.

5  Q    What did you do with the other half?

6  A    I spent serving as Curator for the house and the

7  furnishings, working on facilities management, assisting

8  the family, that sort of thing.

9  Q    With regard to event planning, how common was it for

10 you and the other government employees to participate in

11 the planning?

12 A    A hundred percent.

13 Q    So when you say that, do you mean that -- what do you

14 mean by that?

15 A    Well, the plans for events, the decision on having

16 events would be made in the Governor's Office or the

17 Office of the First Lady.  The information would come to

18 me, and I would take over the planning at that point.

19 Q    So who had the decision-making authority to schedule

20 an event at the Mansion?

21 A    That would be the Governor and First Lady's staff,

22 the Governor's scheduler, Chief of Staff, that sort of

23 role.

24 Q    In those two administrations, did the Governor and

25 First Ladies have to bless an event that was put on a

1    calendar?

2    A    Yes.  An event had to be part of their -- applicable

3    to their job and their roles, and they had to be hosted by

4    either the Governor or the First Lady.

5    Q    Now, can a -- in those two administrations, could a

6    member of the public just come on in and rent the Mansion?

7    A    No.

8    Q    Did either or both Governors ever have Mansion events

9    that related to Virginia business and economic

10   development?

11   A    Yes.

12   Q    Were both Governors supportive of Virginia business?

13   A    Yes.

14   Q    Can you tell the jury a little bit about what kinds

15   of events related to Virginia business and economic

16   development they might have had or had?

17   A    We hosted events for companies that were considering

18   opening operations in Virginia or that had opened

19   operations in Virginia.  When JetBlue decided to fly to

20   Richmond, we had an event for them.  When the Commerce and

21   Trade was wooing the Sabra Hummus people, we had an event

22   for them as well.  We also had events for the Tourism

23   Office, the Film Office, the Virginia Economic Development

24   Partnership, all came under Commerce and Trade.

25   Q    Was it your experience that events at the Mansion had

1  to be applicable to the work being done by the Governor

2  and First Lady?

3  A    Absolutely.

4  Q    Now, in those two administrations, if the Mansion

5  events were related to business, is it fair to say that

6  they were generally related to a significant business

7  opening or luring a business to Virginia?

8  A    Yes.

9  Q    Did the Mansion ever host receptions for the

10 Department of Commerce and Trade?

11 A    Yes.

12         MS. ABER:  If I could have one moment, please,

13 Your Honor.

14      (Counsel conferring with co-counsel.)

15         MS. ABER:  Thank you, Your Honor.  I pass the

16 witness.

17         THE COURT:  Cross.

18                    **CROSS-EXAMINATION**

19 BY MR. ASBILL:

20 Q    Good afternoon, Ms. Bridge.  My name is Hank Asbill.

21 I represent Bob McDonnell.

22 A    Good afternoon.

23 Q    How are you?

24 A    Fine.  Thank you.

25 Q    You spent only a brief period of time during the

1  transition of administrations, essentially --

2  A    Correct.

3  Q    -- with my client?

4       So you were there for about a month; is that correct?

5  A    Yes.

6  Q    And then Sarah Scarbrough took your job; is that

7  correct?

8  A    Yes.  We worked together for that month so that I

9  could provide some training.

10 Q    So you could provide some training and help in the

11 transition; is that correct?

12 A    Uh-huh.

13 Q    And, you know, with respect to hosting events in the

14 Mansion and that sort of thing, is there any kind of law

15 or regulation that governs what someone can do as a

16 Governor or First Lady in the Mansion?

17 A    To my knowledge, the only rule is that there cannot

18 be ticketed events at the Mansion.  People cannot pay to

19 buy a ticket to come to an event at the Mansion.

20 Q    Okay.  And is there some sort of -- as you

21 transitioned, was there some sort of manual, basically, of

22 how to operate a Mansion that was left behind?

23 A    I -- yes.  I wrote a Mansion manual that we used

24 during my two administrations.

25 Q    And those were about sort of administrative things or

1    were those about hosting events?

2    A    They were the day-to-day operations, staff

3    requirements, procedures, that sort of thing.

4    Q    Okay.  And you experienced that position with two

5    different Governors, correct?

6    A    I did.

7    Q    And is it fair to say that each Governor who comes in

8    basically does it his own way?

9    A    They are given the freedom to run the Mansion however

10   they would like.

11   Q    Okay.  And with respect to the idea of supporting

12   Virginia businesses, were you aware that -- that my

13   client's campaign initiative was Bob's For Jobs?

14   A    I think I had heard that.  But that was not part of

15   my job in that month.

16   Q    Okay.  And you talked about events for opening

17   operations or, what, expanding operations or what was it

18   that you said?

19   A    That could be.  But generally, it was for bringing

20   new companies to Virginia.

21   Q    Or perhaps trying to keep companies in Virginia to

22   stay in Virginia instead of going to another state?

23   A    Perhaps.  I don't recall that.

24   Q    Okay.  Were there any events when you were there that

25   were designed to -- for companies to give money to

1   Virginia?

2   A    Not to my knowledge.

3   Q    All right.  And I take it that you had, I mean, a

4   brief interaction in the transition period with my client;

5   is that correct?

6   A    Correct.

7   Q    And since that time, have you seen him?

8   A    I saw the Governor twice.  Once on election day last

9   year at my previous employer, and once recently at a

10  funeral.

11  Q    And did you all exchange greetings?

12  A    Just greetings and hello, how are you type things.

13            MR. ASBILL:  Thank you very much.

14            THE COURT:  Mr. Burck.

15            MR. BURCK:  Your Honor, very briefly.

16                      **CROSS-EXAMINATION**

17  BY MR. BURCK:

18  Q    Good afternoon, Ms. Bridge.  My name is Bill Burck,

19  and I represent Maureen McDonnell.  Just a few quick

20  questions.

21  A    Yes, sir.

22  Q    The Governors you worked for were both married,

23  right?

24  A    Correct.

25  Q    And they both -- so they had First Ladies of

1  Virginia?

2  A    Correct.

3  Q    And the First Ladies would participate in Mansion

4  events on occasion?

5  A    Yes.

6  Q    And the -- the Mansion would typically invite people

7  to these events, right?

8  A    Yes, uh-huh.

9  Q    And typically, the First Lady would also have an

10 opportunity, when she was going to be part of an event, to

11 invite people to events, right?

12 A    Yes.

13 Q    So there was nothing unusual about that, in your

14 experience?

15 A    No.

16 Q    And do you know -- I think the First Lady, the only

17 official position she has is she's the Honorary Chair of

18 some kind of Citizens' Committee?

19 A    Correct.  There is a Citizens' Advisory Council on

20 Furnishing and Interpreting the Executive Mansion, known

21 as the CAC, and the First Lady is an ex officio member of

22 that.

23 Q    And ex officio meaning, I guess in common parlance,

24 sort of honorary?

25 A    Yes.

1              MR. BURCK:  That's it, Your Honor.

2              THE COURT:  All right.  Anything else?

3              MS. ABER:  No, Your Honor.  Thank you.

4              THE COURT:  All right.  Thank you, ma'am.  You

5   may stand down.

6        (Witness stood aside.)

7              THE COURT:  Call your next witness.

8              MS. ABER:  Special Agent Charles Hagan.

9                        **CHARLES HAGAN,**

10  called as a witness by and on behalf of the government,

11  having been first duly sworn by the Clerk, was examined

12                  and testified as follows:

13                     **DIRECT EXAMINATION**

14  BY MS. ABER:

15  Q    Good afternoon, sir.

16  A    Hello.

17  Q    Please state your name, and spell your last for the

18  record.

19  A    Charles Hagan.  H-A-G-A-N.

20  Q    How are you currently employed, Special Agent?

21  A    I'm a Special Agent accountant with the Virginia

22  State Police.

23  Q    How long have you had that job?

24  A    Ten years.

25  Q    Okay.  Were you employed in law enforcement before

1    that?

2    A    Yes, I was.

3    Q    Let's start at the beginning of your law enforcement

4    career, please, and walk through it to present for the

5    jury.

6    A    Okay.  In 1975, I became a police officer in the City

7    of Baltimore.  I left there in 1978 to attend graduate

8    school in New York City.  I then took a position as a

9    Special Agent with the Internal Revenue Service in

10   Chicago.  Took a promotion and transferred to Washington,

11   D.C.  While I was there, I transferred over to the FBI,

12   and I retired from the FBI in March of 2004.

13   Q    And instead of retiring to a beach, you joined the

14   State Police?

15   A    Yes, I did.

16   Q    Okay.  And just for the jury's knowledge, were you

17   run out of these various law enforcement agencies?  Why

18   were you leaving each of them?

19   A    It was -- the police department was so I could attend

20   school, go to graduate school.  I left the IRS because I

21   was traveling six months out of the year.  I was in the

22   International Division.  And then I stayed with the FBI,

23   and retirement was at 57, mandatory retirement.  And I

24   left in 2004 because there was an opening in the State

25   Police.

CHARLES HAGAN - DIRECT                2928

1  Q    Now, are you one of the case agents in the

2  investigation of Mr. and Ms. McDonnell?

3  A    Yes, I am.

4  Q    Before that, were you a case agent on any related

5  cases?

6  A    Yes.  I was the case agent on the investigation

7  concerning the chef of the Executive Mansion that was

8  embezzling food from the Mansion.

9  Q    Now, Special Agent, was there ever a federal, federal

10 grand jury investigation opened on the case about the chef

11 stealing food from the Mansion?

12 A    No, there was not.

13 Q    Okay.  Were you also involved in the investigation of

14 Jonnie Williams for suspected securities fraud?

15 A    Yes, I was.

16 Q    And was a federal grand jury opened on that case?

17 A    Yes, there was one.

18 Q    And is it fair to say there was a federal grand jury

19 involving Mr. and Ms. McDonnell opened in this case?

20 A    Yes, there was.

21 Q    Now, in the course of these various investigations,

22 did you have to keep your supervisors at the Virginia

23 State Police apprised of your progress?

24 A    Yes, I did.

25 Q    And why was that?

1  A    Because it involved -- first, it involved the

2  Mansion, and they were very worried about someone stealing

3  from the Governor's Mansion.

4      And then when we got involved with the Governor's

5  investigation, Mr. McDonnell was the boss of all of us in

6  the State Police, and my supervisors wanted to know what

7  was going on regarding the investigation.

8  Q    Now, did you have an opportunity to interview

9  Defendant Ms. McDonnell back in February, that being

10 February 15th of 2013?

11 A    Yes, I did.

12 Q    Did you set up that interview?

13 A    No, I did not.

14 Q    Do you know what explanation was given to put on her

15 calendar?

16 A    At the time, I did not.

17 Q    Now, Special Agent, do you typically tell folks that

18 you're going to interview what topics will be addressed

19 during the interview?

20 A    No, I do not.

21 Q    And why don't you do that?

22 A    Normally when we do interviews, we'll knock on

23 someone's door and identify ourselves and explain we're

24 here and we need to ask you some questions.  We do that so

25 that we don't give them an opportunity to think about

CHARLES HAGAN - DIRECT          2930

1    their answers prior to us coming to interview them.

2    Q    Now, setting aside the topic of lawyers who want to

3    attend an interview, putting that aside, do you customary

4    permit just additional folks to tagalong to participate in

5    interviews?

6    A    No.  You normally want to have the person you're

7    interviewing be by themselves so there's no distractions.

8    I found if somebody is present, they might interject

9    things as I'm talking to the witness.

10   Q    Now, on that day in February of 2013, why did you go

11   interview Ms. McDonnell?

12   A    I had to -- for several reasons.  Number one was one

13   of the allegations in the chef case was that -- Todd

14   Schneider had mentioned that Ms. McDonnell had authorized

15   a bartering agreement between the two where he owned a

16   catering company on the side as well as being the chef for

17   the Mansion, and he would provide services to the Mansion.

18   In exchange, he was allowed to take food from the Mansion.

19   Kind of like in a bartering system.

20   Q    And --

21   A    And secondly, I needed to -- we had some information

22   where we had found a $50,000 check made payable to

23   Ms. McDonnell from a trust, Starwood Trust, and also a

24   $15,000 check from Starwood Trust that paid for her

25   daughter's wedding.

1  Q    Now, at the time of this interview, what payments

2  from Starwood Trust to Maureen McDonnell did you know had,

3  in fact, occurred?

4           MR. BURCK:  Objection, Your Honor.  Can we

5  approach briefly?

6           THE COURT:  Come on up.

7      (At Bench.)

8           MR. BURCK:  Your Honor, the objection is

9  actually to the prior question.  The testimony that came

10 in was that she was involved in the bartering transaction.

11 I just wanted to make sure that the -- they are going to

12 elicit that she, in fact, did not, that she was not

13 involved in any criminal activity with the chef.  Because

14 right now the impression that maybe left is that she's

15 committed another crime that has not been either informed

16 of --

17           THE COURT:  I don't have any -- any of that.

18 You'll be able to deal with that on cross-examination.

19 That objection will be overruled.

20           MR. BURCK:  Okay.  Thank you, Your Honor.

21     (In Open Court.)

22 BY MS. ABER:

23 Q    Let me ask the question one more time.  At the time

24 that you went to the Mansion for the interview, what

25 payments from Starwood Trust to Maureen McDonnell did you

1  know had, in fact, occurred?

2  A    I was aware of the $15,000 check from Starwood Trust,

3  payable to Great Seasons for the benefit of

4  Ms. McDonnell's child's wedding.  And I was also aware of

5  a $50,000 check made payable to Maureen McDonnell.

6  Q    Did you take a second agent with you to the

7  interview?

8  A    Yes, I did.

9  Q    And why did you do that?

10 A    Several reasons.  Normally, whenever I interview a

11 female, I always bring another person so that there could

12 never be any allegations of something misappropriate.

13      Secondly, I wanted a witness when I did the

14 investigation -- interview.  And thirdly, because it was

15 Ms. McDonnell, the First Lady of Virginia, I thought I

16 better have another witness with me.

17 Q    Who did you take with you?

18 A    Special Agent -- well, we know him as Doc Lyons.

19 Well, it's -- James Lyons is his official name.  He's a

20 Special Agent with the State Police.

21 Q    And why did you pick him?

22 A    Because he was a senior agent and mature.

23 Q    Did he have anything else to do with this

24 investigation?

25 A    No.  He was not involved in the investigation at all.

1   Q    Now, where did your interview take place?

2   A    It took place on the grounds of the Executive

3   Mansion.   There was a building to -- as you're looking at

4   the Executive Mansion, there's a building to the right,

5   and it was in that building.

6   Q    And within that building, were you in Ms. McDonnell's

7   office?

8   A    It looked like her office.  Yes.

9   Q    Had you ever interviewed Ms. McDonnell before?

10  A    No, I had not.

11  Q    Who was present at this interview?

12  A    Ms. McDonnell, Agent Lyons, and myself.

13  Q    Did either of you take notes during the interview?

14  A    I took notes.

15  Q    Who did the questioning of Ms. McDonnell?

16  A    I did the questioning.

17  Q    Was it -- is it fair to say you were trying to ask

18  questions and take notes at the same time?

19  A    That's correct.

20  Q    Now, talking about the interview itself, did you say

21  anything at the beginning of the interview to

22  Ms. McDonnell?

23  A    We introduced ourselves.  We displayed our

24  credentials and our badges, identified ourselves to her.

25  I engaged her in some conversation, kind of like trying to

1  build up a rapport with her.  I knew that she had been a

2  former FBI employee, as I was.  So we talked about that

3  for a while.  And then I learned that when her father was

4  an agent, an FBI agent, he lived in New York, and we found

5  out that we lived in the same neighborhood.  She lived in

6  the neighborhood that I grew up in.

7  Q     Now, at the interview, what was the very first topic

8  you addressed?

9  A     We talked about the chef and how she came about

10 meeting him.

11 Q     And did the conversation then turn to Cailin

12 McDonnell's wedding?

13 A     Yes, it did.

14 Q     Did you ask Ms. McDonnell about the contract for the

15 wedding catering?

16 A     About the wedding catering?

17 Q     Uh-huh.  Did you ask her about the contract?

18 A     Yes.

19 Q     Did you ask Ms. McDonnell about the payment on the

20 wedding catering contract?

21 A     Yes.

22 Q     Did you then explain to Ms. McDonnell that a search

23 warrant had been conducted at the catering company?

24 A     Yes.

25 Q     And did you tell Ms. McDonnell that investigators had

 1   found a $15,000 check?

 2              MR. BURCK:  Objection, Your Honor.  Leading

 3   questions.

 4              THE COURT:  Sustained.

 5              MS. ABER:  Your Honor, can we approach for a

 6   moment?

 7              THE COURT:  Come on up.

 8         (At Bench.)

 9              MS. ABER:  Your Honor, I'm trying to tread

10   carefully in light of our previous -- the motion in limine

11   filed by the defendant in reference to the three

12   particular statements that Special Agent Hagan can

13   articulate that Ms. McDonnell provided.  Other than that,

14   we're constrained to topics.  And I'm not sure, other than

15   having him list all the topics, how I can list --

16              MR. BURCK:  If that's the basis of the

17   objection, then -- they just didn't tell me that.

18              THE COURT:  Okay.

19              MR. ASBILL:  Excuse me one second.  I can hear

20   the conversation from counsel table.  I don't know if

21   there's a hush, but I can hear it.  That's why I came up.

22              THE COURT:  Okay.

23         (In Open Court.)

24   BY MS. ABER:

25   Q    Special Agent Hagan, did you explain to Ms. McDonnell

1  that a search warrant had been conducted at the catering

2  company?

3  A    Yes, I did.

4  Q    Did you tell Ms. McDonnell that investigators had

5  found a $15,000 check from Starwood Trust to the catering

6  company for Cailin McDonnell's wedding?

7  A    We explained to her that we found $15,000 that had

8  been applied to the catering bill, yes.

9  Q    Did you talk to Ms. McDonnell about Jonnie Williams?

10 A    Yes, I did.

11 Q    Okay.  Now, tell the jury what Ms. McDonnell said

12 about the origin of her relationship with Mr. Williams.

13 A    She explained that Mr. Williams was a friend of the

14 family for a long time.  She indicated that her husband,

15 when he left the Army, first had employment at the

16 American Hospital Supply Company.  And that's where he met

17 Jonnie Williams, who was a representative for American

18 Hospital Supply, at the same time.

19 Q    Did Ms. McDonnell say how many -- how long ago she

20 had met Mr. Williams?

21 A    She said that her husband met him first, and that was

22 when he got out of the Army.

23 Q    Okay.  Did you talk to Ms. McDonnell about her

24 May 2011 trip to the Roskamp Institute?

25 A    Yes, we did.

1  Q    Did you talk to Ms. McDonnell about the August 30th

2  2011 lunch at the Mansion?

3  A    Yes, I did.

4  Q    Did you talk to Ms. McDonnell about her attendance at

5  a Star Scientific event in California?

6  A    Yes, I did.

7  Q    Did you tell Ms. McDonnell then that you had

8  uncovered a check from Starwood Trust to her?

9  A    Yes, I did.

10 Q    Is it accurate that that was a $50,000 check?

11 A    It was a $50,000 check payable to her.  It was

12 written on May 23rd, I believe.

13 Q    Okay.  What did Ms. McDonnell say about the $50,000

14 check in reference to a loan agreement?

15 A    Well, she said that the $50,000 was a personal loan

16 to her and that Jonnie Williams had provided the money and

17 that she had signed a contract for the loan agreement and

18 that she was making periodic payments on the loan.

19 Q    Did Ms. McDonnell ask you any questions?

20 A    Yes, she did.

21 Q    And what did she ask?

22 A    She -- when we were talking about the $15,000 check

23 for the catering bill, she asked if we had interviewed her

24 children.

25 Q    Could you tell the jury what Ms. McDonnell's demeanor

1   was like during the interview?

2   A     She was very pleasant.  She was -- when we began the

3   interview.  She was pleasant throughout the interview.

4   But she got a little more inquisitive of why we were

5   asking questions about the $50,000 check and the $15,000

6   check.

7   Q     Once you concluded the interview in her office, what

8   happened next?

9   A     She escorted us out through the gardens, telling us

10  this was the gardens of the Executive Mansion.  As we were

11  walking out, I asked her for a copy of the loan agreement.

12  And she advised me she didn't think she had a copy of it,

13  she remembers signing it, giving it back to Jonnie

14  Williams, and she would try to get a copy from him for us.

15  Q     At any time during your interview with Ms. McDonnell,

16  or your time walking through the gardens, did she ever ask

17  for an attorney?

18  A     No, she did not.

19        MS. ABER:  Okay.  One moment, please, Your

20  Honor.

21        (Counsel conferring with co-counsel.)

22  BY MS. ABER:

23  Q     Special Agent Hagan, at the beginning of your

24  testimony, I believe you mentioned the various reasons why

25  you went to go interview Ms. McDonnell; is that right?

