```
 1                    IN THE UNITED STATES DISTRICT COURT
                     FOR THE EASTERN DISTRICT OF VIRGINIA
 2                            RICHMOND DIVISION

 3      -----------------------------------------

 4      UNITED STATES OF AMERICA,

 5
                                        Plaintiff;
 6      v.                                           Criminal Action
                                                        3:14CR12
 7      ROBERT F. McDONNELL and
        MAUREEN G. McDONNELL,
 8                                      Defendants.

 9      -----------------------------------------

10                            August 13, 2014
                              Richmond, Virginia
11                               9:45 a.m.

12                       JURY TRIAL - VOLUME XIII

13      BEFORE:          HONORABLE JAMES R. SPENCER
                         United States District Judge
14

15      APPEARANCES:     MICHAEL S. DRY, ESQ.
                         DAVID V. HARBACH, II, ESQ.
16                       JESSICA D. ABER, ESQ.
                         RYAN S. FAULCONER, ESQ.
17                            Counsel for Government;

18                       JOHN L. BROWNLEE, ESQ.
                         HENRY W. ASBILL, ESQ.
19                       JAMES M. BURNHAM, ESQ.
                         DANIEL I. SMALL, ESQ.
20                       CHRISTOPHER M. IAQUINTO, ESQ.
                         OWEN T. CONROY, ESQ.
21                            Counsel for Robert F. McDonnell;

22                       WILLIAM A. BURCK, ESQ.
                         HEATHER H. MARTIN, ESQ.
23                       STEPHEN M. HAUSS, ESQ.
                         DANIEL KOFFMANN, ESQ.
24                            Counsel for Maureen G. McDonnell.

25                          JEFFREY B. KULL
                         OFFICIAL COURT REPORTER
```

3081

```
 1                      P-R-O-C-E-E-D-I-N-G-S
 2              THE CLERK:  Day thirteen, Case Number 3:14CR12:
 3    United States of America versus Robert F. McDonnell and
 4    Maureen G. McDonnell.  The government is represented by
 5    Michael Dry, David Harbach, Jessica Aber, and Ryan
 6    Faulconer.  Robert F. McDonnell is represented by John
 7    Brownlee, Henry Asbill, Daniel Small, James Burnham, and
 8    Christopher Iaquinto.  Maureen G. McDonnell is represented
 9    by Heather Martin, William Burck, Stephen Hauss, and
10    Daniel Koffmann.  Are counsel ready to proceed?
11              MR. DRY:  The United States is ready to proceed.
12              MR. ASBILL:  Mr. McDonnell is ready, Your Honor.
13              MR. BURCK:  Maureen McDonnell is ready.
14              THE COURT:  I understand you had some
15    preliminary issues.
16              MR. ASBILL:  The parties are trying to figure
17    out scheduling for this week and the beginning of next
18    week.  We subpoenaed a lot of witnesses for the 18th
19    anticipating the government's case would go through the
20    end of this week, and we understood that Friday afternoon
21    was going to be off for other matters.  There is the
22    motion hearing pursuant to the motion that the Washington
23    Post has filed.  So we are really trying to figure out
24    Thursday and Friday of this week and what you want to do,
25    and we are trying to accomodate that.  I'm not sure of
```

1   precisely when the Government's case is going to end.

2          MR. DRY:  The government can't say when its case

3   is going to end precisely.  Based on the pace, our summary

4   witness may be on as early as this afternoon.  We don't

5   know what the length of cross is, but we anticipate that

6   we will be resting sometime tomorrow.

7          THE COURT:  All right.  This is what I would

8   envision.  If we finish with the government's case

9   tomorrow, then I would give the jury Friday off while we

10  deal with your end-of-government-case motions Friday

11  morning.  And then, of course, we have the media issue at

12  noon on Friday.  And then Monday we would get started with

13  your case.

14         MR. ASBILL:  That's fine, sir.

15         THE COURT:  Okay?

16         MR. ASBILL:  That's fine.

17         THE COURT:  So we may have some, you know, some

18  down time tomorrow if we finish early tomorrow, but it

19  can't be helped.

20         MR. ASBILL:  Thank you, sir.

21         MR. DRY:  Thank you, sir.

22         THE COURT:  All right.  Bring in the jury.

23      (The jury entered the courtroom.)

24                    CROSS-EXAMINATION

25  BY MR. BROWNLEE:

1   Q    Mr. Sessoms, good morning.  My name is John Brownlee.

2   I represent Bob McDonnell, and I have some questions for

3   you this morning.  First of all, you had testified

4   yesterday you are the President of TowneBank; is that

5   correct?

6   A    President of Towne Financial Services Group.  I was

7   President of Townebank-Virginia Beach a few years ago.

8   Q    Okay.  And is TowneBank Financial Services, is the

9   bank part of that?

10  A    Yes.

11  Q    Okay.  Now, it is my understanding that you have met

12  with the government twice on both August 8th, 2013, and

13  again on July 1st, 2014; does that sound about right?

14  A    It does.

15  Q    You have also then testified in the grand jury, I

16  believe, on November 6th, 2013; is that correct?

17  A    That sounds right.

18  Q    Sir, the document at issue in this case as it

19  pertains to TowneBank is Government Exhibit 416.  Could we

20  pull that up?  If you could blow up the top part of that.

21  Now, Mr. Sessoms, this is in evidence.  This is a personal

22  financial statement that was submitted to your bank, it is

23  actually for a Heritage Bank, but it was submitted to your

24  bank by Robert McDonnell; is that correct?

25  A    Yes, sir.

WILLIAM SESSOMS, JR. - CROSS - BROWNLEE      3084

1   Q    This is dated April 30th, 2012; is that correct?

2   A    Yes.

3   Q    Okay.  And this is filled out by one person, Robert

4   McDonnell; is that right?

5   A    Yes.

6   Q    Okay.  Now, if you look down, if you scroll down just

7   a bit, there is a block there in the middle.  It says,

8   "You may apply for credit individually or jointly with

9   another party."  Is that correct?

10  A    Yes.

11  Q    So the person filling out this form has an option.

12  They can go by themselves or jointly; is that correct?

13  A    That's correct.

14  Q    And below that is the place where you pick which one.

15  And in this case, Mr. McDonnell picked Individual

16  Financial Statement.  Is that correct?

17  A    Yes.

18  Q    Below that, it says, it is a little hard to read, but

19  it says, "Does not include jointly-held assets."  Is that

20  correct?

21  A    Yes.

22  Q    Okay.  Then below that, it says, "If joint, complete

23  the following."  And there is an area there below for

24  information, and that is blank in this form; is that

25  correct?

1   A    Yes.

2   Q    So from this information, this is an individual

3   personal financial statement, not a joint financial

4   statement; is that right?

5   A    Yes.

6   Q    And therefore, it only requires information

7   pertaining to Mr. McDonnell and not his wife; is that

8   right?

9   A    Yes.

10  Q    Okay.  We can take down the highlights and just kind

11  of leave up the document.

12       Now, Mr. Faulconer asked you at the close of your

13  testimony yesterday whether loans that were provided by

14  Mr. Williams were on this form.  Do you remember that

15  question?

16  A    Yes, I do.

17  Q    And you answered no.

18  A    Yes, that's correct.

19  Q    Well, I want to talk about those loans in relation to

20  this form.  First of all, the first, if we could pull up

21  RM-0896.  No, no, keep going.  Scroll down.  There you go.

22            MR. BROWNLEE:  I believe this is in evidence as

23  a government's exhibit number.  I'm not sure what the

24  government's exhibit number is.

25            MR. FAULCONER:  That's right, Your Honor, at

WILLIAM SESSOMS, JR. - CROSS - BROWNLEE    3086

```
1    least this page is.
2              MR. BROWNLEE:  This is in evidence.  If we could
3    publish this.
4              THE COURT:  All right.
5    BY MR. BROWNLEE:
6    Q    And this is a check from Starwood Trust to Maureen
7    McDonnell for $50,000.  And this, Mr. Sessoms, is the loan
8    that Mr. Williams gave to Ms. McDonnell on --
9              MR. FAULCONER:  I object to that.  The check is
10   made out to Ms. McDonnell.  Mr. Brownlee is testifying
11   about who the loan is to.
12             THE COURT:  Sustained.
13   BY MR. BROWNLEE:
14   Q    This is made out to Ms. McDonnell, correct?
15   A    Correct.
16   Q    If you look at the deposit slip below it, that's
17   signed by Ms. McDonnell; is that correct?
18   A    Yes.
19   Q    Okay.  Now, Mr. McDonnell's name does not appear
20   anywhere on this check; is that correct?
21   A    Yes.
22   Q    Okay.  Now, could we pull up RM-2058?
23             MR. BROWNLEE:  Court's indulgence for a moment,
24   Your Honor.  We will do this the old fashioned way.
25             THE COURT:  Go ahead.
```

1               (Document proffered to witness.)

2    BY MR. BROWNLEE:

3    Q    This is an account showing on May 25th, where there

4    is a deposit of $50,000.  Do you see that, sir?

5    A    Yes, I do.

6    Q    Whose account is this?

7    A    Maureen G. McDonnell's.

8    Q    Okay.  Mr. McDonnell's name is not on this anywhere,

9    is it?

10   A    No.

11   Q    Okay.  Now --

12             MR. BROWNLEE:  Your Honor, we move RM-2058 into

13   evidence.

14             THE COURT:  It will be admitted.

15   BY MR. BROWNLEE:

16   Q    Now, Mr. Sessoms, you testified that the form in

17   question here is a personal financial statement; is that

18   correct?

19   A    Correct.

20   Q    So a loan to Ms. McDonnell would not need to be on

21   that form, correct?

22   A    Correct.

23   Q    Okay.  Now, if we could pull 416 back up, please.  If

24   we could go to the bottom right-hand corner, that block.

25   Now, Mr. Faulconer showed this area to you yesterday in

WILLIAM SESSOMS, JR. - CROSS - BROWNLEE     3088

```
1    your examination.  And he asked you about liabilities of

2    partnerships and joint ventures, he asked you about

3    liabilities of proprietorships; do you remember that?

4    A    Yes.

5    Q    Now, what he didn't ask you is about liabilities to

6    an LLC, did he?

7    A    No.

8    Q    Okay.  The documents that we just showed you with

9    regard to the check to Maureen McDonnell, her account

10   balance, the deposit slip, when you interviewed with the

11   government three times, did they ever show you those

12   records?

13   A    No, sir, that I recall.

14   Q    Okay.  Now, what is an LLC?

15   A    It is a Limited Liability Company.

16   Q    Okay.  I want to show you what's been previously

17   admitted, RM-0502.  This has been admitted, Your Honor.

18   This is an Incorporation Certificate of Organization for

19   MoBo Real Estate Partners, LLC.  Is that correct?

20   A    Yes.

21   Q    An LLC is a separate legal entity; is that correct?

22   A    Yes.

23   Q    Okay.  And so it is fair to say that debts of a

24   separate legal entity do not need to be on a personal

25   individual financial statement.
```

```
 1              MR. FAULCONER:  Objection, Your Honor.

 2              THE COURT:  Sustained.

 3  BY MR. BROWNLEE:

 4  Q    Okay.  Well, would a debt of an LLC need to be on the

 5  debt of a personal financial statement?

 6              MR. FAULCONER:  Objection.  Depends on how the

 7  LLC is --

 8              THE COURT:  Sustained.

 9  BY MR. BROWNLEE:

10  Q    Well, are some loans personally guaranteed?  Can you

11  have a loan that is personally guaranteed by an

12  individual?

13  A    An individual signing on a loan by themself is their

14  personal guarantee.

15  Q    So in instances where people actually sign for a

16  loan, they take on what you call a personal guarantee.

17  A    Yes.

18  Q    Okay.  And in instances where people get loans

19  without signing, are those not personally guaranteed?

20  A    If they haven't signed a guarantee agreement or an

21  endorsement agreement --

22              MR. FAULCONER:  Objection as to if somebody

23  doesn't sign a guarantee.

24              THE COURT:  He can answer that.

25  BY MR. BROWNLEE:
```

1   Q    If someone doesn't sign a personal guarantee, is

2   there in fact a personal guarantee on that loan?

3   A    If there is no personal guarantee or personal

4   signature or endorsement, no.

5   Q    It has to be in writing, right?

6   A    Correct.

7   Q    Okay.  Now, let me show you what's been marked as

8   Government Exhibit 355.  If we could blow that up.  Now,

9   this is in evidence.  This is a check from Starwood to

10  MoBo MoBo Realty, and a deposit slip for MoBo Realty of

11  $50,000; is that correct?

12  A    Yes.

13          THE COURT:  We don't have that in evidence.

14          MR. FAULCONER:  Your Honor, I don't know if this

15  specific version is in evidence, but --

16          MR. BROWNLEE:  Why don't we just show the

17  checks.  I believe the checks and deposit slip are in

18  evidence from the government.

19          THE COURT:  You can just move it.

20          MR. BROWNLEE:  Okay.  We will move RM-2059 into

21  evidence, Your Honor.

22          MR. FAULCONER:  No objection.

23          THE COURT:  It will be admitted.

24  BY MR. BROWNLEE:

25  Q    So as I asked, this is a check from Starwood Trust to

1    MoBo Realty, and a deposit slip of that check for MoBo; is

2    that correct?

3    A    Yes.

4    Q    Okay.  Can we pull up RM-1454?  Blow that up.  Now,

5    if you look there in the middle, there is a deposit on

6    March 12th of $50,000.

7    A    Got it.

8    Q    Do you see that?

9    A    Yes.

10    Q    And if you go to the top, this is the account, keep

11    going up, thank you, for MoBo Real Estate Partners, LLC;

12    is that correct?

13    A    That's correct.

14         MR. BROWNLEE:  We move RM-1454 into evidence.

15         THE COURT:  It will be admitted.

16    BY MR. BROWNLEE:

17    Q    So this is a check to an entity; is that correct?

18    A    This is a checking statement I have in front of me.

19    Q    That's right.  And the check I showed you that is the

20    basis for this deposit, it is to an entity.

21    A    Yes.

22    Q    And that entity is MoBo Real Estate Partners, LLC.

23    A    Correct.

24    Q    Okay.  And sir, is this corporate debt something that

25    would need to be included on a personal financial

```
 1   statement?
 2              MR. FAULCONER:  Objection, Your Honor, as to Mr.
 3   Brownlee testifying.
 4              THE COURT:  Sustained.
 5   BY MR. BROWNLEE:
 6   Q    Well, let me just ask it this way:  Would this
 7   $50,000 check to MoBo, in your view, need to be on a
 8   personal financial statement?
 9              MR. FAULCONER:  Objection, Your Honor.
10              THE COURT:  Sustained.
11   BY MR. BROWNLEE:
12   Q    This debt on a personal financial statement, is the
13   individual only required to put on debts from which he has
14   personal guarantees?
15   A    Yes.
16   Q    Okay.  So if there is no personal guarantee for a
17   debt, it doesn't need to be placed on the personal
18   financial statement; is that correct?
19              MR. FAULCONER:  Objection, Your Honor.  Asked
20   and answered.
21              THE COURT:  The objection is sustained.  Let me
22   ask you a question:  If you have outstanding liabilities,
23   joint or otherwise, and you apply for a personal loan, is
24   your bank interested in the outstanding liabilities even
25   though they are shared?
```

1    THE WITNESS:  We are required -- by law, we have

2    to be very careful how we address that.  And as such, with

3    an individual financial statement, we cannot ask about any

4    other debt except the individual's debt based on the way

5    that statement is filled out.

6    THE COURT:  All right.  My question to you is,

7    if my debt is shared, let's just pick a figure, there is a

8    $100,000 outstanding liability, and I am 50 percent

9    responsible for that liability, is that something that

10    your bank needs to know about under the personal loan?

11    THE WITNESS:  Yes.

12    THE COURT:  All right.

13    MR. BROWNLEE:  May I follow up?

14    THE COURT:  Sure, go ahead.

15    BY MR. BROWNLEE:

16    Q    But if you don't have a personal guarantee on that

17    debt, that debt, as the Court has explained, is a

18    corporate debt, it doesn't need to be on your personal

19    financial statement.

20    A    Correct.

21    Q    So it doesn't, that's right?

22    A    Correct.

23    Q    So in this instance, this $50,000 went to MoBo, LLC,

24    that entity that you testified is a separate entity.  So

25    under the Court's hypothetical, this would not need to go

1    on someone's personal financial statement; is that

2    correct?

3             MR. FAULCONER:  Objection, Your Honor.  He is

4    conflating where the check goes versus where the loan --

5             THE COURT:  The objection is sustained.  Go

6    ahead.

7    BY MR. BROWNLEE:

8    Q    Just to make sure I'm clear, and then I'll move

9    along, a debt that does not have a personal guarantee,

10   that goes to -- that is a corporate debt, does not need to

11   go on someone's personal financial statement; is that

12   correct?

13   A    Repeat it one more time.  You are getting me

14   confused.

15   Q    All right.  A debt that is held by an entity, a

16   separate corporate entity, that debt, unless there is a

17   personal guarantee, and you said a personal guarantee in

18   writing, it doesn't need to go on someone's personal

19   financial statement.

20            MR. FAULCONER:  Objection, Your Honor.  He did

21   not say "personal guarantee in writing."

22            MR. BROWNLEE:  Actually, he did.

23            THE COURT:  The objection is sustained.  If

24   there is any point to be made, you have made it.  So move

25   on.

1          MR. BROWNLEE:  Thank you, Judge.

2     BY MR. BROWNLEE:

3     Q    Let me move to this next loan if we can.  If we could

4     pull up RM-1521.  If you blow up the middle there, there

5     you see a wire transfer on 5-22 from Starwood Trust for

6     $20,000; is that correct?

7     A    Yes.

8     Q    If you go to the top, once again, this is to MoBo

9     Real Estate Partners, LLC?

10    A    Yes.

11    Q    We won't go into it again, but again, this is now a

12    payment, and if it is a loan, it is a debt for the LLC; is

13    that correct?

14         MR. FAULCONER:  Objection, Your Honor.

15    Characterizing the payment.

16         THE COURT:  No, he can answer that.  It is

17    clearly a debt of the LLC.

18    BY MR. BROWNLEE:

19    Q    Okay.  And then if you just blow up that part, the

20    date on it is what, sir?

21    A    The date for the deposit, the wire, was 5-22, May

22    22nd.

23    Q    That's May 22nd.  Now, if we pull up Government

24    Exhibit 416, a government exhibit, I think, that's dated

25    as of April 30th, 2012.  Do you see that?

1    A    Correct.

2    Q    So if you have a financial statement and it is

3    submitted as of this date, do you need to include debts

4    that you incur after that?

5    A    Financial statement is good for one year from the

6    date it is issued.  And it would not be required.

7    Q    So the answer is no.

8    A    Right.

9    Q    Okay.  Let's move on.  The government asked you

10   yesterday about late fees.  And I want -- and there were a

11   series of late fees that we went through for the year

12   2009.  Do you remember that?

13   A    Yes, I do.

14   Q    Is it fair to say that a late fee is imposed on an

15   individual or an entity after 15 days; is that right?

16   A    Correct.

17   Q    And then the payment is considered missed after 30

18   days.  So if 30 days lapses, it is a missed payment, and

19   after 15, it is late.  Is that fair?

20   A    Yes.

21   Q    All right.  And based on your knowledge,

22   Mr. McDonnell and his sister never missed a payment; is

23   that correct?

24   A    Correct.

25   Q    Okay.  And of course they never defaulted on the

1    loan; is that correct?

2    A     Correct.

3    Q     Okay.  And I think you have testified before that as

4    long as the bank receives the payment within 30 days, the

5    bank is what you called very comfortable; is that right?

6    A     Yes, that's correct.

7    Q     All right.  Now, let me talk generally about Maureen

8    McDonnell.  We will call her sister Maureen and Bob.  You

9    have known them for a long time; is that correct?

10   A     Yes.

11   Q     Okay.  And it was your understanding that combined,

12   they had sufficient resources to cover these debts, and

13   you knew that and you felt comfortable with that; is that

14   correct?

15             MR. FAULCONER:  Objection, Your Honor, to the

16   analysis after the fact.

17             THE COURT:  If you give it a time that's

18   relevant, you can go ahead and ask the question.  But

19   after the fact, it is not good.

20   BY MR. BROWNLEE:

21   Q     At the time they had this loan, you felt very

22   comfortable that together, his sister and him together

23   could make the payments on these loans; is that right?

24   A     Yes.

25             MR. FAULCONER:  I apologize, I object again.

1    The time they had this loan to MoBo was before and after

2    the financial statement.

3              THE COURT:  "At the time that you granted these

4    loans."  You can ask that question.

5    BY MR. BROWNLEE:

6    Q    At the time you granted the loans, did you feel

7    comfortable that Bob and his sister, Maureen, could make

8    payments on these loans?

9    A    Yes.

10   Q    Okay.  And they always made their payments and they

11   never missed a payment, I believe you testified.

12   A    Yes.

13   Q    Okay.  Now, this loan was originated in 2005; is that

14   correct?

15   A    I don't know.  We have one in 2005 and one in 2006.

16   I don't know which one you are referring to.

17   Q    Let's pull up RM-0035.  Is this a loan transaction

18   history?

19   A    Correct.

20   Q    Okay.  And this goes all the way back to 2005; is

21   that right?

22   A    Okay.

23   Q    And I just want to walk through this.  If you could

24   make the page a little smaller.  And these loan

25   transaction histories here show late fees if there are

```
1     any; is that right?

2     A     Yes.

3     Q     So is there any late fees on this page?

4     A     No.

5     Q     How about the next page?

6     A     Can you make it bigger, please?  No.

7     Q     How about the next page?

8     A     No.

9     Q     How about the next page?

10    A     No.

11    Q     How about the next page?

12    A     No.

13    Q     We are up to 2007.  How about the next page?

14    A     No.

15    Q     How about the next page?

16    A     No.

17    Q     We are up to 2008.  How about the next page?

18    A     No.

19    Q     How about the next page?

20    A     No.

21    Q     How about the next page?

22    A     No.

23    Q     How about the next page?

24    A     No.

25    Q     How about the next page?
```

1    A    Yes.

2    Q    In April.

3    A    Yes.

4    Q    All right.  So there are no late fees from 2005 until

5    2009, in April of 2009; is that correct?

6    A    Yes.

7    Q    Okay.  You can take that down.  Now, it is understood

8    that one of the reasons you gave this loan is the strength

9    of the Governor's sister's financial status; is that

10   correct?

11   A    Yes.

12   Q    Okay.  And you understood -- well, let me show you

13   what's been marked as RM-077.  This has been admitted.  I

14   think it is 0077.  All right, this is Maureen McDonnell's

15   W-2 for 2012.  If we could redact the Social Security

16   information, please.  All right.  And in 2012, at the time

17   these loans were made from Mr. Williams, you see the

18   Governor's sister made nearly $530,000 that year.

19   A    Yes.

20   Q    All right.  And if you look at, pull up RM-0033.

21   This is in evidence as well, Your Honor.  The date of this

22   is what, sir?  If you look at the top right-hand corner.

23   A    Advice date?

24   Q    Do you see it?  Is that March 9th, 2012?

25        MR. FAULCONER:  Objection, Your Honor.  May we

```
1    approach?

2              THE COURT:  Come on up.

3         (At Bench.)

4              MR. FAULCONER:  Your Honor, the objection to

5    this question is materiality, which you have already

6    excluded.  Looking at documents which are on the face of

7    the financial statement couldn't go to a material point

8    relevant to Mr. McDonnell.

9              MR. BROWNLEE:  This is not materiality.  The

10   first section was about falsity.  These documents are not

11   false.  He went through every single late fee to try to

12   establish that somehow they were financially desperate.

13   This goes directly at that.  The partnership of MoBo had

14   more than sufficient resources.  So they raised this, and

15   I think it is fair to allow us to show that, yes, there

16   may have been some late fees, but these people had more

17   than enough resources to cover these debts, and this is

18   the President of the bank.

19             THE COURT:  What does this have to do with this

20   witness?

21             MR. BROWNLEE:  The financial information we are

22   showing now is of the Governor's sister, and the testimony

23   here is when he made these loans, he made it to both of

24   them.  They want to try to lay this all on one guy, when

25   in reality she was a big part of this.
```

1          THE COURT:  The objection is sustained.

2          MR. BROWNLEE:  Thank you, Judge.

3      (In Open Court.)

4  BY MR. BROWNLEE:

5  Q    All right, Mr. Sessoms, yesterday Mr. Faulkner talked

6  about when they first got these loans, that their intent

7  was that the rental payments would cover what you

8  testified as the debt service; is that correct?

9  A    Correct.

10  Q    And I think you have said that that was your

11  understanding and that was what they communicated to you

12  that they would hope would happen; is that correct?

13  A    Correct.

14  Q    Okay.  And now, covering the debt service is

15  different than covering all the expenses of the business;

16  is that correct?

17  A    You are correct, yes.

18  Q    Okay.  So let me pull up Government Exhibit 513, Page

19  8, just for the witness.  If you look at the line called

20  "Total Rental Income," okay, that's for 2008 through 2012.

21  If you will highlight "Total Rental Income" all the way

22  across.

23  A    Yes.

24  Q    Okay.  And then if you look down at the bottom line,

25  total interest expense, is it fair to say that the rental

1    income for every year from '08 to 2012 --

2              MR. FAULCONER:  He is testifying.  This document

3    is in evidence.  The witness has never seen it before.  He

4    is asking him to compare numbers on a document that's not

5    in evidence.

6              THE COURT:  Do you know anything about this

7    document?

8              THE WITNESS:  No, sir.

9              MR. BROWNLEE:  You can take it down.

10   BY MR. BROWNLEE:

11   Q    If the rental income is more than the debt service,

12   the interest that they are paying on the debt, is that

13   your understanding of what the point was, when they went

14   into this, that the debt service -- that the rental income

15   would be more than the debt service?

16   A    That was certainly the desire, yes.

17   Q    Fair enough.

18             MR. BROWNLEE:  Court's indulgence for one

19   minute.

20             THE COURT:  Sure.

21             (Counsel conferring with co-counsel.)

22             MR. BROWNLEE: Your Honor, could we just approach

23   for a moment?

24             THE COURT:  Come on up.

25        (At Bench.)

```
1              MR. BROWNLEE:  This is the first of a series of
2    bankers we are going to hear from today, Judge.  And we
3    understand the Court's materiality ruling and we are going
4    to follow it to the letter.  But we also believe that the
5    elements they have to establish is that, number one, the
6    document is false, and secondly, it was done with the
7    intent to influence the bank.  And so our questioning is
8    about falsity and I want to make sure that we are in line
9    with the Court's rulings, but that we can try to show,
10   because if they don't have to be on there --
11             THE COURT:  Let's go back to the previous
12   ruling.  I'm not saying that you can't get that
13   information out through the right witness.  But this
14   wasn't the one.
15             MR. BROWNLEE:  I understand the last part of it,
16   Judge.  I'm just talking generally speaking --
17             THE COURT:  If you want to make the case that
18   they had sufficient financial wherewithal to do that,
19   there is nothing wrong with that.  But you can't have a
20   witness get up and start talking about stuff --
21             MR. BROWNLEE:  I understand.  I'm really talking
22   about the initial part of the examination when we were
23   trying to establish that these loans to an entity don't
24   need to be on this form.  And I think we got that in, but
25   I want to make sure because all these witnesses are coming
```

**WILLIAM SESSOMS, JR. - CROSS - BROWNLEE**          3105

```
 1    up, and that's the heart of this, that the document itself

 2    is not false.

 3              MR. FAULCONER:  We didn't have any problem with

 4    him asking questions about what does the form say, does it

 5    say LLC, partnership, other loans payable.  That kind of

 6    testimony is fine.  We also have our own testimony about

 7    the conversations with the defendant on direct

 8    examination.  We don't have any problem with any of that

 9    testimony.  It is when they start going to things that are

10    either after the loan or things that are just the banker's

11    subjective intent, legal conclusions, materiality

12    conclusions.

13              THE COURT:  I'm afraid you've got all the

14    guidance I can give you.  I rule on the questions as you

15    ask them.

16              MR. BROWNLEE:  I don't want to run afoul of the

17    Court's position.  But our position is these documents are

18    not false because the loans didn't need to be on there.

19    That's what the evidence is in the 302's from the other

20    witness.  They never asked those questions.  They never

21    asked if it was false.

22              MR. FAULCONER:  Respectfully, that's not true.

23    And obviously, we disagree with that position as to who

24    the loans are to.

25              MR. ASBILL:  Our client is going to testify as
```

1   well, and the question, and if in fact the loan is to

2   Ms. McDonnell, if in fact the loans are to MoBo, they are

3   not required to be on the form.

4            MR. FAULCONER:  To clarify, this particular

5   transaction is only charged with omitting $50,000 in

6   liability.  Even if the first loan is to Ms. McDonnell,

7   that makes absolutely no difference on whether we have

8   sufficient on this particular charge.  It is our position

9   based on the testimony that these loans were to

10  Mr. McDonnell and that he had gauranteed these just as

11  much as Ms. McDonnell.

12           THE COURT:  Listen to me.  When the bankers come

13  along, the question that you ask is, are these particular

14  procedures, methods, how things are done as the bankers.

15  You can't ask him "In your view."  Right?  This is an

16  inappropriate question.  So I can't tell you how to ask

17  this question to get you to do it right, but what I will

18  tell you, if the objection is made and your question is

19  inappropriate, I will sustain it.  I don't have anything,

20  any problem with the area of inquiry.

21           MR. ASBILL:  We have several bankers, who could

22  justify under the Court's ruling that the practice of the

23  bank would be you wouldn't have to put it on.

24           THE COURT:  Well, if you can make that out.

25           MR. ASBILL:  He has been President.

```
 1                  THE COURT:  We will see.
 2             (In Open Court.)
 3   BY MR. BROWNLEE:
 4   Q    Mr. Sessoms, I'm just about done.  I just want to go
 5   back and make sure.  Sir, is it the practice of the bank
 6   that loans to LLC's that don't have personal guarantees in
 7   writing, they do not need to be on personal financial
 8   statements?  Is that an accurate statement?
 9   A    Yes.
10   Q    Okay.  Thank you.
11             THE COURT:  All right.  Mr. Burck?
12             MR. BURCK:  Your Honor, just very briefly.
13                       CROSS-EXAMINATION
14   BY MR. BURCK:
15   Q    Good morning, Mr. Sessoms.
16   A    Good morning.
17   Q    My name is Bill Burck, and I represent Maureen
18   McDonnell.  Now, just for clarity, the application that
19   you were going through with the government and Mr.
20   Brownlee, Ms. McDonnell was not -- Ms. McDonnell, the
21   wife, was not an applicant on that form, right?
22   A    On the financial statement?
23   Q    The financial statement.
24   A    That's correct.
25   Q    Just so I understand, a personal guarantee in your
```

```
1    practice and your experience with this form and as the
2    President of this bank, a personal guarantee is required
3    for a loan that is not in the name of the applicant in
4    order for that loan to be listed on this form, right?
5    A    One more time.
6    Q    Let me try it this way.  If a personal loan is to
7    Ms. McDonnell, and there is no written guarantee by
8    Mr. McDonnell for that loan, would that loan have to be
9    listed on Mr. McDonnell's application?
10   A    No.
11   Q    No.
12          MR. BURCK:  Thank you, Your Honor, that's it.
13          THE COURT:  Redirect?
14                REDIRECT EXAMINATION
15   BY MR. FAULCONER:
16   Q    Mr. Sessoms, how many conversations did you have with
17   Mr. McDonnell about whether or not any loans from Jonnie
18   Williams or Starwood Trust were personal guarantees, LLC
19   guarantees, personal loans, LLC loans?  How many
20   conversations?
21   A    None.
22   Q    As a banker, how do you typically know who is
23   responsible for a loan?
24          MR. BROWNLEE:  Objection.
25          THE COURT:  Overruled.
```

```
 1                    THE WITNESS:  The financial statement.

 2      BY MR. FAULCONER:

 3      Q    Piece of paper, right?

 4      A    Right.

 5      Q    How many pieces of paper or loan documents did you as

 6      TowneBank sign with MoBo, LLC?

 7      A    I do not know.

 8      Q    Are you aware of any loans that you made to MoBo,

 9      LLC?

10      A    No.

11      Q    But you were aware that there was a real estate

12      partnership that was operating these properties, right?

13      A    Yes.

14      Q    But you made the loan to Mr. McDonnell and his

15      sister, right?

16      A    Correct.

17      Q    Now, as a politician, it is fair to say, have you

18      shaken a lot of hands before?

19                    MR. BROWNLEE:  Objection, Your Honor.

20                    THE COURT:  Overruled.

21                    THE WITNESS:  Yes.

22      BY MR. FAULCONER:

23      Q    How many of those have been of a corporation?

24      A    Have I shaken hands with a corporation?

25                    MR. BROWNLEE:  I object.
```

```
 1              THE WITNESS:  None.
 2   BY MR. FAULCONER:
 3   Q    Have you ever Done a handshake deal with a
 4   corporation?
 5   A    No.
 6         MR. FAULCONER:  One moment, Your Honor.
 7         (Counsel conferring with co-counsel.)
 8   BY MR. FAULCONER:
 9   Q    If we could pull up Exhibit 416.  Just to be clear,
10   Mayor Sessoms, looking at the top of this document, can
11   you tell us what date this document was actually sent to
12   TowneBank?
13   A    October 3rd, 2012.
14   Q    And scrolling down to the bottom right-hand portion
15   of this document, could you read what it says, the first
16   line under "Liabilities and Net Worth"?
17   A    The first line?
18   Q    Yes.
19   A    "Other Loans Payable."
20         MR. FAULCONER:  One moment, Your Honor.  No
21   further questions.
22         THE COURT:  All right.  Thank you, Mayor.  You
23   may stand down.
24         THE WITNESS:  Thank you, sir.
25         (Witness stood aside.)
```

```
1            Call your next witness.
2                MR. FAULCONER:  Your Honor, the United States
3   calls Barbara Tierney.
4                        BARBARA TIERNEY,
5   called as a witness by and on behalf of the government,
6   having been first duly sworn by the Clerk, was examined
7   and testified as follows:
8                      DIRECT EXAMINATION
9   BY MR. FAULCONER:
10  Q    Could you please state your name and spell your last
11  for the court reporter?
12  A    Barbara Tierney, T-I-E-R-N-E-Y.
13  Q    And what city do you currently live in?
14  A    Virginia Beach.
15  Q    Am I correct that you recently retired?
16  A    You are correct.
17  Q    Before that, where did you work?
18  A    I worked for TowneBank.
19  Q    What was your role there?
20  A    I was a Senior Vice President.  My functional title
21  was Senior Credit Analyst.
22  Q    About how long did you work there?
23  A    Almost nine years.
24  Q    Now, are you familiar with any real estate-related
25  loans that TowneBank had with Mr. McDonnell, Robert
```

1    McDonnell, and his sister, Maureen McDonnell, while you

2    worked there?

3    A    Yes, I am familiar.

4    Q    How many loans were there, to your knowledge?

5    A    Two.

6    Q    And just to be clear, was that the wife, Maureen

7    McDonnell, or the sister, Maureen McDonnell?

8    A    No, it would be the sister.

9    Q    Now, I'd like to show you what's been previously

10   admitted as Exhibit 41.  Zooming in on the top portion

11   there, is this the Disbursement Request and Authorization

12   for one of those two loans?

