UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | |
| ROBERT F. MCDONNELL, | Action No. 3:14-CR-12 |
| and | |
| MAUREEN G. MCDONNELL, | |
| Defendants. | |

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendant Robert F. McDonnell's Motion #40 ("Motion") (ECF No. 511). The Government filed an Opposition Memorandum ("Opp'n Mem.") (ECF No. 530) on October 14, 2014. McDonnell subsequently filed a reply on October 24, 2014 ("Reply Mem.") (ECF No. 541). The parties have not requested a hearing on this matter, and the Court finds that oral argument is unnecessary. E.D. Va. Loc. Crim. R. 47(J). For the reasons set forth below, the Motion is hereby DENIED.

I.  **BACKGROUND**

Defendant Robert F. McDonnell ("McDonnell") served as the 71st Governor of the Commonwealth of Virginia from January 2010 to January 2014. His wife, Maureen G. McDonnell ("Mrs. McDonnell"), served as the First Lady of Virginia.

During his campaign for Governor, McDonnell met Jonnie Williams ("Williams"). Williams was the Chief Executive Officer of Star Scientific, Inc. ("Star Scientific"). Beginning in or about 2007, Star Scientific focused on utilizing certain alkaloids in the tobacco plant, namely anatabine, to address issues related to the desire to smoke. The company engaged in the development, manufacture, and marketing of two anatabine-based dietary supplements: CigRx

and Anatabloc. To gain customer and physician approval of its products, Star Scientific sought scientific studies of anatabine.

On January 21, 2014, McDonnell, along with his wife, was charged in a 14-count indictment, with Counts 1-11 alleging that he committed and conspired to commit honest-services wire fraud and extortion under color of official right. Specifically, the indictment alleged that "the defendants participated in a scheme to use ROBERT MCDONNELL's official position as the Governor of Virginia to enrich the defendants and their family members by soliciting and obtaining payments, loans, gifts, and other things of value from [Williams] . . . in exchange for ROBERT MCDONNELL . . . performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products, including Anatabloc." Indictment ¶ 22. On September 4, 2014, a jury convicted McDonnell on Counts 1-11.

On September 18, 2014, McDonnell filed the instant Motion, asking the Court to vacate the jury's "flawed" verdict and grant a new trial based on the following four reasons: (1) the Court's jury instructions were legally erroneous because they (i) allowed the jury to convict McDonnell on an erroneous understanding of "official act," and (ii) allowed a conviction on the theory that McDonnell accepted things of value that were given for future unspecified action; (2) McDonnell was deprived of his right to an impartial jury due to an inadequate inquiry into each prospective juror's exposure to the "near constant, overwhelmingly prejudicial publicity" before the trial; (3) the Court's failure to voir dire the jurors based on evidence of juror misconduct; and (4) the Court erroneously admitted highly prejudicial Rule 404(b) evidence that McDonnell received things of value from William Goodwin and that McDonnell's staff organized free golf for him.

## II.   **LEGAL STANDARD**

Under Federal Rule of Criminal Procedure 33, "the [district] court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A

motion for a new trial brought on the basis of any ground besides newly discovered evidence "must be filed within 14 days after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1)–(2).

Whether to award a new trial is within the district court's broad discretion. *See United States v. Smith*, 451 F.3d 209, 216–17 (4th Cir. 2006). The discretion to award a new trial, however, should be used sparingly, and "only when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003) (citations and internal quotation marks omitted).

### III.   DISCUSSION

#### A.   Claim 1: The Court's Jury Instructions Were Legally Erroneous

Based on *United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998), McDonnell harps on the argument that "vague expectations of some future benefit" are not "sufficient to make a payment a bribe." He claims that upholding his conviction based on the Government's overbroad interpretation of "official act" would set a precedent of criminalizing routine political courtesies. McDonnell's contentions, however, miss the mark.

(1)  Erroneous Understanding of "Official Act"

McDonnell first argues that the Court's jury instructions turned established legal principles "on their head" by allowing the jury to convict McDonnell on an erroneous understanding of "official act."

The Hobbs Act, 18 U.S.C. § 1951, criminalizes extortion, or the obtaining of property from another, with the official's consent, under color of official right. 18 U.S.C. § 1951(b)(2). At common law a public official committed extortion when he took "by color of his office" money that was not due to him for the performance of his official duties. *Evans v. United States*, 504 U.S. 255, 260 (1992). The portion of the present-day Hobbs Act that refers to official misconduct continues to mirror this common-law definition. *Id.* at 264. Thus, to prosecute a violation of the Hobbs Act, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for *official acts*." *Id.* at

268 (emphasis added).

Similarly,"[t]he intangible right of honest services refers to the public's right to a government official's honest, faithful, and disinterested services." *United States v. Harvey*, 532 F.3d 326, 333 (4th Cir. 2008) (quoting *United States v. Mandel,* 591 F.2d 1347, 1362 (4th Cir. 1979)) (internal quotation marks omitted). As such, acceptance of a bribe, or the exchange of a thing or things of value for *official action* by a public official[1], constitutes a violation of this public right. *Id.*

This case hinges on the interpretation of an "official act" and whether McDonnell's actions constitute such. At its most basic definition, an "'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). More specifically, official action is conduct that is taken "as part of a public official's position"—whether pursuant to an explicit duty or as a matter of "clearly established settled practice." *United States v. Jefferson*, 674 F.3d 332, 353 (4th Cir. 2012). Obviously, however, McDonnell challenges the finer aspects of this elementary definition.

