UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

UNITED STATES OF AMERICA,

v.

ROBERT F. MCDONNELL,

and

MAUREEN G. MCDONNELL,

Defendants.

Action No. 3:14-CR-12

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendant Robert F. McDonnell's Motion #39– Renewed Motion for Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Motion") (ECF No. 509). The Government filed an Opposition Memorandum ("Opp'n Mem.") (ECF No. 532) on October 14, 2014. McDonnell subsequently filed a reply on October 24, 2014 ("Reply Mem.") (ECF No. 540). The parties have not requested a hearing on this matter, and the Court finds that oral argument is unnecessary. E.D. Va. Loc. Crim. R. 47(J). For the reasons set forth below, the Motion is hereby DENIED.

### I. BACKGROUND

Defendant Robert F. McDonnell ("McDonnell") served as the 71st Governor of the Commonwealth of Virginia from January 2010 to January 2014. His wife, Maureen G. McDonnell ("Mrs. McDonnell"), served as the First Lady of Virginia.

During his campaign for Governor, McDonnell met Jonnie Williams ("Williams"). Williams was the Chief Executive Officer of Star Scientific, Inc. ("Star Scientific"). Beginning in or about 2007, Star Scientific focused on utilizing certain alkaloids in the tobacco plant, namely anatabine, to address issues related to the desire to smoke. The company engaged in the

1

development, manufacture, and marketing of two anatabine-based dietary supplements: CigRx and Anatabloc. To gain customer and physician approval of its products, Star Scientific sought scientific studies of anatabine.

On January 21, 2014, McDonnell, along with his wife, was charged in a 14-count indictment, with Counts 1-11 alleging that he committed and conspired to commit honest-services wire fraud and extortion under color of official right. Specifically, the indictment alleged that "the defendants participated in a scheme to use ROBERT MCDONNELL's official position as the Governor of Virginia to enrich the defendants and their family members by soliciting and obtaining payments, loans, gifts, and other things of value from [Williams] . . . in exchange for ROBERT MCDONNELL . . . performing official actions on an as-needed basis, as opportunities arose, to legitimize, promote, and obtain research studies for Star Scientific's products, including Anatabloc." Indictment ¶ 22. On September 4, 2014, a jury convicted McDonnell on Counts 1-11. On September 18, 2014, McDonnell filed the instant Motion, asking for a judgment of acquittal on those eleven Counts. Specifically, McDonnell contends that the Government has failed to prove that he performed or promised to perform any "official act" for Williams, and also failed to establish federal jurisdiction for Counts 5-11.

## II.    LEGAL STANDARD

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). If the jury returned a guilty verdict, the court can "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2).

The test for determining if a court should grant a Rule 29(c) motion is "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). Substantial evidence is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to

support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996). If "any rational trier of fact could have found the elements of the offense beyond a reasonable doubt," the jury's verdict must stand. *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1402 (4th Cir. 1993).

### III. DISCUSSION

#### A. Claim 1: McDonnell Did Not Perform or Promise to Perform Any Specific "Official Acts" to Benefit Williams

*(1)* Failure to Prove "Official Act"

The critical issue that predominates in this case is what constitutes an "official act" under the federal anticorruption laws. At its most basic definition, an "'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). More specifically, official action is conduct that is taken "as part of a public official's position"—whether pursuant to an explicit duty or as a matter of "clearly established settled practice." *See United States v. Jefferson*, 674 F.3d 332, 353 (4th Cir. 2012).

Clearly the bribery statute does not encompass every action taken in one's official capacity, *see id.* at 356, or else absurd outcomes would assuredly result. But, on the other hand, "[e]very action that is within the range of official duty comes within the purview of [this statute]." *United States v. Birdsall*, 233 U.S. 223, 230 (1914). Thus, to distinguish between the apparent fine line of routine official duties and public corruption, the Court must look to whether a quid pro quo agreement existed.

A quid pro quo agreement evinces a sort of "I'll scratch your back if you scratch mine" arrangement. *United States v. Jennings*, 160 F.3d 1006, 1014 (4th Cir. 1998). In other words, "[b]ribery requires the intent to effect an exchange of money (or gifts) for specific action (or inaction), but each payment need not be correlated with a specific official act." *Id.* "The quid pro

quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official *in exchange for* a pattern of official actions favorable to the donor.' Thus, all that must be shown is that payments were made with the intent of securing a specific *type* of official action or favor in return." *Id.* (citation and internal quotation marks omitted).