CHARLES HAGAN - CROSS - BURCK        2939

```
1   A    Yes.

2   Q    Okay.  Did your investigation reveal that this

3   purported bartering agreement between the chef and

4   Ms. McDonnell had actually occurred?

5   A    It had not occurred.  There was -- she said that she

6   had not made -- entered into an agreement with the chef.

7   Q    Okay.  And so is it fair to say, as sit here, that

8   Ms. McDonnell -- your investigation didn't show that she

9   did anything wrong in the chef --

10  A    No.

11  Q    -- investigation?

12  A    No.  No, not at all.

13  Q    Okay.

14       MS. ABER:  Thank you, Your Honor.  I have no

15  further questions.

16       THE COURT:  All right.  Cross?

17       MR. BURCK:  Thank you, Your Honor.

18               CROSS-EXAMINATION

19  BY MR. BURCK:

20  Q    Good afternoon, Special Agent Hagan.

21  A    Hello.

22  Q    My name is Bill Burck, and I represent Maureen

23  McDonnell.

24  A    Hello, sir.

25  Q    Can you just -- how long have you been in law
```

1   enforcement?

2   A     Oh, over 30 years.

3   Q     Over 30 years.  And during that time, you received

4   training on how to take police reports and take notes as

5   part of your interview process?

6   A     Yes.

7   Q     And when you -- when you testify in a case where

8   you've conducted the investigation, sometimes you use

9   reports to help refresh your recollection if you don't

10  remember things that well?

11  A     That's correct.

12  Q     And these reports that you -- you come up with that

13  you write as part of your job, it's important that they be

14  accurate?

15  A     They -- they are my best recollection of what the

16  person has told me.  Yes.

17  Q     Okay.  But -- but they are --

18  A     It's my best recollection.

19  Q     And your best recollection to you, it's important

20  that that be accurate?

21  A     Yes.  We strive to be accurate.  Yes.

22  Q     Okay.  And do you try to have these reports be

23  thorough?

24  A     Yes, sir.

25  Q     And you try to have them as complete as possible --

CHARLES HAGAN - CROSS - BURCK        2941

```
 1  A     Yes, sir.

 2  Q     -- within reason?

 3        Okay.  Now, you, obviously, can't write a report

 4  while you're conducting an interview.  So you have to take

 5  notes?

 6  A     Yes, sir.

 7  Q     And is that your typical practice, to take notes

 8  while you're interviewing somebody?

 9  A     Normally, if I'm with two people, one person is --

10  asks the questions, and the second person is the note

11  taker.  In this particular case, Agent Lyons didn't know

12  much about the case so I took both, as we normally do in

13  the State Police because we do a lot of our interviews by

14  ourselves.

15  Q     Okay.  We'll get back to Agent Lyons in a moment.

16  So -- and sometimes do you use your handwritten notes?

17  Well, let me put it this way.  You use your handwritten

18  notes to help inform your -- your typed up report?

19  A     That's correct.

20  Q     And just to be clear, the handwritten notes are

21  typically taken at the time that you're interviewing the

22  person?

23  A     Yes.  And they are not verbatim notes.

24  Q     Of course.

25  A     As you know, they are just to refresh my memory when
```

1    I'm sitting down to write the report.

2    Q    Okay.  And just to be clear, in this case, for the

3    February 15, 2013, interview of Maureen McDonnell, those

4    notes were being taken simultaneous -- or

5    contemporaneously with you interviewing her?

6    A    That's correct.

7    Q    And you were asking the questions?

8    A    Yes, sir.

9    Q    Okay.  Now, you testified that -- you answered some

10   questions on direct about having started this

11   investigation -- or let me put it this way.  That you had

12   begun looking at the McDonnells in connection with another

13   case, the Chef Todd case, Chef Todd Schneider?

14   A    Todd Schneider.  Yeah, Todd Schneider.

15   Q    It was Todd Schneider.  And you also -- excuse me.

16   Todd Schneider.

17   A    Schneider.

18   Q    And you also said that you had been looking at Jonnie

19   Williams as well, right?

20   A    Yes, sir.

21   Q    Okay.  Now, in connection with the Chef Todd

22   Schneider case, which is related to this one, at least in

23   the origins, you had originally scheduled an interview

24   with Ms. McDonnell in early part of 2012; is that right?

25   A    That is correct.

1          MR. BURCK:  I'd like to show, just for the

2   witness, only RM-2072.  And if you could blow up the

3   second page, the bottom -- the first e-mail.

4   BY MR. BURCK:

5   Q    You'll see this is an e-mail, sir, from Rick Jenkins

6   to Steven Flaherty, cc'ing Herman Davis, and it's dated

7   February 29th of 2012.  Can you tell us, who is Rick

8   Jenkins, and who is Steven Flaherty?

9   A    Steven Flaherty is the Colonel with the State Police.

10  And Rick Jenkins is the Major of the Criminal -- Bureau of

11  Criminal Investigations.  He's like the Deputy Chief of

12  the Bureau of Investigations.

13  Q    Okay.  And had you told Mr. Jenkins, as of

14  February 29th, that you would like to interview the First

15  Lady --

16  A    Yes.

17  Q    -- that week?

18  A    Yes, I did.

19  Q    Okay.

20          MR. BURCK:  And can we please go to the first

21  page.

22  BY MR. BURCK:

23  Q    You'll see there's an e-mail from Martin Kent to

24  Steven Flaherty, dated February 29th, 2012, same day.  And

25  it's -- do you know who Martin Kent is?

1  A      Yes, I do.

2  Q      And who is he?

3  A      He's the Chief of Staff for the Governor.

4  Q      Okay.  And you'll see there's a series of e-mails

5  above that.

6           MR. BURCK:  If you would just blow up the whole

7  page so that he can see that.

8  BY MR. BURCK:

9  Q      And fair to say that this e-mail is a -- reflects

10  this attempt to set up an interview back in 2012, early

11  2012?

12  A      That's correct.

13  Q      Now, I know you're not on these e-mails, but is this

14  a fair reflection of your recollection as well?

15  A      My recollection was there was a -- a scheduled

16  interview, yes.

17           MR. BURCK:  Your Honor, we would offer RM-2072

18  into evidence.

19           MS. ABER:  I object.  He's not on the e-mails.

20  He's testified about his knowledge.

21           THE COURT:  Sustained.

22           MR. BURCK:  You can take that down.

23      Can you also show the witness RM-2074.  Just for the

24  witness.

25      Now, you'll see this is an e-mail from Mr. Flaherty

1   to Mr. Michael Morehart.  Do you know who Michael Morehart

2   is?

3   A    Yes, I do.

4   Q    Who is he?

5   A    Well, I've known him for many years.  I knew him when

6   he was with the FBI.  I used to car pool with him up to

7   Washington headquarters.  And I know that he became the

8   Special Agent in charge of the FBI office here in

9   Richmond, and then he also become the first Inspector

10  General for the State of Virginia.

11  Q    Okay.  Now, you see this e-mail suggests that a

12  meeting was canceled, an interview.  Do you have any

13  recollection of whether or not that interview occurred

14  with Maureen McDonnell on that date?

15  A    It did not.

16  Q    It did not.  It was canceled?

17  A    Yes, sir.

18          MR. BURCK:  You can take that down.  Thank you.

19  BY MR. BURCK:

20  Q    And why was it canceled?

21  A    At that time, we were starting to find additional

22  checks made payable to Ms. McDonnell.  So we asked to hold

23  back until we could further find out what was going on

24  before we interviewed.

25  Q    Okay.  So this was in February, March of 2012 you had

CHARLES HAGAN - CROSS - BURCK          2946

1  discovered additional checks -- or checks involving

2  Ms. McDonnell?

3  A    No.  This was the $15,000 check.  We found out -- we

4  were told on February 22nd, from Ryan Greer, about the

5  $15,000 check.

6  Q    And this is -- so you knew -- you had learned about

7  the check for Cailin's wedding.  And had you learned about

8  the $50,000 loan as well?

9  A    No, I was not at that time.

10  Q    Just the $15,000 check for Cailin's wedding?

11  A    I was aware of the $15,000 check, yes.  But I had not

12  obtained a copy of it yet.

13  Q    Okay.  Now, back at this time, were you working with

14  the FBI on these investigations?

15  A    Yes.  We worked everything jointly.

16  Q    And there was a meeting between yourself, Colonel

17  Flaherty, who you testified about earlier, FBI Special

18  Agent Tyler Kennedy and others to discuss the Mansion

19  investigation, is that right, in January 2012?

20        How about I do this.

21            MR. BURCK:  Can you show the witness RM-2067.

22  Just the witness, please.

23  BY MR. BURCK:

24  Q    And what I would ask you to do is just take a look at

25  that page, and this is just to refresh your recollection.

1    If this reminds you of anything in January of 2012?

2    A    Yes.

3    Q    So do you recall if you had a meeting with Colonel

4    Steven Flaherty, Special Agent Tyler Kennedy, and yourself

5    about the Mansion investigation?

6    A    That's correct.

7    Q    And this was the -- this was the -- the period of

8    time, meaning this meeting, that you learned that Jonnie

9    Williams had given a $15,000 check for Cailin's wedding,

10   right?

11   A    No.

12   Q    No.

13   A    No.

14   Q    Go ahead, please.

15   A    All right.  This is -- in January 30th.  This is when

16   we first became aware of the allegations about the chef

17   and the embezzlement.  I was called at home that night

18   before the meeting, was told to report to the Colonel's

19   office the next morning and -- they didn't tell me why.

20        And when I arrived, I met Agent Kennedy and his

21   assistant, Special Agent Allie Mackenzie.

22   Q    Okay.  So when did you learn, if you can recall,

23   about the Cailin check precisely?

24   A    We were first -- all right.  Based on the January

25   30th meeting, they provided us the information about the

1  chef embezzlement.  They had the information first.  They

2  passed it off to us.  We started looking into the matter.

3  On February 22nd, I interviewed Ryan Greer.  That's when

4  he mentioned the $15,000 check.

5  Q    Okay.

6  A    I was able to obtain a copy of the check by -- I

7  believe it was March 1st, from BB&T.  And that's when I

8  had a copy of the check.

9  Q    Okay.  And Ryan Greer, he worked with Todd Schneider?

10 A    Yes.  He was the general manager for Todd Schneider's

11 catering company.

12 Q    Okay.  And around this time, when did you learn about

13 the Roskamp visit by Ms. McDonnell?

14 A    It would have been after March 1st.

15 Q    After March 1st?  Do you know -- is it around

16 March 1st or long after March 1st?  Do you have a

17 recollection?

18 A    I know it was between March 1st and May 23rd when I

19 briefed my bosses on the matter.

20 Q    Okay.  And it was around this time that the FBI

21 opened a wire fraud or public corruption investigation of

22 the McDonnells?

23 A    My understanding is back in January they opened it,

24 or maybe February.  I don't know when they opened it,

25 specifically.  But we worked it jointly.

```
1    Q    Okay.  So -- but around --
2    A    As of January 30th, we worked it jointly.
3    Q    Okay.  And this was the -- just to make sure I'm
4    clear, because there were two different investigations.
5    A    Yes.
6    Q    This was -- the wire fraud/public corruption
7    investigation of the McDonnells had been opened in that
8    time frame as well?
9    A    The McDonnells had not been opened yet.  No.
10   Q    Okay.  I'm sorry.  So the McDonnells were opened in
11   March of 2012?
12   A    I -- what happened was on March 8th, we had met with
13   Todd Schneider and his attorney.  They provided us with
14   the contract that the Governor had signed for the wedding.
15        And as a result of that, since it appeared that there
16   might be something that -- some illegality by the
17   Governor, I was -- by rule, or by law, I have to stop
18   investigating because he's an elected official.  And
19   that's what happened.
20   Q    Okay.
21        MR. BURCK:  Could you show, just for the witness
22   only, RM-2068, please.  Page 2, please.
23   BY MR. BURCK:
24   Q    You see some highlighting.  This is just for ease so
25   that you can read it more easily.
```

CHARLES HAGAN - CROSS - BURCK          2950

1          By the way, do you recognize the handwriting on this?

2    A    No.

3    Q    Does this document refresh your recollection as to

4    about when a wire fraud/public corruption investigation

5    was opened by the FBI into the McDonnells?

6    A    No, it does not.

7    Q    Okay.

8              MR. BURCK:  Please take that down.

9    BY MR. BURCK:

10   Q    Now, the FBI and the -- and the Virginia State

11   Police, is that common for the FBI and the Virginia State

12   Police to work together on investigations?

13   A    Yes, sir, it is.

14   Q    And it's common for public corruption cases; isn't

15   that right?

16   A    Yes.

17   Q    Is there -- would it be fair to say that it enhances

18   the credibility of an investigation if the FBI is

19   involved?

20   A    That, and also what it does, it -- for the State

21   Police, I know in this particular investigation, since it

22   regarded the Executive Mansion and the Governor, my

23   management wanted very much to have an outside agency to

24   basically investigate it with us so it wouldn't look like

25   we were trying to -- if it was unfounded, that we were

1  trying to, you know, slip it underneath the rug or

2  something.  So they wanted to have an outside, independent

3  agency investigating with us.

4  Q    Okay.  And that's -- and, again, that's Special Agent

5  Tyler Kennedy --

6  A    Yes.

7  Q    -- who was the -- and is he here in the courtroom

8  today?

9  A    Yes, he is.

10 Q    He's sitting over here at the prosecution table?

11 A    Yes.

12 Q    Next to Mr. Dry?

13 A    Yes.

14 Q    Okay.

15        MR. BURCK:  Your Honor, I have quite a bit left.

16 So I don't know if you want to stop now or --

17        THE COURT:  All right.  We'll stop here for

18 lunch.  And let's make it 2:05.  We'll get back and get

19 started with the afternoon session.

20     (The jury left the courtroom.)

21 ///

22 ///

23 ///

24 ///

25 ///

```
 1              (Luncheon recess taken from 1:01 p.m. to 2:05

 2     p.m.)

 3              THE COURT:  All right, let's bring in the jury,

 4     please.

 5              (The jury entered the courtroom.)

 6              All right, Mr. Burck?

 7                   CROSS-EXAMINATION (Cont'd.)

 8     BY MR. BURCK:

 9     Q    Special Agent Hagan, I know you have been doing

10     this for 30 years, so I'm going to ask you this for the

11     record.  You didn't speak to the prosecutors during the

12     break, right?

13     A    At lunch?

14     Q    Yes, sir.

15     A    No, I did not, sir.

16     Q    Just to reorient you where we were before we broke,

17     we were talking about the 2012 period and the

18     investigations that led up to the McDonnells -- the

19     charges that were brought in this case.

20     A    Okay.

21     Q    And in 2012, at this point, you were also looking at

22     Jonnie Williams; is that right?

23     A    I don't know what point you are talking about.

24     Around the end of March, April is when we began looking

25     into Jonnie Williams, yes.
```

1   Q    You were looking at securities fraud issues related

2   to him; is that right?

3   A    Yes, sir.

4   Q    Now, on May 23rd, 2012, I think you testified a bit

5   about this on direct, you had a briefing about the

6   investigation, the status of the investigations that were

7   going on at the time, right?

8   A    That's correct.

9   Q    And the status, the briefing was about Jonnie

10  Williams, about Chef Todd Schneider, and also about the

11  McDonnells investigation; is that right?

12  A    That's correct.

13  Q    And you drafted a memo that would summarize how you

14  saw the investigation at that time and the facts that you

15  had developed and the legal theories you were looking at

16  at the time, right?

17  A    Well, yes.  It wasn't a memo.  It was notes from

18  myself to present to the upper management, yes.

19  Q    If you could just show just for the witness only,

20  this would be RM-0016.  Now, sir, this is the document,

21  the notes that you prepared for yourself, right?

22  A    That's correct.

23  Q    And the first part of this document is about Todd

24  Schneider, the Todd Schneider investigation?

25  A    That's correct, sir.

1    Q     Then if you turn to the third page of the document,

2    you will see that this section is where it begins to

3    discuss the Robert and Maureen McDonnell investigation?

4    A     Correct.

5    Q     And then you walk through, I think, in this document

6    the various aspects of your investigation, the various

7    suspicions you are looking at, the facts you are looking

8    at, right?

9    A     Suspicions and then anticipated additional

10   investigation that was going to be needed.  Yes.

11   Q     Okay.  And then on the second-to-last page, under

12   Number 7, that's where you start talking about Jonnie

13   Williams and his companies?

14   A     Yes.

15   Q     Okay.  Then on the last page, this is the end of the

16   document, right?

17   A     Right.  That's where it says "Additional

18   Investigation," that's what I anticipated would happen, we

19   would have to look at.

20   Q     At this time on May 23rd of 2012, at this point, had

21   you concluded that gifts to, or say, money to Maureen

22   McDonnell was not illegal?

23   A     No.

24         MS. ABER:  Objection, Your Honor.

25         THE COURT:  Sustained.  His legal conclusion is

1   not relevant.

2   BY MR. BURCK:

3   Q    Let me ask you this:  Had you been told by someone

4   that money to Maureen McDonnell was not illegal?

5            MS. ABER:  Objection.

6            THE COURT:  Sustained.

7   BY MR. BURCK:

8   Q    Were you told as part of your investigation, had you

9   been told by anyone that the Governor was not required to

10  list gifts to his spouse?

11           MS. ABER:  Objection.

12           THE COURT:  He can answer that.

13           THE WITNESS:  I don't know if someone told me

14  that, but reading the statute, if it was gifts, it was

15  gifts for the Governor, not for his immediate family.

16  BY MR. BURCK:

17  Q    And at this point in the investigation, had

18  you -- were you suspicious that Jonnie Williams had

19  possibly committed securities fraud?

20  A    There were indications, yes.  We were starting

21  to -- we, Agent Kennedy and myself were starting to

22  receive some of the documentation that we had subpoenaed

23  underneath the state subpoena power, and it appeared there

24  might be, yes.

25  Q    Okay.  And did you also have suspicions that Jonnie

1   Williams had committed fraud in obtaining financing for

2   his company?

3   A    Suspicions, yes.

4   Q    Okay.  And did you wonder at the time whether or not

5   you could use Williams to go after the McDonnells?

6   A    It was a possibility down the road, yes.

7   Q    Okay.  And what did you mean by that?  What was your

8   thinking at that point?

9   A    Well, what I had at the time was I had the $15,000

10  check that was to the Governor's benefit.  It was not

11  reported on his Statement of Economic Interests, which is,

12  at that time, I thought was a violation.  I had the

13  $50,000 that was being given to Maureen.  I didn't know

14  what that was.  If it was a loan, it should have been

15  reported.  It wasn't on the Statement of Economic

16  Interests form.  If the $50,000 was for her services to go

17  to Roskamp and talk on behalf of Star Scientific, that

18  wasn't reported, which should have been reported.  And if

19  it was considered a gift, then it did not have to be

20  reported.

21  Q    Okay.  So why were you saying or why were you

22  thinking that you could use Williams to go after the

23  McDonnells?

24  A    Well, someone was going to have to tell me eventually

25  down the road what kind of document was this, what was the

1    $50,000 for.

2    Q    Okay.  But you knew or you suspected at that time

3    that Mr. Williams had committed securities fraud in a

4    separate matter.

5    A    Yes.  We suspected, yes.

6    Q    Okay.  Is it fair to say that you thought you could

7    use the fact that Mr. Williams might have committed fraud

8    in something else to get him to assist you against the

9    McDonnells?

10    A    Yes.

11    Q    And this is May 23rd of 2012, right?

12    A    Right.  And this was what I anticipated what was

13    going to happen.  There was a lot more work to be done

14    because we weren't trying to go overt yet.

15    Q    The investigation is ongoing, you are looking for

16    leads and facts, et cetera.  Right?

17    A    I was letting my bosses know that this was going to

18    be a prolonged investigation; it was not something that

19    was going to be handled or resolved quickly.

20    Q    And of those bosses was Colonel Flaherty, right?

21    A    Yes, sir.

22    Q    As of May 23rd of 2012, you had not interviewed

23    Maureen McDonnell, right?

24    A    No, we didn't go overt until January of 2013.

25    Q    You had not interviewed Jonnie Williams at that

1    point, either?

2    A    No, we had not.

3    Q    You testified that you were investigating

4    Mr. Williams on direct, so I'd like to ask you a little

5    bit about that interview in January of 2013.  Now, that

6    interview occurred on January 23rd, 2013; is that right?

7    A    23rd, yes.

8    Q    Okay.  That was you and Special Agent Tyler Kennedy

9    of the FBI?

10   A    Yes.

11   Q    And you showed up at Mr. Williams' house unannounced,

12   right?

13   A    Correct.

14   Q    And you started asking him questions about his

15   potential violation of securities laws.

16   A    Yes, sir.

17   Q    You asked him about a possible scheme to sell his

18   stock through John McKeon without reporting it; is that

19   right?

20   A    It was more of a collateralization of stock for a

21   loan that Mr. McKeon had provided to Jonnie Williams.

22   Q    And the reason why you were asking about that is

23   because you thought it might constitute a securities

24   fraud?

25   A    Yes.

1    Q    Okay.  And you were asking about transfers of shares

2    to his children, right?

3              MS. ABER:  I have to object as this being beyond

4    the scope of direct examination.  If they want to make

5    Special Agent Hagan their witness, that's fine.

6              THE COURT:  Our philosophy is exhaust the

7    witness.  You go ahead.

8    BY MR. BURCK:

9    Q    So you asked him about transfers of shares to his own

10   children, right?