13   A    Could I see the bottom, please, as well?

14   Q    Sure.  If we could scroll down.

15   A    Yes.  I believe it is.

16   Q    And what's the dollar amount at the top of that one?

17   A    $249,990.

18   Q    We can take that down.  Now, if we could turn to

19   what's been previously admitted as Exhibit 43.  Do you

20   recognize this document?

21   A    Yes.

22   Q    Is this the Disbursement Request and Authorization

23   for the other of the two loans?

24   A    Yes, it is.

25   Q    All right.  You can take that down.  Now,

1   Ms. Tierney, do you recall participating in a loan renewal

2   process for the larger of these two loans in October of

3   2012?

4   A    Yes, I do.

5   Q    Could you explain exactly what a loan renewal process

6   is?

7   A    On a regular basis, the bank reviews its loan

8   portfolio to ensure that the credit is of good standing.

9   Q    During that process, do you typically request a

10  personal financial statement from the borrower?

11  A    Yes, we do.

12  Q    I'd like to show you what's been admitted into

13  evidence as Exhibit 416.  If we could show this to Ms.

14  Tierney, and then flip through the pages.  Ms. Tierney, do

15  you recognize this document?

16  A    I do.

17  Q    What is it?

18  A    It is a personal financial statement of Robert

19  McDonnell.

20  Q    Is this the personal financial statement that you

21  used in the annual review in the October of 2012 time

22  frame?

23  A    It is.

24  Q    If we could go to the first page of that document.

25  And zooming in on the lower right-hand portion,

1    Ms. Tierney, do you see anything listed on "Other Loans

2    Payable" there?

3    A    No, I do not.

4    Q    Is there anything listed under "Liabilities of

5    Proprietorships"?

6    A    No, there is not.

7    Q    Is there anything listed under "Liabilities of

8    Partnerships or Joint Ventures"?

9    A    No, there is not.

10   Q    If we could zoom back out.  Now, Ms. Tierney, I see

11   that this says that it is a Heritage Bank personal

12   financial statement.  Even if somebody submits a personal

13   financial statement from another bank, will you still use

14   it in your renewal process?

15   A    Yes, we do.

16   Q    Is that what you did in this case?

17   A    Yes, I did.

18   Q    Now, in addition to receiving and incorporating a

19   personal financial statement, did someone on your staff or

20   someone at TowneBank also run a credit report as part of

21   this annual review?

22   A    Yes.

23   Q    I'd like to show you what's been previously admitted

24   as Exhibit 417.  Zooming in on the top portion there, does

25   this look like the credit report that was run as part of

1    this annual review?

2    A    Yes, it is.

3    Q    Have you had a chance to review this credit report

4    before coming in to testify today?

5    A    Yes, I have.

6    Q    To your knowledge, are there any loans related to

7    Jonnie Williams or Starwood Trust listed on this credit

8    report?

9    A    To my knowledge, no, there are not.

10   Q    Now, in your experience, would you typically see a

11   personal undocumented loan on a credit report?

12   A    No, you would not.

13   Q    As someone who is doing this process, how would you

14   typically find out about that type of loan?

15   A    It would have to be disclosed on the personal

16   financial statement.

17   Q    Now, we have looked at the personal financial

18   statement and at the credit report.  In the entire process

19   that you did here for this loan renewal, did you ever

20   become aware in any way of any loan related to Jonnie

21   Williams or Starwood Trust?

22   A    No, I was not aware of any loan.

23            MR. FAULCONER:  One moment, Your Honor.

24            (Counsel conferring with co-counsel.)

25            No further questions, Your Honor.

```
1                    THE COURT:  All right.  Cross?

2                        CROSS-EXAMINATION

3    BY MR. BROWNLEE:

4    Q    Ms. Tierney, my name is John Brownlee, and I

5    represent Bob McDonnell.  I just have a couple of

6    questions.  Mr. Faulconer showed you what's been marked as

7    Government Exhibit 416.  This is the Heritage Bank

8    financial statement for Bob McDonnell.  And he asked you

9    if there were loans from Mr. Williams that were on this

10   document.  And he asked you if you ever became aware of

11   that; is that correct?

12   A    That's correct.

13   Q    Is it fair to say, ma'am, that if those loans are not

14   required to be on this document, then they wouldn't be on

15   the document; is that correct?

16   A    I'm not sure that I understand your question.

17   Q    Okay.  Well, he asked you if they are on there, and

18   you said no.  I'm just asking, if they are not supposed to

19   be on here, they don't need to be on here, that wouldn't

20   be a surprise to you, right?  That they are not on there?

21                    MR. FAULCONER:  Objection as to relevance.

22                    THE COURT:  Sustained.

23                    MR. BROWNLEE:  Thank you.

24                    THE COURT:  Sure.

25                        CROSS-EXAMINATION
```

```
 1  BY MR. BURCK:

 2  Q    Good morning.

 3  A    Good morning.

 4  Q    My name is Bill Burck, and I represent Maureen

 5  McDonnell.  Maureen McDonnell, wife, was not a borrower on

 6  this transaction, this account, right?

 7  A    That's correct.

 8  Q    So you wouldn't have been collecting information from

 9  her.

10  A    No.

11  Q    And is there any circumstance in which you would have

12  collected information from her for this transaction?

13  A    No, not really, if she is not a borrower.  No, we

14  would not.

15         MR. BURCK:  Thank you, Your Honor.  No further

16  questions.

17         THE COURT:  Anything else?

18         MR. FAULCONER:  No, Your Honor.

19         THE COURT:  All right.  Thank you, ma'am.  You

20  may stand down.

21      (Witness stood aside.)

22      Call your next witness, please.

23         MR. DRY:  The United States calls Frank Pollack

24  to the stand.

25                  FRANK R. POLLACK,
```

**FRANK POLLACK - DIRECT**                        3118

1    called as a witness by and on behalf of the government,

2    having been first duly sworn by the Clerk, was examined

3    and testified as follows:

4                        DIRECT EXAMINATION

5    BY MR. DRY:

6    Q    Good morning, Mr. Pollack.

7    A    Good morning.

8    Q    Could you please state your name for the record?

9    A    Frank Richard Pollack.

10   Q    And how do you spell your last name?

11   A    P-O-L-L-A-C-K.

12   Q    Now, where did you work in January of 2013, sir?

13   A    Pentagon Federal Credit Union.

14   Q    How long had you worked for Pentagon Federal Credit

15   Union?

16   A    Since April of 1978.

17   Q    Is Pentagon Federal Credit Union often called PenFed?

18   A    Yes, sir, it is.

19   Q    Now, in January of 2013, what was your title?

20   A    I was President and CEO.

21   Q    And how long were you the President and CEO of

22   PenFed?

23   A    Since January 1st, 2000.

24   Q    At some point did you step down from that role?

25   A    I did, March 31st of this year.

**FRANK POLLACK - DIRECT**          3119

1    Q    Okay.  Now, is PenFed a federally-chartered credit

2    union?

3    A    Yes, it is.

4    Q    How long has it been federally chartered?

5    A    1935.

6    Q    Now, I'd like to bring up Government Exhibit 453.  Do

7    you recognize this document, sir?

8    A    Yes, sir, I do.

9    Q    What is it?

10   A    It is my calendar for January of 2013.

11         MR. DRY:  Government moves to admit Government

12   Exhibit 453, Your Honor.

13         THE COURT:  It will be admitted.

14   BY MR. DRY:

15   Q    Do you normally record your meetings and phone calls

16   on this calendar?

17   A    Yes, I do.

18   Q    That was your standard practice?

19   A    Yes.

20   Q    Okay.  Turning your attention to January 11th, if we

21   could blow up that block, please.  Now, you see where it

22   says phone call around 1:10 p.m. with Governor McDonnell,

23   and what is the "Re:," what does that mean?

24   A    There was a phone call to take place regarding a

25   mortgage refinancing on his home.

1  Q    Did you in fact have a call with Mr. McDonnell on

2  January 11th?

3  A    Yes, sir.

4  Q    And how did that come about?

5  A    I had been contacted earlier by a gentleman named

6  Richard Pillow, the CEO of the Virginia Credit Union

7  League, and he had asked whether we would be interested in

8  the Governor refinancing his home with us.

9  Q    Okay.  At this time, when you are getting this call,

10  did you even know that Mr. McDonnell was a customer of

11  PenFed at that point?

12  A    Yes, we knew he had been a member for a long time.

13  Q    Okay.  What did you and Mr. McDonnell discuss during

14  your call on January 11th?

15  A    He was interested in the rates that we had, and we

16  had a brief discussion regarding rates and loan-to-value

17  requirements.

18  Q    Did he discuss what kind of mortgage, what type of

19  properties he wanted mortgages for?

20  A    Initially, the conversation revolved around their

21  personal home, as well as later on, a second home that was

22  owned in, I think, Nelson County.

23  Q    And from your call, did you understand that these

24  were going to be rental properties or these were personal

25  residences?

**FRANK POLLACK - DIRECT**                    3121

1    A     They were personal residences.

2    Q     And during that call, did the Governor,

3    Mr. McDonnell, talk about how quickly he wanted to move

4    forward on these?

5    A     We had very good rates and he was interested in

6    closing quickly.

7    Q     That's not unusual, for people to want to lock down

8    rates?

9    A     It is very frequent.

10   Q     Okay.  Let's go to Government Exhibit 466, please.

11   Do you recognize this document, sir?

12   A     Yes, I do.

13   Q     And that's an e-mail from Mr. McDonnell to you?

14   A     Yes.

15            MR. DRY:  Government moves Exhibit 466 into

16   evidence, Your Honor.

17            THE COURT:  It will be admitted.

18   BY MR. DRY:

19   Q     If we could blow up the top for a second.  What's the

20   date of this e-mail, sir?

21   A     January 21st.

22   Q     And when he talks about "We are interested in

23   pursuing both," what is he referring to?

24   A     Both properties.

25   Q     Okay.  And those are the properties we just talked

**FRANK POLLACK - DIRECT**                    3122

1    about, the personal residences?

2    A    Yes, sir.

3    Q    At this point, had you had any discussions or

4    communications with Mr. McDonnell about the idea of

5    refinancing rental properties?

6    A    No, sir.

7    Q    Okay.  Now, going back to Government Exhibit 453, I

8    want to turn your attention to January 23rd.  Did you have

9    another call with Mr. McDonnell on January 23rd?

10   A    Yes, we did.

11   Q    And who participated in that call?

12   A    The Governor, his wife, and his sister.

13   Q    That was sister, Maureen?

14   A    Yes, sir.

15   Q    And from PenFed, who participated in the call from

16   that side?

17   A    Myself, our Executive Vice President for Mortgages,

18   Debbie Ames Naylor, her number two, Larry Blake, and our

19   loan processor who was going to handle the Governor's

20   requests, Nan Bolt.

21   Q    B-O-L-T; is that correct?

22   A    Yes.

23   Q    Now, while you are on this call, what's being

24   discussed?

25   A    Well, I wasn't on this call very long, actually.  I

1    introduced the Governor to the people that were going to

2    handle his account, made sure that he knew we would take

3    good care of him and get the loan closed quickly.

4    Q    Do you typically participate in phone calls with

5    people seeking mortgages or was this kind of a special

6    case?

7    A    This was a special case.  He was the Governor.

8    Q    Fair enough.  Now, PenFed is what's referred to as a

9    full doc lender?

10   A    Yes, we are.  That's the only kind of loan we make.

11   Q    What is a full doc lender?  What does that mean?

12   A    It means that you have to verify your income, your

13   place of employment, all of your debts, everything that is

14   involved in the loan application.  It is what the rest of

15   the world didn't do and why we got in trouble.

16   Q    When you say "we got in trouble," you are talking

17   about the financial crisis?

18   A    Yes.

19   Q    So how do you go about verifying information provided

20   by a lender -- by a borrower?

21   A    With regard to employment, we require pay stubs and

22   bank statements for their assets, and we check on

23   valuations of the home, so an appraisal is required, and

24   we will pull a credit report to see their credit history.

25   Q    Do you want to see documentation of any debts?

1    A    Generally speaking, debts are in the credit report,

2    so we might occasionally ask for documentation on a

3    particular mortgage.  But not necessarily so.

4    Q    Let's talk about that.  If a loan applicant has

5    personal loans that are undocumented --

6              MR. BROWNLEE:  Objection.

7              THE COURT:  Overruled.

8    BY MR. DRY:

9    Q    If an individual has personal loans that are not

10   documented on the credit report, what would be the way

11   that you would be able to find out about those?

12   A    The consumer would have to tell us about them.

13             MR. DRY:  I have nothing further.  Thank you,

14   sir.

15             THE COURT:  Any questions, Mr. McDonnell?

16                   CROSS-EXAMINATION

17   BY MR. BROWNLEE:

18   Q    Good afternoon, sir.  My name is John Brownlee, and I

19   represent Bob McDonnell.  I have just a few questions.

20   Mr. Dry asked you about, that you are a full doc lender;

21   is that correct?

22   A    Yes.

23   Q    I think he asked you what that meant.  You testified

24   that it means you had to verify income, place of

25   employment, and debts and liabilities; is that correct?

```
1    A     That's correct.

2    Q     You take that seriously, do you not?

3    A     We do.

4    Q     So if you felt like someone wasn't complying with

5    full doc --

6              MR. DRY:  Objection, Your Honor.

7              THE COURT:  Finish the question.

8    BY MR. BROWNLEE:

9    Q     If you felt like someone wasn't complying with what

10   Mr. Dry talked about full doc lender, you would have an

11   issue with that; is that correct?

12             MR. DRY:  Objection, relevance.

13             THE COURT:  Sustained.

14             MR. BROWNLEE:  We have nothing further.

15             THE COURT:  Mr. Burck?

16             MR. BURCK:  Nothing, Your Honor, thank you.

17             THE COURT:  I assume you don't have anything

18   else?

19             MR. DRY:  No, Your Honor.

20             THE COURT:  You may stand down.

21        (Witness stood aside.)

22        Call your next witness, please.

23             MR. DRY:  The government calls Nanette Bolt.

24                      NANETTE BOLT,

25   called as a witness by and on behalf of the government,
```

```
 1    having been first duly sworn by the Clerk, was examined

 2    and testified as follows:

 3                       DIRECT EXAMINATION

 4    BY MR. DRY:

 5    Q    Good morning, Ms. Bolt.

 6    A    Good morning.

 7    Q    Can you please state your name for the record and

 8    please spell both your first and second?

 9    A    Nanette, N-A-N-E-T-T-E, Jeanine, J-E-A-N-I-N-E, Bolt

10    B-O-L-T.

11    Q    Now, what city and state do you currently live in?

12    A    Woodbridge, Virginia.

13    Q    And do you work in the banking industry?  Or the

14    credit union industry, I should say?

15    A    Yes, I do.

16    Q    And how long have you worked in that industry?

17    A    24, 25 years.

18    Q    And where do you currently work?

19    A    Pentagon Federal Credit Union.

20    Q    And what was your first job at PenFed?

21    A    Equity Supervisor.

22    Q    What does an Equity Supervisor do?

23    A    Essentially overlook the equity processing staff,

24    underwriting, managing the department.

25    Q    Were you subsequently promoted from that job?
```

**NANETTE BOLT - DIRECT**

1    A    Yes, I was.

2    Q    And what were you promoted to?

3    A    First Mortgage Supervisor.

4    Q    That was about three-and-a-half years ago?

5    A    Yes.

6    Q    What does a First Mortgage Supervisor do?

7    A    Basically the same thing, receive processors,

8    troubleshoot loans, take care of higher profiles, higher

9    profile files, difficult files, anything like that.

10   Q    When you say "processors," what are you talking

11   about, processors of what?

12   A    Loan processors.

13   Q    Including mortgages?

14   A    Yes.

15   Q    Okay.  And as part of your job at PenFed, did you

16   work on certain loan refinancings for Mr. and Ms.

17   McDonnell?

18   A    Yes, I did.

19   Q    How did that come about?

20   A    One day I was requested to go up to Frank Pollack's

21   office for a conversation in regards to a Governor loan.

22   Q    Did that occur on January 23rd, 2013?

23   A    Around there, yes.

24   Q    And who was on the call from PenFed?

25   A    Frank Pollack, Debbie Ames Naylor, Larry Blake, and

3128

1    myself.

2    Q    And who was on the call from the Governor's family

3    side?

4    A    The Governor was, I think Ms. McDonnell, I don't

5    recall, and the sister, Maureen McDonnell.

6    Q    Okay.  Now, can you just walk me through what's

7    discussed on this January 23rd -- at some point,

8    Mr. Pollack drops off; is that right?

9    A    Yes.

10   Q    And what was discussed?  Were you on the call the

11   entire time?

12   A    Yes.

13   Q    What was discussed during the call?

14   A    We discussed refinancing a property on Devils Knob

15   Loop, which was a second home that they had.  We kind of

16   discussed the primary residence which we currently held

17   lien at that time.

18   Q    Whose primary residence are we talking about?

19   A    I'm sorry, that would be Robert and Maureen

20   McDonnell.

21   Q    Okay.  Not sister Maureen, but wife Maureen?

22   A    Correct.

23   Q    Was there any discussion, were you collecting any

24   information from the Governor and Ms. McDonnell, wife

25   Maureen?

1  A     Wife Maureen.  I did.  Maureen McDonnell, the sister,

2  dropped off the conversation.  We basically went over some

3  of the information as far as assets, income, credit

4  properties owned.  We briefly scanned that information and

5  I did so off of the previous application we had with them.

6  Q     Let's talk a little bit about that.  When you say

7  there is a previous application, what are you talking

8  about?

9  A     I'm sorry, it was a previous loan that we had done

10 for the primary residence.

11 Q     So at the time of this call, PenFed was carrying the

12 Morton the primary residence of Mr. and Ms. McDonnell?

13 A     Yes.

14 Q     And do you remember approximately when that was?

15 A     I want to say it was like 2007, 2008.

16 Q     Okay.  And what is the purpose for you getting this

17 information from the Governor?

18 A     In order to process the loan to move forward with an

19 application for Devils Knob Loop.

20 Q     When you say Devils Knob Loop, was there

21 another -- was there an entity associated with Devils Knob

22 Loop?

23 A     Yes, there was.

24 Q     Blue Ridge Heaven?

25 A     Yes.

1   Q    Okay.  Now, how quickly did the McDonnells want to

2   close on -- first of all, taking a step back, in the

3   conversation are you discussing only Devils Knob Loop or

4   are you also discussing refinancing the personal residence

5   of the McDonnells'?

6   A    Briefly, the personal residence at that time.

7   Q    Okay.

8   A    But mostly Devils Knob Loop.

9   Q    How quickly did they want to refinance the loan on

10  Devils Knob Loop?

11            MR. BURCK:  The witness doesn't recall if

12  Ms. McDonnell is on the phone call.  He is referring to

13  both McDonnells.

14            THE COURT:  Is that what you said?  That you

15  didn't recall whether she was, Ms. McDonnell, was on the

16  call or not?

17            THE WITNESS:  Correct.

18            THE COURT:  Okay.  Well, confine it to who she

19  can testify about or do something else, move on.

20            MR. DRY:  Yes, sir.

21  BY MR. DRY:

22  Q    How quickly did at least Mr. McDonnell want to close

23  the loan on Devils Knob Loop?

24  A    Pretty quickly.  They were looking at about a 30-day

25  turnaround.

**NANETTE BOLT - DIRECT**

1    Q    Is that unusual, ma'am?

2    A    No.

3    Q    Why is that not unusual?

4    A    Everybody wants to refinance quickly to get a lower

5    rate.

6    Q    That's locking in the current rate?

7    A    Yes.

8    Q    Okay.  During that conversation, were you taking any

9    notes?

10   A    I was, yes.

11   Q    And do you have those notes today?

12   A    No, I do not.

13   Q    And do you know what happened to them?

14   A    They were most likely shredded.  My desk had moved

15   around a couple times and I was carrying a lot of

16   paperwork and our office is primarily paperless.

17              MR. DRY:  One moment, Your Honor.  The

18   government would like to refresh the witness's

19   recollection.

20       (Document proffered to witness.)

21   BY MR. DRY:

22   Q    Just read to yourself the second paragraph.

23   A    You want me to read this?

24   Q    I just want you to read it to yourself, the second

25   paragraph.  You can flip over to the second page as well.

1    (Witness perusing document.)

2    After reviewing that document, ma'am, do you remember

3    Ms. McDonnell participating in this call on January 23rd,

4    2013?

5    A    She most likely was.

6    Q    Okay.  At any point during this initial call, do you

7    remember Mr. or Ms. McDonnell mentioning personal loans

8    that they had?

9    A    No.

10   Q    Did you recall any mention of a Mr. Jonnie Williams?

11   A    No.

12   Q    Any mention of an entity called Starwood Trust?

13   A    No.

14   Q    Now, in order to fill out -- to obtain a mortgage

15   loan from PenFed, do borrowers have to fill out a mortgage

16   application?

17   A    Yes.

18   Q    Okay.  And typically, how do they go about that?

19   A    Through our institution, typically they would apply

20   online or they would call up a member services

21   representative who will complete the application for them

22   over the phone.

23   Q    That's the typical way a mortgage application gets

24   filed?

25   A    Yes.

**NANETTE BOLT - DIRECT**

1    Q    In this case, for Mr. and Ms. McDonnell, wife

2    Ms. McDonnell, did they use either one of those processes?

3    A    No, they did not.

4    Q    And in fact, what process was used in this case?

5    A    I built the applications in because of the

6    sensitivity of the applications.

7    Q    And when you say "the sensitivity," PenFed was trying

8    to assist with what?

9    A    Assist with, one, expediting their applications, and

10   kind of keeping their applications a little more

11   sensitive.

12   Q    Their personal identifiers, limiting the number of

13   people.  It is nothing nefarious.  And it was your idea,

14   it wasn't their idea, correct?

15   A    Correct.

16   Q    I just want to make sure.  When you say build the

17   application or build the loan, I guess, what do you do to

18   build a loan?

19   A    I go into the system and input the information that's

20   provided, create an application number.

21   Q    Okay.  And in this case, this is after, you would be

22   doing this after the January 23rd call?

23   A    Yes.

24   Q    Okay.  And what did you rely on to build the loan

25   application?

1    A      I relied on the notes I had at the time, the previous

2    application from the loan that we had with them, part of

3    our conversation that we had on the 23rd, and discussing

4    the application with Larry Blake.

5    Q      Had you run a credit report?

6    A      Yes.

7    Q      Did you consider the credit report in building the

8    application as well?

9    A      Yes.

10   Q      I'd like to go to Government Exhibit 475, please.

11   Ma'am, do you recognize this string of e-mails?

12   A      Yes, I do.

13   Q      This is between you and Mr. McDonnell as well as

14   Larry Blake and it appears Ms. McDonnell, correct?

15   A      Correct.

16          MR. DRY:  Government moves for Government's

17   Exhibit 475 into evidence, Your Honor.

18          THE COURT:  It will be admitted.

19   BY MR. DRY:

20   Q      I'd like to go to your e-mail at 6:56 p.m., ma'am.

21   Who is that e-mail to?

22   A      Governor McDonnell and his wife.

23   Q      Okay.  Regarding the, where it says, "The encrypted

24   documents can be accessed using the last four digits of

25   the primary borrower's Social Security Number," what does

1    that mean?

2    A    When we send electronic documents, we encrypt the

3    documents because they are personal information.  And

4    typically we will use the four last digits of the primary

5    borrower's Social Security Number.

6    Q    I got you.  Then the second paragraph, you talk about

7    "Attached are the documents for refinancing on Devils Knob

8    Loop.  Please review the information, sign, and return.

9    Please make any changes, corrections you feel are

10   necessary on the application."

11        First of all, what documents are you sending them on

12   the encrypted system?

13   A    The Application, the Good Faith Estimate, Truth In

14   Lending, Notice of Intent to Proceed, Borrower's

15   Authorization for Additional Information, Affiliated

16   Companies.  There's quite a few different documents.

17   Q    Okay.  And then you write, "Once received, this will

18   provide your authorization for PenFed to begin ordering

19   services, appraisal, and title."  Is this kind of like a

20   necessary first step from them for you to go forward?

21   A    Yes.  Because I needed their permission to move

22   forward.

23   Q    Okay.  And when you, going up, can you just read what

24   Mr. McDonnell responds with, please?

25   A    "Nan, thanks so much for your very prompt service.

1    We will review and edit and sign and fax back soon.

2    Thanks."

3    Q    Okay.  Let's go to Government Exhibit 476, please.

4    Have you had an opportunity to review this document before

5    your testimony today, ma'am?

6    A    Yes, I have.

7    Q    And generally, what is this document?

8    A    This is the Uniform Residential Loan Application,

9    also known as a 1003.

10   Q    Does it also include the other documents that you

11   were talking about earlier, the Good Faith Estimate and

12   Borrower's Authorization, all of that?

13   A    Uh-huh.

14        MR. DRY:  The government would move government

15   Exhibit 476 into evidence, Your Honor.

16        THE COURT:  It will be admitted.

17   BY MR. DRY:

18   Q    Is it fair to say that what we have, this packet of

19   documents, is what you were referencing in your earlier

20   e-mail that was going to be accessed with the last four

21   digits of the Social Security Number?

22   A    Correct.

23   Q    That's this packet?

24   A    Correct.

25   Q    Now, this is typically, this is a Uniform Residential

1  Loan Application; is this often referred to as a URLA?

2  A    Yes.

3  Q    Who put input of the information on this form?

4  A    I did.

5  Q    Okay.  And had you had any subsequent conversations

6  from the 23rd to the date of this e-mail, January 28th,

7  before you filled out this, that you can remember, with

8  the McDonnells?

9  A    I don't recall off the top of my head.

10  Q    Okay.  But what information did you use to fill out

11  this loan application or input the data?

12  A    Again, it was from our initial conversation.  It was

13  going over the application with Larry Blake and using

14  previous information that we already had on file.

15  Q    Okay.  Now, going to the next page, can you blow up

16  on the right-hand side, please, the liabilities?  Go up a

17  little bit, please.  In fact, can you blow up the

18  paragraph, the instruction paragraph right there?  Can you

19  read that, ma'am, where it says, "Liabilities and pledged

20  assets..."?

21  A    Just a little bit more.

22  Q    There you go.

23  A    Yes.

24  Q    Okay.  And this requires that a borrower list the

25  creditor's name, address, and account number for all

1   outstanding debts, including automobile loans, revolving

2   charge accounts, real estate loans, alimony, child

3   support, stock pledges, et cetera, and to use a

4   continuation sheet if necessary.

5        Can we scroll down and just slowly scroll down, are

6   any of these, do any of these mention Starwood Trust?

7   A    No, they do not.

8   Q    Any mention of Jonnie Williams?

9   A    No.

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

```
1              MR. DRY:  Okay.  Now, stop there.
2  BY MR. DRY:
3  Q    Now, on the bottom there, it says what?
4  A    "See Attached."
5  Q    Okay.
6              MR. DRY:  And can you come back out to the full
7  document, and then go on the left-hand side towards the
8  bottom.  Thank you, Shelly.
9  BY MR. DRY:
10 Q    And is there a place for stocks and bonds?
11 A    Yes, there is.
12 Q    And is there anything listed there?
13 A    No.
14 Q    Okay.
15             MR. DRY:  Now, going to the fourth page of the
16 application.  Okay.  And going to the top.  Thank you,
17 Ms. Noble.
18 BY MR. DRY:
19 Q    Do you see where it says "Additional Liabilities"?
20 A    Yes.
21 Q    And this is continuation sheet that was mentioned on
22 the "See Attached"?
23 A    Yes.
24 Q    Okay.  And, again, nothing about Jonnie Williams or
25 Starwood Trust, correct?
```

1    A      No.

2    Q      All right.  Now, just briefly, going to the next

3    page, can you briefly describe what a good faith estimate

4    is?

5    A      A good faith estimate gives an estimate of the

6    charges that will be applied to the application.

7    Q      All right.

8            MR. DRY:  And, Ms. Noble, if we can go to the

9    eighth page of the exhibit.

10   BY MR. DRY:

11   Q      And what is an Affiliated Business Arrangement

12   Disclosure Statement?

13   A      It discloses any affiliates that we deal with, what

14   their potential charges would be, what the average charges

15   are in the market for different services that are required

16   for the application.

17   Q      Okay.  And on the next page, it has to be signed by

18   the borrowers?

19   A      Correct.

20   Q      And on the tenth page of the exhibit, please, which

21   should be the next.  What's a Borrower's Authorization?

22   A      It authorizes the lender to obtain information for

23   the processing of the application.

24   Q      From third parties?

25   A      Yes.  Yes.

NANETTE BOLT - DIRECT                3141

```
1   Q    And I believe PenFed is a full doc lender?
2   A    Correct.
3   Q    And does this authorize you to go get back-up
4   documentation as needed?
5   A    Correct.
6   Q    Okay.  And that's -- the borrowers have to sign on
7   that as well?
8   A    Yes.
9            MR. DRY:  Going to the 13th page of the exhibit,
10  please.
11  BY MR. DRY:
12  Q    And what is this document, ma'am?
13  A    The Notice of Intent to Proceed.
14           MR. DRY:  And can you just blow that up.
15  BY MR. DRY:
16  Q    And what does this authorize you to do?
17  A    It authorizes me to start ordering services,
18  full-blown processing of the application.
19  Q    Now, what property is listed on that?
20  A    770 Devils Knob Loop.
21           MR. DRY:  And can we go back?  I apologize.  I
22  don't know if I did this, and I should have.  Can we go
23  back to the first page of this exhibit?  And can you blow
24  up just that top paragraph?  No.  No.  No.  You were right
25  before.  Right there.  Thank you.
```

NANETTE BOLT - DIRECT                3142

```
 1  BY MR. DRY:
 2  Q    And what property is this loan package related to?
 3  A    770 Devils Knob Loop.
 4  Q    And that was the Blue Ridge Heaven?
 5  A    Correct.
 6  Q    Okay.
 7          MR. DRY:  All right.  Let's go to Government's
 8  Exhibit 479, please.
 9  BY MR. DRY:
10  Q    Do you recognize this string of e-mails?
11  A    Yes, I do.
12  Q    And this is between you and Mr. McDonnell?
13  A    Correct.
14  Q    And this is dated February 1st of 2013?
15  A    Yes.
16          MR. DRY:  Government moves Government's Exhibit
17  479 into evidence, Your Honor.
18          THE COURT:  It will be admitted.
19  BY MR. DRY:
20  Q    Now, going to the bottom of this.  Right there.  The
21  very bottom, is that -- 6:56 p.m., is that the same e-mail
22  that we talked about earlier, and then this is just a
23  separate response at a later date from the Governor?  Is
24  that right?
25  A    Correct.
```

1  Q    Okay.  And in this, it says, "Nan, did you send

2  documents to my sisters also for signature.  Some of my

3  originals show a space for their signatures, but I assume

4  you sent them their own copies."

5       When you have multiple people -- borrow -- or

6  multiple people on one loan, do you typically try to make

7  sure that personal information from one borrower goes to

8  that borrower only, and there's not -- the borrowers,

9  regardless of family relationship, don't see each other's

10 personal information?

11 A    Correct.

12 Q    Okay.  Now, he asked, "Can I fax back the forms and

13 mail originals and then send the supporting documents

14 Monday after I find them all this weekend?"

15      And, again, the date of that e-mail, ma'am?

16 A    January 31st.

17 Q    And what's the date -- or the day of the week?

18 A    Thursday.

19 Q    Okay.

20           MR. DRY:  And can we go up?

21 BY MR. DRY:

22 Q    And, in fact -- stop -- wait.  No.  Down a little bit

23 lower.  There you go.

24      And, in fact, is this your response?

25 A    Yes, it is.

NANETTE BOLT - DIRECT                3144

```
1    Q     And is that your fax number that you can -- that you
2    informed Mr. McDonnell he could fax the information to?
3    A     Yes, it is.
4    Q     And you tell him it's not necessary to send the
5    originals.  Faxes are fine?
6    A     Correct.
7    Q     And then he responds with a "thanks," correct?
8    A     "Thanks, Nan."
9    Q     Okay.  Now, that's Thursday -- I'm sorry.  That
10   "thanks" response is Friday, February 1st, correct?
11         And what's the time on that?
12   A     9:32 a.m.
13   Q     Okay.
14         MR. DRY:  Now, let's go to Government's Exhibit
15   480, please.
16   BY MR. DRY:
17   Q     Ma'am, this is an e-mail from Pam Watts to you,
18   correct?
19   A     Correct.
20   Q     It's on February 1st of 2013?
21   A     Yes.
22   Q     And it's later that afternoon?
23   A     Correct.
24   Q     Okay.
25         MR. DRY:  Government moves for Government's
```

1   Exhibit 480 into evidence, Your Honor.

2              THE COURT:  It will be admitted.

3   BY MR. DRY:

4   Q    Can you please read the subject line of this?

5   A    "Ms. Bolt, attached are the loan documents from

6   Governor McDonnell.  Please do not hesitate to contact me

7   with questions.  Thank you."

8   Q    And on the subject line it says, "Scanned from a

9   Xerox multifunction device"?

10  A    Correct.

11  Q    What was attached to this e-mail?

12  A    That would most likely be all the documents that I

13  had sent to them.  Disclosures.

14  Q    And let's take a look at this.

15             MR. DRY:  Let's go to the second page of the

16  exhibit.

17  BY MR. DRY:

18  Q    And was this the Affiliated Business Arrangement

19  Disclosure Statement that we talked about?

20  A    Yes.

21             MR. DRY:  And then if we go to the next page.

22  BY MR. DRY:

23  Q    And who is signing and acknowledging?

24  A    Robert McDonnell and Maureen McDonnell.

25  Q    And what's the date?

1   A      February 1st, 2013.

2   Q      Okay.  And then going to the fourth page of the

3   exhibit, this is the Borrower's Authorization we spoke

4   about?

5   A      Correct.

6   Q      And who signs that document?

7   A      Robert McDonnell and Maureen McDonnell.

8              MR. DRY:  Can you go down, please.

9   BY MR. DRY:

10  Q      Okay.  And to be clear, this is wife Maureen?

11  A      Yes.

12  Q      The Maureen G.  Okay.  And then on the Borrower's

13  Authorization, can you just read the first sentence for

14  me?

15  A      "I/we have applied for a mortgage loan from Pentagon

16  Federal Credit Union."

17  Q      Okay.

18             MR. DRY:  Now let's go the eight page of the

19  exhibit.

20  BY MR. DRY:

21  Q      And, again, ma'am, this is the Intent to Proceed?

22  A      Yes.  Yes.

23  Q      And who signs this, and what's the date?

24  A      Robert McDonnell and Maureen McDonnell.

25  Q      And what property is this referring to?

1    A      770 Devils Knob Loop.

2    Q      All right.

3           MR. DRY:  Now let's go to the ninth page of the

4    document, and let's just kind of, yeah, blow it up.

5    BY MR. DRY:

6    Q      Have you had an opportunity to review this, the URLA

7    that was contained in this packet before?

8    A      Yes.

9    Q      And this is what was faxed to Pentagon Federal Credit

10   Union on federal 1st?

11   A      Yes.

12   Q      February 1st of 2013?

13   A      Correct.

14   Q      Okay.  Now -- just going down, scrolling down,

15   please.

16          Now, I see some handwriting on this document.  For

17   all the non-handwritten portions, who would fill that out?

18   A      I had.

19   Q      Okay.  And, again, you base that on the prior loan

20   app, the credit report, and information from the call?

21   A      Correct.

22   Q      Okay.  Did you fill out any of these handwritten

23   corrections?