Clearly the bribery statute does not encompass every action taken in one's official capacity, *see id.* at 356, or else absurd outcomes would assuredly result. But, on the other hand, "[e]very action that is within the range of official duty comes within the purview of [this statute]." *United States v. Birdsall*, 233 U.S. 223 (1914). Thus, to distinguish between the apparent fine line of routine official duties and public corruption, the Court must look to whether a quid pro quo agreement existed.

A quid pro quo agreement evinces a sort of "I'll scratch your back if you scratch mine" arrangement. *Jennings*, 160 F.3d at 1014. In other words, "[b]ribery requires the intent to effect an exchange of money (or gifts) for specific action (or inaction), but each payment need not be

---

[1] Tr. Vol. XXVI 6100:9–11.

correlated with a specific official act." *Id.* "The quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor.' Thus, all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return." *Id.* (citation and internal quotation marks omitted).

Admittedly, mere "[i]ngratiation and access" may not alone create a quid pro quo agreement within the meaning of the bribery statutes. *See Citizens United*, 558 U.S. 310, 360 (2010). As Judge Merritt recently observed,

> Subjective intent is the keystone of bribery. The influence of money in politics is growing by leaps and bounds, and the subjective intent of the public official receiving the money is perhaps the last and only distinguishable feature between criminal "*quid pro quo* bribery" and permissible "ingratiation." The exchange of money for a vote is a crime that threatens the foundation of democracy. *Buckley v. Valeo*, 424 U.S. 1, 26–27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The exchange of money for "ingratiation and access is not corruption" at all; indeed, the exchange is so essential to the foundation of democracy that it is protected by the First Amendment. *McCutcheon v. FEC*, ––U.S. ––, 134 S.Ct. 1434, 1441,188 L.Ed.2d 478 (2014) (internal edits omitted). We are left to distinguish the two as best we can by looking into the subjective intent of the public official. And by we, I mean the jury.

*United States v. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014) (Merritt, J., dissenting). Thus, to distinguish between mere access and federal corruption, the Court should look to McDonnell's subjective intent in receiving the money.

The Government provided substantial evidence for the jury to conclude that McDonnell knew what Williams was seeking, specifically, research studies for Star Scientific's Anatabloc product. Through Williams' direct examination, the Government elicited testimony that in October of 2010, McDonnell flew back from California to Virginia on Williams' private jet. Tr. Vol. III 658:18–20. On that flight Williams explained to McDonnell that he "needed testing and [he] wanted to have this done in Virginia." *Id.* at 660:7–8. Williams testified that he asked McDonnell if McDonnell "[w]ould connect [him] with the person in Virginia in [McDonnell's] administration so that [he could] move this forward." *Id.* at 660:9–11. Moreover, and most

tellingly, in June 2011, Williams sent a letter to McDonnell that specifically described the context within which Williams sought official action from McDonnell. Tr. Vol. IV 701–705; Gov't Ex. 162. And McDonnell admitted on cross-examination that he received the letter, Tr. Vol. XXI 5036:10, and at least read the portion of the letter suggesting that McDonnell initiate a "Virginia study" of Anatabloc at UVA and the Medical College of Virginia ("MCV"), *id.* at 5037:3–11. Thus, based on the evidence presented, the jury could have properly determined that in accepting Williams' gifts and loans, McDonnell understood the implicit quid pro quo.

The next logical question the Court must now address is whether the Government provided sufficient evidence of the "quo," that is the "official action," in this case. McDonnell argues that the Government invited the jury to find that he had performed official acts merely by acting in his official capacity, so long as there was some connection to "Virginia business development." (Mem. in Supp. of Mot. at 4.) But contrary to McDonnell's argument, the Government did not rely on vague, broadly defined actions or matters. The Government instead pointed to five specific actions taken by McDonnell "to legitimize, promote, and obtain research studies for Star Scientific products."

One such example is the meeting between McDonnell, Lisa Hicks-Thomas ("Hicks-Thomas"), McDonnell's Secretary of Administration, and Sarah Wilson ("Wilson"), the Virginia Department of Human Resource Management Director. In that meeting, McDonnell pulled out a bottle of Anatabloc and said that he had been taking the pills and "they were working well for him, and [] he thought it would be good for [] state employees." Tr. Vol. XI 2676:15-19. Hicks-Thomas testified that *McDonnell then asked if she and Wilson would "meet with the people." Id.* at 2676:19–20 (emphasis added). After the meeting, both women then went down to Hicks-Thomas' office and looked up Anatabloc on the computer. *Id.* at 2677:1–5. Or, for another example, the email to Jason Eige ("Eige"), the Governor's counsel and policy advisor, in which McDonnell said, "Please see me about Anatabloc issues at VCU and UVA." Tr. Vol. VII 1666:9–10. Eige subsequently responded, "Will do. We need to be careful with this issue." *Id.* at 1666:12.

6

In each example, McDonnell attempted to use his gubernatorial position to influence governmental decisions, specifically attempting to obtain research studies for Star Scientific. McDonnell clearly had influential power over Hicks-Thomas, for example, as she testified that she reported to the Governor and he had the power to fire her. Tr. Vol. XI 2673:14–15, 19–20; *see United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential . . . .").

These actions were within the range of actions on questions, matters, or causes pending before McDonnell as Governor as multiple witnesses testified that Virginia business and economic development was a top priority in McDonnell's administration. Tr. Vol. IX 2037:17–23; 2234:22–25. His campaign slogan was "Bob's for Jobs." *Id.* at 2232:17–19. And several former McDonnell staffers testified about the various ways that McDonnell would customarily take action on questions, matters and causes of Virginia business and economic development, including hosting events and having meetings. *See id.* at 2235:14–16; Tr. Vol. XI 2545:14–16.