McDonnell first contends that no evidence was introduced to prove that he ever promised to perform any specific official act for the benefit of Williams or his company. McDonnell contends that at worst he provided a vague promise to Williams to help Williams obtain studies for Star Scientific, which he argues fails to establish federal corruption. *See id.* at 1022. However, both of McDonnell's initial contentions especially when viewed in light most favorable to the Government fail to persuade this Court.

A quid pro quo agreement need not be expressly stated "for otherwise the law's effect could be frustrated by knowing winks and nods." *Evans v. United States*, 504 U.S. 255, 274 (1992) (Kennedy, J., concurring). Rather, "[t]he inducement from the official is criminal if it is express or if it is implied from his words and actions, so long as he intends it to be so and the payor so interprets it." *Id.* Thus, the Government was entitled to establish an implicit agreement through circumstantial evidence, which it did by using permissible temporal and contextual inferences. Moreover, quite unlike McDonnell's argument that at worst he only provided only a vague promise to Williams, substantial evidence supports the jury's finding that McDonnell actually performed official acts in exchange for gifts and loans from Williams.

Naturally, then, the Court must analyze the alleged five "official acts" presented by the Government to determine whether they were in fact "official." The five alleged "official acts" include: (1) the August 1, 2011 meeting between Williams and Molly Huffstetler, an official from the Health and Human Resources Department; (2) the August 30, 2011 Mansion event; (3) the February 17, 2012 email to Jason Eige; (4) the February 29, 2012 Healthcare Leaders Reception; and (5) McDonnell's March 21, 2012 meeting with Lisa-Hicks Thomas and Sarah Wilson. *See* Tr. Vol. XXV 5869:16–5870:1; 6039:25–6042:14. McDonnell argues that none of these identified

actions purported to exercise, or influence the exercise of, any of the regulatory powers of the state. In other words, McDonnell argues that because he never asked or directed University of Virginia ("UVA") or Virginia Commonwealth University ("VCU") officials to conduct research on anatabine he did not take any "official action." Rather, McDonnell argues that at worst he only provided mere access to Williams. Thus, in his reply brief, McDonnell asserts that if his conviction is left standing, it "will be the only one in which a public official has ever been found guilty of bribery not for promising to himself influence the exercise of governmental power, but for merely facilitating access so that a third party could attempt to do so." (Reply Mem. at 1.)

Admittedly, mere "[i]ngratiation and access" may not alone create a quid pro quo agreement within the meaning of the bribery statutes. *See Citizens United*, 558 U.S. at 360. As Judge Merritt recently observed,

> Subjective intent is the keystone of bribery. The influence of money in politics is growing by leaps and bounds, and the subjective intent of the public official receiving the money is perhaps the last and only distinguishable feature between criminal "*quid pro quo* bribery" and permissible "ingratiation." The exchange of money for a vote is a crime that threatens the foundation of democracy. *Buckley v. Valeo,* 424 U.S. 1, 26–27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The exchange of money for "ingratiation and access is not corruption" at all; indeed, the exchange is so essential to the foundation of democracy that it is protected by the First Amendment. *McCutcheon v. FEC,* ––U.S. ––, 134 S.Ct. 1434, 1441,188 L.Ed.2d 478 (2014) (internal edits omitted). We are left to distinguish the two as best we can by looking into the subjective intent of the public official. And by we, I mean the jury.

*United States v. Dimora*, 750 F.3d 619, 632 (6th Cir. 2014) (Merritt, J., dissenting). Thus, to distinguish between mere access and federal corruption, the Court must analyze McDonnell's subjective intent in receiving the money.

The Government provided substantial evidence for the jury to conclude that McDonnell knew what Williams was seeking, specifically, research studies for Star Scientific's Anatabloc product. Through Williams' direct examination, the Government elicited testimony that in October of 2010, McDonnell flew back from California to Virginia on Williams' private jet. Tr. Vol. III 658:18–20. On that flight Williams explained to McDonnell that he "needed testing and

[he] wanted to have this done in Virginia." *Id.* at 660:7–8. Williams testified that he asked McDonnell if McDonnell "[w]ould connect [him] with the person in Virginia in [McDonnell's] administration so that [he could] move this forward." *Id.* at 660:9–11. Moreover, and most tellingly, in June 2011, Williams sent a letter to McDonnell that specifically described the context within which Williams sought official action from McDonnell. Tr. Vol. IV 701–705; Gov't Ex. 162. And McDonnell admitted on cross-examination that he received the letter, Tr. Vol. XXI 5036:10, and at least read the portion of the letter suggesting that McDonnell initiate a "Virginia study" of Anatabloc at UVA and the Medical College of Virginia ("MCV"), *id.* at 5037:3–11. Thus, based on the evidence presented, the jury could have properly determined that in accepting Williams' gifts and loans, McDonnell understood the implicit quid pro quo.