11   A    Yes.

12   Q    And you asked him about withdrawals from a trust set

13   up for his children.

14   A    Yes.

15   Q    And your reason for asking these questions, again,

16   was because you thought he might have committed some kind

17   of securities fraud, all those questions.

18   A    Yes.

19   Q    At some point in the interview or the meeting -- by

20   the way, Mr. Williams, he was alone, right?

21   A    Yes, he was.

22   Q    Okay.  And he didn't have any lawyers with him or

23   anything like that.

24   A    No, he did not.

25   Q    Now, at some point in that interview you started

1    asking him about his relationship with the McDonnells,

2    right?

3    A    That's correct.

4    Q    And he told you that he had provided Maureen

5    McDonnell with a $50,000 loan, right?

6    A    Correct.

7    Q    He said it was a personal loan.

8    A    Yes.

9    Q    And he told you that it was two days after he gave

10   the $50,000 loan to Ms. McDonnell that Governor McDonnell

11   called him on his cell phone to discuss the loan, right?

12   A    That's my recollection, yes.

13   Q    Okay.  And he said that Governor McDonnell would

14   repay the loan when the real estate situation had

15   improved.

16   A    Right.  He was explaining that there was no due date.

17   He said when things got better, he would end up paying it.

18   Q    He also told you about the $15,000 wedding gift for

19   Cailin McDonnell, right?

20   A    Yes.

21   Q    And he said that the Governor and he were friends?

22   A    Yes, he did.

23   Q    And he said that the Governor was the best Governor

24   Virginia had ever had, something like that?

25   A    That's correct.

**CHARLES HAGAN - CROSS - BURCK**

1   Q    And he said that he never got anything in return for

2   the $50,000 personal loan to Maureen McDonnell, right?  He

3   said that?

4   A    Yes, he did.

5   Q    And he said that he never asked for anything from the

6   Governor and never expected anything from him; is that

7   right?

8   A    I don't remember expected, but he did not ask for

9   anything or receive anything, yes.

10  Q    He told you also that Maureen McDonnell was into

11  wellness, into his products, right?  He said that?

12  A    Yes, he did.

13  Q    And he also said that he had never paid Maureen

14  McDonnell for anything, right?

15  A    Yes, he did.

16  Q    Now, he also asked you several questions generally

17  about the investigation, like whether or not he was a

18  target of the investigation?

19  A    That was in the beginning of the interview, yes.

20  Q    So he asked you is he a target.

21  A    Yes.

22  Q    What did you say?

23  A    I didn't say anything.

24  Q    You just didn't answer the question?

25  A    I wasn't the lead for the interview.  Agent Kennedy

1    was.

2    Q    So what did he say, if you recall?

3    A    He told him that, he said he did not have a target

4    letter for Mr. Williams, and that there was a grand jury

5    investigation going on, but he did not have a target

6    letter for him.

7    Q    Okay.  So did he say how long -- I'm sorry, did

8    Mr. Williams ask Tyler Kennedy or yourself how long the

9    investigation would last?

10   A    Yes, he did ask that.

11   Q    What did you say or what did Special Agent Kennedy

12   say?

13   A    Well, both of us explained some of that, because

14   Agent Kennedy talked about the federal grand jury portion

15   of it, and I had the state grand jury portion of it.  And

16   we basically told him we didn't know how long it would

17   take.

18   Q    So Special Agent Kennedy, because he is with the FBI,

19   talked about the federal grand jury investigation at that

20   time?

21   A    That's my recollection.

22   Q    It is your understanding there was a federal grand

23   jury investigation at that time?

24   A    Yes, there was.

25   Q    This is on January 23rd, 2013.

1    A     That's correct.  I believe it was in July, 2012, the

2    U.S. Attorney's Office opened up a federal grand jury

3    investigation on the securities case.

4    Q     That's on Mr. Williams' securities case?

5    A     Right.

6    Q     Then the grand jury, federal grand jury investigation

7    that you are talking about in January of 2013 -- January

8    23rd, 2012, just so I'm clear, this is a grand jury

9    investigation about Mr. Williams only, or also about the

10   McDonnells?

11   A     At the time it was Mr. Williams and everything that

12   fell underneath it, yes.

13   Q     So it included the McDonnells?

14   A     I don't know if it did.  I was pursuing the, at the

15   time, we thought we had state charges against the

16   McDonnells, so that was being pursued on the state grand

17   jury.  The time of the interview was underneath the

18   federal grand jury, so in answer to your question, it was

19   two separate grand juries going on.

20   Q     But again, I just want to be clear, there is a

21   federal grand jury investigation that covered Williams and

22   there was a state grand jury investigation that covered

23   the McDonnells?

24   A     That's correct.

25   Q     Was there overlap between the two?

```
1    A     No.   No, because my recollection is most of the

2    federal grand juries were to get bank records.  At that

3    time, that was our first overt interview, so everything

4    had been done collecting documents, and it was usually

5    done by the particular grand jury that was, whatever we

6    were looking at at the time.

7    Q     Okay.  Now, as part of the collecting the documents,

8    you and Special Agent Kennedy would serve subpoenas,

9    right?

10   A     Yes, sir.

11   Q     Did you give Mr. Williams a subpoena at this

12   interview on January 23rd, 2013?

13   A     Agent Kennedy served him with a federal grand jury

14   subpoena, yes.

15   Q     Okay.  He served him with a federal grand jury

16   subpoena?

17   A     Correct.

18   Q     And this was for records in his possession?

19   A     Yes.

20   Q     Relating to what?

21   A     Star Scientific.  I don't remember the specifics of

22   the subpoena, but anything that related to his dealings as

23   part of Star Scientific.

24   Q     Okay.  Would that subpoena, did that subpoena cover

25   the McDonnells as well?
```

1   A     No.  Not that I am aware of, no.

2   Q     Did you give him a state grand jury subpoena?

3   A     No, I did not.

4   Q     Okay.  And as part of this meeting, did you take

5   notes of the meeting?

6   A     Yes, I did.

7   Q     So did Special Agent Kennedy, he did most of the

8   questioning?

9   A     He did.

10  Q     You took the notes?

11  A     Yes, sir.

12  Q     A little different than what you did with

13  Ms. McDonnell, where you both took notes and listened.

14  A     That's correct.

15  Q     We talked about this at the beginning:  You were

16  trained in how to take notes of things that had happened

17  in the meeting, right?

18  A     I mean, trained to take notes, no.  I mean, you were

19  trained you should take notes to help you recollect, but

20  not how to take them, no.

21  Q     Is it fair to say that your notes are intended to

22  help you remember the important things that happened in

23  the meeting?

24  A     Yes.  What's relevant.

25  Q     Okay.  Now, during this interview or near the end,

1   did you or Special Agent Kennedy ask Mr. Williams to wear

2   a wire against Governor McDonnell?

3   A    It wasn't that specific.  What happened was,

4   Mr. Williams, after we had basically concluded the

5   interview, said he was willing -- he was going to contact

6   his attorneys, he was going to cooperate with the

7   investigators, he was going to turn over documents that we

8   wanted, and I mentioned to him, "Would that also include

9   consensually monitoring a conversation some day?"  So it

10  was not specifically to Mr. McDonnell.

11  Q    So you didn't tell him that it was actually, you were

12  asking him to record Governor McDonnell?

13  A    No.  It was more of, "While you are talking to your

14  attorneys and you want to cooperate, consider this."

15  Q    Let me ask you, what was your intention when you said

16  that?  Were you asking him to consider recording Governor

17  McDonnell?

18  A    If it needed to be, yes.

19  Q    And he had just told you, though, that --

20  Mr. Williams had just said he had not gotten anything or

21  received anything or offered anything.  Why did you

22  not -- why did you want him to consensually record

23  Governor McDonnell potentially?

24             MS. ABER:  Objection.

25             THE COURT:  Sustained.

```
1    BY MR. BURCK:

2    Q    Now, you took the notes of this interview?

3    A    I did.

4    Q    Those notes don't include a reference to the request

5    for a consensual recording, do they?

6    A    No, they do not.

7    Q    Is there a reason why you didn't include those in the

8    notes?

9    A    It was just a suggestion to him.  It was nothing that

10   was specific.

11   Q    But he did end the interview after you said, you

12   asked him whether or not he would consensually record?

13   A    That wasn't the last thing that was said, but it was

14   in that little segment of explaining where he said he

15   wanted to cooperate and we threw that out to him.

16   Q    Okay.  And you informed the prosecutors about the

17   request for consensual recording while this trial had

18   occurred, right, the first time you told them about it?

19   I'm sorry, let me be more clear.  The trial started on

20   July 28th, last month.

21   A    That's correct.

22   Q    You first told the prosecutors about the consensual

23   recording request after the trial had started.

24             MS. ABER:  Objection, relevance.

25             THE COURT:  Sustained.
```

```
 1   BY MR. BURCK:
 2   Q    Going on to Maureen McDonnell's interview, which
 3   occurred about three weeks or so after the Jonnie Williams
 4   interview, which was on February 15th, 2013.  Remember
 5   that interview?
 6   A    I do.
 7   Q    Now, if you would call up, publish RM-2028, which has
 8   already been admitted into evidence.  If you could blow up
 9   the bottom e-mail, please.  Now, sir, you are not on this
10   e-mail, but this e-mail is in evidence and it is an e-mail
11   from Steven Flaherty to Martin Kent.  I think you
12   testified earlier that Mr. Flaherty was your supervisor?
13   A    He is the Colonel of the State Police,
14   Superintendent.
15   Q    He is one of the people that you were keeping
16   informed of the progress of your investigation of the
17   McDonnells and Mr. Williams?
18   A    Yes.  He wasn't there for all of the updates.  He
19   would be there occasionally when he could, because he was
20   busy.  But yes, at times he was there present when I was
21   filling him in.
22   Q    He was aware that you were investigating the
23   McDonnells?
24   A    Yes, he was.
25   Q    Okay.  And as of February 13th of 2013, a year ago,
```

1    did he know that you were investigating the McDonnells?

2    A    Yes, he did.

3    Q    And when -- that week, before you went to interview

4    Ms. McDonnell, was he aware that you were planning to

5    interview Ms. McDonnell about the Jonnie Williams matter?

6    A    I'm sorry, I lost that.

7    Q    Was he aware as of this week, the week of February

8    13th?

9         MS. ABER:  Objection.  He knows whether the

10   Colonel was aware or not?

11        THE COURT:  He can answer.

12        THE WITNESS:  Judging from this e-mail, yes, he

13   was aware that we wanted to.

14   BY MR. BURCK:

15   Q    You had spoken to him about it.

16   A    I don't know if I spoke to him specifically

17   one-on-one about it.  I did speak to the executive

18   management.  It could have been the Major or Lieutenant

19   Colonel.  But I don't have any clear recollection of

20   actually talking to the Colonel and saying I wanted to.

21   It may have worked its way up the chain.

22   Q    You testified that you were diligent about keeping

23   your supervisors apprised of the progress of this

24   investigation, right?

25   A    Yes.

1    Q    Okay.  Now, this e-mail, as you will see, Martin

2    Kent, you also testified earlier, is the Chief of Staff to

3    the Governor.  And in this e-mail, Colonel Flaherty says,

4    "We want to wrap up the Chef Todd case, plan to go to the

5    grand jury next week.  If the First Lady is available

6    Friday, you can block off about two hours to talk to

7    Charlie Hagan and Tyler Kennedy we would appreciate it.

8    Thanks, Steve."  That e-mail doesn't reference anything

9    about the Jonnie Williams investigation relating to the

10   McDonnells, right?

11   A    No, it does not.

12   Q    Okay.  Going into that meeting -- you can take that

13   down.  Going into that meeting, did you have a discussion

14   with anybody at the Office of the Governor prior to

15   showing up on the 15th of February to interview Maureen

16   McDonnell?

17   A    I was instructed by someone from the executive

18   management to call Ms. McDonnell's scheduler and confirm a

19   meeting, which I did.  The lady asked what it was about,

20   and I said, "She knows."

21   Q    "She knows," meaning Maureen McDonnell knows?

22   A    Yes.

23   Q    Okay.  And do you remember, you said executive

24   management.  Do you remember who it was who told you to

25   call?

1    A    No, I don't recall.  Probably the Major, but -- the

2    Major is the one that would usually communicate with me,

3    but I had no clear recollection of the individual or when

4    it was done.

5    Q    What's the Major's last name?

6    A    Jenkins.

7    Q    Major Jenkins.  We saw him from an earlier e-mail,

8    the first time you wanted to interview Maureen McDonnell.

9    A    Yes.

10   Q    This is the second effort to interview her, because

11   the first time you had canceled?

12   A    Correct.

13   Q    Now, you show up at the Mansion.  Do you show up with

14   Special Agent Kennedy?

15   A    No, I did not.

16   Q    So it was just yourself and --

17   A    Special Agent Lyons.

18   Q    Was Special Agent Kennedy supposed to be at the

19   interview?

20            MS. ABER:  Objection, relevance.

21            THE COURT:  Sustained.

22   BY MR. BURCK:

23   Q    So it was just yourself and Special Agent Lyons?

24   A    Correct.

25   Q    And when you meet Ms. McDonnell, you go into her

1   office; is that right?

2   A    I presume it was her office.  No one ever told me it

3   was, but it appeared to be, yes.

4   Q    Did you have an understanding of Martin Kent, you

5   know he was the Chief of Staff, did you know that he had

6   requested to be part of that interview?

7   A    I have no recollection of him wanting to be part of

8   the interview for the second interview.  I know he wanted

9   to be there for the first one that was set up that was

10  eventually canceled.

11  Q    Right.  But you have testified earlier that your

12  practice is not to have a second person who you are not

13  interviewing present.

14  A    Right.  I recall being asked if I would want him

15  present, and I said, "No."

16  Q    Okay.  And you don't recall if that happened in 2012

17  or 2013?

18  A    Right.

19  Q    Okay.  So the interview starts at around 1 o'clock on

20  the 15th?  Roughly?

21  A    I think so, yes.

22  Q    And again, Colonel Flaherty had contacted Mr. Kent 48

23  hours before, right?

24  A    It appears from the e-mail you showed me, yes.

25  Q    Okay.  Now, you conducted the interview, Mr. Lyons

```
1   sat there.
2   A     Correct.
3   Q     Did he ask any questions at all that you can recall?
4   A     He may have asked one or two, but I don't know what
5   they were.  I don't recall what they were.
6   Q     You testified earlier that he hadn't really been
7   involved in this investigation at all.
8   A     He wasn't.  He wasn't involved.
9   Q     He wasn't involved at all until this day.
10  A     Right.
11  Q     And why was it that you brought him and not Special
12  Agent Kennedy?
13              MS. ABER:  Objection.
14              THE COURT:  Sustained.
15  BY MR. BURCK:
16  Q     And Ms. McDonnell did not have an attorney present,
17  right, for the interview?
18  A     That's correct.
19  Q     Now, at the beginning of the interview, at any point,
20  did you advise Ms. McDonnell that she was under
21  investigation?
22  A     No, I did not.
23  Q     At any point, did you advise her that she has a right
24  to an attorney?
25  A     She was not -- it was not a custodial interview.
```

```
 1    Q    Custodial interview, right.  You did not advise her

 2    that she had a right to remain silent?

 3    A    No.  It wasn't custodial.

 4    Q    You started the interview by asking her about the

 5    chef, Todd Schneider, and his theft issues, right?

 6    A    Well, I mean, I started by talking about our common

 7    denominators, yes.  But then the meat of it, yes, we

 8    started talking about Todd Schneider.  Of course, the AG's

 9    office was anticipating indicting him relatively soon.

10    Q    And at the beginning of the interview, you said,

11    testified on direct that you were trying to build a

12    rapport with her.

13    A    That's correct.

14    Q    You said that she had worked at the FBI?

15    A    Yes.

16    Q    Do you know what she did at the FBI?

17    A    No.

18    Q    Okay.  Was she a lawyer?  Do you know if

19    Ms. McDonnell is a lawyer?

20    A    No, not that I am aware of.

21    Q    And you also testified that she mentioned at some

22    point during the interview or the part of the interview

23    about Jonnie Williams, that she said that her husband had

24    met him 30 years before or knew him for 30 years?  Do you

25    remember that?
```

```
1    A    I don't know if I said 30 years.  I think I said when

2    he got out of the Army, he took a job with American

3    Hospital Supply, and that's where he met Jonnie Williams,

4    who also worked for American Hospital Supply as a

5    representative.

6    Q    Okay.  Do you recall that in fact what she said was

7    that her husband and Mr. Williams had overlapped at

8    American Hospital Supply sometime many years before and

9    that's the original connection?

10   A    That's not my recollection of what she told me.

11   Q    Okay.  Now, you prepared -- while you were listening

12   to the interview, you are taking notes, right?

13   A    Correct.

14   Q    And you also eventually, or maybe the next day, you

15   do a typed-up version of your handwritten notes, right?

16   A    I do a summary of what she told us during the

17   interview to my best recollection while I'm looking at the

18   notes helping refresh my memory.

19   Q    Okay.

20   A    I'm not taking the notes and writing them on a

21   document.

22   Q    I'm sorry.  But you are handwriting the notes and

23   then separately later on you use those notes to write the

24   typed-up version?

25   A    Yes, that's what I do.
```

1    Q    Okay.   Now, just focusing on what you have testified

2    Ms. McDonnell said during the interview about Jonnie

3    Williams and her relationship and the Governor's

4    relationship with Jonnie Williams, let's just focus on

5    that, you testified that Ms. McDonnell said that she

6    had -- she had received a $50,000 check as a personal loan

7    from Jonnie Williams, right?

8    A    That's correct.

9    Q    And she also said that, this is nothing you testified

10   to, but I'm asking you the question, she also said that

11   Jonnie Williams, that she had asked Jonnie Williams for a

12   loan to help with the McDonnells' expenses and cash flow.

13   Do you recall that she said that?

14   A    I don't remember if there was a -- those were the

15   specific words, but yes, they had accumulated some debts

16   with regards to the election.   There was also something

17   about some houses that they rented, some beach houses.

18   Q    And you also testified that she said she had a

19   written agreement or contract with Mr. Williams?

20   A    Yes.

21   Q    And that she was making periodic payments to satisfy

22   that loan.

23   A    That's correct.

24   Q    And you also testified that she had or could get a

25   copy of the loan.

1    A     Yes.

2    Q     And again, you said that, I think you already

3    testified to this, but just to be clear, you said she also

4    said that Jonnie Williams and the Governor had been

5    friends for many years, right?

6    A     Since the Governor left the Army.  I don't know when

7    he left, so I can't say how long.

8    Q     What I would like to do is just show you now RM-2079,

9    which is just for the witness.  Okay.  Now, these are your

10   handwritten notes of that interview?

11   A     Yes.

12   Q     Okay.  Now, let me ask you just some questions about

13   the notes.  Again, these are the notes that you took while

14   you were listening to her.

15   A     Yes.

16   Q     Now, these notes don't say anything about a written

17   contract, do they?  You can read it, if you would like to

18   spend a minute to look it over.

19   A     Yeah, I'd like to.  Can you make it bigger?

20   Q     Sure.  Actually, what we will do is, we will do even

21   better.  We will turn you to the right section of the

22   notes.  Please show the witness 2079-0004.  That's easier,

23   I think.

24         (Document displayed to witness.)

25   A     That little segment that you are showing me does not

1    say anything about, except for written notes, it says, "I

2    have a contract."

3    Q    Doesn't say "written contract"?

4    A    No.

5    Q    And what about, does it say anything about periodic

6    payments being made?

7    A    "I am paying back."

8    Q    It says, "I am paying back"?

9    A    Uh-huh.

10   Q    Does it say anything about periodic payments being

11   made?

12   A    No.  Doesn't say specifically periodic.

13   Q    It says "I am paying back."

14   A    Right.  That's this section.  I haven't seen the rest

15   of it.

16   Q    Did you have a chance to review your notes as part of

17   the -- preparing for trial today?

18   A    Yes, I tried to.  I have done a lot of interviews.

19   Q    I understand.  I'll give you, with the Court's

20   indulgence, I'll let you, there are two pages of

21   handwritten notes that you can review right now.  This is

22   your handwriting.

23         MR. BURCK:  I don't think it will take more than

24   a couple minutes, Your Honor.