24   A      No, I did not.

25   Q      Okay.  And had you previously informed the Governor

NANETTE BOLT - DIRECT          3148

```
 1  in that e-mail we talked about, "Make any corrections and
 2  send it to me"?
 3  A    Yes.
 4  Q    Okay.  Now, on the first page, what's written,
 5  handwritten in the years of school for Mr. McDonnell?
 6  A    Twenty-one.
 7  Q    And on the first page, what's handwritten in the
 8  years of school for Ms. McDonnell?
 9  A    It looks like 23.
10          MR. DRY:  Can you just blow that up?
11  A    Twenty-three or 13.
12  BY MR. DRY:
13  Q    Okay.  Either 23 or 13.  One of the two.  Okay.  On
14  the first page of the loan application, what's handwritten
15  in for number of dependents?
16  A    Two.
17  Q    And what is handwritten in for years at current
18  address?
19  A    Six.
20  Q    And I think we might have --
21          MR. DRY:  Can you go down, please?  Okay.  I
22  think we redacted the business phone block.
23  BY MR. DRY:
24  Q    What is handwritten in for the -- well, first of all,
25  can you look on your copy and see if there is a
```

1  handwritten phone number on that page?  It's going to be

2  GMP-02588169 is the Bates number.  That's been redacted as

3  well.  Don't worry about it, ma'am.

4      What's handwritten next to the position title for

5  Ms. McDonnell?

6  A    Director.

7  Q    All right.

8          MR. DRY:  Now, going to the second page of the

9  application.  That's Bates Number 170.  There we go.

10 BY MR. DRY:

11 Q    On the left-hand side, towards the bottom, the

12 "Stocks & Bonds" block, is there anything listed?

13 A    No.

14         MR. DRY:  And then on the right-hand side, if we

15 could scroll up.

16 BY MR. DRY:

17 Q    Is there anything listed in any of the liabilities on

18 this page regarding Jonnie Williams, Starwood Trust?

19 A    No.

20 Q    Okay.  Now, on the bottom of that, it still says,

21 "See Attached," correct?

22 A    Correct.

23 Q    All right.

24         MR. DRY:  And then going further down -- sorry.

25 Going to the next page --

 1  BY MR. DRY:

 2  Q    This isn't the continuation sheet.  This is just part

 3  of the loan application, correct?

 4  A    Correct.

 5  Q    Going down, who signs and dates that?

 6  A    Robert McDonnell and Maureen McDonnell.

 7  Q    Okay.  And what's the date on that?

 8  A    February 1st, 2013.

 9          MR. DRY:  Now, let's go to the next page,

10  please.  And going to the -- yeah.  Blow up the top,

11  please.

12  BY MR. DRY:

13  Q    This is the "Additional Liabilities" block?

14  A    Correct.

15  Q    Or box?

16  A    Correct.

17  Q    Is there anything listed for Mr. Williams there?

18  A    No, there is not.

19  Q    Starwood Trust?

20  A    No.

21  Q    At this point, you pulled the credit report?

22  A    Yes.

23  Q    Was there anything regarding Mr. Williams on the

24  credit report?

25  A    No, there wasn't.

```
1   Q     Starwood Trust?

2   A     No.

3   Q     Before you filled out the application for -- for

4   Mr. and Ms. McDonnell, up to this point, before this comes

5   back, had either one of them ever mentioned Jonnie

6   Williams or Starwood Trust to you?

7   A     No.

8   Q     Ever mention personal loans that they held?

9   A     No.

10  Q     All right.

11        MR. DRY:  Going to the bottom of that page,

12  please.  On the very bottom, keep going.  There we go.

13  Can you just blow up that bottom, please.

14  BY MR. DRY:

15  Q     And this is the continuation page.  They sign again,

16  correct?

17  A     Correct.

18  Q     Can you read what is right above their signatures?

19  A     Can you blow it up just a little more?

20  Q     We can try.

21  A     "I/we fully understand that it is a federal crime

22  punishable by fine or imprisonment, or both, to knowingly

23  make any false statements concerning any of the above

24  facts as applicable under the provisions of Title 18

25  United States Code, Section 1001."
```

NANETTE BOLT - DIRECT          3152

```
 1              MR. DRY:  Okay.  We can take this exhibit down,
 2    please.
 3    BY MR. DRY:
 4    Q    Now, what's the next step in the loan process?  After
 5    you get this from the borrower, the signed Loan
 6    Application, Intent to Proceed, all that, what do you do?
 7    What's the next order?
 8    A    I order appraisal, order title, and then I start
 9    accumulating the information I requested.
10    Q    Okay.
11              MR. DRY:  Let's bring up Government's Exhibit
12    483, please.
13    BY MR. DRY:
14    Q    Do you recognize this document, ma'am?
15    A    Yes, I do.
16    Q    And what is it?
17    A    It's a --
18    Q    -- series of e-mails between you and Mr. McDonnell
19    and some of the people at the bank?
20    A    Correct.
21    Q    And the date is February 5th of 2013 on the top one?
22    A    Correct.
23              MR. DRY:  Government moves Government's Exhibit
24    483 into evidence, please.
25              THE COURT:  It will be admitted.
```

NANETTE BOLT – DIRECT               3153

```
 1            MR. DRY:  Turning to the second page of the
 2  exhibit, please, towards the top.  There you go.  That top
 3  e-mail.
 4  BY MR. DRY:
 5  Q    And this e-mail is from Mr. McDonnell to Debbie Ames
 6  Naylor.  First of all, who is that?
 7  A    She is the executive vice president in charge of
 8  mortgages at Pentagon Federal Credit Union.
 9  Q    Okay.  So just the chain of command.  It goes from
10  Mr. Pollack to Ms. Naylor, and then to you?
11  A    Larry Blake is between Debbie and myself.
12  Q    Gotcha.  And in this, Mr. McDonnell writes, "We have
13  decided that on the 3112 and 3113 Sandfiddler properties
14  we would like to apply" -- it looks like for a loan.
15       Do you recall, what are 3112 and 3113?
16  A    Those were two properties that they had down in
17  Virginia Beach, also known as MoBo.
18  Q    They were rental properties?
19  A    Correct.
20  Q    And can you read what he writes, starting with the
21  "Since"?
22  A    I'm sorry?
23  Q    On the fifth line -- or fourth line, it says,
24  "Since"?
25            MR. DRY:  There we go.
```

1   A    "Since we provided all the data for the loans already

2   to Nan on the Wintergreen loan application, what else do

3   you need from us on these applications?  Thanks again.

4   The appraiser can call me on these properties.  Thank

5   you."

6   Q    Okay.

7            MR. DRY:  And can we go up, please -- or

8   actually, to the next -- or the first page of the exhibit.

9   BY MR. DRY:

10  Q    And then at the bottom, Ms. Naylor is responding back

11  to you and Mr. Blake.

12  A    Correct.

13  Q    And what is she instructing you to do at this point?

14  A    "Can you please incorporate this info into their

15  applications and confirm with him that we have adjusted

16  the loan to those products.  Also see his comment on

17  appraiser.  Thanks much, Debbie."

18  Q    Okay.

19           MR. DRY:  And then can you go up in the e-mail

20  chain?

21  BY MR. DRY:

22  Q    And just being clear, what are you being told to do

23  there?  Exactly what are you supposed to do with the 3112

24  and 3113, building those loan applications?

25  A    Build those applications in like I did with the 770

1   Devils Knob Loop and apply --

2   Q     What are you going to use that --

3   A     We're going to use the products that they chose, the

4   5/5 ARM at the 2.625 percent.

5   Q     But in order to build the loans, what are you going

6   to be using for information to fill out the URLA?

7   A     The information they provided for 770 Devils Knob

8   Loop.

9   Q     Okay.  And, in fact, Mr. Blake writes back, "We will

10  use information from your existing applications for the

11  loans on these two properties."  Is that accurate?

12  A     Correct.

13  Q     Okay.

14         MR. DRY:  And then can we just go to the top

15  part of the e-mail, please.

16  BY MR. DRY:

17  Q     And that's Mr. McDonnell's response, correct?

18  A     Correct.

19  Q     All right.

20         MR. DRY:  Let's go to Government's Exhibit 485.

21  BY MR. DRY:

22  Q     And this is an e-mail chain between you and

23  Mr. McDonnell?

24  A     Correct.

25  Q     And the date on this is February 15th of 2013?

NANETTE BOLT - DIRECT                3156

```
 1  A     Correct.
 2           MR. DRY:  Government moves Government's Exhibit
 3  485 into evidence, Your Honor.
 4           THE COURT:  It will be admitted.
 5  BY MR. DRY:
 6  Q     This is a long e-mail chain, but let's see if we can
 7  move it along.
 8           MR. DRY:  Going to the fifth page of the
 9  exhibit.  It's going to be RFM-012655.
10  BY MR. DRY:
11  Q     And I want to go with -- in the middle at 4:59.  What
12  are you telling the -- this is an e-mail from you to the
13  Governor and Ms. McDonnell; is that correct?
14  A     Correct.
15  Q     And what are you telling them there?
16  A     "The encrypted attachment can be accessed."  And
17  then, "Attached are the disclosures and estimated closing
18  amounts for 31222 Sandfiddler."
19  Q     Okay.
20  A     "We are awaiting the appraisal to see what the
21  current value actually is."
22  Q     And at this point, had you started ordering
23  appraisals for the prior loans, the 77(sic) Devils Knob
24  Loop?
25  A     Yes.
```

NANETTE BOLT - DIRECT                3157

1   Q    Okay.  And in this, you're sending them disclosures

2   and estimated closing costs, correct?

3   A    Correct.

4   Q    But not a new URLA, or did you, or do you remember?

5   A    I usually would.

6   Q    Okay.

7   A    I do believe I did.  Because each application will

8   have its own application.

9   Q    And on -- going to the fourth page of the exhibit,

10  you say, "Sign me up."  What is that in reference to?

11  A    A phone meeting.

12  Q    With who?

13  A    Governor McDonnell.

14  Q    Okay.  And, in fact, if you go down in the e-mail

15  chain -- we can just show this quickly -- is that him

16  setting up a 1:30 call with you on February 13th?

17  A    Yes, it is.

18  Q    Okay.  And, in fact, did you talk to him on that

19  date?

20  A    Yes, I did.

21  Q    And what -- what, generally, was discussed?

22  A    I don't recall at this time.

23  Q    Okay.  Well, during that call, do you ever remember

24  him mentioning --

25            MR. BROWNLEE:  Objection.  Leading.

```
 1              THE COURT:  Go ahead and answer the question.
 2   BY MR. DRY:
 3   Q    Any mention of Starwood Trust or Jonnie Williams
 4   during that call?
 5   A    No.  There wouldn't have been.
 6   Q    Okay.  And then going to the second page of the
 7   exhibit, do you see where that's from you at 6:57 p.m.?
 8   A    Correct.
 9   Q    And you write, "I have received information from
10   Maureen and Eileen.  I have requested additional items
11   from both."  You write, "I reviewed your documentation
12   very quickly," and these are the few items I need from
13   you.
14         What are you asking them for there?  What's the
15   2000 -- well, first of all, "Beach Municipal:  Provide
16   statement reflecting you/Ms. McDonnell as the account
17   holder."
18         What was that?
19   A    There was a document from Beach Municipal, and I
20   don't believe they had identifiers on them.  It was
21   basically a snapshot from computer.
22   Q    And then you've got K-1s there for various things.
23   What are K-1s?
24   A    K-1s establish their part of the corporate tax
25   returns that reflect the percentage of ownership in a
```

NANETTE BOLT – DIRECT                3159

1  company.

2  Q    Okay.  And there you've got, "Profit and loss

3  covering 2012 for herbal supplements.  (Schedule C

4  income.)"  Do you remember what that was in reference to?

5  A    On the Schedule C of their personal tax returns,

6  Ms. McDonnell claimed income for herbal supplements.

7  Q    You're just looking for proof of that?

8  A    Correct.

9  Q    Okay.

10 A    Correct.

11 Q    And "Mortgage" --

12 A    Basically, I had a proof.  I just needed a profit and

13 loss to see what she had made year to date.

14 Q    Gotcha.  And the "Mortgage statements from

15 TowneBank"?

16 A    Yes.

17 Q    Okay.  Is this just you requesting the actual

18 documentation to support the loan application?

19 A    Correct.

20 Q    Okay.  And then going to the first page, the top

21 there, this is Mr. McDonnell's response to you.  And he's

22 providing you, it looks like, with a fax.  And those were

23 the MoBo -- or the beach rental properties; is that right?

24 A    Correct.

25 Q    Okay.  And did any of the information that

1    Mr. McDonnell faxed to you, as of February 15th of 2013,

2    did any of that reference Mr. Williams or Starwood Trust

3    in any way?

4    A    No, it did not.

5    Q    And in any of your discussions with Mr. McDonnell,

6    did he ever reference Mr. Williams or Starwood Trust --

7    A    No, he did not.

8    Q    -- as of that date and time?

9    A    No.

10   Q    Okay.  As of the date and time of this, did

11   Mr. McDonnell ever tell you, "Hey, I still need to look at

12   that loan application, the URLA, for 777" -- "770 and

13   update it"?

14   A    No.

15   Q    Okay.

16        MR. DRY:  Let's go to Government's Exhibit 487,

17   please.

18   BY MR. DRY:

19   Q    Ma'am, do you recognize this document?

20   A    Yes, I do.

21   Q    And this is a fax from the Governor to you containing

22   an amended loan application?

23   A    Correct.

24        MR. DRY:  Has this been entered into evidence?

25        Government moves to admit Government's Exhibit 487.

```
 1              THE COURT:  It will be admitted.
 2  BY MR. DRY:
 3  Q    Now, on the top, what's the date and time of this?
 4  A    February 18th, 2013, 10:57 a.m.
 5  Q    And do you remember what day of the week that was?
 6  A    Not off the top of my head.
 7  Q    Okay.  We can -- on the top left corner, that says
 8  10:57 a.m.  Do you see that?
 9  A    Correct.
10          MR. DRY:  Now, going down to the bottom, stop
11  right there.
12  BY MR. DRY:
13  Q    Can you read what Mr. McDonnell wrote?
14  A    "Nan, I reviewed the general loan application again
15  this weekend and made some updates concerning information
16  that was incomplete.  Please use this as the template for
17  the loan" --
18          MR. DRY:  And then go down, please.
19  A    -- "applications for all four loan refinances we
20  requested.  Please advise if you have any questions.
21  Thank you for your work."
22  BY MR. DRY:
23  Q    All right.
24          MR. DRY:  Let's go to the third page of the
25  exhibit.
```

1   BY MR. DRY:

2   Q    And on the left-hand side, in the "Stocks & Bonds,"

3   is there handwritten any information?

4   A    Yes there is.

5   Q    What is that?

6   A    There's stocks.  There's a car.  There's retirement

7   plans.  There's Racehorse, LLC, which is a company that's

8   held.

9   Q    And do you see "Star Scientific 1,672 SH common" with

10  a 3,143 value?

11  A    Yes, I do.

12          MR. DRY:  And then let's go to the right-hand

13  size, please.  And first of all -- let's go up a little

14  bit.

15  BY MR. DRY:

16  Q    Had there been some confusion regarding which loans

17  went with which properties?

18  A    Yes.

19  Q    And kind of describe that?

20  A    Specifically, it was 3112 and 3113.  Both of those

21  properties had numerous liens against them, and it was

22  just -- I had trouble matching them up.  One of the liens

23  was actually held by the sister's name alone.  So it

24  wasn't reflected within the Governor's credit report.

25  Q    But is it fair to say he's just kind of laying it

NANETTE BOLT - DIRECT                3163

```
1  out, hey, this loan goes with this property?

2  A    Yes.  He -- yes.  Yes.

3  Q    Okay.

4         MR. DRY:  And then can we scroll down, please.

5  BY MR. DRY:

6  Q    And in the "See Attached," what's handwritten there?

7  A    "Starwood Trust" and "J. Williams."

8  Q    Okay.  And zero and -- it looks like 36 months, and

9  zero and 24 months.

10 A    Correct.

11 Q    Does that look right?

12 A    Yes.

13 Q    And then 70,000 and 50,000?

14 A    Correct.

15 Q    Okay.  As of this date, receiving this, had you even

16 heard Mr. McDonnell refer to unsecured loans?

17 A    No.

18 Q    Okay.

19         THE COURT:  Why don't we stop now for our

20 morning break.  We'll take 15 minutes.

21      (The jury left the courtroom.)

22      (Recess taken from 11:31 a.m. until 11:30 a.m. )

23      (The jury entered the courtroom.)

24         THE COURT:  All right.

25         MR. DRY:  Thank you, Your Honor.
```

NANETTE BOLT - DIRECT                    3164

1          Can we bring back up the exhibit, please.  That's

2    487, Page 3.

3    BY MR. DRY:

4    Q    Okay.  Ma'am, to be fair, there are other handwritten

5    changes in this document as well other than the

6    Mr. Williams loans and the Star Scientific stock, correct?

7    A    Correct.

8    Q    We talked about one of those was the Devils --

9    putting the correct properties next to the correct loan

10   balances?

11   A    Correct.

12          MR. DRY:  Now, I'd like to go on the left-hand

13   side of the document, on the bottom left.

14   BY MR. DRY:

15   Q    Where it says "457, 401(a) Plan," what are those?

16   A    Those are retirement plans.

17   Q    Okay.  And then Racehorse, LLC, what is that?

18   A    That is a limited liability company that Governor

19   McDonnell belongs to.

20   Q    And you --

21          MR. DRY:  Well, let's go the top of the document

22   where it says, "Racehorse Properties K-1 distribution."

23   BY MR. DRY:

24   Q    That's handwritten, right?

25   A    Correct.

NANETTE BOLT - DIRECT          3165

1   Q    But on the right-hand side, that's -- that's 16 -- it

2   looks like 67.  Had you filled that in?

3   A    Correct.  Yes.

4   Q    And what did that represent?

5   A    That represents his -- his percentage of income from

6   that company.

7   Q    Okay.  So you had taken that into account --

8   A    Yes.

9   Q    -- and put that there yourself?

10  A    Yes.

11  Q    And he's just putting in the name of the entity?

12  A    Correct.  It had previously been disclosed on his

13  previous application.

14  Q    I gotcha.  Now, to be fair, is it unusual for

15  borrowers to make changes to their loan applications

16  occasionally?

17  A    No, it's not unusual.

18  Q    But before this, had Mr. McDonnell ever communicated

19  to you in any way that he needed to do any further review

20  on his loan application before you received this fax?

21  A    No.

22  Q    Okay.

23       MR. DRY:  Let's go to Government's Exhibit 489,

24  please.

25       Oh, I'm sorry.  Before you go there.  Back on this

1   one.  I just want to make sure.  I don't know if I did

2   this.

3   BY MR. DRY:

4   Q    The next page of the document, that still has Mr. and

5   Ms. McDonnell's signatures as of February 1st, correct?

6   A    Correct.

7   Q    And then the following page of the document, there's

8   some additional handwriting explaining, on the right-hand

9   side, who's guaranteeing --

10  A    Correct.

11  Q    It's just further explanation on the guarantee of

12  certain car loans, it looks like.  And then at the bottom

13  of the document, that's still the signature that you

14  received from the McDonnells on February 1st, right?

15  A    Correct.

16  Q    Okay.

17        MR. DRY:  All right.  Sorry about that,

18  Mr. Starnes.

19      Let's go to Government's Exhibit 489, please.

20  BY MR. DRY:

21  Q    Is this an e-mail from Mr. McDonnell to you dated

22  February 18th at 11:42 p.m.?

23  A    Correct.

24        MR. DRY:  Government moves Government's Exhibit

25  489 into evidence, Your Honor.

```
1              THE COURT:  It will be admitted.

2   BY MR. DRY:

3   Q    And on this, I just want to focus, what's -- it's

4   from you to -- I'm sorry.  From Mr. McDonnell to you, and

5   do you know who "Senior Management Maureen" is?

6   A    By the last name, I'd identify that as his sister.

7   Q    Okay.  You think it's his sister, or are you talking

8   about "Uncapher Mo"?  It looks like there's two different

9   addresses.  I'm just asking what you know.  If you don't,

10  it's fine.

11  A    I don't know.

12  Q    Okay.  But on the last line, can you just read what

13  he wrote?

14  A    "Also sent fax with updated information for loan

15  application.  Thanks."

16  Q    Okay.

17           MR. DRY:  Now let's go to Government's Exhibit

18  492.

19  BY MR. DRY:

20  Q    And this is an e-mail from you to Mr. McDonnell, and

21  then it looks like to Ms. McDonnell's wife; is that

22  correct?

23  A    Yes.

24  Q    Okay.

25           MR. DRY:  Government moves Government's Exhibit
```

1    492 into evidence, Your Honor.

2              THE COURT:  It will be admitted.

3    BY MR. DRY:

4    Q    The date on this is February 21st, correct?

5    A    Correct.

6    Q    Okay.  And then it looks like -- you write, "I have

7    been through your paperwork and had a few things I still

8    need."  And then what are you -- what are you asking for?

9    Generally, what's the stuff, "K-1s, Profit and Loss,

10   Source of Deposit"?

11   A    The "K-1s" were part of the -- their ownership in

12   Blue Ridge Heaven, which was the Devils Knob Loop

13   property.  "MoBo Real Estate" for the properties down in

14   Virginia, 3112 and 3113 Sandfiddler -- or Sand --

15   Sandfiddler.  "Profit and Loss Statement," which is

16   typically covered under the company just to show what has

17   been made year to date.  Also requesting the Schedule C.

18   And also a source of deposit for a large deposit that was

19   made on January 2nd.

20   Q    Okay.  Is it fair to say that you're just looking for

21   paperwork to back up the loan application?

22   A    Correct.  Supporting documentation.

23   Q    Okay.  And then what do you ask for -- can you just

24   read starting with "Question"?

25   A    "Question regarding unsecured notes for Starwood

NANETTE BOLT - DIRECT                3169

```
 1  Trust 0/36 months $70,000 and J. Williams 0/24 $54,000.
 2  Do you have a note with a terms/maturity date?  The loans
 3  you are guarantor for, can you provide documentation
 4  reflecting the other party is making the payments?
 5  (Typically they look for 12 months canceled checks)."
 6  Q    Okay.  And why are you requesting additional
 7  information regarding Starwood Trust and the J. Williams
 8  loans?
 9       Had you had -- at this point, did you have any
10  information other than what was in the loan application,
11  the amended loan application?
12  A    No, I didn't, other than the conversation I had had
13  with the Governor --
14  Q    Okay.  Well, let's --
15  A    -- which pretty much reinstated this information.
16  Q    Okay.  Well, let's go into that.  Did you have a
17  conversation after this e-mail with Mr. McDonnell in which
18  he provided you additional information that you had
19  requested in this e-mail?
20  A    Yes.
21  Q    I'm sorry?
22  A    Yes.
23  Q    Okay.  And can you tell the jury -- can you tell the
24  jury what Mr. McDonnell told you about the Starwood Trust
25  loan and the J. Williams loan?
```

NANETTE BOLT - DIRECT          3170

```
 1  A    The conversation reflecting the 70,000, I was told
 2  that that was part of the company MoBo.  And the $54,000,
 3  it was -- there was no documentation.
 4  Q    And to be clear, when you say "no documentation,"
 5  there was no loan application?
 6  A    A verbal agreement.
 7  Q    Okay.  It was a verbal agreement?
 8  A    Yes.
 9  Q    And was it unsecured?
10  A    It was unsecured.
11  Q    Okay.  But did Mr. McDonnell want those reflected on
12  this personal financial statement?
13  A    He did.  The 54,000 -- the 54,000 was a personal loan
14  to Maureen McDonnell, the wife.  The 70,000, what I had
15  explained to him was under MoBo --
16  Q    Well, hold on.  I want you to stop there.
17  A    Okay.
18  Q    I'm just asking for what he explained to you.
19  A    Okay.
20  Q    Had he told you -- well, I'll withdraw that question.
21       In your discussion with Mr. McDonnell, did he ever
22  mention to you that his wife had been interviewed by law
23  enforcement on February --
24            MR. BROWNLEE:  Objection, Your Honor.
25            THE COURT:  No.  If he mentioned it, she can
```

NANETTE BOLT - CROSS - BROWNLEE          3171

```
1   recall.

2   BY MR. DRY:

3   Q    Did he ever mention to you that his wife had been

4   interviewed by law enforcement on February 15th, 2013?

5   A    No.

6        (Counsel conferring with co-counsel.)

7   BY MR. DRY:

8   Q    And just to be clear, where is -- is PenFed located

9   within the Eastern District of Virginia?

10  A    Alexandria, Virginia.

11  Q    Okay.  Thank you.

12           MR. DRY:  Nothing further.

13           THE COURT:  All right.  Cross?

14                     CROSS-EXAMINATION

15  BY MR. BROWNLEE:

16  Q    It's still good morning, Ms. Bolt.

17  A    Good morning.

18  Q    My name is John Brownlee.  I represent Bob McDonnell.

19  I have some questions for you today.

20       Now, when you -- I think you've testified that when

21  most people -- or it's typical when folks come and apply

22  for a loan with PenFed, that they do so on-line; is that

23  correct?

24  A    Correct.

25  Q    Okay.  And -- but in this case, Mr. McDonnell, there
```

NANETTE BOLT - CROSS - BROWNLEE        3172

```
1   was a phone call.  He didn't do it on-line.  You actually
2   had a phone call from which he provided you his
3   information; is that correct?
4   A    Correct.
5   Q    Okay.  And I think you testified that because of his
6   position and the bank's efforts to keep his personal
7   identifiers and financial information, I guess, protected
8   because it was sensitive, that's why the phone call was
9   done; is that correct?
10  A    Correct.
11  Q    Okay.  Now, is it fair to say that the bank wants to
12  be careful with everybody's private information?
13  A    Yes.
14  Q    Okay.  And you are familiar with the bank's policy
15  and procedures 709?
16  A    I don't know the number.
17  Q    Okay.  Let me show you on the screen.
18          MR. BROWNLEE:  If we could pull up, just for the
19  witness, RM-0229.
20  BY MR. BROWNLEE:
21  Q    And if you look at I.A. -- just take a look at that.
22  First of all, are these the policies and procedures with
23  regard to third-party requests for members' records?
24  A    Yes.
25  Q    Okay.
```

NANETTE BOLT - CROSS - BROWNLEE        3173

1            MR. BROWNLEE:  Your Honor, at this time we'd

2    move RM-0229 into evidence.

3            MR. DRY:  We would object, Your Honor.  If

4    there's no evidence that Mr. McDonnell was aware of the

5    internal policies at PenFed, they're irrelevant.

6            MR. BROWNLEE:  Your Honor, these are speaking

7    objections.  Your Honor, this is --

8            THE COURT:  Go ahead and answer the question.

9    BY MR. BROWNLEE:

10   Q    Are these the policies of your bank?

11   A    Yes.

12   Q    Okay.  And the one I've highlighted, is that with --

13   talking about the protecting of members' information?

14   A    Yes.

15            MR. BROWNLEE:  Your Honor, at this time we'd

16   move RM-0229 into evidence.

17            MR. DRY:  Objection.  Relevancy.

18            THE COURT:  Overruled.  Admitted.

19   BY MR. BROWNLEE:

20   Q    All right.  And will you please read just the last

21   sentence of A?

22   A    "According" --

23   Q    Go ahead.

24   A    Am I starting at the correct place?

25   Q    Please.  The word "Accordingly" is perfect.  Thank

1  you.

2  A     "Accordingly, unless requested or consented to by the

3  member of a thrift share or credit account, required by

4  law, or otherwise authorized, member information shall be

5  withheld from dissemination.

6  Q     Okay.  Thank you.

7            MR. BROWNLEE:  We can take that down.

8  BY MR. BROWNLEE:

9  Q     Now, Ms. Bolt, Mr. Dry talked a lot about some of the

10 interaction you had with Bob McDonnell through this loan

11 process --

12 A     Uh-huh.

13 Q     -- and we're going to talk about some of that.  But I

14 just want to confirm, is it accurate that in your dealings

15 with him, that he appeared to be forthcoming and

16 responsive to your requests?

17 A     Yes.

18 Q     Okay.  Okay.  If we can start on January 23rd.  I

19 believe you testified that there was a conference call

20 with the Governor and several members of his family on

21 that date; is that correct?

22 A     Correct.

23 Q     Okay.  And you took the call with your boss, Debbie

24 Naylor; is that right?

25 A     Correct.  And Larry Blake.

1   Q    And Mr. Blake was on the line?

2   A    Correct.

3   Q    And at the beginning, the head of the bank,

4   Mr. Pollack, was on kind of to give the intro?

5   A    Correct.

6   Q    Okay.  And this -- I think you've testified that this

7   first call, as you've described it, was general in nature;

8   is that right?

9   A    Yes.

10  Q    Okay.  And you were -- the purpose of the call was to

11  collect information about the Governor's general assets

12  and liabilities; is that right?

13  A    Correct.

14  Q    Okay.  So it wasn't all his assets or all his

15  liabilities.  It was just the general; is that correct?

16  A    Correct.

17  Q    Okay.  All right.  And is it fair to say that this

18  first call, it was to get the very basic information at

19  that time with the understanding that it would be followed

20  up with later?

21  A    Correct.

22  Q    And so, in other words, it was your understanding, as

23  of this first phone call, that you collected some basic

24  information to begin the loan process, and then it was

25  your understanding that the information would be

NANETTE BOLT - CROSS - BROWNLEE          3176

1  supplemented thereafter?

2  A    Correct.

3  Q    Okay.  So Mr. Dry has gone through several iterations

4  of this loan application.  So is it fair to say this

5  doesn't happen like all at one time?  It happens over a

6  period of time --

7  A    Correct.

8  Q    -- the actual process itself?

9  A    Correct.

10 Q    Okay.  And the person, the borrower, sends in lots of

11 information and then supporting documentation, tax

12 documentation.  And I think Mr. Dry asked, I think

13 appropriately, is this -- sometimes people make mistakes

14 in providing you this information?

15 A    Correct.

16 Q    And your job is to kind of help them give you the

17 right information that you need so that the form, at the

18 end of the day, can be prepared properly?

19 A    Correct.

20          MR. DRY:  Objection, Your Honor.

21          THE COURT:  Overruled.

22 BY MR. BROWNLEE:

23 Q    I think you also stated that, pursuant to Mr. Dry's

24 question, that sometimes borrowers will write down things

25 incorrectly.  Is that fair?

NANETTE BOLT - CROSS - BROWNLEE          3177

1   A    Correct.

2   Q    Okay.  And -- or miss something on one of these

3   drafts?

4   A    Correct.

5   Q    Okay.  And that with regard to the Form 1003, which

6   is the main form we're talking about here, that it's quite

7   common for borrowers to make multiple updates to these

8   loan documents, including the Form 103 -- 1003?

9   A    Correct.

10  Q    Now, on this first phone call, if you remember, do

11  you remember Mr. McDonnell talking about any auto loans

12  that he had?

13  A    I don't recall.

14  Q    Okay.  How about student loans?

15  A    I don't recall.

16  Q    Okay.  How about any credit card debt?

17  A    It was very basic.  Most of that information is

18  pulled up through the credit report.

19  Q    Okay.  Personal lines of credit with a bank?

20  A    Correct.

21  Q    Okay.  Or any business loans?

22  A    Typically, not business loans.

23  Q    Okay.  And did you also then have another

24  conversation with Mr. McDonnell's sister Maureen?

25  A    Yes.

NANETTE BOLT - CROSS - BROWNLEE        3178

1  Q    Yes.  Okay.  And that was the same, similar type of

2  call where you got some -- just the basic information?

3  A    Correct.

4  Q    All right.

5           MR. BROWNLEE:  If we could pull up RM-2049 just

6  for the witness.

7  BY MR. BROWNLEE:

8  Q    And this is an e-mail --

9           MR. DRY:

10          MR. BROWNLEE:  Is this the right one?  Could you

11  go up on that?  That's it.

12  BY MR. BROWNLEE:

13  Q    Okay.  If you look down at the bottom, this is an

14  e-mail from Mr. Pollack to Bob McDonnell on January 24th;

15  is that correct?

16  A    Yes.

17  Q    Okay.  And if we scroll up, it eventually gets to

18  you; is that right?

19  A    Correct.

20          MR. BROWNLEE:  Your Honor, at this time we move

21  RM-2049 into evidence.

22          THE COURT:  It will be admitted.

23  BY MR. BROWNLEE:

24  Q    All right.

25          MR. BROWNLEE:  So if we go down a little bit,

1  right in the middle.  In the middle.  If you'd go up just

2  a bit.  There you go.  Thank you.

3  BY MR. BROWNLEE:

4  Q    This is from Mr. McDonnell, and it looks like it's

5  sent to his family members on January 24th, and it's

6  titled "Estimates on Your Loan."  And then he says, "FYI,

7  estimates coming tomorrow."

8       So the FYI is referring, in this one, to the e-mail

9  that he just received from Mr. Pollack; is that correct?

10 A    Yes.

11 Q    Okay.  So is it accurate that as of January 24th,

12 2013, they were still -- the rates were still moving a

13 little bit?  They were still kind of trying to figure out

14 what the rate was to lock down?

15 A    Correct.

16 Q    Okay.  And that's why -- and that is the -- when they

17 say "estimates coming tomorrow," that's hopefully more

18 rates?

19 A    Correct.

20 Q    Okay.  Okay.  Let's look at RM-2050-01.  All right.

21 Now, this date -- I believe this is -- I believe this is

22 in evidence, but we'll do it this way.  This is an e-mail,

23 on the top, from Bob McDonnell to you, is that correct, on

24 January 28th?

25 A    Correct.

1  Q    All right.

2          MR. BROWNLEE:  Your Honor, at this time we move

3  2050 into evidence.

4          THE COURT:  It will be admitted.

5          MR. BROWNLEE:  All right.  Can we publish this?

6  BY MR. BROWNLEE:

7  Q    All right.  So if we go to the middle there, it says,

8  "Attached" -- it says, "Attached are the documents for the

9  refinancing of Devils Knob Loop.  Please review the

10 information, sign and return."  And then you attach some

11 documents to the e-mail; is that correct?

12 A    Correct.

13 Q    And you attached a draft loan application that you

14 had filled out; is that correct?

15 A    Correct.

16 Q    Okay.  And you had prepared an Affiliated Business

17 Arrangement Disclosure Statement; is that right?

18 A    Correct.

19 Q    And Mr. Dry asked you a little bit about that.  I

20 want to make sure.

21          MR. BROWNLEE:  Can we just -- just for a second

22 pull up 2050-10?  It's the tenth page of this document.

23 BY MR. BROWNLEE:

24 Q    This is the Affiliated Business Arrangement

25 Disclosure Statement?

```
 1  A    Correct.

 2  Q    To be clear, this is a disclosure of PenFed?

 3  A    Correct.

 4  Q    All right.  This isn't a disclosure of the borrower?

 5  A    Correct.

 6  Q    And you are, in this document, disclosing to the

 7  borrower your relationships with another entity?

 8  A    Correct.

 9  Q    Okay.

10          MR. BROWNLEE:  We can take that down.

11  BY MR. BROWNLEE:

12  Q    And then you also gave him a Borrower's

13  Authorization?  Yes?

14  A    Correct.

15  Q    A Federal and State Compliance Document?

16  A    Correct.

17  Q    A Borrower's Notice of Intent to Proceed with Loan

18  Application?

19  A    Correct.

20  Q    A PenFed Closing Credits document?

21  A    Correct.

22  Q    A Notice to First Lien Mortgage Loan Applicants?

23  A    Correct.

24  Q    A Truth-in-Lending Disclosure Statement?

25  A    Correct.
```

NANETTE BOLT - CROSS - BROWNLEE        3182

1   Q    Okay.  And so once these documents were -- were

2   prepared and sent back, that now gives you the

3   authorization to begin; is that -- once all that's done

4   and completed, now you have the authority to disburse

5   funds; is that correct?