The alleged exchange in this case was not simply receiving things of value in return for official action in the abstract; McDonnell fails to account for the permissible inferences the jury may have drawn with regards to the timing of Williams' gifts and McDonnell's official actions. Moreover, the Court's instructions explicitly required the jury to find a quid pro quo agreement. Tr. XXVI 6100:9–13 ("Bribery involves the exchange of a thing or things of value for official action by a public official. In other words, a quid pro quo. You've heard that phrase, the Latin phrase, meaning 'this for that' or 'these for those.'") The Court specified that the indictment alleged that the McDonnells accepted things of value from Williams "in exchange for Robert McDonnell and the Office of the Governor of Virginia performing official actions on an as-needed basis as opportunities arose to legitimize, promote, and obtain research studies for Star Scientific products." *Id.* at 6089:18–22. These instructions cemented the view that an "official

act" is not simply any action related to a broadly defined matter that was taken in McDonnell's official capacity—rather, it was an action taken specifically with respect to Star Scientific.

McDonnell attempts to analogize his case with *United States v. Sun-Diamond Growers of Calif.*, 526 U.S. 398 (1999). In that case, the Supreme Court discussed the illegal gratuity statute, 18 U.S.C. § 201, and differentiated between an illegal gratuity and a bribe, with the latter requiring proof of a quid pro quo. In its opinion, the Supreme Court noted that to give effect to the statute's language "some particular official act [must] be identified and proved." *Id.* at 406. If an alternative reading was allowed, the Supreme Court noted that actions such as a high school principal's gift of a school baseball cap to the Secretary of Education on the occasion of the latter's visit to the school, or a group of farmers' complimentary lunch for the Secretary of Agriculture in conjunction with his speech to the farmers would be criminalized. *Id.* at 407. The Court admitted that while these actions are assuredly "official acts" in some sense, they are not "official acts" within the meaning of the statute. *Id.* The Supreme Court refused to read the illegal gratuity statute as a "prohibition of gifts by reason of the donee's office." *Id.* at 408. The Court ultimately held that the Government needed to "prove a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." *Id.* at 414.

As an initial matter, the Supreme Court in *Sun-Diamond* did not rule on what constitutes an official act; the Court instead "simply embraced a narrow reading of the illegal gratuity statute." *Jefferson*, 674 F.3d at 355. However, that being said, here the evidence presented by the Government did not simply show that Williams gave gifts and loans to McDonnell by reason of McDonnell's gubernatorial position. Rather, the jury permissibly reasoned that Williams' gifts were tied to the five identified "official acts" and thus fulfilled the requisite quid pro quo agreement.

McDonnell next challenges two specific lines of the Court's jury instructions, but as explained below, both of McDonnell's arguments are equally unavailing.

8

    (i)    *Settled Practice Instruction*

In its instructions to the jury, this Court first defined the definition of "official act" as spelled out under 18 U.S.C. § 201(a)(3). The Court then continued:

> Official action as I just defined it includes those actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law. In other words, official actions may include acts that a public official customarily performs, even if those actions are not described in any law, rule, or job description.

Tr. Vol. XXVI at 6102:23–6103:5. McDonnell objects to this instruction, arguing that although an official act may include actions established by settled practice, "the bare fact that an action is a settled practice does not make it an official act." (Mem. in Supp. of Mot. at 6.) McDonnell contends that this "unwieldy language" would inevitably lead the jury to erroneously conclude that an official act is any settled practice of an official.

However, McDonnell fails to align his argument with controlling Fourth Circuit precedent. In *Jefferson*, the district court had delivered a nearly identical instruction. 674 F.3d 332. In explaining § 201(a)(3)'s statutory definition of an "official act," the Court charged the jury that "[a]n act may be official even if it was not taken pursuant to responsibilities explicitly assigned by law. Rather, official acts include those activities that have been clearly established by settled practice as part [of] a public official's position." *Id.* at 353. Jefferson appealed his conviction, arguing, *inter alia*, that the district court's "official act" bribery instruction was fatally erroneous. *Id.* The Fourth Circuit rejected Jefferson's challenge to the district court's instructions. The Court refused to exclude from the bribery statute's definition of an official act settled practices by a public official. *Id.* at 356.

In comparing this Court's instruction with that presented in *Jefferson*, the given instruction was appropriate. McDonnell argues, without citation, that the instruction elides the critical distinction between settled practices that are official acts and those that are not. However, McDonnell fails to consider the entirety of the instruction given. *See United States v.*

*Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). The jury was not authorized to ignore the directive that an "official action" must still pertain to a pending question, matter or cause that was before McDonnell. "In other words, the jury could not rely exclusively on [McDonnell's] settled practices." *Jefferson*, 674 F.3d at 357. Viewed in this context, this Court, like the Fourth Circuit in *Jefferson*, holds that "the 'settled practice' instruction did not impermissibly expand the term 'official act.'" *Id.* at 358.

        (ii)       *Series of Steps Instruction*

The Court's charge to the jury also included the following instruction: "[O]fficial action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." Tr. Vol. XXVI 6103:10–14. McDonnell argues that this charge "bears no relation to the actual definition of 'official act.'" (Mem. in Supp. of Mot. at 7). However, again, McDonnell's argument is unsupported by Fourth Circuit precedent.