Secondly, McDonnell's argument is misguided as he assuredly did more for Williams than merely provide "access." The Government adduced substantial evidence of the "quo," that is the "official action," in this case. As stated above, "'official act' means any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity . . . ." 18 U.S.C. § 201(a)(3). The alleged official actions in this case were within the range of actions on questions, matters, or causes pending before McDonnell as Governor as multiple witnesses testified that Virginia business and economic development was a top priority in McDonnell's administration. Tr. Vol. IX 2037:17–23; 2234:22–25. His campaign slogan was "Bob's for Jobs." *Id.* at 2232:17–19. And several former McDonnell staffers testified about the various ways McDonnell would customarily take action on questions, matters and causes of Virginia business and economic development, including hosting events and having meetings. *See id.* at 2235:14–16; Tr. Vol. XI 2545:14–16.

Yet, McDonnell argues that because he never asked or directed any official to give Williams the governmental action he desired he did not perform any official action. However, the Court need not look any further than the March 21, 2012 meeting between McDonnell, Lisa

6

Hicks-Thomas ("Hicks-Thomas"), McDonnell's Secretary of Administration, and Sarah Wilson ("Wilson"), the Virginia Department of Human Resource Management Director, to discredit McDonnell's argument. During that meeting McDonnell pulled out a bottle of Anatabloc and said that he had been taking the pills and "they were working well for him, and [] he thought it would be good for [] state employees." Tr. Vol. XI 2676:15-19. Hicks-Thomas testified that *McDonnell then asked if she and Wilson would "meet with the people." Id.* at 2676:19–20 (emphasis added). After the meeting, both women then went down to Hicks-Thomas' office and looked up Anatabloc on the computer. *Id.* at 2677:1–5. Or, for another example, the email to Jason Eige ("Eige"), the Governor's counsel and policy advisor, in which McDonnell said, "Please see me about Anatabloc issues at VCU and UVA." Tr. Vol. VII 1666:9–10. Eige subsequently responded, "Will do. We need to be careful with this issue." *Id.* at 1666:12.

In each of the aforementioned examples, McDonnell attempted to use his gubernatorial office to influence governmental decisions, (*see* Reply Mem. at 14), specifically attempting to obtain research studies for Star Scientific. McDonnell clearly had influential power over Hicks-Thomas, for example, as she testified that she reported to the Governor and he had the power to fire her. Tr. Vol. XI 2673:14–15, 19–20. *See United States v. Carson*, 464 F.2d 424, 433 (2d Cir. 1972) ("There is no doubt that federal bribery statutes have been construed to cover any situation in which the advice or recommendation of a Government employee would be influential . . . ."). McDonnell's argument that he never followed back up with these individuals or pressured them any further is essentially irrelevant as such standard is not defined in any supporting case law.

Furthermore, McDonnell fails to account for the fact that "official action can include actions taken in furtherance of longer-term goals, and an official action is no less official because it is one in a series of steps to exercise influence or achieve an end." Tr. Vol. XXVI 6103:10–14. Thus, it is unnecessary "to link every dollar paid to [McDonnell] to a specific meeting, letter, trip, or other action by [McDonnell] to fulfill his end of a corrupt bargain." *Jefferson*, 674 F.3d

at 359. Rather, it is enough that the "[Williams] intended for each payment to induce [McDonnell] to adopt a specific *course of action*." *Id.* (quoting *United States v. Quinn*, 359 F.3d 666, 673 (4th Cir. 2004)) (internal quotations omitted) (emphasis added). Therefore, just because there is no evidence that McDonnell directly asked UVA or VCU researchers to conduct studies of Anatabloc does not discount the fact that McDonnell took official actions in pursuit of achieving that ultimate goal.

In its charge to the jury, the Court defined bribery as "the exchange of a thing or things of value for official action by a public official. In other words, a quid pro quo." Tr. Vol. XXVI 6100:9–11. Substantial evidence supports the jury's finding of a quid and fairly specific, related quo. *See Jennings*, 160 F.3d at 1019. McDonnell did more than just provide access to Williams; he directed his employees to take action on research studies for Anatabloc. And he did so corruptly.

### *(2)* Unconstitutionally Vague Statutes & Legal Conduct Pursuant to State Law

McDonnell next argues that the honest services fraud statute and Hobbs Act are unconstitutionally vague. He further alleges that extending the federal criminal law into state self-governance violates the Tenth Amendment and the principles of federalism.