25         THE COURT:  Go ahead.  Have you got the hard

```
 1   copy of this?
 2            MR. BURCK:  Oh, yes, Your Honor, that would be
 3   easier.
 4        (Document proffered to witness.)
 5        (Witness perusing document.)
 6            THE WITNESS:  Okay.
 7   BY MR. BURCK:
 8   Q    So can you tell us now, do the notes say anything
 9   about -- I'm sorry, I've lost what I was asking you about.
10   A written contract?
11   A    No, it just says "contract."
12   Q    Does it say anything about periodic payments?
13   A    Just says "paying back."
14   Q    Does it say anything about Jonnie Williams being a
15   friend for many years?  Look at the top of the page, I'll
16   just direct you to it, the third-to-last page.  The very
17   top.
18   A    Okay.  Yes, it says that "Williams was a family
19   friend."
20   Q    So it doesn't say "many years."
21   A    No.
22   Q    "He had been a friend for many years."
23   A    No.
24   Q    Does it say anything about a signed agreement?  I
25   think you testified she said she had also signed this
```

```
 1    written contract.

 2    A     That's correct.

 3    Q     Do the notes say anything about a signed agreement?

 4    A     No, they do not.

 5    Q     Now, during the interview, Ms. McDonnell one time or

 6    twice, actually, asked to speak to her husband, didn't

 7    she?

 8    A     No.

 9    Q     She never asked to speak to her husband?

10    A     No.

11    Q     Okay.  That's not you don't recall; that didn't

12    happen, right?

13    A     I have no recollection of her saying that, yes.

14    Q     Okay.  And you said that she tensed up or she became

15    more, her demeanor became more tense when you started

16    asking her about the Jonnie Williams checks?

17    A     Yes.  When I say "tensed up," I didn't use -- she

18    became more inquisitive, why we were asking.

19    Q     Had you told her prior to entering the meeting that

20    this meeting was going to be about Jonnie Williams as well

21    as Chef Todd Schneider?

22    A     I didn't talk to her at all prior to the interview.

23    Q     Okay.  Did you hear Special Agent Lyons say anything

24    to her prior to going into the meeting that this was going

25    to be about Jonnie Williams as well as Todd Schneider?
```

1  A    No, I don't remember him saying that.

2  Q    So as far as you know, she has no idea what the

3  interview is about?

4  A    That's correct.

5  Q    Although you did say, "She knows what it is about"

6  before.

7  A    Yes.

8  Q    You didn't really mean that?

9  A    No, I meant it, because I knew that the Executive

10  Office had set up the interview.  And I didn't want to

11  tell the scheduler what I was there for.  So she had been

12  told by the executive staff what.  What that was, I don't

13  know.

14  Q    Understood.  And just one last question:  In March of

15  2013, that's about a month after the Maureen McDonnell

16  interview, you learned from the Tobacco Commission, the

17  Executive Director of the Tobacco Commission that no one

18  had approached the Tobacco Commission to initiate a

19  research project involving anatabine or Anatabloc, right?

20          MS. ABER:  Objection.

21          THE COURT:  He can answer that.

22          THE WITNESS:  I recall interviewing, I think his

23  name was Neal Noyes, and that's what he told us, yes.

24          MR. BURCK:  Thank you, Your Honor.  Just one

25  moment, Your Honor.

```
 1                THE COURT:  Can I see that hard copy?
 2                MR. BURCK:  I'm sorry, Your Honor.  Just for, we
 3     would like to offer the notes, the handwritten notes into
 4     evidence.
 5                THE COURT:  All right.  Is this RM-2079?
 6                MR. BURCK:  Yes.
 7                THE COURT:  You had some particular pages?
 8                MR. BURCK:  Yes, Your Honor.  We have
 9     RM-2079-0003, through RM-2079-0005.  What we will do is
10     make sure there is nothing in there that should be
11     redacted in terms of personal information.  But we offer
12     that, Your Honor.
13                THE COURT:  All right.  Before I admit them, you
14     all take care of any redactions.
15                MR. BURCK:  Thank you, Your Honor.
16                THE COURT:  All right.  Mr. McDonnell?
17                          CROSS-EXAMINATION
18     BY MR. BROWNLEE:
19     Q    Agent Hagan, good afternoon.  My name is John
20     Brownlee, and I represent Bob McDonnell And I have some
21     questions for you today.  Let me begin, I believe you
22     testified that in a meeting in May of 2012, that you had
23     anticipated, that was -- at that time, I think you
24     testified that you anticipated using Mr. Williams to go
25     after the McDonnells; is that correct?
```

1   A    That's what I wrote, but what I was explaining to my

2   supervisors was that we were in the initial stages of the

3   investigation; it was going to take a lot of documentation

4   to put it together; and down the line I anticipated

5   possibly that we would have to get Mr. Williams to tell us

6   what's going on.

7   Q    All right.  Now, let me show the witness, just for

8   the witness, RM-2069.  Just blow up just the bottom part

9   there.  Sir, this is an e-mail that you received in

10  February of 2013 from John C. Bullard.  Do you know who

11  that is?

12  A    Yes. Mr. Bullard, B-U-L-L-A-R-D, is the Deputy

13  Commonwealth's Attorney for the City of Richmond.

14  Q    Okay.  And you had testified earlier about you had a

15  state investigation as well; is that correct?

16  A    Yes.

17  Q    On the McDonnells.

18  A    Yes.

19  Q    Okay.

20        MR. BROWNLEE:  Your Honor, at this time we would

21  move RM-2069 into evidence.

22        MS. ABER:  Objection, Your Honor.  This is a

23  communication between the Special Agent Hagan and the

24  Commonwealth's Attorney for the City of Richmond and his

25  deputy about various legal requirements under the PAC

```
 1    rules.
 2              THE COURT:  Let me take a look at it, and come
 3    on up here.
 4         (At Bench.)
 5              MR. BROWNLEE:  This is just classic bias
 6    testimony.  This was an investigation into PAC resources.
 7    It turned out that they couldn't prosecute the McDonnells
 8    for that.  He sent it to his own private e-mail, and then
 9    flips it to us and says, I forgot exactly what he said,
10    but basically he is disappointed that this didn't work
11    out.  We think it is biased testimony, Your Honor.
12              THE COURT:  No.  The objection is sustained.
13         (In Open Court.)
14    BY MR. BROWNLEE:
15    Q    Now, Agent Hagan, as part of your investigation,
16    first of all, do you know who Christopher Young is?
17    A    Yes, I do.
18    Q    Who is Christopher Young?
19    A    He is the individual that married Cailin McDonnell.
20    Q    Okay.  And as part of your investigation in May of
21    2012, did you and some of your agents put a tail on him
22    and follow him?
23    A    I did a solo surveillance on him.  What I believe.
24    And yes.
25    Q    And you went to his place of employment and sat
```

1   outside and watched him leave work; is that correct?

2   A     That's correct.

3   Q     And this is -- he works, he is an engineer?

4   A     Yes, he was, or is.

5   Q     Okay.  And he married Cailin McDonnell; is that

6   right?

7   A     Yes.

8   Q     Okay.  Also as part of your investigation, did there

9   come a time when you learned that one of Mr. Williams'

10  loans went to a company called MoBo?

11  A     Yes, I did.

12  Q     All right.  And you investigated that; is that

13  correct?

14  A     Yes, I did.

15  Q     All right.  And as part of your investigation, did

16  you investigate whether or not the Governor's sister was

17  involved in disguising some loan?

18  A     Sister involved with what?

19  Q     With attempting to disguise the loan.

20  A     I don't recall that.

21  Q     Okay.

22            MR. BROWNLEE:  May I approach the witness?

23            THE COURT:  Go ahead.

24        (Document proffered to witness.)

25  BY MR. BROWNLEE:

1    Q    Look at the last line of the e-mail there, sir.

2         (Witness perusing document.)

3    A    Okay.

4    Q    All right.  Does that refresh your recollection that

5    part of your investigation, you looked into whether or not

6    the Governor and his sister were trying to disguise this

7    loan from it going to their company?

8    A    What I was thinking possibly is that the second

9    $50,000 loan may have been given to the sister when it

10   should have been going to Maureen, the wife.

11   Q    Okay.  So as part of your investigation, you looked

12   at his sister and her involvement; is that right?

13   A    No, did I not look at her involvement.  Well, the

14   check indicated that it was possibly to the sister.  And

15   what I was saying is possibly we need to look into this,

16   that the $50,000 may have been to Maureen, but went to the

17   sister.

18   Q    His sister's name is Maureen?

19   A    Yeah, that's where the confusion is.

20   Q    All right.  Now, let me take -- if I can take your

21   memory to May of 2013.  Do you recall having a meeting

22   with Mr. Dry and Mr. Kilgore and Mr. Kilgore's boss,

23   Richard Cullen, to discuss this case?  Do you remember

24   that meeting?

25   A    I attended several meetings.  Can you be more

1    specific?  Mr. Kilgore?

2    Q    This is a meeting in which it was yourself,

3    Mr. Kilgore -- I tell you what.  Since you are having

4    trouble, let me just show you --

5                MR. DRY:  Your Honor, may we approach?

6                THE COURT:  Come on up.

7          (At Bench.)

8                MR. DRY:  Judge, Mr. Brownlee has asked me about

9    whether there was any kind of meeting like this.  He has

10   handwritten notes.  I'm not sure whose they are, but they

11   are not this witness's, and this meeting never occurred.

12   I told Mr. Brownlee that.  Now what he is trying to do is

13   dirty up the prosecution team with these kinds of

14   questions.  This meeting never occurred and it is

15   irrelevant what meetings happened.

16               THE COURT:  What is it regarding this?

17               MR. BROWNLEE:  The government just called as

18   their witness Jerry Kilgore.  These are notes from the

19   Superintendent of State Police which indicates Charlie

20   Hagan met with Mike Dry, Kilgore, Williams' attorney and

21   Richard Cullen to discuss the federal case.  He agreed to

22   testimony, by documents and testimony they could prove the

23   payments to McDonnell were not loans.  So their last

24   witness --

25               MR. DRY:  You should have asked Mr. Kilgore

1   about it.

2          THE COURT:  The objection is sustained.

3          MR. BROWNLEE:  Thank you.

4      (In Open Court.)

5   BY MR. BROWNLEE:

6   Q    Agent Hagan, let me ask you, do you know an

7   individual named Marc Wiley?

8   A    Yes, I do.

9   Q    Marc Wiley is, at the time of the investigation, was

10  in charge of EPU; is that correct?

11  A    No.

12  Q    What role did he have at EPU?

13  A    When I first met Marc Wiley, he was a Sergeant in the

14  Executive Protection Unit.  I met him when I went to the

15  Mansion to review and make copies of the closed circuit TV

16  in regards to the chef embezzlement investigation.

17  Q    But he is a part of EPU?

18  A    Yes, he is.

19  Q    EPU, we have had a couple of the officers here, but

20  EPU was the Executive Protective Unit and they protect the

21  Governor and his family; is that correct?

22  A    Yes, they do.

23  Q    Okay.  Did there come a time in April of 2012 when

24  Mr. Wiley on your behalf began to communicate back to you

25  what was going on with the Governor?

1    A    It wasn't -- well, my recollection when we first

2    started talking to Sergeant or First Sergeant Wiley, I was

3    asking at the time, I was looking for additional gifts

4    that Jonnie Williams may have provided to the Governor

5    that were not reported on his Statement of Economic

6    Interests.  And yes, I did reach out to him and ask for

7    some assistance.

8    Q    Okay.  And so for the next 19 to 20 months, he on

9    behalf of you essentially was eavesdropping on

10   conversations of the Governor and reporting them back to

11   you; is that correct?

12   A    No, I've never instructed him to do that.  I don't

13   know why you say -- well, no, I never instructed him to

14   eavesdrop.

15   Q    Okay.

16        MR. BROWNLEE:  Court's indulgence, Your Honor.

17   Let me grab one thing, Your Honor.

18        (Counsel retrieving document.)

19   BY MR. BROWNLEE:

20   Q    Agent Hagan, did you not write in a State Police

21   document in April of 2012 that Mr. Wiley reported back to

22   you that he advised Trooper John Dudley, who was assigned

23   to the Governor on a trip, the flight manifest indicated

24   Jonnie Williams was supposed to be on the plane but he

25   wasn't, one of Williams' co-workers was on the flight and

1    sat next to the Governor for most of the flight, but

2    Trooper Dudley could not hear their entire conversation

3    because of the jet engine noise, but he was able to hear

4    them talking about Anatabloc?

5               MS. ABER:  Objection.

6               MR. BROWNLEE:  I'm just asking if he recalls

7    that, Your Honor.

8               THE COURT:  I'll let you answer that.

9               THE WITNESS:  Okay.  I recall First Sergeant,

10   may have been Sergeant then, Wiley telling me that, but I

11   never instructed him to tell me that.

12   BY MR. BROWNLEE:

13   Q    Did you have Officer Wiley get a new cell phone when

14   he started this process back in 2012?

15   A    I have no knowledge of that, no.

16              MR. BROWNLEE:  May I approach to refresh his

17   recollection?

18              THE COURT:  Go ahead.

19        (Document proffered to witness.)

20   BY MR. BROWNLEE:

21   Q    Just take a look at the first page.

22        (Witness perusing document.)

23   A    Okay.

24   Q    Does this refresh your recollection that Mr. Wiley

25   got a new cell phone in April of 2012 right after he

1   started reporting back to you?

2   A    He advised me that he had a new cell phone and he

3   gave me his number, yes.

4   Q    All right.

5            MR. BROWNLEE:   That's all, Your Honor.   Thank

6   you.

7            THE COURT:   Redirect?

8                    REDIRECT EXAMINATION

9   BY MS. ABER:

10  Q    Special Agent Hagan, let start where Mr. Brownlee

11  left off.   About Officer -- what's Mr. Wiley's title?

12  A    He is a First Sergeant right now.

13  Q    First Sergeant Wiley.   Is the EPU at all affiliated

14  with the Virginia State Police?

15  A    Yes, they are.

16  Q    And were they at all aware, had you informed

17  Mr. Wiley in some terms about what you were investigating?

18  A    Yes, I did.

19  Q    Okay.   And tell the jury, when Mr. Brownlee uses

20  words like "on your behalf," what was your affiliation

21  with Mr. Wiley, First Sergeant Wiley?   Was he acting on

22  your behalf?

23  A    No, he never acted on my behalf, except if I asked

24  for specific information, such as, "Can you give me a list

25  of what flights the Governor has been on in the last year

1    or so?"  The reason we did that is because we were still

2    in the covert stage, we didn't go overt yet, and I didn't

3    want to go to the travel office in the Mansion to let them

4    know we were looking into that area.

5    Q    Did you ever ask First Sergeant Wiley to listen in on

6    Mr. McDonnell's phone calls?

7    A    No, never.

8    Q    Did you ever ask him to look at e-mails that

9    Mr. McDonnell may have been writing?

10   A    No, never.

11   Q    How would you characterize, in sum, the information

12   that First Sergeant Wiley was providing to you?

13   A    He would provide information that I had asked him

14   specifically for.  And then he knew the areas that we were

15   looking into, the investigation was centered on, based on

16   what I was asking about.  And he would voluntarily call me

17   many times and say, "Hey, this might help your

18   investigation."

19   Q    And were you using Special Agent Wiley as some sort

20   of deliberate secret spy on the Governor?

21   A    No.

22   Q    Changing topics.  At the very beginning, I believe,

23   of Mr. Burck's cross-examination, I believe there was a

24   lot about investigations and who had what open when.  At

25   the time you went to interview Ms. McDonnell in February

1    of 2013, was there a federal grand jury investigation open

2    into the McDonnells for public corruption?

3    A     No, there was not.

4    Q     Was there a state grand jury investigation into the

5    McDonnells for public corruption?

6    A     Yes, there was.

7    Q     Now, I believe you mentioned something about a

8    custodial interview.  Could you describe to the jury what

9    that is?

10   A     Normally --

11             MR. BURCK:  Objection, Your Honor, relevance.

12             THE COURT:  Overruled.

13   BY MS. ABER:

14   Q     What's a custodial interview?

15   A     A custodial interview is when I conduct an interview,

16   usually of a suspect, and my intention, either the person

17   has been placed under arrest or my intention is to place

18   the person under arrest after I interview the person.

19   Underneath those circumstances, my understanding is I'm

20   supposed to let the suspect know the Miranda warnings;

21   that the person is allowed to get an attorney and whatever

22   they say can be used against them.  In a non-custodial

23   interview, it is just a normal interview that I would

24   normally do.  I have no intention of detaining the person.

25   I take their information and leave.

1    Q    Which one occurred here with Ms. McDonnell?

2    A    Non-custodial.

3              MR. BURCK:   Objection, asked and answered.

4              THE COURT:   Overruled.

5              THE WITNESS:   Non-custodial.

6    BY MS. ABER:

7    Q    Let's talk a little more about those notes.   I'm

8    going to show you so you have it in front of you RM-2079,

9    the set of notes of your interview with Ms. McDonnell.

10   Now, I think we have established, sir, is it fair to say

11   that your notes are not a verbatim transcript of this

12   interview?

13   A    Oh, yes, definitely.

14   Q    Did you ask Ms. McDonnell at certain points for

15   clarification on issues that interested you?

16   A    Yes.

17   Q    What would something like that have been in this

18   interview?

19   A    Well, while I was interviewing Ms. McDonnell, I was

20   interested in the $50,000.  She told me it was a loan.

21   She indicated that there was a written agreement that she

22   had signed, a written contract.  And that contradicted

23   what I had been told three weeks earlier, so there was a

24   conflict, contradictory information, from what I had heard

25   from Jonnie Williams.  Secondly, she indicated that she

```
1    was making payments for the loan.  Again, that was

2    contradictory from the knowledge I had at the time,

3    because I had pulled her bank records and I analyzed her

4    Wachovia and her Beach bank accounts, and I think they

5    were from March of 2010 to March of 2012, and I did not

6    see any payments going back to Jonnie Williams.

7    Q    Now, Special Agent, did those notes say that Special

8    Agent Lyons was present at that interview?  Do you see his

9    name anywhere?

10   A    I don't believe it does.

11   Q    So how do you know he was there?

12   A    I was there.

13   Q    Okay.  Do those notes say the word "Jonnie Williams"

14   or do you just use the shorthand "JW"?

15   A    "JW."

16   Q    How do you know that that's a reference to Jonnie

17   Williams?

18   A    Because it is his initials that I, I guess, created

19   so I would know that's who they were talking about.

20   Q    Why did you testify before this jury that Maureen

21   McDonnell said there was a written contract?

22   A    Because that's what she said.

23            MS. ABER:  One moment, please, Your Honor.  I

24   have no further questions, Your Honor.  Thank you.

25            MR. BURCK:  Your Honor, I just want you to know,
```

1    this document is okay with us.  It doesn't need redaction.

2              THE COURT:  So you are ready to move that in?

3              MR. BURCK:  Yes, just those two pages, unless

4    the government wants to put in the entire document.  For

5    us, all we need is RM-2079-0003 through RM-2079-0005.  We

6    have no objection if the government wants to put in the

7    entire document.

8              THE COURT:  They will be admitted.

9              MR. BURCK:  Thank you.

10       (Witness stood aside.)

11       Call your next witness, please.

12              MS. ABER:  James Lyons.

13                        JAMES LYONS,

14   called as a witness by and on behalf of the government,

15   having been first duly sworn by the Clerk, was examined

16   and testified as follows:

17                    DIRECT EXAMINATION

18   BY MS. ABER:

19   Q    Good afternoon, sir.

20   A    Good afternoon.

21   Q    Please state your name and spell your last for the

22   record.

23   A    James R. Lyons.  L-Y-O-N-S.

24   Q    Do they also call you Doc?

25   A    Yes, ma'am.

```
1    Q    You are not a doctor, though, right?

2    A    No, ma'am.

3    Q    Where are you presently employed?

4    A    I am presently employed with the Northumberland

5    County Sheriff's Office as their Undersheriff.

6    Q    Were you previously employed with the Virginia State

7    Police?

8    A    I was.

9    Q    For how long did you work there?

10   A    25 years.

11   Q    Okay.  I'm going to turn your attention back to

12   February 15th of 2013, please.  Were you working for the

13   Virginia State Police on that date?

14   A    Yes, ma'am.

15   Q    On that day, did Special Agent Charlie Hagan ask you

16   to join him for an interview?

17   A    Yes, ma'am, he did.

18   Q    Who was that interview of?

19   A    Ms. McDonnell.

20   Q    Until that day, did you have anything to do with the

21   State Police investigation of food thefts at the Mansion?

22   A    No, I did not.

23   Q    Until that day, did you have anything to do with any

24   investigations of Jonnie Williams?

25   A    No, I did not.
```

2998

1    Q    Until that day, had you had anything to do with any

2    investigations of Mr. and Ms. McDonnell?

3    A    No, I did not.

4    Q    Did you attend any briefings or witness interviews

5    related to those investigations?

6    A    No, I did not.

7    Q    After that date, did you assist in any way with those

8    investigations?

9    A    No, ma'am.

10   Q    Okay.  Thank you.  Now, did you help schedule that

11   interview of Ms. McDonnell?

12   A    No, ma'am.

13   Q    All right.  Let's talk about the interview itself.

14   Walk us through what happens when you got to the Mansion.

15   A    We went to the Mansion, myself and Special Agent

16   Hagan.  We were met at the entrance to Ms. McDonnell's

17   office by, I don't remember the young lady's name, but we

18   were told that she was expecting us.  And we went in,

19   introduced ourselves, and the interview began.

20   Q    Okay.  In what room were you conducting the

21   interview?

22   A    I believe it was her office.

23   Q    And who was present for the interview?

24   A    Myself, Special Agent Hagan, and Ms. McDonnell.

25   Q    Did either you or Special Agent Hagan take notes

1   during the interview?

2   A    Special Agent Hagan did.

3   Q    Is it fair to say he did most of the questioning of

4   Ms. McDonnell?

5   A    Yes, ma'am.

6   Q    Now, I'd like to ask you first if Special Agent Hagan

7   said anything at the beginning of the interview.