6   A    We have to go through the entire process, but yes.

7   Q    Right.  But when it's all done --

8   A    Yes.

9   Q    -- when everything is completed, then we have

10  closing, that's when you have the authority to disburse

11  funds?

12  A    Yes.

13  Q    So when you got these documents back, when the first

14  set came back -- I guess the first draft, we'll call it,

15  got back, at that point it wasn't completed.  You didn't

16  have authority to disburse funds, did you?

17  A    No.

18  Q    Okay.  All right.  Let's talk about a couple of them.

19  First, the Truth-in-Lending Disclosure Statement.

20          MR. BROWNLEE:  If we could pull up Page 24 of

21  that document.  RM-2050.  Page 24.

22  BY MR. BROWNLEE:

23  Q    All right.  This is the Truth-in-Lending Disclosure

24  Statement; is that correct?

25  A    Yes.

```
1   Q    All right.  And you see the two boxes on the right?

2   A    Yes.

3   Q    And in this case, the "Preliminary" is checked; is

4   that right?

5   A    Correct.

6   Q    And not the final; is that correct?

7   A    Correct.

8   Q    Okay.

9             MR. BROWNLEE:  Can we pull up Page 13 of that

10  document?

11  BY MR. BROWNLEE:

12  Q    Okay.  There is called a Federal and State Compliance

13  Document?

14  A    Yes.

15            MR. BROWNLEE:  And if we could pull up the line

16  that starts, "This."

17  BY MR. BROWNLEE:

18  Q    It says, "This document is neither a contract nor a

19  commitment to lend"; is that correct?

20  A    Correct.

21  Q    Okay.

22            MR. BROWNLEE:  All right.  Can we pull up Page

23  16 of that document?  If you highlight the first

24  paragraph -- or second paragraph.

25  BY MR. BROWNLEE:
```

NANETTE BOLT - CROSS - BROWNLEE        3184

```
1   Q    This document says, "This form is not a commitment to
2   extent credit"; is that correct?
3   A    Correct.
4   Q    And then there's some information on the form about
5   closing credits; is that right?
6   A    Correct.
7   Q    Okay.  And that's, what, $10,000 at closing?
8   A    I don't recall at that time what the credits for
9   closing costs were.  We changed our program a number of
10  times.
11  Q    Okay.  I think if we pull it up there, we might see
12  it.  I'm sorry.  It's small to read.  So it says, "If the
13  loan closes using our preferred title/settlement
14  provider," correct?
15  A    Yes.  But I don't recall.  Is this document dated
16  from that time frame?
17  Q    Yes.
18  A    Because it may not have had a limit on it.
19  Q    Okay.  This is what you sent --
20  A    Okay.
21  Q    -- to Bob McDonnell.
22       MR. DRY:  Objection, Your Honor.  She's just
23  asking when the document is.
24       MR. BROWNLEE:  Oh, I see.  Okay.
25  BY MR. BROWNLEE:
```

```
1  Q    I don't think there's a date on it.
2       Okay.  And so then it discusses origination charge;
3  is that correct?
4  A    Correct.
5  Q    Okay.  And it talks about required service, "All
6  Required Services" there?
7  A    Correct.
8  Q    It talks about "Title Service and Lender's Title
9  Insurance"?
10 A    Correct.
11 Q    Okay.  It talks about a "Settlement Fee"?
12 A    Correct.
13 Q    And "Government Recording Charges"?
14 A    Correct.
15 Q    And "Transfer Taxes"?
16 A    Correct.
17 Q    Okay.  And all these things happen at closing; is
18 that correct?
19 A    Correct.
20 Q    So when this was sent out on January 28th, none of
21 these things had happened yet?
22 A    Correct.  It was an estimate.
23 Q    Okay.  And fair to say that none of these things had
24 happened when Bob McDonnell sent the form back to you on
25 February 1st?
```

NANETTE BOLT - CROSS - BROWNLEE          3186

```
 1  A    Correct.

 2  Q    Okay.  And I think the document also says that it is

 3  "subject to change at any time prior to the time you

 4  submit a loan application"; is that correct?

 5  A    Correct.

 6  Q    Okay.

 7            MR. BROWNLEE:  Let's highlight that.

 8  BY MR. BROWNLEE:

 9  Q    Okay.  It's the last line of that paragraph?

10  A    Correct.

11  Q    Okay.  Now, if we also look at Page 16 of that

12  document, if you look at where it says "Purchases."

13            MR. BROWNLEE:  If you could blow that up.

14  BY MR. BROWNLEE:

15  Q    And it says if you want this special deal, on closing

16  you must send "the application and a fully executed

17  purchase agreement during the promotional period"; is that

18  correct?

19  A    Correct.

20  Q    What is a "fully executed a personal agreement"?

21  A    It's a purchase agreement between seller and buyer --

22  Q    Okay.

23  A    -- executed -- fully ratified.

24  Q    Okay.  And that means -- how does that apply in a

25  refi?
```

1    A    It does not.

2    Q    Okay.  So in this case, you wouldn't have that

3    because you already own the property?

4    A    Correct.

5    Q    Okay.

6           MR. BROWNLEE:  All right.  And let's look at

7    Page 1.

8    BY MR. BROWNLEE:

9    Q    And this is back in this original e-mail that was

10   sent that says, "The Account Condition Letter reflects

11   items that are needed for verification of the processing

12   of your application"; is that correct?

13   A    Correct.

14   Q    And this document is called the "Account Condition

15   Letter"?

16   A    Correct.

17   Q    Okay.

18          MR. BROWNLEE:  Let's take a look at RM-17959.

19   That's not it.  17 -- there it is.  If we could blow that

20   up.  Can you show that just to the witness?

21   BY MR. BROWNLEE:

22   Q    What is this, ma'am?

23   A    Accounts Condition Letter.

24   Q    And is it dated -- what's the date?

25   A    It looks like 1/28/2013.

1   Q    Okay.  And is this for the loans for 770 Devils Knob

2   Loop?

3   A    Yes.

4   Q    All right.  For Bob and Maureen McDonnell?

5   A    Correct.

6          MR. BROWNLEE:  Your Honor, we move in 1759-22.

7          THE COURT:  It will be admitted.

8          MR. BROWNLEE:  Thank you, Your Honor.

9   BY MR. BROWNLEE:

10  Q    Now, this is a document that lists all kinds of

11  information that's needed from the borrower; is that

12  correct?

13  A    Correct.

14  Q    Okay.  Tax returns, pay stubs, stock account

15  statements, and the like?

16  A    Correct.

17  Q    Okay.  And this is information that the bank needs

18  before it can act on the loan; is that correct?

19  A    Correct.

20  Q    Okay.  And, now, when Mr. McDonnell had sent in his

21  application -- or his draft application on February 1st,

22  had all these things been done?

23         MR. DRY:  Objection, Your Honor.  The witness

24  has never called this a draft application.

25         THE COURT:  Would you characterize it

1  differently, please.

2            MR. BROWNLEE:  Yes, sir.

3  BY MR. BROWNLEE:

4  Q    When Mr. McDonnell sent in his document on February

5  1st, had he completed all these things?

6  A    I -- I don't recall.

7  Q    Okay.  All right.  Do you see about halfway down

8  where it says, "Provide copy of most recent stock account

9  statement"?

10 A    Yes, I do.

11 Q    Okay.  And is written next to that "Maureen"?

12           MR. DRY:  Objection, Your Honor.  I don't

13 believe this witness has any personal knowledge of this

14 document.

15           THE COURT:  All right.  Let's -- let's get

16 through this.  We --

17           MR. BROWNLEE:  Very well, Your Honor.

18           THE COURT:  This is -- this is a process, right?

19 And this is a loan process?

20           THE WITNESS:  Correct.

21           THE COURT:  Things don't -- as you asked the

22 question, it doesn't happen all at once.

23           MR. BROWNLEE:  Yes, sir.

24           THE COURT:  So if you've got some point, make

25 it.  But dragging through this, demonstrating that some of

1   these things are not at the point of closing, it's really

2   not helping us.

3          MR. BROWNLEE:  Okay.  Thank you, Your Honor.

4   BY MR. BROWNLEE:

5   Q    Let's move -- now, I want to move to January 31st,

6   2013.

7          MR. BROWNLEE:  If we could pull up 2051.  And if

8   you would blow up the middle part of that, please.

9   BY MR. BROWNLEE:

10  Q    Okay.  This is a document that's in evidence that was

11  introduced by the government.

12  A    Uh-huh.

13         MR. BROWNLEE:  And if you go -- scroll down.

14  BY MR. BROWNLEE:

15  Q    This is Mr. McDonnell and -- a couple things.  In

16  this, he's saying, "Nan, did you send documents to my

17  sister."  And you've read this for the government.  Is it

18  fair to say that he asked if he could fax back the forms?

19  A    Correct.

20  Q    And that is -- he's asking if he can do that before

21  he locates the supporting documents; is that correct?

22  A    Correct.

23  Q    Okay.  And so essentially what he's saying is I'm

24  going to send in this paperwork now, some of it, and then

25  I'll find the other documents and I'll get those later?

1           MR. DRY:  Objection, Your Honor.

2           THE COURT:  Sustained.

3           MR. BROWNLEE:  Okay.

4    BY MR. BROWNLEE:

5    Q    And you replied to him; is that correct?

6    A    Correct.

7    Q    Okay.  And if we move up, what you -- first word you

8    said is, "Yes."  So were you telling him it was okay for

9    him to go ahead and fax the documents and then get the

10   supporting documentation later?

11   A    Correct.

12   Q    Okay.  Let me just ask you.

13           MR. BROWNLEE:  You can take that down.

14   BY MR. BROWNLEE:

15   Q    Were you aware at the time that Governor McDonnell

16   was in the middle of a legislative session?

17   A    Yes.  He mentioned it to me in one of our

18   conversations.

19   Q    Okay.  And did he mention that in the sense of how

20   busy he was and that he had a lot going on?

21   A    I think that goes without mentioning.

22   Q    Okay.  Great.

23           MR. BROWNLEE:  Okay.  Let's pull up

24   RM-1787-0006.  87.

25   BY MR. BROWNLEE:

NANETTE BOLT - CROSS - BROWNLEE          3192

1   Q     Okay.  And I believe you've -- this has been

2   introduced by the United States as Government's Exhibit

3   480.

4              MR. BROWNLEE:  This is in evidence, Your Honor.

5              THE COURT:  All right.

6              MR. BROWNLEE:  If you would publish it.  Now,

7   let's start at the very top, if we can.  If you'll blow up

8   just the very top part.

9   BY MR. BROWNLEE:

10  Q     All right.  Can you read this for us, Ms. Bolt?

11  A     "This application is designed to be completed by the

12  applicant with the lender's assistance.  Applicants should

13  complete this form as borrower or co-borrower as

14  applicable.  Co-borrower information must be provided and

15  appropriate boxed checked."

16  Q     Okay.  Let me stop you there.  So it says co-borrower

17  information must also be provided if that box is checked;

18  is that -- and then check the appropriate box; is that

19  correct?

20  A     Correct.

21  Q     Okay.  Now, on this application, or this document,

22  are there any boxes checked?

23  A     No, there is not.

24  Q     Okay.  So let's start, then, with the last line,

25  beginning with "If."

1    A    "If this" --

2    Q    And read that for us.

3    A    "If this application" -- "if this is an application

4    for joint credit, borrower and co-borrower each agree that

5    we intend to apply for joint credit (sign below)."

6    Q    Okay.  And this is unsigned; is that correct?

7    A    Correct.

8    Q    Okay.  Let's look at the asset section of this.  Is

9    it fair to say that in looking at all the documents that

10   Mr. Dry introduced to you and you talked about, that

11   Mr. McDonnell didn't include many assets in this -- in

12   this submission; is that correct?

13   A    Correct.

14   Q    Okay.  And once again, to state the obvious, in a

15   loan, assets are good; is that correct?

16   A    Correct.

17   Q    Okay.  And they improve the chances of getting a

18   refi; is that correct?

19              MR. DRY:  Objection, Your Honor.

20              THE COURT:  Sustained.

21   BY MR. BROWNLEE:

22   Q    Okay.  Well, if one is applying for a loan, the more

23   assets you have, the greater likelihood you'll get a loan?

24              MR. DRY:  Objection, Your Honor.

25              THE COURT:  She's indicated assets are good.

1          MR. BROWNLEE:  Okay.  Thank you.

2          THE COURT:  Why do you want to beat the dead

3  horse?

4  BY MR. BROWNLEE:

5  Q    And -- we'll come back and look at that.

6       Now, in one section here -- if you could blow it

7  up -- his application talked about a note for a car for

8  9,877.  Do you see that?

9  A    Yes.

10 Q    Okay.  But if you look on the asset page, he didn't

11 include the actual collateral for the car itself?

12 A    Correct.

13 Q    Okay.

14         MR. BROWNLEE:  You can take that down.

15      All right.  Let's look at Page 9 of 1787.  If you'd

16 blow up the middle section here.

17 BY MR. BROWNLEE:

18 Q    Now, this is a document that was dated February 1st

19 that he sent back to you; is that correct?

20 A    Correct.

21 Q    Okay.  And in the "Liabilities" section, did he add

22 $704,000 worth of debt?

23 A    Yes, he did.

24 Q    Okay.  And then another $250,000 in debt; is that

25 correct?

1   A     Correct.

2   Q     Okay.  And that was sent back to you on February 1st?

3   A     Correct.

4   Q     Okay.  All right.  So you received this on --

5              MR. BROWNLEE:  We can take that down.

6   BY MR. BROWNLEE:

7   Q     -- on the 1st.  And then let's look at -- I believe

8   on the 15th -- you had a call, I think you talked about,

9   and then there was some additional information sent to you

10  on the 15th; is that correct?

11  A     Yes.

12             MR. BROWNLEE:  Let's you pull up 0591-09.  009.

13  BY MR. BROWNLEE:

14  Q     Okay.  And do you remember Mr. Dry showing you this?

15  A     Yes.

16  Q     Okay.  And this is -- Mr. McDonnell --

17             MR. BROWNLEE:  If you could blow up that last --

18  that bottom part.

19  BY MR. BROWNLEE:

20  Q     Mr. McDonnell is indicating that he is sending

21  several faxes.  One of them is 18 pages, and one of them

22  is 34 pages; is that correct?

23  A     Yes.

24  Q     Okay.  And these are for -- these are forms for two

25  additional properties that --

1          MR. BROWNLEE:  Can we publish this?

2          MR. DRY:  I don't believe it's bee -- I don't

3    think the top has been admitted.  I think this is a --

4    this is a chain where the top has not been admitted.  We

5    don't object to it admitting it.

6          MR. BROWNLEE:  Okay.  I thought this was in.

7    I'm sorry.

8       We would request admission of 0591, Your Honor.

9          THE COURT:  It will be admitted.

10          MR. BROWNLEE:  Thank you.

11   BY MR. BROWNLEE:

12   Q    So he's sending you some documents on this date, some

13   facsimiles; is that correct?

14   A    Correct.

15   Q    With some additional information.  And most of this

16   information has to do with two additional properties that

17   they are considering refinancing; is that correct?

18   A    Correct.

19   Q    Okay.  And what he says is --

20          MR. BROWNLEE:  If we go to the actual page,

21   let's look at 0591.  Go ahead.  The next page.  Let's look

22   at 0591.  The next page.  The next page.  Keep going.

23      Actually, let's look at RM-0612.  No.

24      Okay.  Your Honor --

25   BY MR. BROWNLEE:

NANETTE BOLT - CROSS - BROWNLEE        3197

1  Q    If you'll take a look at this, is this one of the

2  facsimiles that was sent to you on February 15th, 2013?

3  A    Yes.

4         MR. BROWNLEE:  All right.  Your Honor, we move

5  in RM-0612.

6         MR. DRY:  No objection.

7         THE COURT:  It will be admitted.

8  BY MR. BROWNLEE:

9  Q    All right.  And Mr. McDonnell wrote, "Nan, here are

10 the forms for the loan.  As discussed on the phone, please

11 disregard the ones that have the incorrect loan amounts

12 and resend when revised"; is that correct?

13 A    Yes.

14 Q    Okay.

15        MR. BROWNLEE:  And if we could look at page 18.

16 BY MR. BROWNLEE:

17 Q    Okay.  On top, is it true Mr. McDonnell has written

18 in "for 770 Devils Knob Loop"?

19 A    Yes.

20 Q    And if you go to the bottom where it says, "Total

21 Assets" -- I think it's on the next page -- it says 804.

22        And if you move to the right -- keep going -- what

23 does it have for "Total Liabilities"?

24 A    Zero.

25 Q    Zero.  Right.  Okay.  And if you go to the next page,

1  and one more page.  Excuse me.  At the bottom, did

2  Mr. McDonnell sign this as well?

3  A    Yes, he did.

4  Q    Okay.  All right.  Any reason why he would have

5  signed this having put no liabilities on it?

6              MR. DRY:  Objection.  Calls for --

7              THE COURT:  Sustained.

8  BY MR. BROWNLEE:

9  Q    Okay.  Let's look at RM-0612-0032.  And, again, this

10  is another application, still for Devils Knob Loop?

11  A    Correct.

12  Q    And if we go down to the next page, once again, he

13  puts in no liabilities; is that correct?

14  A    Correct.

15  Q    Okay.  And if you look at the next page and the one

16  next, he signs this one as well?

17  A    Correct.

18  Q    Okay.  Let's move along.  If we go to the actual

19  February 18th application.

20              MR. BROWNLEE:  I believe that is Government's

21  Exhibit 487.

22  BY MR. BROWNLEE:

23  Q    And this is what he faxed you on the 18th; is that

24  correct?

25  A    Yes.

1  Q    Okay.  And when you received this, is it fair you've

2  testified that it struck you that he must have used his

3  free time over the weekend to review what he had

4  previously sent and had come up with these edits?

5           MR. DRY:  Objection, Your Honor.  She did not

6  testify to that.

7           THE COURT:  Sustained.

8  BY MR. BROWNLEE:

9  Q    Well, let me ask it this way.  When you got this, did

10  you have any sense of that?

11          MR. DRY:  Objection, Your Honor.

12          THE COURT:  Just ask her a question about a

13  fact.

14  BY MR. BROWNLEE:

15  Q    When you got this, what did you think, ma'am?

16          MR. DRY:  Objection, Your Honor.

17          THE COURT:  Sustained.

18  BY MR. BROWNLEE:

19  Q    Fair to say that you were not surprised to get these

20  edits?

21  A    Correct.

22  Q    Okay.  Now, let me walk through, if I can, a couple

23  of things on this document.  We'll try to do this quickly.

24          MR. BROWNLEE:  Can we go to the next page?

25  BY MR. BROWNLEE:

NANETTE BOLT - CROSS - BROWNLEE          3200

1  Q    All right.  First of all, in the very top part that

2  we had talked about earlier, in this one he signed the

3  very top, indicating the borrower and -- that he was a

4  borrower; is that correct?

5  A    Correct.

6  Q    Okay.

7           MR. BROWNLEE:  Let's move down.  The next page.

8  And let's look at the right-hand column.

9  BY MR. BROWNLEE:

10 Q    I believe Mr. Dry discussed this with you.  Mr. Dry

11 talked about these edits on the right-hand side, and that

12 you said that -- I think you said this was in an effort to

13 try to clear this up; is that correct?

14 A    Correct.

15 Q    All right.  What was confusing at the time?

16 A    The number of liens against the number of properties

17 not totally reflecting all on the individual's

18 application.  It was also reflected on his sister's

19 application.  I believe there was one lien that was not

20 reported on the credit report, which is where I was kind

21 of vague until I became more familiar with the

22 application.

23 Q    Okay.  And so fair to say that what he's providing

24 here is giving you clarity as to some of this confusion?

25 A    Yes.

```
1   Q    Okay.

2             MR. BROWNLEE:  All right.  Let's move to Page 5.

3   BY MR. BROWNLEE:

4   Q    And then on the right-hand side there, also providing

5   you additional information about which one is co-signed,

6   guarantors and things for some of these other debts; is

7   that correct?

8   A    Correct.

9             MR. BROWNLEE:  All right.  Let's go down to the

10  next page.  Actually, if you could go one page up.  One

11  more up.  Okay.  And on the left-hand side for the assets.

12  BY MR. BROWNLEE:

13  Q    Okay.  Here, he's added -- or edited certain things.

14  This PedFed IRA and Share.  Okay.  Do you see that?

15  A    Yes, I do.

16  Q    Okay.  He's also added the Star Scientific stock.  I

17  believe he's also added a life insurance policy with a

18  cash value of about $4,000; is that correct?

19  A    Yes.

20  Q    Okay.  He's also added his ownership of this 2005

21  Toyota; is that correct?

22  A    Yes.

23  Q    And then he's also added the 457 and the 401 Plans

24  and then the Racehorse, LLC?

25  A    Correct.
```

NANETTE BOLT – CROSS – BROWNLEE          3202

1   Q     And take my word for it.  That adds to up about

2   $243,000.  Challenge that?

3   A     I can't challenge it.

4   Q     Okay.  Fair enough.  All right.

5         MR. BROWNLEE:  And then if you move to the other

6   side.  If you blow that up.

7   BY MR. BROWNLEE:

8   Q     The Starwood Trust and the loans from Mr. Williams

9   put on there, those equal 120,000; is that correct?

10  A     Correct.

11  Q     Okay.  Let's look at RM-0591-0037.  And if you look

12  at the line second from the bottom there -- first of all,

13  this is an e-mail from you; is that correct?

14  A     Correct.

15  Q     All right.

16        MR. BROWNLEE:  Your Honor, we move in RM-0591.

17        MR. DRY:  Objection, Your Honor.  This is

18  subsequent to the charge account, and any communications

19  other than what Mr. McDonnell is telling to her after

20  about these --

21        MR. BROWNLEE:  I think we should approach.

22        THE COURT:  Come on up.

23     (At Bench.)

24        MR. DRY:  Your Honor, I think we're going to

25  start veering into materiality world if we're going for

1    anything after February 18th.

2              THE COURT:  What's the point of it?

3              MR. BROWNLEE:  Your Honor, the charge account is

4    February 1.  So once the government went beyond

5    February 1, they have put in play all the communications

6    after that.  So we think that's all relevant,

7    particularly -- we are not talking about materiality.

8    We're talking about the ultimate question that this

9    witness --

10             THE COURT:  I mean, tell me what this is going

11   to prove that's relevant to this.

12             MR. BROWNLEE:  Two points.  One is that this

13   was, in fact, a draft.  This is a charge account for a

14   first draft in a multi-layer process.  That's one.

15   Secondly --

16             THE COURT:  When was the draft?

17             MR. BROWNLEE:  The February 1 submission.  I

18   mean, that's the charged offense.  What he submitted in,

19   in February, the first thing he submitted is what the

20   government alleges is false.  The government has already

21   gone beyond that date.  So --

22             THE COURT:  Don't start -- a tit for tat is not

23   an argument.

24             MR. BROWNLEE:  Your Honor --

25             THE COURT:  Tell me again.  I want to make sure

1   I understand.  Your point is that this document indicates

2   that the relevant document was a draft.  Is that -- that's

3   your point?

4          MR. BROWNLEE:  Yes, sir.  That is one.  That is

5   one thing.  Secondly -- or where we ultimately get is that

6   when he submitted it, there was no intent to influence

7   because it was a draft.  Secondly, what we'll ultimately

8   get to is that the loans themselves do not need to be on

9   this form.

10         THE COURT:  That's a complete -- yeah.  The

11  objection is overruled.  Go ahead.

12         MR. DRY:  Thank you.

13      (In Open Court.)

14         MR. BROWNLEE:  If we could pull up RM-0591-0037.

15  And if we highlight that again.

16  BY MR. BROWNLEE:

17  Q    Second to the last line, could you please read that?

18  A    "I am continuing to review the documentation you

19  provided and am including it in all files open now."

20  Q    Okay.

21         MR. BROWNLEE:  We can take that down.  If we

22  could pull up RM-0598.

23  BY MR. BROWNLEE:

24  Q    Now, two days later, this is an e-mail from you; is

25  that correct?

```
 1   A      Correct.

 2              MR. BROWNLEE:  All right.  We move into RM-0598.

 3              MR. DRY:  Objection.  It has the defendant's

 4   hearsay on the top.

 5              THE COURT:  Let me see it.  Just let me have it,

 6   if you've got a hard copy.

 7              MR. BROWNLEE:  Do you have a hard copy of that?

 8        (At Bench.)

 9              MR. DRY:  If Mr. McDonnell wants to get on the

10   stand and talk about this document is one thing.  But

11   getting into this, it's hearsay to Nanette Bolt two weeks

12   after the February 1st and after he disclosed the Starwood

13   Trust and Jonnie Williams relationship.

14              THE COURT:  This witness is not on this?

15              MR. DRY:  She's on it.  But he's the one writing

16   to her.

17              MR. BROWNLEE:  He's writing back to her.

18              MR. DRY:  It's hearsay.

19              THE COURT:  Let me see.

20              MR. DRY:  He has to take the stand and talk

21   about it.

22              MR. BROWNLEE:  Well, he's going to, but --

23              MR. DRY:  Your Honor, they shouldn't be able to

24   put the defendant's statements of Nanette Bolt --

25              THE COURT:  Just be quiet.
```

1              MR. DRY:  Yes, sir.

2              THE COURT:  The objection is overruled.

3              MR. BROWNLEE:  Thank you, Your Honor.

4         (In Open Court.)

5              MR. BROWNLEE:  Your Honor, we move in RM-0598.

6              THE COURT:  It will be admitted.

7    BY MR. BROWNLEE:

8    Q    So two days later, you asked for some loan

9    documentation; is that correct?

10   A    Correct.

11   Q    All right.  And then he responded to you.  If you --

12   Governor McDonnell responded.  If you move up.  And this

13   is on February 22nd, 2013.  Do you remember this e-mail?

14   A    Yes.

15   Q    Essentially, what is he telling you here?

16   A    He received the appraisal on 3112, and the appraisal

17   came up much lower than anticipated.

18   Q    Okay.  So he's letting you know that --

19   A    Yes.

20   Q    -- and trying to come up with ways that they can

21   continue to work with you all?

22   A    Yes.  Yes.

23   Q    Okay.  All right.  Thank you.  Now, if you go down,

24   you were asked about -- if you look in the middle of the

25   page there, you were asked about these loans; is that

1  correct?

2  A    Correct.

3  Q    Okay.  And I believe Mr. Dry -- messed up my dates

4  here maybe.  But you talked with Mr. McDonnell on the

5  phone after that; is that right?

6  A    Yes.

7  Q    Okay.  And do you remember what he told you about

8  those loans?

9  A    The 70,000 was MoBo, and the 54,000 would have been

10 to -- I believe it was Maureen.

11 Q    All right.  And did he tell you that these were

12 balloon loans and there were no payments due until 2013?

13 A    That was the 0/36.  Zero due in three, and zero due

14 in two.

15 Q    Okay.

16        MR. BROWNLEE:  We can take that down.

17 BY MR. BROWNLEE:

18 Q    Now, Ms. Bolt, this process went through -- and I'm

19 going to try to just cut to this -- over time, and

20 ultimately, these loans closed, I believe, in the May,

21 June time frame of 2013; is that correct?

22 A    The primary residence I believe closed in April.

23 Q    Okay.

24 A    And the other -- Devils Knob Loop and 3112 I believe

25 closed both in May.

NANETTE BOLT - CROSS - BROWNLEE          3208

1   Q     Okay.

2   A     Or beginning of June.

3   Q     Okay.  And is it -- when these things went to

4   closing -- let me just talk about the MoBo loans first.

5   Did the bank make a judgment that the MoBo loans did not

6   need to be on the application?

7              MR. DRY:  Objection, Your Honor.

8              THE COURT:  Sustained.

9              MR. BROWNLEE:  Okay.

10  BY MR. BROWNLEE:

11  Q     Well, let me ask it this way.  When you prepared for

12  closing, after having -- going through this whole process,

13  were the MoBo loans on the final closing documents?

14             MR. DRY:  Objection, Your Honor.

15             THE COURT:  Nope.  She can answer that.

16       Go ahead.

17  A     They were reflected on the application.

18  BY MR. BROWNLEE:

19  Q     The MoBo loans?

20  A     No.  The MoBo loans were not.  I'm sorry.  I

21  misunderstood your question.

22  Q     Okay.  And tell us why those loans were not on the

23  closing documents.

24             MR. DRY:  Objection.

25             THE COURT:  Sustained.

BY MR. BROWNLEE:

Q    Well, would the fact that they were not on there, was that a decision of the bank?

MR. DRY:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. BROWNLEE:

Q    Let me talk -- let me focus on this again, because I want to make sure we have this.  The MoBo loans you testified to were not reflected on the final closing papers?

MR. DRY:  Asked and answered.

THE COURT:  Sustained.

MR. BROWNLEE:  Okay.

BY MR. BROWNLEE:

Q    And can you tell us why?

MR. DRY:  Objection, Your Honor.

THE COURT:  Sustained.

MR. BROWNLEE:  Your Honor, can we approach?

THE COURT:  No, we cannot.

MR. BROWNLEE:  Okay.

BY MR. BROWNLEE:

Q    One of the things you requested were tax returns; is that correct?

A    Correct.

Q    Okay.  And can you tell us why you requested tax

NANETTE BOLT - CROSS - BROWNLEE          3210

1    returns?

2    A    Personal tax returns?

3    Q    Business tax returns.

4    A    Business tax returns.  To reflect any income or loss

5    of income on any of the companies that were held by the

6    borrowers.

7    Q    Okay.  Did you request tax returns for MoBo?

8    A    Yes.

9    Q    Okay.  And did you receive those?

10   A    I did.

11   Q    Okay.  And did you receive those before closing?

12   A    Yes.

13   Q    Okay.  Let me ask --

14          MR. BROWNLEE:  I'm just about done, Your Honor.

15   BY MR. BROWNLEE:

16   Q    Let me ask about Ms. McDonnell's loan.  Was that loan

17   on the final closing documents, that you recall?

18   A    Not initially, no.

19   Q    Not initially.  Okay.  And did that have anything to

20   do with the nature of this balloon payment that this loan

21   reflected?

22          MR. DRY:  Objection, Your Honor.  The reason

23   that it wasn't on there is immaterial.  We're getting into

24   the materiality analysis again.

25          THE COURT:  No.  I -- she can answer that.

1  BY MR. BROWNLEE:

2  Q    Okay.  Why wasn't that loan on the final closing

3  papers?

4         MR. DRY:  That's a different question, Your

5  Honor.

6         THE COURT:  That is a different question.

7         MR. BROWNLEE:  Okay.  Let me see if I can

8  remember the one before, Judge.

9  BY MR. BROWNLEE:

10 Q    With regard to Ms. McDonnell's loan, you testified it

11 was not on there, on the final closing papers originally;

12 is that correct?

13 A    Correct.

14 Q    Okay.  Why?

15        MR. DRY:  Objection, Your Honor.

16 BY THE COURT:

17 Q    The question was the balloon payments, what impact

18 did that have on them not being on or being on the form?

19 A    There were no immediate payments due at that time.

20 Q    Thank you.

21        MR. BROWNLEE:  Thank you.

22    All right.  Thank you for your patience, Your Honor.

23        THE COURT:  All right.  Mr. Burck.

24        MR. BURCK:  Thank you, Your Honor.

25                    **CROSS-EXAMINATION**

BY MR. BURCK:

Q     Good afternoon, Ms. Bolt.  My name is Bill Burck, and I represent Maureen McDonnell.

A     Hello.

Q     Just starting off where Mr. Brownlee left off.  You testified that the personal loan to Maureen McDonnell was initially not on the final application; is that right?

A     Correct.

Q     And you also testified that the MoBo loan was not on the final application; is that right?

A     The MoBo loans were not on any of the applications.

Q     Any of the applications, right?

A     Correct.

Q     And they had been disclosed to you by Governor McDonnell prior to the final application; is that right?

A     Yes.

Q     And did you give them the loan, the McDonnells?

A     Yes.

Q     Okay.  Now, you testified earlier about a conversation that happened on January 23rd of 2013.  And you said that you recall that Governor McDonnell was on and Maureen McDonnell sister was on the call?

A     Yes.

Q     And you were not -- you said that you did not recall if Ms. McDonnell was on the call, right?

1  A    Correct.

2  Q    And you had to be shown a document by Mr. Dry to

3  refresh your recollection that she was on the call?

4  A    Correct.

5  Q    Is it fair to say that even though she was on the

6  call, that you don't recall her saying anything on that

7  call?

8  A    Correct.

9  Q    Okay.

10  A    She -- if she was there, she didn't speak much.

11  Q    Okay.  And is it fair to say that the Governor did --

12  the Governor and Maureen the sister, who you recall being

13  on the call, did most of the talking?

14  A    Correct.

15  Q    You have no idea if she was even listening on that

16  call, do you?

17  A    I -- I -- I don't know.

18  Q    Okay.  Now, the -- you've testified about a number of

19  conversations and e-mails you had with Governor McDonnell

20  today.  And do you recall having any specific

21  conversations with Ms. McDonnell, Maureen McDonnell, the

22  wife, about this application?

23  A    Not very much.

24  Q    Okay.  Is it fair to say that Governor McDonnell was

25  the person you were dealing with with respect --

NANETTE BOLT - CROSS - BURCK          3214

```
1   A     Point of contact, right.
2   Q     And getting information during the various iterations
3   of the application, that information came from Governor
4   McDonnell, right?
5   A     Correct.
6   Q     Okay.  Just to -- one thing that I -- clear.
7             MR. BURCK:  Can you show RM-2049, please.  I
8   think this is already in evidence.  Actually, you know
9   what.  It's not worth the time.  You can take it down.
10  That's okay.  Thanks.
11  BY MR. BURCK:
12  Q     Now, just a couple of last questions.  On the forms
13  that were -- the various iterations of the application,
14  there was one dated February 15, 2013, and that is
15  RM-0612.  I believe that's in evidence.  It's a government
16  exhibit.
17            MS. TARAKTCHIAN:  06 --
18            MR. BURCK:  0612.
19            MR. DRY:  I don't think that we introduced it.
20  I think he may have, but I'm not sure.  So many --
21            MR. BURCK:  This is in evidence, Your Honor.
22  It's RM-0612.
23            THE COURT:  All right.
24  BY MR. BURCK:
25  Q     And this is a fax cover sheet dated February 15,
```

1  2013.  It's from Robert McDonnell to yourself.  Do you see

2  that?

3  A    Yes.

4  Q    And you testified a little bit about this document.

5  A    Yes.

6  Q    Were you aware on that date that Ms. McDonnell was

7  interviewed by the FBI -- excuse me -- by the Virginia

8  State Police?

9  A    No.

10 Q    Okay.  And Mr. McDonnell didn't tell you about that?

11 A    No.

12 Q    Okay.

13       MR. BURCK:  If you turn to -- please turn to

14 page 0612-00019.  And if you blow up the bottom half of

15 it, please, just so it's easier to read.

16 BY MR. BURCK:

17 Q    This is a page that you testified about in response

18 to questions from Mr. Brownlee.  And it is -- it's

19 supposed to list assets and liabilities; is that right?

20 A    Correct.

21 Q    Do you see anything listed on either side, other than

22 a total number?