In *Jefferson*, the district court instructed the jury that "the quid pro quo requirement is satisfied if you find that the government has established beyond a reasonable doubt that the defendant agreed to accept things of value in exchange for performing official acts on an as-needed basis . . . ." 674 F.3d at 358. The Court highlighted the fact that it is unnecessary "to link every dollar paid to one of the Jefferson family companies to a specific meeting, letter, trip, or other action by Jefferson to fulfill his end of a corrupt bargain." *Id.* at 359. Rather, it is enough that the "payor intended for each payment to induce the official to adopt a specific *course of action.*" *Id.* (quoting *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004)) (internal quotations omitted) (emphasis added). In other words, so long as the government's "evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor," then the quid pro quo requirement is satisfied. *Id.* Here, the Court's instruction merely rephrased *Jefferson*'s teachings that bribery can be accomplished through an ongoing course of conduct. *Id.* (quoting *United States v. Ganim*, 510

F.3d 134, 149 (2d Cir. 2007)).

*(2)* Promise of Unspecified Future Action

The Court additionally included an instruction that read:

Bribery also includes a public official's solicitation or agreement to accept a thing of value in exchange for official action whether or not the payor actually provides the thing of value and whether or not the public official ultimately performs the requested official action or intends to do so. Thus, it is not necessary that the scheme actually succeeded or that any official action was taken by the public official in the course of the scheme. What the government must prove is that the defendant you are considering knowingly devised and participated in a scheme or artifice to defraud the public and the government of their right to a public official's honest services through bribery.

Tr. Vol. XXVI 6100:18–6101:5. McDonnell challenges this instruction as well, arguing that the Court's instructions improperly invited the jury to convict him based on a promise of unspecified future action. He argues that if a corrupt agreement is all that the Government must prove, the jury must also be instructed that, to find such an agreement, it must find that the things of value were given in exchange for some specific official act or course of conduct. In other words, he contends that "the instructions failed to explain that quid pro quo corruption involves the 'intent to induce a *specific* act.'" (Mem. in Supp. of Mot. at 9.)

McDonnell's argument with respect to this issue revolves around the Fourth Circuit's opinion in *Jennings*. In that case, the Fourth Circuit held that the district court's instruction on the "corrupt intent" element of bribery left out the requirement of intent to engage in a quid pro quo. *Jennings*, 160 F.3d at 1020. "The definition fail[ed] to explain that 'corrupt intent' is the intent to induce a specific act." *Id.* at 1021. In other words, none of the court's instructions "stated that Jennings [the bribe-payor] must have given money to Morris [the bribe-payee] in exchange for some specific official act or course of action . . . ." *Id.* at 1022. Rather, the district court only "charged that it was sufficient if Jennings paid Morris to influence him (Morris) 'in connection with' or 'in reference to' [government business]." *Id.* This instruction, the Fourth Circuit held, could have described a situation that only involved a "vague expectation of some future benefit." *Id.*

First, to address a subsidiary argument, the Supreme Court has stated that "fulfillment of the *quid pro quo* is not an element of [bribery]." *Evans*, 504 U.S. at 268. Rather, "the offense is completed at the time when the public official receives a payment in return for his *agreement* to perform specific official acts." *Id.* (emphasis added). Furthermore, this agreement need not be express but instead may be established by circumstantial evidence. *Jennings*, 160 F.3d at 1014.

Secondly, and most importantly, quite unlike the jury instruction given in *Jennings* that "left out the quid pro quo requirement," *id.* at 1021, this Court explicitly stated that bribery requires a quid pro quo, meaning "this for that" or "these for these." Tr. Vol. XXVI 6100:11–13. The given instructions were not "too general," *Jennings*, 160 F.3d at 1022, because they explained that an item of value must be given in exchange for official action. Specifically, that official action was intended to "legitimize, promote, and obtain research studies for Star Scientific's products." Tr. Vol. XXVI at 6089:21–22. Taken as a whole, *see Rahman*, 83 F.3d at 92, the Court's instructions did not advise the jury to convict McDonnell on a promise of unspecified future action. *See Jennings*, 160 F.3d at 1022 ("If any of the court's four explanations of 'corrupt intent' required the jury to find a relatively specific quid pro quo, the jury instruction would have been saved.").

### *(2) Claim 2: Court's Voir Dire on Pretrial Publicity was Inadequate*

McDonnell argues that the voir dire process failed to provide reasonable assurances that bias would be discovered. He contends that the Court's failure to conduct an independent inquiry of each prospective juror to determine what affect the "avalanche" of prejudicial pretrial publicity had on the juror's impartiality necessitates the grant of a new trial. However, in the province of voir dire, the district court holds the reigns.

Jury voir dire is an essential element in guaranteeing a criminal defendant's Sixth Amendment right to an impartial jury. *United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir. 1996). Federal Rule of Criminal Procedure 24 provides the basic procedure for empaneling a jury in a federal criminal trial:

(1) In General. The court may examine prospective jurors or may permit the attorneys for the parties to do so.
(2) Court Examination. If the court examines the jurors, it must permit the attorneys for the parties to:
(A) ask further questions that the court considers proper; or
(B) submit further questions that the court may ask if it considers them proper.

Fed. R. Crim. P. 24(a).