As an initial matter, McDonnell's arguments are not an appropriate basis for an evidentiary sufficiency challenge under Rule 29. Fed. R. Crim. P. 29(a) ("[T]he court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."). However, regardless, both arguments are without merit.

McDonnell's assertion that the charging statutes are unconstitutionally vague fails. The void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions. *Skilling v. United States*, 561 U.S. 358, 412 (2010). The Supreme Court has held unequivocally that "[i]nterpreted to encompass only bribery and kickback schemes, § 1346 is not unconstitutionally vague." *Id.* The Court reached this conclusion by observing that bribery has long constituted honest services fraud and has been defined and

prohibited under related federal statutes. *Id.* at 412–13. Moreover, the honest services fraud statute requires proof that Defendants acted with a criminal state of mind, which "further blunts any notice concern." *Id.* at 412.

Secondly, McDonnell's invocation of the principles of federalism is equally unpersuasive, particularly because Virginia law does not necessarily "decriminalize" the conduct for which McDonnell was convicted. Virginia Code section 2.2-3103 prohibits any officer or employee of a state or local government from "solicit[ing] or accept[ing] money or other thing of value for services performed within the scope of his official duties." Va. Code § 2.2-3103(1); *see also id.* § 2.2-3103(8) (prohibiting the acceptance of gifts "from a person who has interests that may be substantially affected by the performance of the officer's or employee's official duties under circumstances where the timing and nature of the gift would cause a reasonable person to question the officer's or employee's impartiality in the matter affecting the donor"). McDonnell's conduct thus falls within the province of these Virginia statutes and therefore the present argument is unavailing.

### B. Claim 2: The Government Failed to Establish the Jurisdictional Basis for Hobbs Act Extortion

The Hobbs Act requires that a defendant's extortion "obstruct[], delay[], or affect[] commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 1951(a). In order to satisfy this jurisdictional element, the prosecution bears the burden of proving a "reasonably probable effect on commerce, however, minimal, as a result of the extortion." *United States v. Spagnolo*, 546 F.2d 1117, 1119 (4th Cir. 1976). In other words, "'the connection with or effect on interstate commerce must have been at least a realistic probability at the time of the extortion.'" *United States v. Buffey*, 899 F.2d 1402, 1404 (4th Cir. 1990) (quoting *United States v. Elders*, 569 F.2d 1020, 1023–24 (7th Cir. 1978)). Thus, the Fourth Circuit has held that no particular commercial movements need actually be affected. *United States v. Brantley*, 777 F.2d 159, 162 (4th Cir. 1985). Instead, it is sufficient if commerce would have been affected had

the extortionate project been carried through to the contemplated conclusion. *Id.* The Court's jury instructions mirrored this precedent:

> To find the interstate commerce element satisfied, it is not necessary to find that a defendant actually intended to obstruct, delay, or affect commerce. Rather, the government need not [sic] only prove that the defendant you are considering deliberately performed or attempted to perform an act, the ordinary and natural consequences of which would be to obstruct, delay, or affect commerce. The effect on interstate commerce need only be slight, and it need not be adverse.

Tr. Vol. XXVI 6114:15–23.

In the present case, McDonnell argues that the Government failed to prove the requisite federal jurisdiction. He argues that there is no evidence that the alleged bribery scheme had an actual or realistically probable effect on interstate commerce. Rather than meet its burden of proof, McDonnell argues that the Government simply left it to the jury to infer a "reasonable probability" of an effect on interstate commerce. However, contrary to McDonnell's position, the Court finds that the Government presented evidence that had it been successful, the bribery scheme would have affected interstate commerce.

The Government introduced evidence that Star Scientific marketed and distributed CigRx and Anatabloc *nationwide*. Tr. Vol. X 2341:15–18. Testimony was also elicited that Star Scientific had a scientific office in Gloucester, Massachusetts, an executive and regulatory and legal office in Washington, D.C., and a manufacturing facility in New Jersey. *Id.* at 2341:25–2342:15. In its closing argument, the Government stated, "[O]bviously, had the scheme actually worked out a little better than it did for Star, then the effects on their business would have been positive and would have affected interstate commerce." Tr. Vol. XXV 5891:16–19. Viewing the evidence in light most favorable to the Government, the Court finds that the Government has fulfilled its burden. A reasonable finder of fact could accept the aforementioned evidence as adequate and sufficient in establishing a realistic probability of an effect on interstate commerce.

//

## IV. CONCLUSION

For the foregoing reasons, McDonnell's Motion is DENIED.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order will issue.

_____/s/_____
James R. Spencer
Senior U. S. District Judge

ENTERED this __1st__ day of December 2014.