8   A    Just an introduction, and then just we introduced

9   ourselves and then it was just general conversation for a

10  few minutes.

11  Q    All right.  And in sum, what was that general

12  conversation about?

13  A    Growing up in -- apparently, Special Agent Hagan and

14  Ms. McDonnell had grown up in the same neighborhood in New

15  York.  Just general chit-chat.  I think Ms. McDonnell

16  asked me if I was from New York, and I told her I was from

17  the other side of the state in Southwest Virginia.  It was

18  just general conversation.

19  Q    Do you recall whether Special Agent Hagan said

20  anything about previously working for the FBI?

21  A    Yes, he did.

22  Q    Now, what was the first topic addressed at the

23  interview?

24  A    The first topic addressed was the food from the

25  Mansion, as I recall.

**JAMES LYONS - DIRECT**

1    Q    Did the conversation then turn to Cailin McDonnell's

2    wedding?

3    A    Yes, ma'am, it did.

4    Q    And did you or Special Agent Hagan ask about the

5    contract for the wedding catering?

6    A    There was discussion about the contract for the

7    reception.  Ms. McDonnell had said --

8    Q    Hang on there.  Let me stop you.  Did you explain or

9    did Special Agent Hagan explain to Ms. McDonnell that a

10   search warrant had been conducted at the catering company?

11   A    Yes, ma'am.

12   Q    And did one of you tell Ms. McDonnell that

13   investigators had found a $15,000 check from the Starwood

14   Trust to the catering company for Cailin McDonnell's

15   wedding?

16   A    Yes, ma'am.

17   Q    Did you both talk to Ms. McDonnell about a gentleman

18   named Jonnie Williams?

19   A    Yes, ma'am.

20   Q    Okay.  Now, tell the jury, please, what Ms. McDonnell

21   said about the origin of her relationship with

22   Mr. Williams.

23   A    May I refer to my notes?

24   Q    Yes, sir, but you need to tell -- just for the

25   record, what is it that you are looking at?

1   A    I have a copy of the interview, the VSP-102 that was

2   done by Special Agent Hagan after the --

3   Q    They are signed by Special Agent Hagan.  Did you

4   review them at the time they were made?

5   A    Yes, ma'am, I reviewed them as soon as he made them.

6   Q    Before they were finalized and processed through the

7   State Police?

8   A    Yes, ma'am.

9   Q    At the time, did you agree with everything that

10  Special Agent Hagan had written?

11  A    Yes, ma'am, I did.

12        MR. BURCK:  Objection.  If the witness doesn't

13  remember and has to refer to notes, then the testimony

14  is -- there is no point in testifying.

15        THE COURT:  Let's determine whether or not the

16  witness has any independent recollection before we start

17  dealing with the notes.

18  BY MS. ABER:

19  Q    Let me ask you to put them away for a second.  If I

20  were to ask you if you could tell this jury about what

21  Ms. McDonnell said about the origin of her relationship

22  with Mr. Williams, how long they had known each other, do

23  you know that off the top of your head?

24  A    I can tell you that, yes, ma'am.  She stated that

25  they had, she and the Governor had first met Mr. Williams

1    a long time ago, after Governor McDonnell had left the

2    Army.  That Mr. Williams was a sales rep for American

3    Hospital Supply, and that Governor McDonnell had gone to

4    work with American Hospital Supply.  And that is where

5    they met.

6    Q    Now, did you talk to Ms. McDonnell about her May,

7    2011 trip to the Roskamp Institute?

8    A    She discussed that in my presence, yes, ma'am.

9    Q    Okay.  Did the subject of the August 30th, 2011 lunch

10   at the Mansion come up?

11   A    Yes, ma'am, it did.

12   Q    And did the topic of a Star Scientific event in

13   California come up?

14   A    Yes, ma'am, it did.

15   Q    Did you all tell Ms. McDonnell that you had uncovered

16   a check from the Starwood Trust to her?

17   A    Yes, ma'am.

18   Q    Okay.  And from your recollection, what did

19   Ms. McDonnell say about the existence of a loan agreement

20   for that $50,000 check?

21   A    She said that there was a loan agreement that she had

22   signed, and that she was making payments on that loan.

23   Q    Now, did Ms. McDonnell ask you any questions, ask any

24   questions of both of you?

25   A    Yes, she did.  At one time she asked if we had

```
 1    interviewed the children, and then she also asked was it
 2    necessary that the children be interviewed.
 3    Q    When the interview concluded, how did you all exit?
 4    A    We went out the front door of her office, she
 5    escorted us around the Mansion, and we left at the gate.
 6         MS. ABER:  One moment, please, Your Honor.  No
 7    further questions.  Thank you.
 8         THE COURT:  Mr. Burck?
 9         MR. BURCK:  Very briefly.
10                        CROSS-EXAMINATION
11    BY MR. BURCK:
12    Q    Special Agent Lyons, my name is Bill Burck.  I
13    represent Maureen McDonnell.  I just have a few questions
14    for you.
15    A    Yes, sir.
16    Q    You testified that you didn't have anything to do
17    with this investigation before the interview of Maureen
18    McDonnell or after the interview of Maureen McDonnell,
19    right?
20    A    That's correct, sir.
21    Q    So the words Starwood Trust and all this that you
22    heard from Ms. Aber, did that mean anything to you at the
23    time?
24    A    Well, the only thing I knew about the investigation
25    at the time when I went over to the Mansion was what I had
```

1    read in the paper.

2    Q    What you had read in the paper.

3    A    Yes, sir.

4    Q    Fair to say the information you were hearing from

5    Special Agent Hagan that was being asked of Maureen

6    McDonnell at the time didn't mean much to you?

7    A    It didn't mean a lot to me.  No, sir.

8    Q    Jonnie Williams didn't mean a lot to you, other than

9    what you read in the paper?

10   A    I had heard of him, but again, other than what I read

11   in the paper or heard on the news.

12   Q    You were asked by Ms. Aber whether or not you have

13   prepared for your testimony here today.

14   A    Yes, I have prepared for my testimony.

15   Q    I think you said that you reviewed a VSP report,

16   Virginia State Police report, right?

17   A    That's correct, sir.

18   Q    Is it a typewritten version?

19   A    Yes, sir, it is.

20          MR. BURCK:  May I approach the witness?

21          THE COURT:  Go ahead.

22      (Document proffered to witness.)

23   BY MR. BURCK:

24   Q    Sir, is that a copy of the same thing you reviewed?

25   A    No, sir, it is not.  This is more -- the information

1    that I reviewed is different from what I am seeing here.

2    Q    Okay.  So there is a -- so you have something else

3    that you reviewed?  That's not that document?

4    A    Yes, sir.  This document is dated January 26th, 2013.

5    And the information that I referred to was dated February

6    15th, 2013.

7    Q    Okay.

8    A    I have not seen this document.

9    Q    Okay.  I'm going to show you another document.

10   Actually, bring up RM-2079.

11            MR. BURCK:  Your Honor, I'm sorry, I gave him

12   the wrong document.  My apologies.

13       (Document proffered to witness.)

14   BY MR. BURCK:

15   Q    That one, sir.  I'm sorry, I gave you the wrong

16   report.  Is that the same document?

17   A    Yes, sir, this is the same report.

18   Q    That's a typewritten document that was created by

19   Special Agent Hagan?

20   A    That's correct, sir.

21   Q    And if you could just publish for the jury as well,

22   RM-2079-0003.  Can you just flip through, sir, would you

23   just look, you don't have to read it, but do you recognize

24   that document?

25   A    On the screen?

```
1    Q    Yes.

2    A    No, sir.

3    Q    These are handwritten notes of Mr. Hagan's.  You have

4    never seen those before?

5    A    No, sir, I have not.

6    Q    You didn't review them prior to testifying today?

7    A    No, sir.  This is the first time I've seen them.

8              MR. BURCK:  Thank you.  That's it, Your Honor,

9    for us.

10             THE COURT:  Mr. McDonnell?

11                       CROSS-EXAMINATION

12   BY MR. ASBILL:

13   Q    Good afternoon, sir.  My name is Henry Asbill.  I

14   represent Governor McDonnell.

15   A    Yes, sir.

16   Q    I just want to make sure I understand your testimony

17   clearly.  At the time you went to this interview you were

18   not involved in the planning of it or anything of that

19   nature.

20   A    No, sir, I was not.

21   Q    You say what you knew is just what you read in the

22   paper?

23   A    Basically, that's correct.

24   Q    Did that relate only to the Chef Todd issue or was it

25   broader than that?
```

1    A    Sir, I don't recall.  It was whatever was popular in

2    the paper in February.

3    Q    Did it involve the McDonnells in any way, do you

4    recall?

5    A    Yes, sir, it did.

6    Q    It did.

7    A    Uh-huh.

8    Q    So you knew that that was at least a subject matter

9    of the interview.

10   A    That's correct.  Yes, sir.

11   Q    As you got into the interview, Agent Hagan was doing

12   the questioning and it became very clear to you what the

13   various subjects were in the interview, correct?

14   A    Well, it became clearer to me what the subjects were,

15   yes.

16   Q    So whatever you knew beforehand, it became more clear

17   once the interview commenced; is that right?

18   A    That's correct, yes, sir.

19   Q    During the interview, Agent Hagan was the one who was

20   doing the questioning, and simultaneously taking notes.

21   Correct?

22   A    That's correct.  Yes, sir.

23   Q    And you were not doing the questioning, but you also

24   were not taking notes.

25   A    I think I asked two questions the entire time.

1  Q    But you didn't have to worry about trying to talk and

2  write at the same time.

3  A    No, sir, I did not.

4  Q    So would you have been or would somebody have been

5  recording this interview in any way?

6  A    I don't recall, sir, whether it was recorded.  I know

7  that I did not record it.  And whether Charlie Hagan

8  recorded it or not, I don't know.

9  Q    Was there any discussion between the two of you about

10  whether or not you should record it?

11  A    Not with me, no, sir.

12  Q    Is there any reason to think of why it wouldn't be

13  appropriate to record it?

14  A    No, I can't answer that.  I have done interviews that

15  I have recorded and I've done interviews that I have not

16  recorded.  So I can't speak for him.  I don't know why he

17  chose not to record it.

18       MR. ASBILL:  Thank you, sir.  No further

19  questions.

20       THE COURT:  Anything else?

21       MS. ABER:  No, Your Honor.

22       THE COURT:  Thank you, sir.  You may stand down.

23     (Witness stood aside.)

24     Call your next witness.

25       MR. HARBACH:  Thank you, Your Honor.  The

| 1 | government calls Donnie Williams. |
|---|---|
| 2 | DONNIE WILLIAMS, |
| 3 | called as a witness by and on behalf of the government, |
| 4 | having been first duly sworn by the Clerk, was examined |
| 5 | and testified as follows: |
| 6 | DIRECT EXAMINATION |
| 7 | BY MR. HARBACH: |
| 8 | Q    Good afternoon, Mr. Williams. |
| 9 | A    Good afternoon. |
| 10 | Q    Could you please state your full name for the record? |
| 11 | A    It is Donnie O. Williams. |
| 12 | Q    What do you do for a living, sir? |
| 13 | A    I'm a retired Deputy Sheriff. |
| 14 | Q    Are you working right now? |
| 15 | A    I have a lot of rental property that I work on. |
| 16 | Q    What sorts of work do you do? |
| 17 | A    A little bit of everything: painting, carpentry work, |
| 18 | roof work. |
| 19 | Q    When did you retire from law enforcement? |
| 20 | A    Four or five years ago. |
| 21 | Q    Are you related to Mr. Jonnie Williams? |
| 22 | A    Yes, he is my brother. |
| 23 | Q    Do you recall, turning your attention to the fall of |
| 24 | 2012 now, okay, do you recall around that time making the |
| 25 | acquaintance of Ms. McDonnell? |

**DONNIE WILLIAMS - DIRECT**

1   A    Yes, I do.

2   Q    What were the circumstances?

3   A    My brother asked me to go by there and see if I could

4   help them out, and I didn't have the time.  I said, "As a

5   favor to you, I'll run by there and see what they have,

6   see what the problems are."

7   Q    Where was it that you were going to run by and check

8   out?

9   A    It was over in Glen Allen.  I forgot the street name.

10  Q    And what was the location?  Was it their home?

11  A    Yes, it was their home.

12  Q    We are not talking about the Governor's Mansion here,

13  right?

14  A    No, we are not.  Their personal home.

15  Q    Did you in fact provide some assistance in terms of

16  repairs and what not at the McDonnells' home in Glen

17  Allen?

18  A    Yes.

19  Q    What sorts of stuff did you do for them?

20  A    We replaced some hardwood floors that got damaged

21  from a water leak in a bathroom.  We had to pull them up.

22  I bought some hardwood flooring and matched the stain and

23  we put them back down.

24  Q    How did you learn about the stuff that needed to be

25  done at the house?

**DONNIE WILLIAMS - DIRECT**                    3011

```
1    A    She told me.

2    Q    Who is "she"?

3    A    Ms. McDonnell.

4    Q    Did you meet with her in person?

5    A    Yes.

6    Q    Did you also communicate with her via text message?

7    A    Yes.

8    Q    Have you had a chance to review some text messages

9    between yourself and Ms. McDonnell before you came into

10   Court today?

11   A    No.

12   Q    Have you reviewed them at any time in the past with

13   the government?

14   A    Yes.

15           MR. HARBACH:  Your Honor, can I tender hard

16   copies to the witness?  It might make this easier.

17           THE COURT:  Sure.

18           MR. HARBACH:  For the record, I'm sending up

19   paper copies to the witness of Government 424 through 427,

20   437 through 441, 463, 473, and 491.

21   BY MR. HARBACH:

22   Q    My question for you, Mr. Williams, is that stack of

23   paper that the Court Security Officer just handed you, do

24   you recognize those to be paper copies of text messages

25   between you and Ms. McDonnell?
```

**DONNIE WILLIAMS - DIRECT**                    3012

1    A    Yes.

2              MR. HARBACH:   The government offers that same

3    list, I'll repeat for the record, Government's 424 through

4    427, 437 through 441, 463, 473, and 491.

5              THE COURT:   They will be admitted.

6    BY MR. HARBACH:

7    Q    Now, before we get to the texts, Mr. Williams, do you

8    recall having any conversations with your brother about

9    the list of repairs that Ms. McDonnell had requested that

10   you do?

11   A    He didn't know what it was, he just said, "Go by

12   there and see if you can help them out."

13   Q    After you did that, did you talk to him again about

14   it, to your recollection?

15   A    To Jonnie?

16   Q    Yes, sir.

17   A    Yes.  I called him because they had a hot tub and

18   they couldn't find or they didn't know anybody, it needed

19   a new top on it.  She asked me could I find one.  I found

20   it.  They would need a new hot tub cover, and I deal with

21   a pool company in Fredericksburg, and I talked to the guy

22   there and he was going to order it.

23   Q    Did you relate that to your brother?

24   A    Yes.  And I asked him did he want, "What's going on,

25   are you going to pay for it or do you want me to bill

**DONNIE WILLIAMS - DIRECT**                    3013

1     them?"

2     Q     What did he say?

3     A     He said he would go ahead and pay for that.

4     Q     Let's take a look at some of those text messages.  We

5     can roll through them quickly.  I'd like to start with

6     Government's 424 in evidence, please.  We can blow this

7     one up for the witness and the jury.  This one is from

8     Ms. McDonnell.  And you mentioned a moment ago not

9     remembering the exact location of their home.  Seeing on

10    the screen now there is a reference she makes to Wyndham.

11    Is that where their private home was located, their

12    personal home?

13    A     Yes.

14    Q     Let's take a look at 425, please.  Noting the date on

15    this one is November 12th of 2012, is this your response

16    to her?  It says, "No, everything's fine"?

17    A     Yes.

18    Q     Okay.  Let's keep going and look at 426, please.

19    Before we blow up the text, let's let the jury see the

20    date, please.  Thank you.  We are still on November 12th

21    of 2012.  Ms. McDonnell is asking you:  "Do you need me to

22    get a key out to you?  To get into the garage."  And she

23    gives you other instructions.  Do you recall whether in

24    fact you were provided a key to their residence?

25    A     Yes, they left a key for me.

**DONNIE WILLIAMS - DIRECT** 3014

1  Q    They did.  Can we take a look at the next one,

2  please, which I believe is 427.  Blow up the date and the

3  content for the witness.  We are still on November 12th;

4  is that right, sir?

5  A    Yes.

6  Q    And Ms. McDonnell, she is making reference here to a

7  hot tub cover which you testified about a moment ago.  Is

8  this what got that started?

9  A    Yes.

10 Q    Okay.  Let's look at the next text message, please,

11 which is Government's 437.  Now, this is about a month

12 later.  This is December the 12th of 2012.  Do you see

13 that there, sir?

14 A    Yes.

15 Q    And Ms. McDonnell is asking you, "Forgot to ask you,

16 were you able to get the model number of the Jacuzzi?"

17      Were you able in fact to get hold of a new Jacuzzi

18 top from your contact?

19 A    I did.  I never found the model number on it, and I

20 had to go drive from Fredericksburg and pick it up and

21 take it to the pool company in Fredericksburg so they can

22 get the measurements and get the accurate ones.

23 Q    Did a replacement cover end up coming?

24 A    Yes.

25 Q    Let's take a look at 438, please.  This is your

1    response to Ms. McDonnell a couple of days later on the

2    14th.  And you say, "Spa cover will be here in three

3    weeks."  Is that consistent with your memory?

4    A    Yes.

5    Q    Can we take a look at 439, please.  This is

6    Ms. McDonnell's response to you.  Now, you told us a

7    moment ago that you had a conversation with your brother

8    about him paying for it; is that right?

9    A    Yes.

10   Q    Let's take a look at Government's 441.  That's what

11   you tell her.

12   A    Yes.

13   Q    Now, you mentioned some other odd jobs that you did

14   for the McDonnells around their home.  I think you said

15   you replaced some flooring; is that right?

16   A    Some hardwood flooring.

17   Q    Okay.  Any other jobs of significance that you

18   remember besides that?

19   A    Well, we ended up staining the deck and fixing some

20   lattice on it, and ended up replacing some bushes on the

21   side of the house and putting new rows of bushes in the

22   back, trimming bushes.  I told her, at the time I told her

23   we were really busy, Jonnie was aerating and seeding his

24   lawn, you know, it is a large lawn, and she asked could we

25   do theirs.  And I said, "Okay."  So we ended up getting

1    all the leaves up, aerating it, bringing the machine over,

2    aerating it, seeding it.  We fixed a couple of the

3    sprinkler heads, let's see, stained the deck.

4    Q    You are saying "we" when you describe this.  How big

5    of a team of workers do you have out there?

6    A    Well, when we done aerating and seed, there was four

7    people.  It took us a good part of the day.

8    Q    Are you yourself actually out there working, too?

9    A    Yes.

10   Q    And what about the staining the deck and replacing

11   the hardwood floors, ballpark, how many people are we

12   talking about?

13   A    Well, there was two people the first day and three

14   people the second day and we were there all day because it

15   was getting cold and we wanted to finish it up.

16   Q    Over the course of time that you are doing these

17   things for the McDonnells, did Ms. McDonnell ever say

18   anything to you about offering to pay for any of it?

19   A    She offered to pay several times.

20   Q    She did?

21   A    She did.

22   Q    Before the investigation in this case became public,

23   did she ever ask for an invoice?

24   A    Before that, no.

25   Q    Before the investigation ever became public, did

1   Ms. McDonnell ever ask you how much anything cost?

2   A    No.

3   Q    Before the investigation became public, did

4   Ms. McDonnell ever actually pay for anything?

5   A    No.

6   Q    Approximately how many times -- withdrawn.  On

7   approximately how many different occasions would you say

8   you went over to the McDonnells' home in Wyndham to make

9   repairs?  How many times did you all go over there?

10  A    Ten to twelve times.

11  Q    Let's take a look now at what's in evidence as

12  Government's 463.  The date on this one is January 19th of

13  2013.  And if you see there, about three lines in, she is

14  inquiring whether any of your days next week might work

15  for meeting out at Wyndham.  Was this an example of

16  another occasion when you went out there to do some work?

17  A    Yes.

18  Q    I'm sorry?

19  A    Yes.

20  Q    Okay.  Let's take a look at Government's 473 in

21  evidence, please.  This is five days later on January 24th

22  of 2013, and she is asking about if you can help out with

23  the heat and furnace unit in the garage.  The e-mail goes

24  on.  Do you recall if you in fact do some work on their

25  HVAC?

1    A     Yes, replaced all the filters in the house, but they

2    didn't know anything around the Richmond area, they said,

3    that worked on it, so I called the company I use, and they

4    came down and it ended up being the internal filter in

5    there.  He ordered a new one, I picked it up from him in

6    Fredericksburg, and my little brother and I put it in.

7    Q     What's your little brother's name?

8    A     Deanie.

9    Q     Dean?

10   A     Dean.  Excuse me, I call him Deanie.

11   Q     Can we take a look at the last text message, which is

12   Government's 491, please.  Now we are into February of

13   2013.  This is February 19th.  And in this one,

14   Ms. McDonnell references a granite guy.  Do you recall

15   what that was about?