23 A    No.

24 Q    So you don't see any assets and no liabilities

25 listed?

1    A    Correct.

2    Q    And then a few -- two pages later, 0612-00021,

3    that's -- I think you testified that was signed, actually,

4    by Mr. McDonnell, and it appears to be Ms. McDonnell as

5    well, on the 13th, right?

6    A    Correct.

7    Q    Okay.  So this document didn't contain any assets or

8    liabilities?

9    A    Correct.

10   Q    And was this a document that -- that there are

11   typewritten notes or typewritten aspects of it?  This was

12   typed in by you?

13   A    Yes.

14   Q    Okay.

15           MR. BURCK:  And then finally, on -- can you

16   bring up the February 18, 2015, document.  Government

17   Exhibit -- this is the -- the -- RM- -- Your Honor, just

18   one moment.

19           THE COURT:  Sure.

20           MR. BURCK:  Government Exhibit 487.  Thank you.

21   BY MR. BURCK:

22   Q    And this is the -- you've testified about this

23   document as well.  This is from Governor McDonnell to

24   yourself on the 18th, a few days after the 15th, correct?

25   A    Yes.

NANETTE BOLT - CROSS - BURCK          3217

```
 1  Q    And on this document, page -- the third page of the
 2  exhibit, right.  I know you've testified a bit about this
 3  today too, so I'm sorry to replow old ground.  But on this
 4  page is handwriting from the Governor listing additional
 5  assets and liabilities; is that right?
 6  A    Correct.
 7  Q    And, for example, he -- Mr. Dry took you through the
 8  Starwood Trust and the Jonnie Williams, right?
 9  A    Correct.
10  Q    And he also mentioned the Racehorse, LLC, right?
11  A    Correct.
12  Q    Do you see that there's also an addition of a car,
13  the 2005 Toyota Avalon?
14  A    Correct.
15  Q    And the 457 Plan, the 401(a) Plan?
16  A    Correct.
17  Q    And above that there's an IRA and Share?  Do you see
18  that above the Star Scientific stock?
19  A    Correct.
20  Q    So this had not been previously provided by the
21  Governor as of that date, right?
22  A    Correct.
23         MR. BURCK:  Your Honor, just one moment.
24       (Counsel conferring with co-counsel.)
25         MR. BURCK:  That's it for us, Your Honor.  Thank
```

1  you.

2              THE COURT:  All right.  Redirect?

3              MR. DRY:  Can we have -- can we have RM-229?

4  Can you -- somebody.  RM-229.  I believe it was the first

5  document.

6                    **REDIRECT EXAMINATION**

7  BY MR. DRY:

8  Q    Ma'am, I believe Mr. Brownlee talked about this and

9  the highlighting.

10             MR. DRY:  Can you blow up the highlighting

11  again?

12  BY MR. DRY:

13  Q    Did you ever have any discussions with Mr. McDonnell

14  discussing the policy regarding disclosure of his

15  information by bank staff?

16  A    I don't recall having that conversation.

17  Q    Okay.

18             MR. DRY:  Let's bring up RM-2050.  And can

19  you -- can we scroll through and -- just scroll through

20  some pages.  Do you guys have a paper copy?  Do you have a

21  paper copy?  Okay.

22  BY MR. DRY:

23  Q    I'm sorry.  Do you see this?

24  A    Yes.

25  Q    Mr. Brownlee took you through a lot of things that

1  were talking about how things hadn't happened until the
2  closing table, that there was things that had to happen
3  before the -- after the application, the URLA was filed
4  before closing.  Do you remember those questions?
5  A    Yes.
6  Q    Before you could order appraisals, before you could
7  go through that process, did you have to get the loan
8  application from him?
9  A    Yes.
10 Q    So that was like a necessary first step, right?
11 A    Yes.
12 Q    Okay.
13        MR. DRY:  Now, let's go to Government's Exhibit
14 480, please.  And then let's go to the second page.
15 Actually, I think I'm going to -- can we get to the URLA?
16 The loan application.  Right there.  And can you blow up
17 the top of that?
18 BY MR. DRY:
19 Q    Now, Mr. Brownlee asked you about the check boxes of
20 whether it was going to be a joint application or not,
21 right?
22 A    Correct.
23 Q    From your conversation with Mr. and Ms. McDonnell on
24 the 23rd, did you understand this was going to be a joint
25 application?

NANETTE BOLT - REDIRECT            3220

1  A     Yes.

2           MR. DRY:  And can we actually go down, please.

3  BY MR. DRY:

4  Q     And, in fact, when you were building this loan

5  application and when Mr. McDonnell is doing handwritten

6  notes, is he providing information for both himself and

7  his wife?

8  A     Yes.

9  Q     And then -- I'm sorry, ma'am.  You've seen this

10 document before, correct?

11 A     Yes.

12 Q     This URLA?

13 A     Yes.

14 Q     Do you recall, in reviewing it, ever seeing anything

15 about first draft or draft anywhere on this document?

16 A     No.

17 Q     Okay.  And Mr. Brownlee, he talked about, I think,

18 your role is to assist in helping a borrower in filling

19 out this information and collecting information, right?

20 Do you recall that question?

21 A     Correct.

22           MR. DRY:  Can we go to the signature block,

23 please.  I think it's going to be on the second page of

24 the URLA.  Third page, then.

25 BY MR. DRY:

NANETTE BOLT - REDIRECT          3221

1  Q    Ma'am, is there anywhere for you to sign and make any

2  representations regarding the accuracy of this

3  information?

4            MR. BROWNLEE:  Objection, Your Honor.

5            THE COURT:  Overruled.

6  BY MR. DRY:

7  Q    Do you have to sign this?

8  A    Typically, it's signed down at the bottom.  My name

9  is down there.

10 Q    But are you making any representations regarding the

11 accuracy of the information?

12 A    No.

13 Q    Whose responsibility is that?

14 A    The borrower's.

15           MR. DRY:  And then let's go -- I just need --

16 thank you very much.

17           MR. BURCK:  Sure.

18           MR. DRY:  I really appreciate it.

19 BY MR. DRY:

20 Q    You were asked questions about the additions of

21 information I believe on the fourth page of the exhibit --

22 or I'm sorry.  Fourth page of the URLA.

23           MR. DRY:  It's going to be Bates number

24 GMP-02588172.  Right there.  Can we blow up that middle

25 part?

NANETTE BOLT - REDIRECT          3222

1  BY MR. DRY:

2  Q    Now, ma'am, we talked a lot -- there's confusion

3  about which loan went with which.  But is it going to be

4  possible for you to actually give the McDonnells the money

5  that they are applying for for 3112 and 3113 later without

6  knowing what the correct amounts are?

7  A    Correct.

8  Q    You have to know what the liens are in order to

9  refinance the property, right?

10 A    Yes.

11 Q    Okay.

12          MR. DRY:  Then let's go to -- let's go to 0612.

13 RM-0612, please.  Can we -- 0612.

14     Oh, I think we need to flip it.  Okay.  And the first

15 page, please.  0612-1.  Right there.

16 BY MR. DRY:

17 Q    Do you know what time of day Mr. McDonnell faxed this

18 to you?

19 A    I don't see a time on it.

20 Q    Okay.

21          MR. DRY:  And can we go through the document

22 slowly so I can -- keep going.  All right.  Stop there.

23 One page back.

24 BY MR. DRY:

25 Q    What is the date that Mr. McDonnell and Ms. McDonnell

1   are signing this document?

2   A    2/13/2013.

3   Q    Okay.

4           MR. DRY:  And can we keep going, please.  I'm

5   sorry I'm having to do this.  I just don't have a paper

6   copy.  I want to get to the URLAs that were discussed.

7   Oh, stop there.  One page back.

8   BY MR. DRY:

9   Q    What date is being signed there by Ms. McDonnell?

10  A    2/13/2013.

11          MR. DRY:  Thanks a lot, John.  I really

12  appreciate it.  Was this in the admitted exhibit?

13          MR. BROWNLEE:  I don't think so.  Not the top.

14          MR. DRY:  Okay.

15      Then let's go to -- I believe we talked about total

16  assets and -- let's go to the 19th page, 0612-19.

17  BY MR. DRY:

18  Q    Now, when you're sending this, ma'am, is this

19  populated?

20  A    No.

21  Q    It's not populated.  Why isn't it populated with all

22  the information?

23  A    I, most likely, didn't populate the information

24  before sending out the application.

25  Q    And when you're sending this, this is just the -- had

NANETTE BOLT - REDIRECT                3224

1  you already been informed to use the 770 information for

2  these loans?

3  A    I don't recall.

4  Q    Okay.  Well, let's do it this way.

5         MR. DRY:  Can I pull up -- actually, I don't

6  think I need to.

7      And can you go down a little bit further on this one,

8  please.

9      I apologize, Your Honor.

10     Right to the -- can we go to 612-21?

11 BY MR. DRY:

12 Q    And I believe you were shown the signature at the

13 top?

14 A    Correct.

15 Q    Do you remember that?

16        MR. DRY:  Can we scroll down to the bottom?

17 BY MR. DRY:

18 Q    What date is Mr. and Ms. McDonnell signing this?

19 A    February 13th, 2013.

20        MR. DRY:  One moment, Your Honor.

21     (Counsel conferring with co-counsel.)

22        MR. DRY:  Nothing further.  Thank you, ma'am.

23        THE COURT:  All right.  Thank you, ma'am.  You

24 may stand down.

25     (Witness stood aside.)

1          THE COURT:  We're going to stop here for lunch.

2    And if you all could come back at -- let's make it 2:25,

3    we'll get started with the afternoon session.

4          MR. DRY:  Judge, just one thing.

5       (The jury left the courtroom.)

6          MR. DRY:  I just want to confirm.  We don't

7    object to the bank record portions coming in, but there's

8    a lot of handwritten notes on the first page and the back

9    page that we didn't know were going in.  So to the extent

10   that they are in, we'd object to any of that.

11         MR. BROWNLEE:  Right.  That was not admitted,

12   and we'll make sure we get it all cleaned up, Your Honor.

13         THE COURT:  Okay.

14         MR. DRY:  Thank you, Your Honor.

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

| | |
|---|---|
| 1 | (Luncheon recess taken from 1:09 p.m. to 2:25 p.m.) |
| 2 | THE COURT:  Let's bring in the jury. |
| 3 | (The jury entered the courtroom.) |
| 4 | All right, government, call your next witness, |
| 5 | please. |
| 6 | MR. FAULCONER:  The United States calls Jeffrey |
| 7 | Creekmore. |
| 8 | JEFFREY CREEKMORE, |
| 9 | called as a witness by and on behalf of the government, |
| 10 | having been first duly sworn by the Clerk, was examined |
| 11 | and testified as follows: |
| 12 | DIRECT EXAMINATION |
| 13 | BY MR. FAULCONER: |
| 14 | Q    Good afternoon. |
| 15 | A    How are you doing? |
| 16 | Q    Could you please state your name and spell your last |
| 17 | for the court reporter? |
| 18 | A    Jeffrey Creekmore, C-R-E-E-K-M-O-R-E. |
| 19 | Q    What city do you currently live in? |
| 20 | A    Chesapeake, Virginia. |
| 21 | Q    Could you briefly tell the jury what sort of |
| 22 | educational background you have? |
| 23 | A    I have a Bachelors degree from James Madison |
| 24 | University. |
| 25 | Q    And where are you currently employed? |

3227

1    A    Heritage Bank in Norfolk, Virginia.

2    Q    What is your title or role there?

3    A    Senior Vice President, Business Banking Executive,

4    essentially a commercial loan officer.

5    Q    Now, have you ever met Mr. or Ms. Robert or Maureen

6    McDonnell?

7    A    I have not.

8    Q    Can you tell us, though, whether Heritage Bank has

9    ever done any business with entities that are affiliated

10   with Mr. McDonnell?

11   A    Heritage Bank currently banks Poole Mahoney, which

12   was formerly Huff, Poole & Mahoney which was the law firm

13   that Mr. McDonnell was a partner in.

14   Q    Have you also done some loans for an entity called

15   Racehorse, LLC?

16   A    Racehorse Properties, LLC.  Yes, sir.  Racehorse

17   Properties is a holding company that was formed in 2004, I

18   believe, by ten partners of Huff, Poole & Mahoney to

19   purchase a building where the law firm would operate out

20   of it.

21   Q    Is one of those partners Mr. McDonnell?

22   A    He is.

23   Q    Can you tell us what -- are there two types of loans

24   that you had with them or can you describe what the loans

25   are that you had?

1    A    Yes, sir.  We have a commercial mortgage, which is a

2    first mortgage that we refinanced from the institution

3    that originated it, and later, we refinanced it again and

4    combined a second mortgage that was held on that property

5    into one loan.  And we also have a line of credit to that

6    entity that's used for, very rarely, for repair purposes,

7    tenant upgrades, things like that.  The law firm does not

8    occupy the entire building, so sometimes it is used for

9    tenant outfit for a new tenant in the additional parts of

10   the building.

11   Q    Do these loans go back a number of years?

12   A    Yes, sir.  The line of credit goes back to 2006 with

13   Heritage Bank, and the mortgage was refinanced originally

14   over in 2009.

15   Q    All right.  Now, can you tell us what a personal

16   financial statement is?

17   A    A personal financial statement is a document that the

18   bank requests from guarantors on a loan who are going to

19   be personally obligated for the debt of the loan that

20   basically states the assets and liabilities of the

21   individual who is guaranteeing the loan.

22   Q    Is it common for you to request those as part of a

23   loan renewal process on a periodic basis?

24   A    That's correct.

25   Q    Did you require them at various times for these

1    transactions, the two that you have mentioned?

2    A    Yes, sir, we have.  We require it on, I believe, an

3    annual basis for the line of credit renewal, and also,

4    when we did the refinance with the first mortgage

5    combining the second and first, we also requested them.

6    Q    Typically, would you request them from all ten

7    partners?

8    A    Yes.

9    Q    I'd like to show you what's been admitted as Exhibit

10   106.  There we go.  Mr. Creekmore, do you recognize what

11   type of document this is?

12   A    Yes, sir, that is Heritage Bank's standard personal

13   financial statement.

14   Q    And looking at this, is this a personal financial

15   statement that came from the files for these loans?

16   A    Yes, sir.

17   Q    Could you tell us what the date is there stamped in

18   the upper right-hand corner as received?

19   A    Received on June 15th, 2011.

20   Q    Can you tell us what the crossed-out date is there

21   next to "As of"?

22   A    The crossed-out date is June 1st, 2011.

23   Q    Is that June or may?

24   A    May 1st, 2011.  I apologize.

25   Q    What's the actual date for the personal financial

1    statement?

2    A    December 31st, 2010.

3    Q    Now, that "Date Received," is that the date that you

4    got it at Heritage Bank?

5    A    I assume that's what that stamp represents, yes, sir.

6    Q    If we can go down to the lower right-hand corner, am

7    I reading correctly that first line says, "Other Loans

8    Payable"?

9    A    That's correct.

10   Q    And then "Liabilities of Proprietorships" and

11   "Liabilities of Partnerships/Joint Ventures" down below

12   that?

13   A    That's correct.

14   Q    Now, if we could turn briefly to what's been admitted

15   as Exhibit 373.  Do you recognize this document?

16   A    That's also Heritage Bank's personal financial

17   statement.

18   Q    Is this a later one dated April 30th of 2012?

19   A    That's correct.

20   Q    Was this in the Heritage Bank files for a subsequent

21   renewal process?

22   A    That is correct.

23   Q    Now, if we could zoom in on the box in the lower

24   right-hand corner.  Does that, I know it is harder to read

25   on this one, but does that list all the same categories we

1    saw on that form just a moment ago?

2    A    Yes, sir, it is the same form.

3    Q    On this form, is there anything listed under "Other

4    Loans Payable"?

5    A    No, there is not.

6    Q    Is there anything listed under liabilities of

7    proprietorships?

8    A    No, there is not.

9    Q    Is there anything listed under "Liabilities of

10   Partnerships/Joint Ventures"?

11   A    No, there is not.

12   Q    If we could turn on this document to, I believe, the

13   last page, Page 4.  If we could zoom in on the

14   "Representations and Warranties" at the bottom.  Now, sir,

15   I'm not going to ask you to try to read this one, but have

16   you had a chance to compare the "Representations and

17   Warranties" on this financial statement, the April 30th,

18   2012 one, to that other one that we looked at a moment ago

19   from December of 2010?

20   A    It is the same form.

21   Q    So if we could go back to Exhibit 106.  And sir,

22   could you read just the first three lines of those

23   representations and warranties there?

24   A    "The information contained in this statement is

25   provided to induce Heritage Bank (Heritage) to extend or

1    to continue the extension of credit to the undersigned or

2    to others upon the guaranty of the undersigned.  The

3    undersigned acknowledge and understand that Heritage is

4    relying on the information provided herein in deciding to

5    grant or continue credit or to accept a guaranty thereof.

6    Each of the undersigned represents, warrants, and

7    certifies that the information provided herein is true,

8    correct, and complete."

9    Q    If we could scroll down, what's the date that this

10   one is signed?

11   A    Signed May 1st, 2011.

12   Q    All right.  And now I'd like to show you what's been

13   marked for identification as Exhibit 394.  Sir, is this a

14   credit report from your Heritage Bank files?

15   A    Yes, sir, it is.

16   Q    Is that date there June 14th of 2012?

17   A    That's correct.

18   Q    So is this part of the annual review for the second

19   renewal that we have been talking about?

20   A    That date would most likely have been the renewal of

21   the line of credit for Racehorse Properties.

22          MR. FAULCONER:  We would offer Exhibit 394 into

23   evidence.

24          MR. SMALL:  Objection as to relevance.

25          THE COURT:  It will be admitted.

BY MR. FAULCONER:

Q     Just to clarify, if we could go back to Exhibit 373.

Could you tell us what the date is there?

A     April 30th, 2012.

Q     So going back to Exhibit 394, that's June 14th, 2012,

right?

A     Correct.

Q     Have you had an opportunity to review this credit

report before coming into Court?

A     I have not reviewed it as of very recently, no, sir.

Q     Let me hand up a paper copy to you with the

assistance of the security officer.

      (Document proffered to witness.)

      Taking a look at this --

            MR. SMALL:  Can I see that?

            MR. FAULCONER:  It is up on the screen.

            MR. SMALL:  I wanted to take a look at the whole

thing.

            MR. FAULCONER:  One moment.

            THE COURT:  Why don't you go ahead while they

look for that.

BY MR. FAULCONER:

Q     Sir, could you take a look at that document and look

at each page of that credit report and tell us, look to

see whether or not there is anything referencing Jonnie

```
 1    Williams or Starwood Trust.
 2          (Witness perusing document.)
 3    A     No, sir, I do not see anything referencing either of
 4    those two items.
 5    Q     All right.
 6              MR. FAULCONER:  One moment, Your Honor.
 7          (Counsel conferring with co-counsel.)
 8          No further questions, Your Honor.
 9              THE COURT:  All right.
10              MR. FAULCONER:  I believe 106 was admitted on
11    Mayor Sessoms' testimony yesterday, but if not, I would
12    move it into evidence now.
13              THE COURT:  It will be admitted.
14                        CROSS-EXAMINATION
15    BY MR. SMALL:
16    Q     Good afternoon, Mr. Creekmore.  My name is Dan Small.
17    I represent Bob McDonnell.  I think we talked briefly on
18    the phone a week or two ago, sir.
19    A     Right.
20    Q     I appreciate your being here.  You weren't here this
21    morning in Court.  The jury has heard a lot of this, so
22    I'm going to try to move pretty quickly through it.  If I
23    move too fast for you, just let me know.  All right?
24          The government interviewed you several times in this
25    investigation, correct?
```

1    A    Yes, sir.

2    Q    And they interviewed you about these loans, correct?

3    A    Yes, sir.

4    Q    They never actually showed you the loan documents,

5    though, did they?  Relating to Jonnie Williams.

6              MR. FAULCONER:  Objection.  There are no loan

7    documents.

8              THE WITNESS:  No, sir, I did not receive any.

9    BY MR. SMALL:

10   Q    They never showed you any of the checks, did they,

11   sir?

12   A    No, sir.

13   Q    Now, going to, I guess 373, please.  This is your

14   bank's form, correct?

15   A    Correct.

16   Q    And it is a form for a personal financial statement,

17   correct?

18   A    Correct.

19   Q    And it is dated April 30th, 2012, right?

20   A    Yes, sir.

21   Q    Now, personal financial statement means it is for an

22   individual, correct?

23   A    Yes, sir.

24   Q    You all have a different form if there is an entity

25   applying for a loan, correct?

```
 1    A    We would generally request the tax returns or
 2    financial statements of that entity, yes, sir.
 3    Q    All right.  So this is for a person, and the person
 4    here is Robert F. McDonnell, correct?
 5    A    Correct.
 6    Q    He is the only person listed on this.
 7    A    Yes, sir.
 8    Q    Going down a little bit, go up just a little bit
 9    here, okay, so right in the middle there, there is a box
10    with writing in capital letters.  Do you see that, sir?
11    A    Yes, sir.
12    Q    That box says, "You may apply for credit individually
13    or jointly with another party."  Have I read that
14    correctly?
15    A    Yes, sir, you have.
16    Q    Below that, there are about four lines of text which
17    I'm not going to try to read, but am I correct that those
18    are the instructions on how to apply either individually
19    or jointly?  Is that fair?
20    A    Correct.
21    Q    And then below that, there are two boxes.  One says,
22    "Individual Financial Statement," the other says, "Joint
23    Financial Statement."  Correct?
24    A    Yes, sir.
25    Q    And there is a box to check one or the other, and
```

1    here, individual has been checked, correct?

2    A    Yes, sir.

3    Q    And then below that box, blow up the box again, where

4    it is checked.  Right below there, it says, "Does not

5    include jointly-held assets."  Is that correct?

6    A    That's correct.

7    Q    And then right below that, it says, "If joint,

8    complete the following."  And all of that is left blank;

9    is that correct?

10   A    Yes, sir.

11   Q    So it is clear on the bank's practice, this is an

12   individual personal financial statement for Mr. McDonnell,

13   correct?

14   A    That's how it is intended, yes, sir.

15   Q    Not a joint statement, correct?

16   A    Correct.

17   Q    Now, there are three loans related to Jonnie Williams

18   or Starwood Trust.  Let me just walk through them very

19   quickly.  Going first to RM-0896, already admitted, do you

20   see this as a check -- that's the wrong one.

21        MR. FAULCONER:  This has not been admitted.

22        MR. SMALL:  No.  Did I have the wrong number?  I

23   want the Starwood Trust check to Maureen McDonnell.  I

24   have it as 96, but I could have the wrong number.

25        (Document displayed.)

```
 1    BY MR. SMALL:

 2    Q    You see this check from Starwood Trust to Maureen

 3    McDonnell?

 4    A    Yes, sir.

 5              MR. SMALL:  That's been admitted.  Please

 6    publish it.

 7              MR. FAULCONER:  896 has not been admitted.

 8    There is a version of this that's a government exhibit,

 9    not this document.

10              MR. SMALL:  What number is that?

11              MR. FAULCONER:  One moment.

12              THE COURT:  Is there some problem with offering

13    this exhibit as your own, even though the government --

14              MR. SMALL:  I have no problem.

15              THE COURT:  That's too bad then.  That way we

16    know what's in.

17              MR. FAULCONER:  We ask it be just this page,

18    Your Honor.

19              MR. SMALL:  That's fine to offer this page.

20              THE COURT:  It will be admitted.  Give us the

21    number again.

22              MR. SMALL:  I have 0896-0015.

23              THE COURT:  All right.  It will be admitted.

24    BY MR. SMALL:

25    Q    And this is a check from Starwood Trust to Maureen
```

1   McDonnell, correct?

2   A    Yes, sir.

3   Q    So am I correct that based on your experience with

4   Heritage Bank and your form, the bank's practice would be

5   that a loan to a different individual would not have to

6   appear on a personal financial statement, correct?

7   A    Correct.

8   Q    And that would include a loan to a spouse would not

9   have to appear on a personal financial statement, correct?

10  A    If that statement was individual, it would not,

11  correct.

12  Q    And we already said this is an individual personal

13  financial statement.  Correct?

14  A    Yes.

15  Q    So clearly, a loan, if this was a loan, I know you

16  weren't here for the testimony, but if this was a loan to

17  Maureen McDonnell, it would not have to appear on the

18  Heritage Bank statement, correct?

19            MR. FAULCONER:  Objection, Your Honor.

20            THE COURT:  Only to the fact that it has been

21  stated a number of times.

22            MR. SMALL:  Okay.

23  BY MR. SMALL:

24  Q    Now, are you familiar with an LLC generally?  You

25  know what that is?

1   A    Yes, sir.

2   Q    Just tell the jury very quickly your understanding of

3   what an LLC is.  You can take this down.

4   A    Limited liability corporation, often used to -- I see

5   it most often used to hold assets such as real estate or

6   other items that multiple parties can hold an entity in.

7   Q    The prosecutor asked you a question about a

8   proprietorship.  That's different than an LLC, correct?

9   A    My understanding is, yes, sir.

10  Q    He asked you questions about a partnership.  That's

11  different from an LLC, correct?

12  A    Yes, sir.

13          MR. FAULCONER:  Objection.

14          THE COURT:  He can answer the question based on

15  his experience.

16  BY MR. SMALL:

17  Q    Finally, he asked you a question about a joint

18  venture.  That's also different in your experience.

19  A    Legally, yes, sir.

20  Q    So pull up 0502 previously admitted.  Publish it,

21  please.  I don't know if you have seen this particular

22  document, but you have seen Certificates of Organization

23  of LLC's before, correct?

24  A    Yes, sir, I have.

25  Q    This is Certificate of Organization of MoBo Real

1   Estate Partners, LLC, correct?

2   A    Yes, sir.

3   Q    And that means that -- well -- so am I correct then,

4   the bank's practice with regards to a personal financial

5   statement such as this one is that a loan to an LLC would

6   not have to appear on the bank's personal financial form,

7   correct?

8   A    The bank has a separate page for contingent

9   liabilities, and if the loan to the LLC was guaranteed by

10  the individual, it would appear on the contingent

11  liability page.

12  Q    Fair enough.  Let's address that quickly.  Sometimes,

13  am I correct, you see a loan to an LLC which is in

14  addition to the loan documents or whatever the loan

15  agreement, whatever it is, there is also a personal

16  guarantee by one or more of the members of the LLC,

17  correct?

18  A    That's the practice of our bank, to do a loan.

19  Q    You understand that, well, the bank's practice is

20  that a guarantee, a personal guarantee like that has to be

21  a document in writing, correct?

22  A    That's my understanding, yes, sir.

23  Q    That's also Virginia law, correct?

24  A    Correct.

25           MR. FAULCONER:  Objection, Your Honor.

```
 1                  THE COURT:  Sustained.

 2    BY MR. SMALL:

 3    Q    And so if there is no written, signed personal

 4    guarantee, let's take that situation out, assuming for the

 5    moment there is no written, signed personal guarantee, the

 6    bank's practice is that a loan to an LLC would not have to

 7    be disclosed on a personal individual financial statement;

 8    is that correct?

 9                  MR. FAULCONER:  Objection, Your Honor,

10    hypothetical.  We have already been over this.

11                  THE COURT:  Plus it has been asked and answered

12    like five times.

13                  MR. SMALL:  No, sir, not of this witness, Your

14    Honor.

15                  THE COURT:  Let's go on to something else.

16    BY MR. SMALL:

17    Q    Could I see Government Exhibit 355?  RM-2059.  You

18    see this is a $50,000 check from Starwood Trust to MoBo

19    Realty; is that correct?

20    A    Yes, sir.

21                  MR. SMALL:  One moment, Your Honor.

22        (Counsel conferring with co-counsel.)

23                  MR. SMALL:  Thank you, Mr. Creekmore.  No

24    further questions.

25                  THE COURT:  Mr. Burck?
```

**GEORGE FLOYD - DIRECT**                    3243

```
 1                   MR. BURCK:  No questions, Your Honor.

 2                   THE COURT:  Government?

 3                   MR. FAULCONER:  Briefly, Your Honor.

 4                        REDIRECT EXAMINATION

 5     BY MR. FAULCONER:

 6     Q    If we could pull up Exhibit 106 and go to Page 4.  I

 7     apologize -- oh, there we go.  In that upper right-hand

 8     corner, is that the contingent liability section you were

 9     talking about?

10     A    That's a smaller version of it.  There is a full page

11     on Page 5 of our form.

12     Q    Got it.  Does that say, "Are you indirectly liable

13     for obligations of others?"

14     A    Yes, it does.

15     Q    And turning to Page 5, is that a longer list for

16     those types of liabilities?

17     A    Yes, sir.

18                   MR. FAULCONER:  No further questions, Your

19     Honor.

20                   THE COURT:  Thank you, sir.  You may stand down.

21          (Witness stood aside.)

22          Call your next witness, please.

23                   MS. ABER:  George Floyd.

24                        GEORGE FLOYD,

25     called as a witness by and on behalf of the government,
```

1    having been first duly sworn by the Clerk, was examined

2    and testified as follows:

3                          DIRECT EXAMINATION

4    BY MS. ABER:

5    Q    Good afternoon, sir.  Please state your name and

6    spell it for the court reporter.

7    A    Good evening.  It is George, G-E-O-R-G-E, Floyd,

8    F-L-O-Y-D.

9    Q    And where do you work, sir?

10   A    I work for Verizon Wireless.

11   Q    What is your title there?

12   A    I am a custodian of records.

13   Q    How long have you been so employed?

14   A    I have been employed for six years with Verizon

15   Wireless.

16   Q    As the custodian of records, have you received

17   training on how Verizon keeps records of phone calls and

18   text messages and data?

19   A    Yes, I have received several hours of training.

20   Q    Okay.  In short, are you aware that Mr. and Ms.

21   McDonnell are Verizon customers?

22   A    Yes, I am.

23   Q    Did Verizon get a federal grand jury subpoena back in

24   April of 2013 for subscriber information and toll records

25   related to their account?

**GEORGE FLOYD - DIRECT**

1    A    Yes, we did.

2    Q    Did Verizon produce records in response to that

3    subpoena?

4    A    Yes, we did.

5    Q    I'd like to walk through very briefly a couple pages

6    of that.  I'd like to bring up Government Exhibit 145.

7    Sir, with the assistance of the Court Security Officer,

8    I'd like to show you an unredacted version of this to help

9    you follow along.

10        (Document proffered to witness.)

11        Are these a few pages from the very many documents

12   that Verizon produced in response to the subpoena?

13   A    Yes.

14        MS. ABER:  I would move 145 into evidence,

15   please.

16        THE COURT:  It will be admitted.

17   BY MS. ABER:

18   Q    If we could back out for one second.  Is it fair to

19   say this is the first page of a bill sent to Robert

20   McDonnell?

21   A    Yes.

22   Q    Okay.  If we could zoom in there, please.  Going to

23   the second page, is it accurate that this is what you

24   might call a toll record?

25   A    Yes.

3246

1    Q    What's a toll record?

2    A    A toll record, and this is commonly known, as you

3    stated, as a bill, toll records are pretty much the

4    records that we store that can consist of text messages,

5    call logs, and even data transferring information from one

6    device to another.

7    Q    Okay.  And does this show that the phone number

8    associated with Bob McDonnell ends in the four digits

9    0714?

10   A    Yes, it does.

11   Q    Okay.  So walking through the columns here very

12   briefly, specifically taking the first row as an example,

13   tell the jury what each of those columns means, please.

14   A    Yes.  The first column to the far left is the Date.

15   That's the date that the call was processed.  The next

16   column is the Time.  That's the time that the call was

17   processed.  It is based upon the origin on the call, where

18   the time zone indicates.  In this case, it would be

19   Eastern Standard Time.  The Number that you see is the

20   number that was called, and in some cases, it would appear

21   as the number that the call was made to as being the call

22   that was received.  The Rate, that's basically how Verizon

23   Wireless bills the calls.  As you can see, it is Peak, so

24   that means that it was during the time frame of 6 a.m. in

25   the morning to 9 p.m. at night.  Off Peak indicates that,

1   of course, it is a night call and you have your weekend

2   calls.  Usage Type, it says "M to M," that means on the

3   very first one at the top, that shows that's a

4   mobile-to-mobile call.  Origination, that shows where the

5   call was actually processed from.  So as I stated earlier,

6   if a call was processed on the East Coast, it is going to

7   be East Coast time, or if it is processed on the West

8   Coast, it will be West Coast time.  And again, the Origin

9   indicates that.  The Destination indicates where the call

10  was placed to.  So if a call, as I stated earlier, was

11  made in Virginia and it was processed in California, then

12  it is going to show California in that particular section.

13  Then you have the Minute section.  All calls are rounded

14  to the next minute, so if you are on a call for 30

15  seconds, it is basically rounded to the next minute.  That

16  includes a voicemail as well.  Then the Airtime Charges,

17  as you can see, there is nothing there, mainly because all

18  of that was indicated in the billing peak hours and what

19  have you.

20  Q    How far back does Verizon keep toll records like

21  this?

22  A    On average, it is three to five years.

23  Q    This may sound like a silly question, but I have to

24  ask it anyway.  Does Verizon record phone calls?  Do you

25  have content available?

1   A    We record calls for quality and training purposes,

2   which is to train our representatives, and they are only

3   kept for like 30 days.

4   Q    Absent a court order, at the time the call was made

5   contemporaneous, could you go back in time and find the

6   content of these calls?

7   A    No, we couldn't.

8   Q    Does Verizon keep records of text messages in a

9   similar way?

10  A    Yes, we do.

11  Q    How long do you all keep text message data like that?

12  A    We keep text message data in records to where the

13  call was processed from, to.  That's typically kept for a

14  year.  The content, meaning the actual message itself, we

15  keep that roughly about three to five days.

16  Q    So even with a grand jury subpoena, the government,

17  or anyone with a subpoena, couldn't go back and get

18  content of text messages.

19  A    Correct.

20  Q    Would a message remain on the cell phone itself if

21  the user had not deleted it?

22  A    Yes.

23  Q    Now, are you familiar with an Apple application

24  called iMessaging?

25  A    Yes.

GEORGE FLOYD - CROSS - JOCHUM                3249

```
1    Q     Is that something that can be used, among other
2    things, on iPhones?
3    A     Yes.
4    Q     Tell the jury very simply what is an iMessage.
5    A     In contrast to a text message, Verizon Wireless, of
6    course, we keep our text messages because they are sent on
7    our network.  iMessage is a third-party application,
8    commonly known as a chat.  They can be used through Apple,
9    Yahoo Messenger, AOL uses it as well.  Basically, as you
10   just stated, it is something that's kept on the device.
11   We process it as data so it is processed through like an
12   IP address, through the Internet from Verizon Wireless's
13   standpoint.
14   Q     Would a toll record showing text messages capture
15   iMessages?
16   A     They would not.
17             MS. ABER:  One moment, please, Your Honor.
18         (Counsel conferring with co-counsel.)
19             MS. ABER:  No further questions, Your Honor.
20             THE COURT:  All right.  Any questions?
21                        CROSS-EXAMINATION
22   BY MS. JOCHUM:
23   Q     Good afternoon, Mr. Floyd.
24   A     Good afternoon.
25   Q     I'm Elizabeth Jochum.  I represent Bob McDonnell.
```

1    Just a couple questions for you.  Does a user decide when

2    to use text messaging and when to use Apple iMessage?

3    A    Yes, it is totally independent on the user.

4    Q    So if you are engaged in a text message conversation

5    and the phone switches to a Wi-Fi connection, does that

6    automatically transfer the conversation to iMessage?