Beyond this rule, the voir dire process is essentially committed to the sound discretion of the district court "because the determination of impartiality, in which demeanor plays such an important part, is particularly within the province of the trial judge." *Lancaster*, 96 F.3d at 738 (citations and internal quotation marks omitted); *see also Skilling v. United States*, 561 U.S. 358, 386 (2010) ("When pretrial publicity is at issue, primary reliance on the judgment of the trial court makes [especially] good sense . . . ."). The Supreme Court has refrained from dictating the subject matter of voir dire questions in all but the most limited circumstances, including capital cases and cases in which racial issues are inextricably bound up with the conduct of the trial. *Lancaster*, 96 F.3d at 739; *see also Skilling*, 561 U.S. at 386 ("No hard-and-fast formula dictates the necessary depth or breadth of *voir dire*."). However, one limitation restrains the district court's discretion–that being the voir dire process must "provide a reasonable assurance that prejudice would be discovered if present." *Lancaster*, 96 F.3d at 740 (citations and internal quotation marks omitted).

"In an era of rapid and widespread communications," the effect of pretrial publicity on a defendant's right to an impartial jury is a question that will become increasingly prominent. *See United States v. Bakker*, 925 F.2d 728, 734 (4th Cir. 1991). However, courts must be reluctant to instantly equate publicity with prejudice. As the Supreme Court noted, "Prominence does not necessarily produce prejudice, and juror *impartiality* . . . does not require *ignorance*." *Skilling*, 561 U.S. at 381 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)). Thus, we do not require jurors to enter the courtroom totally oblivious to the facts and issues involved in the case, "and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as

to the merits of the case." *Irvin*, 366 U.S. at 722. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Id.* at 723. Rather, all that is required is that a juror can lay aside his initial impression or opinion and render a verdict based on the evidence presented in the courtroom. *Id.* Only in extreme circumstances will prejudice be presumed from the existence of pretrial publicity itself. *Wells v. Murray*, 831 F.2d 468, 472 (4th Cir. 1987).

In order to empanel such an impartial jury, the court should undertake a careful voir dire. *Bakker*, 925 F.2d at 734. This inquiry "typically entails an evaluation of the pre-trial publicity complained of and its impact, if any, on the jury . . . ." *Wells*, 831 F.2d at 472 (citation and internal quotation marks omitted).

McDonnell contends that the Court's error lay in its failure in relying on the juror's own assertion of impartiality, rather than conducting a probing inquiry to permit the court to reach its own conclusion. But McDonnell fails to credit the procedures employed by the Court to protect McDonnell's Sixth Amendment right.

First, the Court issued a 99-item questionnaire to 650 prospective jurors that "helped to identify prospective jurors excusable for cause and served as a springboard for further questions put to the remaining members of the array." *Skilling*, 561 U.S. at 388. Second, during in-court voir dire the Court acknowledged the publicity generated by the case and posed two questions to the panel: (1) "[I]f you have read, heard or seen something in the media, I want you to stand up for me;" and (2) "Based on what you have heard or read or seen relating to this case, if you are, in your mind, able to put aside whatever it is that you've heard, listen to the evidence in this case and be fair to both sides, then I want you to sit down." Tr. Vol. I 140:24–25; 141:5–9. After the entire panel answered in the affirmative to both questions, the Court summoned counsel to the bench. The Court stated it was satisfied with the panel's answers. *Id.* at 141:14. However, McDonnell's counsel noted his concerns about the credibility of the jurors and requested further

inquiry. *Id.* at 141:21–23. The Court subsequently brought to the bench each juror that McDonnell's counsel identified as cause for concern and questioned each about his or her opinion of the case and ability to remain impartial. *See id.* at 145:2–155:12. At the end of this questioning the Court asked McDonnell's counsel if there is "anybody else" he would like to question, and McDonnell's counsel responded "not on publicity." *Id.* at 155:18–19. Thus, the record demonstrates that after its collective questioning, the Court allowed McDonnell to follow-up with individual jurors whom he believed provided less than satisfactory answers. *See Bakker*, 925 F.2d at 734. Therefore, based on the adequacy of the procedures employed, and the Court's overall discretion in managing voir dire, McDonnell's instant claim is unfounded.

### (3) Claim 3: Court's Failure to Voir Dire the Jurors Based on Evidence of Juror Misconduct

McDonnell's third claim focuses on the juror, Louis DeNitto ("DeNitto"), who was stricken from the jury on August 12, 2014 on the ground that he had violated the Court's order against discussing the case with anyone. DeNitto had contacted James Watson ("Watson"), an attorney who had previously represented DeNitto in civil matters. DeNitto reportedly told Watson that he was the foreman of the jury and the jurors were "all over the place." After the issue came to light, the Court held an in-chambers conference on August 12, 2014 where both DeNitto and Watson were questioned. When interviewed by the Court, DeNitto denied saying that he was the foreman. Chambers Conf. Tr., August 12, 2014, 13:14–15. With regards to his statement that the jury was "all over the place," DeNitto stated, "What I meant by that was we didn't know, I didn't know where the charges referred to in what we were, the lawyers and so forth were talking about in the trial [sic]." *Id.* at 13:25–14:3. DeNitto denied that he talked to any of the jurors about the case. *Id.* at 14:12–14. Rather, all DeNitto admitted was that "[d]ifferent comments are made when [the jury] walks back [into the jury room], like 'Wow, glad that's over with,' or that sort of thing . . . ." *Id.* at 14:15–16. McDonnell then requested that (1) the entire panel be interviewed *in camera* given the evidence that they have been actively discussing the

case, contrary to the Court's order that "[u]ntil you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case," Tr. Vol. II, at 193:2–4; (2) the Court declare a mistrial in light of the same; and (3) the first alternate juror be struck in view of the fact that he had been sleeping through much of the trial, including the cross-examination of Williams. However, the Court denied each of McDonnell's requests.