16   A     Yes.  She had a crack in some granite, and she asked

17   me, you know, did we know anybody.  And I have a guy I use

18   for granite in the Richmond area, and he came over.

19   Q     To do some repairs?

20   A     Yes, to get an estimate on if he can fix it, and I

21   think he was looking in the kitchen at the granite.

22   Q     We are still at their personal residence in Wyndham;

23   is that right?

24   A     Yes.

25   Q     You can take the exhibit down.  Mr. Williams, did you

1   ever have any conversations with Mr. McDonnell about any

2   of these repairs?

3   A     Yes, one day they came together.

4   Q     And where were you when you had this conversation

5   with Mr. McDonnell?

6   A     We were in the garage.  He was talking about the

7   air-conditioning.  It wasn't working properly on -- I

8   forgot what floor it was.  But it was the air-conditioner

9   located in the garage.

10  Q     Did you all end up fixing that?  Was this the same

11  filter problem you described a few minutes ago?

12  A     Yes.  That's what was the problem.

13  Q     During that conversation with Mr. McDonnell, did he

14  offer to pay for the work?

15  A     No.

16  Q     During your conversation with Mr. McDonnell, did he

17  ask you how much it cost?

18  A     No.

19  Q     Now, after the investigation became public in early

20  spring of 2013, after that point, did you get a request

21  from Ms. McDonnell for an invoice?

22  A     Yes.

23  Q     What do you recall about that?

24  A     She wanted it on a paper with all the work on it from

25  my company.  And I said, "Look --" I felt uncomfortable

1    then because I'm not a contractor.  I work on my own

2    stuff.  I've built houses and stuff, but it is my personal

3    stuff.  And I didn't want to get involved with taxes or if

4    you needed any kind of permits for any of the stuff.

5    Q    Was there conversation with Ms. McDonnell in person

6    or over the phone or do you remember?

7    A    It was in person.

8    Q    Did Ms. McDonnell say why she wanted a receipt or an

9    invoice?

10   A    She said she wanted -- she needed a record of it.

11   Q    Did you in fact provide her with one?

12   A    I did.

13   Q    Let's take a look at Government's 496, please.

14   Mr. Williams, can you see that okay?

15   A    Yes.

16   Q    Is this an e-mail exchange that at least is in part

17   between you and Ms. McDonnell with the list of

18   expenditures?

19   A    Yes.

20   Q    That you have been discussing?

21   A    Yes.

22            MR. HARBACH:  The government offers Government's

23   496.

24            THE COURT:  It will be admitted.

25   BY MR. HARBACH:

3021

1    Q    Publishing to the jury, what's the date, looking at

2    the bottom e-mail there, Mr. Williams?  Is the date that

3    you sent this list of expenditures, is that March 4th of

4    2013?

5    A    Yes.

6    Q    And was this what you sent that was in response to

7    Ms. McDonnell's prior request?

8    A    Yes.

9    Q    Let's take a look at the next page of Government's

10   496, please.  Let's blow up the top part for the witness.

11   Did you prepare this document, sir?

12   A    Yes.

13   Q    Now, looking at the figures that are on here, for

14   example, staining the deck, you charged $150 of labor and

15   apparently no materials costs.  Was that the actual cost

16   of the labor that was involved here?

17   A    No.

18   Q    How did it compare to what the actual cost of the

19   labor was?

20   A    A third.  A third of that.

21   Q    Okay.  And similarly, look at the next-to-the-bottom

22   line, "Repair and replace hardwood flooring."  You charged

23   only $50 in labor.  Was that similarly a fraction of what

24   the actual labor cost was?

25   A    Yes.

**DONNIE WILLIAMS - DIRECT** 3022

1  Q    Why did you make the prices so low on this invoice,
2  sir?
3  A    I just made it up in a couple minutes.  I wanted to
4  get it and get it to her, get it over with.
5  Q    Let's scroll down to the bottom so we can see the
6  total, please.  $1,685.50; is that right?
7  A    Yes.
8  Q    Did Ms. McDonnell, after you sent her this invoice,
9  did she send you a check?
10 A    Yes, she did.
11 Q    Did you either cash or deposit it right away?
12 A    No.
13 Q    Why not?
14 A    I wasn't going to -- I wasn't even going to cash it.
15 I didn't want anything to do with any of this mess.  So I
16 just left the check in my vehicle.
17 Q    Did you eventually either cash or deposit the check?
18 A    Yes.
19 Q    Why did you eventually do it?
20 A    I talked to my brother.  He said, "You might as well
21 go on and cash it.  You can get some money."
22 Q    Did you have any conversations with Ms. McDonnell
23 about whether you should cash or deposit the check?
24 A    I believe she sent me text messages.
25 Q    What do you recall the substance of the text message

1   as being?

2   A    Questioning "When are you going to cash the check?"

3   Q    Did you eventually do that?

4   A    I did.

5   Q    Do you recall at some point having an encounter with

6   Ms. McDonnell in the garage of their home where she gave

7   you something?

8   A    Yes.

9   Q    Tell us what you remember about that.

10  A    She had, she said it was a couple of dresses in there

11  that she had worn, I believe it was in a box, and she had

12  written a note.  I believe it was for Jonnie.  I didn't

13  look at the note, but she said to give them, you know, get

14  them to Rachel so she can maybe auction them off for

15  charity, and say the First Lady wore the dresses.

16  Q    Who is Rachel?

17  A    Rachel is my niece.

18  Q    Whose daughter?

19  A    Jonnie's daughter.

20  Q    Prior to this conversation with Ms. McDonnell where

21  she gave you the box, had you heard anything about any of

22  this clothing from anybody?

23  A    No.

24  ///

25  ///

1  Q     You mentioned that there was -- your recollection is

2  that there was a note or something, some kind of letter

3  with the box?

4  A     Yes.

5  Q     And you said you did not look at it?

6  A     No, I did not.

7  Q     How would you describe Ms. McDonnell's demeanor when

8  she gave you the box with the note attached?

9  A     She was nervous.

10 Q     Did she say anything to you that made you think she

11 was nervous?

12 A     The tone of her voice, and she was talking fast.

13 Q     Did she say anything about anything that had happened

14 to her recently?

15 A     I don't -- I don't know.

16 Q     Do you recall whether she made any reference to

17 having any contact with law enforcement?

18             MR. HAUSS:  Objection.

19 A     Oh, yeah.

20             MR. HAUSS:  Leading.

21             MR. BURNHAM:  Leading.

22             THE COURT:  Overruled.

23 BY MR. HARBACH:

24 Q     What do you recall about that, sir?

25 A     I think we were in the living or the foyer or

1  something, and she was upset.  And she said that she was

2  going to call the FBI agent up and tell him Jonnie is a

3  generous person and they shouldn't be doing this, you

4  know, to him.

5      And I told her, I said, "It doesn't make any sense,

6  you calling up the FBI agent" -- I forgot his name -- "and

7  tell them Jonnie is a good person.  It just doesn't make

8  any sense.  You need to talk your attorney before you talk

9  to, you know, one of the FBI agents about something.  It

10 just doesn't make any sense."

11 Q    Now, were you aware, at the time of this conversation

12 with Ms. McDonnell, that your brother Jonnie had loaned

13 the McDonnells, you know, many thousand dollars of

14 dollars?

15              MR. HAUSS:  Objection.

16              THE COURT:  Overruled.

17 A    Yes.

18 BY MR. HARBACH:

19 Q    How did you know about, let's say, the $50,000 loan?

20 A    Jerri Fulkerson called me up on the telephone.

21 Q    For what purpose?

22 A    To tell me she was giving the $50,000 loan out to the

23 Governor and his wife.

24 Q    Do you have an understanding of why Ms. Fulkerson

25 needed to call you about that?

DONNIE WILLIAMS - DIRECT          3026

1  A    She calls me for everything because I'm the trustee

2  on Jonnie's trust, on the Starwood Trust for the kids.

3  Q    The day that you had this conversation with

4  Ms. McDonnell when she mentioned the FBI, did she also

5  mention the $50,000 loan?

6  A    Yes.

7  Q    What do you recall her saying about that?

8  A    She was worried about it because they didn't have a

9  contract and stuff.  And I -- I said, "Well, you know" --

10 I told her it was a check, and on the check it was written

11 "loan" on it.  And -- but she was -- you know, because

12 they didn't have a contract with Jonnie or anything, and

13 they were upset over that.  So -- she was.

14 Q    Now, let's go back to the -- the box for a minute.

15 What did you do with the box with the note that was with

16 it?

17 A    I took the box and put in my little brother's truck

18 and told him to take it back to Jonnie's and put it on the

19 kitchen counter, because I was going to Fredericksburg at

20 the time --

21 Q    All right.

22 A    -- when I left.

23        MR. HARBACH:  Can I have just a moment, Judge,

24 please.

25        THE COURT:  Sure.

1      (Counsel conferring with co-counsel.)

2          MR. HARBACH:  Thank you, Your Honor.

3   BY MR. HARBACH:

4   Q    Mr. Williams, do you recall the -- when Ms. McDonnell

5   asked you for the -- the invoice for the stuff -- all the

6   stuff you had done at the McDonnells' house, was that

7   after you had had this conversation with her where she

8   gave you the box?

9   A    Yes.

10  Q    Okay.

11         MR. HARBACH:  No further questions, Your Honor.

12  Thank you.

13         THE COURT:  All right.  Cross?

14         MR. HAUSS:  Thank you, Your Honor.

15                    **CROSS-EXAMINATION**

16  BY MR. HAUSS:

17  Q    Good afternoon.

18  A    Good afternoon.

19  Q    So you -- my name is Steve Hauss.  I'm an attorney

20  for Maureen McDonnell.

21      You did not meet Ms. McDonnell until October or

22  November 2012; is that correct?

23  A    Somewhere around there.

24  Q    And you had testified that your brother Jonnie was

25  the one who asked you to do some repairs on the

DONNIE WILLIAMS - CROSS - HAUSS        3028

1  McDonnells' home; is that correct?

2  A     Yes.

3  Q     And you testified that it was around November 11th,

4  2012, when you first went over there, correct?

5  A     Yes.

6  Q     And when you went to the home the first time, you met

7  with my client, Ms. McDonnell?

8  A     Yes.

9  Q     And she pointed out to you the various things that

10 needed to be repaired; is that correct?

11 A     Yes.  There was a lot -- a lot of things.

12 Q     Okay.  Do you recall at some point after that

13 Ms. McDonnell calling you and telling you that a list had

14 been left for you?

15 A     I told her to make a list because it was so many

16 things that needed to be done around there.

17 Q     And do you recall that, in fact, she had left a list

18 for you in a black folder by the door?

19 A     It was -- I remember it was in the garage.  I never

20 looked at it.

21 Q     Okay.

22 A     I never got to that part.

23 Q     Do you recall her telling you that the Governor had

24 written out the items that needed to be worked on for --

25 on the list that was in the folder?

DONNIE WILLIAMS - CROSS - HAUSS          3029

1  A    I don't recall that.  But I -- she told me that she

2  was writing stuff -- I told her to make the list.  She was

3  writing stuff.  I don't know who wrote it, whether it was

4  the Governor or her.  So --

5  Q    Do you recall her telling you that she had already

6  marked off the items from the list that had been completed

7  so that you could send her a bill?

8  A    No.

9  Q    Okay.  And you never looked at the list?

10 A    I never -- no.

11 Q    So you don't know if things were marked off or not?

12 A    No.

13 Q    Now, you've testified that you went over to do work

14 at the McDonnells approximately 10 to 12 times?

15 A    Yes.

16 Q    Okay.  And every time you met with Maureen McDonnell,

17 she offered to pay; is that correct?

18 A    No.

19 Q    Okay.

20 A    She offered several times during the time I was there

21 to pay.  It wasn't every time.

22 Q    Do you recall meeting with the prosecutors and the

23 agents in this case in about October of last year?

24 A    Yes.

25 Q    Okay.  Do you recall telling the prosecutors and the

1  agents that every time you met FLOVA, she offered to pay?

2  A    Every time I --

3  Q    You met with Ms. McDonnell, she offered to pay?

4  A    It wasn't every time.

5  Q    I'm asking do you recall telling that to the

6  prosecutors?

7  A    I don't recall.

8  Q    Okay.

9         MR. HAUSS:  Could we pull up for the witness the

10  302 dated October 23rd, 2013.

11      Your Honor, if I could approach.  I have a hard copy

12  I can just show the witness.

13         THE COURT:  Go ahead.

14         MR. HAUSS:  Thank you.

15  BY MR. HAUSS:

16  Q    And I'm showing you a hard copy of the interview

17  summary from your October 23rd, 2013, interview with the

18  prosecutors.  Have you had a chance to read that?

19  A    Yes.

20  Q    And does that refresh your recollection reading that?

21  A    It does.  But I -- I just don't recall every time.

22  I'm trying to remember back a couple years.  I just don't

23  remember every time.  But she did offer several times.  I

24  remember that.

25         MR. HAUSS:  If I may approach again, Your Honor.

1  BY MR. HAUSS:

2  Q    Now, you were shown some text messages from the

3  prosecutor, by Mr. Harbach, on your direct.

4          MR. HAUSS:  And if we could pull up Government

5  Exhibit 439.  And this is in evidence.  And if we could

6  blow up the body of the text.

7  BY MR. HAUSS:

8  Q    And you testified that this is a text between

9  yourself and Ms. McDonnell regarding the spa cover that

10  you just talked about?

11  A    Yes.

12          MR. HAUSS:  And if we could go now to Government

13  Exhibit 429, also in evidence.  Sorry.  439.  Thank you.

14  BY MR. HAUSS:

15  Q    And this was Ms. McDonnell's response to you; is that

16  correct?

17  A    Yes.

18  Q    And she asked, "Do I need to give you a credit card?"

19  A    Yes.

20          MR. HAUSS:  Now, if you could pull up Government

21  Exhibit 440.

22  BY MR. HAUSS:

23  Q    And this is a response from you to Ms. McDonnell.

24  This is you indicating, "No.  Jonnie is paying for it"?

25  A    That's correct, because I called Jonnie and asked

DONNIE WILLIAMS - CROSS - HAUSS        3032

```
 1  him.
 2           MR. HAUSS:  And if we could pull up Government
 3  Exhibit 441.
 4  BY MR. HAUSS:
 5  Q    And this is Ms. McDonnell's response to you; is that
 6  correct?
 7           MR. DRY:  It's not in evidence.
 8  A    Yes.
 9           MR. HAUSS:  I'm sorry?
10           MR. HARBACH:  We don't think it's in evidence.
11           MR. HAUSS:  441?
12           MR. HARBACH:  No.  My mistake.
13  BY MR. HAUSS:
14  Q    And this, I'm sorry, is Ms. McDonnell's response to
15  you; is that correct?
16  A    Yes.
17  Q    And she says, "OMG.  I didn't expect him to do that."
18  That's correct?
19  A    Yes.
20  Q    Now, in the end, Ms. McDonnell, in fact, paid you for
21  the work you did at the house, correct?
22  A    Yes.
23  Q    You've also indicated to the prosecutors that she
24  paid the plumber and the air conditioning contractors
25  directly; is that correct?
```

DONNIE WILLIAMS - CROSS - HAUSS          3033

```
 1   A    Yes.
 2   Q    Now, you testified that Ms. McDonnell did not request
 3   an invoice until the investigation became public, correct?
 4   A    That's correct.
 5   Q    Okay.  Now, you could have sent her an invoice before
 6   that, couldn't you have?
 7   A    Well, I was doing very small things.  Sometimes I was
 8   there a couple hours.  Sometimes it was four or five.  And
 9   it was just too many little things.  I just waited until
10   the end to, you know, put everything on there.  So --
11   Q    Ms. McDonnell never told you not to send her an
12   invoice; is that correct?
13   A    That's correct.
14   Q    And Mr. McDonnell never told you not to send an
15   invoice, correct?
16   A    That's correct.
17   Q    Now, you also indicated that she never asked you what
18   the price was; is that correct?
19   A    She did not.
20   Q    Okay.  And you could have told her the price.  She
21   never told you not to tell her the price, correct?
22   A    That's correct.  But never asked.  So --
23   Q    So it was your choice not to send her an invoice and
24   not to give her the price?
25   A    Yes.
```

1   Q    Now, you testified that it was only after the

2   investigation became public that she asked for an invoice.

3   What do you mean when you say "the investigation became

4   public"?

5   A    When it hit the newspapers.

6   Q    Okay.

7          MR. HAUSS:  So could we pull up Government

8   Exhibit 496, which is in evidence.

9   BY MR. HAUSS:

10  Q    Now, this is when you sent the invoice to

11  Ms. McDonnell, correct?

12  A    Yes.

13  Q    And the date on here is March 4th, 2013?

14  A    Yes.

15  Q    Now, prior to this, Ms. McDonnell had asked you for

16  the invoice, correct?  You're saying that's in response to

17  her because you had previously asked her for -- I'm

18  sorry -- she had previously asked you for the invoice?

19  A    Can you -- I'm not sure what you're trying to --

20  Q    Sure.  She had asked you, prior to you sending this,

21  Ms. McDonnell had asked you for an invoice?

22        Let me ask you this.  Do you recall telling the

23  prosecutors that Ms. McDonnell asked you at least three

24  times, both in person and over the phone, for an invoice

25  before --

1  A     Oh, yes.

2  Q     -- you sent this?

3  A     Yes.

4  Q     And that was prior to this date, March 4th, 2013?

5  A     Yeah.  I'm not sure.

6  Q     Now, you said that your first meeting with her was on

7  November 11th, 2012, correct?

8  A     Yes.

9  Q     And this invoice was sent on March 4th.  So that's

10 about four months later?

11 A     Yes.

12 Q     Now, Ms. McDonnell asked you for an invoice from a

13 business, correct?

14 A     Yes.

15 Q     She didn't want one from you personally?

16 A     Yes.

17 Q     But you did not give her an invoice from a business,

18 did you?

19 A     No.

20 Q     And the reason for that was because you didn't have a

21 contractor permit, correct?

22 A     I don't have a contractor's license.  And I have

23 several LLCs, and I didn't want any of that into my -- my

24 personal stuff.

25 Q     Okay.  So during your direct examination, you said

1   that you charged less than the cost of the labor and the

2   actual work, correct?

3   A     I just wanted it over with.

4   Q     Okay.  You're not a professional contractor, correct?

5   A     No.

6   Q     Okay.  And you don't have a business or construction

7   license?

8              MR. HARBACH:  Objection.  Relevance.

9   A     No.

10             THE COURT:  He's already answered this.

11  BY MR. HAUSS:

12  Q     Is it correct that you generally only do jobs for

13  family and friends?

14  A     Yes.

15             MR. HAUSS:  And could we show, just for the

16  witness, this is not in the evidence, RM-146-0029.  I'm

17  sorry.  RM-1546-0029.  And if you could blow it up for the

18  witness.

19  BY MR. HAUSS:

20  Q     So, Mr. Williams, this is a text message sent from

21  Ms. McDonnell to you on November 17th, 2012; is that

22  correct?

23  A     Yes.

24             MR. HAUSS:  And, Your Honor, we would offer

25  RM-1546-0029.

DONNIE WILLIAMS - CROSS - HAUSS        3037

```
1              THE COURT:  It will be admitted.
2  BY MR. HAUSS:
3  Q    And, Mr. Williams, this is a text message where
4  Ms. McDonnell invited you and your brother to a Christmas
5  party; is that correct?
6  A    Yes.
7  Q    Now, you testified that at some point Ms. McDonnell
8  gave you a box; is that correct?
9  A    Yes.
10 Q    Okay.  And that was in the garage of the McDonnells'
11 home?
12 A    Yes.
13 Q    Okay.  Do you remember what the date was when she did
14 that?
15 A    No.
16 Q    Do you recall if it was in March 2013 versus
17 February?
18 A    I believe it was -- it was in 2013.
19 Q    Okay.
20 A    March.  That sounds about right.
21            MR. HAUSS:  Could we --
22 A    I'm not sure of the exact date.  I don't know.
23 BY MR. HAUSS:
24 Q    Sure.  Now, there was no one else there that day but
25 you and Ms. McDonnell, correct?
```

1   A    That's not true.

2   Q    There was someone else there?

3   A    Several other people there.

4   Q    Who else was there?

5   A    My little brother was there and a helper.  Because I

6   put the dress in his truck.

7   Q    And did you have an interview with the prosecutors

8   and the police in this case just a month ago, on July 8th,

9   2014?

10  A    Yes.

11  Q    Okay.  Do you recall telling the prosecutors that you

12  did not recall anyone else being present at the time?

13  A    It was just her and I in the garage.  They were

14  outside.

15  Q    Okay.  So --

16  A    But, you know.

17  Q    Okay.  Just -- so to clarify, it was just -- in the

18  garage where she gave you the box, it was just you and

19  Ms. McDonnell?

20  A    Yes.

21  Q    Okay.  And you testified that you never looked in the

22  box?