7    A    It necessarily does not.  Again, it is really going

8    to be independent on the user.

9    Q    iMessage functions very similar, though, to text

10   message conversations?

11   A    Yes.  It is easy to get them confused.  They are

12   typically in the same thread as your text messages so you

13   can easily, you know, attempt to send a text message and

14   actually send an iMessage.

15   Q    So a user may, they wouldn't necessarily make a

16   conscientious choice of text message or iMessage, they are

17   just trying to send a message?

18   A    That's totally independent of the user.

19   Q    So if you have toll records showing, for example, a

20   thousand text messages between two individuals, that would

21   not necessarily represent the entire universe of messages

22   sent between the two?

23   A    Correct.

24             MS. JOCHUM:  No further questions.

25             THE COURT:  Anything?

```
 1            MR. BURCK:  No questions.

 2            THE COURT:  Anything else from the government?

 3            MS. ABER:  No, Your Honor.

 4            THE COURT:  Thank you, sir.  You may stand down.

 5        (Witness stood aside.)

 6            Call your next witness, please.

 7            MS. ABER:  William Long, please.

 8                        WILLIAM LONG, JR.

 9    called as a witness by and on behalf of the government,

10    having been first duly sworn by the Clerk, was examined

11    and testified as follows:

12                        DIRECT EXAMINATION

13    BY MS. ABER:

14    Q    Good afternoon, sir.

15    A    Good afternoon.

16    Q    Please state your name for the court reporter.

17    A    Sure.  My name is William John Long, Jr.

18    Q    Mr. Long, where do you work?

19    A    I work for AT&T.

20    Q    In what capacity?

21    A    In the Asset Protection Group.

22    Q    How long have you been so employed?

23    A    A little over a year.

24    Q    In the course of that position, have you received

25    training on how AT&T keeps records of phone calls, text
```

1    messages, and data?

2    A    Yes.

3    Q    Now, are you aware that a user named Celeste Williams

4    is an AT&T customer?

5    A    Yes.

6    Q    And that a gentleman named Jonnie Williams is listed

7    as a user on her account?

8    A    That is correct.

9    Q    Did AT&T get a federal grand jury subpoena back in

10   roughly February of 2013 for subscriber information and

11   toll records for the phone number associated with those

12   folks?

13   A    That's correct.

14   Q    Okay.  Did AT&T produce records in response to that

15   subpoena?

16   A    Yes.

17             MS. ABER:  I'd like to bring up Government

18   Exhibit 96, please, which has not been admitted.  And to

19   facilitate Mr. Long, if you don't mind, I'd like to hand

20   him up an unredacted version of what we've got.

21        (Document proffered to witness.)

22   BY MS. ABER:

23   Q    Mr. Long, before you is an unredacted version.  On

24   the screen is a redacted version.  Does 96 reflect a few

25   pages from the large production that AT&T sent in response

1    to the subpoena?

2    A    Yes, it does.

3    Q    Okay.

4         MS. ABER:  The United States would move 96 into

5    evidence, please.

6         THE COURT:  It will be admitted.

7    BY MS. ABER:

8    Q    Very briefly, sir, if we could scroll in on the top,

9    please, could we walk through the columns and let the jury

10   know what kinds of data AT&T maintains on these sorts of

11   calls?

12   A    Sure, absolutely.  So at the very top in the upper

13   left-hand corner, that first number is just going to be an

14   internal AT&T case number.  So when we receive the order,

15   our court order compliance folks would create an internal

16   AT&T case number to supply the records.  So that's an

17   internal number.  The date below that would be the date

18   that the records were run, and where it says SCAMP, that's

19   the application, internal proprietary application that we

20   use to extract the information from our billing system.

21   Q    Let me direct your attention to the line that says

22   "Voice Usage" for a phone number ending in 5828.  Is that

23   affiliated with the user Jonnie Williams on Celeste

24   Williams' account?

25   A    Sorry, repeat that, please.

1    Q    Absolutely.  The phone number there, the number

2    ending in 5828, sir, is that affiliated with the user,

3    Jonnie Williams?

4    A    Yes, it is.  It is listed as the user on the account.

5    Q    Thank you.  Scroll down.  Tell the jury briefly what

6    is the item, what does that column mean?

7    A    So the item is just a line number for each

8    transaction or connection or event that took place.

9    Q    What does Conn. Date mean?

10   A    That's going to be the connection date that the

11   transmission or connection actually took place.

12   Q    And the third column, what is that?

13   A    The connection time.  That's going to be the local

14   switch time.

15   Q    What does Seizure Time mean?

16   A    Seizure Time is best described as the time it takes

17   somebody to push the send button on their cell phone and

18   the person receiving the call to hit Talk on their phone.

19   So it is the time distance between Send and somebody

20   answering the call.

21   Q    Okay.  Originating Number, does that mean the call

22   from which the phone -- the phone number from which the

23   call is coming?

24   A    The Originating Number is going to be the person

25   placing the call.

1   Q    Got you.   What does Terminating Number mean?

2   A    The Terminating Number is going to be the person

3   receiving the call.

4   Q    What does Elapsed Time mean?

5   A    That's going to be the duration of the call itself.

6   Q    Number Dialed?

7   A    The Number Dialed is generally going to be the same

8   number that is dialed by the originating number.   The

9   number that's being called.

10  Q    Moving along quickly to the other columns, is it fair

11  to say these are associated with the serial numbers on the

12  phone and the SIM card?

13  A    That's correct.   The IMEI is International Mobile

14  Equipment Identification number.   That's specific to the

15  actual phone.   And then the IMSI number, International

16  Serial Identification, is specific to the SIM card, which

17  is specific to the phone number.

18  Q    Let's back out, please.   Turning your attention, sir,

19  to the column that says Conn. Time, is it fair to say that

20  that reflects the local switch through which the call is

21  being routed?

22  A    That is going to be the local switch where this phone

23  user was at the time that the call was either received or

24  placed.

25  Q    Okay.   Thank you.

**WILLIAM LONG, JR. - DIRECT**                    3256

1   A      There is no location information, so I can't say.

2   Q      Yes, sir.  Now, how long does AT&T keep these sorts

3   of records?

4   A      We maintain these toll records for seven years.

5   Q      And does AT&T record any content of phone calls

6   absent a court order?

7   A      No.

8   Q      Now, does AT&T keep similar records of text messages?

9   A      Yes.

10  Q      And how long does AT&T keep those kinds of records?

11  A      For a minimum of four years up to -- it could be

12  seven years.

13  Q      In reference to content of text messages, do you all

14  keep that?

15  A      So the content of text messages is maintained, not

16  reviewed, but maintained for a period of seven days going

17  back.  It is maintained only for subscribers that use

18  Android devices.  It is only supplied with court-ordered

19  search warrant through law enforcement.  And it is only

20  that seven-day period.

21  Q      Finally, are you familiar with a program called

22  iMessaging?

23  A      Yes.

24  Q      Would a record of an iMessage appear on an AT&T toll

25  record?

1  A    It would appear somewhere in the data formula that's

2  provided for the data usage.  It would not show up in the

3  SMS or the Short Message Service, texting, or call

4  records.  So iMessage doesn't use the AT&T network other

5  than using data.  It is a proprietary application owned by

6  Apple.  They would maintain the records.  I'm not sure if

7  they maintain content, but it is an application

8  proprietary to Apple.

9           MS. ABER:  One moment, please.  No further

10  questions, Your Honor.  Thank you.

11           THE COURT:  Any questions from Mr. McDonnell?

12                    CROSS-EXAMINATION

13  BY MS. JOCHUM:

14  Q    Good afternoon, Mr. Long.

15  A    Good afternoon.

16  Q    I'm Elizabeth Jochum.  I represent Bob McDonnell.

17  A    Yes, ma'am.

18  Q    Can you tell us, does a user decide when to use a

19  text message and when to use Apple iMessage?

20  A    There is, I believe, a way to turn that feature on

21  and off with the phone.  The iMessage is only available on

22  the i products, the Apple products.  So I can't tell from

23  these records here.

24  Q    Do you know under some circumstances if when a user

25  goes from a data service to Wi-Fi, if it can automatically

1    switch from text to iMessage?

2    A    I don't know that information.

3    Q    Okay.  Do you know if text messages and iMessages

4    show up in the same thread, the same application?

5    A    They are two completely different services, so they

6    don't show up in any of these records, iMessages.

7    Q    So the toll records that reflect text messages, SMS,

8    if they happen to show, say, a thousand text messages,

9    that would not reflect necessarily the total

10   communications between the two users?

11   A    I can only speak to these records.  So if you are

12   asking if it is possible, I'm not sure if folks were using

13   this application or not according to these records.  So

14   the only thing that I can say is that if there are a

15   thousand text messages listed, that a thousand text

16   messages occurred.  So I don't know about this iMessage

17   program, how many messages would travel through that.  So

18   we maintain data usage, and those iMessages are exchanged

19   through the data usage.  So we don't maintain records in

20   relationship to applications and what's being used.  So if

21   somebody is using the iMessage service, it would look no

22   different than if somebody was using Facebook or another

23   type of application.

24   Q    But just to clarify, the text messages, the toll

25   records would not show iMessages?

```
 1    A     That's correct.
 2               MS. JOCHUM:  Nothing further, Your Honor.
 3               THE COURT:  Mr. Burck?
 4               MR. BURCK:  No questions, Your Honor.
 5               THE COURT:  Government?
 6               MS. ABER:  No, Your Honor.
 7               THE COURT:  All right, sir.  You may stand down.
 8          (Witness stood aside.)
 9          Call your next witness, please.
10               MR. HARBACH:  We have a couple stipulations we
11    would like to read into the record, please.
12               THE COURT:  Sure.
13               MR. HARBACH:  There are two, Your Honor.  May I
14    proceed?
15               THE COURT:  Go ahead.
16               MR. HARBACH:  The first stipulation is labeled
17    Stipulation 1 and the parties have agreed as follows:  "1:
18    All documents bearing a Bates number prefix of RFM or
19    otherwise associated with FBI tracking numbers," and there
20    is a series of numbers which I won't read, were produced
21    by defendant, Robert F. McDonnell, to the United States in
22    response to a grand jury subpoena.  All such documents are
23    authentic.
24               "2:  All documents bearing a Bates number prefix
25    of MPM or otherwise associated with FBI tracking numbers"
```

```
1    listed, "were produced by defendant Maureen G. McDonnell
2    to the United States in response to a grand jury subpoena.
3    All such documents are authentic.
4              "3:  All documents bearing a Bates number prefix
5    of OGV or otherwise associated with FBI tracking numbers,"
6    list following, "were produced by the office of the
7    Governor of Virginia to the United States in response to a
8    grand jury subpoena and were so produced when defendant
9    Robert F. McDonnell was Governor of Virginia and defendant
10   Maureen G. McDonnell was the First Lady of Virginia.  All
11   such documents are authentic.
12             "4:  Records produced to the government by Star
13   Scientific, Inc., Starwood Aviation, and Starwood Trust or
14   otherwise associated with FBI tracking numbers," list,
15   "were produced by Star Scientific, Starwood Aviation, or
16   Starwood Trust and are authentic.
17             "5:  The documents associated with FBI tracking
18   numbers," again, a list, "are e-mails, attachments,
19   calendar invites, and other electronic files produced by
20   the Virginia Information Technologies Agency and are
21   e-mails, attachments to e-mails, Outlook calendar events,
22   and other electronic files located in Commonwealth of
23   Virginia government e-mail accounts.  All such documents
24   are authentic.
25             "6:  Visitor logs from the Patrick Henry
```

1    Building are authentic.

2              "7:  Records received from AT&T and Verizon,

3    including," list of FBI tracking numbers, "are authentic

4    and constitute records of regularly-conducted activity

5    under Federal Rule of Evidence 803(6).

6              "8:  The phone numbers shown on Attachment A to

7    this stipulation, which the parties have reviewed and

8    signed, accurately reflect the phone numbers for the

9    listed individuals.

10             "9:  All bank and financial records, including

11   those associated with the following entities and FBI

12   tracking numbers, are authentic and constitute records of

13   regularly-conducted activity under Federal Rule of

14   Evidence 803(6)."  Following is a list of 47 entities and

15   the associated FBI tracking numbers which I won't read,

16   but are part of the stipulation.

17             "10:  At all times material to the indictment,

18   including the duration of January and February, 2013,

19   Pentagon Federal Credit Union was a federally-chartered

20   credit union.

21             "11:  At all times material to the indictment,

22   including the duration of October, 2012, TowneBank was an

23   institution the accounts of which were insured by the

24   Federal Deposit Insurance Corporation.

25             "12:  The Washington Post article dated May

1  10th, 2013 and available at" an Internet address "is an

2  authentic Washington Post article.

3       "13:  GMP-2588131 through GMP-2588133 is an

4  authentic Word document drafted by Mary-Shea Sutherland.

5       "14:  MPM-042938 is an authentic e-mail sent

6  from and to the e-mail accounts reflected on the e-mail.

7       "15:  GMP-0766239 to GMP-0766243 is an authentic

8  document authored by and with handwritten notes from

9  Virginia State Police Agent Charles Hagan.

10       "16:  GMP-2558918 to GMP-2558920 and

11  GMP-IRGJ-008285 to GMP-IRGJ-008287 are authentic.

12       "17:  As First Lady of Virginia, defendant

13  Maureen G. McDonnell was not a public official."

14     That concludes the first stipulation.  There is, the

15  Attachment A included with the names and phone numbers

16  which I won't read, Your Honor, and the entirety of this

17  stipulation is marked Government Exhibit 532 and we offer

18  it into evidence.

19       THE COURT:  All right.  It will be admitted.

20       MR. HARBACH:  The second stipulation reads as

21  follows:

22       "1:  E-mails and Outlook calendar entries sent

23  from an e-mail account were sent from that e-mail account

24  and attachments to those e-mails and Outlook calendar

25  entries were attached to those e-mails and Outlook

1    calendar entries.  E-mails and Outlook calendar entries

2    received by an e-mail account were received by that e-mail

3    account and attachments to those e-mails and Outlook

4    calendar entries were attached to those e-mails and

5    Outlook calendar entries.  The fact that an e-mail or

6    calendar entry was sent or received from or by an e-mail

7    account does not mean that the account holder personally

8    sent or viewed the e-mail or Outlook calendar entry and

9    attachments.

10          "2:  The historical stock prices for Star

11   Scientific, Inc., STSI, as listed on Yahoo! Finance," and

12   there is an Internet address, "under the ticker symbol

13   RCPI for Rock Creek Pharmaceuticals, Inc., are accurate

14   and constitute market reports under Federal Rule of

15   Evidence 803(17).

16          "3  The Excel spreadsheet of text messages

17   electronically Bates stamped MOBO000630, and associated

18   with FBI Tracking Number 1A208, was produced by Maureen

19   McDonnell, formerly Uncapher, the sister of Robert F.

20   McDonnell.  The text messages reflected in MOBO0003060 are

21   authentic.

22          "4:  An 'inspection of items' bearing a Bates

23   number of GMP--2008936 to 37 is authentic and admissible.

24   On or about August 9th, 2013, Robert F. McDonnell and

25   Maureen G. McDonnell, through their separate counsel,

1    returned the listed items to Jonnie R. Williams, Sr.,

2    through his attorneys.  Mr. Williams' attorneys, in turn,

3    provided all of the listed items to the Federal Bureau of

4    Investigation.

5             "5:  The photos of Robert and Maureen McDonnell

6    produced by the defense to the government and Bates

7    Numbered with the prefix RFM-R16 are authentic.

8             "6:  All tax returns and other tax documents

9    filed with the IRS as produced by the government are

10   authentic.

11            "7:  Public filings with the Securities and

12   Exchange Commission are authentic.

13            "8:  Records maintained by the Virginia Public

14   Access Project at," web address, "are authentic.

15            "9:  The specific wire communications alleged in

16   Counts Two through Four occurred on the dates alleged,

17   were interstate wire communications in furtherance of

18   completing the referenced financial transactions, and were

19   transmitted from the Eastern District of Virginia to a

20   location outside the Eastern District of Virginia."

21            The stipulation is signed by counsel for the

22   parties.  It is marked as Government Exhibit 533, and we

23   offer it into evidence, Your Honor.

24            THE COURT:  It will be admitted.

25            MR. HARBACH:  Thank you, Judge.

**DAVID HULSER - DIRECT**                    3265

```
 1                THE COURT:  All right.  Call your next witness.
 2                MR. FAULCONER:  Your Honor, the United States
 3    calls Special Agent David Hulser.
 4                          DAVID HULSER,
 5    called as a witness by and on behalf of the government,
 6    having been first duly sworn by the Clerk, was examined
 7    and testified as follows:
 8                       DIRECT EXAMINATION
 9    BY MR. FAULCONER:
10    Q    Good afternoon.
11    A    Good afternoon.
12    Q    Could you please state your name and spell your last
13    for the court reporter?
14    A    Yes.  It is David Patrick Hulser, H-U-L-S-E-R.
15    Q    How are you currently employed?
16    A    I'm a Special Agent with the FBI.
17    Q    And what office of the FBI do you work in?
18    A    The Richmond Division.
19    Q    How long have you been at the FBI?
20    A    It will be 19 years this October.
21    Q    What did you do before you worked as an FBI agent?
22    A    I worked for six years with a CPA firm.
23    Q    Now, in your current role as an FBI Special Agent,
24    what are your responsibilities?
25    A    I'm currently assigned to a white-collar criminal
```

1   squad, which is responsible for public corruption and

2   other financial matters.

3   Q    Now, turning to this case, approximately how many

4   agents have worked on this case, to your knowledge?

5   A    Approximately eight.

6   Q    What agencies have those been from?

7   A    The FBI, the Virginia State Police, and the IRS.

8   Q    Where has your work focused on the course of the

9   investigation?

10  A    Sir, my work has focused primarily on conducting

11  interviews as well as review of texts, toll, and financial

12  records.

13  Q    As one of the agents on this case, have you

14  participated in every single interview that's been done?

15  A    I have not.

16  Q    Do you know approximately how many interviews have

17  been done?

18  A    In excess of 300.

19  Q    Have you reviewed every single document that's been

20  collected?

21  A    I have not.

22  Q    Do you know approximately how many pages of documents

23  that have been collected?

24  A    Approximately three-and-a-half million.

25  Q    Are some of those pages duplicates?

```
 1    A    They are.
 2    Q    Are some of those pages from related investigations
 3    that aren't actually Mr. and Ms. McDonnell's
 4    investigation?
 5    A    That's correct.
 6    Q    Have you looked at every single page of those more
 7    than three-and-a-half million pages?
 8    A    No, sir.
 9    Q    Now, have the documents that the FBI collected in
10    this case included documents obtained from the defendants,
11    Robert McDonnell and Maureen McDonnell?
12    A    They have.
13    Q    How were those documents obtained?
14    A    Through the federal grand jury subpoena process.
15    Q    Now, generally speaking, are you able to tell which
16    defendant produced which document when you look at it?
17    A    Yes, sir.  Documents received from Robert McDonnell
18    are Bates stamped with a prefix RFM.  And documents
19    produced from Ms. McDonnell are Bates stamped with the
20    prefix MPM.
21    Q    What types in general terms, what types of documents
22    were obtained from the defendants?
23    A    We received text messages, toll records, and other
24    documents containing handwriting and then other documents.
25    Q    Did those include some e-mails?
```

3268

1    A    They did.

2    Q    You said text messages and e-mails.  Just to be

3    clear, do the documents that you obtained from the

4    defendants via grand jury subpoena include every text or

5    e-mail that one of the defendants ever sent?

6    A    No.

7    Q    What documents do they include?

8    A    Only those that were responsive to the federal grand

9    jury subpoena.

10   Q    Now, that's the defendants.  Did you do essentially

11   the same thing for Mr. Jonnie Williams?

12   A    We did.

13   Q    And setting aside those three individuals, did you

14   also obtain e-mails and other records from the Office of

15   the Governor of Virginia?

16   A    Yes, sir.

17   Q    Did you also obtain records from the Virginia

18   Information Technologies Agency or VITA?

19   A    We did.

20   Q    Were those generally e-mail records?

21   A    Yes.

22   Q    How about Star Scientific; did you get any records

23   from them?

24   A    Yes.

25   Q    Now, in addition to the parties, those entities that

1   we have heard a little bit about, have you also collected

2   financial and bank records for the defendants?

3   A    We have.

4   Q    Could you walk us through in general terms what types

5   of bank and financial records you got and reviewed?

6   A    Sure.  We received bank records, credit card records,

7   tax records, other accounting records, and also some

8   mortgage records.

9   Q    Now, did the bank records that you got, did they

10  include every transaction and every detail of those

11  transactions or just detail for ones over a certain dollar

12  amount?

13  A    Just detail over, generally, a $500 limit.

14  Q    And did those include at least some financial records

15  related to the various things of value given by

16  Mr. Williams to the McDonnells?

17  A    Yes.

18  Q    Have you also obtained some phone records via grand

19  jury subpoena?

20  A    We have.

21  Q    Did those include records for the McDonnells and for

22  Mr. Williams?

23  A    Yes.

24  Q    Could you walk us through the phone records that you

25  got and describe them just a little bit, starting with the

**DAVID HULSER - DIRECT**

1   ones that you got for the McDonnells?

2   A     From the McDonnells, as we just heard, they both

3   maintained their accounts through Verizon Wireless.  So

4   for Mr. McDonnell, he had two cell phones during the

5   period that we received the subpoenaed records, and that

6   covered the period from December of 2009 through April of

7   2013.  Ms. McDonnell maintained one cell phone, and that

8   covered the period June of 2009 through April of 2013.

9   Q     To be clear, we heard a little bit about it from the

10  Verizon and AT&T folks, but did you obtain any sort of

11  recorded phone calls?

12  A     No.

13  Q     Was there any sort of wiretap done in this case?

14  A     There was not.

15  Q     What about text message records for the McDonnells?

16  Did you get any text message records for their cell

17  phones?

18  A     We did, but only during the period September of 2012

19  through September of 2013.

20  Q     To be clear, is that because that's all you asked for

21  or why is that the only year that you got?

22  A     No, they only maintained one year worth of text

23  records.

24  Q     Even for the text records that you do have, speaking

25  just to what you obtained from the phone companies, did

1   you get any content of text messages from the phone

2   companies?

3   A     No, we did not.

4   Q     Now, for Mr. Williams, could you walk us through the

5   phone records that you got for Mr. Williams?

6   A     Sure.  From Mr. Williams, he maintains his account

7   with AT&T, and we received records from July of 2009

8   through February of 2013.  We also received information

9   relative to text messages and data covering the period

10  February of 2010 through February of 2013.

11  Q     And generally speaking, the text message records that

12  you have for either of these two companies, well, just

13  talking about AT&T real quick, did you get any content of

14  text messages from AT&T?

15  A     We did not.

16  Q     Are you aware that text messages that are sent via

17  iMessaging don't show up on those text records?

18  A     Correct.

19  Q     Just talking a little bit about the two different

20  types of records, could you walk us through, is there a

21  difference in terms of the type of information that you

22  can locate in a Verizon record versus an AT&T record?

23  A     Sure.  With the Verizon records, they typically

24  utilize a rounding as far as the duration of the call.

25  So, for example, if it was a 50-second call it would be

1    rounded up to one minute.  If it was a 1 minute 20 second

2    call, it would be rounded up to 2 minutes.  The Verizon

3    records also indicate generally the location of the user,

4    where they were when the call was placed.

5    Q    Is that sort of a general location?

6    A    Correct.

7    Q    Now, for the AT&T records, do those include both

8    minutes and seconds in terms of duration?

9    A    They do.

10   Q    And to be clear, again, for the AT&T records for

11   Mr. Williams, did you have any sort of content of the

12   phone calls?

13   A    We did not.

14   Q    Any sort of wiretap done?

15   A    No, sir.

16   Q    Now, we have talked a little bit about cell phones.

17   Did you obtain any phone records for landline,

18   residential, or office phones?

19   A    We did not.

20   Q    For the phone records that you did obtain, how did

21   you compile and review them?

22   A    Primarily through utilizing a spreadsheet program,

23   which allowed us to sort and analyze the data.

24   Q    Now, for the specific calls and text messages that

25   you are going to talk about during your testimony, have

1    you actually gone back and looked at the paper records to

2    confirm that they are there?

3    A    I have.

4    Q    Did it take a while?

5    A    It did.

6    Q    Earlier you said that your work on this case focused

7    mostly on financial, phone, and text message records.  Did

8    I get that right?

9    A    That's correct.

10   Q    Could you tell us how you tied all of that together

11   to prepare for your testimony here today?

12   A    Sure.  Through the analysis of all that information,

13   approximately 50 summary charts were prepared.

14   Q    Have you also sat through all of the testimony here

15   at trial?

16   A    I have.

17   Q    With the exception, I guess, of occasionally helping

18   out to run grab a witness and the like.

19   A    Correct.

20   Q    Now, I'd like to start by showing you what's been

21   marked for identification as Exhibit 566.  Special Agent

22   Hulser, is this a two-page chart?

23   A    It is.

24   Q    What is on the first page, generally speaking?

25   A    Generally, it is just a listing of names and

1    abbreviations.

2    Q    And what is on the second page, generally speaking?

3    A    The second page is a key or a legend that contains

4    particular marks or notations that are utilized throughout

5    the summary charts.

6          MR. FAULCONER:  We offer Exhibit 566 into

7    evidence.

8          MR. ASBILL:  We object.

9          THE COURT:  Come on up.

10         (At Bench.)

11         MR. ASBILL:  I believe all of these charts are

12   under 1006, and these are not admissibile.  These are

13   demonstratives, and I object to them being admitted into

14   evidence.

15         MR. FAULCONER:  We provided these charts a week

16   ago.  We were told yesterday that we would get any

17   objection last night.  We got no objection to these charts

18   last night.  They are Rule 1006 charts.  They are phone

19   records, financial records.  This is a legend for the

20   other charts.  If these aren't in evidence, nobody can

21   understand the others.

22         THE COURT:  The objection is overruled.

23         (In Open Court.)

24         MR. FAULCONER:  Is 566 in evidence?

25         THE COURT:  It will be admitted.

**DAVID HULSER - DIRECT**                    3275

```
 1   BY MR. FAULCONER:

 2   Q    All right.  Now, Special Agent Hulser, walking

 3   through this sort of names and abbreviations, does this

 4   apply for all the rest of the charts you are going to be

 5   talking about?

 6   A    Yes, sir, it does.

 7   Q    Could you start just by telling us what the initials

 8   and color coding mean in the first couple of rows there?

 9   A    Sure.  For Robert F. McDonnell, the initials or the

10   abbreviation used throughout is RFM, and also highlighted

11   in yellow.  For Maureen G. McDonnell, the abbreviation is

12   MM, and highlighted throughout in orange.  For Jonnie R.

13   Williams, Sr., the abbreviation would be JRW, and

14   highlighted in green.  One other, Maureen C. McDonnell,

15   who is the sister of Mr. McDonnell, formerly Ms. Uncapher,

16   the abbreviation is SisM.

17   Q    For these other ones, I see there is Celeste

18   Williams, Michael Uncapher, Cailin McDonnell Young, Robert

19   Bobby McDonnell, Sean McDonnell.  Are those simply the

20   first names throughout the rest of the charts?

21   A    Yes.

22   Q    What does MSS stand for in the rest of them?

23   A    Mary-Shea Sutherland.

24   Q    For anybody on this summary chart, is generally their

25   last name used?
```

**DAVID HULSER - DIRECT**                    3276

```
 1   A     That's correct.
 2   Q     If we could turn to the second page.  Just to walk
 3   everybody through these, since we will be looking at a few
 4   of them, could you tell us what the asterisk next to a
 5   time means on these subsequent charts?
 6   A     Sure.  That asterisk next to a time would indicate a
 7   one-minute time difference between the records.  So for
 8   example, if there was a toll record with a call between
 9   Jonnie Williams, or JRW, and Ms. McDonnell, and there was
10   a one-minute time difference, we would utilize the time
11   for Mr. Williams and the asterisk would be notated next to
12   Ms. McDonnell's.
13   Q     If you didn't have -- let's say it is a call
14   involving not Jonnie Williams, but Maureen McDonnell and
15   Mr. McDonnell.  Then whose records would you default to
16   when there is that one-minute time discrepancy?
17   A     Ms. McDonnell's.
18   Q     Looking at the asterisk on the call recipient, could
19   you tell us what that indicates if it is on one of these
20   subsequent charts?
21   A     That just indicates that one of the two parties, the
22   call did not appear on their recipient records.
23   Q     And then where it says there a double asterisk on
24   call recipient, could you explain what that means if it
25   shows up on one of these charts?
```

1   A    Sure.  That applied to Ms. McDonnell only, and there

2   were several instances where Mr. McDonnell had a phone

3   conversation with her and it would show up as Unavailable

4   due to the Caller ID block.

5   Q    So is that, for those records, are those only calls

6   where it is RFM to MM?

7   A    Correct.

8   Q    So in those, does the record show up in the RFM

9   records, am I right?

10  A    It does.

11  Q    They show up in the MM records just as an unavailable

12  call.

13  A    Correct.

14  Q    Now, what does the, I don't know exactly what to call

15  it, the upside down V next to the time, what does that

16  indicate?

17  A    That indicates that we had to make a time zone

18  adjustment, which is typically based on the records that

19  we have received, some of the text records, were in UTC

20  format, which is the coordinated universal time, also

21  known commonly as Greenwich Mean Time or Zulu Time, so the

22  four-hour conversion was made.

23  Q    When you made those adjustments, were they generally

24  based on trying to compare two different records and

25  figure out which one is the most likely the Eastern time?

```
 1    A    That's correct.

 2    Q    We can take that down.  All right.  Now, just to

 3    clarify a few things before we get into some of the charts

 4    themselves.  When you have calls listed on some of these

 5    later charts, do you, Special Agent Hulser, personally

 6    know what was or wasn't discussed on any of those calls?

 7    A    No.

 8    Q    When you list calls or text messages for a given day,

 9    do you necessarily include every single call or text

10    message from that given day?

11    A    No.  Only those that are relevant to our

12    investigation.

13    Q    I'd like to show you what's been already admitted as

14    Exhibit 54.  Now, are you familiar with this e-mail dated

15    December 22nd, 2009?

16    A    I am.

17    Q    I'd like to focus on two parts of this e-mail.  The

18    first is there at the top.  Do you see Mr. Eige and

19    Ms. McDonnell exchanging an e-mail conversation about a

20    potential phone call?

21    A    I do.

22    Q    Have you reviewed the phone records to determine

23    whether or not Ms. McDonnell's cell phone and Mr. Eige's

24    cell phone had a phone call in that time frame?

25    A    Yes.
```

**DAVID HULSER - DIRECT**                    3279

1   Q    I'd like to show you what's been marked as Exhibit

2   567.  Is this a chart showing what the phone records

3   indicated in terms of calls in proximity to that e-mail?

4   A    It is.

5             MR. FAULCONER:  We offer Exhibit 567 into

6   evidence.

7             THE COURT:  It will be admitted.

8   BY MR. FAULCONER:

9   Q    Now, starting with the, just reading across the time

10  there, is that the time of either the e-mail or phone

11  call?

12  A    Yes, sir.

13  Q    From or To is the individuals or e-mail accounts,

14  phone numbers involved.

15  A    Correct.

16  Q    Now, that 11:19 a.m., is that the e-mail, at least

17  the last one in the thread of what we were just looking

18  at?

19  A    Yes, sir.

20  Q    Could you walk us through what this chart shows on

21  the next two lines subsequent to that e-mail?

22  A    Approximately six minutes later, Ms. McDonnell

23  contacts Jasen Eige and a phone call is connected for

24  approximately 17 minutes.  And immediately thereafter,

25  Ms. McDonnell contacts Mr. McDonnell's cell phone and a

1   call is connected for two minutes.

2   Q    All right.  Now, during this time frame, up through

3   December of 2009, based on your review of the records, are

4   there any calls between Mr. Williams' cell phone and

5   either of the McDonnells' cell phones?

6   A    No, there were no calls during calendar year 2009 or

7   2010.

8   Q    All right.  Let's go back to Exhibit 54 briefly.  I'd

9   like to focus on the e-mail at the bottom of the first

10  page.  Do you see there where it says, "We are broke, have

11  an unconscionable amount in credit card debt already, and

12  this inaugural is killing us"?

13  A    Yes.

14  Q    Have you reviewed Mr. and Ms. McDonnell's credit card

15  records for that general time frame?

16  A    I have.

17  Q    I'd like to show you what's been marked for

18  identification as Exhibit 568.  Could you tell us what

19  this chart shows?

20  A    Sure.  This chart shows credit card balances in seven

21  different credit cards during the month of January, 2010

22  for Mr. and Ms. McDonnell.

23  Q    Is this the month following that e-mail we were just

24  looking at?

25  A    It is.

**DAVID HULSER - DIRECT**                                    3281

1          MR. FAULCONER:  We would offer Exhibit 568 into

2     evidence.

3          THE COURT:  It will be admitted.

4     BY MR. FAULCONER:

5     Q    All right.  Now, Special Agent Hulser, if we could

6     just zoom in on the portion that's in color there.

7     Looking at this, could you start by walking us through

8     what the color coding means on this chart?

9     A    Sure.  The color coding is associated with the credit

10    card account holder, so those in yellow are

11    Mr. McDonnell's and those in orange are Ms. McDonnell's.

12    Q    How many credit cards are listed on here in each

13    person's name?

14    A    Seven.

15    Q    Is that four for Mr. McDonnell and three for

16    Ms. McDonnell?

17    A    That's correct.

18    Q    And what is the total credit card balance as of

19    January, 2010?

20    A    $74,941.11.

21    Q    And when we look at this document or this chart, the

22    statement dates being different in the far left-hand

23    column, can you explain why those are different dates?

24    A    Sure.  Each account just has its own independent

25    statement closing date for the month.

**DAVID HULSER - DIRECT**                    3282

1    Q    We can take that down.  Now, there is also a

2    reference in the e-mail that we saw to being broke.  Have

3    you heard some of the testimony in trial about MoBo

4    Realty?

5    A    I have.

6    Q    And based on the records that you have reviewed, can

7    you tell us what the ownership percentages are in MoBo

8    Realty?

9    A    It is 50/50, Mr. McDonnell and his younger sister,

10   Maureen.

11   Q    During the course of the investigation, have you

12   reviewed some e-mails in which Mr. McDonnell and his

13   sister are discussing MoBo's financial situation in this

14   2009 time frame?

15   A    Yes.

16   Q    I'd like to show you what's been admitted as Exhibit

17   51.  If we could just focus on the middle e-mail there.

18   Do you see where it says, "In other words, we are in

19   trouble and need to act NOW," and then discusses a short

20   sale?

21   A    Yes.

22   Q    Based on your review of the mortgage and financial

23   records, was there actually any sort of short sale or

24   refinance done in this time frame?

25   A    No.

**DAVID HULSER - DIRECT**                3283

1    Q    We can take that down.  Now, in addition to reviewing

2    some of the e-mails, have you also looked at MoBo's tax

3    returns and bank records for the 2009 and 2010 time frame?

4    A    I have.

5    Q    Are you familiar with what its cash flow situation

6    was like in that time frame as reflected on the tax

7    returns?

8    A    Yes.

9         MR. FAULCONER:  I'd like to show the witness

10   what's been marked for identification as Exhibit 569.

11   BY MR. FAULCONER:

12   Q    Special Agent Hulser, can you tell us what this chart

13   is, generally speaking?