McDonnell now contends that based on the Court's interviews of Watson and DeNitto, credible evidence existed that the jury had begun deliberating prematurely. He argues that the Court's failure to voir dire the remaining jurors despite this evidence constitutes grounds for a new trial. However, again, the Court possesses generous discretion in handling a claim of juror misconduct.

It is a well-established principal of trial administration that jurors must not engage in discussions of a case prior to the time they retire and begin formal deliberations. *United States v. Resko*, 3 F.3d 684, 688 (3d Cir. 1993). Accordingly, trial judges routinely admonish juries at the outset of trial not to discuss the case with anyone before the conclusion of trial. *Id.* at 689. In the present case, the Court gave such an instruction: "First, I instruct you that during the trial, you are not to discuss the case with anyone or permit anyone to discuss it with you. Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about this case." Tr. Vol. II 192:25–193:4. However, it is unrealistic to believe that jurors will never comment to each other on any matter related to a trial, especially in a trial spanning a total of more than five weeks. Thus, the Court must address the issue when, such as here, jurors allegedly fail to follow the Court's explicit order.

Courts have distinguished between external jury influences and "intra-jury" communications. *Wolfe v. Johnson*, 565 F.3d 140, 161 (4th Cir. 2009). External influences, such as the media and pre-trial publicity, pose a far more serious threat to the defendant's Sixth Amendment right to an impartial jury "because the extraneous information completely evades the safeguards of the judicial process." *Resko*, 3 F.3d at 690. In contrast, when there are intra-

jury communications, such as premature jury deliberations, "the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *Id.* Thus, "[a]lthough external jury influences necessitate a thorough judicial inquiry, no such obligation is imposed with regard to an internal jury influence." *Wolfe*, 565 at 161.

Ultimately, like the voir dire process described above, the Court is given ample discretion in dealing with situations of jury misconduct. *Resko*, 3 F.3d at 690; *see also United States v. Diaz*, 597 F.3d 56, 62 (1st Cir. 2010) (citations omitted) ("Indeed, we have held that the court's discretion is 'at its broadest' when it responds to an allegation of premature jury deliberations."). The trial court is in a superior position to observe the jury's demeanor and the impact of any alleged premature deliberations. *Resko*, 3 F.3d at 690. Obviously, however, the Court must exercise caution and careful consideration when allegations of jury misconduct are brought to the Court's attention. *See United States v. Gianakos*, 415 F.3d 912, 921 (8th Cir. 2005).

The First Circuit has developed a multi-step framework for assessing juror misconduct, including premature deliberations: (1) ascertain whether the allegation is colorable; (2) if it is, investigate the extent of any prejudice caused and consider prophylactic measures to alleviate that prejudice; and (3) if no curative measures are adequate, the court may grant a mistrial. *Diaz*, 597 F.3d at 62–63. Following the First Circuit's structure, our analysis need not go any further than the first step.

Based on the Court's face-to-face examination of both DeNitto and Watson, the Court was entitled to exercise its discretion and assess the situation presented. DeNitto's alleged statement that the jurors were "all over the place" did not provide sufficient indicia of premature deliberations. "Conversations between jurors concerning the case they are hearing do not always amount to premature deliberations." *Id.* at 63; *see also United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004) ("Not every comment a juror may make to another juror about the case is a discussion about a defendant's guilt or innocence that comes within a common sense definition

of deliberation."). The Court, however, still struck DeNitto for violating the Court's Order. After dismissing him, the Court again admonished the entire jury not to talk about the case, not "between yourselves as well as outsiders." Tr. Vol. XII 3076:18–25. There was no further evidence that the remaining jurors failed to abide by the Court's admonition.

McDonnell relies on the Third Circuit's rationale in *Resko* to support his argument regarding his third claim. In *Resko*, on the seventh day of a nine-day trial, a juror approached a court officer and told him that the members of the jury had been discussing the case during their recesses and while waiting in the jury room, in disregard of the court's admonition. 3 F.3d at 687. The court responded by distributing a two-part questionnaire, which asked: (1) whether the jurors had discussed the case with other jurors, and (2) if so, whether those discussions had led them to form an opinion as the guilt or innocence of the defendants. *Id.* at 688. Each of the twelve jurors answered "yes" to the first question and "no" to the latter. *Id.* Based on this questionnaire, the district court denied defendants' requests for individualized voir dire and denied their motions for a mistrial. *Id.* The Third Circuit ultimately held that the district court erred by refusing to conduct a "more searching inquiry into the potential prejudice." *Id.* at 686.

While McDonnell correctly alleges all of the above-stated facts from *Resko*, McDonnell fails to ascertain the relevant argument that distinguishes that case from the present one. In *Resko*, the Third Circuit concentrated on the "dearth of information" provided by the questionnaires and the consequent inability of the district court to assess the nature and extent of the jurors' premature discussions. *See id.* at 690–91. In other words, "the questionnaire raised more questions than it answered." *Id.* at 690. "[T]he very crux of the problem [] is that neither we [the Third Circuit] nor the district court know anything about the nature of the jurors' discussions." *Id.* at 691.

Unlike the situation in *Resko*, in the present case the Court "had enough information [based on the interviews of both Watson and DeNitto] to make a reasoned determination that [McDonnell] would suffer no prejudice due to the jury misconduct." *Id. Resko* explicitly admits

that in situations where the jury engaged in premature deliberations and the court refused counsel's request for individualized voir dire, but the court had knowledge of the substance of the premature communications, other federal courts of appeals have upheld criminal convictions. *Id.* at 693. This is the exact situation in the present case. Therefore, McDonnell's argument must be rejected.