23  A    I did not.

24  Q    You never saw what was inside of the box?

25  A    No.

DONNIE WILLIAMS - CROSS - HAUSS        3039

1   Q     You never saw the note that accompanied the box?

2   A     No.  It was for Jonnie.  I wasn't going to read it.

3   Q     Now, you testified on direct that when she gave you

4   the box, Ms. McDonnell said some things about the loan

5   from Mr. -- from your brother Jonnie; is that correct?

6   A     Yes.

7   Q     Do you remember that when you met with the

8   prosecutors last month you told them, at first, that

9   Ms. McDonnell never said anything about the loan when she

10  delivered the box to you?

11  A     That was a -- I believe that was a different day on

12  that.  I'm not sure if it was the same day.  When the loan

13  come up and when the dresses, I think it might have been a

14  different day.

15  Q     So you're not sure, when Ms. McDonnell gave you the

16  box, if that was the time she talked about a loan?

17  A     It was approximately the time.  But I talked to her

18  several times.  I believe the $50,000 check was a

19  different time or a different day than that.

20  Q     Okay.  So sitting here today, you're not sure if when

21  she talked about the loan and when she gave you the box

22  were at the same time?  You're not sure?

23  A     That's true.

24  Q     Okay.  And you also testified on direct that when she

25  gave you the box, Ms. McDonnell referred to Rachel, your

1  niece?

2  A    Yes.

3  Q    And that she said that the dresses were for Rachel?

4  A    She said -- well, she said to give them back to

5  Jonnie, to give them to Rachel and she could auction them

6  off for charity or something, say the First Lady wore

7  them.  So --

8  Q    Okay.  Do you recall that when you met with the

9  prosecutors last month, that what you said to them was

10  that you learned the box contained clothing belonging to

11  Rachel and you recall thinking to yourself why would

12  Ms. McDonnell have Rachel's clothing?

13  A    I didn't have a clue, because I hadn't heard nothing

14  about these dresses.  But she told me there were dresses

15  in there.

16  Q    Is it fair to say you have no idea if Ms. McDonnell

17  ever met your niece Rachel?  Is that fair?

18  A    I don't have a clue.  Yeah.

19          MR. HAUSS:  One moment, Your Honor.

20      Thank you.  Nothing further, Your Honor.

21          THE COURT:  All right.

22      Anything from Mr. McDonnell?

23          MR. BURNHAM:  No, Your Honor.  We're good.

24          THE COURT:  All right.  Any redirect?

25          MR. HARBACH:  Yes, please, Judge.

| | |
|---|---|
| 1 | **REDIRECT EXAMINATION** |
| 2 | BY MR. HARBACH: |
| 3 | Q    Mr. Williams, you were asked a moment ago about a |
| 4 | Christmas party that Ms. McDonnell invited you to go to. |
| 5 |      Did you go to the party, sir? |
| 6 | A    No. |
| 7 | Q    You testified on cross-examination that -- and I |
| 8 | believe on direct also, that you mainly did contractor |
| 9 | work and the like for friends; is that right? |
| 10 | A    Yes.   That's -- it's mainly relatives or friends. |
| 11 | Q    Okay.   At the time that you first went over to |
| 12 | Mr. and Ms. McDonnell's residence, were they personal |
| 13 | friends of yours? |
| 14 | A    No. |
| 15 | Q    Why did you do the work for them? |
| 16 | A    Because Jonnie asked me to stop by there. |
| 17 |           MR. HARBACH:  Nothing else, Your Honor.  Thank |
| 18 | you. |
| 19 |           THE COURT:  All right. |
| 20 |      Thank you, sir.  You may stand down. |
| 21 |      (Witness stood aside.) |
| 22 |           THE COURT:  All right.  We're going to take the |
| 23 | afternoon break.  It will be 15 minutes. |
| 24 |      (The jury left the courtroom.) |
| 25 |           MR. BROWNLEE:  Judge, could we steal your ear |

1   just for a second.

2              THE COURT:  Sure.

3        (At Bench.)

4              MR. DRY:  This last witness, who is also on the

5   list, we didn't give them.  So they're not prepared to

6   cross.  And we have additional witnesses.  I think our

7   stuff is moving quicker than maybe anticipating, but -- no

8   one's fault.  We're just moving quicker.  We're going to

9   be done with our case, most likely, by Thursday.  We did

10  not give them additional names today so they are,

11  understandably, not prepared to cross.

12       If the Court is willing to take a break at this

13  point.

14             THE COURT:  Well, we'll get through what we have

15  and then go -- we'll just have to break early.

16             MR. DRY:  Do you want to break now or -- the

17  next witness is the one that they are not prepared to

18  cross on.  We do have a witness ready to go.  We have a

19  witness here ready to go, but they are not prepared to

20  cross that witness because we didn't give that name to

21  them before.  We're going to give them all of our

22  remaining witnesses' names so that this doesn't happen

23  again.

24             THE COURT:  Oh, jeez, man.  We don't have --

25             MR. DRY:  We can do the direct and the --

```
 1              THE COURT:  All right.  We'll do the direct, and
 2  then we'll give you all overnight to --
 3              MR. BROWNLEE:  Okay.  Thank you.
 4              MR. DRY:  Does that make sense?  The direct
 5  might take a while.  So I don't think we're going to break
 6  too early.
 7              MR. BROWNLEE:  Thank you, Judge.
 8        (Recess taken from 4:07 p.m. until 4:25 p.m.)
 9        (The jury entered the courtroom.)
10              THE COURT:  Call your next witness, please.
11              MR. FAULCONER:  Yes, Your Honor.  The
12  United States calls William Sessoms.
13                    WILLIAM SESSOMS, JR.,
14   called as a witness by and on behalf of the government,
15   having been first duly sworn by the Clerk, was examined
16                  and testified as follows:
17              MR. FAULCONER:  May I, Your Honor?
18              THE COURT:  Go ahead.
19                    DIRECT EXAMINATION
20  BY MR. FAULCONER:
21  Q    Good afternoon.
22  A    Good afternoon.
23  Q    Could you please state your name, and spell your last
24  for the court reporter.
25  A    William D. Sessoms, Jr.  S-E-S-S-O-M-S.
```

```
1   Q     And what is your -- what are your current

2   occupations?

3   A     I am President of Towne Financial Services Group and

4   Mayor of the City of Virginia Beach.

5   Q     And how long have you been the Mayor of Virginia

6   Beach?

7   A     Six years.

8   Q     And Towne Financial Services Group, is that what you

9   said?

10  A     Correct.

11  Q     Is that part of TowneBank?

12  A     Yes, it is.

13  Q     How long have you been with TowneBank?

14  A     I've been with TowneBank eight years.

15  Q     And how long in the current position that you have?

16  A     Approaching three.

17  Q     Now, where is the TowneBank location that you work

18  at?

19  A     In Virginia Beach, and it's 622nd Street.

20  Q     And TowneBank, does it offer mortgages to borrowers?

21  A     Yes, it does.

22  Q     Could you move the microphone just a little closer to

23  you?

24  A     I'd be glad to.

25  Q     Thanks.  Now, you said that TowneBank offers
```

1    mortgages, right?

2    A    Correct.

3    Q    And in the roles that you've served in, have you

4    overseen parts of that mortgage process?

5    A    Yes.

6    Q    And are you familiar with the types of documents that

7    you all have?

8    A    Yes.

9    Q    Now, you said that TowneBank offers mortgages.  Are

10   those sort of the typical 30-year mortgages or are they

11   usually different types of mortgages?

12   A    No, they are not.  They are usually short term.  In

13   the commercial bank, we have mortgages that might have a

14   30-year amortization, but could have anywhere from a one

15   year to five year, seven year type call.

16   Q    And are those sometimes interest-only loans?

17   A    Yes.  Sometimes.

18   Q    Now, do you also offer what's called a -- I think the

19   term is HELOC?

20   A    Yes.

21   Q    Could you explain what a HELOC is?

22   A    It's a home equity loan.

23   Q    And does HELOC stand for Home Equity Line of Credit?

24   A    Yes, it does.

25   Q    And could you explain, just briefly, what that is?

WILLIAM SESSOMS, JR. - DIRECT          3046

1  A    If someone has a residence and there's equity in

2  their home, they can establish a line of credit to use

3  that equity if and when they want to and be available to

4  them.

5  Q    All right.  Well, I'd like to transition to some of

6  your interactions with the McDonnells.

7  A    Okay.

8  Q    Can you explain -- have you met Mr. McDonnell?

9  A    Yes.

10  Q    Could you explain how you met Mr. McDonnell?

11  A    I -- I met Mr. McDonnell in the late '80s.  I had

12  just run on the City Council seat in Virginia Beach, and

13  he was just starting his political career, running for the

14  House of Delegates, and ended up supporting him and

15  working very hard for him.

16  Q    Would you consider him a friend?

17  A    Yes.

18  Q    And in the years that you've known him, have you

19  socialized with him and Ms. McDonnell?

20  A    Yes.

21  Q    All right.  Well, I'd like to focus in on your

22  interactions with them as President of TowneBank.

23  A    Okay.

24  Q    And can you tell us how -- did you end up doing some

25  loans with them?

1   A     Yes, I did.

2   Q     Can you tell us how it first came about that you were

3   doing some loan transactions with Mr. McDonnell?

4   A     This was a number of years ago.  I believe it was

5   2005 and 2006, if my memory is correct.  And they were

6   purchasing homes down at Sandbrige, and I had the

7   opportunity to offer them a mortgage loan on -- on one of

8   those and I believe a HELOC on another.

9   Q     And when you say "they were purchasing properties,"

10  did you actually talk to Mr. McDonnell about these loans?

11  A     Yes.

12  Q     And do you know who "they" were in that conversation?

13  A     He, his wife, and his sister.

14  Q     And his wife and his sister have the same name,

15  right?

16  A     Correct.

17  Q     Now, did he tell you how he was planning to buy the

18  properties?  Are these -- let me clarify that a little

19  bit.

20        Did he tell you how he was planning on running the

21  properties or what type of properties these were going to

22  be?

23  A     Yeah.  These would be rental properties and

24  investment properties.

25  Q     And did he tell you whether there was any sort of

1  entity that was going to be affiliated with running the

2  properties?

3  A    Not that I recall.

4  Q    Do you recall any conversation at any point about any

5  sort of partnership or entity with him and his sister?

6  A    Down the road, I believe there was one established.

7  Yes.

8  Q    But in terms of your interactions as TowneBank, did

9  you ever actually do any business with that entity or was

10 it always just with the individuals?

11 A    As I recall, the key reason I was making these loans

12 were the reason for their personal income and assets that

13 the three of them held.  I said, at one point, if they

14 were going to form a partnership or something along those

15 lines, however they wanted to do it would be fine as long

16 as they understood they would be personally guaranteeing

17 the debt.

18 Q    Got it.  So any business you did with them was a

19 personal guarantee?

20 A    Correct.

21 Q    All right.  Well, you said that there were two loans.

22 Do you remember, were there two properties as well?

23 A    Correct.

24 Q    And I'd like to show you what's been marked for

25 identification as Exhibit 41.

1              MR. FAULCONER:  And if we could just zoom out on

2    sort of the top third of that there.

3    BY MR. FAULCONER:

4    Q    Is this a document called a "Disbursement Request and

5    Authorization"?

6    A    Yes, it is.

7    Q    And is this one of the standard documents that will

8    be part of a TowneBank loan package?

9    A    Yes, it is.

10   Q    I'm sorry.  If you could just make sure to pull the

11   microphone over.

12   A    I picked up on that.  Got it.

13   Q    And does this appear to be for the first of the two

14   loans that you did with Mr. McDonnell and his sister?

15   A    I would believe so.  If my recollection, another loan

16   was made in 2006.  So -- this is in 2005.  So that's -- I

17   believe this was the first one.

18              MR. FAULCONER:  Your Honor, we'd offer Exhibit

19   41 into evidence.

20              THE COURT:  It will be admitted.

21   BY MR. FAULCONER:

22   Q    All right.  Now, Mr. Sessoms, what is the date under

23   "Loan Date" on this document?

24   A    September 23rd, 2005.

25   Q    And is that consistent with your recollection of when

1  the first loan was?

2  A    Yes.

3  Q    And what's the dollar amount on this loan?

4  A    $249,990.

5  Q    And is that consistent with your recollection of what

6  the loan amount was?

7  A    Yes.

8  Q    Now, earlier you said that you had both mortgages and

9  HELOCs.  Do you remember whether this was a mortgage or a

10 home equity line of credit?

11 A    I -- my recollection, this is a HELOC.

12 Q    And there under borrower, could you tell us what

13 names are listed under borrower?

14 A    "Robert F. McDonnell.  Maureen C. McDonnell."

15 Q    And do you recall whether, when it says "Maureen C.

16 McDonnell," is that the wife or the sister?

17 A    I don't recall.

18 Q    Well, in terms of whether you recall the initials or

19 not, do you recall whether the loan that you did was with

20 the wife and Mr. McDonnell or with the sister and

21 Mr. McDonnell?

22 A    The sister.

23 Q    Okay.  Now, when it says there "Borrower:  Robert F.

24 McDonnell, Maureen C. McDonnell," does that -- can you

25 tell, from looking at that, whether it was a personal

1  guarantee or a business guarantee?

2  A    This was a personal loan.  So that would result as

3  being a personal guarantee.

4  Q    All right.  So there's no MoBo or anything --

5  A    No.

6  Q    -- any entity like that on the paperwork?

7  A    No.

8  Q    All right.  I'd like to show you what's been marked

9  for identification as Exhibit 42.  Zooming in on the top

10 third or so there, is this a settlement statement that

11 appears to be for that same loan?

12 A    I'm looking for the date.

13 Q    Over in the sort of right, middle portion, there's a

14 box that says "Settlement Date."  Is that the same date?

15 A    Yes.

16         MR. FAULCONER:  Your Honor, we'd offer Exhibit

17 42 into evidence.

18         THE COURT:  It will be admitted.

19 BY MR. FAULCONER:

20 Q    Now, just looking at the -- where it says "Name and

21 Address of Borrower," again, what are the names that are

22 listed there?

23 A    "Robert F. McDonnell" and "Maureen C. McDonnell."

24 Q    And that address that's listed on Sandfiddler Road,

25 is that consistent with where you understood the

WILLIAM SESSOMS, JR. - DIRECT          3052

1  properties to be?

2  A    Yes.

3  Q    I'd like to show you now what's been marked for

4  identification as Exhibit 43.  Zooming in on that top

5  portion there, is this another "Disbursement Request and

6  Authorization"?

7  A    Yes, it is.

8  Q    And does this appear to be for the other loan?

9  A    Yes, it does.

10  Q    And what's the loan date on this?

11  A    3/1/2006.  March 1st, 2006.

12        MR. FAULCONER:  Your Honor, we'd offer Exhibit

13  43 into evidence.

14        THE COURT:  It will be admitted.

15  BY MR. FAULCONER:

16  Q    Now, what's the dollar amount listed on this loan?

17  A    $722,550.

18  Q    And under "Borrower," again, who's listed on this

19  document as the borrower?

20  A    "Robert F. McDonnell" and "Maureen C. McDonnell."

21  Q    Is there anything about MoBo Realty on this document?

22  A    No, there's not.

23  Q    All right.  Now, do you recall what type of loan this

24  was in terms of when you were earlier talking about

25  30-year mortgages versus more short-term mortgages?

1   A    This would have a long-term amortization, which could

2   be a 20- to 30-year mortgage -- I don't recollect the

3   term -- with a call of a number of years less than that,

4   20 to 30 years.  Probably five years, I believe.

5   Q    Okay.

6   A    I'd have to look at it closer.

7   Q    Got it.  And we may have some documents later on

8   that.

9   A    Okay.

10  Q    But do you recall whether or not, during the initial

11  period of this loan, whether principal was being repaid or

12  whether it was interest only?

13  A    I believe -- we started with interest only, as I

14  recall.

15  Q    Now, I'd like to show you what's been marked for

16  identification as Exhibit 44.  And is this a settlement

17  statement?

18  A    Yes, it is.

19  Q    And the date there, sort of in the middle, right-hand

20  portion, under "Settlement Date," is that the same date --

21  A    Yes, it is.

22  Q    -- as the document we were just looking at?

23  A    Yes, it is.

24         MR. FAULCONER:  Your Honor, we'd offer Exhibit

25  44 into evidence.

WILLIAM SESSOMS, JR. – DIRECT          3054

1        THE COURT:  It will be admitted.

2   BY MR. FAULCONER:

3   Q    Now, Mr. Sessoms, do you recall that the first

4   settlement statement we were looking at says 3113

5   Sandfiddler.  Am I right about that?

6   A    Yes, sir.

7   Q    Okay.  And this one is 3112; is that right?

8   A    Yes.

9   Q    And do you recall the properties being relatively

10  close in proximity to each other?

11  A    Yes.

12        MR. FAULCONER:  Now, if we could go back briefly

13  to Exhibit 43.  I apologize, Mr. Starnes.

14  BY MR. FAULCONER:

15  Q    The dollar amount on that one is what, again?

16  A    $722,550.

17  Q    And do you recall the combined loan exposure being

18  somewhere around a million dollars?

19  A    Yes, I do.

20  Q    Now --

21        MR. FAULCONER:  We can take that down.

22  BY MR. FAULCONER:

23  Q    Now, at the time that you extended these loans, you

24  said you had conversations with Mr. McDonnell about them.

25  Do you recall what, if anything, he told you about how he

1  intended to pay for the mortgages?

2  A    Well, the -- the hope is, you know, the rental income

3  would be a big part of paying it.  At the same time, it

4  was investment property.  And there was no guarantee that

5  that would be available.  But the vast majority should be

6  paid by the rental income generated by the property.

7  Q    And do you recall him telling you; that he believed

8  that there would be sufficient income to cover the

9  mortgages?

10 A    I don't recall that specifically, but that, I

11 believe, was the intent.

12        MR. FAULCONER:  Your Honor, I'd like to hand the

13 witness a document for purposes of refreshing his

14 recollection.

15 BY MR. FAULCONER:

16 Q    And, sir, if you could just take a look at the bottom

17 of Page 24, on to the top of Page 25.  Starting on Page

18 24, line 19.  And if you could read through the bottom of

19 that page on 24.

20 A    Start at line 19?

21 Q    Yes.  Just read it to yourself.  Don't read it out

22 loud.

23 A    Oh, okay.

24 Q    Starting on line 19 on Page 24, down to the bottom,

25 and then on to the next page, down to line 24 on the next

1    page.

2         Have you gotten a chance to read that?

3    A    Yes, uh-huh.

4    Q    All right.  Does that refresh your recollection about

5    whether or not -- about whether or not the subject of the

6    rentals covering the mortgage payments came up in your

7    conversation with -- with the Governor?

8    A    Correct.

9    Q    And what was the conversation?

10   A    If I read through the whole thing, it's basically

11   what I just said.  But I do say that it's expected that

12   the rents will cover the debt service.

13   Q    And that was based on what Mr. Mr. McDonnell told

14   you?

15   A    Yes.

16   Q    Now, I'd like to talk about how things sort of

17   unfolded with these loans as time went along.  I'd like to

18   show you what's been marked for identification as Exhibit

19   518.  And zooming in on sort of top portion of this, is

20   this a "TowneBank Loan Transaction History"?

21   A    Yes, it is.

22   Q    And is this for the smaller of the two loans?

23   A    Yes, it is.

24        MR. FAULCONER:  Your Honor, we'd offer Exhibit

25   518 into evidence.

```
 1              THE COURT:  It will be admitted.
 2   BY MR. FAULCONER:
 3   Q    Now, I see there at the top, it starts with
 4   January 1st, 2009.  Am I correct that the loan actually
 5   started a number of years earlier, back in '05, right?
 6   A    Correct.
 7   Q    So is this a transaction history that just goes from
 8   the beginning of '09 until sometime in 2013?
 9   A    I just see the two dates, '09.  But I'm assuming
10   that's correct.
11              MR. FAULCONER:  Now, if we could -- okay.  Now,
12   if we could zoom back out, Mr. Starnes.  I apologize.
13   BY MR. FAULCONER:
14   Q    All right.  Now, Mayor Sessoms, have you had a chance
15   to review this document before coming in to testify?
16   A    Yes.
17              MR. FAULCONER:  And if we could turn to the
18   second page of this document, and if we could zoom in on
19   the entry on 4/24/2009.
20   BY MR. FAULCONER:
21   Q    Could you tell us what's indicated there on
22   4/24/2009?
23   A    A late fee of $28.22.
24   Q    And, Mayor Sessoms, could you tell us, is that the
25   only late fee that's listed in this document?
```

```
1   A     No, it's not.

2   Q     Have you had an opportunity to count how many late

3   fees are shown on this document from 2009 to 2013?

4   A     I did.

5   Q     Do you recall how many there are?

6   A     I don't.

7   Q     All right.  Let me give you a moment, and I can hand

8   you a paper copy.

9              MR. FAULCONER:  And for the record, Your Honor,

10  this is a paper copy of Exhibit 518.

11             THE COURT:  All right.

12             THE WITNESS:  Thank you.

13  BY MR. FAULCONER:

14  Q     All right.  Now, Mayor Sessoms, if you could start

15  with the first page of this document.  And I don't -- do

16  you see any late fees on the first page?

17  A     I do not.

18  Q     All right.  On the second page, can you tell us how

19  many late fees you see on the second page of this

20  document?

21  A     Two.

22  Q     And turning to the third page, can you tell us how

23  many late fees are indicated on the third page?

24  A     One.

25  Q     So that -- so we're up to three now.  Turning to the
```

1  fourth page, could you tell us how many additional ones

2  are on the fourth page?