14   A    This is just a summary chart, scheduling out the

15   rental real estate activity for 2009 and 2010 for MoBo

16   Real Estate Partners.

17        MR. FAULCONER:  We would offer Exhibit 569 into

18   evidence.

19        THE COURT:  It will be admitted.

20   BY MR. FAULCONER:

21   Q    All right.  Now, Special Agent Hulser, could you walk

22   us through what each of the three rows on this chart are

23   indicating?

24   A    Yes.  The first row is the rental real estate income,

25   so that's actual monies received for the rental of the

**DAVID HULSER - DIRECT**                    3284

1  combined two properties that make up MoBo.  So we have for

2  2009, it is just over $178,000.  For 2010, it is just over

3  $196,000.

4  Q    Does that number there, rental real estate income,

5  does that include any sort of outside loans or owner

6  contributions into MoBo Realty?

7  A    No.

8  Q    Now, the second line there, rental real estate

9  expenses, can you tell us what's included within that?

10 A    Sure.  Those are the annual operating expenses that

11 were incurred for both 2009 and 2010.  So for 2009, just

12 over $221,000.  For 2010, over $236,000.

13 Q    Now, there in rental real estate expenses, can you

14 tell us whether that includes any principal repayments on

15 loans?

16 A    It does not.

17 Q    So what part of any loan repayment is included in

18 that category?

19 A    Just the interest.

20 Q    Does that row include any sort of capital

21 improvements or expenses on capital improvements?

22 A    None that were capitalized.

23 Q    Now, what is the net rental real estate income for

24 each of those two years, 2009 and 2010?

25 A    For 2009, it is a negative 43,203.  And for 2010, it

**DAVID HULSER - DIRECT**

1    was a negative 40,321.

2    Q    Just to be totally clear, Special Agent Hulser, is

3    this number that we are seeing here actually the tax loss

4    that's taken or is that a different number?

5    A    No, that number does not include depreciation

6    expense, which is a tax entry.  It is a non-cash item

7    that's calculated and deducted for income tax purposes

8    only.

9    Q    All right.  We can go and take that one down.  All

10   right, now I'd like to move forward in time to April of

11   2011.

12        MR. FAULCONER:  Unless Your Honor wants us to

13   stop here for the break?

14        THE COURT:  No, let's try to get to 4 o'clock.

15   BY MR. FAULCONER:

16   Q    Moving forward in time to April of 2011, have you

17   heard the testimony at trial about the shopping trip to

18   New York in April, 2011?

19   A    I have.

20   Q    I'd like to show you what's been admitted as Exhibit

21   97.  Have you reviewed this e-mail?

22   A    Yes, sir.

23   Q    Do you see there where Monica Block and

24   Ms. McDonnell, at least Monica Block refers to "Per our

25   conversation"?

```
1    A    Yes.

2    Q    Have you reviewed the phone records for that day for

3    Ms. McDonnell?

4    A    I have.

5    Q    I'd like to show you what's been marked for

6    identification as Exhibit 570.  Special Agent Hulser, can

7    you tell us what this chart is for Monday, April 11th,

8    2011?

9    A    Sure, this is a summary chart summarizing

10   communications involving Ms. McDonnell, Jonnie Williams,

11   the RFM Travel Aide, and Monica Block.

12              MR. FAULCONER:  We would offer Exhibit 570 into

13   evidence.

14              THE COURT:  It will be admitted.

15   BY MR. FAULCONER:

16   Q    I see here that the first call is from Maureen

17   McDonnell to Jonnie Williams at 5:28 p.m.  Before this

18   call that's shown on this chart, how many calls were there

19   between Ms. McDonnell, Ms. McDonnell's cell phone and

20   Mr. Williams' cell phone?

21   A    Zero.

22   Q    How about between Mr. McDonnell's cell phone and

23   Mr. Williams' cell phone?

24   A    Also zero.

25   Q    Now, before we sort of walk through this in a little
```

3287

1    bit more detail, can you remind us again what the asterisk

2    there means on the time?

3    A    Yes, that just indicates that this was a one-minute

4    time difference between the records for Jonnie Williams

5    and Maureen McDonnell as far as when the call was placed.

6    Q    Now, after the 5:28 call from Ms. McDonnell to

7    Mr. Williams for about 12 seconds, is there then a text

8    message at 5:33 p.m., same people, Ms. McDonnell to

9    Mr. Williams?

10   A    Yes.

11   Q    Could you walk us through the next three rows in

12   terms of what's shown there?

13   A    Sure.  There were a series of text messages from

14   Mr. Williams to Ms. McDonnell followed by a 15-minute

15   phone call from Mr. Williams to Ms. McDonnell, and then

16   also followed by a text message.

17   Q    Now, what does this chart show three minutes after

18   the last of those text messages from Ms. McDonnell to

19   Mr. Williams?

20   A    That Ms. McDonnell has contacted the RFM Travel Aide

21   and had a brief conversation, two minutes.

22   Q    Is that about two minutes?

23   A    Correct.

24   Q    Immediately after that conversation concludes, what

25   is that next eight-minute conversation, at least phone

**DAVID HULSER - DIRECT**                    3288

1    call?

2    A    Ms. McDonnell contacts Ms. Block.

3    Q    And then that 10:31 entry, is that the e-mail we

4    looked at right before we looked at this chart?

5    A    It is.

6    Q    All right.  We can take that down.  Now, we have

7    also, we heard some testimony about the shopping trip that

8    actually occurred on April 13th of 2011.  Have you

9    reviewed Mr. Williams' credit card bill for that time

10   frame?

11   A    Yes.

12   Q    I'd like to show you what's been marked for

13   identification as Exhibit 571.  Can you tell us what this

14   chart is?

15   A    Sure.  This is a summary chart providing detail for

16   Mr. Williams' American Express bill during the days April

17   13th and 14th, 2011.

18   Q    Does this focus on the stores that were mentioned

19   during testimony?

20   A    It does.

21        MR. FAULCONER:  We offer Exhibit 571 into

22   evidence.

23        THE COURT:  It will be admitted.

24   BY MR. FAULCONER:

25   Q    Without necessarily reading off every dollar amount,

1    could you just tell us how many transactions are located

2    here and what the total is?

3    A    Sure.  There are a total of six transactions: two

4    charges at the Louis Vuitton store, two charges at the

5    Bergdorf Goodman store, and two charges at the Oscar de la

6    Renta store.  The total of those charges is $20,979.28.

7    We then backed out the amount for Mary-Shea Sutherland's

8    dress that was purchased, which was $1,690, to arrive at a

9    total associated with Ms. McDonnell of $19,289.28.

10   Q    The dollar amount listed there for the Mary-Shea

11   Sutherland dress, did you just take that from something

12   Ms. Sutherland told you or where did you take that amount

13   from?

14   A    No, it is on the tag of the dress right over here.

15   Q    Is that the dress over there?

16   A    Yes.

17   Q    Okay.  Now, earlier we saw a chart of the

18   McDonnells's credit card debt in January of 2010.  Are you

19   aware of what their credit card debt was like from the

20   span from January of 2010 until April of 2011?

21   A    I am.

22   Q    I'd like to show you what's been marked for

23   identification as Exhibit 572.  Special Agent Hulser, is

24   this a chart showing that credit card debt over that time

25   span?

1  A    It is.

2          MR. FAULCONER:  We offer Exhibit 572 into

3  evidence.

4          THE COURT:  It will be admitted.

5  BY MR. FAULCONER:

6  Q    Again, Special Agent Hulser, without reading off

7  every single amount on here, could you just tell us how

8  that amount of credit card debt generally changed over

9  time?

10  A    Sure.  From the point that we started in January of

11  2010, the balance was just shy of $75,000.  And in

12  September, by September of 2010, it hit a high watermark

13  of over $90,000.  And by January of 2011, the combined

14  balances were just over $30,000 and remained fairly

15  consistent until April of 2011.

16  Q    In that time frame from September of 2010 until

17  January of 2011, where that drop occurs, have you reviewed

18  the bank accounts for Mr. and Ms. McDonnell to determine

19  whether there were any large deposits that weren't

20  deposits that would happen on a routine basis?

21  A    I have.

22  Q    Could you describe what if any such deposits there

23  were?

24  A    During that time period there was a deposit of just

25  shy of $25,000 from the Gardner Family Trust.  And there

1    were also in excess of $30,000 of deposits from a series

2    of insurance companies.  I believe life insurance.

3    Q    The Gardner Family Trust, was that associated with

4    the death of one of Ms. McDonnell's parents?

5    A    I believe so.

6    Q    Now, earlier you said that April 11th, 2011 was the

7    first communication between Ms. McDonnell and Mr. Williams

8    by cell phone.  After that time, did their communication

9    frequency increase?

10   A    It did.

11   Q    We have heard a number of, a number was sort of

12   tossed out there about how many communications there were.

13   Have you reviewed the number of communications?

14   A    Yes.

15   Q    Have you also reviewed the communications between

16   Ms. McDonnell and Mr. McDonnell in that same time frame?

17   A    I have.

18   Q    I'd like to show you what's been marked for

19   identification as Exhibit 573.  Now, what is this chart

20   that we are looking at here, generally speaking?

21   A    This is just a summary of overall phone record totals

22   associated with Mr. McDonnell, Ms. McDonnell, and Jonnie

23   Williams during the period April 11th, 2011 through

24   February 15th, 2013.

25            MR. FAULCONER:  We would offer Exhibit 573 into

 1   evidence.

 2            THE COURT:  It will be admitted.

 3   BY MR. FAULCONER:

 4   Q    Agent Hulser, could you tell us why you picked the

 5   dates April 11th, 2011 through February 15th, 2013?

 6   A    April 11th was the date of the first contact, and

 7   February 15th was through the date of the law enforcement

 8   interview with Ms. McDonnell.

 9   Q    When you say "first contact," is that first contact

10   between whom?

11   A    Between Jonnie Williams and Ms. McDonnell.

12   Q    After February 15th, 2013, were there any

13   communications between Ms. McDonnell and Mr. Williams?

14   A    No.

15   Q    Now, does it also say here, it says "Number of calls

16   greater than one minute."  Does this only include calls

17   greater than a minute?

18   A    Yes.

19   Q    Now, in the AT&T records, do those records include

20   some calls that actually show up as zero seconds?

21   A    They do.

22   Q    Can you explain whether those sometimes duplicate

23   calls that actually show up for a duration of time?

24   A    I'm sorry, could you repeat that?

25   Q    I phrased that very confusingly.  Could you explain

```
1    whether any of the zero-second calls appear to duplicate

2    any of the calls that actually have a time duration on

3    them?

4    A    No.

5    Q    Were there any calls that lasted zero seconds that

6    corresponded with a call that lasted more than zero

7    seconds?

8    A    Yes.

9    Q    Does this chart include any call that lasted zero

10   seconds?

11   A    No.

12   Q    Does it include any call that lasted less than a

13   minute?

14   A    No.

15   Q    In that first upper left-hand corner, how many calls

16   are shown between Mr. McDonnell and Ms. McDonnell from

17   April 11th of 2011 to December 31st of 2011?

18   A    130.

19   Q    Where it says "RFM Verizon," can you explain why this

20   says RFM Verizon in the furthest left box there?

21   A    We utilized Mr. McDonnell's records primarily because

22   of the Caller ID issue that was previously testified to.

23   Q    Can you explain exactly what that was one more time?

24   A    Sure.  Caller ID block on Mr. McDonnell's phone.  If

25   he contacts Ms. McDonnell, it would show up as Unavailable
```

1    on her records.

2    Q    As compared to that first time frame, April 11th,

3    2011 to December 31st, 2011, compared to that first time

4    frame, what are Mr. McDonnell and Ms. McDonnell's

5    communications greater than a minute from January 1st,

6    2012 to February 15th, 2013?

7             MR. BURCK:  Objection, Your Honor.  The question

8    was communications or was it phone calls?

9    BY MR. FAULCONER:

10   Q    How many phone calls greater than one minute?

11   A    178.

12   Q    Going to Ms. McDonnell and Mr. Williams, how many

13   phone calls greater than one minute are in that first time

14   frame during 2011?

15   A    94.

16   Q    And how if at all do those number of communications

17   compare to the number of communications from January of

18   2012 to February 15th, 2013?

19   A    They decreased to 73.

20   Q    Now, to be clear, Special Agent Hulser, are you aware

21   that Ms. McDonnell and Mr. Williams exchanged at least 733

22   text messages during that left-hand time frame in 2011?

23   A    That's correct.

24   Q    Were you able to do sort of an apples to apples

25   comparison of the number of text messages exchanged

**DAVID HULSER - DIRECT**                    3295

```
 1    between Mr. McDonnell and Ms. McDonnell during that same

 2    2011 time frame?

 3    A    No.

 4    Q    And why were you unable to do that?

 5    A    Because we didn't have those records.  We only had

 6    the records for a one-year period that began in September

 7    of 2012.

 8    Q    Now, during the 2012 time frame to February 13th,

 9    2013, are you aware that Mr. McDonnell and Mr. Williams

10    exchanged around 179 text messages?

11    A    Yes.

12    Q    Were you able to do a comparison of that number to

13    whatever number of text message communications were

14    between Ms. McDonnell and Mr. McDonnell during that same

15    time frame?

16    A    No.

17    Q    Now, during the time frame that's indicated here, how

18    did this overall number of text messages that we were just

19    discussing, 733 and 178, how did that compare to the total

20    number of text messages that Mr. Williams sent or

21    received, at least as indicated in his phone records,

22    during that time frame?

23    A    Sure.  During that time frame, April of 2011 through

24    February of 2013, Mr. Williams had sent or received over

25    40,000 text messages.
```

1   Q    But again, were you able to look at a comparison of

2   the number of text messages Ms. McDonnell sent to

3   Mr. Williams as compared to how many text messages she

4   generally sent?

5   A    I'm sorry, repeat that.

6   Q    Looking at Ms. McDonnell's records, were you able to

7   look at how many records she sent to Mr. Williams in that

8   time frame and compare it to how many she sent generally

9   during that time frame?

10  A    No.

11  Q    Again, why is that?

12  A    We didn't have the records.

13  Q    Now, during this same time frame, three more

14  questions about this time frame.  Are you aware of how

15  many communications Mr. McDonnell had with Mr. Williams,

16  phone communications, greater than one minute in 2011?

17  A    One.

18  Q    And how many phone communications in 2012 greater

19  than one minute?

20  A    Nine.

21  Q    During 2011, are you aware of how many text messages

22  the records showed Mr. Williams and Mr. McDonnell

23  exchanging in 2011?

24  A    Five.

25  Q    And how about number of text messages between, at

1    least according to the records, Mr. McDonnell and

2    Mr. Williams in 2012?

3    A    22.

4    Q    But as of April of 2011, had there been any

5    communications by cell phone between Mr. McDonnell and

6    Mr. Williams?

7    A    No, sir.

8         MR. FAULCONER:  Do you want to stop at 4 o'clock

9    now?

10        THE COURT:  Yes.  We will go ahead and take the

11   afternoon break.  15 minutes.

12        (The jury left the courtroom.)

13        (Recess taken from 4:05 p.m. to 4:24 p.m.)

14   ///

15   ///

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

DAVID HULSER - DIRECT                3298

```
 1                    THE COURT:  All right.

 2          (The jury entered the courtroom.)

 3                    THE COURT:  All right.  Government.

 4                    MR. FAULCONER:  Thank you, Your Honor.

 5   BY MR. FAULCONER:

 6   Q    All right, Special Agent Hulser.  I'd like to pick up

 7   with what's been admitted at Exhibit 104.  Are you

 8   familiar with this calendar entry from April 29th of 2011?

 9   A    Yes, sir.

10   Q    Were you in court for the testimony about this dinner

11   between Mr. and Ms. Williams and the McDonnells?

12   A    I was.

13   Q    Have you also reviewed e-mails produced by the

14   defendants, pursuant to the grand jury subpoena, for

15   e-mails discussing Star or MoBo properties in this general

16   time frame?

17   A    Yes.

18   Q    I'd like to show you what's been marked for

19   identification as Exhibit 107.  Is this an e-mail from

20   Ms. McDonnell to Mr. McDonnell?

21   A    It is.

22   Q    Was this produced by Ms. McDonnell?

23   A    Yes.

24   Q    And is it dated May 1st of 2011?

25   A    Yes.
```

DAVID HULSER - DIRECT          3299

```
 1            MR. FAULCONER:  Your Honor, we'd offer Exhibit
 2  107 into evidence.
 3            THE COURT:  It will be admitted.
 4  BY MR. FAULCONER:
 5  Q    All right.  Now, Special Agent Hulser, starting with
 6  what's at the bottom there, could you tell us what is
 7  written in that link at the bottom of this e-mail chain?
 8  A    Sure.  It's "seekingalpha.com/article" -- some
 9  numbers, and then
10  "star-scientific-has-home-run-potential."
11  Q    In the middle e-mail, what is written by the
12  individual who sends this e-mail to Ms. McDonnell?
13  A    "Please give to the Governor and his wife as per
14  Jonnie Williams.  Thank you Rob."
15  Q    Now, after that e-mail at 10:45 a.m., what does
16  Ms. McDonnell's e-mail account do with that e-mail?
17  A    She forwards that e-mail to Mr. McDonnell on May the
18  1st, 2011, at 12:17 p.m.
19  Q    Now, is there any difference between the subject line
20  in the middle e-mail and the first e-mail and the subject
21  line of that e-mail when it's sent by Ms. McDonnell to
22  Mr. McDonnell?
23  A    There is.  It's been changed to "Home Run Potential."
24            MR. FAULCONER:  Oh, Your Honor.  We offer this
25  into evidence.  I apologize.
```

1          THE COURT:  It will be admitted.

2          MR. BURCK:  Your Honor, I'm sorry.  Objection.

3  May we approach on this document?

4          THE COURT:  Come up.

5          MR. BURCK:  Your Honor, the only reason for the

6  objection is that this document, the subject line that he

7  just testified about where it says "Home Run Potential,"

8  the agent testified that somebody changed it.  But on the

9  face of it, it could be that they forwarded the document.

10  And the document comes up as a forward as a "Home Run

11  Potential" as the title of the article.  So I'd like --

12          MR. FAULCONER:  The face of the first e-mail to

13  the middle e-mail has something different.  So I can

14  clarify.

15          MR. BURCK:  If you would just clarify, that

16  would be fine.  Because I don't know if there's proof --

17          THE COURT:  All right.

18          MR. BURCK:  Thanks.

19      (In Open Court.)

20  BY MR. FAULCONER:

21  Q    All right.  Agent Hulser, just looking at the subject

22  line from the first e-mail to the middle e-mail to the top

23  e-mail, can you just tell us what, on the face of this

24  document, the difference is in the text from the middle

25  e-mail to the top e-mail?  Without necessarily saying what

DAVID HULSER - DIRECT          3301

1  happened, just tell us whether there's a difference in the

2  text on the face of it.

3  A    Sure.  The subject in the middle e-mail is "FW:" and,

4  in parens, "no subject."

5       The subject line in the e-mail that's forwarded is

6  "FW:  Home Run Potential."

7  Q    All right.  Now, I'd like to show you what's been

8  marked for identification as Exhibit 108.  Now, is this an

9  e-mail produced by Ms. McDonnell?

10 A    Yes, sir.

11 Q    And is this an e-mail from Ms. McDonnell to Celeste

12 Williams?

13 A    Yes.

14 Q    Is it dated May 1st, 2011?

15 A    It is.

16        MR. FAULCONER:  Your Honor, we'd offer Exhibit

17 109(sic) into evidence.

18        THE COURT:  It will be admitted.

19 BY MR. FAULCONER:

20 Q    All right.  Now, looking at this document, can you

21 tell us -- can you read just what the first three lines of

22 this e-mail say?

23 A    Sure.  It says, "Hi, Jonnie and Celeste.  Here's one

24 of our beach rental properties that we own with Bob's

25 sister and her husband...MoBo Realty."

DAVID HULSER - DIRECT                3302

```
1   Q    And where it says "Sunseeker" there, were you in
2   court for the testimony of Mr. Uncapher that that refers
3   to one of the two MoBo properties?
4   A    I was.
5   Q    All right.  Now, I'd like to show you what's been
6   marked for identification as Exhibit 109.
7            MR. FAULCONER:  Your Honor, just to clarify, the
8   one that we just showed was 108.  I believe I might have
9   misspoke and said we offer 109.  Just to clarify, 108 is
10  what we just offered.
11           THE COURT:  108 has been admitted.
12           MR. FAULCONER:  Thank you.
13  BY MR. FAULCONER:
14  Q    Now, showing you what's been marked for
15  identification as Exhibit 109.  Is this another e-mail
16  dated May 1st, 2011, from Maureen McDonnell to Celeste
17  Williams?
18  A    It is.
19           MR. FAULCONER:  Your Honor, we'd offer Exhibit
20  109 into evidence.
21           THE COURT:  It will be admitted.
22  BY MR. FAULCONER:
23  Q    Now, could you read for us what the subject -- or the
24  first three lines of this e-mail are?
25  A    Yes.  "Hi, Jonnie and Celeste.  Here's the other
```

DAVID HULSER – DIRECT          3303

1  beach rental property that we own with Bob's sister and

2  her husband...MoBo Realty."

3  Q    And East Coast Palace.  Were you in court for the

4  testimony about that being the other MoBo property?

5  A    I was.

6  Q    Now, all three of these e-mails that we've looked at,

7  the Home Run Potential e-mail and these MoBo e-mails are

8  May 1st, 2011.  Have you reviewed the phone records and

9  Mr. McDonnell's schedule for that day?

10 A    I have.

11 Q    I'd like to show you what's been marked for

12 identification as Exhibit 574.  And is this a chart

13 that -- chart that shows texts and tolls as they relate to

14 and surround those e-mails that we just looked at?

15 A    Yes, sir.

16 Q    And does it also include some information from

17 Mr. McDonnell's schedule for that day?

18 A    It does.

19       MR. FAULCONER:  We'd offer Exhibit 574 into

20 evidence, Your Honor.

21       THE COURT:  It will be admitted.

22 BY MR. FAULCONER:

23 Q    Now, Special Agent Hulser, could you walk us through

24 what's shown on the first line of this chart here?

25 A    Sure.  On the first line, from 11:20 to 12:55 p.m.,

1  Government Exhibit 105 references personal time, Executive
2  Mansion, for Mr. McDonnell.
3  Q    Now, during that same frame time, while that's on his
4  schedule, could you tell us which one of the three e-mails
5  we just looked at is sent at 12:17 p.m.?
6  A    Yes.  The e-mail from Ms. McDonnell to Mr. McDonnell.
7  Q    Now, at 1:11 and 1:13 p.m., can you tell us what's
8  indicated on that line on the chart?
9  A    Yes, sir.  That's a combination of two texts that are
10 sent from Mr. McDonnell to his younger sister, Maureen,
11 SisM.
12 Q    Could you read that text, that combined text message
13 there?
14 A    Yes.  "Any chance we could do a call tonight on MoBo
15 and bank options.  Need about an hour.  I can walk thru
16 loans, and Mike, if you can outline expenses that would be
17 great.  Need to make some decisions.  Mo, any ideas on
18 properties we can buy if we sell these 2 a reasonable
19 prices?  If not tonight, another this week?  Bob."
20 Q    Now, just to be clear, at least to the best of your
21 ability, are the typos that are on here, did you try to
22 get it how the materials that were produced to you look?
23 A    Yes.
24 Q    Now, after the response text message there at
25 1:20 p.m. from sister Maureen McDonnell to Mr. McDonnell's

1  cell phone, can you tell us what calls are shown there --

2  what call is shown there at 3:02 p.m.?

3  A    Sure.  Ms. McDonnell contacts Jonnie Williams, and

4  the call is connected for just over 41 minutes.

5  Q    And those next two rows, are those the two e-mails

6  about the two different Sandbrige or MoBo properties that

7  we just looked at?

8  A    They are.

9  Q    And then ten minutes after the second of those

10 e-mails, can you tell us what the phone records indicated

11 at 4:16 p.m.?

12 A    Mr. Williams contacts Ms. McDonnell, and a call is

13 connected for 8 minutes and 53 seconds.

14 Q    All right.  Now, let's move to the next day.

15 May 2nd, 2011.  I'd like to show you what's already

16 admitted as Exhibit 110.  Have you reviewed this Mansion

17 log for May 2nd, 2011?

18 A    I have.

19 Q    And have you also reviewed the toll records for

20 Mr. and Ms. McDonnell for this day?

21 A    Yes.

22 Q    I'd like to show you what's been marked for

23 identification as Exhibit 575.  Can you tell us, is this

24 the type of similar types of information for Monday, May

25 2nd, 2011?

DAVID HULSER - DIRECT                  3306

```
 1   A    It is.
 2             MR. FAULCONER:  Your Honor, we'd offer Exhibit
 3   575 into evidence.
 4             THE COURT:  It will be admitted.
 5   BY MR. FAULCONER:
 6   Q    All right.  Now, the times there where there's sort
 7   of the bracket on the right, and then it says 9:24 a.m. to
 8   11:25 a.m., where are those times taken from?
 9   A    Those are taken from the Mansion log as referenced on
10   Exhibit 110.
11   Q    Now, what does this chart show the phone records
12   indicated at 7:53 a.m., about an hour and a half before
13   that?
14   A    That Maureen McDonnell, the sister, contacted
15   Mr. McDonnell, and a call was connected for seven minutes.
16   Q    Now, a few minutes after that, at 8:03 a.m., what
17   does that refer to there in reference to Government
18   Exhibit 112?
19   A    If references an Outlook calendar invite being set on
20   Ms. McDonnell's -- Ms. McDonnell's calendar.
21   Q    And is that one of the Outlook invites that Special
22   Agent Huff testified about earlier in the trial?
23   A    Yes, sir.
24   Q    Now, after Mr. Williams arrives at the Mansion,
25   according to the log, at 9:24 a.m., can you walk us
```

DAVID HULSER - DIRECT          3307

```
 1  through the progression of phone calls from 9:57 a.m. to
 2  10:02 a.m. from Ms. McDonnell's cell phone?
 3  A    Sure.  There are a series of cell phone calls where
 4  Ms. McDonnell reaches out for Michael Uncapher, then
 5  sister Mo, or sister Maureen, then Mr. McDonnell, followed
 6  by sister Maureen again, and a second time, and then at
 7  10:02 a.m., Michael Uncapher again.
 8  Q    Now, to be clear, the asterisk that's located there
 9  next to RFM at 10 a.m., does that indicate that that call
10  didn't actually show up in Mr. McDonnell's record?
11  A    It does.
12  Q    Or does it indicate that it does not show up there?
13  Sorry.  That was a terrible way of asking it.
14       What does the asterisk indicate?
15  A    It does not show up on his records.
16  Q    So do you know if that even connected for a call?
17  A    I don't.
18  Q    Now, were you in court for Mr. Burck's testimony of
19  Michael Uncapher?
20  A    Yes.
21  Q    Or Mr. Burck's cross-examination of Michael Uncapher?
22  I apologize.
23  A    Yes.
24  Q    And were you in court when he showed him some of the
25  phone records from May 2nd, 2011?
```

1   A     I was.

2   Q     And were in you court when he asked him about this

3   10:44 a.m. call from Michael Uncapher back to Maureen

4   McDonnell?

5   A     Yes.

6   Q     And is that a call for 13 minutes during the same

7   time frame when Mr. Williams, according to the log, was in

8   the Mansion?

9   A     It is.

10  Q     Now, after that, at 1:19 p.m. and 1:41 p.m., what

11  does this chart show?

12  A     It shows two -- two calls connected between

13  Mr. Williams and Ms. McDonnell.

14  Q     And then at 9:34 p.m., is that a 48 minute and 18

15  second call between the two of them?

16  A     It is.

17  Q     What does this chart show happens a little while

18  after that call ends at 10:37 p.m.?

19  A     Mr. McDonnell contacts his younger sister Maureen,

20  and that call is connected for 84 minutes.

21  Q     Now, have you reviewed Mr. McDonnell's schedule for

22  this day, Monday, May 2nd of 2011?

23  A     I have.

24  Q     Now, keeping in mind the times here, 9:34 and 10:37.

25  Could you tell us what Mr. McDonnell's schedule shows on

1  the last page of this exhibit for where he's scheduled --

2  I'm sorry, this is Exhibit 623, which has already been

3  admitted.

4       On the last page of this document -- sorry, second to

5  last page, is this the portion for May 2nd, 2011?

6  A    It is.

7  Q    And what does this schedule say as far as where

8  Mr. McDonnell is scheduled to be after 7:15 p.m. on

9  Monday, May 2nd, 2011?

10 A    At the Executive Mansion.

11 Q    And is there anything on his schedule after 9 p.m.?

12 A    No.

13        MR. FAULCONER:  Just for comparison purposes,

14 can we flip back briefly to Exhibit 575?

15 BY MR. FAULCONER:

16 Q    All right.  Now, in addition to these calls and some

17 of the e-mails that we've looked at, have you also

18 reviewed any e-mails regarding Cailin McDonnell's wedding

19 that were sent by Mr. McDonnell in this time frame?

20 A    I have.

21 Q    I'd like to show you what's already been admitted as

22 Exhibit 111.  Now, the two dates that we just looked at

23 were May 1st, 2011, and May 2nd, 2011.  Can you tell us

24 when these two e-mails that are shown here on Exhibit 111,

25 when they were sent relative to the dates that we just

DAVID HULSER - DIRECT                    3310

1  looked at?

2  A    Sure.   The first -- the e-mail string starts on

3  May 1st, 2011.   And that's an e-mail from Mr. McDonnell to

4  Cailin McDonnell.   And she then replies on Monday,

5  May 2nd.   Cailin McDonnell replies to Mr. McDonnell.

6  Q    And is that e-mail on May 1st a few minutes before

7  the call between Mr. McDonnell and sister Maureen

8  McDonnell?

9  A    It is.

10  Q    And is the e-mail back from Cailin McDonnell a few

11  minutes before the call between sister Maureen McDonnell

12  and Mr. McDonnell?

13  A    Yes.

14  Q    All right.   Now, we've looked at May 1st and May 2nd.

15  Have you compared the link that Ms. McDonnell sent to

16  Mr. McDonnell, the one that ended in Home Run Potential,

17  from May 1st, 2011, with any documents that Mr. McDonnell

18  or his staff forwarded on to other individuals?

19  A    I have.

20  Q    I'd like to show you what's been entered as Exhibit

21  116.   Have you reviewed this e-mail from Pam Watts to

22  Dr. Bill Hazel?

23  A    I have.

24  Q    And what is the date of that e-mail?

25  A    Thursday, May 5th, 2011, at 12:25 p.m.

DAVID HULSER - DIRECT            3311

1   Q    Now, turning to the second page of this document, and

2   going down to the very bottom there, can you tell us

3   whether or not the links shown at the bottom of this

4   printout matches the link from that e-mail that we looked

5   at earlier?

6   A    It does.

7   Q    And this e-mail was dated May 5th, 2011.  But can you

8   tell us what the date is that shows that this document was

9   printed?

10  A    On May 1st, 2011.

11  Q    Now, going back to the first page real quick, what is

12  the time on May 5th, 2011, that's shown here?

13  A    12:25 p.m.

14  Q    All right.  Now, turning to Exhibit 117, which has

15  already been admitted, this is Monday, May 9th, 2011.

16  What day of the week does Dr. Hazel refer to in his e-mail

17  there in the middle where he says, "He mentioned this to

18  me"?

19  A    "He mentioned this to me on Thursday."

20  Q    Now, have you reviewed Mr. McDonnell's schedule for

21  the prior Thursday, May 5th, 2011?

22  A    Yes.

23  Q    I'd like to show you what's already been admitted as

24  Exhibit 115.  Now, could you tell us, is this the schedule

25  for May 5th, 2011?

DAVID HULSER - DIRECT                  3312

1  A     It is.

2  Q     And at the bottom of that first page, could you tell

3  us, what's shown there from 11 to 11:45?

4  A     Sure.  It states, "Meet on HHR Strategic Plan -- PHB:

5  Governor's Conference Room."

6  Q     Now, turning to the next page, who does it show is

7  the scheduled participants for that meeting?

8  A     Bill Hazel and Martin Kent.

9  Q     All right.  So keeping that in mind and turning

10 briefly back to Exhibit 116, where does that 11 to

11 11:45 a.m. meeting fall relative to when Pam Watts

12 forwards this e-mail on to Dr. Hazel?

13 A     It's about an hour difference.

14 Q     All right.  I'd like to move forward to May 23rd of

15 2011.  Are you aware that that's the date of the two

16 checks, $50,000 and $15,000 from Starwood Trust?

17 A     Yes.

18 Q     And were you in court when Mr. Williams testified

19 about dropping the checks off at the Mansion that day?

20 A     I was.

21 Q     And did you hear him testify about potentially seeing

22 Mr. McDonnell on that day?

23 A     Yes.

24 Q     I'd like to show you what's been already admitted as

25 Exhibit 125.  Have you reviewed this Mansion log for

DAVID HULSER - DIRECT                3313

1   May 23rd of 2011?

2   A    I have.

3   Q    And have you compared it to the phone records and

4   Mr. McDonnell's schedule for that day?

5   A    Yes, sir.

6   Q    I'd like to show you what's been marked for

7   identification as Exhibit 576.  Is this a chart that shows

8   information that you obtained from phone records and

9   Mr. McDonnell's schedule for May 23rd of 2011?

10  A    Yes.

11           MR. FAULCONER:  Your Honor, we'd offer Exhibit

12  576 into evidence.

13           THE COURT:  It will be admitted.

14  BY MR. FAULCONER:

15  Q    All right.  Now, this one has a little bit more on it

16  than some of the other ones we've looked at.  The first

17  two lines on there, is that two calls from Mr. Williams to

18  Ms. McDonnell at 9:21 to 9:24 a.m.?

19  A    That's correct.

20  Q    And then a text message back at 10:40 a.m. from

21  Ms. McDonnell?

22  A    Correct.

23  Q    Now, could you tell us what is shown there from noon

24  to 1:15 p.m. as being scheduled on Mr. McDonnell's

25  calendar during the same time frame when Mr. Williams is

DAVID HULSER - DIRECT                3314

1  at the Mansion, according to the log?

2  A    Sure.  The schedule states, "Private work time --

3  PHB" Governor's Office."

4  Q    And what does Mr. McDonnell's schedule say that he is

5  scheduled to do at 1:15 p.m., around the same time that

6  Mr. Williams leaves the Mansion?

7  A    Scheduled to depart for RIC, or the Richmond airport,

8  with Maureen McDonnell.

9  Q    All right.  Now, in that time frame from 1:30 p.m. to

10 10:15 p.m., what does Mr. McDonnell's schedule say there

11 from, Exhibit 624, about what he and Ms. McDonnell are

12 scheduled to be doing?

13 A    They are scheduled to be traveling together.

14 Q    And what do those three bullet points underneath that

15 show about the cell phone records from that time?

16 A    The cell phone records indicate that they had made

17 separate calls, both -- both cell phones utilized at

18 various locations.  Verona, Virginia.  Staunton, Virginia,

19 and Warm Springs, Virginia.

20 Q    And are those locations -- just to be clear, for each

21 one of those bullet points, is there at least one call

22 from each one of their two cell phones from those various

23 origination locations?

24 A    There is.

25 Q    And do those locations generally match the locations

DAVID HULSER - DIRECT                3315

1  that are shown on the travel schedule?