### (4) Claim 4: The Court Erroneously Admitted Prejudicial Rule 404(b) Evidence

Finally, McDonnell argues that the Government was allowed to impugn his character in violation of Rule 404(b) on at least two significant occasions, thereby causing substantial prejudice to the defense. However, this final argument suffers the same fate as the rest.

Although "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith," such evidence "may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ." Fed. R. Evid. 404(b). "Because the rule recognizes the admissibility of prior crimes, wrongs, or acts, with only the one stated exception, it is understood to be a rule of inclusion . . . ." *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997) (citations omitted).

The principal danger Rule 404(b) seeks to avoid is the fear that defendants will be convicted simply for possessing bad character. *Id.* at 995. However, the Rule "also recognizes that '[e]xtrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when that issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct.'" *Id.* at 996 (quoting *Huddleston v. United States*, 485 U.S. 681, 685 (1988)).

In *Queen*, the Fourth Circuit spelled out specific findings the Court should make in order to determine that evidence should be admitted under 404(b):

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant. In

this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense.[2] (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.[3]

132 F.3d at 997.

*(1)* Goodwin Evidence

First, McDonnell contends that the Court erroneously admitted evidence that he received things of value from William Goodwin ("Goodwin"). Specifically, the Government introduced evidence that McDonnell's draft 2012 Statement of Economic Interest ("SOEI") listed a Kiawah Island trip from Goodwin with a value of $23,312.55. *See* Tr. Vol. XXII 5295:9–5296:7. However, McDonnell subsequently crossed out the trip and wrote "personal," *Id.* at 5296:10–13, and thus McDonnell's final SOEI contained no reference to the Kiawah Island trip, *id.* at 5296:20–24. However, the SOEI still contained other gifts from Goodwin, including a Keswick Cabinet Retreat valued at $920. *Id.* at 5296:17–19. McDonnell argues that the Government never established that this evidence was relevant to an issue other than character. In essence, he argues, all the evidence did was to suggest that he had a propensity to accept expensive gifts from donors. (Mem. in Supp. of Mot. at 27.)

Under Virginia law, certain state officials, including the Governor, are required to annually file a standardized disclosure of their personal economic interests, commonly referred to as the SOEI. The SOEI requires a state official to disclose, *inter alia*, gifts or entertainment valued in excess of fifty dollars received by the state official from any business or individual other than a relative or *close personal friend*. The Government introduced the Goodwin

---

[2] The Court defines evidence as "necessary where, considered in the light of other evidence available to the government, it is an essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Queen*, 132 F.3d at 998 (internal citations and quotation marks omitted).

[3] The court also points to "(1) a limiting jury instruction, when requested by a party, explaining the purpose for admitting evidence of prior acts, and (2) the requirement in a criminal case of advance notice, when so requested, of the intent to introduce prior act evidence" as protections against potential "pit falls" under this Rule. *Queen*, 132 F.3d at 997.

evidence at trial in order to prove McDonnell's prior improper manipulation of this "personal friend" exception because although McDonnell testified that Goodwin was supposedly his personal friend, *id.* at 5051:21–22, the Government produced sufficient evidence for a reasonable jury to reject that testimony. *See id.* at 5051:23–5055:20.

Contrary to McDonnell's argument that this evidence did no more than suggest to the jury that McDonnell had a propensity to accept expensive gifts from donors, the Goodwin evidence was clearly relevant to issues other than McDonnell's general character. First, the evidence showed McDonnell's knowledge of the SOEI and the existence of the "personal friend" exception. Second, McDonnell testified that, like Goodwin, he viewed Williams as a personal friend in 2012, *see* Tr. Vol. XXI 5109:9–14, but despite this opinion of their relationship, he still chose to disclose gifts from Williams on his 2012 SOEI. Thus, this evidence indicated an absence of mistake or accident in omitting the gifts and loans from Williams and thus was relevant to McDonnell's intent to defraud.

Applying the factors defined in *Queen*, evidence of McDonnell's knowledge and of the absence of mistake is relevant to, and probative of, his alleged intent to defraud—an element of the charged crimes; the prior act alleged is similar to the act the Government sought to prove— omission of gifts from Williams pursuant to the personal friend exception; and there is nothing in the record to suggest that the evidence was unreliable or unfairly prejudicial to McDonnell. *See Queen*, 132 F.3d at 997. Therefore, the Goodwin evidence was properly admitted.

*(2)* Zubowsky Email

Secondly, McDonnell argues that the Court erroneously admitted evidence indicating that his staff organized free golf for him. This piece of evidence revolved around a January 2013 email exchange between Emily Rabbit ("Rabbit"), McDonnell's scheduler at the time, and Adam Zubowsky ("Zubowsky"). Gov't Ex. 627. Rabbit asked Zubowsky whether he had any background in planning a golf trip for the Governor and his sons. Tr. Vol. XXI 5137:23–5138:3. Zubowsky responded that Rabbit should find a golf course that will host McDonnell and his family for free.

*Id.* at 5138:14–16. Zubowsky then directed Rabbit to put all the information in a briefing book for McDonnell's review. *Id.* at 5138:21–5139:1.