3  A    One.

4  Q    All right.  So that's up to four.  Turning to the

5  fifth page, how many are located on that one?

6  A    Two.

7  Q    All right.  Is that six now?  Am I right?  I

8  shouldn't do math in public, but is that right?

9  A    Yeah.

10  Q    Now, on to the sixth page, how many late fees are

11  indicated on the sixth page?

12  A    One.

13  Q    So that being seven.  Turning on to the seventh page,

14  are there any located on that seventh page?

15  A    No.

16  Q    Turning to the eight -- eighth page, am I correct

17  that there are two located on that page?

18  A    Yes.

19  Q    All right.  So that being up to nine.  Turning to

20  Page 9, am I correct that there is a tenth late fee on

21  Page 9?

22  A    Yes.

23  Q    Turning to Page 10, am I correct that there are no

24  late fees on Page 10?

25          MR. BROWNLEE:  We don't object if Mr. Faulconer

1    wants to give the final number, and we'll agree with it.

2              THE COURT:  He said he didn't remember the final

3    number.  So we have to do this.

4    BY MR. FAULCONER:

5    Q    Okay.  So turning to Page 10, are there any late fees

6    on that page?

7    A    No.

8    Q    Turning to Page 11, am I correct that there is an

9    11th and a 12th late fee on that page?

10   A    Correct.

11   Q    Turning to Page 12?

12   A    Two of them.

13   Q    So that would be up to 14.  Am I right?

14   A    Correct.

15   Q    Okay.  And then on to Page 13, how many late fees

16   there?  Are there two?

17   A    Yes, two.

18   Q    All right.  So we're up to 16.  Turning to Page 14,

19   how many are on that page?

20   A    Two.

21   Q    I'm sorry.  How many is that?

22   A    Two.

23   Q    All right.  So we're up to 16.  How many on Page 15?

24   A    I don't see any.

25   Q    Okay.  On to Page 16?

1    A    Don't see any.

2    Q    On to Page 17?

3    A    Do not see any.

4    Q    All right.  Now, regardless of whether or not you and

5    I just doing that math was correct, are all the late fees

6    from that time period located on that document?

7    A    Yes.

8    Q    And do you recall there being late fees, at times, on

9    this loan?

10   A    Yes, I do.

11   Q    All right.  I'd like to show you what's been marked

12   for identification as Exhibit 519.  And zooming in on the

13   top, is this a loan transaction history for the other

14   larger one of the loans?

15   A    Yes, it is.

16   Q    Now, without --

17          MR. FAULCONER:  Your Honor, we'd offer Exhibit

18   519 into evidence.

19          THE COURT:  It will be admitted.

20   BY MR. FAULCONER:

21   Q    And, Mayor Sessoms, have you had a chance, at some

22   point, to look over this document?

23   A    Yes, I have.

24   Q    And without asking you to, necessarily, count this

25   one up, does it seem about accurate that there are

WILLIAM SESSOMS, JR. - DIRECT          3062

1    somewhere in the range of 29 late fees on this document?

2    A     Yes.

3    Q     And is that consistent with your recollection of how

4    this loan unfolded over time?

5    A     Yes.

6    Q     All right.

7              MR. FAULCONER:  We can take that down.

8    BY MR. FAULCONER:

9    Q     All right.  So we've talked a little bit about late

10   fees.  Can you tell us whether you ever discussed those

11   late fees with Mr. McDonnell?

12   A     What I discussed would be late payments.

13   Q     Probably scoot back from the microphone just a little

14   bit.

15   A     And just acknowledging that we just don't want the

16   loan to go 30 days past due.

17         These payments, the late payment was at 15 days, as I

18   recall.  But that would be the extent of just saying we

19   cannot let those payments go up to 30 days past due.

20   Q     All right.  Just lean back just a little bit.  Sorry.

21         Now, can you explain what you mean by the late fee

22   coming at 15 days and not wanting it to go to 30 days?

23   What would happen at 30 days?

24   A     We consider a loan reportable to the Board when it

25   goes 30 days past due.

WILLIAM SESSOMS, JR. - DIRECT          3063

1   Q    Got it.

2   A    And that's something we always try to avoid.  We want

3   to make sure all the payments are in prior to that date.

4   Q    And at times during the course of these loans, in

5   that 15- to 30-day period, or at least between the late

6   fee and whenever the 30 days would come, would you have

7   conversations with Mr. McDonnell about them?

8   A    Yes.

9   Q    And would you tell him that -- what would happen if

10  it went 30 days overdue?

11  A    Yes.

12  Q    And what would usually happen at that point?

13  A    If it goes to the Board, in other words, it hits a

14  Board report, and that would have an impact on your

15  credit.

16  Q    And about how many of these conversations would you

17  say you had with Mr. McDonnell?

18  A    I don't recall off the top of my head.

19       Is it somewhere in here?

20  Q    Well, let me ask you this way.  Was it more than just

21  two or three?

22  A    I would say more than two or three.  Yes.

23  Q    Now, as time went on, over the course of these loans,

24  did you also have conversations with Mr. McDonnell about

25  him trying to get more permanent financing for these

1  properties?

2  A    Yes, I did.

3  Q    And could you tell us what happened in those

4  conversations?

5  A    Well, as you know, interest rates were extremely low

6  during this time period, and he wanted to take advantage

7  of getting the lowest interest rate and, again, fixed for

8  a longer term.

9       As I shared with you, we have an amortization that

10 might be long, but the loan would be callable in a shorter

11 term period.  It was his desire to get a long-term rate of

12 20 to 30 years at a fixed rate for that term, also with

13 the market being, you know, low interest rates like they

14 were.

15 Q    And about how often do you think you had

16 conversations with him, in terms of how often annually,

17 about potentially getting more permanent financing?

18 A    I'd say we probably had that annually.

19 Q    And was that from the time that the loan started in

20 '05 on through until at least 2012?

21 A    I would say that's fair.  Because he always was

22 trying to get a long-term interest rate, you know,

23 especially with the rates being low, yes.

24 Q    Now, can you recall what he told you about whether or

25 not he was able to get, at least from 2005 to 2011,

1    whether he was actually able to get that refinancing?

2    A    He was having issues getting refinanced because the

3    real estate market had turned, and as such, the values of

4    the properties had decreased and that would result in not

5    being an acceptable loan to value on trying to obtain the

6    permanent financing.

7    Q    Now, what about any conversations about something we

8    had talk about earlier, about whether or not the rentals

9    were covering the mortgage payments?  Did you have

10   conversations with Mr. McDonnell about that?

11   A    Yes.

12   Q    And can you tell us what you recall about whether or

13   not the rental payments were covering the mortgage

14   payments?

15   A    It -- they were not covering it, and they were using

16   their personal assets to cover the debt service.

17   Q    And do you recall about how much there was in a gap?

18   A    I do not.

19   Q    Now, I'd like to show you what's been marked for

20   identification as Exhibit 227.  Zooming in on the top

21   there, is this a document called a "Change in Terms

22   Agreement"?

23   A    Yes, it is.

24   Q    And is it dated August 30th of 2011?

25   A    Yes, it is.

1  Q    And does this pertain to the larger of the two loans

2  we've been discussing?

3  A    Yes, it does.

4          MR. FAULCONER:  Your Honor, we'd offer Exhibit

5  237 into evidence.

6          THE COURT:  It will be admitted.

7  BY MR. FAULCONER:

8  Q    All right.  Now, Mayor Sessoms, do you recall -- this

9  is, I guess -- am I correct that this is about five years

10  after the loan had started in 2006?

11  A    That would be correct.

12  Q    Do you recall the terms in the loan changing in 2011?

13  A    I -- I do.

14  Q    Looking at this document where it says "Description

15  of Change in Terms," what does it say the change in terms

16  is?

17  A    It says, "Description of Change in Terms."  Is that

18  what you're looking at?

19  Q    Yes.  Could you just read what it says there?

20  A    "Change payments from interest only to principal and

21  interest payments; fixed rate of 2.75 will expire on

22  September 28, 2012."

23  Q    All right.  So before this time, they had just been

24  interest payments; is that right?

25  A    Correct.

1   Q    And then after this time, what was going to change?

2   A    We would be getting a principal payment as well as

3   interest.  In other words, we would start collecting

4   principal.  The loan had been extended for five years,

5   which is about right on an interest only, and then we had

6   to start terming it out.

7   Q    Now, where it says "fixed rate of 2.75 percent will

8   expire on September 28, 2012," what does that mean in

9   terms of that only being about a year from when this

10  document is dated?

11  A    Well, two things.  First of all, the rent -- the

12  interest rate is lowest -- lower because it's only a

13  one-year commitment.  And then secondly, the intent of

14  trying to find permanent financing.

15  Q    So at this time, what was going to happen about a

16  year from then, or so?

17  A    We'd have the option to reprice the loan, renew the

18  loan or call the loan.

19  Q    And is it typical for you, when you have situations

20  like this, to do sort of an annual review after that year

21  is up?

22  A    Absolutely.

23  Q    And based on your review of the bank files from

24  TowneBank on these loans, was there a renewal process the

25  following year?

1  A    Yes.

2  Q    As part of that, do you request a personal financial

3  statement?

4  A    Yes.

5  Q    I'd like to show you what's been marked for

6  identification -- sorry.  Real quick.

7       Could you tell us what it means to call a loan?  You

8  used that terminology.

9  A    We have the ability to demand payment for the loan to

10 be paid in full.

11 Q    Got it.  And does that allow you, then, to go after

12 somebody's assets if they say no?

13 A    Yes.

14 Q    Now, I'd like to go back to showing you what's been

15 marked for identification as Exhibit 416.  And is this a

16 personal financial statement -- if we could scroll up to

17 include the top portion.

18      Is this a personal financial statement that was

19 located in the TowneBank file for these loans?

20 A    Yes, it is.

21           MR. FAULCONER:  Your Honor, we'd offer Exhibit

22 416 into evidence.

23           THE COURT:  It will be admitted.

24 BY MR. FAULCONER:

25 Q    All right.  Now, Mayor Sessoms, looking at this page,

1   I see there that it says "TowneBank" at the top, but it

2   says "Heritage Bank" on the actual top of the document.

3   A    Correct.

4   Q    Do you accept personal financial statements that are

5   filled out on a different bank's form, at times?

6   A    Yes.

7   Q    And did you do that in this case?

8   A    Yes.

9   Q    All right.  Looking at this document, can you tell us

10  whose handwriting is on that first page?

11  A    It's Mr. McDonnell's.

12       MR. FAULCONER:  And if we could zoom out.

13  BY MR. FAULCONER:

14  Q    Zooming in on the numbers that are there towards the

15  bottom, is that also Mr. McDonnell's handwriting?

16  A    Yes, it is.

17  Q    All right.

18       MR. FAULCONER:  Turning to the second page.

19  BY MR. FAULCONER:

20  Q    Have you had a chance to review this second page as

21  well?

22  A    At some point, yes.

23  Q    And do you recognize the handwriting on it?

24  A    Yes.

25  Q    Whose is it?

1   A    Mr. McDonnell's.

2   Q    All right.  Turning to the third page, do you

3   recognize the handwriting on this page?

4   A    Mr. McDonnell's.

5   Q    Turning to the fourth page, do you recognize the

6   handwriting on the fourth page?

7   A    Mr. McDonnell's.

8   Q    Now, turning back to Page 1 of this document, zooming

9   in on the box on the lower right-hand corner, do you see

10  there where it says $2,075,000 under "Total Liabilities"?

11  A    Yes, I do.

12  Q    Sir, is there anything listed on this document under

13  "Other Loans Payable"?

14  A    No, there's not.

15  Q    Where it says "Loans on Life Insurance," am I correct

16  that there's about $4,000 listed there?

17  A    Correct.

18  Q    "Taxes Due, Income," there's nothing listed, right?

19  A    Correct.

20  Q    How much is listed under "Credit Card or Accounts

21  Payable"?

22  A    10,000.

23  Q    Is there anything listed under "Liabilities of

24  Proprietorships"?

25  A    No, there's not.

1  Q    Is there anything listed under "Liabilities of

2  Partnerships or Joint Ventures"?

3  A    No.

4  Q    Is there a number there of about $2,061,000 for loans

5  on wholly owned real estate.

6  A    Yes, there is.

7          MR. FAULCONER:  If we could zoom back out.

8  A    Excuse me?

9  BY MR. FAULCONER:

10 Q    Sorry.  I'm just asking Mr. Starnes to zoom back out.

11     Now, Mayor Sessoms, in the chance that you've had to

12 review this document, have you looked at it to see whether

13 or not there's anything about any loans from Jonnie

14 Williams or Starwood Trust on this document?

15 A    I have looked at that.

16 Q    And is there any reference to any loan from Jonnie

17 Williams or Starwood Trust on this document?

18 A    No, there's not.

19 Q    All right.  Now, I'd like to show you what's been

20 marked for identification as Exhibit 373.  Mr. Sessoms,

21 does this appear to be a version of that same document

22 with the same handwriting, but just a different fax header

23 on it?

24 A    Yes, sir.

25          MR. FAULCONER:  Your Honor, we'd offer Exhibit

1  373 into evidence.  It's been stipulated as a business

2  record.

3            THE COURT:  It will be admitted.

4            MR. FAULCONER:  Now, if we could take that down.

5  BY MR. FAULCONER:

6  Q    I'd like to show you what's been marked for

7  identification as Exhibit 106.  Mr. Sessoms, is that

8  another Heritage Bank personal financial statement?

9  A    Yes, it is.

10 Q    Now, to be clear, was this one in your TowneBank

11 files?

12 A    I don't see where it says TowneBank anywhere on it.

13 Q    Got it.  But I --

14           MR. FAULCONER:  Your Honor, I'm simply going to

15 ask him about recognizing handwriting.  It's a stipulated

16 business record.

17           THE COURT:  All right.

18 BY MR. FAULCONER:

19 Q    Mr. Sessoms, on this first page of this document, do

20 you recognize the handwriting?

21 A    Yes, I do.

22 Q    Whose handwriting it is?

23 A    Mr. McDonnell's.

24           MR. FAULCONER:  If we could zoom back out.  And

25 if we could just flip through the second page.

1   BY MR. FAULCONER:

2   Q    Is that also Mr. McDonnell's handwriting?

3   A    Yes.

4   Q    The third page, is that Mr. McDonnell's handwriting?

5   A    Yes.

6   Q    And the fourth page --

7   A    Yes.

8   Q    -- is that also his handwriting?

9        Sorry.  Was that a yes?

10  A    Yes.

11  Q    And then on the fifth page, is that also

12  Mr. McDonnell's handwriting?

13  A    Yes.

14  Q    All right.

15           MR. FAULCONER:  We can take that down.

16  BY MR. FAULCONER:

17  Q    Now, I'd like to show you what's been marked for

18  identification as Exhibit 417.

19           MR. FAULCONER:  All right.  And zooming in --

20  yes.

21  BY MR. FAULCONER:

22  Q    All right.  Now, is this a credit report for

23  Mr. McDonnell?

24  A    Yes, it is.

25  Q    And where you see there under "User ID," do you

1  recognize who that indicates is the user ID?

2  A    Yes, I do.

3  Q    And is that -- who does it indicate?

4  A    Denise Stolle.  She was a loan administrative person

5  at the bank.

6           MR. FAULCONER:  Your Honor, we'd offer Exhibit

7  417 into evidence.

8           THE COURT:  It will be admitted.

9  BY MR. FAULCONER:

10 Q    Now, Mr. Sessoms, before coming in to testify, have

11 you had a chance to review this document?

12 A    Yes, I have.

13 Q    And on this document, are there any loans from Jonnie

14 Williams or Starwood Trust listed?

15 A    No.

16 Q    Now --

17          MR. FAULCONER:  We can take that down.

18 BY MR. FAULCONER:

19 Q    Now, to be clear, Mr. Sessoms, you've been in banking

20 for a while, are personal undocumented loans typically put

21 on credit reports?

22 A    Yes -- oh, no.  Not on credit reports, no.

23 Q    So how do you find out about them if there is an

24 undocumented loan?

25 A    On a financial statement.

1  Q    Now, was the loan that was being reviewed in 2012

2  ultimately renewed?

3  A    Yes.

4  Q    I'd like to show you what's been marked for

5  identification as Exhibit 423.  Zooming in on the top half

6  of this, is this the document that shows that loan being

7  renewed?

8  A    Yes, it does.

9           MR. FAULCONER:  Your Honor, we'd offer Exhibit

10 423 into evidence.

11          THE COURT:  It will be admitted.

12 BY MR. FAULCONER:

13 Q    Now, Mayor Sessoms, this says, "Loan Change

14 Authorization."  From looking at the loan amount on this

15 document, can you tell whether this was the larger or the

16 smaller of the two loans?

17 A    It's the large loan.  And you can see where the

18 principal has been reduced.

19 Q    Got it.  So over the course of the -- I guess how

20 long is it, about six years now, since the 2006

21 origination?

22 A    Yes.

23 Q    About how much had been paid down in principal?

24 A    15,000.

25 Q    And, Mayor Sessoms, at any time before this loan

1  change was finalized, whether it was on the phone or in

2  person, did you have any conversations with Mr. McDonnell

3  in which he told you anything about loans from Jonnie

4  Williams or Starwood Trust?

5  A    No.

6        MR. FAULCONER:  One moment, Your Honor.

7        (Counsel conferring with co-counsel.)

8        MR. FAULCONER:  No further questions, Your

9  Honor.

10       THE COURT:  Thank you.

11     All right.  Ladies and gentlemen, we're going to have

12  to stop a little early today.  I'm sorry about that, but

13  it couldn't be helped.

14     I have some instructions that I'm going to give you,

15  repeating what I told you earlier, but simply for

16  emphasis.  And as I said, I'm simply repeating what I told

17  you earlier, but I want you to listen to me.

18     I instruct you that during the trial, you are not to

19  discuss the case with anyone or permit anyone to discuss

20  it with you.  Until you retire to the jury room at the end

21  of the case to deliberate on your verdict, you simply are

22  not to talk about this case.  And that means between

23  yourselves as well as outsiders.  It also means you are

24  not to discuss what goes on in the jury room with anyone

25  outside.

1    Second, do not read or listen to anyone or anything

2    touching on this case in any way.  If anyone should try to

3    talk to you about it, bring it to the Court's attention

4    promptly.

5    Third, do not try to do any research or make any

6    investigation about the case on your own.  Everything that

7    you will learn about this case should come here in open

8    court.  And finally, do not form any opinion until all of

9    the evidence is in.  Keep an open mind until you start

10   your deliberations at the end of the case.

11   So jealously guard your -- the juror's prerogative

12   and privacy in this matter.  Do not discuss this case with

13   anyone.  You will find that we are absolutely serious

14   about this.

15   And the reason for this should be clear.  We want a

16   fair trial.  We want a fair trial for these defendants as

17   well as the government.  A fair trial.  And they can only

18   get a fair trial from a jury that's unbiased and impartial

19   and follows the instructions of the Court.

20   So everybody understand it?  You hear it?  All right.

21   Great.

22   Now, we will see you tomorrow -- let me give you a

23   time.  Again, it will be 9:45.  So we will see you in the

24   morning.  You all take care, and we will see you at 9:45

25   sharp.

1        (The jury left the courtroom.)

2        (The trial adjourned at 5:03 p.m.)

```
 1                        I N D E X

 2
                             WITNESSES
 3
    Examination By:                              Page
 4
                         JERRY KILGORE
 5  Direct Cont'd    – MR. DRY              2832
    Cross            – MR. BROWNLEE         2833
 6  Cross            – MR. BURCK            2849
    Redirect         – MR. DRY             2857
 7
                         EMILY RABBITT
 8  Direct           – MS. ABER             2861
    Cross            – MR. ASBILL           2875
 9  Cross            – MR. HAUSS            2877

10                  DR. GEORGE VETROVEC
    Direct           – MR. FAULCONER        2879
11  Cross            – MR. ASBILL           2897
    Cross            – MS. MARTIN           2914
12  Redirect         – MR. FAULCONER        2917

13                      AMY BRIDGE
    Direct           – MS. ABER             2917
14  Cross            – MR. ASBILL           2921
    Cross            – MR. BURCK            2924
15
                      CHARLES HAGAN
16  Direct           – MS. ABER             2926
    Cross            – MR. BURCK            2939
17  Cross            – MR. BROWNLEE         2982
    Redirect         – MS. ABER             2991
18
                       JAMES LYONS
19  Direct           – MS. ABER             2996
    Cross            – MR. BURCK            3003
20  Cross            – MR. ASBILL           3006

21                   DONNIE WILLIAMS
    Direct           – MR. HARBACH          3009
22  Cross            – MR. HAUSS            3027
    Redirect         – MR. HARBACH          3041
23
                   WILLIAM SESSOMS, JR.
24  Direct        – MR. FAULCONER           3043

25
```