2  A    Yes.

3  Q    And then at 10:15 p.m., what are Mr. and

4  Ms. McDonnell scheduled to be doing that day?

5  A    They are scheduled to depart for the Executive

6  Mansion from the Richmond Airport.

7  Q    All right.  Well, let's move forward in time, then,

8  to the end of May of 2011.  And I'd like to show you

9  what's been marked for identification as Exhibit 134 --

10  sorry.  What's already been admitted as Exhibit 134.  Do

11  you see -- are you familiar with this e-mail?

12  A    I am.

13  Q    And do you see there where it refers to a round of

14  golf tomorrow for the boys?

15  A    Yes.

16  Q    Have you also reviewed the Kinloch Golf Club records

17  for the next day?

18  A    I have.

19  Q    Showing you Exhibit 135, which has already been

20  admitted, on Page 2, the second receipt, zooming in on

21  that one, who, in addition to Mr. McDonnell's sons, is

22  listed on that receipt?

23  A    Governor Bob McDonnell and future son-in-law.

24  Q    Now, looking at this receipt, what's the first time

25  that's on this bill, as best you can tell?  Do you need a

DAVID HULSER - DIRECT                3316

1   paper copy?

2   A    No.  I've got it right there.  1:39 p.m.

3   Q    And what is the last receipt time that's shown on

4   this bill?

5   A    You have to back out.  I think it's the middle -- the

6   middle one right there.  Yeah.  It's at 8:59 p.m.

7   Q    Now, have you reviewed Mr. McDonnell's cell phone

8   records for this day?

9   A    I have.

10  Q    I'd like to show you what's been marked for

11  identification as Exhibit 577.  And this is a chart that

12  you prepared based off of those records?

13  A    Yes.

14         MR. FAULCONER:  Your Honor, we'd offer Exhibit

15  577 into evidence.

16         THE COURT:  It will be admitted.

17  BY MR. FAULCONER:

18  Q    All right.  Now, the first row there, is that

19  essentially the first and last receipt time from the

20  Kinloch receipt we just looked at?

21  A    Yes, sir.

22  Q    What do the cell phone records show Mr. McDonnell's

23  cell phone did at 15 minutes after the last of those

24  receipts?

25  A    Mr. McDonnell contacted Mr. Williams' cell phone.

DAVID HULSER - DIRECT          3317

1   Q     And how many contacts, prior to this phone call, were

2   there between Mr. McDonnell and Mr. Williams' cell phone?

3   A     Zero.

4   Q     Approximately 24 minutes, or so, after that contact,

5   what did the phone records indicate for Mr. McDonnell's

6   cell phone?

7   A     Mr. McDonnell reaches out to Ms. McDonnell, and the

8   call lasts for six minutes.

9   Q     And to be clear, that double asterisk again, what

10  does that mean?

11  A     That the records indicate an unavailable source on

12  her records.

13  Q     But do those records still indicate a six-minute

14  call?

15  A     They do.

16  Q     All right.  Let's go forward a few days to June 1st

17  of 2011.  Have you heard the testimony about both a

18  purchase of stock that day and Ms. McDonnell's travel to

19  the Roskamp Institute in Florida?

20  A     I have.

21  Q     I'd like to show you what's been already admitted as

22  Exhibit 149.  Have you reviewed this Davenport & Company

23  statement from June 1st to June 30th of 2011?

24  A     Yes.

25            MR. FAULCONER:  And I'd like to go to Page 2 of

DAVID HULSER - DIRECT          3318

1   this document.  And zooming in on the sort of bottom half

2   there.

3   BY MR. FAULCONER:

4   Q    Do you see there the purchase date of June 1st, 2011?

5   A    I do.

6   Q    Now, the deposit date there says June 6th of 2011.

7   Have you reviewed the check that was actually used to make

8   that deposit?

9   A    Yes.

10  Q    And do you know what the date of that check is?

11  A    June 4th, 2011.

12  Q    Have you reviewed Ms. McDonnell's toll records for

13  those two days?

14  A    I have.

15  Q    I'd like to show you what's been marked for

16  identification as Exhibit 578.  Is this a chart showing

17  some of the calls from Ms. McDonnell's toll records for

18  those two days?

19  A    It is.

20         MR. FAULCONER:  Your Honor, we'd offer Exhibit

21  578 into evidence.

22         THE COURT:  It will be admitted.

23  BY MR. FAULCONER:

24  Q    All right.  Now, what's the first call shown here on

25  the chart on June 1st of 2011 from Ms. McDonnell's cell

1  phone?

2  A    A call from Ms. McDonnell to Mr. Piscitelli at 9:55

3  a.m., what lasts approximately 11 minutes.

4  Q    Now, what is the next call shown in Ms. McDonnell's

5  phone records for that day, June 1st, 2011?

6  A    A call to Mr. McDonnell's cell phone, which lasts

7  four minutes.

8  Q    Now, the date of the check, June 4th, 2011, is that a

9  call from Ms. McDonnell to Mr. Piscitelli for about one

10 minute at 11:27 a.m.?

11 A    That's correct.

12 Q    What's the next call in Ms. McDonnell's phone records

13 on that day?

14 A    Ms. McDonnell contacts Mr. McDonnell's cell phone,

15 and that call is connected for approximately two minutes.

16 Q    And is that another call at noon from Ms. McDonnell

17 to Mr. Piscitelli?

18 A    Yes.

19 Q    And just to be clear, Agent Hulser, we've said it a

20 couple of times, but do you know personally what was

21 discussed on any of these calls?

22 A    I do not.

23 Q    Now, the checks from Mr. Williams were written on

24 May 23rd, 2011.  Have you reviewed the account into which

25 the $50,000 check was deposited?

DAVID HULSER - DIRECT            3320

1   A      I have.

2   Q      Have you reviewed the other checks, in addition to

3   the one to Davenport, from around that time frame out of

4   that account?

5   A      Yes.

6   Q      And I'd like to -- and have you also reviewed the

7   other deposits?

8   A      Yes.

9   Q      I'd like to show you what's been marked for

10  identification as Exhibit 579.  Is this a chart showing

11  the activity in that bank account during that general time

12  frame?

13  A      Yes, sir.

14         MR. FAULCONER:  Your Honor, we'd offer Exhibit

15  579 into evidence.

16         THE COURT:  It will be admitted.

17  BY MR. FAULCONER:

18  Q      All right.  Now, Agent Hulser, what does this chart

19  show the balance was in that account as of May 20th of

20  2011?

21  A      Just over $4,700.

22  Q      After the deposit from Starwood Trust -- the Starwood

23  Trust check on May 25th, 2011, could you tell us what the

24  entries there that are in color, what those refer to?

25  A      Sure.  Those are credit cards that are associated

DAVID HULSER - DIRECT          3321

1  with Ms. McDonnell in orange or Mr. McDonnell in yellow.

2  Q    Now, with respect to the credit cards that are

3  indicated there in yellow, for Mr. McDonnell, can you tell

4  us, based on your review of the accounts, whether

5  Ms. McDonnell had ever made any payments before or after

6  these payments to any of those credit cards?

7  A    She had not.

8  Q    And what is the total amount that was withdrawn from

9  this account between May 25th and June 4th of 2011?

10 A    Over $55,000.

11 Q    Now, I'd like to show you -- in reference to some of

12 these credit card payments that are here, I'd like to show

13 you what's been marked for identification as Exhibit 127.

14 And is this one of those checks to Pentagon Federal Credit

15 Union?

16 A    It is.

17       MR. FAULCONER:  Your Honor, we'd offer Exhibit

18 127 into evidence.

19       THE COURT:  It will be admitted.

20 BY MR. FAULCONER:

21 Q    Now, this check is from Maureen McDonnell's account.

22 To be clear, whose name was that credit card in?

23 A    Mr. McDonnell's.

24 Q    I'd like to show you what's been marked for

25 identification as Exhibit 128.  Is this a check to MoBo

1   Realty from that time frame?

2   A    Yes.

3           MR. FAULCONER:  Your Honor, we'd offer Exhibit

4   128 into evidence.

5           THE COURT:  It will be admitted.

6   BY MR. FAULCONER:

7   Q    And, again, was Ms. McDonnell a partner in MoBo

8   Realty?

9   A    No.

10  Q    I'd like to show you what's been marked for

11  identification as Exhibit 132.  Is this a check from

12  Ms. McDonnell's Wachovia account to Bank of America?

13  A    It is.

14  Q    Is it dated May 25th, 2011?

15  A    Yes, sir.

16          MR. FAULCONER:  Your Honor, we'd offer Exhibit

17  132 into evidence.

18          THE COURT:  It will be admitted.

19  BY MR. FAULCONER:

20  Q    And, Special Agent Hulser, this check is for

21  Ms. McDonnell.  But can you tell us, whose name was the

22  Bank of America credit card in?

23  A    Robert McDonnell.

24  Q    All right.  Now, stepping back from the specific

25  checks for a moment, have you reviewed the activity more

DAVID HULSER - DIRECT                3323

1  generally in the McDonnells' checking accounts in this

2  time frame, sort of the first half of 2011?

3  A    I have.

4  Q    I'd like to show you what's been marked for

5  identification as Exhibit 580.  And is this a two-page

6  chart?

7  A    It is.

8  Q    Can you tell us what's shown on the first page of

9  this chart?

10 A    Yes.  The first page just summarizes all of the

11 accounts that are -- and checking accounts that are held

12 by either Mr. McDonnell, Ms. McDonnell or joint accounts.

13 Q    And the second page of this chart, what does that

14 show, generally?

15 A    Generally, that shows a summary of deposits and

16 withdrawals from the period January to June 2011.

17        MR. FAULCONER:  Your Honor, we'd offer Exhibit

18 580 into evidence.

19        THE COURT:  It will be admitted.

20 BY MR. FAULCONER:

21 Q    All right.  Now, turning to the -- the first page is

22 the list of accounts, right?

23 A    Correct.

24 Q    All right.  Now, turning to the second page, without

25 going through every number on here, could you tell us what

DAVID HULSER - DIRECT                3324

1  each column here means?

2  A    Sure.  The "Deposits" column is simply a summary of

3  deposits by month, which totals up to just over $178,000

4  from January to June.

5  Q    And what about the "Withdrawals" column there?

6  A    Same thing.  A total of all withdrawals from the

7  account, from the combined accounts, from January to June,

8  totaling just over $175,000.

9  Q    So how big of a difference is there here in the "Net"

10 column between the total deposits in and the total

11 withdrawals out in this time frame?

12 A    Just over 3,000.

13 Q    Now, does the number there on the left, the total

14 deposits, does that number include both the $50,000

15 payment from Mr. Williams as well as the refund from the

16 catering company in June of 2011?

17 A    It does.

18 Q    And if you subtracted that amount from the number on

19 the far right, would that number be positive or negative?

20 A    It would be negative.

21 Q    All right.  Now, let's move forward from that time

22 frame to late July of 2011.  I'd like to show you what's

23 been already admitted as Exhibit 180.  Are you familiar

24 with this schedule for Mr. McDonnell for July 29th to

25 July 31st of 2011?

DAVID HULSER - DIRECT                3325

```
 1   A    Yes.
 2   Q    And turning to Page 4, partway down, do you see there
 3   where it says a 7 p.m. departure for the Executive
 4   Mansion?
 5   A    I do.
 6   Q    I'd like to show you now what's been already admitted
 7   as Exhibit 185.  Are you also familiar with this e-mail
 8   from 7:47 p.m. that same day?
 9   A    I am.
10   Q    And just to make sure everybody knows, what is the
11   attachment to this document?
12           MR. FAULCONER:  If we flip forward to the next
13   page.
14   BY MR. FAULCONER:
15   Q    Special Agent Hulser, do you recognize that?
16   A    I do.
17   Q    What is it?
18   A    Picture of Mr. McDonnell driving.
19   Q    Now, have you reviewed texts and toll records
20   relating to the time frame when the McDonnells visited
21   Smith Mountain Lake?
22   A    I have.
23   Q    I'd like to show you what's been marked for
24   identification as Exhibit 581.  Now, Agent Hulser, is this
25   a four-page chart?
```

DAVID HULSER - DIRECT                3326

1    A    Yes.

2    Q    And does this show some of the text and toll records

3    from around this time frame?

4    A    It does.

5    Q    The third page of this chart, can you tell us what

6    that is?

7    A    That is a map of Virginia.

8    Q    And the fourth page, does that show some of the

9    text records -- or toll records as they relate to

10   origination locations?

11   A    It does.

12        MR. FAULCONER:  Your Honor, we'd offer Exhibit

13   581 into evidence.

14        THE COURT:  It will be admitted.

15   BY MR. FAULCONER:

16   Q    All right.  Now, going to the first page and walking

17   through this, can you tell us, what's shown there on

18   July 28th, 2011, at 2:04 p.m.?

19   A    Yes.  A Outlook calendar invite was sent from

20   Mary-Shea Sutherland to Maureen McDonnell, and it

21   referenced a meeting with Jonnie Williams on 8/1.

22   Q    Now, that same day, how many text messages are

23   exchanged between Ms. McDonnell and Mr. Williams?

24   A    Eleven.

25   Q    The next day, is that a 12 minute, 33 second call

DAVID HULSER - DIRECT               3327

```
1   from Mr. Williams to Ms. McDonnell?
2   A    It is.
3   Q    And does that show 14 text messages exchanged?
4   A    Yes.
5   Q    Now, the next day, on July 30th of 2011, how many
6   phone calls are shown there between Ms. McDonnell and
7   Mr. Williams?
8   A    Seven.
9   Q    All right.  Turning to the second page of this chart,
10  July 31st, 2011, is that the date of the scheduled
11  departure?
12  A    It is.
13  Q    Now, after that text message shown at the top and
14  then the scheduled departure at 7 p.m., can you tell us
15  what's shown there at 7:10 p.m.?
16  A    At 7:10 p.m., Ms. McDonnell sends Mr. Williams a text
17  message.
18  Q    Now, that 7:47 p.m. entry, is that the e-mail with
19  the photo that we just looked at?
20  A    Yes.
21  Q    And then an 8 p.m. text message on the next line,
22  could you tell us what's shown there at 8:12 and 8:13?
23  A    Sure.  An exchange of telephone calls between
24  Ms. McDonnell and Mr. Williams.
25  Q    Now, have you reviewed those phone calls as far as
```

DAVID HULSER - DIRECT                    3328

1  what they show about the origination location of where

2  those cell -- where Ms. McDonnell's cell phone was when

3  those calls were made?

4  A    I have.

5            MR. FAULCONER:  If we could turn to the

6  second -- or third page.

7  BY MR. FAULCONER:

8  Q    Is that the sort of just general map of Virginia?

9  A    Correct.

10  Q    Turning to the fourth page.  All right.  Could you

11  tell us what, first off, is the furthest left circle that

12  you have there?

13  A    Smith Mountain Lake.

14  Q    And what is the sort of circle I guess a little bit

15  up and to the right?

16  A    Rustburg is circled.

17  Q    And do you recall what's indicated for the

18  origination location in Ms. McDonnell's phone records for

19  the calls at 8:12 and 8:13 p.m.?

20  A    Yes.  It was Yellow BR.

21  Q    And do you know what that refers to?

22  A    I believe it refers to Yellow Branch, which is very

23  close to Rustburg.

24  Q    And then what's circled on the furthest right on that

25  chart?

1  A     Richmond.

2  Q     All right.

3          MR. FAULCONER:  Now, if we could go back to Page

4  2, briefly.

5  BY MR. FAULCONER:

6  Q     That e-mail at 11:29 p.m.  If we could go to what's

7  been already admitted as Exhibit 189, is that the e-mail

8  that's referenced on that chart?

9  A     It is.

10 Q     All right.  And, now, if we could go to Exhibit 183,

11 which has already been admitted, is this a series of 21

12 photographs that was produced by Ms. McDonnell to the FBI?

13 A     Yes.

14 Q     To be clear, Special Agent Hulser, was there any

15 metadata produced showing when these text -- when these

16 photographs were taken or what was done with them?

17 A     No.

18 Q     All right.  Now, we just saw the e-mail for the

19 scheduling of the meeting on August 1st, 2011.  I'd like

20 to now go to the Mansion log that's already been admitted

21 as Exhibit 186.  Are you familiar with this Mansion log?

22 A     Yes, sir.

23 Q     And does that show Mr. Williams, Ms. Huffstetler, and

24 Dr. John Clore at various times?

25 A     It does.

DAVID HULSER - DIRECT          3330

1   Q     Now, I'd like to show you, in reference to the same

2   date, August 1st, 2011 -- well, first off, what's the last

3   time next to John Clore's name for time out there?

4   A     11:31.

5   Q     All right.  Now, if I could show you what's been

6   already admitted as Exhibit 192.  Are you familiar with

7   this document showing a calendar entry being set on

8   Ms.  McDonnell's calendar?

9   A     I am.

10  Q     And what's the time there at the bottom that it shows

11  that this calendar event for August 30th was set on her

12  calendar?

13  A     It was set at 11:44 a.m.

14  Q     Is that August 1st, 2011?

15  A     That's correct.

16  Q     All right.  Well, now I'd like to show you what's

17  been marked for identification as Exhibit 582.  Is this a

18  chart showing certain calls and text messages both

19  before -- or before and during Mr. Williams' time at the

20  Mansion that day?

21  A     It is.

22        MR. FAULCONER:  Your Honor, we'd offer Exhibit

23  582 into evidence.

24        THE COURT:  It will be admitted.

25  BY MR. FAULCONER:

DAVID HULSER - DIRECT          3331

1    Q    All right.  Now, are those three text messages
2    between Ms. McDonnell and Mr. Williams before he arrives,
3    on the first three rows?
4    A    Yes.
5    Q    Now, at the same time of the last of those three text
6    messages, what does Ms. McDonnell's records show in terms
7    of phone calls?
8    A    At 9:41 a.m., Ms. McDonnell contacts Mr. Williams --
9    oh, I'm sorry.  At 9:41 Ms. McDonnell contacts
10   Mr. McDonnell.
11   Q    Now, again, that asterisk, does that mean that the
12   call -- am I correct to say that that means that the call
13   did not actually show up in Mr. McDonnell's records?
14   A    Correct.
15   Q    So do you know whether that call actually connected?
16   A    I don't.
17   Q    All right.  Now, after that, I see there that
18   Mr. Williams arrives at 9:45 and Ms. Huffstetler at 9:55.
19   What happens, according to the phone records, six minutes
20   after Ms. Huffstetler's arrival?
21   A    Ms. McDonnell reaches out to Mr. McDonnell, and the
22   phone call -- or the contact is four minutes.
23   Q    Now, 33 minutes after that, it says that Dr. Clore
24   arrives.  What happens at 10:57 a.m., according to the
25   phone records, between the time that Dr. Clore arrives and

1  the time that Ms. Huffstetler leaves?

2  A     Mr. McDonnell contacts Ms. McDonnell for a one-minute

3  contact.

4  Q     And then are those remaining rows essentially the

5  people leaving the Mansion and then the calendar entry

6  being set?

7  A     Correct.

8  Q     All right.  Now, in reference to this date of

9  August 1st, 2011, did you recover any e-mails from Mr. or

10  Ms. McDonnell discussing Star Scientific in the days

11  following this meeting?

12  A     Yes.

13  Q     I'd like to show you what's been marked as Exhibit

14  199.  Is this an e-mail produced by Ms. McDonnell?

15  A     It is.

16  Q     Now, looking at the top of this e-mail, can you tell

17  us, who is it from and to?

18  A     Sure.  The e-mail is from Ms. McDonnell, and it's to

19  governor@bobmcdonnell.com.

20  Q     And is it dated August 4th, 2011?

21  A     Yes, sir.

22         MR. FAULCONER:  Your Honor, we'd offer Exhibit

23  199 into evidence.

24         THE COURT:  It will be admitted.

25  BY MR. FAULCONER:

DAVID HULSER - DIRECT                3333

1  Q    All right.  Now, that's August 4th, 2011, at

2  5:58 p.m.  Can you read underneath where it says "Quote,"

3  and then the sort of part that's a little grayed out?  Can

4  you read what that says in the e-mail from Ms. McDonnell

5  to Mr. McDonnell on August 4th?

6  A    Sure.  It's, "Quote from Patrick Cox, today, in

7  Breakthrough Technology Alert."  And in quotes, "As an

8  economist, however, I am utterly certain that Anatabloc is

9  going to shake our political system to its very roots.

10 This is because even" -- something -- "changes to the

11 actuarial tables will have enormous budgetary" -- I can't

12 read that.

13 Q    It's hard to read.  Is that fair to say?

14 A    Yeah, it is.

15 Q    Now, I'd like to show you, keeping this date and time

16 in mind, Exhibit 201, what's been marked for

17 identification.  Is this an e-mail produced by

18 Ms. McDonnell dated August 5th of 2011?

19 A    It is.

20       MR. FAULCONER:  Your Honor, we'd offer Exhibit

21 201 into evidence.

22       THE COURT:  It will be admitted.

23 BY MR. FAULCONER:

24 Q    All right.  Now, is this an e-mail from Ms. McDonnell

25 to Patrick Cox?

DAVID HULSER – DIRECT                3334

1   A    Yes, sir.

2   Q    Could you read what Ms. McDonnell writes in sort of

3   the italicized text there on the e-mail to Patrick Cox on

4   August 5th of 2011?

5   A    Sure.  It states, "Would it be possible for you to

6   send this as an attachment like you did in the first

7   e-mail so I would be able to print out a clean copy for my

8   husband?"

9   Q    All right.  Now, if we could move forward to what's

10  been already admitted as Exhibit 200.  Have you reviewed

11  this Kinloch receipt?

12  A    I have.

13  Q    And have you also reviewed Mr. McDonnell's and

14  Mr. Williams' toll records in this time frame?

15  A    Yes.

16  Q    I'd like to show you what's been marked for

17  identification as Exhibit 583.  Is this a chart showing

18  Mr. McDonnell and Mr. Williams' toll communications as

19  they relate to the various golf transactions in August of

20  2011?

21  A    It is.

22        MR. FAULCONER:  Your Honor, we'd offer Exhibit

23  583 into evidence.

24        THE COURT:  It will be admitted.

25  BY MR. FAULCONER:

DAVID HULSER - DIRECT                3335

1    Q    All right.  Now, where it says August 5th, 2011,

2    there in the first row, and it says "From JRW to Sean &

3    Pfister," does that include -- does that indicate that

4    Mr. Williams was there or what does that actually indicate

5    there?

6    A    Yes, it does.

7              MR. FAULCONER:  Well, if we could turn back to

8    Exhibit 200 and to the second page and on to the third

9    page.

10   BY MR. FAULCONER:

11   Q    On August 5th, 2011, the receipt at the top there --

12   sorry, going down -- is Mr. Williams indicated on that

13   receipt?

14   A    No, he's not.  It's Sean McDonnell and Hunter

15   Pfister.

16   Q    All right.

17             MR. FAULCONER:  So if we could go back to

18   Exhibit 583.

19   BY MR. FAULCONER:

20   Q    After that golf on August 5th, 2011, what is the

21   contact between Mr. McDonnell and Mr. Williams' cell phone

22   there two days later?

23   A    On August the 7th, at 11:48 p.m., Mr. McDonnell

24   contacts Mr. Williams via text.

25   Q    And how much cell phone contact was there between

DAVID HULSER - DIRECT          3336

1   Mr. McDonnell and Mr. Williams between May 29th of 2011

2   and that day?

3   A    None.

4   Q    It looks like on August 8th there's a response back

5   from Mr. Williams.  Is that another text message then on

6   August 13th, 2011, at 9:59 a.m. from Mr. Williams to

7   Mr. McDonnell?

8   A    It is.

9   Q    And to be clear, from the Kinloch records, did

10  Mr. McDonnell play golf on August 13th, 2011, at Kinloch

11  Golf Club?

12  A    No.

13  Q    Sorry.  Was that a no, as far as whether

14  Mr. McDonnell played on --

15  A    Oh, I'm sorry.  Mr. McDonnell played, yes.

16  Mr. Williams did not.

17  Q    I'll try to stop mumbling quite as much.  All right.

18  And is that dollar amount taken from the Kinloch Golf Club

19  receipts?

20  A    It is.

21  Q    All right.  Now, earlier we heard testimony about a

22  Rolex being purchased on August 14th in Malibu in this

23  same general time frame.  Did you review Mr. Williams'

24  credit card records for any purchases in Malibu on

25  August 14, 2011?

DAVID HULSER - DIRECT                3337

```
1   A     I did.

2   Q     I'd like to show you what's been marked for

3   identification as Exhibit 203.  Is this that credit card

4   bill?

5   A     It is.

6              MR. FAULCONER:  Your Honor, we'd offer Exhibit

7   203 into evidence.

8              THE COURT:  It will be admitted.

9              MR. FAULCONER:  All right.  Now, if we could

10  turn to Page 2 of this bill, and if we could go halfway

11  down there.

12  BY MR. FAULCONER:

13  Q     What purchase is indicated there on August 14th,

14  2011, with a posting date of August 16th, 2011?

15  A     A purchase at Traditional Jewelers in Malibu,

16  California, for $6,500.

17  Q     All right.  So let's move forward a little bit to

18  some of the information about the lunch event at the

19  Mansion at the end of August 2011.  I'd like to show you

20  what's been admitted, I think, as Exhibit 204.

21       Now, zooming in there, what is the date of the

22  exchange there between Ms. Harris and Ms. Sutherland about

23  whether Mr. McDonnell is going to go to this event?

24  A     On Monday, August 15th, 2011, at 8:16 p.m.

25  Q     Now, going to Exhibit 207, which has already been
```

DAVID HULSER - DIRECT          3338

1  admitted, and focusing in on the bottom e-mail in this

2  thread, can you tell us what date and time Mr. Zubowsky

3  e-mails Mary-Shea Sutherland asking for "info on the fl

4  lunch at the Mansion, the wtop day, so I can ask him"?

5  A    August 16th, 2011, at 2:50 p.m.

6  Q    All right.  Well, have you looked at

7  Mr. McDonnell's -- Ms. McDonnell and Mr. Williams' toll

8  records around this time frame?

9  A    I have.

10 Q    I'd like to show you what's been marked as Exhibit

11 584.  And is this a chart showing toll records from

12 August 15th and 16th of 2011, the same two days we were

13 just looking at?

14 A    It is.

15         MR. FAULCONER:  Your Honor, we'd offer Exhibit

16 584 into evidence.

17         THE COURT:  It will be admitted.

18 BY MR. FAULCONER:

19 Q    All right.  So August 15th, 2011, is that e-mail

20 shown on the top line the same e-mail that we were just

21 looking at a moment ago, or the first of the two?

22 A    Yes, sir.

23 Q    All right.  Now, on August 16th of 2011, how many

24 phone calls are there between Mr. Williams and

25 Ms. McDonnell in the morning?

DAVID HULSER - DIRECT          3339

1  A     Three calls.

2  Q     And then what happens at 11:17 a.m.?

3  A     She sends Mr. Williams a text message.

4  Q     And then at 2:47 p.m., what's shown in Ms. McDonnell

5  and Mr. McDonnell's phone records?

6  A     A three-minute call.

7  Q     And how does that relate to the time of the e-mail

8  from the Travel Aide asking Mary-Shea Sutherland for "info

9  on the fl lunch at the Mansion"?

10 A     Three minutes prior.

11 Q     All right.  I'd like to show you what's been admitted

12 as Exhibit 552.  Now, is this Mr. McDonnell's schedule for

13 the second of those two days, August 16th of 2011?

14 A     It is.

15 Q     And turning to the end of this schedule, where does

16 it show, at the bottom there, Mr. McDonnell ending his day

17 on this schedule?

18 A     The Executive Mansion.

19 Q     Now, showing you what's been admitted as Exhibit 208,

20 and turning -- zooming in on the middle of those e-mails,

21 what is the date and time of the e-mail response back from

22 Mr. Zubowsky saying, "Governor wants to make it to the

23 last part of this lunch"?

24 A     Wednesday, August 17th, 2011, at 8:25 a.m.

25 Q     All right.  So let's move forward in time to December

1    of 2011.   Have you reviewed the Davenport & Company

2    records that were provided related to purchases and sales

3    of stock in Ms. McDonnell's name?

4    A    I have.

5    Q    I'd like to show you what's been already admitted as

6    Government's Exhibit 247.   Do you recognize this document?

7    A    Yes.

8    Q    What is it?

9    A    It's a Davenport & Company statement.

10   Q    Now, turning to the third page of this document, what

11   is the date shown there on sort of the upper third for the

12   sale of Star Scientific stock?

13   A    The date is December 20, 2011.

14   Q    Now, have you reviewed Ms. McDonnell's toll records

15   for that day and the day before?

16   A    I have.

17   Q    And were you in court for Mr. Piscitelli's testimony

18   that he would typically execute sales either the day or

19   the day after he spoke to clients?

20   A    Yes.

21   Q    I'd like to show you what's been marked for

22   identification as Exhibit 585.   Is this a chart showing

23   the tolls that you pulled from those two days,

24   December 19th and 20th of 2011?

25   A    Yes.

1          MR. FAULCONER:  Your Honor, we'd offer Exhibit

2    585 into evidence.

3          THE COURT:  It will be admitted.

4    BY MR. FAULCONER:

5    Q    All right.  So what is the first call shown on this

6    chart at 1:15 p.m. on December 19th of 2011?

7    A    A five-minute call between Mr. McDonnell and

8    Ms. McDonnell.

9    Q    And immediately after that, at 1:20 p.m., what

10   occurs, according to the phone records?

11   A    Ms. McDonnell reaches out for Mr. Piscitelli.

12   Q    And then after that call to Mr. Williams in the

13   middle, is there another call there from Ms. McDonnell to

14   Mr. McDonnell?

15   A    There is.  A one-minute call.

16   Q    And then how long is the call at 4:03 p.m. from

17   Ms. McDonnell to Mr. Piscitelli?

18   A    A 20-minute call.

19   Q    And then the next day, the date of the sale of the

20   stock, how long of a call is there between Ms. McDonnell

21   and Mr. Williams at 10 p.m.?

22   A    Thirty-one minutes.

23   Q    All right.  Now, are you aware of when

24   Mr. McDonnell's SOEI was filed for the following year in

25   2012?

DAVID HULSER - DIRECT                3342

1   A    I am.

2   Q    And do you know what date that was?

3   A    Yes.  July -- or January 16th.

4   Q    And are you aware, according to the Davenport

5   records, on when the stock was repurchased?

6   A    I believe it was on January 20th.

7   Q    All right.  Now, were you in court earlier for the

8   trial testimony from Bobby McDonnell about the Rolex watch

9   being given to Mr. McDonnell over Christmas of 2011?

10  A    I was.

11  Q    When you served grand jury subpoenas, or when the FBI

12  did, on the defendants, did either of them produce any

13  pictures of Mr. McDonnell wearing what appears to be a

14  watch?

15  A    Yes.

16  Q    I'd like to show you what's been marked for

17  identification as Exhibit 274.  Now, taking a moment --

18  have you had a chance to review this exhibit before your

19  testimony?

20  A    I have.

21  Q    And is this a series of photographs of Mr. McDonnell?

22  A    Yes.

23  Q    And were all of these produced by Ms. McDonnell?

24  A    They were.

25  Q    All right.

1          MR. FAULCONER:  Now, if we could go back to the

2   first page.

3       Your Honor, we'd offer Exhibit 274 into evidence.

4          THE COURT:  It will be admitted.

5   BY MR. FAULCONER:

6   Q    All right.  Now, Agent Hulser, if we could just flip

7   through these -- or sorry.

8          MR. FAULCONER:  Mr. Starnes, if we could just

9   flip through these briefly for the jury to see.

10  BY MR. FAULCONER:

11  Q    All right.  Now, Special Agent Hulser, was there any

12  metadata associated with these pictures produced to the

13  government in response to the grand jury subpoena about

14  what phone these were on or when they were sent or whether

15  they were sent anywhere?

16  A    No, there was not.

17  Q    But were you in court for Mr. Williams' testimony

18  about receiving a picture of Mr. McDonnell posing with a

19  watch at some point in time?

20  A    I was.

21  Q    I'd like to show you what's been entered into

22  evidence as Exhibit 444.  And looking at the first and

23  second page of this document, are these the photos that

24  Mr. Williams testified about?

25  A    They are.

1  Q    Did you compare these photos to the photos that we

2  just reviewed that were produced by Ms. McDonnell?

3  A    Yes.

4  Q    Did it appear that these photos here matched any of

5  those obtained from Ms. McDonnell?

6  A    Yes.  It appeared that it matched the eighth photo.

7           MR. FAULCONER:  Now, if we could turn to the

8  second page of this one more time.  And then could we turn

9  back to the eighth page of Exhibit 274 for the jury's

10 comparison.

11 BY MR. FAULCONER:

12 Q    Now, to be clear, Special Agent Hulser, were you in

13 court when Mr. Williams testified about sending photos of

14 a chef to the McDonnells before receiving whatever photo

15 he got back in return?

16 A    I was.

17 Q    And have you reviewed Mr. Williams' toll records to

18 determine whether those text messages that he actually

19 produced showed up in his toll records?

20 A    Yes.

21 Q    And did they actually show up in his toll records?

22 A    No.

23 Q    So sitting here today, can you tell the members of

24 this jury exactly how that photo of Mr. McDonnell got to

25 Mr. Williams?

```
 1  A    I can't.
 2  Q    All right.  Now, I'd like to move forward to January
 3  of 2012, and I'd like to show you what's been already
 4  admitted as Exhibit 285.  Are you familiar with this
 5  Kinloch receipt, Agent Hulser?
 6  A    I am.
 7          MR. FAULCONER:  Judge, do you want to stop now
 8  or have us keep going for a little longer?
 9          THE COURT:  We'll go ahead and stop.
10      All right.  We'll stop for this evening.  I know it
11  may not seem like it, but we are -- we're making progress.
12  We're getting there.  Tomorrow, 9:45.  And we'll see you
13  at 9:45.
14      Again, let me tell you, as I do every day, please
15  don't discuss the case with anyone or allow anyone to
16  discuss it with you, and please don't review any media
17  items related to this -- to this case.  You all have a
18  great evening, and we will see you at 9:45.
19      (The jury left the courtroom.)
20          THE COURT:  All right.  We'll be back at 9:45 in
21  in case.  9:00.
22      (The trial adjourned at 5:25 p.m.)
23
24
25
```

```
 1                       I N D E X

 2
                         WITNESSES
 3
      Examination By:                              Page
 4
                    WILLIAM SESSOMS, JR.
 5    Cross        – MR. BROWNLEE              3082
      Cross        – MR. BURCK                 3107
 6    Redirect     – MR. FAULCONER             3108

 7                    BARBARA TIERNEY
      Direct       – MR. FAULCONER             3111
 8    Cross        – MR. BROWNLEE              3116
      Cross        – MR. BURCK                 3116
 9
                       FRANK POLLACK
10    Direct       – MR. DRY                   3118
      Cross        – MR. BROWNLEE              3124
11
                      NANETTE BOLT
12    Direct       – MR. DRY                   3126
      Cross        – MR. BROWNLEE              3171
13    Cross        – MR. BURCK                 3211
      Redirect     – MR. DRY                   3218
14
                   JEFFREY CREEKMORE
15    Direct       – MR. FAULCONER             3226
      Cross        – MR. SMALL                 3234
16    Redirect     – MR. FAULCONER             3243

17                     GEORGE FLOYD
      Direct       – MS. ABER                  3244
18    Cross        – MS. JOCHUM                3249

19                   WILLIAM LONG, JR.
      Direct       – MS. ABER                  3251
20    Cross        – MS. JOCHUM                3257

21                     DAVID HULSER
      Direct       – MR. FAULCONER             3265
22

23

24

25
```