McDonnell now objects to the introduction of this email, arguing that it is both inadmissible hearsay and Rule 404(b) evidence. As an initial matter, when the Government first attempted to introduce this email through its direct examination of Rabbit, McDonnell's counsel objected on the basis that the evidence is not relevant and "extraordinarily prejudicial." Tr. Vol. XII 2869:1–2. When the Government subsequently attempted to introduce the email during the cross-examination of McDonnell, his counsel again objected solely based on relevancy. Tr. Vol. XXI 5137:7–9. Thus, during trial McDonnell's counsel never objected based on hearsay or Rule 404(b). Based on Federal Rule of Evidence 103, a party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and if the party both timely objected at trial and *stated the specific grounds for the objection.* Fed. R. Evid. 103(a)(1). Because McDonnell's counsel objected solely on the basis of relevance, this Court properly admitted the email at trial. Despite McDonnell's apparent mistake, the Court may still consider McDonnell's present objections if the introduction of this email constituted plain error, meaning it affected McDonnell's substantial rights. Fed. R. Crim. P. 52(b); Fed. R. Evid. 103(e).

To proceed with the merits, McDonnell first argues that this email was inadmissible hearsay, and should have been excluded as such. Hearsay is an out-of-court statement that is offered in court to prove the truth of the matter asserted, Fed. R. Evid. 801(c), and is inadmissible at trial unless an exception applies, Fed. R. Evid. 802. A statement that is offered against an opposing party and was made by either the party in his individual capacity or representative capacity, or made by the party's agent or employee on a matter within the scope of that relationship and while it existed, is deemed non-hearsay. Fed. R. Evid. 801(d)(2)(A), (D).

First, the portion of the email from Rabbit is not hearsay. *See* Fed. R. Evid. 801(d)(2)(D). Rabbit was McDonnell's scheduler at the time and thus an employee. The statement she made in the email was within the scope of her employment relationship, as McDonnell requested that

they meet to discuss golf trips in Myrtle Beach or Florida. The statement was then offered against McDonnell at trial.

Second, with respect to Zubowsky's statements in the email, McDonnell's counsel is correct that the email is hearsay that does not fall within any exception. Zubowsky was no longer employed by McDonnell at the time he sent the email and he does not purport to relate any statement made by McDonnell. However, the admission of this evidence was harmless error as it did not affect any substantial right of McDonnell and thus McDonnell's argument must be disregarded. *See* Fed. R. Crim. P. 52(a). "Where non-constitutional error is involved, the proper test of harmlessness is whether, on appellate review, this Court can say 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by error.'" *United States v. Hartgrove*, No. 90-5331, 919 F.2d 139, at *2 (4th Cir. Nov. 29, 1990) (quoting *United States v. Urbanik*, 801 F.2d 692, 698 (4th Cir. 1986)). Based on the considerable amount of evidence introduced over a five-week period during this trial, the Court can assuredly state that the jury's verdict was not swayed by one portion of one e-mail.

McDonnell next contends that this evidence also violated Rule 404(b) as the Government's only purpose in introducing it was to show McDonnell's character in an unflattering light–that he had a propensity to seek out free expensive gifts. On the other hand, the Government contends that this email "was not Rule 404(b) evidence; [rather] it was offered to rebut Mr. McDonnell's assertion that he didn't seek gifts and he simply accepted gifts to spend time with his family." (Opp'n Mem. at 29.) As support, the Government cites a section of "McCormick on Evidence," which describes impeachment by "specific contradiction." 1 McCormick on Evid. § 45 (7th ed. 2013).

"Impeachment by contradiction is a means of policing the defendant's obligation to speak the truth in response to proper questions." *United States v. Gilmore*, 553 F.3d 266, 271 (3d Cir. 2009) (internal quotation marks and citations omitted). Specifically, "this doctrine

provides that when a witness puts certain facts at issue in his testimony, the government may seek to rebut those facts, including by resorting to extrinsic evidence if necessary." *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010). In sum, this form of impeachment is intended to prevent the defendant from invoking "the Federal Rules of Evidence in order to shield his perjury from contradiction." *Id.* Impeachment by contradiction is authorized by Federal Rule of Evidence 607 and its application is governed by Rule 403. *Gilmore*, 553 F.3d at 271; *see also United States v. Perez-Perez*, 72 F.3d 224, 227 (1st Cir. 1995) (finding that impeachment by contradiction is not governed by Rule 608(b), but by common-law principles). Most importantly, this form of impeachment is used to contradict a *specific fact* the defendant testified to on *direct. See Ramirez*, 609 F.3d at 499; *Gilmore*, 553 F.3d at 271; *United States v. Scott*, 693 F.3d 715, 722 (6th Cir. 2012).

The Government attempts to argue that the introduction of the Zubowsky email was intended to rebut McDonnell's testimony on *direct* that the "most important gift" he received as governor was "having some time with his family." Tr. Vol. XX 4853:22–25. However, it was not until *cross-examination* when the Government specifically questioned McDonnell regarding his solicitation of free golf outings. Thus, the Government cannot rest its argument of impeachment by contradiction on the general "notion" implicit in McDonnell's direct testimony.

If the Government's argument is rejected, then the Court must analyze the Zubowsky email pursuant to Rule 404(b). According to the factors defined in *Queen*, this evidence was relevant to McDonnell's motive for entering a corrupt agreement with Williams; the prior act alleged is similar to the act the Government sought to prove—acceptance of free gifts from Williams; and there is nothing in the record to suggest that the evidence was unreliable or unfairly prejudicial to McDonnell. *See Queen*, 132 F.3d at 997. Therefore, the Zubowsky email was also properly admitted.

//

//

24

## IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, McDonnell's Motion is DENIED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this __1st____ day of December 2014.